UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UBS SECURITIES LLC and
UBS LOAN FINANCE LLC,

                                        Plaintiffs,

    v.

THE FINISH LINE, INC and
GENESCO INC.,

                                        Defendants.

07-CV-10382
(LAP/MHD)

---

## DECLARATION OF WILLIAM C. JACKSON IN SUPPORT OF DEFENDANT GENESCO INC.'S MOTION TO DISMISS

Pursuant to 28 U.S.C. §1746, William C. Jackson, declares as follows:

1.    I am a partner in the law firm of Boies, Schiller & Flexner LLP, attorneys for Genesco Inc. ("Genesco"), a defendant in the above-captioned action. I make this declaration based on my personal knowledge and in support of Genesco's motion to dismiss.

### The Pertinent Agreements

2.    On June 17, 2007, Genesco, The Finish Line, Inc. and Headwind, Inc. (a subsidiary of The Finish Line, Inc., established for the purpose of the merger), (collectively "Finish Line") agreed to merge pursuant to an Agreement and Plan of Merger (the "Merger Agreement"). A true and correct copy of the Merger Agreement by and among Finish Line and Genesco dated as of June 17, 2007 is attached hereto as Exhibit 1.

3.    On the same day, UBS Securities LLC, UBS Loan Finance LLC (collectively "UBS") and Finish Line executed a commitment letter (the "Commitment Letter") by which

UBS agreed to provide funds to Finish Line to finance the merger. A true and correct copy of the Commitment Letter dated June 17, 2007 is attached hereto as Exhibit 2.

**The Tennessee Action**

4.     In September 2007, Finish Line issued press releases concerning its delay of the closing of the Merger Agreement. Following those announcements, on September 21, 2007, Genesco commenced an action in the Chancery Court for the State of Tennessee, 20th Judicial District, Davidson County, seeking specific performance of the Merger Agreement and expedited consideration of the dispute. *Genesco Inc. v. The Finish Line, Inc., et al*, Civil Action No. 07-2137-II(III) (September 21, 2007), (the "Tennessee Action"). A true and correct copy of the docket sheet in the Tennessee Action is attached hereto as Exhibit 3.

5.     On October 10, 2007, UBS moved to intervene in the Tennessee Action asserting, among other things, that as "the potential financier of $1.8 billion for the Finish Line/Genesco merger" the adjudication of the Tennessee Action would "directly affect UBS's obligation and rights under the Commitment Letter." Memorandum of Law in Support of UBS's Motion to Intervene, pp. 6, 5. A true and correct copy of UBS's Motion to Intervene is attached hereto as Exhibit 4. A true and correct copy of the Memorandum of Law in Support of UBS's Motion to Intervene is attached hereto as Exhibit 5.

6.     Also on October 10, 2007, the Court held a hearing concerning, among other things, UBS's motion to intervene. During that hearing, UBS's counsel stated that UBS "submitted itself to the jurisdiction of the [Tennessee] Court to get everything done." Transcript of Proceedings before the Honorable Ellen H. Lyle, Chancellor on October 10,

2007, *Genesco Inc. v. The Finish Line, Inc., et al*, Civil No. 07-2137-II(III) (20th Div. Tenn. Chancery Court). A true and correct copy of excerpts of the Transcript of Proceedings before the Honorable Ellen H. Lyle, Chancellor on October 10, 2007, *Genesco Inc. v. The Finish Line, Inc., et al*, Civil No. 07-2137-II(III) (20th Div. Tenn. Chancery Court), is attached hereto as Exhibit 6.

7.    On October 11, 2007, the Court in the Tennessee Action issued an Order setting a trial schedule to commence on December 10, 2007 and granted UBS's motion to intervene. A true and correct copy of the Memorandum and Order dated October 11, 2007, Civil No. 07-2137-II(III) (20th Div. Tenn. Chancery Court), is attached hereto as Exhibit 7.

8.    On November 16, 2007, UBS notified the Tennessee Court of its filing of the declaratory judgment action filed in this case. A true and correct copy of UBS's Notice of Filing is attached hereto as Exhibit 8.

**UBS's Active Participation in Discovery and Trial**

9.    In addition to voluntarily moving to intervene, asserting affirmative claims for relief, asserting defenses, and making and opposing motions, UBS has fully participated in all the discovery, hearings and trial proceedings in the Tennessee Action.

10.    From the outset of the Tennessee Action the parties sought expedited relief and discovery. Pursuant to agreements and Court orders, the parties engaged in full discovery: requesting and exchanging documents, serving and answering interrogatories, deposing fact and expert witnesses, and issuing and rebutting expert reports.

11.    UBS participated in all of those proceedings.

3

12.    UBS appeared at and participated in over 33 depositions.  It noticed and conducted several depositions of its own, including taking the deposition of several Genesco witnesses and taking the deposition of several non-party witnesses from The Goldman Sachs Group, Inc.

13.    UBS propounded substantial document requests and two sets of interrogatories to Genesco.

14.    UBS issued two expert reports and also moved in limine to limit the expert testimony of one of Genesco's experts.  In contrast, Finish Line issued only one expert report.

15.    For their part in the trial, UBS identified twenty-four witnesses on its witness list.

16.    On December 7, 2007, the last business day before the start of the trial in Tennessee, UBS filed an amended answer and counterclaim.  A true and correct copy of UBS's Amended Answer and Counterclaim is attached hereto as Exhibit 9.

**Tennessee Court Opinions and Clarification Order**

17.    On December 27, 2007, the Tennessee Court issued an opinion and ruled that "all conditions to the Merger Agreement have been met" and that "Finish Line has breached the Merger Agreement by not closing[.]"  Dec. 27, 2007 Memorandum and Order, *Genesco Inc. v. The Finish Line, Inc. et al.*, Civil No. 07-2137-II (III) (20th Div. Tenn. Chancery Ct.).  A true and correct copy of the Tennessee Court's December 27, 2007 decision is attached hereto as Exhibit 10.

18.    On January 2, 2008, the Tennessee Court issued an Order clarifying its

4

December 27, 2007 decision and stating that that decision was "not a final order." A true and

correct copy of the Tennessee Court's January 2, 2008 Order is attached hereto as Exhibit 11.


I declare under penalties of perjury that the foregoing is true and correct.

Executed on February 6, 2008

_____
William C. Jackson

5

*EXECUTION VERSION*

AGREEMENT AND PLAN OF MERGER

BY AND AMONG

THE FINISH LINE, INC.

HEADWIND, INC.

AND

GENESCO INC.

DATED AS OF JUNE 17, 2007



EXHIBIT

2

# TABLE OF CONTENTS

Page

Section 1.    The Merger............................................................................... 1
  Section 1.1    The Merger; Effects of the Merger. ......................................... 1
  Section 1.2    Closing .................................................................................... 2
  Section 1.3    Effective Time ......................................................................... 2
  Section 1.4    Directors and Officers of the Surviving Corporation ................ 2

Section 2.    Conversion of Securities. ........................................................ 3
  Section 2.1    Conversion of Securities........................................................ 3
  Section 2.2    Dissenting Shares................................................................... 4
  Section 2.3    Company Options, Restricted Shares and ESPP .................... 4
  Section 2.4    Exchange of Certificates and Book-Entry Shares.................... 6
  Section 2.5    Withholding ............................................................................. 7
  Section 2.6    Transfer Taxes ........................................................................ 8

Section 3.    Representations and Warranties of Company........................ 8
  Section 3.1    Organization and Qualification.............................................. 8
  Section 3.2    Authority ................................................................................. 9
  Section 3.3    Capitalization. ...................................................................... 10
  Section 3.4    Company Subsidiaries. .......................................................... 12
  Section 3.5    SEC Filings; Financial Statements; Undisclosed Liabilities. ........ 12
  Section 3.6    Absence of Certain Changes or Events................................. 13
  Section 3.7    Compliance with Laws. ......................................................... 14
  Section 3.8    Claims, Actions and Proceedings. ........................................ 14
  Section 3.9    Contracts and Other Agreements. ........................................ 15
  Section 3.10   Intellectual Property.............................................................. 16
  Section 3.11   Property................................................................................ 17
  Section 3.12   Insurance.............................................................................. 18
  Section 3.13   Tax Matters. .......................................................................... 18
  Section 3.14   Employee Benefit Plans. ....................................................... 21
  Section 3.15   Labor Matters. ...................................................................... 24
  Section 3.16   Environmental Matters.......................................................... 24
  Section 3.17   No Breach ............................................................................ 25
  Section 3.18   Board Approvals; Anti-Takeover; Vote Required. ................. 26
  Section 3.19   Financial Advisor.................................................................. 27
  Section 3.20   Information in the Proxy Statement....................................... 28
  Section 3.21   Affiliate Transactions............................................................ 28
  Section 3.22   Suppliers and Vendors ......................................................... 28
  Section 3.23   Inventory.............................................................................. 29
  Section 3.24   No Other Representations or Warranties; Investigation by Parent............... 29

Section 4.    Representations and Warranties of Parent. ........................ 29
  Section 4.1    Organization.......................................................................... 29

**Table of Contents**
(Continued)

Page

Section 4.2    Authority to Execute and Perform Agreement .................................... 30
Section 4.3    No Conflict; Required Filings and Consents. ..................................... 30
Section 4.4    Information in the Proxy Statement ................................................... 31
Section 4.5    Litigation .......................................................................................... 31
Section 4.6    Financing........................................................................................... 31
Section 4.7    Parent and Merger Sub...................................................................... 32
Section 4.8    Brokers.............................................................................................. 32
Section 4.9    Solvency............................................................................................ 33
Section 4.10   No Other Representations or Warranties ........................................... 33

Section 5.     Conduct of Business Pending the Merger; No Solicitation; Employee
               Matters. ............................................................................................ 34
Section 5.1    Conduct of Business ......................................................................... 34
Section 5.2    No Solicitation. ................................................................................. 38
Section 5.3    Employee Matters. ............................................................................ 41
Section 5.4    Employee Preferred Stock Tender Offer. .......................................... 43

Section 6.     Additional Agreements. ..................................................................... 44
Section 6.1    Proxy Statement................................................................................ 44
Section 6.2    Company Shareholders Meeting........................................................ 44
Section 6.3    Access to Information, Confidentiality.............................................. 45
Section 6.4    Regulatory Filings; Reasonable Efforts............................................. 45
Section 6.5    Directors and Officers Indemnification and Insurance. ..................... 47
Section 6.6    Director Resignations........................................................................ 49
Section 6.7    Conduct of Business of Parent and Merger Sub Pending the Merger ........... 49
Section 6.8    Financing........................................................................................... 50
Section 6.9    Public Disclosure ............................................................................. 51
Section 6.10   Notification of Certain Matters ......................................................... 51
Section 6.11   Non-USRPHC Certificate. ................................................................ 52

Section 7.     Conditions Precedent to the Obligation of the Parties to Consummate
               the Merger. ....................................................................................... 52
Section 7.1    Conditions to Obligations of Each Party to Effect the Merger........... 52
Section 7.2    Additional Conditions to the Obligations of Parent and Merger Sub ........... 52
Section 7.3    Additional Conditions to the Obligations of the Company ................ 53

Section 8.     Termination, Amendment and Waiver. ............................................... 53
Section 8.1    Termination........................................................................................ 53
Section 8.2    Effect of Termination........................................................................ 54
Section 8.3    Fees and Expenses ............................................................................ 56
Section 8.4    Amendment........................................................................................ 56
Section 8.5    Waiver................................................................................................ 56

Section 9.     Miscellaneous. ................................................................................... 57

## Table of Contents
### (Continued)

|  |  |  | Page |
|---|---|---|---|
| Section 9.1 | Entire Agreement | | 57 |
| Section 9.2 | No Survival | | 57 |
| Section 9.3 | Parent Guarantee | | 57 |
| Section 9.4 | Notices | | 57 |
| Section 9.5 | Binding Effect; No Assignment; No Third-Party Beneficiaries. | | 58 |
| Section 9.6 | Severability | | 58 |
| Section 9.7 | Governing Law | | 59 |
| Section 9.8 | Submission to Jurisdiction; Waiver | | 59 |
| Section 9.9 | Specific Enforcement | | 59 |
| Section 9.10 | Interpretation | | 60 |
| Section 9.11 | No Waiver of Rights | | 61 |
| Section 9.12 | Counterparts; Facsimile Signatures | | 61 |

Index of Defined Terms ........................................................................... Annex A

**Exhibits:**

Exhibit A – Bylaws of Surviving Corporation

## AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER (the "Agreement"), dated as of June 17, 2007, is by and among The Finish Line, Inc. ("Parent"), an Indiana corporation, Headwind, Inc. ("Merger Sub"), a newly-formed Tennessee corporation and a direct wholly-owned subsidiary of Parent, and Genesco Inc. (the "Company"), a Tennessee corporation.

WHEREAS, the Board of Directors of the Company (the "Company Board of Directors") has (i) determined that it is in the best interests of the Company and the shareholders of the Company, and has approved and declared it advisable for the Company, to enter into this Agreement with Parent and Merger Sub providing for the merger of Merger Sub with and into the Company in accordance with the Tennessee Business Corporation Act (the "TBCA"), upon the terms and subject to the conditions set forth herein, and (ii) resolved to recommend adoption of this Agreement by the shareholders of the Company;

WHEREAS, the Boards of Directors of Parent and Merger Sub have each approved and declared it advisable to enter into this Agreement providing for the Merger in accordance with the Indiana Business Corporation Law and the TBCA, upon the terms and conditions set forth herein;

WHEREAS, as a condition and material inducement to the Company's willingness to enter into this Agreement, Parent and the Lender have delivered to the Company the Commitment Letter with respect to the Financing; and

WHEREAS, the Company, Parent and Merger Sub desire to make certain representations, warranties, covenants and agreements in connection with the Merger and the other transactions contemplated hereby and also to prescribe various conditions to the Merger.

NOW, THEREFORE, in consideration of the foregoing and the respective covenants, agreements, representations and warranties herein contained, the parties hereto, intending to be legally bound, hereby agree as follows:

Section 1.    The Merger.

Section 1.1    The Merger; Effects of the Merger.

(a)    At the Effective Time, upon the terms and subject to the conditions of this Agreement, and in accordance with the TBCA and other applicable Tennessee law, the Company and Merger Sub shall consummate a merger (the "Merger") pursuant to which Merger Sub shall be merged with and into the Company, and the Company shall continue as the surviving corporation of the Merger (sometimes hereinafter referred to as, the "Surviving Corporation").

(b)    The Merger shall have the effects set forth in the Articles of Merger and in the applicable provisions of the TBCA and this Agreement. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time: (i) Merger Sub shall be merged with and into the Company, and the separate corporate existence of Merger Sub shall thereupon cease; (ii) the Surviving Corporation shall continue to be governed by the laws of the State of

Tennessee; (iii) the corporate existence of the Surviving Corporation with all its property, rights, privileges, immunities, powers and franchises shall continue unaffected by the Merger; and (iv) all the property, rights, privileges, immunities, powers and franchises of the Company and Merger Sub shall be vested in the Surviving Corporation, and all debts, liabilities and duties of the Company and Merger Sub shall become the debts, liabilities and duties of the Surviving Corporation.

(c)    The charter of the Company in effect at the Effective Time shall be the charter of the Surviving Corporation until thereafter changed or amended as provided therein, by the TBCA or pursuant to any amendment approved by the shareholders of the Company at the Company Shareholders Meeting, consistent with the obligations set forth in Section 6.5.

(d)    The bylaws of Merger Sub, as in effect immediately prior to the Effective Time and substantially in the form attached hereto as Exhibit A, shall be the bylaws of the Surviving Corporation, except as to the name of the Surviving Corporation, until thereafter amended as provided by the TBCA, the charter of the Surviving Corporation and such bylaws, consistent with the obligations set forth in Section 6.5.

Section 1.2    Closing. The closing of the Merger (the "Closing") will take place at 11:00 a.m. (New York time) on a date to be specified by the parties, such date to be no later than the second business day after satisfaction or waiver of all of the conditions set forth in Section 7 capable of satisfaction prior to the Closing (it being understood that the occurrence of the Closing shall remain subject to the satisfaction or waiver of the conditions that by their terms are to be satisfied at Closing), at the offices of Bass, Berry & Sims PLC, 315 Deaderick Street, Suite 2700, Nashville, Tennessee 37238, unless another time, date and/or place is agreed to in writing by the parties hereto. The date on which the Closing occurs is referred to in this Agreement as the "Closing Date."

Section 1.3    Effective Time. At the Closing, Parent, Merger Sub and the Company shall cause the Merger to be consummated by executing and filing articles of merger (the "Articles of Merger") with the Secretary of State of the State of Tennessee as provided in the TBCA. The Merger shall become effective at the time and date on which the Articles of Merger have been duly filed with the Secretary of State of the State of Tennessee or such later time and date as is specified in the Articles of Merger, such time referred to herein as the "Effective Time." Parent, Merger Sub and the Company shall make all other filings or recordings required under the TBCA or other applicable Tennessee law in connection with the Merger.

Section 1.4    Directors and Officers of the Surviving Corporation. The directors of Merger Sub immediately prior to the Effective Time shall, from and after the Effective Time, be the directors of the Surviving Corporation, and the officers of the Company immediately prior to the Effective Time shall, from and after the Effective Time, be the officers of the Surviving Corporation, in each case until their respective successors shall have been duly elected, designated or qualified, or until their earlier death, resignation or removal in accordance with the Surviving Corporation's charter and bylaws.

2

**Section 2.**    <u>Conversion of Securities</u>.

Section 2.1    <u>Conversion of Securities</u>.  At the Effective Time, by virtue of the Merger and without any action on the part of the Company, Merger Sub or the holders of any shares of outstanding common stock of the Company, par value $1.00 per share ("Company Common Stock"), or the other securities described below:

(a)    <u>Conversion of Shares of Company Common Stock</u>.  Each issued and outstanding share of Company Common Stock (other than shares of Company Common Stock to be cancelled in accordance with Section 2.1(d)), together with the associated Company Rights, shall be cancelled and converted into the right to receive $54.50 in cash, without interest (the "Per Share Price"), payable to the holder thereof (the "Merger Consideration"), upon the surrender in accordance with Section 2.4 of the certificate that formerly evidenced such shares, or as otherwise specified for Book-Entry Shares. From and after the Effective Time, all such shares of Company Common Stock, including the associated Company Rights, shall no longer be outstanding and shall automatically be cancelled and retired and shall cease to exist, and each holder of Book-Entry Shares or a certificate representing any such shares of Company Common Stock, including the associated Company Rights, shall cease to have any rights with respect thereto, except the right, subject to Section 2.4 and Section 2.5, to receive the applicable Merger Consideration therefor.

(b)    <u>Merger Sub Common Stock</u>.  Each issued and outstanding share of common stock of Merger Sub outstanding immediately prior to the Effective Time shall be converted into, be exchanged for and become 1,000,000 validly issued, fully paid and nonassessable shares of common stock of the Surviving Corporation. From and after the Effective Time, all certificates representing the common stock of Merger Sub shall be deemed for all purposes to represent the number of shares of common stock of the Surviving Corporation into which they were converted in accordance with the immediately preceding sentence.

(c)    <u>Preferred Stock</u>.  Each issued and outstanding share of Company Preferred Stock outstanding immediately prior to the Effective Time, including those subject to a Company redemption notice with a redemption date after the Effective Time, shall remain issued and outstanding with the same designation, rights, privileges and preferences as set forth in the Surviving Corporation's charter.

(d)    <u>Cancellation of Company and Parent-Owned Stock</u>.  All shares of Company Common Stock and Company Preferred Stock that are owned by the Company or any Company Subsidiary as treasury stock and any shares of Company Common Stock owned by Parent or Merger Sub immediately prior to the Effective Time shall automatically be cancelled and retired and shall cease to exist, and no consideration shall be delivered in exchange therefor.

(e)    <u>Adjustments</u>.  So long as such transaction is otherwise permitted pursuant to the terms of this Agreement, the Per Share Price shall be appropriately adjusted for any stock dividend (other than the payment or accrual of regular quarterly cash dividends), stock split, recapitalization, reclassification or like transaction affecting the Company Common Stock after the date hereof and prior to the Effective Time.

3

(f)    Convertible Debentures. The 4.125% Convertible Subordinated
Debentures due 2023 (the "Convertible Debentures") issued by the Company and under that
certain indenture dated as of June 24, 2003, between the Company and The Bank of New York
(the "Indenture"), and outstanding immediately prior to the Effective Time, by virtue of the
Merger and the terms of the Indenture and a supplemental indenture required to be entered into
upon the Merger under the terms of the Indenture (the "Supplemental Indenture"), will not be
convertible at or after the Effective Time into shares of Company Common Stock, and following
the Effective Time, the Convertible Debentures will be convertible, pursuant to the terms of the
Indenture and the Supplemental Indenture, into cash in an amount equal to the product of (i) the
Per Share Price times (ii) the number of shares of Company Common Stock into which the
Convertible Debentures could have been converted as of the Effective Time, including fractional
shares. Parent shall, and shall cause the Surviving Corporation to, at all times from and after the
Effective Time maintain sufficient funds to satisfy its obligations to holders of Convertible
Debentures upon the conversion thereof as described in this Section 2.1(f).

Section 2.2    Dissenting Shares.

(a)    Notwithstanding anything in this Agreement to the contrary, shares of
Company Preferred Stock that are issued and outstanding immediately prior to the Effective
Time and which are held by holders of shares of Company Preferred Stock who are entitled to
demand and who have properly demanded and perfected their rights to be paid the "fair value" of
such shares in accordance with Title 48, Chapter 23 of the TBCA (the "Dissenting Shares") shall
be entitled to only such rights, if any, as are granted by Title 48, Chapter 23 of the TBCA;
provided, however, that if any such holder shall fail to perfect or shall effectively waive,
withdraw or lose such holder's rights under Title 48, Chapter 23 of the TBCA, such holder's
shares of Company Preferred Stock shall thereupon cease to be Dissenting Shares.

(b)    The Company shall give Parent (i) prompt notice of any appraisal
demands received by the Company, withdrawals thereof and any other instruments served
pursuant to the applicable section of the TBCA and received by the Company and (ii) the
opportunity to participate in all negotiations and proceedings with respect to the exercise of
appraisal rights under the TBCA. The Company shall not, except with the prior written consent
of Parent or as otherwise required by applicable Law, make any payment with respect to or settle
or offer to settle any such demands.

(c)    Dissenters' rights under the TBCA are not available to the holders of
Company Common Stock for the transactions contemplated by this Agreement.

Section 2.3    Company Options, Restricted Shares and ESPP. Except to the extent
otherwise agreed in writing by the Company and Parent prior to the Effective Time:

(a)    The Company shall take all action necessary to ensure that, (i)
immediately prior to the Effective Time, each outstanding option to acquire shares of Company
Common Stock ("Company Options") granted under the Company's Amended and Restated
1996 Stock Incentive Plan and 2005 Equity Incentive Plan (collectively, the "Equity Incentive
Plans"), shall become fully vested and exercisable (without regard to whether the Company
Options are then vested or exercisable), (ii) at the Effective Time, all Company Options not

4

theretofore exercised shall be cancelled and, in exchange therefor, converted into the right to receive a cash payment from the Surviving Corporation in an amount equal to the product of (x) the excess, if any, of the Per Share Price over the exercise price of each such Company Option and (y) the number of shares of Company Common Stock subject to such option to the extent not previously exercised (such payment, if any, to be net of applicable Taxes withheld pursuant to Section 2.5), and (iii) after the Effective Time, any such cancelled Company Option shall no longer be exercisable by the former holder thereof, but shall only entitle such holder to the payment described in subsection (ii) without interest.

(b)      The Company shall take all action necessary to ensure that, (i) immediately prior to the Effective Time, each share of Company Common Stock granted subject to vesting or other lapse restrictions pursuant to any Equity Incentive Plan (collectively, "Restricted Shares") which is outstanding immediately prior to the Effective Time shall vest and become free of such restrictions (without regard to whether the Restricted Shares are then vested or the applicable restrictions have then lapsed) and (ii) at the Effective Time, the holder thereof shall be entitled to receive the Per Share Price with respect to each such Restricted Share, less any applicable Taxes withheld pursuant to Section 2.5.

(c)      The Company shall take all action necessary to ensure that, (i) the Company's Amended and Restated Employee Stock Purchase Plan (the "ESPP" and, together with the Equity Incentive Plans, the "Equity Plans") is, and that all offering periods in progress under the ESPP are, terminated immediately prior to the Effective Time (or another date prior to the Effective Time date designated by the Company for administrative convenience), (ii) with respect to persons participating in the ESPP on the date on which the offering periods cease and the ESPP terminates (and who have not withdrawn from or otherwise ceased participation in the ESPP prior to such date), accumulated contributions will be deemed to have been applied on such date to the purchase of Company Common Stock in accordance with the ESPP's terms (treating the date of termination as the last day of the relevant offering period), and each such share of Company Common Stock will be deemed to have been cancelled and converted into the right to receive the Merger Consideration, such that, as of the Effective Time, on a net basis, each participant shall be entitled to receive, without interest and less any applicable Taxes withheld pursuant to Section 2.5, (A) a refund by the Company of all deferrals made to the ESPP by the participant during the applicable existing salary deferral periods, to the extent such deferrals have not been applied to the purchase of Company Common Stock in accordance with the ESPP's terms, and (B) an amount in cash equal to the excess of (1) the product of (x) the number of shares of Company Common Stock that the participant is deemed to have acquired pursuant to the terms of the ESPP and (y) the Per Share Price, over (2) the aggregate amount of the participant's purchase price deemed to have been paid in connection with the deemed purchase, and (iii) there are no outstanding rights of participants under the ESPP following the Effective Time. The aggregate amount specified in Sections 2.3(a), (b) and (c) with respect to the Company Options, Restricted Shares and "Options" pursuant to the ESPP ("ESPP Options") is referred to herein as the "Cash Out Amount."

(d)      The Company shall take all action necessary to ensure that, as of the Effective Time, the Equity Plans shall terminate and that no person shall have any right under the Equity Plans, except as set forth herein.

(e)     At or promptly after the Effective Time, the Surviving Corporation shall, and Parent shall cause the Surviving Corporation to, deliver the applicable Cash Out Amount to the holders of Company Options, Restricted Shares and ESPP Options, without interest and less any applicable withholding Taxes. If for any reason the Surviving Corporation does not have adequate freely available and unrestricted cash to pay the aggregate Cash Out Amount, (i) Parent shall promptly fund the Surviving Corporation with additional cash sufficient to make all required payments to the holders of Company Options, Restricted Shares and ESPP Options in respect of the Cash Out Amount and (ii) Parent and the Surviving Corporation shall in any event be liable for payment thereof. Parent shall, and shall cause the Surviving Corporation to, at all times from and after the Effective Time maintain sufficient funds to satisfy its obligations to holders of Company Options, Restricted Shares and ESPP Options in respect of the Cash Out Amount pursuant to this Section 2.3.

Section 2.4    Exchange of Certificates and Book-Entry Shares.

(a)     Paying Agent. Prior to the Effective Time, Parent shall designate a bank or trust company reasonably acceptable to Company to act as paying agent for the holders of shares of Company Common Stock, including associated Company Rights, in connection with the Merger (the "Paying Agent") and to receive the funds to which holders of shares of Company Common Stock will become entitled pursuant to Section 2.1. At or prior to the Effective Time, Parent shall provide, or shall cause to be provided, to the Paying Agent cash necessary to pay for the shares of Company Common Stock to be converted into the right to receive the Merger Consideration (such cash being hereinafter referred to as the "Exchange Fund"). If for any reason the Exchange Fund is inadequate to pay the amounts to which holders of shares of Company Common Stock shall be entitled under Section 2.1, Parent shall, or shall cause the Surviving Corporation to, promptly deposit additional cash with the Paying Agent sufficient to make all payments of Merger Consideration, and Parent and the Surviving Corporation shall in any event be liable for payment thereof.

(b)     Exchange Procedures. As soon as reasonably practicable after the Effective Time, the Surviving Corporation shall cause to be mailed to each (i) record holder, as of the Effective Time, of an outstanding certificate or certificates which immediately prior to the Effective Time represented shares of the Company Common Stock (the "Certificates") or (ii) holder, as of the Effective Time, of shares of Company Common Stock represented by book-entry ("Book-Entry Shares"), a form of letter of transmittal (which shall be in customary form and shall specify that delivery shall be effected, and risk of loss and title to the Certificates held by such person shall pass, only, subject to Section 2.4(c), upon delivery of the Certificates to the Paying Agent) and/or instructions for use in effecting the surrender of the Certificates or Book-Entry Shares for payment of the Merger Consideration therefor. Upon surrender to the Paying Agent of a Certificate or Book-Entry Shares for cancellation, together with such letter of transmittal, duly completed and validly executed in accordance with the instructions thereto, and/or such other documents as may be reasonably required pursuant to such instructions, the holder of such Certificate or Book-Entry Shares shall be entitled to receive in exchange therefor the Merger Consideration for each share formerly represented by such Certificate or Book-Entry Shares, as applicable, and such Certificate or applicable book-entry shall then be canceled. No interest shall be paid or accrued for the benefit of holders of the Certificates or Book-Entry Shares on the Merger Consideration payable in respect of the Certificates or Book-Entry Shares.

6

Until surrendered for cancellation as contemplated by this Section 2.4(b), each Certificate and each Book-Entry Share shall be deemed at any time after the Effective Time to represent only the right to receive upon such surrender the applicable Merger Consideration as contemplated by this Section 2.

(c)    Lost Certificates. If any Certificate has been lost, stolen, defaced or destroyed, upon the making of an affidavit of that fact by the person claiming such Certificate to be lost, stolen, defaced or destroyed and, if required by the Surviving Corporation, the posting by such person of a bond in such amount as the Surviving Corporation may reasonably direct as indemnity against any claim that may be made against it or Parent with respect to such Certificate, the Paying Agent shall issue in exchange for such lost, stolen or destroyed Certificate the applicable Merger Consideration with respect thereto without interest.

(d)    Transfer Books; No Further Ownership Rights in Shares of Company Common Stock. At the Effective Time, the stock transfer books of the Company with respect to the Company Common Stock will be closed and thereafter there will be no further registration of transfers of shares of Company Common Stock on the records of the Company. From and after the Effective Time, the holders of Book-Entry Shares and the holders of Certificates evidencing ownership of shares of Company Common Stock outstanding immediately prior to the Effective Time shall cease to have any rights with respect to such shares of Company Common Stock, except as otherwise provided for herein or by applicable Law. If, after the Effective Time, Certificates or Book-Entry Shares are presented to the Surviving Corporation for any reason, they shall be cancelled against delivery of the Merger Consideration as provided in this Section 2 without interest.

(e)    Termination of Exchange Fund. At any time following the date that is one year after the Effective Time, the Surviving Corporation shall be entitled to require the Paying Agent to deliver to it any funds (including any interest received with respect thereto) made available to the Paying Agent and not disbursed (or for which disbursement is pending subject only to the Paying Agent's routine administrative procedures) to holders of Certificates or Book-Entry Shares, and thereafter such holders shall be entitled to look only to the Surviving Corporation (subject to abandoned property, escheat or similar Laws) only as general creditors thereof with respect to the Merger Consideration payable upon due surrender of their Certificates or Book-Entry Shares, without any interest thereon.

(f)    No Liability. None of Parent, the Surviving Corporation or the Paying Agent shall be liable to any holder of a Certificate or a Book-Entry Share for Merger Consideration delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.

Section 2.5    Withholding. Each of Parent, Company and the Surviving Corporation is entitled to deduct and withhold, or cause the Paying Agent to deduct and withhold, from any amounts payable or otherwise deliverable pursuant to this Agreement to any holder or former holder of shares of Company Common Stock (including Restricted Shares), Company Options or ESPP Options such amounts as are required to be deducted or withheld therefrom under the Internal Revenue Code of 1986, as amended (the "Code"), or any provision of state, local or foreign Tax Law or under any other applicable legal requirement. To the extent such amounts

7

are so deducted or withheld, such amounts shall be treated for all purposes under this Agreement as having been paid to the person to whom such amounts would otherwise have been paid.

Section 2.6    Transfer Taxes. If payment of the Merger Consideration payable to a holder of shares of Company Common Stock pursuant to the Merger is to be made to a person other than the person in whose name the surrendered Certificate or Book-Entry Share is registered, it shall be a condition of payment that the Certificate or Book-Entry Share so surrendered shall be properly endorsed or shall be otherwise in proper form for transfer and that the person requesting such payment shall have paid all transfer and other Taxes required by reason of the payment of the Merger Consideration to a person other than the registered holder of the Certificate or Book-Entry Share surrendered (or shall have established to the reasonable satisfaction of Parent that such Tax either has been paid or is not applicable).

Section 3.    Representations and Warranties of Company. Except (i) as set forth in the disclosure schedule delivered by the Company to Parent on the date hereof (the "Company Disclosure Schedule") or (ii) as disclosed in reasonable detail in any form, report, schedule, registration, statement, certification or other document filed with, or furnished to, the SEC prior to the date hereof, the Company hereby makes the representations and warranties set forth in this Section 3 to Parent and Merger Sub. The section numbers of the Company Disclosure Schedule are numbered to correspond to the section numbers of this Agreement to which they refer. Any information set forth in one section of the Company Disclosure Schedule will be deemed to apply to each other section or subsection of this Agreement to which its relevance is reasonably apparent.

Section 3.1    Organization and Qualification.

(a)    Each of the Company and each subsidiary of the Company (all such Company subsidiaries being, collectively, the "Company Subsidiaries") is a corporation or other legal entity duly organized, validly existing and in good standing (with respect to jurisdictions that recognize the concept of good standing) under the federal, state, local or foreign laws, statutes, regulations, rules, ordinances, judgments, decrees, orders, writs and injunctions (collectively, "Laws") of any court or any nation, government, state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of, or pertaining to, government ("Governmental Entity") of its jurisdiction of organization and has the requisite corporate or similar power and authority to own, lease and operate its properties and assets it purports to own and to carry on its business as now being conducted, except as has not had, individually or in the aggregate, a Company Material Adverse Effect. The Company and each Company Subsidiary is qualified or otherwise authorized to transact business as a foreign corporation or other organization in all jurisdictions where the nature of their business or the ownership, leasing or operation of their properties make such qualification or authorization necessary, except for jurisdictions in which the failure to be so qualified or authorized has not had, individually or in the aggregate, a Company Material Adverse Effect. "Company Material Adverse Effect" shall mean any event, circumstance, change or effect that, individually or in the aggregate, is materially adverse to the business, condition (financial or otherwise), assets, liabilities or results of operations of the Company and the Company Subsidiaries, taken as a whole; provided, however, that none of the following shall constitute, or shall be considered in determining whether there has occurred, and no event,

8

circumstance, change or effect resulting from or arising out of any of the following shall constitute, a Company Material Adverse Effect: (A) the announcement of the execution of this Agreement or the pendency of consummation of the Merger (including the threatened or actual impact on relationships of the Company and the Company Subsidiaries with customers, vendors, suppliers, distributors, landlords or employees (including the threatened or actual termination, suspension, modification or reduction of such relationships)); (B) changes in the national or world economy or financial markets as a whole or changes in general economic conditions that affect the industries in which the Company and the Company Subsidiaries conduct their business, so long as such changes or conditions do not adversely affect the Company and the Company Subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (C) any change in applicable Law, rule or regulation or GAAP or interpretation thereof after the date hereof, so long as such changes do not adversely affect the Company and the Company Subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (D) the failure, in and of itself, of the Company to meet any published or internally prepared estimates of revenues, earnings or other financial projections, performance measures or operating statistics; provided, however, that the facts and circumstances underlying any such failure may, except as may be provided in subsection (A), (B), (C), (E), (F) and (G) of this definition, be considered in determining whether a Company Material Adverse Effect has occurred; (E) a decline in the price, or a change in the trading volume, of the Company Common Stock on the New York Stock Exchange ("NYSE") or the Chicago Stock Exchange ("CHX"); (F) compliance with the terms of, and taking any action required by, this Agreement, or taking or not taking any actions at the request of, or with the consent of, Parent; and (G) acts or omissions of Parent or Merger Sub after the date of this Agreement (other than actions or omissions specifically contemplated by this Agreement).

(b)    The Company has made available to Parent true, correct and complete copies of the charter and bylaws, or other organizational documents, of the Company and each Company Subsidiary set forth in Section 3.4(a) of the Company Disclosure Schedule as presently in effect. The Company is not in violation of its charter or bylaws. The Company Subsidiaries are not in violation of their respective articles of organization, charter, bylaws or other organizational documents.

Section 3.2    Authority. The Company has all necessary corporate power and authority to enter into, execute and deliver this Agreement and each instrument required hereby to be executed and delivered by it at the Closing and, subject in the case of consummation of the Merger to the adoption of this Agreement by the requisite holders of Company Common Stock and the Company Preferred Stock, to perform its obligations hereunder and thereunder and consummate the Merger and the other transactions contemplated hereby. The execution, delivery and performance of this Agreement and each instrument required hereby to be executed and delivered at the Closing by the Company and the consummation by the Company of the Merger and the other transactions contemplated hereby have been duly and validly authorized by all necessary corporate action and no other corporate proceedings on the part of the Company are necessary to authorize this Agreement or to consummate the Merger and the other transactions contemplated hereby (other than approval of this Agreement by the requisite holders of Company Common Stock and the Company Preferred Stock and the filing with the Secretary of

9

State of the State of Tennessee of the Articles of Merger as required by the TBCA). This Agreement has been duly and validly executed and delivered by the Company and, assuming the due authorization, execution and delivery hereof by Parent and Merger Sub, constitutes a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except to the extent that enforcement of the rights and remedies created hereby is subject to bankruptcy, insolvency, reorganization, moratorium and other similar Laws of general application affecting the rights and remedies of creditors and to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

Section 3.3    Capitalization.

(a)     The authorized capital stock of the Company consists of (i) 80,000,000 shares of Company Common Stock, of which, as of June 2, 2007, 22,773,767 shares (including an aggregate of 400,994 Restricted Shares for which the restrictions have not lapsed) were issued and outstanding, net of any shares held in the treasury of the Company, and (ii) 13,503,315 shares of Company preferred stock (collectively, "Company Preferred Stock"), of which, as of June 2, 2007, 147,896 shares were issued and outstanding and no shares were held in the treasury of the Company. Section 3.3(a) of the Company Disclosure Schedule sets forth, as of June 2, 2007, the classes and series and number of authorized shares of each class and series of Company Preferred Stock, the number of issued and outstanding shares of each class and series of Company Preferred Stock, and, as of June 2, 2007, the per share redemption amount and conversion ratio of each class and series of issued and outstanding Company Preferred Stock. Except as set forth in Section 3.3(a) of the Company Disclosure Schedule, all of the issued and outstanding shares of Company Common Stock and Company Preferred Stock are duly authorized, validly issued, fully paid and nonassessable, and, other than Company Rights, were issued free of any preemptive (or similar) rights. Except as set forth in Section 3.3(a) of the Company Disclosure Schedule, as of the date of this Agreement, the Company has no pending redemption notices in connection with any shares of the Company Preferred Stock.

(b)     As of June 2, 2007, there is $86,250,000 in aggregate principal amount of Convertible Debentures outstanding (excluding those Convertible Debentures that are held by the Company). As of June 2, 2007, each $1,000 in aggregate principal amount of Convertible Debentures is entitled to be converted to 45.2080 shares of Company Common Stock.

(c)     As of June 2, 2007, the Company has reserved 2,153,361 shares of Company Common Stock for issuance pursuant to all of the Equity Incentive Plans, of which Company Options to purchase 1,147,916 shares of Company Common Stock were outstanding as of June 2, 2007, and 394,199 shares remain available for grant as of such date. The maximum remaining number of shares of Company Common Stock authorized for purchase under the ESPP, as of June 2, 2007, is 333,722 shares. All shares of Company Common Stock reserved for issuance as specified above, upon issuance on the terms and conditions specified in the instruments pursuant to which they are issuable, shall be duly authorized, validly issued, fully paid and nonassessable and, other than Company Rights, will not be issued subject to any preemptive (or similar) rights. To the extent any Company Options were exercised after June 2, 2007 and before the date of this Agreement, the Company has received the exercise price (or other applicable consideration) for such exercised Company Options in accordance with the terms of such Company Options.

10

(d)    At the Effective Time, there will not be any shares of Company Common Stock, Company Preferred Stock or Restricted Shares issued and outstanding, except for (i) shares of Company Common Stock, Company Preferred Stock and Restricted Shares indicated in Section 3.3(a) as issued and outstanding as of June 2, 2007, (ii) shares of Company Common Stock issued after June 2, 2007 upon the exercise of Company Options or ESPP Options outstanding as of June 2, 2007 and (iii) shares of Company Common Stock issued after June 2, 2007 upon the conversion of any shares of Company Preferred Stock or any of the Convertible Debentures that were issued and outstanding as of June 2, 2007. Except as set forth on Section 3.3(d) of the Company Disclosure Schedule, since June 2, 2007, (x) no Company Options or Restricted Shares have been issued and (y) there has been no change in the conversion ratios of any of the Company Preferred Stock or the Convertible Debentures.

(e)    No registration rights involving the Company Common Stock will survive consummation of the Merger.

(f)    There are not authorized or outstanding any subscriptions, options, conversion or exchange rights, warrants, calls, repurchase or redemption agreements, or other agreements, instruments, contracts, claims or commitments of any nature whatsoever obligating the Company or any Company Subsidiary to issue, transfer, deliver, sell, repurchase or redeem, or cause to be issued, transferred, delivered, sold, repurchased or redeemed, additional shares of the Company Common Stock or other securities of the Company or to make payments with respect to the value of any of the foregoing or obligating the Company to grant, extend or enter into any such agreement or commitment, other than (i) Company Options and ESPP Options outstanding on June 2, 2007, (ii) the rights (the "Company Rights") issued pursuant to the Amended and Restated Rights Agreement, dated as of August 28, 2000 (the "Company Rights Agreement"), between the Company and Computershare Trust Company, N.A. as successor to First Chicago Trust Company of New York, as rights agent, in respect of which no Distribution Date (as defined in the Company Rights Agreement) has occurred, (iii) the Convertible Debentures outstanding on June 2, 2007, and (iv) Company Preferred Stock outstanding on June 2, 2007 having the rights, privileges and preferences as set forth in the Company's charter. There are no stockholder agreements, voting trusts, proxies or other agreements or instruments with respect to the voting of the capital stock of the Company to which the Company or any of its officers or directors are a party and, to the knowledge of the Company, no other party is a party to any stockholder agreements, voting trusts, proxies or other agreements or instruments with respect to the voting of the capital stock of the Company.

(g)    The Company has no outstanding bonds, debentures, notes or other indebtedness that have the right to vote (or which is convertible into, or exchangeable for, securities having the right to vote) on any matters on which stockholders may vote, other than the Convertible Debentures.

(h)    The Company Common Stock, Employees' Subordinated Convertible Preferred Stock, Subordinated Serial Preferred Stock, Series 1 and the Company Rights constitute the only classes of securities of the Company registered under the Securities Exchange Act of 1934, as amended (together with the rules and regulations promulgated thereunder, the "Exchange Act").

11

Section 3.4    Company Subsidiaries.

(a)    Section 3.4(a) of the Company Disclosure Schedule sets forth a complete list of the names and jurisdictions of organization of each Company Subsidiary. All issued and outstanding shares or other equity interests of each Company Subsidiary have been duly authorized, validly issued, are fully paid and nonassessable and are owned directly or indirectly by the Company free and clear of any pledges, charges, liens, encumbrances, restrictions on the transfer, voting or dividend rights, rights of first offer or first refusal, security interests or adverse rights or claims of any nature whatsoever ("Liens"), except for (i) Liens for current taxes and assessments not yet past due or that are being contested in good faith, (ii) Liens imposed by applicable Law that would not, individually or in the aggregate, have a Company Material Adverse Effect, or (iii) Liens imposed or granted pursuant to or in connection with the Company's existing credit facilities or other indebtedness. None of the Company Subsidiaries owns any shares of Company Common Stock.

(b)    There are not any authorized or outstanding subscriptions, options, conversion or exchange rights, warrants, calls, repurchase or redemption agreements, or other agreements, claims, contracts or commitments of any nature whatsoever obligating any Company Subsidiary to issue, transfer, deliver, sell, register, repurchase or redeem, or cause to be issued, transferred, delivered, sold, repurchased or redeemed, additional shares of the capital stock or other securities of the Company Subsidiary or to make payments with respect to the value of any foregoing or obligating the Company Subsidiary to grant, extend or enter into any such agreement.

Section 3.5    SEC Filings; Financial Statements; Undisclosed Liabilities.

(a)    The Company has filed all forms, reports, registrations, statements, certifications and other documents required to be filed by it with, or furnished by the Company to, the United States Securities and Exchange Commission (the "SEC") for all periods beginning on or after January 31, 2004 (the "Company SEC Reports"). The Company SEC Reports were prepared in accordance with the applicable requirements of the Exchange Act and the Securities Act of 1933, as amended (together with the rules and regulations promulgated thereunder, the "Securities Act"), and did not, as of their respective dates, contain any untrue statement of a material fact or omit to state a material fact required to be stated or incorporated by reference therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. As of the date of this Agreement, there are no outstanding or unresolved comments in comment letters received from the SEC. As of the date hereof, to the Company's knowledge, none of the Company SEC Reports is the subject of ongoing SEC review. No Company Subsidiary is required to file any form, report, registration, statement or other document with the SEC.

(b)    The consolidated financial statements contained in the Company SEC Reports (including the related notes, where applicable) (the "Financial Statements") (i) present fairly, in all material respects, the consolidated financial condition and results of operations and cash flows and statements of shareholders equity of the Company and its consolidated subsidiaries as of and for the periods presented therein (subject, in the case of unaudited quarterly financial statements, to normal year-end adjustments and, with respect to pro forma

12

financial statements, to the qualifications stated therein), (ii) have been prepared in all material respects in accordance with United States generally accepted accounting principles ("GAAP") applied on a consistent basis throughout the periods involved, except as otherwise indicated therein or, in the case of the unaudited quarterly financial statements as permitted by Form 10-Q, and (iii) when filed complied as to form in all material respects with the rules and regulations of the SEC with respect thereto. Since February 3, 2007, there has been no material change in the Company's accounting methods or principles that would be required to be disclosed in the Company's financial statements in accordance with GAAP, except as described in the notes to such financial statements. Except as would not be material to the Company and its Subsidiaries, taken as a whole, (i) management of the Company has implemented and maintains disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) to ensure that material information relating to the Company, including the consolidated Company Subsidiaries, is made known to the chief executive officer and the chief financial officer of the Company by others within those entities, and (ii) the Company's principal executive officer and principal financial officer have disclosed, based on their most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company Board of Directors (or persons performing the equivalent functions): (A) all significant deficiencies and material weaknesses within their knowledge in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and (B) any fraud that involves management or other employees who have a significant role in the Company's internal control over financial reporting. The Company's principal executive officer and principal financial officer have made, with respect to the Company SEC Reports, all certifications required by the Sarbanes-Oxley Act of 2002 and any related rules and regulations promulgated by the SEC. As of the date hereof, the Company has not identified any material weaknesses in the design or operation of the internal controls over financial reporting except as disclosed in the Company SEC Reports filed prior to the date hereof. As of the date hereof, neither the Company nor any of the Company Subsidiaries has outstanding, or has arranged any outstanding, "extensions of credit" to directors or executive officers of the Company or any Company Subsidiaries within the meaning of Section 402 of the Sarbanes-Oxley Act of 2002.

(c)     Neither the Company nor any Company Subsidiary has any liabilities, whether accrued, absolute, contingent or otherwise, other than liabilities and obligations (i) reflected or reserved against on the Financial Statements in accordance with GAAP or reasonably apparent from the notes or management's discussion and analysis related thereto, (ii) incurred in connection with the transactions contemplated herein or since the date of the most recently audited Financial Statements in the ordinary course of business consistent with past practice, (iii) discharged or paid prior to the date of this Agreement, or (iv) that are not, individually or in the aggregate, material to the Company and the Company Subsidiaries, taken as a whole.

Section 3.6    Absence of Certain Changes or Events. Since February 3, 2007 through the date hereof, except as specifically contemplated by this Agreement or set forth on Section 3.6 of the Company Disclosure Schedule, (i) there have not been any changes, events or circumstances of which the Company has knowledge that have had, individually or in the aggregate, a Company Material Adverse Effect, and (ii) the Company and each Company Subsidiary has conducted its respective business in the ordinary course of business, except for

such actions as have not had, individually or in the aggregate, a Company Material Adverse Effect.

Section 3.7    Compliance with Laws.

(a)    The Company and the Company Subsidiaries have obtained each federal, state, county, local or foreign governmental consent, license, permit, registration, order, grant or other authorization of a Governmental Entity that is required for the operation of the business of the Company or any of the Company Subsidiaries or the holding of any interest in any of its properties (collectively referred to herein as, the "Permits"), except where the failure to have, or the suspension or cancellation of, any Permit has not had, individually or in the aggregate, a Company Material Adverse Effect. Except as has not had, individually or in the aggregate, a Company Material Adverse Effect, (i) all of such Permits are valid and in full force and effect and neither the Company nor any Company Subsidiary has violated the terms of such Permits, and (ii) no proceeding is pending or, to the knowledge of the Company, threatened in writing to revoke, suspend, cancel, terminate, or adversely modify any Permit.

(b)    Except as has not had, individually or in the aggregate, a Company Material Adverse Effect, the Company and the Company Subsidiaries are in compliance with, are not in default or violation of, and have not, to the knowledge of the Company, received any notice of non-compliance, default or violation with respect to, any Laws applicable to the business of the Company and the Company Subsidiaries or to which any of its or their properties are bound.

(c)    Neither the Company nor any Company Subsidiary is a party to, or has a legally binding commitment to enter into, any joint venture, off balance sheet partnership or any similar contract (including any contract or arrangement relating to any transaction or relationship between or among the Company or the Company Subsidiary, on the one hand, and any unconsolidated affiliate, including any structured finance, special purpose or limited purpose entity or person, on the other hand or any "off balance sheet arrangements" (as defined in Item 303(a) of Regulation S-K under the Exchange Act)), where the purpose or intended effect of such contract or arrangement is to avoid disclosure of any material transaction involving, or material liabilities of, the Company or any Company Subsidiary in the Company's published financial statements or other Company SEC Reports.

Section 3.8    Claims, Actions and Proceedings. There are no outstanding orders, writs, judgments, injunctions, decrees or other requirements of any court or arbitrator against the Company, any Company Subsidiary or any of their respective securities, assets or properties that would have, individually or in the aggregate, a Company Material Adverse Effect. There are no actions, suits, claims, investigations, arbitrations, legal or administrative proceedings (collectively, "Actions") or any governmental investigations or inquiries pending or, to the knowledge of the Company, threatened, against the Company, the Company Subsidiaries or any of their respective securities, assets or properties, except as would not have, individually or in the aggregate, a Company Material Adverse Effect and other than Actions challenging this Agreement or the transactions contemplated hereby, or seeking to prohibit the Merger or transactions contemplated hereby. As of the date hereof, there are no Actions pending or, to knowledge of the Company, overtly threatened, against the Company or any Company

14

Subsidiary challenging this Agreement or the transactions contemplated hereby, or seeking to prohibit the Merger.

Section 3.9     Contracts and Other Agreements.

(a)     Except for this Agreement, or as set forth in Section 3.9(a) of the Company Disclosure Schedule or in the exhibit lists of any form, report, schedule, registration, statement, certification or other document filed with, or furnished to, the SEC; neither the Company nor any Company Subsidiary is a party to or bound by any note, bond, mortgage, indenture, contract, agreement, lease, license, Permit or other instrument or obligation (each, a "Contract"): (i) that would be required to be filed by the Company as a "material contract" pursuant to Item 601(b)(10) of Regulation S-K under the Securities Act or disclosed on Form 8-K; (ii) that would obligate the Company or any Company Subsidiary to file a registration statement under the Securities Act, which filing has not yet been made; (iii) that relates to indebtedness for borrowed money, guarantees of indebtedness for borrowed money, lines of credit (whether or not drawn), letters of credit, capitalized lease or surety bonds that (x) have an outstanding principal amount in excess of $3,000,000 in the aggregate or (y) impose any Lien on any shares of the Company Common Stock, Company Preferred Stock or Restricted Shares; (iv) that involves acquisition or disposition, directly or indirectly, of assets of the Company or any other Person for aggregate consideration in excess of $3,000,000 and that involves continuing or contingent obligations of the Company or the Company Subsidiaries that are material to the Company and the Company Subsidiaries taken as a whole or is not yet consummated; (v) that involves acquisition or disposition, directly or indirectly (by merger or otherwise), of capital stock or other voting securities or equity interests of the Company or any other Person for aggregate consideration in excess of $3,000,000 that involves continuing or contingent obligations of the Company or the Company Subsidiaries that are material to the Company and the Company Subsidiaries taken as a whole or is not yet consummated; (vi) under which the Company or any Company Subsidiary has advanced or loaned any funds in excess of $3,000,000 or has guaranteed any obligations of another person in excess of $3,000,000, other than extensions of credit to customers or vendors in the ordinary course of business consistent with past practice; (vii) that relates to any single or series of related capital expenditures by the Company or any Company Subsidiary in excess of $3,000,000 (other than purchase orders for the purchase of inventory or real property leases); (viii) to which the Company or any Company Subsidiary is a party constituting a general or limited partnership, a limited liability company or a joint venture (whether limited liability or other organizational form) or material alliance or similar arrangement that is material to the business of the Company and the Company Subsidiaries, taken as a whole; and (ix) except as set forth on Section 3.14 of the Company Disclosure Schedule, that relates to the issuance, offering, voting or pledge of any shares of the Company Common Stock, Company Preferred Stock or Restricted Shares. Each such Contract described in clauses (i) through (ix) of this Section 3.9(a) is referred to herein as a "Material Contract."

(b)     Except as has not had, individually or in the aggregate, a Company Material Adverse Effect, each of the Material Contracts is in full force and effect and is valid and binding on the Company and each Company Subsidiary that is a party thereto and, to the knowledge of the Company, each other party thereto, enforceable against such parties in accordance with their terms, except to the extent that enforcement of the rights and remedies

15

created thereby is subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application affecting the rights and remedies of creditors and to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

(c)    Except as has not had, individually or in the aggregate, a Company Material Adverse Effect, (i) neither the Company nor any Company Subsidiary has breached, is in default under, or has received written notice of any breach of or default under, any Material Contract, and no event has occurred that with the lapse of time or the giving of notice or both would constitute a default thereunder by the Company or any Company Subsidiary, and (ii) to the Company's knowledge, no other party to any Material Contract to which the Company or any Company Subsidiary is a party is in breach or violation of, or default under, such Material Contract. A complete and correct copy, subject to redaction if required pursuant to the terms thereof or if required by applicable Law, of each Material Contract has previously been made available by the Company to Parent or filed by the Company with the SEC.

Section 3.10    Intellectual Property.

(a)    "Intellectual Property" means all intellectual property rights arising from or associated with the following, whether protected, created, or arising under the laws of the United States or of any other jurisdiction: (i) trade names, trademarks and service marks (registered and unregistered), logos, designs and other indicia of origin, domain names and other Internet addresses or identifiers, trade dress and similar rights, and applications (including intent to use applications) to register any of the foregoing (collectively, "Trademarks"); (ii) patents and patent applications, including continuation, divisional, continuation-in-part, reexamination and reissue patent applications, and any patents issuing therefrom (collectively, "Patents"); (iii) works of authorship (whether published or unpublished), copyrights and registrations and applications therefor (collectively, "Copyrights"); (iv) know-how, inventions, discoveries, improvements, concepts, ideas, methods, processes, designs, plans, schematics, technical data, specifications, research and development information, technology and product roadmaps, compilations, databases, and other proprietary or confidential information, including customer lists, excluding any Patents or Copyrights that may cover or protect any of the foregoing (collectively, "Trade Secrets"); (v) software, computer programs, algorithms, and related documentation; and (vi) moral rights, publicity rights, and any other proprietary, intellectual or industrial property rights of any kind or nature.

(b)    Section 3.10(b) of the Company Disclosure Schedule sets forth a complete and accurate list of all registered Trademarks, Patents, and Copyrights, including any pending applications to register any of the foregoing, owned (in whole or in part) by or exclusively licensed to the Company, identifying for each whether it is owned by or exclusively licensed to the Company, and in each case currently used or held for use and material to the operations of the Company (collectively, "Company Registered IP"). Either the Company or a Company Subsidiary owns, or is licensed or otherwise possesses adequate rights to use, all Intellectual Property, and all applications and registrations, used or held for use in their respective businesses as currently conducted. Except as set forth on Section 3.10(c) of the Company Disclosure Schedule, the Company has not received any written notice or claim challenging the Company's ownership of any of the Intellectual Property owned (in whole or in part) by the Company. The

16

Company has not received any written notice or claim challenging the validity or enforceability of any of the Company Registered IP. As of the date of this Agreement, all necessary filing fees, maintenance fees, license fees annuities and similar fees due in connection with the Company Registered IP have been paid.

(c)    To the knowledge of the Company, as of the date of this Agreement, the development, manufacture, sale, distribution and other commercial exploitations of products or services by or on behalf of the Company or any of the Company Subsidiaries has not (except as to matters that have been fixed, resolved or settled) or does not infringe, misappropriate, or otherwise violate any intellectual property rights of any person that would be expected to result in liability that is material to the Company and the Company Subsidiaries taken as a whole, and, to the knowledge of the Company, there are no claims pending or threatened in writing, by any person alleging such infringement or misappropriation. Except as set forth on Section 3.10(c) of the Company Disclosure Schedule, neither the Company nor any of the Company Subsidiaries has made any claim of a violation, misappropriation or infringement by others of its rights to or in connection with the material Intellectual Property of the Company or any of the Company Subsidiaries and, to the knowledge of the Company, no person is infringing, misappropriating or otherwise violating any material Intellectual Property of the Company or any of the Company Subsidiaries.

(d)    The Company has taken commercially reasonable actions to protect the security of its software, systems and networks, to protect its rights in its Intellectual Property and to maintain the confidentiality of all information that constitutes or constituted a Trade Secret of the Company. Except as set forth on Section 3.10(d) of the Company Disclosure Schedule, and except as had not had a Company Material Adverse Effect, all current and former employees, consultants and contractors of the Company who developed or created any material Intellectual Property for, on behalf of, the Company have executed and delivered proprietary information, confidentiality and invention assignment agreements substantially in the Company's standard form.

(e)    The Intellectual Property owned by or licensed to the Company constitutes all of the Intellectual Property rights necessary for the conduct of the business as currently conducted in all material respects. To the knowledge of the Company, no loss or expiration of any of the material Intellectual Property used by the Company or the Company Subsidiaries in the conduct of the business, as presently conducted, is threatened or pending.

Section 3.11  Property.  Except as has not, individually or in the aggregate, had a Company Material Adverse Effect, the Company or a Company Subsidiary owns and has good and valid title to all of its owned real property and good title to all of its personal property and has valid leasehold interests in all of its leased properties, sufficient to conduct their respective businesses as currently conducted, free and clear of all Liens (other than (i) Liens for current taxes and assessments not yet past due or being contested in good faith, (ii) inchoate Liens for construction in progress, (iii) mechanics', materialmen's, workmen's, repairmen's, warehousemen's and carriers' Liens arising in the ordinary course of business of the Company or such Company Subsidiary consistent with past practice for sums not yet delinquent or being contested in good faith by appropriate proceedings, (iv) Liens imposed or granted pursuant to or in connection with the Company's existing credit facilities or other indebtedness, and (v) all

17

Liens and other imperfections of title (including matters of record) and encumbrances that do not materially interfere individually or in the aggregate with the conduct of the business of the Company and the Company Subsidiaries, taken as a whole, materially detract from the value or use of the real property or have, individually or in the aggregate, a Company Material Adverse Effect (collectively, "Permitted Liens")), assuming the timely discharge of all obligations owing under or related to the owned real property, the personal property and the leased property. Except in each case as has not, individually or in the aggregate, had a Company Material Adverse Effect, all leases under which the Company or any of the Company Subsidiaries lease any real or personal property (each a "Lease" and, collectively, the "Leases") are valid and in full force and effect against the Company or any of the Company Subsidiaries and, to the Company's knowledge, the counterparties thereto, in accordance with their respective terms (except to the extent that enforcement of the rights and remedies under the Leases are subject to bankruptcy, insolvency, reorganization, moratorium and other similar Laws of general application affecting the rights and remedies of creditors and to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law)), and there is not, under any of such Leases, any existing default by the Company or any Company Subsidiaries which, with notice or lapse of time or both, would become a default by the Company or any of the Company Subsidiaries. Section 3.11 of the Company Disclosure Schedule sets forth a correct and complete list, as of the date indicated on such schedule, of all of the Leases under which the Company or any Company Subsidiary leases any real property used for commercial purposes.

Section 3.12    Insurance. Except as has not had, individually or in the aggregate, a Company Material Adverse Effect, (a) the Company and the Company Subsidiaries maintain insurance in such amounts and against such risks as is (i) customary in relation to the business, assets and liabilities of the Company and the Company Subsidiaries, and (ii) sufficient to comply with applicable Law, (b) all policies or binders of material fire, liability, product liability, workers' compensation, vehicular, directors' and officers' and other material insurance held by or on behalf of the Company and the Company Subsidiaries (collectively, the "Company Insurance Policies") are (i) except for policies that have expired under their terms, in full force and effect and, to the knowledge of the Company, valid and enforceable in accordance with their terms and (ii) all premiums due thereon have been paid in full, (c) neither the Company nor any Company Subsidiary is in breach or default with respect to any provision contained in any such policy or binder and (d) neither the Company nor any Company Subsidiary has (i) received notice of actual or threatened modification or termination of any material Company Insurance Policy, or (ii) received notice of cancellation or non-renewal of any such Company Insurance Policy, other than in connection with ordinary renewals. Section 3.12 of the Company Disclosure Schedule contains a complete and accurate list of all material Company Insurance Policies.

Section 3.13    Tax Matters.

(a)    For purposes of this Agreement, the term "Tax" (and, with correlative meaning, "Taxes" and "Taxable") means all United States federal, state and local, and all foreign, income, profits, franchise, gross receipts, payroll, transfer, sales, employment, social security, unemployment insurance, workers' compensation, use, property, excise, value added, ad valorem, estimated, stamp, alternative or add-on minimum, recapture, environmental, capital gain, withholding taxes, any other taxes, and any fees, assessments, liabilities, levies, charges,

18

duties, tariffs, impositions or assessments in the nature of taxes, together with all interest, penalties, fines and additions imposed on or with respect to such amounts, whether disputed or not, including any liability for taxes of a predecessor entity. "Tax Return" (and, with correlative meaning, "Tax Returns") means any return, declaration, report, claim for refund or information return or similar statement filed or required to be filed with any taxing authority or any other Governmental Entity in connection with Taxes, including any attachments thereto and any amendments thereof.

      (b)    Except as has not had a Company Material Adverse Effect or as set forth in Section 3.13(b) of the Company Disclosure Schedule:

        (i)    All Tax Returns required to be filed by or with respect to the Company and the Company Subsidiaries have been filed or will be filed with the appropriate Tax authority within the time and in the manner prescribed by Law. All such Tax Returns of the Company and all Company Subsidiaries are true, correct and complete in all respects, and all Taxes owed by the Company or the Company Subsidiaries, whether or not shown on any Tax Return, have been timely paid to the appropriate Tax authority or fully reserved for on the Financial Statements in accordance with GAAP. No claim (which has not been settled and paid or accrued) has ever been made in writing by any Tax authority in any jurisdiction in which any of the Company or the Company Subsidiaries does not file a Tax Return that any of the Company or the Company Subsidiaries is or may be subject to taxation by that jurisdiction. No adjustment relating to any Tax Return of the Company or any Company Subsidiary have been proposed in writing by any Tax authority (insofar as such adjustment relates to the activities or income of the Company or any Company Subsidiary).

        (ii)    There are no Liens with respect to Taxes upon any of the assets or properties of the Company or the Company Subsidiaries, other than with respect to Taxes not yet due and payable.

        (iii)    No audit, assessment, examination, dispute, investigation or judicial or administrative proceeding is currently pending with respect to any Tax Return or Taxes of the Company or any of the Company Subsidiaries with respect to which the Company or a Company Subsidiary has been notified in writing. No deficiency for any Taxes has been proposed or assessed in writing against the Company or any of the Company Subsidiaries, which deficiency has not been paid or accrued in full. All Tax deficiencies determined as a result of any past completed audit with respect to Taxes of the Company and the Company Subsidiaries have been paid.

        (iv)    There are no outstanding requests, agreements, waivers or arrangements extending the statutory period of limitation applicable to any claim for, or the period for the collection or assessment of, Taxes due from or with respect to the Company or the Company Subsidiaries for any taxable period. No power of attorney granted by or with respect to the Company or the Company Subsidiaries relating to Taxes is currently in force.

(v)    With respect to any period ending on or before the date of the latest balance sheet included in the Financial Statements for which Tax Returns have not yet been filed, or for which material Taxes are not yet due or owing, the Company and the Company Subsidiaries have, in accordance with and to the extent required by GAAP, made accruals for such Taxes in their Financial Statements.

(vi)    All withholding and payroll Tax requirements required to be complied with by the Company and the Company Subsidiaries (including requirements to deduct, withhold and pay over amounts to any Governmental Entity and to comply with associated reporting and record keeping requirements) have been satisfied or accrued.

(vii)  /  Neither the Company nor any Company Subsidiary has any liability for the Taxes of any other person (other than the Company and the Company Subsidiaries) under Treasury Regulation 1.1502-6 (or any similar provision of state, local or foreign Law) by contract or as a transferee or successor, by contract, or otherwise. No person has any right to any payment from the Company or any Company Subsidiary with respect to any Tax refunds received or due to be received by the Company or any Company Subsidiary.

(viii)    The Company has delivered or made available to Parent complete copies of all Tax Returns of the Company with respect to 2004 and 2005.

(ix)    Neither the Company nor any Company Subsidiary has participated in a "listed transaction" within the meaning of Section 6707A(c)(2) of the Code.

(x)    Neither the Company nor any Company Subsidiary is a party to any material joint venture, partnership, or other arrangement that the parties treat as a partnership for federal or applicable state, local or foreign Tax purposes.

(xi)    Except as disclosed in its Tax Returns, neither the Company nor any Company Subsidiary (x) has received approval to make or agreed to a change in any accounting method or has any written application pending with any Tax authority requesting permission for any such change, (y) has agreed to or is required to make any adjustment under Section 481 of the Code that will require an adjustment to taxable income for any period following the Closing Date, or (z) has received written notification that the Internal Revenue Service is proposing any adjustment under Section 481 of the Code.

(xii)    Neither the Company nor any Company Subsidiary has been a "distributing corporation" or a "controlled corporation" (within the meaning of Section 355(a)(1)(A) of the Code) (x) in a transaction occurring within the past five years or (y) in a distribution which could otherwise constitute part of a "plan" or "series of related transactions" (within the meaning of Section 355(e) of the Code) in conjunction with the Merger.

(xiii)    Neither the Company nor any Company Subsidiary is party to or bound by any active and material closing agreement pursuant to Section 7121 of the Code

20

(or any similar provision of state, local or foreign Law) or offer in compromise with any Tax authority.

(xiv)   Neither the Company nor any of the Company Subsidiaries is a party to any indemnification, allocation, sharing or similar agreement, with respect to Taxes that would give rise to a payment or indemnification obligation.

(xv)   Neither Company nor any Company Subsidiaries is, nor has been at any time during the 5-year period ending with the Closing Date, a "United States Real Property Holding Corporation" within the meaning of Section 897(c)(2) of the Code.

(xvi)   Neither Company nor any of its Subsidiaries is, or has been, a member of an affiliated group (within the meaning of Section 1504(a) of the Code) filing a consolidated federal income Tax Return (other than a group the common parent of which was Company).

(xvii)   Neither Company nor any Company Subsidiaries (u) has participated in or cooperated with an international boycott within the meaning of Section 999 of the Code, (v) has an unrecaptured overall foreign loss within the meaning of Section 904(f) of the Code, (w) will be required to include any amounts in income in the taxable year that includes the Closing Date pursuant to Section 951 of the Code, (x) has had the amount of its Subpart F income limited in any year pursuant to Section 952(c)(1)(a) of the Code, (y) has been a passive foreign investment company within the meaning of Section 1297 of the Code, or (z) has had any dual consolidated losses within the meaning of Section 1504 of the Code or has entered into any agreement with any Tax authority regarding the use or availability of such losses.

(xviii)   (i) All returns, declarations, and reports required to be filed by the Company or any Company Subsidiary pursuant to any applicable abandoned property, escheat or similar Law have been filed with the appropriate Governmental Entity within the time and in the manner prescribed by Law and (ii) the Company and all Company Subsidiaries have properly delivered to a public official or Governmental Entity all amounts so required to be delivered pursuant to any applicable abandoned property, escheat or similar Law within the time and in the manner prescribed by Law

Section 3.14   Employee Benefit Plans.

(a)   With respect to each pension, savings, profit sharing, retirement, deferred compensation, employment, welfare, fringe benefit, insurance, short and long term disability, medical, death benefit, incentive, bonus, stock, other equity-based, vacation pay, severance pay, cafeteria plan and other plan, program and arrangement for the benefit of any current or former employee, director or consultant of the Company or any Company Subsidiary (collectively, the "Company Employees"), or their beneficiaries, including each "employee benefit plan" (as that term is defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) that is not a Foreign Plan, and that is sponsored or maintained by Company and/or by one or more Company Subsidiaries or to which the Company and/or one or more Company Subsidiaries has any present or future liability (each, a "Plan"), the Company has

delivered or made available (or will make available) to Parent current, accurate and complete copies of each of the following together with, when applicable, all amendments: (i) the Plan, or, if the Plan has not been reduced to writing, a written summary of its material terms, (ii) if the Plan is subject to the disclosure requirement of Title I of ERISA, the summary plan description, and in the case of each other Plan, any similar employee summary, (iii) if the Plan is intended to be qualified under Section 401(a) of the Code, the most recent determination letter (or opinion letter upon which the Company or any Company Subsidiary is entitled to rely) issued by the Internal Revenue Service ("IRS"), (iv) if the Plan is subject to the requirement that a Form 5500 series annual report/return be filed, the three most recently filed annual reports/returns, (v) all related trust agreements, group annuity contracts and administrative services agreements, (vi) for each Plan that is funded, the three most recent financial statements and actuarial reports for each such Plan, and (vii) since January 1, 2005, any material communications received from or sent to the IRS or the U.S. Department of Labor relating to an audit or similar process involving the Plan. Section 3.14(a) of the Company Disclosure Schedule sets forth a list of all material Plans.

(b)    There is no entity (other than the Company or any Company Subsidiary) that, together with the Company or any Company Subsidiary, was, during the five years preceding the date of this Agreement, or currently would be, treated as a single employer within the meaning of Section 414(b), (c), (m) or (o) of the Code or Section 4001(b) of ERISA (an "ERISA Affiliate").

(c)    Each Plan has been established and administered in all material respects in accordance with its terms and the provisions of applicable Law, including ERISA and the Code (and the rules and regulations thereunder). None of the Plans is currently under examination by the IRS or the U.S. Department of Labor. All contributions, premiums and expenses, if any, due under each Plan have been timely made. Each Plan intended to be qualified under Section 401(a) of the Code has received a favorable determination letter (or opinion letter upon which the Company or any Company Subsidiary may rely) from the IRS that it is so qualified, and to the knowledge of the Company nothing has occurred since the date of such letter that adversely affected the qualified status of or reasonably would be expected to disqualify such Plan. Each trust created under any such Plan is exempt from Tax under Section 501(a) of the Code. Except as set forth on Section 3.14(c) of the Company Disclosure Schedule, no Plan is or has been subject to Section 302 of ERISA or Section 412 of the Code. To the knowledge of the Company, no event has occurred and no condition exists that would subject the Company or any Company Subsidiary either directly or by reason of their affiliation with any member of their "Controlled Group" (defined as any organization that is a member of a controlled group of organizations within the meaning of Sections 414 (b), (c), (m) or (o) of the Code), to any Tax, fine, lien, penalty or other liability imposed by ERISA, the Code or other applicable Laws, rules or regulations which could result in any material liability on the part of the Company or any Company Subsidiary.

(d)    Except for continuation of health coverage described in Section 4980B of the Code or Section 601 et seq. of ERISA ("COBRA") and, except as provided on Section 3.14(d) of the Company Disclosure Schedule, no Plan provides for medical, dental, life insurance coverage or any other welfare benefits after termination of employment or for other post-employment welfare benefits.

(e)    No material Action (other than routine claims for benefits in the ordinary course) is pending or, to the knowledge of the Company, threatened against any Plan (including any audit or other administrative proceeding by the U.S. Department of Labor, the IRS or other Governmental Entities).

(f)    Except as set forth on Section 3.14(f) of the Company Disclosure Schedules, neither the Company nor any of the Company Subsidiaries nor any ERISA Affiliate has ever maintained, sponsored, contributed to, been required to contribute to, or incurred any liability under any defined benefit pension plan subject to Title IV of ERISA, including without limitation any multi-employer plan as defined in Section 3(37) or Section 4001(a)(3) of ERISA or any multiple employer plan as defined in Section 413(c) of the Code, or any plan that has two or more contributing sponsors at least two of whom are not under common control, within the meaning of Section 4063(a) of ERISA.

(g)    Neither the Company nor any Company Subsidiary, nor, to the knowledge of the Company, any other "disqualified person" or "party in interest" (as defined in Section 4975(e)(2) of the Code and Section 3(14) of ERISA, respectively) has engaged in any transactions in connection with any Plan that would result in the imposition on the Company or any Company Subsidiary of a material penalty pursuant to Section 502 of ERISA, damages pursuant to Section 409 of ERISA or a material tax pursuant to Section 4975 of the Code.

(h)    Each non-governmental plan maintained, or contributed to, by or on behalf of the Company or any Company Subsidiary applicable to Company Employees located outside of the United States (a "Foreign Plan") and each material non-governmental welfare benefit plan maintained or contributed to by or on behalf of or applicable to the Company Employees located outside of the United States (a "Foreign Welfare Plan"), has been administered in material compliance with its terms and the requirements of all applicable Laws and regulations, and all required contributions to each Foreign Plan and Foreign Welfare Plan have been made. All Foreign Plans that are required to be funded are funded to the extent required under applicable Law in all material respects. There are no Actions (other than routine benefit claims) pending or, to the knowledge of the Company, threatened against any Foreign Plan or Foreign Welfare Plan, or, to the Company's knowledge, no facts or circumstances exist that could give rise to any such Actions, except in each case as has not resulted in liability that is material to the Company and the Company Subsidiaries taken as a whole.

(i)    Except as required by applicable Law or as set forth on Section 3.14(i) of the Company Disclosure Schedule, no Plan exists that, as a result of the execution of this Agreement, shareholder approval of this Agreement, or the consummation of the transactions contemplated by this Agreement, would (i) result in severance pay or any increase in severance pay upon any termination of employment after the date of this Agreement (except as required by the Code or ERISA), (ii) except as contemplated by Section 2 with respect to Options, Restricted Shares and ESPP Options, accelerate the time of payment or vesting or result in any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, increase the amount payable or result in any other material obligation pursuant to, any Plan, or (iii) limit or restrict the right of the Company to merge, amend or terminate any of the Plans.

23

(j)    No deduction for federal income tax purposes has been nor is any such deduction expected by the Company to be disallowed for remuneration paid by the Company or any Company Subsidiary by reason of Section 162(m) of the Code solely by reason of the transactions contemplated hereby.

(k)    To the Company's knowledge, each Plan that is a non-qualified deferred compensation plan or arrangement subject to Section 409A of the Code has been operated and administered in good faith compliance with Section 409A of the Code, IRS Notice 2005-1 and other applicable IRS guidance from the period beginning January 1, 2005 through the date hereof, except in each case as has not resulted in liability that is material to the Company and the Company Subsidiaries taken as a whole.

Section 3.15    Labor Matters.  Neither the Company nor any of the Company Subsidiaries is a party to, or bound by, any collective bargaining agreement, contract or other agreement or understanding with a labor union or labor organization. Neither the Company nor any of the Company Subsidiaries is subject to a dispute, strike or work stoppage except as has not, individually or in the aggregate, had a Company Material Adverse Effect.  To the knowledge of the Company, there are no organizational efforts with respect to the formation of a collective bargaining unit presently being made or threatened involving any Company Employees.

Section 3.16    Environmental Matters.

(a)    Except as set forth on Section 3.16(a) of the Company Disclosure Schedule or has not had, individually or in the aggregate, a Company Material Adverse Effect, (i) none of the Company or any of the Company Subsidiaries is in violation of any Environmental Law or, except for any violation that has been fully resolved, has violated in the past any Environmental Law; (ii) to the knowledge of the Company, there is and has been no Release of Hazardous Substances, on or under any of the properties currently owned, leased, occupied or operated by the Company or any of the Company Subsidiaries or, during the period of the Company's or the Company Subsidiaries' ownership, lease, occupation or operation thereof, formerly owned, leased, occupied or operated by the Company or any of the Company Subsidiaries that would reasonably be expected to result in a liability to the Company or any of the Company Subsidiaries that would be material to the Company and the Company Subsidiaries taken as a whole; (iii) the Company and the Company Subsidiaries have obtained and are in compliance with all required Environmental Permits and, except for any noncompliance that has been fully resolved, have been in the past in compliance with such permits; (iv) there are no Actions, orders, written claims or written notices pending or, to the knowledge of the Company, issued to or threatened against the Company or any of the Company Subsidiaries alleging violations of or liability under any Environmental Law or otherwise concerning the Release or management of Hazardous Substances or with respect to any matter concerning the protection of the environment or pollution, including natural resources; and (v) the Company and any of the Company subsidiaries has made (or will make) accessible to Parent and Merger Sub copies of all environmental assessments, audits, studies, and other environmental reports in its possession related to the Company, any of the Company subsidiaries, or any of its current or former properties or operations.

24

(b)    Parent and Merger Sub acknowledge that (i) the representations and warranties contained in this Section 3.16 are the only representations and warranties being made with respect to compliance with or liability under Environmental Laws related to the Company or to the Company Subsidiaries or to this Agreement or to its subject matter and (ii) no other representation or warranty contained in this Agreement (including pursuant to Section 3.7) shall apply to any such matters and no other representation or warranty, express or implied, is being made with respect thereto.

(c)    For purposes of this Agreement:

(i)    "Environmental Laws" means any Laws (including common law) of the United States federal, state, local, non-United States, or any other Governmental Entity, relating to (A) Releases or threatened Releases of Hazardous Substances or materials containing Hazardous Substances; (B) the presence, production, manufacture, handling, transport, use, treatment, storage, emission, discharge, distribution, labeling, testing, processing, control, cleanup or disposal of Hazardous Substances or materials containing Hazardous Substances; or (C) pollution or protection of the environment, including natural resources, or of human health as such is affected by Hazardous Substances or materials containing Hazardous Substances.

(ii)    "Environmental Permits" means any permit, consent, license, registration, approval, notification or any other authorization pursuant to any Environmental Law.

(iii)    "Hazardous Substances" means (A) those substances, materials or wastes defined as toxic, hazardous, acutely hazardous, pollutants or contaminants, in, or regulated under, the following United States federal statutes and any analogous foreign or state statutes, and all regulations thereunder: the Hazardous Materials Transportation Act, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Clean Water Act, the Safe Drinking Water Act, the Atomic Energy Act, the Federal Insecticide, Fungicide, and Rodenticide Act and the Clean Air Act or any other Environmental Law; (B) petroleum and petroleum products, including crude oil and any fractions thereof; (C) natural gas, synthetic gas, and any mixtures thereof; and (D) polychlorinated biphenyls, asbestos, radioactive materials, radon and molds that would reasonably be expected to have an adverse effect on human health, and urea formaldehyde foam insulation.

(iv)    "Release" means any release, spilling, leaking, pumping, pouring, discharging, emitting, emptying, escaping, leaching, injecting, dumping, disposing or migrating into or through the indoor or outdoor environment.

Section 3.17    No Breach.

(a)    The execution, delivery and performance of this Agreement do not and the consummation by the Company of the Merger and the other transactions contemplated by this Agreement will not (i) violate any provision of the charter or bylaws of the Company or the comparable organizational documents of a Company Subsidiary, (ii) violate, conflict with or

result in the breach of any of the terms or conditions of, result in modification of or the cancellation or loss of a benefit under, require any consent, notice or other action under, or otherwise give any other contracting party the right to terminate, accelerate obligations under or receive payment or additional rights under or constitute (or with notice or lapse of time, or both, constitute) a default under, any Material Contract (excluding Permits), (iii) assuming expiration of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), violate any Law applicable to the Company or any of the Company Subsidiaries or by which any of the Company's or the Company Subsidiaries' assets or properties is bound, (iv) violate any material Permit, (v) except for (a) filings with the SEC under the Exchange Act, (b) filings pursuant to the TBCA as contemplated herein, (c) the filing of a pre-merger notification report under the HSR Act, and any merger control, competition or fair trade Law filings in foreign jurisdictions if and to the extent required, (d) filings required with, and approvals required by, the NYSE and the CHX rules and regulations, and (e) the notifications and consents listed on Section 3.17(a) of the Company Disclosure Schedule, require any registration or filing with, notice to, or Permit, order, authorization, consent or approval of, any Governmental Entity or any third party pursuant to a Material Contract, or (vi) result in the creation of any Lien on the assets or properties of the Company or a Company Subsidiary (other than Permitted Liens), excluding from the foregoing clauses (ii), (iii), (iv), (v) and (vi) violations, conflicts, breaches, accelerations, rights or entitlements, defaults and Liens which, and filings, registrations, notices, Permits, orders, authorizations, consents and approvals the absence of which has not had, individually or in the aggregate, a Company Material Adverse Effect. Notwithstanding the foregoing, for all purposes of the Agreement, the Company does not make any representation or warranty (pursuant to this Section 3.17 or elsewhere in this Agreement) regarding the effect of the applicable antitrust, merger control, competition or fair trade Laws on its ability to execute, deliver, or perform its obligations under this Agreement or to consummate the Merger as a result of the enactment, promulgation, application, or threatened or actual judicial or administrative investigation or litigation under, or enforcement of, any antitrust, merger control, competition or fair trade Law with respect to the consummation of the Merger.

(b)    As of the date of this Agreement, the Company does not have knowledge that any landlord or licensor has notified the Company that it would withhold any consent required upon the consummation of the Merger with respect to the agreements listed on Section 3.17(b) of the Company Disclosure Schedule, except to the extent that the failure to obtain such consents would not have a Company Material Adverse Effect.

Section 3.18    Board Approvals; Anti-Takeover; Vote Required.

(a)    The Company Board of Directors has (i) duly and validly approved and adopted resolutions addressing all corporate action required to be taken by the Company Board of Directors to authorize and adopt this Agreement and the Merger and (ii) subject to the other terms and conditions of this Agreement, resolved to submit this Agreement to the shareholders of the Company and to recommend that the shareholders of the Company approve and adopt this Agreement and the Merger.

(b)    Except to the extent addressed in Section 3.18(e), assuming the accuracy of the representations and warranties set forth in Section 4.7(c), the Company and the Company Board of Directors has taken all action necessary such that no restrictions contained in any "anti-

26

takeover," "fair price," "moratorium," "control share acquisition," "business combination" or similar Law, including the Tennessee Business Combination Act or provision in the Company's charter or bylaws will apply to or prohibit the execution, delivery or performance of or compliance with this Agreement or the Merger.

(c)    The Company Board of Directors has taken such action as is necessary to amend the Company Rights Agreement such that the execution, delivery or performance of or compliance with this Agreement and the Merger will not: (i) result in Parent becoming an "Acquiring Person" under the Company Rights Agreement or (ii) result in the grant of any rights to any person under the Company Rights Agreement or enable, require or cause the Company Rights to become exercisable, be exercised or deemed exercised, or be distributed or otherwise triggered.

(d)    Assuming the accuracy of the representations and warranties set forth in Section 4.7(c), the affirmative vote of the holders of a majority of the outstanding shares of Company Common Stock and Company Preferred Stock voting together as a single group (the "Company Shareholder Approval") is the only vote of the Company's shareholders necessary to approve or adopt this Agreement and the Merger.

(e)    Assuming the accuracy of the representations and warranties set forth in Section 4.7(c), and further assuming that Parent conducts the Employee Preferred Stock Tender Offer in accordance with the terms set forth in Section 5.4 and it otherwise meets the requirements of Section 48-103-102(10)(B)(v) of the Tennessee Investor Protection Act, the Company Board of Directors has taken or will take (prior to the commencement of the Employee Preferred Stock Tender Offer) such action as is necessary (including recommending in favor of the Employee Preferred Stock Tender Offer to the holders of the Employee Preferred Stock) to assure that none of the transactions contemplated by this Agreement, including the Merger and the Employee Preferred Stock Tender Offer, will, to the Company's knowledge, be a "takeover offer" under the Tennessee Investor Protection Act.

(f)    As of the date of this Agreement, Dissenters' rights under the TBCA are not available to the holders of Company Common Stock for the transactions contemplated by this Agreement, including the Merger.

Section 3.19    Financial Advisor.

(a)    The Company Board of Directors has received the opinion of Goldman Sachs & Co. substantially to the effect that, as of the date hereof, and based upon and subject to the factors and assumptions set forth therein, the Per Share Price to be received by the holders of shares of Company Common Stock pursuant to this Agreement is fair from a financial point of view to such holders, a signed copy of which will be shown to Parent promptly after it is available following the date hereof. It is agreed and understood that such opinion is for the benefit of the Company Board of Directors and may not be relied on by Parent or Merger Sub.

(b)    Other than Goldman Sachs & Co., no broker, investment banker, financial advisor, finder, agent or similar intermediary has acted on behalf of the Company or any Company Subsidiary in connection with this Agreement or the transactions contemplated hereby,

27

and there are no other brokerage commissions, finders' fees, financial advisor's fees or similar fees or commissions payable in connection herewith based on any agreement, arrangement, commitment or understanding with the Company or any Company Subsidiary, or any action taken by or on behalf of the Company or any Company Subsidiary. The Company has made available to Parent a true, complete and correct copy of the Company's engagement letter with Goldman Sachs & Co.

Section 3.20    Information in the Proxy Statement.  The proxy statement to be provided to the Company's shareholders in connection with the Company Shareholders Meeting (such proxy statement, inclusive of any amendment thereof or supplement thereto, the "Proxy Statement") on the date mailed to the Company's shareholders and at the time of any meeting of the Company's shareholders to be held in connection with the Merger, will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading, except that no representation is made by the Company with respect to statements made therein based on information supplied in writing by or related to, or the sufficiency of disclosures related to, Parent or Merger Sub. The Proxy Statement will comply as to form in all material respects with the provisions of the Exchange Act and the rules and regulations thereunder.

Section 3.21    Affiliate Transactions.  No executive officer or director of the Company or any Company Subsidiary or any person owning 5% or more of the Company Common Stock or, to the Company's knowledge, any affiliate or family member of any such officer, director or owner (an "Affiliated Party") is a party to any Contract with or binding upon the Company or any Company Subsidiary or has any material interest in any property or assets owned by the Company or any Company Subsidiary or has engaged in any transaction (other than those related to employment or incentive arrangements) with the Company that is material to the Company within the last 12 months, in each case, of the type that would be required to be disclosed under Item 404 of Regulation S-K under the Securities Act.

Section 3.22    Suppliers and Vendors.  Set forth in Section 3.22 of the Company Disclosure Schedule is a list of the twenty largest merchandise vendors of the Company and the Company Subsidiaries based on the dollar value of materials or products purchased by the Company and the Company Subsidiaries for the fiscal year ended February 3, 2007. As of the date of this Agreement, the existing suppliers of the Company are adequate for the operation of the business of the Company and the Company Subsidiaries as presently conducted. Except as would not have a Company Material Adverse Effect, since February 3, 2007 and through the date hereof, (a) the Company has not received any written notice or threat of any material change in relations with any of the major suppliers of the Company or the Company Subsidiaries, the result of which would be material and adverse to the Company and the Company Subsidiaries taken as a whole, and (b) the Company has not received from any of the major suppliers of the Company or any Company Subsidiaries any written notices of termination or material alteration of any Contract or business relationship governed thereby and, to the Company's knowledge, no other party to any such Contract intends or has indicated in writing an intent to (i) terminate, (ii) not renew or extend (if contemplated by the terms thereof and requested by the Company), (iii) seek to amend or modify, or (iv) not fully perform its obligations under any Contract. ...

Section 3.23    Inventory.  Except as would not have a Company Material Adverse Effect, as of the date hereof, all inventory of the Company and the Company Subsidiaries, whether or not reflected in the latest balance sheet included in the Company SEC Reports, consist of a quality and quantity usable and saleable in the Company's and the Company Subsidiaries' ordinary course of business, except for obsolete items and items of below-standard quality, all of which have been or will be written-off or written-down to net realizable value on the balance sheet included in the Company's SEC Reports, and except for inventory items having an aggregate value not to exceed $3,000,000.

Section 3.24    No Other Representations or Warranties; Investigation by Parent.  Parent and Merger Sub each acknowledges and agrees that (a) it has had an opportunity to discuss the business of the Company and the Company Subsidiaries with the management of the Company, (b) it has had reasonable access to (i) the books and records of the Company and the Company Subsidiaries and (ii) the electronic dataroom maintained by the Company through Merrill Corporation for purposes of the transactions contemplated by this Agreement, (c) it has been afforded the opportunity to ask questions of and receive answers from officers of the Company and (d) except for the representations and warranties contained in this Section 3, and any certificates delivered by the Company in connection with Closing, neither Parent nor Merger Sub have relied upon or otherwise been induced by, any other express or implied representation or warranty with respect to the Company or with respect to any information provided to or made available to Parent or Merger Sub in connection with the transaction contemplated hereunder. Neither the Company nor any other person will have or be subject to any liability or indemnification obligation to Parent, Merger Sub or any other person resulting from the distribution to Parent or Merger Sub, or Parent's or Merger Sub's use of, any such information, including any information, documents, projections, forecasts or other material made available to Parent or Merger Sub in certain data rooms or management presentations in expectation of the transactions contemplated by this Agreement, unless any such information is expressly included in a representation or warranty contained in this Section 3 or in the corresponding section of the Company Disclosure Schedule.

Section 4.    Representations and Warranties of Parent.

Except as set forth in the disclosure schedule delivered by Parent to the Company on the date hereof (the "Parent Disclosure Schedule"), Parent and Merger Sub hereby jointly and severally make the representations and warranties set forth in this Section 4 to the Company. The section numbers of the Parent Disclosure Schedule are numbered to correspond to the section numbers of this Agreement to which they refer.  Any information set forth in one section of the Parent Disclosure Schedule will be deemed to apply to each other section or subsection of this Agreement to which its relevance is reasonably apparent.

Section 4.1    Organization.  Each of Parent and Merger Sub is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  Parent and Merger Sub are duly qualified or otherwise authorized to transact business as a foreign corporation or organization in each jurisdiction where the character of the properties owned, leased or operated by them or the nature of their business makes such qualification or authorization necessary, except for such failures to be so qualified or licensed and in good standing that would not reasonably be likely to prevent or materially delay Parent

29

and Merger Sub's ability to consummate the transactions contemplated hereby (a "Parent Material Adverse Effect"). Parent has made available to the Company a complete and correct copy of the articles of incorporation, charter, bylaws or other applicable governing instruments of Parent and Merger Sub.

Section 4.2    Authority to Execute and Perform Agreement. Parent and Merger Sub have the necessary corporate power and authority to enter into, execute and deliver this Agreement and to perform fully their obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement by Parent and Merger Sub and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of Parent and Merger Sub. This Agreement has been duly executed and delivered by Parent and Merger Sub and, assuming the due authorization, execution and delivery hereof by the Company, constitutes a valid and binding obligation of Parent and Merger Sub, enforceable against them in accordance with its terms, except to the extent that enforcement of the rights and remedies created hereby is subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application affecting the rights and remedies of creditors and to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law). No vote of holders of capital stock of Parent is necessary to approve this Agreement and the Merger and other transactions contemplated hereby.

Section 4.3    No Conflict; Required Filings and Consents.

(a)    The execution and delivery by Parent and Merger Sub of this Agreement do not, and the consummation of the transactions contemplated hereby and compliance with the terms hereof will not, (i) violate (A) any provision of the articles of incorporation, charter, bylaws or other organizational documents of Parent or Merger Sub, (B) subject to the filings and other matters referred to in Section 4.3(b), any Law applicable to Parent or Merger Sub or their properties or assets, or (C) any Contract to which Parent or Merger Sub is a party or by which their respective assets or properties are bound in any material respect, or (ii) require the consent of, or registration, declaration or filing with, any third party under any Contract to which Parent or Merger Sub is a party or by which their respective assets or properties are bound, except, in the case of clauses (i)(B), (i)(C) and (ii) above, for such violations, consents, registrations, declarations and filings that, individually or in the aggregate, would not reasonably be expected to have a Parent Material Adverse Effect.

(b)    No consent of, or registration, declaration or filing with, any third party or Governmental Entity is required to be obtained or made by or with respect to Parent or Merger Sub in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby, other than (i) filing of a pre-merger notification report under the HSR Act, (ii) the filing with the SEC of such reports under Section 13 of the Exchange Act as may be required in connection with this Agreement and the transactions contemplated hereby, (iii) the filing of the Articles of Merger with the Secretary of State of the State of Tennessee and any appropriate documents with the relevant authorities of the other jurisdictions in which Parent or Merger Sub is qualified to do business, (iv) compliance with and filings under the merger control, competition or fair trade Laws of any foreign jurisdiction, if and to the extent required, (v) as set forth in Section 4.3 of the Parent Disclosure

30

Schedule and (vi) such items that have not had and are not reasonably likely to have, individually or in the aggregate, a Parent Material Adverse Effect.

Section 4.4    Information in the Proxy Statement. The information supplied in writing by Parent and Merger Sub expressly for inclusion in the Proxy Statement will not contain at the time it is first mailed to the shareholders of the Company or at the time of the Company Shareholders Meeting, any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

Section 4.5    Litigation. As of the date hereof, there is no Action pending or, to the knowledge of Parent, threatened, against Parent or any of its affiliates before any Governmental Entity that would or seeks to delay or prevent the consummation of the Merger. As of the date hereof, neither Parent nor any of its affiliates is subject to any continuing order of, consent decree, settlement agreement or other similar written agreement with, or, to the knowledge of Parent, continuing investigation by, any Governmental Entity, or any order, writ, judgment, injunction, decree, determination or award of any Governmental Entity that would or seeks to delay or prevent the consummation of the Merger.

Section 4.6    Financing. Parent has delivered to the Company a true and complete copy of the Debt Commitment Letter, dated as of the date hereof (the "Commitment Letter"), made by UBS Loan Finance LLC and UBS Securities LLC (together, the "Lender"), and accepted by Parent, pursuant to which the Lender has committed to provide the debt financing (the "Financing") to Parent that is necessary to consummate the transactions contemplated hereby. The Commitment Letter is, as of the date of this Agreement, in full force and effect in the form so delivered. The Commitment Letter has not been amended in any respect that could reasonably be expected to impair or delay the availability of the financing contemplated thereby on the Closing Date. There are no conditions precedent or other contingencies related to the funding of the full amount of the Financing, other than as set forth in or contemplated by the Commitment Letter (the "Disclosed Conditions"), and no Person (including, without limitation, the Lender) has any contractual right to impose (i) any condition precedent to such funding other than the Disclosed Conditions or (ii) any reduction to the aggregate amount available under the Commitment Letter on the Closing Date (or any term or condition which would have the effect of reducing the aggregate amount under the Commitment Letter on the Closing Date). Parent has fully paid all commitment fees required to be paid prior to the Closing Date in connection with the Commitment Letter. The aggregate proceeds contemplated by the Commitment Letter, together with other sources of capital available to Parent, will be sufficient when funded for Parent and the Surviving Corporation to pay the aggregate Merger Consideration (including any applicable Merger Consideration in consideration of the conversion of the Company Preferred Stock and the Convertible Debentures) and the Cash Out Amount, to refinance any outstanding indebtedness of the Company contemplated hereby to be so refinanced, to redeem the Company Preferred Stock (if applicable), to consummate the Employee Preferred Stock Tender Offer (if applicable), and to pay all fees and expenses payable by Parent in connection with the Financing, the Merger or any other transactions contemplated by this Agreement. As of the date of this Agreement, Parent does not have any reason to believe that any of the conditions to the Financing will not be satisfied or that the Financing will not be available to Merger Sub on the

31

Closing Date. For avoidance of doubt, it shall not be a condition to Closing for Parent or Merger Sub to obtain the Financing or any alternative financing.

Section 4.7    Parent and Merger Sub.

(a)    Merger Sub has been formed solely for the purpose of engaging in the transactions contemplated hereby and prior to the Effective Time will have engaged in no other business activities and will have incurred no liabilities or obligations other than as contemplated herein.

(b)    As of the date hereof and through and including the Effective Time, Parent shall own all of the equity securities of Merger Sub.

(c)    Each of Parent, Merger Sub and their respective affiliates do not own (directly or indirectly, beneficially or of record) and is not a party to any agreement, arrangement or understanding for the purpose of acquiring, holding, voting or disposing of, in each case, any shares of capital stock of the Company (other than as contemplated by this Agreement). There are no Contracts between Parent, Merger Sub or any affiliate thereof, on the one hand, and any member of the Company's management or directors, on the other hand, as of the date hereof that relate in any way to the Company or the transactions contemplated by this Agreement. Prior to the Company Board of Directors approving this Agreement, the Merger and the other transactions contemplated hereby for purposes of the applicable provisions of the Tennessee Business Combination Act, neither Parent nor Merger Sub, alone or acting together with any other person as a group, was at any time, or became, an "interested shareholder" of the Company thereunder or has taken any action that would cause any anti-takeover statute under the Tennessee Business Combination Act to be applicable to this Agreement.

(d)    Parent has filed all forms, reports, registrations, statements, certifications and other documents required to be filed by it with, or furnished by Parent to, the SEC for all periods beginning on or after January 1, 2004, including each document required to be filed by Parent with the SEC in connection with the Merger and the related transactions (the "Parent SEC Reports"). The Parent SEC Reports were prepared in accordance with the applicable requirements of the Exchange Act and the Securities Act, and did not, as of their respective dates, contain any untrue statement of a material fact or omit to state a material fact required to be stated or incorporated by reference therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. As of the date of this Agreement, there are no outstanding or unresolved comments in comment letters received from the SEC. To the knowledge of Parent, as of the date hereof, none of the Parent SEC Reports is the subject of ongoing SEC review.

Section 4.8    Brokers. Other than UBS Investment Bank and Peter J. Solomon Securities Company, LLC, no broker, finder, agent or similar intermediary has acted on behalf of Parent or Merger Sub in connection with this Agreement or the transactions contemplated hereby, and there are no brokerage commissions, finders' fees or similar fees or commissions payable in connection herewith based on any agreement, arrangement or understanding with Parent or Merger Sub or any of their respective affiliates, or any action taken by Parent or Merger Sub or any of their respective affiliates.

Section 4.9    Solvency. As of the Effective Time, immediately after giving effect to all of the transactions contemplated by this Agreement, including the Financing, any alternative financing and the payment of the aggregate Merger Consideration (including any applicable Merger Consideration in consideration of the conversion of the Company Preferred Stock and the Convertible Debentures) and the Cash Out Amount, the redemption of the Company Preferred Stock (or the funding of a trust for such purpose), amounts required to consummate the Employee Preferred Stock Tender Offer (if applicable), any other repayment or refinancing of debt that may be contemplated in the Commitment Letter, and payment of all related fees and expenses, the Surviving Corporation and Parent will be Solvent. For purposes of this Section 4.9, the term "Solvent" with respect to the Surviving Corporation and Parent means that, as of any date of determination, (a) the amount of the fair saleable value of the assets of Parent and the Surviving Corporation and their respective Subsidiaries, taken as a whole, exceeds, as of such date, each of (i) the value of all liabilities of Parent and the Surviving Corporation and their respective Subsidiaries, taken as a whole, including contingent and other liabilities, as of such date, as such terms are generally determined in accordance with the applicable Tennessee, Indiana and federal Laws governing determinations of the solvency of debtors, and (ii) the amount that will be required to pay the probable liabilities of Parent, the Surviving Corporation and their respective Subsidiaries, taken as a whole, on their existing debts (including contingent liabilities) as such debts become absolute and matured; (b) Parent and the Surviving Corporation will not have, as of such date, an unreasonably small amount of capital for the operation of the businesses in which they are engaged or proposed to be engaged following such date; (c) Parent and the Surviving Corporation will be able to pay their respective liabilities, including contingent and other liabilities, as they mature in the ordinary course of business; and (d) the satisfaction of any other solvency requirement set forth in the TBCA or pursuant to Indiana or federal Laws applicable to Parent or the Surviving Corporation. It is agreed and understood that Parent will obtain an opinion or opinions of a firm experienced in rendering such opinions as to the solvency of Parent following the transactions contemplated hereby. Parent will make available to the Company (for the Company's reference but not reliance) a true, complete and correct copy of the solvency opinions referred to in the immediately preceding sentence promptly after delivery thereof to Parent.

Section 4.10    No Other Representations or Warranties. Except for the representations and warranties contained in this Section 4, and any certificate delivered by Parent or Merger Sub in connection with Closing, the Company acknowledges and agrees that none of Parent, Merger Sub or any other person on behalf of Parent or Merger Sub makes, nor has the Company relied upon or otherwise been induced by, any other express or implied representation or warranty with respect to Parent or Merger Sub or with respect to any other information provided to or made available to the Company in connection with the transactions contemplated hereunder. Except as provided in Section 6.8, neither Parent, Merger Sub nor any other person will have or be subject to any liability or indemnification obligation to the Company or any other person resulting from the distribution to the Company, or the Company's use of, any such information, including any information, documents, projections, forecasts or other material made available to the Company in certain data rooms or management presentations in expectation of the transactions contemplated by this Agreement, unless any such information is expressly included in a representation or warranty contained in this Section 4 or in the corresponding section of the Parent Disclosure Schedule.

33

Section 5.    **Conduct of Business Pending the Merger; No Solicitation; Employee Matters.**

Section 5.1    Conduct of Business. During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement or the Effective Time, the Company and each Company Subsidiary shall, except as required by Law, as contemplated by this Agreement, as set forth on Section 5.1 of the Company Disclosure Schedule or to the extent that Parent shall otherwise consent in writing (not to be unreasonably withheld, conditioned or delayed), conduct their respective businesses in the ordinary course on a basis consistent with past practice. Without limiting the generality of the foregoing, and to the extent consistent therewith, without the prior written consent of Parent (not to be unreasonably withheld, conditioned or delayed), during the period from the date hereof and continuing until the earlier of the termination of this Agreement or the Effective Time, the Company shall observe the following covenants, in each case except as required by Law or as contemplated by this Agreement or as set forth on Section 5.1 of the Company Disclosure Schedule:

(a)    Affirmative Covenants Pending Closing. The Company shall:

(i)    Preservation of the Business; Maintenance of Properties, Material Contracts. Use reasonable best efforts, on a basis consistent with past practices, to (A) preserve the business of the Company and the Company Subsidiaries, including without limitation, keeping available the services of the current officers, employees and consultants of the Company and the Company Subsidiaries and to preserve the present relationships of the Company and the Company Subsidiaries with customers, suppliers and other persons with which the Company or any Company Subsidiary has significant business relations, (B) advertise, promote and market the Company's products, (C) keep the Company's and the Company Subsidiaries' material properties substantially intact, preserve their goodwill and business, and maintain all physical properties in good repair and condition, (D) perform and comply in all material respects with the terms of the Material Contracts, and (E) maintain, and comply in all material respects with, all material Permits;

(ii)    Insurance. Use reasonable best efforts to keep in effect general liability, casualty, product liability, worker's compensation, directors' and officers' liability and other material insurance policies in coverage scope and amounts substantially similar to those in effect at the date hereof;

(iii)    Convertible Debentures and Preferred Stock. Deliver or cause to be timely delivered to the holders of Convertible Debentures and the Company Preferred Stock all notices required pursuant to the terms of the Indenture and the Company's charter and bylaws in connection with the Merger; and

(b)    Negative Covenants Pending Closing. The Company shall not and shall cause the Company Subsidiaries not to:

(i)    Compensation. (1) Change the compensation payable to any officer, employee, agent or consultant or enter into or amend any employment, change in

34

control, bonus, severance, termination, retention or other agreement or arrangement with any officer, employee, agent or consultant of the Company or a Company Subsidiary, or adopt, or increase the benefits (including fringe benefits), severance or termination pay under, any employee benefit plan or agreement or otherwise, except (A), in each case, as required by Law or in accordance with existing agreements or Plans, (B) in the case of compensation for officers (other than executive officers), employees, agents or consultants, in the ordinary course of business consistent with past practice, and (C) other than any separation, retention or incentive agreement entered into after the date hereof with any non-executive officer of the Company or any Company Subsidiary pursuant to which the aggregate benefits (to the extent additional to existing benefits of a similar nature) do not exceed $250,000 in the aggregate or $25,000 for any person individually, provided the Company provides Parent at least two (2) business days prior written notice, or (2) make any prohibited loans or advances to any of its officers, employees, agents or consultants, or make any material change in its existing borrowing or lending arrangements for or on behalf of any such persons pursuant to a Plan or otherwise; provided, however, that, subject to the remaining provisions of Section 5.1(b), the foregoing clauses (1) and (2) shall not restrict the Company or any of the Company Subsidiaries from entering into or making available to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, in each case in the ordinary course of business, plans, agreements, benefits and compensation arrangements (including incentive grants, but excluding any plans, Contracts, benefits or arrangements that could result in the obligation on the part of the Surviving Corporation to make any material payments in connection with the consummation of the Merger or the termination of such person's employment after the consummation of the Merger) that have a value that is consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions;

     (ii)   <u>Capital Stock</u>. Split, combine or reclassify any of its capital stock or make any change in the number of shares of its capital stock authorized, issued or outstanding or grant, sell or otherwise issue or authorize the issuance of any share of capital stock, any other voting security or any security convertible into, or any option, warrant or other right to purchase (including any equity-based award), or convert any obligation into, shares of its capital stock or any other voting security, declare, set aside, make or pay any dividend or other distribution with respect to any shares of its capital stock, sell or transfer any shares of its capital stock, or acquire, redeem or otherwise repurchase any shares of its capital stock or any rights, warrants or options to purchase any of its capital stock, or any securities convertible into or exchangeable for any such shares; provided, however, that the foregoing clause shall not restrict: (1) the exercise of Company Options and ESPP Options outstanding as of the date hereof and the Company's obligation to issue shares of Company Common Stock upon any such exercise, (2) the repurchase or cancellation of Restricted Shares or other shares of Company Common Stock in accordance with the terms of the applicable award agreements or similar arrangements to satisfy withholding obligations upon the vesting of Restricted Shares or the exercise of Company Options, or (3) the conversion or redemption of Company Preferred Stock in accordance with the Company's charter, and the Company's obligation to issue shares of Company Common Stock upon any such

conversion, (4) the conversion of any of the Convertible Debentures in accordance with the terms of such securities and the Indenture as of the date hereof, the Company's obligation to issue shares of Company Common Stock upon any such conversion and the Company's right to deliver, in lieu of shares of Company Common Stock, cash or a combination of cash and shares of Company Common Stock upon such conversion or (5) the payment of regular quarterly cash dividends with respect to the Company Preferred Stock in accordance with the Company's charter;

(iii)    Charter, By Laws and Directors.  Amend, or otherwise alter or modify in any respect, the charter or bylaws of the Company or any Company Subsidiary;

(iv)    Disposition of Assets.  Except as provided in the Company financial budget and plans previously made available to Parent, sell or transfer, or mortgage, pledge, lease, license, terminate any lease or license, or otherwise dispose of or encumber any tangible or intangible asset or related assets of the Company with a value in excess of $3,000,000, other than sales and non-exclusive licenses of products and services of the Company and the Company Subsidiaries in the ordinary course of business consistent with past practice and other than Permitted Liens;

(v)    Capital Expenditures.  Except as provided in the Company financial budget and plans previously made available to Parent, authorize any single capital expenditure, or a series of related expenditures, in excess of $3,000,000;

(vi)    Accounting Policies.  Except as may be required as a result of a change in Law or GAAP (or any interpretation thereof), change any of the accounting practices or principles used by the Company or by any Company Subsidiary;

(vii)    Writing Up or Down Assets.  Except as provided in the Company financial budget and plans previously made available to Parent, write up, write down or write off the book value of any material assets of the Company and the Company Subsidiaries, other than (i) in the ordinary course of business and consistent with past practice or (ii) as may be required by GAAP or the Financial Accounting Standards Board;

(viii)    Legal.  Settle or compromise any pending or threatened Action that (a) is material to the Company and the Company Subsidiaries taken as a whole, (b) requires payment to or by the Company or any Company Subsidiary (exclusive of attorney's fees, including success fees) in excess of $3,000,000, (c) involves restrictions on the business activities of the Company that would be material to the Company and the Company Subsidiaries taken as a whole, or (d) would involve the issuance of Company securities;

(ix)    Extraordinary Transactions.  Adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, or recapitalization of the Company or any of the Company Subsidiaries (other than this Agreement and the Merger);

(x)  Plans.  Except as required by Law (including Section 409A of the Code) or Contracts (including Plans) in existence on the date hereof or as set forth on Section 5.1(b)(x) of the Company Disclosure Schedule, establish, adopt, enter into or amend any collective bargaining, bonus, profit sharing, thrift, restricted stock, pension, retirement, deferred compensation, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement for the benefit of any current or former directors, officers or employees of the Company or any Company Subsidiary, pay any discretionary bonuses to any director, officer or employee of the Company or any Company Subsidiary, except for the exercise of discretionary elements under existing Plans or arrangements, or change in any material respect the manner in which contributions to any such Plan or arrangement are made or the basis on which such contributions are determined;

(xi)  Taxes.  Except in each case as required by Law or Treasury Regulation, make, revoke or change any material Tax election, file any amended Tax Return with respect to any material Tax, settle or compromise any material federal, state, local or foreign Tax liability, surrender any right to claim a material Tax refund, waive any statute of limitations in respect of a material amount of Taxes, agree to an extension of time with respect to an assessment or deficiency for a material amount of Taxes or change any annual Tax accounting period;

(xii)  Representations and Warranties.  Purposefully and knowingly take any action that would result in any representation or warranty of the Company and the Company Subsidiaries becoming untrue in any material respect at the Closing, to the extent such breach would reasonably be expected to cause any condition set forth in Section 7 not to be satisfied at the Closing.

(xiii)  New Line of Business.  Enter into any new line of business other than the development and testing of concepts reasonably related to the current businesses of the Company and the Company Subsidiaries, or discontinue any significant and material line of business.

(xiv)  Other.  (A) Acquire (by merger, consolidation, acquisition of stock or assets, joint venture or otherwise or through a direct or indirect ownership interest or investment) any Person or division thereof, except that the Company can engage in such acquisition having a transaction price less than $3,000,000 without obtaining Parent's prior consent; (B) incur, assume or prepay any indebtedness for borrowed money for any indebtedness in an aggregate amount in excess of $3,000,000, except to refund or refinance commercial paper or in the ordinary course of business (including for purposes of funding working capital in the ordinary course of business) consistent with past practice; (C) incur, assume, guarantee, endorse or otherwise become liable or responsible (whether directly, contingently or otherwise) for any indebtedness for borrowed money of any other Person in an aggregate amount in excess of $3,000,000, except the incurrence of, guarantee with respect to or provision of credit support for, indebtedness of the Company or any of Company Subsidiary for borrowed money under the Company's or Company Subsidiaries' existing credit facilities in the ordinary course of business; (D) make any loans, advances or capital contributions to, or investments in, any other

37

Person, except in the ordinary course of business consistent with past practice; (E) pledge or otherwise encumber shares of capital stock or other voting securities of any of the Company's Subsidiaries, other than Permitted Liens; (F) mortgage or pledge any of its material assets, tangible or intangible, or create any Lien thereupon (other than Permitted Liens or Liens arising under and created by the Contracts without any breach thereof or hereof or default thereunder or hereunder); (G) enter into any Material Contract other than in the ordinary course of business consistent with past practice to the extent such Contract would be material to the Company and the Company Subsidiaries, taken as a whole; (H) voluntarily terminate or modify in any material adverse respect any Material Contract; (I) enter into material supply agreements with suppliers, except in the ordinary course of business consistent with past practice; or (J) enter into any foreign exchange contract or other hedging contract except in the ordinary course of business consistent with past practice;

(xv)    <u>Obligations</u>.  Obligate itself to do any of the foregoing.

(c)    <u>No Control of the Company's Business</u>.  Parent acknowledges and agrees that:  (i) nothing contained in this Agreement shall give Parent, directly or indirectly, the right to control or direct the Company's or the Company Subsidiaries' operations prior to the Effective Time, (ii) prior to the Effective Time, each of the Company and Parent shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations, and (iii) notwithstanding anything to the contrary set forth in this Agreement, no consent of Parent shall be required with respect to any matter set forth in Section 5.1 or elsewhere in this Agreement to the extent the requirement of such consent would be inconsistent with applicable Law.

Section 5.2    <u>No Solicitation</u>.

(a)    The Company has ceased and caused to be terminated all existing solicitations, discussions, contacts and negotiations with any persons with respect to any inquiry, offer or proposal from any person or group other than Parent or any of its affiliates relating to any transaction or proposed transaction or series of related transactions involving: (A) any direct or indirect acquisition or purchase by any person or "group" (as defined under Section 13(d) of the Exchange Act) of a twenty percent (20%) interest or more in either the total outstanding shares of equity or voting securities of the Company or any Company Subsidiary or the total outstanding shares of any class of equity securities of the Company or any Company Subsidiary, or any tender offer or exchange offer that if consummated would result in any person or "group" beneficially owning twenty percent (20%) or more of the total outstanding shares of equity or voting securities of the Company or the total outstanding shares of any class of equity securities of the Company or any Company Subsidiary, (B) any sale or disposition of consolidated assets of the Company (including for this purpose the outstanding assets, rights and equity securities of the Company Subsidiaries) to any person or "group" for consideration equal to fifteen percent (15%) or more of the aggregate fair market value of all of the outstanding shares of Company Common Stock, or (C) any consolidation, merger, business combination, recapitalization, liquidation, dissolution or similar transaction with respect to the Company or any Company Subsidiary (any of the foregoing inquiries, offers or proposals being an "Acquisition Proposal"). Except as provided in Section 5.2(b), (c) or (d), from the date hereof, until the earlier of the

termination of this Agreement or the Effective Time, the Company shall not and shall not authorize or permit its officers, directors, employees, investment bankers, attorneys, accountants, consultants, financial or other advisors or other agents or those of any Company Subsidiary (collectively, "Representatives") to, directly or indirectly, (i) solicit, initiate or knowingly encourage or take any other action to knowingly facilitate the submission of an Acquisition Proposal, (ii) enter into any letter of intent, memorandum of understanding, agreement, option agreement or any agreement or arrangement with respect to any Acquisition Proposal, (iii) enter into, continue, participate, engage or knowingly assist in any manner in contacts, negotiations or discussions with, or provide any non-public information or data to, any person (other than Parent, Merger Sub or any of their respective affiliates or Representatives) relating to any Acquisition Proposal, or grant any waiver, amendment or release under any standstill, or (iv) take any action to, other than as contemplated by this Agreement in connection with the Merger, render the Company Rights issued pursuant to the terms of the Company Rights Agreement inapplicable to an Acquisition Proposal or the transactions contemplated thereby, exempt or exclude any person from the definition of an Acquiring Person (as defined in the Company Rights Agreement) under the terms of the Company Rights Agreement or allow the Company Rights to expire prior to their expiration date or otherwise amend the Company Rights Agreement. For purposes of this Section 5.2 only, "Company Subsidiary" means any Subsidiary of the Company whose business constitutes 25% or more of the net revenues, net income or assets (based on fair market value) of the Company and the Company Subsidiaries taken as a whole.

(b)    Notwithstanding the foregoing, prior to obtaining the Company Shareholder Approval, the Company (i) may (and may authorize and permit its Representatives to), pursuant to a confidentiality agreement, which shall contain provisions no less favorable in any material respect to the Company than the Confidentiality Agreement (except for such changes as are necessary to allow the Company to comply with the terms of this Agreement), furnish information concerning, and provide access to, its business, properties, employees and assets to any Person (and its Representatives acting in such capacity) that has made an Acquisition Proposal, provided that any such information must be provided to Parent prior to or substantially concurrent with the time of its provision to such third party to the extent not previously made available to Parent, and (ii) may participate, engage or assist in any manner in negotiations and discussions with any Person (and its Representatives acting in such capacity) that has made an Acquisition Proposal with respect to such Acquisition Proposal or inquiry if, but only if, in the case of both clause (i) and (ii): (x) such Acquisition Proposal provides for any Person or group to acquire, directly or indirectly, a majority of the issued and outstanding shares of Company Common Stock (or a majority of the voting securities of any surviving corporation in a merger or consolidation with the Company) or provides for the acquisition of all or, substantially all of the consolidated assets of the Company (a "Takeover Proposal"); (y) such Takeover Proposal was not solicited or initiated in violation of Section 5.2(a) by the Company or by any of its Representatives, and the Company Board of Directors (or any committee thereof authorized to act in such capacity) determines in good faith, after consultation with its financial advisor and outside counsel, that such Takeover Proposal is more favorable than the Merger, from a financial point of view, to the Company's shareholders taking into account all of the terms and conditions of such proposal and this Agreement (including any binding written and complete proposal (including all schedules and exhibits) to amend the terms of this Agreement) and for which financing, to the extent required, is, or is reasonably likely to be, committed on

terms and conditions that the Company Board of Directors (or any committee thereof authorized to act in such capacity) determines, after consultation with its financial advisor, are reasonably likely to result in disbursement sufficient for consummation of the transactions contemplated by the Takeover Proposal; and (z) in the good faith opinion of the Company Board of Directors (or any committee thereof authorized to act in such capacity), after consultation with outside legal counsel, providing such information or access or participating, engaging or assisting in such negotiations or discussions is or would be in the best interests of the Company and its shareholders and that the failure to take such action is or would be inconsistent with the Company Board of Directors' fiduciary duties to the Company's shareholders under applicable Law (a Takeover Proposal which satisfies clauses (x), (y) and (z) being referred to herein as a "Superior Proposal"). The Company shall promptly, and in any event within 48 hours after receipt of any bona fide inquiries, proposals or offers received by, any request for information from, or any negotiations sought to be initiated or continued with, either the Company or its Representatives concerning an Acquisition Proposal, notify Parent orally and in writing and disclose the material terms of such inquiry, offer, proposal or request and, in the case of written materials provided to the Company, provide Parent copies or written summaries of such materials as promptly as reasonably practicable. The Company will keep Parent informed on a reasonably prompt basis of the status and any discussions or negotiations (including amendments and proposed amendments) relating to any Takeover Proposal or other bona fide inquiry, offer, proposal or request.

(c)     Except as set forth in this subsection (c), neither the Company Board of Directors nor any committee thereof shall (i) withdraw or modify, or publicly propose to withdraw or modify, in a manner adverse to Parent or Merger Sub, the approval or recommendation of the Company Board of Directors of this Agreement or the Merger or publicly announce that it has resolved to take such action (any such action under this clause (i), a "Change in Recommendation"), (ii) approve, recommend or adopt or publicly propose to approve, recommend or adopt any Acquisition Proposal or (iii) approve, recommend, adopt or allow the Company to enter into any letter of intent, memorandum of understanding, option agreement or similar arrangement with respect to any Acquisition Proposal. Notwithstanding the foregoing, in response to a Takeover Proposal that did not arise from a breach by the Company of Section 5.2(a), prior to the Company Shareholder Approval (x) the Company Board of Directors (or any committee thereof authorized to act in such capacity) shall be permitted to make a Change in Recommendation if it determines in good faith, after consultation with its outside legal counsel, that the failure to take such action would be inconsistent with the Company Board of Directors' fiduciary duties to the Company's shareholders under applicable Law and (y) the Company may enter into a definitive agreement with respect to such Takeover Proposal if the Company Board of Directors (or a committee thereof authorized to act in such capacity) has made the determination in clause (x), has determined in good faith, after consultation with its financial advisor and outside legal counsel, that such Takeover Proposal constitutes a Superior Proposal and, concurrently with entering into such definitive agreement, terminates this Agreement pursuant to Section 8.1(g) and immediately pays the applicable termination fee as a condition to such termination. The Company shall not be entitled to terminate pursuant to Section 8.1(g), effect a Change in Recommendation or enter into an agreement with respect to a Superior Proposal unless and until (A) after the third business day following Parent's receipt of a written notice (a "Notice of Superior Proposal") from the Company advising Parent that the Company intends to take such action and specifying the reasons therefor, including the material terms and

40

conditions of the Superior Proposal that is the basis of such action in such Notice of Superior Proposal and stating that the Company intends to terminate this Agreement pursuant to Section 8.1(g) or effect a Change in Recommendation, as applicable (it being understood and agreed that (1) in determining whether to cause or permit the Company to so terminate this Agreement, the Company Board of Directors (or a committee thereof authorized to act in such capacity) shall take into account any changes to the financial terms of this Agreement proposed by Parent to the Company in any binding written and complete proposal (including all schedules and exhibits and any necessary amendments to the terms of this Agreement) in response to a Notice of Superior Proposal or otherwise, and (2) any material amendment to the financial terms of such Superior Proposal shall require a new Notice of Superior Proposal and a new three business day period), (B) the Company has complied in all material respects with this Section 5.2 and (C) in the case of a termination pursuant to Section 8.1(g) or entrance into an agreement for a Superior Proposal, the Company has paid, or caused to be paid to, Parent all amounts due Parent pursuant to Section 8.2 of this Agreement as a result of a termination pursuant to Section 8.1(g).

(d)     Nothing contained in this Section 5.2 or any other provision of this Agreement shall prohibit the Company or the Company Board of Directors (or any committee thereof authorized to act in such capacity) from making a Change in Recommendation, or from taking and disclosing to the Company's shareholders a position with respect to any tender or exchange offer by a third party pursuant to Rules 14d-9 and 14e-2(a) promulgated under the Exchange Act or from making any similar disclosure to the Company's shareholders with respect to any Takeover Proposal, if in any such case the Company's Board of Directors (or any committee thereof authorized to act in such capacity) determines in good faith (after consultation with its outside legal counsel) that it is required to do so under applicable Law, provided that any such disclosure (other than a recommendation of rejection of such tender or exchange offer or other Takeover Proposal or a "stop, look and listen" letter or similar communication of the type contemplated by Rule 14d-9(f) under the Exchange Act) shall be deemed to be a Change in Recommendation if it satisfies the definition thereof under Section 5.2(c)(i), unless the Company Board of Directors expressly reaffirms its recommendation of the Merger at least two business days prior to the Company Shareholders Meeting.

Section 5.3    Employee Matters.

(a)     Except as provided in Section 5.3(a) of the Company Disclosure Schedule, from the Effective Time to the date that is twelve (12) months after the Effective Time (the "Benefits Continuation Period"), the Surviving Corporation shall pay or cause to be paid to each employee who continues as an employee of the Company, the Company Subsidiaries or the Surviving Corporation during the Benefits Continuation Period (the "Continuing Employees") salary, wages, cash incentive opportunities, severance, medical benefits and other welfare benefit plans programs and arrangements which are at least comparable in the aggregate to those provided prior to the Closing Date under the Plans or otherwise (including the bonus programs previously approved for fiscal 2008), excluding any equity-based plans; provided, that with respect to Continuing Employees who are subject to employment and/or change in control agreements or arrangements that have not been superseded by agreements with Parent (the "Employment Agreements"), the Surviving Corporation shall expressly assume such Employment Agreements and fulfill all obligations thereunder; provided, further, that, except for those Continuing Employees that are party to the Employment Agreements, neither this Section

41

5.3(a) nor any other provision of this Agreement shall be deemed a guarantee of employment for such Continuing Employees with the Company or any Company Subsidiary. The Surviving Corporation shall expressly assume the Company's Deferred Income Plan dated as of July 1, 2000, as amended, and fulfill all obligations thereunder. During the Benefits Continuation Period, the Surviving Corporation shall pay, subject to such terms and conditions as it shall establish and the terms of applicable Employment Agreements, any such Continuing Employee whose employment is involuntarily terminated by Parent, the Surviving Corporation or any of their Subsidiaries without cause an amount of severance pay in cash equal to the amount of cash severance pay that would have been payable to such Continuing Employee under the terms of the severance policy maintained by the Company and applicable to such Continuing Employee immediately prior to the date of this Agreement or, if applicable, such Continuing Employee's Employment Agreement.

(b)     The Surviving Corporation shall (i) waive any applicable pre-existing condition exclusions and waiting periods with respect to participation and coverage requirements in any replacement or successor welfare benefit plan of the Surviving Corporation that a Continuing Employee is eligible to participate in following the Effective Time to the extent such exclusions or waiting periods were inapplicable to, or had been satisfied by, such Continuing Employee immediately prior to the Effective Time under the relevant Plan in which such Continuing Employee participated, (ii) provide each such Continuing Employee with credit for any co-payments and deductible paid prior to the Effective Time (to the same extent such credit was given under the analogous Plan prior to the Effective Time) in satisfying any applicable deductible or out-of-pocket requirements and (iii) to the extent that any Continuing Employee is allowed to participate in any employee benefit plan of Parent, the Surviving Corporation or any of their subsidiaries following the Effective Time, cause such plan to recognize the service of such Continuing Employee with the Company and the Company Subsidiaries prior to the Effective Time for purposes of eligibility to participate, vesting and benefit accrual (but not for benefit accrual under any defined benefit, retiree welfare or similar plan) to the extent of such service. Parent will make arrangements with its insurance carriers prior to Closing to ensure the results specified in this Section 5.3(b).

(c)     Parent and Company acknowledge and agree that the provisions contained in this Section 5.3 shall not interfere with the right of Parent or the Surviving Corporation to amend, modify or terminate any Plan (subject to the provisions of Section 5.3(a) and (b) above) or to terminate the employment of any Continuing Employee for any reason, subject to the terms of applicable Employment Agreements.

(d)     Prior to the Effective Time, the Company shall take all such steps as may be reasonably necessary (to the extent permitted under applicable Law) to cause any dispositions of the Company Common Stock (including derivative securities with respect to the Company Common Stock) resulting from the Merger or the other transactions contemplated by Section 2 of this Agreement by each individual who is subject to the reporting requirements of Section 16(a) of the Exchange Act with respect to the Company to be exempt under Rule 16b-3 promulgated under the Exchange Act.

(e)     Nothing in this Section 5.3 shall give any Company Employee any right under this Agreement.

42

Section 5.4    Employee Preferred Stock Tender Offer.

(a)    The Company agrees to provide all reasonable cooperation reasonably requested by Parent, at Parent's sole expense, in connection with a tender offer and consent solicitation (the "Employee Preferred Stock Tender Offer") conducted by Parent in respect of the outstanding shares of the Company's Employees' Subordinated Convertible Preferred Stock (the "Employee Preferred Stock"). If this Agreement is terminated prior to the Effective Time, Parent shall (or shall cause Merger Sub to), promptly upon request by the Company, reimburse the Company for all reasonable out-of-pocket costs incurred by the Company or the Company Subsidiaries in connection with such cooperation. If this Agreement is terminated prior to the Effective Time, Parent and Merger Sub shall, on a joint and several basis, indemnify and hold harmless the Company, the Company Subsidiaries and their respective Representatives for and against any and all losses suffered or incurred by them in connection with the Employee Preferred Stock Tender Offer.

(b)    The Employee Preferred Stock Tender Offer shall provide for a per share offer at an amount of cash equal to the Per Share Price and shall provide, as conditions, (i) the prior or simultaneous consummation of the Merger and (ii) that the holders of Employee Preferred Stock grant their proxies to vote in favor of approval of (A) this Agreement, (B) the transactions contemplated hereby including the Merger, (C) an amendment to the Company's charter to allow for the redemption of the Employee Preferred Stock following the consummation of the Merger at an amount of cash equal to the Per Share Price, and (D) any other matters included by the Company in the Proxy Statement for the Company Shareholders Meeting, (the "Employee Preferred Stock Consents"). The Employee Preferred Stock Tender Offer shall be made pursuant to an Offer to Purchase and Consent Solicitation Statement and related letters of transmittal and similar ancillary agreements prepared by Parent in connection with the Employee Preferred Stock Tender Offer in form and substance reasonably satisfactory to the Company and in compliance as to form in all material respects with applicable SEC requirements and in accordance with all requirements under the Tennessee Investor Protection Act as applicable. The Company and its counsel shall be given a reasonable opportunity to review and comment on any materials that are to be provided holders of Employee Preferred Stock in connection with the Employee Preferred Stock Tender Offer, and Parent shall give due consideration to all reasonable additions, deletions or changes suggested thereto by the Company and its counsel. Parent will not waive the conditions regarding the prior or simultaneous consummation of the Merger or the Employee Preferred Stock Consents to the Employee Preferred Stock Tender Offer without the prior written consent of the Company.

(c)    If at any time prior to the acceptance of Employee Preferred Stock pursuant to the Employee Preferred Stock Tender Offer any event should occur that is required by applicable Law to be set forth in an amendment of, or a supplement to, the Employee Preferred Stock Tender Offer Documents, Parent will prepare and disseminate such amendment or supplement; provided, however, that prior to such dissemination, Parent shall consult with Parent with respect to such amendment or supplement and shall afford the Company and its counsel reasonable opportunity to comment thereon. Parent will notify the Company at least 48 hours prior to the dissemination of the Employee Preferred Stock Tender Offer documents, or 24 hours prior to the mailing of any amendment or supplement thereto, to the Employee Preferred Stockholders.

43

(d)     For avoidance of doubt, neither the making nor consummation of the Employee Preferred Stock Tender Offer, nor the approval of the Company shareholders of the amendment to the Company's charter referred to in Section 5.4(b)(C), shall be a condition to Closing for the Company, Parent or Merger Sub.

### Section 6.     Additional Agreements.

Section 6.1     Proxy Statement. The Company shall, as soon as practicable following the date hereof, prepare and file with the SEC the Proxy Statement in preliminary form, and each of the Company, Parent and Merger Sub shall use their reasonable efforts to respond as promptly as practicable to any comments of the SEC or its staff with respect thereto. The Company shall notify Parent promptly of the receipt of any comments from the SEC or its staff and of any request by the SEC or its staff for amendments or supplements to the Proxy Statement or for additional information and shall supply Parent with copies of all correspondence between the Company or any of its Representatives, on the one hand, and the SEC or its staff, on the other hand, with respect to the Proxy Statement. The Company shall use its reasonable best efforts to cause the Proxy Statement to be mailed to the Company's shareholders as promptly as practicable after filing with the SEC. If at any time prior to receipt of the Company Shareholder Approval there shall occur any event that should, upon the advice of the Company's outside legal counsel, be set forth in an amendment or supplement to the Proxy Statement so that the Proxy Statement shall not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading, the Company shall promptly prepare, file with the SEC and mail to its shareholders such an amendment or supplement. Notwithstanding anything to the contrary stated above, prior to filing or mailing the Proxy Statement or any other SEC filing required in connection with the transactions contemplated hereby (or, in each case, any amendment or supplement thereto) or responding to any comments of the SEC with respect thereto, the party responsible for filing or mailing such document shall provide the other party an opportunity to review and comment on such document or response and shall include in such document or response comments reasonably proposed by the other party. At the request of Parent, the Company shall include in the Proxy Statement a proposal to amend the Company's charter to allow for the redemption of the Employee Preferred Stock following the consummation of the Merger at an amount of cash equal to the Per Share Price.

Section 6.2     Company Shareholders Meeting. The Company shall, as soon as practicable following the date hereof, duly call, give notice of, convene and hold a meeting of its shareholders (the "Company Shareholders Meeting") for the purpose of seeking the Company Shareholder Approval. Subject to Section 5.2(c), the Company's Board of Directors (or any committee thereof authorized to act in such capacity) shall recommend adoption and approval of this Agreement and the Merger by the shareholders of the Company and include such recommendation in the Proxy Statement. Unless such recommendation shall have been modified or withdrawn in accordance with Section 5.2(c), the Company shall take all action that is both reasonable and lawful to solicit from its shareholders proxies in favor of the proposal to adopt and approve this Agreement and the Merger and shall take all other reasonable actions necessary or advisable to secure the vote or consent of the shareholders of the Company that are required by the NYSE or CHX rules or the TBCA. Notwithstanding anything to the contrary in the preceding sentence and for avoidance of doubt, at any time prior to the Company Stockholder

44

Approval, the Company may adjourn, postpone or cancel the Company Stockholders Meeting following a Change in Recommendation or in response to an Acquisition Proposal if the Company Board of Directors (or any committee thereof authorized to act in such capacity) determines in good faith after consultation with its outside legal counsel that there is a reasonable likelihood that such Acquisition Proposal could lead to a Superior Proposal and that failure to take such action would be inconsistent with its fiduciary duties under applicable Law or, in any event, if this Agreement is terminated before that meeting is held.

Section 6.3    Access to Information. Confidentiality. Prior to the Effective Time, except as otherwise prohibited by applicable Law or the terms of any Contract to which the Company or any Company Subsidiary is a party, as would materially interfere with the conduct of the business of the Company or any Company Subsidiary, or as would be reasonably expected to violate the attorney-client privilege of the Company or a Company Subsidiary (it being agreed that the parties shall use their reasonable efforts to cause such information to be provided in a manner that does not cause such violation), the Company shall, and shall cause the Company Subsidiaries to, afford to Parent, Merger Sub and their directors, employees, representatives, financial advisors, consultants, lenders, legal counsel, accountants and other advisors and representatives, to have such access to the books and records, financial, operating and other data, assets, properties, facilities, plants, offices, auditors, authorized representatives, business and operations of the Company and the Company Subsidiaries as is reasonably necessary or appropriate in connection with Parent's investigation of the Company and the Company Subsidiaries with respect to the transactions contemplated hereby. Any such investigation and examination shall be conducted at reasonable times upon reasonable advance notice and under reasonable circumstances so as to minimize disruption to or impairment of the Company's business. In order that Parent may have a full opportunity to make such investigation and, provided such persons are bound by the confidentiality agreement, dated as of May 7, 2007 between Parent and the Company (the "Confidentiality Agreement"), or have otherwise agreed to be bound to the provisions of such agreement applicable to representatives, the Company shall furnish the representatives of Parent during such period with all such information and copies of such documents concerning the affairs of the Company as such representatives may reasonably request. The information and documents so provided shall be subject to the terms of the Confidentiality Agreement.

Section 6.4    Regulatory Filings; Reasonable Efforts.

(a)    As promptly as practicable after the date hereof, each of Parent, Merger Sub and the Company shall use reasonable best efforts to make and shall cause their affiliates to use reasonable best efforts to make all filings, notices, petitions, statements, registrations, submissions of information, application or submission of other documents required by any Governmental Entity or any foreign labor organization or works council in connection with the Merger, including: (i) the filings identified on Section 3.17 of the Company Disclosure Schedule that are required to be made with a Governmental Entity, (ii) pre-merger notification reports to be filed with the United States Federal Trade Commission (the "FTC") and the Antitrust Division of the United States Department of Justice ("DOJ") as required by the HSR Act, (iii) filings required by the merger notification or control Laws, and any other applicable antitrust or fair trade Law, of any applicable foreign jurisdiction or filings required by any foreign labor organization or works council, (iv) any filings required under the Securities Act, the Exchange

45

Act, any applicable state securities or "blue sky" laws and the securities laws of any foreign country, or (v) any other applicable Laws or rules and regulations of any Governmental Entity relating to, and material to the consummation of, the Merger.

(b)    Subject to restrictions required by Law, each of Parent, Merger Sub, and the Company shall promptly supply, and shall cause their affiliates or owners promptly to supply, the others with any information which may be reasonably required in order to make any filings or applications pursuant to Section 6.4(a).

(c)    Subject to applicable confidentiality restrictions or restrictions required by Law, each of Parent, Merger Sub and the Company will notify the others promptly upon the receipt of: (i) any comments or questions from any officials of any Governmental Entity in connection with any filings made pursuant hereto or the Merger itself and (ii) any request by any officials of any Governmental Entity for amendments or supplements to any filings made pursuant to any applicable Laws and rules and regulations of any Governmental Entity or answers to any questions, or the production of any documents, relating to an investigation of the Merger by any Governmental Entity. Whenever any event occurs that is required to be set forth in an amendment or supplement to any filing made pursuant to Section 6.4(a), Parent, Merger Sub or the Company, as the case may be, will promptly inform the others of such occurrence and cooperate in filing with the applicable Governmental Entity such amendment or supplement. Without limiting the generality of the foregoing, each party shall provide to the other parties (or their respective advisors) copies of all correspondence between such party and any Governmental Entity relating to the Merger. The parties may, as they deem advisable and necessary, designate any competitively sensitive materials provided to the other under this Section as "outside counsel only." Such materials and the information contained therein shall be given only to outside counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient without the advance written consent of the party providing such materials. In addition, to the extent reasonably practicable, all discussions, telephone calls, and meetings with a Governmental Entity regarding the Merger shall include representatives of Parent, Merger Sub, and the Company. Subject to applicable Law, the parties will consult and cooperate with each other in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, and proposals made or submitted to any Governmental Entity regarding the Merger by or on behalf of any party.

(d)    Upon the terms and subject to the conditions set forth in this Agreement, each of the Company, on the one hand, and Parent and Merger Sub, on the other hand, agrees to use its reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective the Merger, including using its reasonable efforts to accomplish the following: (i) the causing of all of the conditions set forth in Section 7 to the other parties' obligations to consummate the Merger to be satisfied and to consummate and make effective the Merger and the other transactions contemplated hereby, (ii) the obtaining of all necessary actions or non-actions, expirations of all necessary waiting periods, waivers, consents, clearances, approvals, orders and authorizations from Governmental Entities required by it and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Entities, if any) required by it, (iii) the obtaining of all necessary consents, approvals or waivers from third parties (provided, however, in no event

46

shall obtaining any such consent, approval, or waivers be required as a condition to Closing hereunder), (iv) the defending of any suits, claims, actions, investigations or proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the Merger to which it is a party, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Entity vacated or reversed, and (v) the execution or delivery of any additional instruments necessary to consummate the Merger, and to carry out fully the purposes of, this Agreement. In case at any time after the Effective Time any further action is necessary or desirable to carry out the purposes of this Agreement, the proper officers and directors of the Surviving Corporation and Parent shall use all reasonable efforts to take, or cause to be taken, all such necessary actions. Without limiting the foregoing, the parties shall request and shall use reasonable efforts to obtain early termination of the waiting period provided for in the HSR Act. Notwithstanding anything herein to the contrary, Parent agrees to take, and to cause its affiliates and owners to take, whatever action may be necessary to resolve as promptly as possible any objections relating to the consummation of the Merger as may be asserted under the HSR Act or any other applicable merger control, antitrust, competition or fair trade Laws with respect to the Merger.

(e)    If the Company Shareholders Meeting is held, Parent shall vote (or consent with respect to) or cause to be voted (or a consent to be given with respect to) any shares of Company Common Stock or Company Preferred Stock and any shares of common stock of Merger Sub beneficially owned by it or any of its Subsidiaries or with respect to which it or any of its Subsidiaries has the power (by agreement, proxy or otherwise) to cause to be voted (or to provide a consent), in favor of the adoption and approval of this Agreement at any meeting of stockholders of the Company or Merger Sub, respectively, at which this Agreement shall be submitted for adoption and approval and at all adjournments or postponements thereof (or, if applicable, by any action of shareholders of either the Company or Merger Sub by consent in lieu of a meeting). If the Company Shareholders Meeting is held, Parent shall vote (or consent with respect to) or cause to be voted (or a consent to be given with respect to) any shares of Company Preferred Stock to which it obtained a proxy in connection with the Employee Preferred Tender Offer in favor of the adoption and approval of this Agreement at any meeting of stockholders of the Company or Merger Sub, respectively, at which this Agreement shall be submitted for adoption and approval and at all adjournments or postponements thereof (or, if applicable, by any action of shareholders of either the Company or Merger Sub by consent in lieu of a meeting).

Section 6.5    Directors and Officers Indemnification and Insurance.

(a)    The charter and/or bylaws of the Surviving Corporation shall contain provisions with respect to indemnification not less favorable than those set forth in the charter and bylaws of the Company as of the date hereof, which provisions shall not be amended, repealed or otherwise modified for a period of six years from the Effective Time in any manner that would adversely affect the rights thereunder of individuals who at, or prior to, the Effective Time were directors or officers of the Company.

(b)    For a period of six years after the Effective Time, the Company, to the fullest extent permitted and not otherwise prohibited under applicable Law or under the Company's charter, bylaws or any applicable indemnification agreements, and regardless of

whether the Merger becomes effective, shall indemnify, defend and hold harmless, and, after the Effective Time, the Surviving Corporation shall and Parent shall cause the Surviving Corporation, to the extent indemnified as of the date of this Agreement by the Company pursuant to the Company's charter, bylaws and/or indemnification agreements in effect on the date hereof or under applicable Law, to indemnify, defend and hold harmless, each present and former director or officer of the Company or any of the Company Subsidiaries (collectively, the "Indemnified Parties") against any costs or expenses (including attorneys' fees), judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any Action, whether civil, criminal, administrative or investigative, arising out of or pertaining to (x) the fact that the Indemnified Party is or was an officer, director, employee, agent or other fiduciary of the Company or any Company Subsidiary prior to the Effective Time or (y) this Agreement or with respect to the transactions contemplated by this Agreement, whether in any case asserted or arising before or after the Effective Time. Without limiting the generality of the foregoing, if any Indemnified Party becomes involved in any actual or threatened Action with respect to which such Indemnified Party is entitled to indemnification pursuant to this Section 6.5 after the Effective Time, the Surviving Corporation shall and Parent shall cause the Surviving Corporation to, to the fullest extent permitted as of the date of this Agreement by the Company pursuant to the Company's charter, bylaws and/or indemnification agreements in effect on the date hereof or under applicable Law, advance to such Indemnified Party within twenty (20) days after receipt by the Surviving Corporation of a written request for such advance, his or her legal expenses (including the cost of any investigation and preparation incurred in connection therewith); provided that any person to whom expenses are advanced provides an undertaking, to the extent then required by the TBCA, to repay such advances if it is finally judicially determined that such person is not entitled to indemnification. Any determination required to be made, for purpose of this Section 6.5 in advance of final judicial determination, with respect to whether an Indemnified Party's conduct complied with the standards set forth under Tennessee Law, the Company's charter, bylaws or indemnification agreements, as the case may be, shall be made by independent counsel mutually acceptable to Parent and the Indemnified Party.

(c)     Parent shall and shall cause the Surviving Corporation to honor and fulfill in all respects the obligations of the Company pursuant to indemnification agreements with the Company's directors, officers, employees or agents existing at or prior to the Effective Time to the fullest extent permitted by applicable Law or, subject to Section 6.5(a), under the relevant charter or bylaws. Neither Parent nor the Surviving Corporation shall settle, compromise or consent to the entry of any judgment in any threatened or actual claim for which indemnification could be sought by an Indemnified Party hereunder, unless such settlement, compromise or consent includes an unconditional release of such Indemnified Party from all liability arising out of such claim or such Indemnified Party otherwise consents in writing to such settlement, compromise or consent. The Surviving Corporation shall cooperate with an Indemnified Party in the defense of any matter for which such Indemnified Party could seek indemnification hereunder.

(d)     At or prior to the Effective Time, the Surviving Corporation shall obtain a "tail" insurance policy from an insurance carrier with the same or better credit rating as the Company's current insurance carrier with respect to directors' and officers' liability insurance that provides coverage for the six years following the Effective Time at least comparable in amount and scope to the coverage provided under the Company's directors and officers

48

insurance policy in effect as of the Effective Time for the individuals who are or were directors and officers of the Company for claims arising from facts or events occurring prior to the Effective Time, provided, however, that in no event shall the Surviving Corporation be required to expend in excess of 200% of the annual premium currently paid by the Company for such coverage. If the Surviving Corporation is unable to obtain the "tail" insurance described in the first sentence of this Section 6.5(d) for an amount equal to or less than the maximum premium specified in the preceding sentence, the Surviving Corporation shall obtain as much comparable "tail" insurance as possible for an amount equal to such maximum premium.

(e)    Nothing in this Agreement is intended to, shall be construed to or shall release, waive or impair any rights to directors' and officers' insurance claims under any policy that is or has been in existence with respect to the Company, the Company Subsidiaries or any of their respective officers or directors, it being understood and agreed that the indemnification provided for in this Section 6.5 is not prior to or in substitution for any such claims under such policies.

(f)    This Section shall survive the consummation of the Merger at the Effective Time, is intended to benefit the Company, the Surviving Corporation and the Indemnified Parties, shall be binding on all successors and assigns of Parent and the Surviving Corporation and shall be enforceable by the Indemnified Parties. In the event Parent or the Surviving Corporation or any of their respective successors or assigns (i) consolidates with or merges into any other person and shall not be the continuing or surviving corporation or entity of such consolidation or merger, or (ii) transfers all or substantially all of its properties and assets to any person, then, and in each such case, proper provision shall be made so that the successors and assigns of Parent or the Surviving Corporation, as the case may be, shall expressly assume and succeed to the obligations set forth in this Section 6.5.

Section 6.6    Director Resignations.    The Company shall obtain and deliver to Parent at the Closing evidence reasonably satisfactory to Parent of the resignation, effective as of the Effective Time, of those directors of the Company or any Company Subsidiary designated by Parent to the Company in writing at least ten (10) business days prior to the Closing.

Section 6.7    Conduct of Business of Parent and Merger Sub Pending the Merger.    Each of Parent and Merger Sub agrees that, between the date of this Agreement and the Effective Time, it will not, directly or indirectly, take any action (a) to cause its representations and warranties set forth in Section 4 to be untrue in any material respect or as would constitute a Parent Material Adverse Effect; or (b) that would, or would reasonably be expected, individually or in the aggregate, (i) to prevent, materially delay or impede the ability of Parent or Merger Sub to borrow under the Commitment Letter in connection with the consummation of the Merger or the other transactions contemplated by this Agreement, (ii) to prevent, materially delay or impede the ability of Parent or Merger Sub to consummate the Merger or the other transactions contemplated by this Agreement or (iii) to constitute a Parent Material Adverse Effect. Merger Sub agrees that, between the date of this Agreement and the Effective Time, it shall not engage in any business activities and will incur no liabilities or obligations other than as expressly contemplated by this Agreement.

49

Section 6.8    Financing.

(a)    Parent shall use reasonable best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper or advisable to arrange the Financing on the terms and conditions described in the Commitment Letter, including using reasonable best efforts to: (i) maintain in effect the Commitment Letter, (ii) satisfy, on a timely basis, all conditions applicable to Parent and Merger Sub to obtaining the Financing set forth therein (including the payment of any commitment, engagement or placement fees required as a condition to the Financing), (iii) enter into definitive agreements with respect thereto on the terms and conditions contemplated by the Commitment Letter (including the flex provisions related to the Financing) or on other terms reasonably acceptable to Parent (to the extent the other terms would not adversely affect the ability of Parent or Merger Sub to timely consummate the transactions contemplated hereby), and (iv) consummate the Financing at or prior to Closing. In the event any portion of the Financing becomes unavailable on the terms and conditions contemplated in the Commitment Letter, Parent shall use its reasonable best efforts to arrange to obtain alternative financing from alternative sources in an amount sufficient to consummate the transactions contemplated by this Agreement on terms and conditions not materially less favorable to Parent in the aggregate (as determined in the good faith reasonable judgment of Parent) than the Financing as promptly as practicable following the occurrence of such event but in all cases at or prior to Closing. Parent shall give the Company prompt notice of any material breach by any party to the Commitment Letter of which Parent or Merger Sub becomes aware or any termination of the Commitment Letter. Parent shall keep the Company informed on a reasonably current basis in reasonable detail of the status of its efforts to arrange the Financing.

(b)    The Company agrees to provide all reasonable cooperation in connection with the arrangement of the Financing as is customary and may be reasonably requested by Parent (provided that such requested cooperation does not unreasonably interfere with the ongoing operations of the Company and the Company Subsidiaries), including (i) participation in meetings and marketing presentations at times reasonably acceptable to the Company, (ii) furnishing customary information (including financial statements) reasonably required to be included in the preparation of offering memoranda, private placement memoranda, prospectuses and similar documents in connection with financings similar in scope and nature to the Financing contemplated by the Commitment Letter (provided such memoranda or documents need not be issued by the Company or any Company Subsidiaries), (iii) cooperation in the preparation of any pledge and security documents, other definitive financing documents, including customary comfort letters of accountants and legal opinions as may be reasonably requested by Parent, and (iv) execution of a customary representation letter in respect of information provided by the Company or the Company Subsidiaries in writing expressly for use in connection with the Financing or the syndication thereof, for the benefit of the arrangers of the Financing and lenders and proposed lenders to Parent and Merger Sub in the Financing; provided that Parent and Merger Sub may not and hereby disclaim any reliance by either of them upon such a representation letter; provided further that none of the Company or any Company Subsidiary shall be required to pay any commitment or other similar fee or incur any other liability (other than in respect of such representation letter) in connection with the Financing prior to the Effective Time except for any liabilities that are conditioned on the Effective Time having occurred. If this Agreement is terminated prior to the Effective Time, Parent shall, promptly upon request by the Company, reimburse the Company for all reasonable out-of-pocket costs

incurred by the Company or the Company Subsidiaries in connection with such cooperation. The Company and its counsel shall be given a reasonable opportunity to review and comment on any materials that are to be presented during any road shows conducted in connection with the Financing to the extent such materials include or are derived from information provided by the Company or the Company Subsidiaries for use in connection with the Financing or the syndication thereof, and Parent shall give due consideration to all reasonable additions, deletions or changes suggested thereto by the Company and its counsel. If this Agreement is terminated prior to the Effective Time, Parent and Merger Sub shall, on a joint and several basis, indemnify and hold harmless the Company, the Company Subsidiaries and their respective Representatives for and against any and all losses suffered or incurred by them in connection with the arrangement of the Financing or any alternative financing and any information utilized in connection therewith (other than information provided by the Company or the Company Subsidiaries expressly for use in connection therewith). The Company hereby consents to the reasonable use of its and the Company Subsidiaries' logos in connection with the Financing, provided that such logos are used solely in a manner that is not intended to nor reasonably likely to harm or disparage the Company or any of the Company Subsidiaries or the reputation or goodwill of the Company or any of the Company Subsidiaries and its or their marks.

Section 6.9    Public Disclosure. The initial press release concerning the Merger shall be a joint press release and, thereafter, so long as this Agreement is in effect, neither Parent, Merger Sub nor the Company will disseminate any press release or other public announcement concerning the Merger or this Agreement or the other transactions contemplated by this Agreement to any third party, except as may be required by Law or by any listing agreement with the Nasdaq National Market, NYSE or CHX, without the prior consent of each of the other parties hereto, which consent shall not be unreasonably withheld; provided, however, that Parent's consent will not be required, and the Company need not consult with Parent, in connection with any press release or public statement to be issued or made with respect to any Acquisition Proposal or with respect to any Change in Recommendation. Notwithstanding the foregoing, without prior consent of the other parties, the Company and Parent (a) may communicate with customers, vendors, suppliers, financial analysts, investors and media representatives in the ordinary course of business in a manner consistent with its past practice and in compliance with applicable Law and (b) may disseminate the information included in a press release or other document previously approved for external distribution by the other parties hereto.

Section 6.10    Notification of Certain Matters. Each party shall give prompt notice to the other parties of (i) the occurrence or non-occurrence of any event the occurrence or non-occurrence of which would reasonably be expected to cause any representation or warranty made by such party in this Agreement to be untrue or inaccurate in any material respect at the Closing, or would reasonably be expected to cause any condition set forth in Section 7 not to be satisfied in any material respect at the Closing, and (ii) any material failure of such party or any of its representatives to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder; provided however that no such notification shall affect the representations, warranties, covenants or agreements of the parties (or the remedies with respect thereto) or the conditions to the obligations of the parties under this Agreement.

51

Section 6.11    Non-USRPHC Certificate.  On or prior to the Closing, the Company will provide Parent a statement pursuant to Treasury Regulations Sections 1.897-2(h)(1) and 1.1445.2(c)(3) certifying that as of the Closing Date an interest in the Company does not constitute a U.S. real property interest (as that term is defined in Section 897(c) of the Code).

Section 7.    Conditions Precedent to the Obligation of the Parties to Consummate the Merger

Section 7.1    Conditions to Obligations of Each Party to Effect the Merger.  The respective obligations of each party to this Agreement to effect the Merger shall be subject to the satisfaction or written waiver at or prior to the Closing Date of the following conditions:

(a)    Shareholder Approval.  The Company Shareholder Approval shall have been obtained.

(b)    Statutes; Court Orders.  No statute, rule, executive order or regulation shall have been enacted, issued, entered or promulgated by any Governmental Entity which prohibits the consummation of the Merger, and there shall be no order or preliminary or permanent injunction of a court of competent jurisdiction, including any temporary restraining order, in effect preventing or prohibiting consummation of the Merger.

(c)    Regulatory Approvals.  The waiting period (and any extension thereof) applicable to the Merger under the HSR Act and applicable foreign competition or merger control Laws shall have been terminated or shall have expired, and approvals under all foreign competition or merger control Laws set forth in Section 7.1(c) of the Company Disclosure Schedule shall have been obtained or expired, as the case may be.

Section 7.2    Additional Conditions to the Obligations of Parent and Merger Sub.  The obligations of Parent and Merger Sub to consummate and effect the Merger shall be subject to the additional conditions, which may be waived in writing in whole or in part by Parent or Merger Sub to the extent permitted by applicable Law, that:

(a)    Representations, Warranties and Covenants.  The representations and warranties of the Company contained in this Agreement (other than the representations and warranties set forth in Sections 3.2 and 3.3), disregarding all qualifications and exceptions contained therein relating to materiality or Company Material Adverse Effect, shall be true and correct as of the Closing Date as if made on and as of the Closing Date (or, if given as of a specific date, at and as of such date), except where the failure or failures of any such representations and warranties to be so true and correct have not had, individually or in the aggregate, a Company Material Adverse Effect.  The representations and warranties of the Company contained in Sections 3.2 and 3.3 shall be true and correct in all material respects as of the Closing Date as if made on and as of the Closing Date (or, if given as of a specific date, at and as of such date).  The Company shall have performed and complied in all material respects with all material covenants and agreements required by this Agreement to be performed or complied with by it on or prior to the Closing Date.  The Company shall have delivered to Parent a certificate from an officer of the Company, dated the Closing Date, to the foregoing effect.

(b)     _Material Adverse Effect._  Since the date of this Agreement, there shall not have occurred a Company Material Adverse Effect with respect to the Company and the Company Subsidiaries, considered as a whole, that has not been cured prior to the Termination Date.

Section 7.3     _Additional Conditions to the Obligations of the Company._  The obligations of the Company to consummate and effect the Merger shall be subject to the additional conditions, which may be waived in writing in whole or in part by the Company to the extent permitted by applicable Law, that: (i) the representations and warranties of Parent and Merger Sub contained in this Agreement, disregarding all qualifications and exceptions contained therein relating to materiality or Parent Material Adverse Effect, shall be true and correct as of the Closing Date as if made on and as of the Closing Date (or, if given as of a specific date, at and as of such date), except where the failure or failures of any such representations and warranties to be so true and correct would not reasonably be expected to prevent or materially impede the timely consummation of the Merger; (ii) Parent and Merger Sub shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by it on or prior to the Closing Date; and (iii) Parent and Merger Sub shall each have delivered to the Company a certificate from an officer of the Company, dated the Closing Date, to the foregoing effect.

Section 8.     **Termination; Amendment and Waiver.**

Section 8.1     _Termination._  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time before the Effective Time, whether before or after the Company Shareholder Approval:

(a)     By mutual written consent of Parent and the Company authorized by the Parent's Board of Directors and the Company Board of Directors;

(b)     By either Parent or the Company, if the Merger has not been consummated by December 31, 2007 (the "Termination Date"); provided, however, that the right to terminate this Agreement pursuant to this Section 8.1(b) shall not be available to any party whose action or failure to fulfill any obligation under this Agreement or failure to act in good faith has been the principal cause of, or resulted in, the failure of the Merger to be consummated by such date;

(c)     By either Parent or the Company, if a court of competent jurisdiction or other Governmental Entity shall have issued a final, non-appealable order, decree or ruling or taken any other action, or there shall exist any statute, rule or regulation, in each case preventing or otherwise prohibiting (collectively, "Restraints") the consummation of the Merger or that otherwise has the effect of making the Merger illegal; provided, however, that the party seeking to terminate this Agreement pursuant to this Section 8.1(c) shall have used all reasonable efforts to prevent the entry of and to remove such Restraints to the extent within their control or influence;

(d)     By Parent (if neither it nor Merger Sub is in material breach of it representations, warranties, covenants and obligations under this Agreement so as to cause any

of the conditions set forth in Section 7.1 or 7.3 not to be satisfied) if there has been a breach of, or inaccuracy in, any representation, warranty, covenant or agreement of the Company set forth in this Agreement, which breach or inaccuracy would cause any condition set forth in Section 7.1 or 7.2 not to be satisfied (and such breach or inaccuracy has not been cured or such condition has not been satisfied within twenty (20) business days after the receipt of written notice thereof or such breach or inaccuracy is not reasonably capable of being cured or such condition is not reasonably capable of being satisfied prior to the Termination Date);

(e)    By the Company (i) (if it is not in material breach of its representations, warranties, covenants and obligations under this Agreement so as to cause any of the conditions set forth in Section 7.1 or 7.2 not to be satisfied) if there has been a breach of, or inaccuracy in, any representation, warranty, covenant or agreement of Parent or Merger Sub set forth in this Agreement, which breach or inaccuracy would cause any condition set forth in Section 7.1 or 7.3 not to be satisfied (and such breach or inaccuracy has not been cured or such condition has not been satisfied within twenty (20) business days after the receipt of written notice thereof or such breach or inaccuracy is not reasonably capable of being cured or such condition is not reasonably capable of being satisfied prior to the Termination Date);

(f)    By Parent, if the Company Board of Directors shall have (i) made a Change in Recommendation, (ii) recommended to the shareholders of the Company, or approved any, Acquisition Proposal (as defined in Section 8.2(c) hereof) or (iii) failed to include in the Proxy Statement its recommendation that the shareholders of the Company adopt and approve this Agreement and the Merger;

(g)    By the Company, at any time prior to the Company Shareholder Approval, if the Company concurrently enters into a definitive agreement with respect to a Superior Proposal in accordance with, and subject to the terms and conditions of, clause (y) of Section 5.2(c) and at least three (3) business days have passed since the last Notice of a Superior Proposal; provided that, any such purported termination pursuant to this Section 8.1(g) shall be void and of no force or effect unless the Company has paid the applicable termination fee in accordance with Section 8.2; or

(h)    By either Parent or the Company, if upon a vote at a duly held meeting to obtain the Company Shareholder Approval at which a quorum is present, the Company Shareholder Approval is not obtained.

Section 8.2    Effect of Termination.

(a)    Any termination of this Agreement under Section 8.1 will be effective immediately upon the delivery of a valid written notice of the terminating party to the other parties hereto and, if then due, payment of the termination fee required pursuant to this Section 8.2. In the event of termination of this Agreement as provided in Section 8.1, this Agreement shall forthwith become null and void and be of no further force or effect, except as set forth in the penultimate sentence of Section 6.3, the indemnification and reimbursement obligations set forth in Section 6.8(b), Section 8, Section 9 and the Confidentiality Agreement, each of which shall remain in full force and effect and survive any termination of this Agreement in accordance with the terms thereof, provided, however, that, except as provided in Section 8.2(e), nothing

54

herein shall relieve a party from liability for any breach hereof occurring prior to such termination.

(b)     If Parent or the Company terminates this Agreement pursuant to Section 8.1(f) or Section 8.1(g), respectively, the Company shall pay to Parent by wire transfer in immediately available funds a termination fee of $46,000,000 concurrently with the termination of this Agreement by the Company or no later than two business days after such termination by Parent, as applicable. In addition, if this Agreement is terminated pursuant to Section 8.1(f) or Section 8.1(g), then, concurrently with the payment of the termination fee specified in the immediately preceding sentence, the Company shall pay to Parent by wire transfer in immediately available funds all of Parent's reasonable, actual and documented out-of-pocket expenses and fees (including reasonable attorneys' fees) incurred by Parent on or prior to the termination of this Agreement in connection with the transactions contemplated by this Agreement in an amount not to exceed $10,000,000.

(c)     If Parent terminates this Agreement pursuant to Section 8.1(d) or if Parent or Company terminates this Agreement pursuant to Section 8.1(b) or Section 8.1(h), and (i) if prior to the date of such termination (but on or after the date hereof) a bona fide Acquisition Proposal is publicly announced, and (ii) within twelve (12) months after the date of such termination, the Company enters into a definitive agreement with respect to such Acquisition Proposal, the Company shall pay to Parent a termination fee of $46,000,000 concurrently with the execution of such definitive agreement; provided, that solely for purposes of this Section 8.2(c) and Section 8.1(f)(ii), the term Acquisition Proposal shall have the meaning ascribed thereto in Section 5.2(a), except that all references to twenty percent (20%) therein shall be changed to seventy-five percent (75%). In addition, if Parent terminates this Agreement pursuant to Section 8.1(d) or Section 8.1(h), and (i) if prior to the date of such termination (but on or after the date hereof) a bona fide Acquisition Proposal is publicly announced, and (ii) within twelve (12) months after the date of such termination, the Company enters into a definitive agreement with respect to such Acquisition Proposal, then, concurrently with the payment of the termination fee specified in the immediately preceding sentence, the Company shall pay to Parent by wire transfer in immediately available funds all of Parent's reasonable, actual and documented out-of-pocket expenses and fees (including reasonable attorneys' fees) incurred by Parent on or prior to the termination of this Agreement in connection with the transactions contemplated by this Agreement in an amount not to exceed $10,000,000. Furthermore, if Parent or Company terminates this Agreement pursuant to Section 8.1(h), then, concurrently with such termination, the Company shall pay to Parent by wire transfer in immediately available funds all of Parent's reasonable, actual and documented out-of-pocket expenses and fees (including reasonable attorneys' fees) incurred by Parent on or prior to the termination of this Agreement in connection with the transactions contemplated by this Agreement in an amount not to exceed $10,000,000.

(d)     The Company acknowledges that the agreements contained in this Section 8.2 are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, Parent would not enter into this Agreement; accordingly, if the Company fails promptly to pay the amounts due pursuant to Sections 8.2(b) or (c), respectively, and, in order to obtain such payment, Parent commences a suit which results in a final non-appealable judgment against the Company, the Company shall pay to Parent its reasonable attorneys' fees and

expenses actually incurred in connection with such suit, together with interest on the amount of the fee from the date such payment was required to be made until the date such payment is actually made.

(e)    Parent hereby agrees, that, upon any termination of this Agreement under circumstances where it is entitled to a termination fee pursuant to Section 8.2(b) or 8.2(c) and provided such termination fee is paid in full, such payment shall be a sole and exclusive remedy and Parent and its affiliates (including Merger Sub) shall be precluded from any other remedy against the Company and its affiliates, at law or in equity or otherwise, and neither Parent nor any of its affiliates (including Merger Sub) may seek (and Parent shall cause its affiliates (including Merger Sub) not to seek) to obtain any recovery, judgment, or damages of any kind, including consequential, indirect, or punitive damages, against the Company or any of its affiliates, directors, officers, employees, shareholders or Representatives in connection with this Agreement or the transactions contemplated hereby or the termination or breach of this Agreement (whether or not such damages result from fraud or the willful and material breach of the Company's representations, warranties, covenants or agreements set forth in this Agreement). Parent acknowledges that the agreements contained in this Section 8.2(e) are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, the Company would not enter into this Agreement, and Parent and the Company acknowledge and agree that the termination fees provided in Section 8.2(b) and 8.2(c) are reasonable and constitute liquidated damages and not a penalty.

Section 8.3    Fees and Expenses.  Except as otherwise expressly provided in Section 6.8(b) or in Sections 8.2(b) or (c), all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such expenses whether or not the Merger is consummated, including all out-of-pocket expenses (including all fees and expenses of counsel, accountants, investment bankers, financing sources, hedging counterparties, experts and consultants to a party hereto and its affiliates) incurred by a party or on its behalf (or, with respect to Parent, incurred by Parent's stockholders or on their behalf) in connection with or related to the authorization, preparation, negotiation, execution and performance of this Agreement, the preparation, printing, filing and mailing of the Proxy Statement, the solicitation of the Company Shareholder Approval, regulatory filings and notices, the Financing and all other matters related to the closing of the Merger.

Section 8.4    Amendment.  Subject to applicable Law, this Agreement may be amended, modified and supplemented in any and all respects, whether before or after any vote of the shareholders of the Company contemplated hereby, by written agreement of the parties hereto, by action taken by their respective Boards of Directors, but after the Company Shareholder Approval, no amendment shall be made which by Law requires further approval by such shareholders without obtaining such further approval.  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.

Section 8.5    Waiver.  At any time prior to the Effective Time, each party hereto may (a) extend the time for the performance of any of the obligations or other acts of any other party hereto or (b) waive compliance with any of the agreements of any other party or any conditions to its own obligations; provided, that any such extension or waiver shall be binding upon a party only if such extension or waiver is set forth in a writing executed by such party.

## Section 9.    Miscellaneous.

Section 9.1    Entire Agreement. This Agreement, together with the Company Disclosure Schedule and the Parent Disclosure Schedule and the documents and instruments referred to herein that are to be delivered at the Closing, contains the entire agreement among the parties with respect to the Merger and related transactions, and supersedes all prior agreements, written or oral, among the parties with respect thereto, other than the Confidentiality Agreement which shall survive execution of this Agreement and shall terminate in accordance with the provisions thereof. EACH PARTY HERETO AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, NEITHER PARENT, MERGER SUB NOR THE COMPANY MAKES ANY OTHER REPRESENTATIONS OR WARRANTIES, AND EACH HEREBY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES MADE BY ITSELF OR ANY OF ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, FINANCIAL AND LEGAL ADVISORS OR OTHER REPRESENTATIVES (OTHER THAN AS SET FORTH IN THE CONFIDENTIALITY AGREEMENT), WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT OR THE MERGER, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO THE OTHER OR THE OTHER'S REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION WITH RESPECT TO ANY ONE OR MORE OF THE FOREGOING.

Section 9.2    No Survival. None of the representations, warranties and, except as provided in the following sentence, covenants contained herein or in any instrument delivered pursuant to this Agreement shall survive the Effective Time. This Section 9, the agreements of Parent and the Company in Sections 5.3, 6.5 and 8.3 and those other covenants and agreements contained herein that by their terms apply, or that are to be performed in whole or in part, after the Effective Time shall survive the consummation of the Merger.

Section 9.3    Parent Guarantee. Parent agrees to take all action necessary to cause Merger Sub or the Surviving Corporation, as applicable, to perform all of its respective agreements, covenants and obligations under this Agreement. Parent unconditionally guarantees to the Company the full and complete performance by Merger Sub or the Surviving Corporation, as applicable, of its respective obligations under this Agreement and shall be liable for any breach of any representation, warranty, covenant or obligation of Merger Sub or the Surviving Corporation, as applicable, under this Agreement. Parent hereby waives diligence, presentment, demand of performance, filing of any claim, any right to require any proceeding first against Merger Sub or the Surviving Corporation, as applicable, protest, notice and all demands whatsoever in connection with the performance of its obligations set forth in this Section 9.3.

Section 9.4    Notices. Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed given when delivered in person, by overnight courier, by facsimile transmission (with receipt confirmed by telephone or by automatic transmission report) or two business days after being sent by registered or certified mail (postage prepaid, return receipt requested), as follows:

57

*If to Parent or Merger Sub:*

The Finish Line, Inc.
Headwind, Inc.
c/o Gary D. Cohen
3308 North Mitthoefer Road
Indianapolis, Indiana 46235
Telephone: (317) 899-1022
Facsimile: (317) 894-6340

*If to the Company:*

Genesco Inc.
c/o Hal N. Pennington
Genesco Park
1415 Murfreesboro Road
Nashville, Tennessee 37217-2895
Telephone: (615) 367-7000
Facsimile: (615) 367-7073

*With copies (which shall not constitute notice) to:*

Jonathan K. Layne, Esq.
Gibson, Dunn & Crutcher LLP
2029 Century Park East, 40th Floor
Los Angeles, California 90067
Telephone: (310) 552-8641
Facsimile: (310) 552-7053

*With copies (which shall not constitute notice) to:*

James H. Cheek, III, Esq.
Bass, Berry & Sims, PLC
315 Deaderick Street, Suite 2700
Nashville, Tennessee 37238
Telephone: (615) 742-6223
Facsimile: (615) 742-2723

Any party may by notice given in accordance with this Section 9.4 to the other parties designate another address or person for receipt of notices hereunder. Rejection or other refusal to accept or the inability to deliver because of changed address or facsimile of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

Section 9.5    Binding Effect; No Assignment; No Third-Party Beneficiaries.

(a)    This Agreement shall not be assigned by any of the parties hereto (whether by operation of Law or otherwise) without the prior written consent of the other parties. Subject to the preceding sentence, but without relieving any party (including any assignor) hereto of any obligation hereunder, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns.

(b)    Other than Section 6.5 and the rights of the holders of Company Options, ESPP Options and Restricted Shares to receive the Cash Out Amount, nothing in this Agreement, express or implied, is intended to or shall confer upon any person other than Parent, Merger Sub and the Company and their respective successors and permitted assigns any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 9.6    Severability. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable. The parties further agree to negotiate in good faith to replace such invalid or unenforceable provision of this Agreement, or invalid or unenforceable portion thereof, with a valid and enforceable provision that will achieve, to the extent possible, the

economic, business and other purposes of such invalid or unenforceable provision or portion thereof.

Section 9.7    Governing Law.  This Agreement, and all claims or causes of action (whether at law, in equity, in contract or in tort) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance hereof, shall be governed by and construed in accordance with the Laws of the State of Tennessee, without giving effect to any choice or conflict of Law provision or rule (whether of the State of Tennessee or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Tennessee.

Section 9.8    Submission to Jurisdiction; Waiver.  Each of the Company, Parent and Merger Sub irrevocably submits to the exclusive jurisdiction and venue of the courts of the State of Tennessee (or, in the case of any claim as to which the federal courts have exclusive subject matter jurisdiction, the Federal court of the United States of America) sitting in the City of Nashville in the State of Tennessee in any Action arising out of or relating to this Agreement, and hereby irrevocably agrees that all claims in respect of such action may be heard and determined in such court.  Each of the Company, Parent and Merger Sub hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any Action with respect to this Agreement, (a) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to lawfully serve process, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and (c) to the fullest extent permitted by applicable Law, that (i) the Action in any such court is brought in an inconvenient forum, (ii) the venue of such Action is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  EACH OF THE COMPANY, PARENT AND MERGER SUB WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

Section 9.9    Specific Enforcement.  The parties recognize and agree that if for any reason any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, immediate and irreparable harm or injury would be caused for which money damages would not be an adequate remedy.  Accordingly, each party agrees that, in addition to other remedies, prior to any termination of this Agreement pursuant to Section 8.1 under circumstances where a fee or expenses are payable pursuant to Section 8.2, any other party shall be entitled to an injunction (without posting a bond or other undertaking) restraining any violation or threatened violation of the provisions of this Agreement.  In the event that any action shall be brought in equity to enforce the provisions of this Agreement, no party shall allege, and each party hereby waives the defense, that there is an adequate remedy at law.

59

Section 9.10    Interpretation.

(a)    When a reference is made in this Agreement to a Section, subsection or clause, such reference shall be to a Section, subsection or clause of this Agreement unless otherwise indicated.

(b)    The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(c)    This Agreement is the result of the joint efforts of Parent and the Company, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the parties and there shall be no construction against any party based on any presumption of that party's involvement in the drafting thereof.

(d)    To the extent this Agreement refers to information or documents having been made available (or delivered or provided) to Parent, the Company shall be deemed to have satisfied such obligation if the Company or its Representatives made such information or document available (or delivered or provided such information or document) to any officer of Parent or any of its Representatives.

(e)    The term "affiliate" or "Affiliate" means a person that directly, or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the first-mentioned person.

(f)    The term "business day" means any day on which the principal offices of the SEC in Washington, D.C. are open to accept filings, or in the case of determining a date when any payment is due, any day on which banks are not required or authorized to close in the City of New York.

(g)    The words "include," "includes" or "including" shall be deemed to be followed by the words "without limitation."

(h)    The term "knowledge" of the Company shall mean the actual knowledge of the officers of the Company or a Company Subsidiary listed on Section 9.10(h) of the Company Disclosure Schedule. The term "knowledge" of Parent shall mean the actual knowledge of the officers of Parent listed on Section 9.10(h) of the Parent Disclosure Schedule.

(i)    The disclosure of any matter or item in the Company Disclosure Schedule or the Parent Disclosure Schedule shall not be deemed to constitute an acknowledgement that such matter or item is required to be disclosed therein or is a material exception to a representation, warranty, covenant or condition set forth in this Agreement and shall not be used as a basis for interpreting the terms "material," "materially," "materiality," "Company Material Adverse Effect" or "Parent Material Adverse Effect" or any word or phrase of similar import and does not mean that such matter or item would, with any other matter or item, have or be reasonably expected, individually or in the aggregate, to have a Company Material Adverse Effect or a Parent Material Adverse Effect. Certain matters have been disclosed in the Company Disclosure Schedule for informational purposes only.

(j)     The term "person" or "Person" shall mean any individual, corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization, entity or Governmental Entity.

(k)     The term "subsidiary" or "Subsidiary," with respect to any Person, means any other Person of which the first Person owns, directly or indirectly, securities or other ownership interests having voting power to elect a majority of the board of directors or other persons performing similar functions (or, if there are no such voting interests, more than 50% of the equity interests of the second Person).

Section 9.11  No Waiver of Rights.  No failure or delay on the part of any party hereto in the exercise of any right hereunder will impair such right or be construed to be a waiver of, or acquiescence in, any breach of any representation, warranty or agreement herein, nor will any single or partial exercise of any such right preclude other or further exercise thereof or of any other right.

Section 9.12   Counterparts; Facsimile Signatures.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Facsimile signatures shall be acceptable and binding.

[Remainder of page intentionally left blank.]

61

IN WITNESS WHEREOF, the parties have executed this Agreement and Plan of Merger as of the date first stated above.

GENESCO INC.

By: _____
Name:  Hal N. Pennington
Title:  Chairman and Chief Executive Officer

THE FINISH LINE, INC.

By: _____
Name:  Alan H. Cohen
Title:  Chairman of the Board and
        Chief Executive Officer

HEADWIND, INC.

By: _____
Name:  Alan H. Cohen
Title:  President and Chief Executive Officer

    **IN WITNESS WHEREOF,** the parties have executed this Agreement and Plan of Merger as of the date first stated above.

**GENESCO INC.**

By: _____
Name:
Title:

**THE FINISH LINE, INC.**

By: _____
Name: Alan H. Cohen
Title:  Chairman of the Board and
       Chief Executive Officer

**HEADWIND, INC**

By: _____
Name: Alan H. Cohen
Title:   President and Chief Executive Officer

# ANNEX A

## Index of Defined Terms

**Section**

Acquiring Person. 3.18(c)
Acquisition Proposal. 5.2(a)
Actions. 3.8
affiliate or Affiliate. 9.10
Affiliated Party. 3.21
Agreement. Preamble
Articles of Merger. 1.3
Benefits Continuation Period. 5.3(a)
Book-Entry Shares. 2.4(b)
business day. 9.10
Cash Out Amount. 2.3(c)
Certificates. 2.4(b)
Change in Recommendation. 5.2(c)
CHX. 3.1(a)
Closing. 1.2
Closing Date. 1.2
COBRA. 3.14(d)
Code. 2.5
Commitment Letter. 4.6
Company. Preamble
Company Board of Directors. Recitals
Company Common Stock. 2.1
Company Disclosure Schedule. 3
Company Employees. 3.14(a)
Company Insurance Policies. 3.12
Company Material Adverse Effect. 3.1(a)
Company Options. 2.3(a)
Company Preferred Stock. 3.3(a)
Company Registered IP. 3.10(b)
Company Rights. 3.3(f)
Company Rights Agreement. 3.3(f)
Company SEC Reports. 3.5(a)
Company Shareholder Approval. 3.18(d)
Company Shareholders Meeting. 6.2
Company Subsidiaries. 3.1(a)
Confidentiality Agreement. 6.3
Continuing Employees. 5.3(a)
Contract. 3.9(a)
Controlled Group. 3.14(c)
Convertible Debentures. 2.1(f)

Copyrights, 3.10(a)
Disclosed Conditions. 4.6
Dissenting Shares. 2.2(a)
DOJ. 6.4(a)
Effective Time. 1.3
Employee Preferred Stock. 5.6(a)
Employee Preferred Stock Consents. 5.6(a)
Employee Preferred Stock Tender Offer. 5.6(a)
Employment Agreements. 5.3(a)
Environmental Laws. 3.16(c)
Environmental Permits. 3.16(c)
Equity Incentive Plans. 2.3(a)
Equity Plans. 2.3(c)
ERISA. 3.14(a)
ERISA Affiliate. 3.14(b)
ESPP. 2.3(c)
Exchange Act. 3.3(h)
Exchange Fund. 2.4(a)
Financial Statements. 3.5(b)
Financing. 4.6
Foreign Plan. 3.14(h)
Foreign Welfare Plan. 3.14(h)
FTC. 6.4(a)
GAAP. 3.5(b)
Governmental Entity. 3.1(a)
Hazardous Substances. 3.16(c)
HSR Act. 3.17
Indemnified Parties. 6.5(b)
Indenture. 2.1(f)
Intellectual Property. 3.10(a)
IRS. 3.14(a)
knowledge. 9.10
Laws. 3.1(a)
Lender. 4.6
Liens. 3.4(a)
Material Contract. 3.9(a)
Merger. 1.1(a)
Merger Consideration. 2.1(a)
Merger Sub. Preamble
Notice of Superior Proposal. 5.2(c)
NYSE. 3.1(a)
Parent. Preamble
Parent Disclosure Schedule. 4
Parent Material Adverse Effect. 4.1
Patents. 3.10(a)
Paying Agent. 2.4(a)

Per Share Price. 2.1(a)
Permitted Liens. 3.11
person or Person. 9.10
Plan. 3.14(a)
Proxy Statement. 3.20
Release. 3.16(c)
Representatives. 5.2(a)
Restraints. 8.1(c)
Restricted Shares. 2.3(b)
SEC. 3.5(a)
Securities Act. 3.5(a)
Solvent. 4.9
subsidiary or Subsidiary. 9.10(k)
Superior Proposal. 5.2(b)
Supplemental Indenture. 2.1(f)
Surviving Corporation. 1.1(a)
Takeover Proposal. 5.2(b)
Tax. 3.13(a)
Tax Return. 3.13(a)
Taxes and Taxable. 3.13(a)
TBCA. Recitals
Termination Date. 8.1(b)
Trademarks. 3.10(a)

UBS LOAN FINANCE LLC
677 Washington Boulevard
Stamford, Connecticut  06901

UBS SECURITIES LLC
299 Park Avenue
New York, New York  10171

June 17, 2007

The Finish Line, Inc.
3308 N. Mitthoeffer Road
Indianapolis, Indiana 46235

Attention:  Chief Financial Officer

<u>Bank and Bridge Facilities Commitment Letter</u>

Ladies and Gentlemen:

   You have advised UBS Loan Finance LLC ("<u>UBS</u>") and UBS Securities LLC ("<u>UBSS</u>" and, together with UBS, "<u>we</u>" or "<u>us</u>") that The Finish Line, Inc. ("<u>you</u>" or the "<u>Borrower</u>") proposes to acquire (the "<u>Acquisition</u>") Genesco Inc. (the "<u>Acquired Business</u>"). The Acquisition will be effected pursuant to a merger agreement (the "<u>Acquisition Agreement</u>") among you, a wholly-owned merger subsidiary created by you and the Acquired Business. All references to "<u>dollars</u>" or "<u>$</u>" in this agreement and the attachments hereto (collectively, this "<u>Commitment Letter</u>") are references to United States dollars. All references to "Borrower" or "Borrower and its subsidiaries" for any period from and after consummation of the Acquisition shall include the Acquired Business.

   We understand that the sources of funds required to fund the Acquisition consideration, to repay certain existing indebtedness of Borrower, the Acquired Business and their respective subsidiaries of approximately $84.3 million (the "<u>Refinancing</u>"), to pay fees, commissions and expenses of approximately $70.5 million in connection with the Transactions (as defined below) and to provide ongoing working capital requirements of Borrower and its subsidiaries following the Transactions will include:

-  a senior secured revolving credit facility to Borrower of up to $450.0 million (the "<u>Revolving Credit Facility</u>") as described in the Summary of Principal Terms and Conditions attached hereto as <u>Annex I</u> (the "<u>Revolver Term Sheet</u>"), of which no more than the Closing Date Permitted Revolver Draw shall be drawn immediately after giving effect to the Transactions;

-  a senior secured term loan facility to Borrower of up to $690.0 million (the "<u>Term Loan Facility</u>" and, together with the Revolving Credit Facility, the "<u>Bank Facilities</u>"), as described in the Summary of Principal Terms and Conditions attached hereto as <u>Annex II</u> (the "<u>Term Loan Term Sheet</u>");

LA\1729820.12



- the issuance by Borrower of up to $700.0 million aggregate gross proceeds of unsecured senior notes (the "Notes") pursuant to a public offering or Rule 144A or other private placement (the "Notes Offering") or, in the event the Notes are not issued at the time the Transactions are consummated, borrowings by Borrower of up to $700.0 million under a senior unsecured credit facility (the "Bridge Facility" and, together with the Bank Facilities, the "Facilities"), as described in the Bridge Facility Summary of Principal Terms and Conditions attached hereto as Annex III (the "Bridge Term Sheet" and, together with the Revolver Term Sheet and the Term Loan Term Sheet, the "Term Sheets"); and

- excess cash of the Borrower of approximately $11.0 million.

No other financing will be required for the uses described above. Immediately following the Transactions, neither you nor any of your subsidiaries will have any indebtedness or preferred equity other than the Bank Facilities, the Notes or the Bridge Facility and other existing indebtedness to be mutually agreed (including the Convertible Bonds, the Employee Preferred Stock and the Genesco Preferred Stock (in each case, as defined below)). As used herein, the term "Transactions" means the Acquisition, the Refinancing, the initial borrowings under the Bank Facilities, the issuance of the Notes or the borrowings under the Bridge Facility and the payments of fees, commissions and expenses in connection with each of the foregoing.

As used herein, the term "Closing Date Permitted Revolver Draw" means the positive difference, if any, between (i) $250.0 million and (ii) (a) the amount of 4.125% Convertible Subordinated Debentures due 2023 (the "Convertible Bonds") outstanding on the Closing Date after giving effect to any tender offer for or conversion of the Convertible Bonds on or prior to the Closing Date, (b) the amount of the Acquired Business's Employees' Subordinated Convertible Preferred Stock (the "Employee Preferred Stock") outstanding on the Closing Date after giving effect to any tender offer for or conversion of the Employee Preferred Stock on or prior to the Closing Date and (c) the amount of the Acquired Business's preferred stock other than Employee Preferred Stock (the "Genesco Preferred Stock") outstanding as of the Closing Date after giving effect to any redemption of, tender offer for or conversion of the Genesco Preferred Stock on or prior to the Closing Date; provided however that in no event shall the Closing Date Permitted Revolver Draw exceed the Borrowing Base Amount (as defined in the Revolver Term Sheet).

Notwithstanding anything to the contrary herein, to the extent that the Borrowing Base Amount (as defined in the Revolver Term Sheet) as of the Closing Date is not sufficient to fund, together with the amount of the Term Loan Facility set forth above, the Acquisition consideration, the Refinancing and the payments of fees, commissions and expenses in connection with the Acquisition, the Refinancing, the Notes Offering and the Facilities (the "Funding Shortfall"), the amount of the Term Loan Facility set forth above shall be increased on a dollar-for-dollar basis by the amount of the Funding Shortfall and the Revolving Credit Facility shall be reduced on a dollar-for-dollar basis by the amount of the Funding Shortfall.

Commitments.

You have requested that UBS commit to provide the Facilities and that UBSS agree to structure, arrange and syndicate the Facilities.

UBS is pleased to advise you of its commitment to provide the entire amount of the Bank Facilities to Borrower upon the terms and subject to the conditions set forth or referred to in this Commitment Letter. The commitment of UBS hereunder is subject to the negotiation, execution and delivery of definitive documentation (the "Bank Documentation") with respect to the Bank Facilities reasonably satisfactory to UBS reflecting the terms and conditions set forth in the Bank Term Sheet, in Annex IV hereto (the "Conditions Annex") and in the letter of even date herewith addressed to you providing, among other things, for certain fees relating to the Facilities (the "Fee Letter"), and such other terms (but not conditions) as you and we may mutually agree. In addition, UBS is pleased to advise you of its commitment to provide the entire amount of the Bridge Facility to Borrower upon the terms and subject to the conditions set forth or referred to in this Commitment Letter. The commitment of UBS hereunder is subject to the negotiation, execution and delivery of definitive documentation (the "Bridge Documentation" and, together with the Bank Documentation, the "Financing Documentation") with respect to the Bridge Facility reasonably satisfactory to UBS reflecting the terms and conditions set forth in the Bridge Term Sheet, the Conditions Annex and the Fee Letter, and such other terms (but not conditions) as you and we may mutually agree. You agree that the closing of the Facilities, and if applicable, the Notes Offering (the "Closing Date") shall be a date mutually agreed upon between you and us, but which shall be concurrent with the closing of the Acquisition in accordance with the Acquisition Agreement so long as all conditions precedent to the initial funding of the Facilities set forth herein, in the Term Sheets and in the Conditions Annex have been satisfied, or as soon as practicable thereafter after all such conditions are satisfied.

Syndication.

It is agreed that UBSS will act as the sole and exclusive advisor, arranger and book-manager for the Facilities, and, in consultation with you, will exclusively manage the syndication of the Facilities, and will, in such capacities, exclusively perform the duties and exercise the authority customarily associated with such roles. It is further agreed that no additional advisors, agents, co-agents, arrangers or bookmanagers will be appointed and no Lender (as defined below) will receive compensation with respect to any of the Facilities other than as provided herein and in the Fee Letter in order to obtain its commitment to participate in such Facilities, in each case unless you and we so agree.

UBS reserves the right, prior to or after execution of the Bank Documentation, in consultation with you, to syndicate all or a portion of its commitment to one or more institutions (other than those certain institutions previously identified by you in your reasonable discretion to us, if any, prior to the date of this Commitment Letter to be excluded from syndication, the "Blacklist") that will become parties to the Bank Documentation (UBS and the institutions becoming parties to the Bank Documentation with respect to all or a portion of the Bank Facilities, the "Bank Lenders"). UBS also reserves the right, prior to or after the execution of the Bridge Documentation, to syndicate all or a portion of its commitment to one or more institutions other than those on the Blacklist that will be-

come parties to the Bridge Documentation (UBS and the institutions becoming parties to the Bridge Documentation, the "Bridge Lenders" and, together with the Bank Lenders, the "Lenders"). Notwithstanding UBS's right to syndicate the Facilities and receive commitments with respect thereto, UBS will not be relieved of all or any portion of its commitments hereunder prior to the initial funding under the Facilities. Without limiting your obligations to assist with syndication efforts as set forth herein, UBS agrees that completion of such syndications is not a condition to its commitments hereunder.

UBSS will exclusively manage all aspects of the syndication of the Facilities, including selection of additional Lenders (other than the Blacklist), determination of when UBSS will approach potential additional Lenders, awarding of any naming rights and the final allocations of the commitments in respect of the Facilities among the additional Lenders. You agree to, and to use commercially reasonable efforts to cause the Acquired Business to (including a covenant to such effect in the Acquisition Agreement), actively assist UBSS in achieving a timely syndication of the Facilities. To assist UBSS in its syndication efforts, you agree that you will, and will cause your representatives and advisors to, and will use commercially reasonable efforts to cause the Acquired Business and its representatives and advisors to, (a) prepare and provide all financial and other information as we may reasonably request and as is customary for similar financings with respect to you, the Acquired Business, your and their respective subsidiaries and the transactions contemplated hereby, including but not limited to financial projections (the "Projections") relating to the foregoing, (b) provide copies of any due diligence reports or memoranda prepared at your direction or any of your affiliates by legal, accounting, tax or other advisors in connection with the Acquisition (subject to (x) the delivery of customary non-disclosure agreements reasonably acceptable to UBSS and (y) your right to maintain any applicable attorney-client or other applicable privilege as you may reasonably determine in good faith), (c) use commercially reasonable efforts to ensure that such syndication efforts benefit materially from your existing lending relationships and the existing lending relationships of the Acquired Business and your and its respective subsidiaries, (d) make available to prospective Lenders your senior management and advisors, and the senior management of the Acquired Business and its subsidiaries at mutually agreeable times, (e) host, with UBSS, one or more meetings with prospective Lenders under each of the Facilities at mutually agreeable times, (f) assist UBSS in the preparation of one or more customary confidential information memoranda and other customary marketing materials to be used in connection with the syndication of each of the Facilities, and (g) use commercially reasonable efforts to obtain, at your expense, monitored public ratings of the Facilities and the Notes from Moody's Investors Service ("Moody's") and Standard & Poor's Ratings Group ("S&P") at least 30 days prior to the Closing Date and to participate reasonably in the process of securing such ratings, including having your senior management and the senior management of the Acquired Business meet with such rating agencies at mutually agreeable times.

At our request, you agree to prepare a version of the information package and presentation and other marketing materials to be used in connection with the syndication that do not contain material non-public information concerning you or the Acquired Business, your or their respective affiliates or your or their securities. In addition, you agree that unless specifically labeled "PUBLIC — Contains No Material Non-Public Information," all information, documentation or other data disseminated to prospective Lenders in connection with the syndication of the Facilities, whether through an Internet website (including, without limitation, an IntraLinks workspace), electronically, in presen-

LA\1729820.12

tations at meetings or otherwise, will be assumed by us to contain material non-public information concerning you or the Acquired Business, your or their respective affiliates or your or their securities. You acknowledge and agree that the following documents are public and may be distributed to public Lenders (unless you promptly notify us otherwise): (a) drafts and final definitive documentation with respect to the Facilities; (b) administrative materials prepared by us for prospective Lenders (such as a lender meeting invitation, allocations and funding and closing memoranda); and (c) notification of changes in the terms of the Facilities.

Information.

You hereby represent and covenant that (a) to the best of your knowledge, all information (other than the Projections) that has been or will be made available to us or any of the Lenders by you, the Acquired Business or any of your or its respective representatives in connection with the transactions contemplated hereby (the "Information"), when taken as a whole, is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein, in the light of the circumstances under which such statements are made, not misleading and (b) the Projections that have been or will be made available to us or any of the Lenders by you, the Acquired Business or any of your or its respective representatives in connection with the transactions contemplated hereby have been and will be prepared in good faith based upon assumptions believed by you to be reasonable (it being understood that projections by their nature are inherently uncertain and no assurances are being given that the results reflected in the Projections will be achieved). You agree to supplement the Information and the Projections from time to time and agree to promptly advise us and the Lenders of all developments materially affecting you, the Acquired Business, any of your or its respective subsidiaries or affiliates or the transactions contemplated hereby or the accuracy of Information and Projections previously furnished to us or any of the Lenders.

Compensation.

As consideration for the commitments of UBS hereunder with respect to the Facilities and the agreement of UBSS to structure, arrange and syndicate the Facilities and to provide advisory services in connection therewith, you agree to pay, or cause to be paid, the fees set forth in the Term Sheets and the Fee Letter. Once paid, such fees shall not be refundable under any circumstances.

Conditions.

The commitment of UBS hereunder with respect to each of the Facilities and UBSS's agreement to perform the services described herein may be terminated by UBS if (i) since the date hereof, a Material Adverse Effect (as defined below) has occurred with respect to the Acquired Business and its subsidiaries, considered as a whole, that has not been cured prior to December 31, 2007; or (ii) any condition set forth in either Term Sheet or the Conditions Annex is not satisfied or any covenant or agreement in this Commitment Letter or the Fee Letter is not complied with in any material respect. As used herein, "Material Adverse Effect" means any event, circumstance, change or effect that, individually or in the aggregate, is materially adverse to the business, condition (financial or otherwise), assets, liabilities or results of operations of the Acquired Business and its subsidiaries,

LA\1729820.12

taken as a whole; provided, however, that none of the following shall constitute, or shall be considered in determining whether there has occurred, and no event, circumstance, change or effect resulting from or arising out of any of the following shall constitute, a Material Adverse Effect: (A) the announcement of the execution of the Acquisition Agreement or the pendency of consummation of the Acquisition (including the threatened or actual impact on relationships of the Acquired Business and its subsidiaries with customers, vendors, suppliers, distributors, landlords or employees (including the threatened or actual termination, suspension, modification or reduction of such relationships)); (B) changes in the national or world economy or financial markets as a whole or changes in general economic conditions that affect the industries in which the Acquired Business and its subsidiaries conduct their business, so long as such changes or conditions do not adversely affect the Acquired Business and its subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (C) any change in applicable law, rule or regulation or in accounting principles generally accepted in the United States or interpretation thereof after the date hereof, so long as such changes do not adversely affect the Acquired Business or its subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (D) the failure, in and of itself, of the Acquired Business to meet any published or internally prepared estimates of revenues, earnings or other financial projections, performance measures or operating statistics; provided, however, that the facts and circumstances underlying any such failure may, except as may be provided in subsection (A), (B), (C), (E), (F) and (G) of this definition, be considered in determining whether a Material Adverse Effect has occurred; (E) a decline in the price, or a change in the trading volume, of the common stock of the Acquired Business on the New York Stock Exchange or the Chicago Stock Exchange; (F) compliance with the terms of, and taking any action required by, the Acquisition Agreement, or taking or not taking any actions at the request of, or with the consent of, you; and (G) acts or omissions of you or your wholly-owned merger subsidiary after the date of the Acquisition Agreement (other than actions or omissions specifically contemplated by the Acquisition Agreement).

Notwithstanding anything in this Commitment Letter, the Term Sheets, the Fee Letter, the Financing Documentation or any other letter agreement or other undertaking concerning the financing of the Transactions to the contrary, (i) the only representations relating to the Borrower, the Acquired Business, their respective subsidiaries and their respective businesses the making of which shall be a condition to availability of the Facilities on the Closing Date shall be (A) such of the representations made by the Acquired Business in the Acquisition Agreement as are material to the interests of the Lenders, but only to the extent that you have the right to terminate your obligations under the Acquisition Agreement as a result of a breach of such representations in the Acquisition Agreement (including but not limited to the Acquired Business' representation regarding the nonoccurrence of a Material Adverse Effect since February 3, 2007) (collectively, the "Acquisition Agreement Representations") and (B) the Specified Representations (as defined below) and (ii) the terms of the Financing Documentation shall be in a form such that they do not impair availability of the Facilities on the Closing Date if the conditions set forth herein and in the Term Sheets and the Conditions Annex are satisfied. For purposes hereof, "Specified Representations" means the representations and warranties relating to the Borrower and the Acquired Business set forth in the Term Sheets relating to corporate power and authority, the due authorization, execution, delivery and enforceability of the Financing Documentation, the Financing Documentation not conflicting with charter documents or law, Federal Reserve margin regulations, validity, priority and perfection of security interests (subject to paragraph

6 of the Conditions Annex), status of debt under the applicable Facility as senior debt, the Patriot Act and the Investment Company Act.

### Clear Market.

From the date of this Commitment Letter until the earlier of (x) our completion of syndication (as determined by us and notified in writing to you) of each of the Facilities and, if later, of the distribution of the Notes or (y) 90 days after the Closing Date, you will (and with respect to the Acquired Business, until the Closing Date, you will use commercially reasonably efforts to) ensure that no financing for you, the Acquired Business or any of your or its respective subsidiaries or affiliates is announced, syndicated or placed without the prior written consent of UBS if such financing, syndication or placement would have, in the reasonable judgment of UBS, a detrimental effect upon the transactions contemplated hereby.

### Indemnity and Expenses.

By your acceptance below, you hereby agree to indemnify and hold harmless us and our affiliates (including, without limitation, controlling persons) and the directors, officers, employees, advisors and agents of the foregoing (each, an "Indemnified Person") from and against any and all losses, claims, costs, expenses, damages or liabilities (or actions or other proceedings commenced or threatened in respect thereof) that arise out of or in connection with this Commitment Letter, the Term Sheets, the Conditions Annex, the Fee Letter, the Facilities or any of the transactions contemplated hereby or thereby or the providing or syndication of the Facilities (or the actual or proposed use of the proceeds thereof), and to reimburse each Indemnified Person promptly upon its written demand for any legal or other expenses incurred in connection with investigating, preparing to defend or defending against, or participating in, any such loss, claim, cost, expense, damage, liability or action or other proceeding (whether or not such Indemnified Person is a party to any action or proceeding); *provided* that any such obligation to indemnify, hold harmless and reimburse an Indemnified Person shall not be applicable to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from the bad faith, gross negligence or willful misconduct of such Indemnified Person. You shall not be liable for any settlement of any such proceeding effected without your written consent, but if settled with such consent or if there shall be a final judgment against an Indemnified Person, you shall, subject to the proviso in the preceding sentence, indemnify such Indemnified Person from and against any loss or liability by reason of such settlement or judgment. You shall not, without the prior written consent of any Indemnified Person, effect any settlement of any pending or threatened proceeding in respect of which such Indemnified Person is or could have been a party and indemnity could have been sought hereunder by such Indemnified Person, unless such settlement (i) includes an unconditional release of such Indemnified Person from all liability or claims that are the subject matter of such proceeding and (ii) does not include a statement as to or an admission of fault, culpability, or a failure to act by or on behalf of such Indemnified Person. None of us (or any of our respective affiliates) shall be responsible or liable to you, the Acquired Business or any of your or its respective subsidiaries, affiliates or stockholders or any other person or entity for any indirect, punitive or consequential damages which may be alleged as a result of this Commitment Letter, the Term Sheets, the Conditions Annex, the Fee Letter, the Facilities or the transactions contemplated hereby or thereby. In addition, you hereby agree to reimburse us from time to time upon

demand for all reasonable out-of-pocket costs and expenses (including, without limitation, reasonable legal fees and expenses of UBS and UBSS, appraisal, consulting and audit fees, and printing, reproduction, document delivery, travel, communication and publicity costs) incurred in connection with the syndication and execution of the Facilities, and the preparation, review, negotiation, execution and delivery of this Commitment Letter, the Term Sheets, the Conditions Annex, the Fee Letter, the Financing Documentation and the administration, amendment, modification or waiver thereof (or any proposed amendment, modification or waiver), whether or not the Closing Date occurs or any Financing Documentation is executed and delivered or any extensions of credit are made under either of the Facilities.

Confidentiality.

     This Commitment Letter is delivered to you upon the condition that neither the existence of this Commitment Letter, the Term Sheets, the Conditions Annex or the Fee Letter nor any of their contents shall be disclosed by you or any of your affiliates, directly or indirectly, to any other person, except that such existence and contents may be disclosed (i) as may be compelled in a judicial or administrative proceeding or as otherwise required by law and (ii) to your directors, officers, employees, legal counsel and accountants, in each case on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby. In addition, this Commitment Letter, the Term Sheets and the Conditions Annex (but not the Fee Letter) may be disclosed to the Acquired Business and its directors, officers, employees, advisors and agents, in each case on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby.

     Until the earlier of the execution of the Financing Documentation and 90 days following the termination of this Commitment Letter, UBS and its affiliates will use all confidential information provided to it or such affiliates by or on behalf of you hereunder solely for the purpose of providing the services which are the subject of this Commitment Letter and shall treat confidentially all such information; *provided* that nothing herein shall prevent UBS or its affiliates from disclosing any such information (a) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case UBS, to the extent permitted by law, agrees to inform you promptly thereof), (b) upon the request or demand of any regulatory authority having jurisdiction over UBS or any of its affiliates (in which case UBS, to the extent permitted by law, agrees to inform you promptly thereof), (c) to the extent that such information becomes publicly available other than by reason of disclosure by UBS or any of its related parties, (d) to the extent that such information is received by UBS from a third party that is not to UBS' knowledge subject to confidentiality obligations to you, (e) to the extent that such information is independently developed by UBS or its affiliates, (f) to UBS' affiliates and the employees, legal counsel, independent auditors and other experts or agents of UBS or UBS' affiliates who need to know such information in connection with the Transactions and are informed of the confidential nature of such information (with UBS responsible for such persons' compliance with this paragraph), (g) to potential Lenders, participants or assignees or swap counterparties who agree to be bound by the terms of this paragraph (or language substantially similar to this paragraph), (h) for purposes of establishing a "due diligence" defense or enforcing its rights hereunder, (i) to any other party hereto or its affiliates, (j) to Moody's and/or S&P or (k) with your consent (including in a confidential information memorandum or other marketing document).

LA\1729820.12

Other Services.

You acknowledge and agree that we and/or our affiliates may be requested to provide additional services with respect to you, the Acquired Business and/or your or their respective affiliates or other matters contemplated hereby. Any such services will be set out in and governed by a separate agreement(s) (containing terms relating, without limitation, to services, fees and indemnification) in form and substance satisfactory to the parties thereto. Nothing in this Commitment Letter is intended to obligate or commit us or any of our affiliates to provide any services other than as set out herein.

Governing Law, Etc.

This Commitment Letter and the commitment of UBS shall not be assignable by you without the prior written consent of UBS, and any purported assignment without such consent shall be void. We reserve the right to employ the services of our affiliates in providing services contemplated by this Commitment Letter and to allocate, in whole or in part, to our affiliates certain fees payable to us in such manner as we and our affiliates may agree in our sole discretion. You also agree that, subject to the penultimate sentence in the second paragraph under the caption "Syndication" herein, UBS may at any time and from time to time assign all or any portion of its commitments hereunder to one or more of its affiliates. You further acknowledge that we may share with any of our affiliates, and such affiliates may share with us, any information related to you, the Acquired Business, or any of your or its respective subsidiaries or affiliates (including, without limitation, information relating to creditworthiness) and the transactions contemplated hereby. We agree to treat, and cause any such affiliate to treat, all non-public information provided to us by you as confidential information in accordance with customary banking industry practices.

This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by us and you. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart of this Commitment Letter. Headings are for convenience of reference only and shall not affect the construction of, or be taken into consideration when interpreting, this Commitment Letter. This Commitment Letter is intended to be for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, and may not be relied on by, any persons other than the parties hereto and, with respect to the indemnification provided under the heading "Indemnity and Expenses," each Indemnified Person.

This Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of law to the extent that the application of the laws of another jurisdiction will be required thereby. Any right to trial by jury with respect to any claim or action arising out of this Commitment Letter is hereby waived. You hereby submit to the exclusive jurisdiction of the federal and New York State courts located in The City of New York (and appellate courts thereof) in connection with any dispute related to this Commitment Letter or any of the matters contemplated hereby, and agree that service of any process, summons, notice or document by registered mail addressed to you shall be effective service of

LA\1729820.12

process against you for any suit, action or proceeding relating to any such dispute. You irrevocably and unconditionally waive any objection to the laying of such venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. A final judgment in any such suit, action or proceeding brought in any such court may be enforced in any other courts to whose jurisdiction you are or may be subject by suit upon judgment.

     <u>Patriot Act</u>.

     We hereby notify you that pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "<u>Patriot Act</u>"), we and the other Lenders may be required to obtain, verify and record information that identifies you, which information includes the name, address and tax identification number and other information regarding you that will allow us or such Lender to identify you in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective as to us and the Lenders.

     Please indicate your acceptance of the terms hereof and of the Term Sheets, the Conditions Annex, the Fee Letter by returning to us executed counterparts of this Commitment Letter, the Fee Letter not later than 5:00 p.m., New York City time, on June 22, 2007 (the "<u>Deadline</u>"). This Commitment Letter and the commitments of UBS hereunder and the agreement of UBSS to provide the services described herein are also conditioned upon your acceptance hereof and of the Fee Letter, and our receipt of executed counterparts hereof and thereof on or prior to the Deadline. Upon the earliest to occur of (A) the execution and delivery of the Financing Documentation by all of the parties thereto and the initial funding of the Term Loan Facility on the Closing Date, (B) December 31, 2007, if the Financing Documentation shall not have been executed and delivered by all such parties prior to that date and (C) if earlier than (B), the date of termination of the Acquisition Agreement, this Commitment Letter and the commitments of UBS hereunder and the agreement of UBS to provide the services described herein shall automatically terminate unless UBS and UBSS shall, in their discretion, agree to an extension. The compensation, expense reimbursement, confidentiality, indemnification and governing law and forum provisions hereof and in the Term Sheets and the Fee Letter shall survive termination of (i) this Commitment Letter (or any portion hereof) and (ii) any or all of the commitments of UBS hereunder. The provisions under the headings "Syndication" and "Clear Market" above shall survive the execution and delivery of the Financing Documentation.

     [Signature Page Follows]

LA\1729820.12

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

UBS LOAN FINANCE LLC

By: _____
Name:
Title:

John C. Crockett
Executive Director

By: _____
Name:
Title:

Warren Jervey
Executive Director and Counsel
Region Americas Legal

UBS SECURITIES LLC

By: _____
Name:
Title:

John C. Crockett
Executive Director

By: _____
Name:
Title:

Warren Jervey
Executive Director and Counsel
Region Americas Legal

Signature page to Commitment Letter

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

UBS LOAN FINANCE LLC

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

UBS SECURITIES LLC

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Accepted and agreed to as of
the date first written above:

THE FINISH LINE, INC.

By: _____
    Name: Kevin S. Wampler
    Title: Executive Vice President,
        Chief Financial Officer and
        Assistant Secretary

Signature page to Commitment Letter

ANNEX I

**REVOLVING CREDIT FACILITY**

**SUMMARY OF PRINCIPAL TERMS AND CONDITIONS**[1]

| | |
|---|---|
| <u>Borrower</u>: | The Finish Line, Inc. ("<u>Borrower</u>"), the outstanding equity interests of which are currently traded in the public securities markets. |
| <u>Sole Lead Arranger and Sole Book Running Manager</u>: | UBS Securities LLC ("<u>UBSS</u>" or the "<u>Arranger</u>"). |
| <u>Lenders</u>: | A syndicate of banks, financial institutions and other entities (other than the Blacklist), including UBS Loan Finance LLC ("<u>UBS</u>"), arranged by UBSS (collectively, the "<u>Lenders</u>"). |
| <u>Revolving Administrative Agent and Issuing Bank</u>: | UBS AG, Stamford Branch. |
| <u>Revolving Co-Collateral Agents</u>: | UBS AG, Stamford Branch and a financial institution to be designated by the Arranger (together, the "<u>Revolving Co-Collateral Agents</u>"). |
| <u>Swingline Lender</u>: | UBS Loan Finance LLC. |
| <u>Type and Amount of Facility</u>: | An asset-based revolving credit facility (the "<u>Revolving Credit Facility</u>") in an aggregate principal amount of $450.0 million (the "<u>Maximum Amount</u>"). |
| <u>Purpose</u>: | Not more than the Closing Date Permitted Revolver Draw will be used on the Closing Date to finance a portion of the Acquisition consideration and the Refinancing and to pay fees, commissions and expenses in connection therewith. Following the Closing Date, the Revolving Credit Facility will also be used by Borrower and its subsidiaries for working capital and general corporate purposes. |
| <u>Maturity Date</u>: | 5 years from the Closing Date. |
| <u>Availability</u>: | Upon satisfaction or waiver of conditions precedent to drawing to be specified herein and subject to the then current Bor- |

---

[1]    All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

LA\1729820.12

-2-

rowing Base, borrowings may be made at any time on or after the Closing Date to but excluding the business day preceding the maturity date of the Revolving Credit Facility. Borrowing availability under the Revolving Credit Facility will be limited to the lesser of (i) the Borrowing Base Amount (as defined below) and (ii) the Maximum Amount, in each case less any applicable reserves as determined by the Revolving Administrative Agent in its reasonable discretion.

**Letters of Credit:**    Up to $50.0 million of the Revolving Credit Facility will be available for letters of credit, on terms and conditions to be set forth in the Bank Documentation. Each letter of credit shall expire not later than the earlier of (i) 12 months after its date of issuance and (ii) the fifteenth day prior to the Maturity Date of the Revolving Credit Facility.

Drawings under any letter of credit shall be reimbursed by Borrower on the same business day. To the extent that Borrower does not reimburse the Issuing Bank on the same business day, the Lenders under the Revolving Credit Facility shall be irrevocably obligated to reimburse the Issuing Bank pro rata based upon their respective Revolving Credit Facility commitments.

The issuance of all letters of credit shall be subject to the customary procedures of the Issuing Bank.

**Swingline Facility:**    Up to $25.0 million of the Revolving Credit Facility will be available for swingline borrowings, on terms and conditions to be set forth in the Bank Documentation.

Except for purposes of calculating the commitment fee described below, any swingline borrowings will reduce availability under the Revolving Credit Facility on a dollar-for-dollar basis.

**Amortization:**    None.

**Interest:**    At Borrower's option, loans will bear interest based on the Base Rate or LIBOR, as described below (except that all swingline borrowings will accrue interest based on the Base Rate):

A. Base Rate Option

Interest will be at the Base Rate plus the applicable Interest Margin, calculated on the basis of the actual number of days

-3-

elapsed in a year of 365 days and payable quarterly in arrears. The Base Rate is defined as the higher of the Federal Funds Rate, as published by the Federal Reserve Bank of New York, plus 1/2 of 1% and the prime commercial lending rate of UBS AG, as established from time to time at its Stamford Branch.

Base Rate borrowings will be in minimum amounts to be agreed upon and (other than swingline borrowings) will require same day prior notice.

B. LIBOR Option

Interest will be determined for periods to be selected by Borrower ("Interest Periods") of one, two, three or six months (or nine or twelve months if agreed to by all relevant Lenders) and will be at an annual rate equal to the London Interbank Offered Rate ("LIBOR") for the corresponding deposits of U.S. dollars, plus the applicable Interest Margin. LIBOR will be determined by the Revolving Administrative Agent at the start of each Interest Period and will be fixed through such period. Interest will be paid at the end of each Interest Period or, in the case of Interest Periods longer than three months, quarterly, and will be calculated on the basis of the actual number of days elapsed in a year of 360 days. LIBOR will be adjusted for statutory reserve requirements (if any).

LIBOR borrowings will require three business days' prior notice and will be in minimum amounts to be agreed upon.

Default Interest and Fees:    Upon the occurrence and during the continuance of a payment default, interest will accrue (i) in the case of principal or interest on any loan at a rate of 2.0% per annum plus the rate otherwise applicable to such loan and (ii) in the case of any other amount, at a rate of 2.0% per annum plus the non-default interest rate then applicable to Base Rate loans under the Revolving Credit Facility. Default interest shall be payable on demand.

Interest Margins:    The applicable Interest Margin will be the basis points set forth in the following table:

-4-

|  | Base Rate Loans | LIBOR Loans |
|---|---|---|
| Revolving Credit Facility | 25 bps | 150 bps |

After the date on which Borrower shall have delivered financial statements for the fiscal quarter ending at least six months after the Closing Date, the Interest Margin will be determined pursuant to the following grid based on Excess Availability (as defined below).

| Excess Availability | Base Rate Loans | LIBOR Loans |
|---|---|---|
| <$100.0 million | 50 bps | 175 bps |
| ≥$100.0 million and ≤$300.0 million | 25 bps | 150 bps |
| >$300.0 million | 0 bps | 125 bps |

"Excess Availability" shall mean, on the date of determination, (a) the lesser of (i) the commitments of all of the Lenders under the Revolving Credit Facility and (ii) the Borrowing Base on the date of determination *less* (b) all outstanding loans and obligations in respect of letters of credit under the Revolving Credit Facility.

Commitment Fee:

A Commitment Fee shall accrue on the unused amounts of the commitments under the Revolving Credit Facility. Such Commitment Fee will be 0.25% per annum. Accrued Commitment Fees will be payable quarterly in arrears (calculated on a 360-day basis) for the account of the Lenders from the Closing Date.

Letter of Credit Fees:

Borrower will pay (i) the Issuing Bank a fronting fee equal to 12.5 basis points per annum and (ii) the Lenders under the Revolving Credit Facility letter of credit participation fees equal to the Interest Margin for LIBOR Loans under the Revolving Credit Facility, in each case, on the undrawn amount of all outstanding letters of credit. In addition, Borrower will pay the Issuing Bank customary issuance fees.

-5-

| | |
|---|---|
| <u>Mandatory Prepayments</u>: | From and after the date that is 30 days after the Closing Date, all cash or cash equivalents (other than payroll accounts and certain other accounts to be mutually agreed) and proceeds will be deposited (or swept within 3 business days after receipt of collected funds) into one or more bank accounts with respect to which account control agreements acceptable to the Revolving Co-Collateral Agents and the Revolving Administrative Agent have been executed and delivered or with respect to which the Revolving Co-Collateral Agents have otherwise obtained control in a manner acceptable to the Revolving Co-Collateral Agents and the Revolving Administrative Agent and if either (a) an Event of Default shall have occurred and be continuing or (b) Excess Availability shall be less than $50.0 million at any time (each of clauses (a) and (b), a "<u>Trigger Event</u>"), such proceeds, at the option of the Revolving Co-Collateral Agents, shall be applied to reduce the balance of any swingline loans, and thereafter to any other revolving loans outstanding under the Revolving Credit Facility or to cash collateralize Letters of Credit. |

Borrower shall make mandatory prepayments with respect to outstanding borrowings under the Revolving Credit Facility in an amount, if any, required from time to time, to assure that amounts outstanding under the Revolving Credit Facility do not exceed the Borrowing Base. Any such prepayments shall not reduce the commitments.

There will be no prepayment penalties (except LIBOR breakage costs) for mandatory prepayments.

| | |
|---|---|
| <u>Optional Prepayments</u>: | Permitted in whole or in part, with prior notice but without premium or penalty (except LIBOR breakage costs) and including accrued and unpaid interest, subject to limitations as to minimum amounts of prepayments. |
| <u>Application of Prepayments</u>: | Mandatory and optional prepayments shall be applied first to repay any swingline loans, then to prepay principal on a pro rata basis among the Lenders and pay accrued and unpaid interest on the principal amount so prepaid. |
| <u>Guarantees</u>: | The Revolving Credit Facility will be fully and unconditionally guaranteed on a joint and several basis by all of the existing and future direct and indirect domestic subsidiaries of Borrower (collectively, the "<u>Guarantors</u>"). |
| <u>Security</u>: | The Revolving Credit Facility and any hedging or treasury management obligations to which a Lender or an affiliate of a |

-6-

Lender is a counterparty will be secured by (i) perfected first priority security interests on all accounts receivable, inventory and deposit accounts of Borrower and the Guarantors, wherever located, now or hereafter owned, and all proceeds thereof (including cash, cash equivalents, instruments, chattel paper, general intangibles (excluding trademarks, trade names and other intellectual property), letters of credit, insurance proceeds and investment property in each case arising from any such accounts receivable, inventory and deposit accounts) and (ii) perfected second priority pledges of all of the equity interests of each of Borrower's direct and indirect domestic subsidiaries (and of 65% of the equity interests of each of the Borrower's direct and indirect first-tier foreign subsidiaries) and perfected second priority security interests in and mortgages on all tangible and intangible assets of the Borrower and the Guarantors, wherever located, now or hereafter owned (including, without limitation, equipment, general intangibles, intercompany notes, insurance policies, investment property, intellectual property, owned real property and cash and proceeds of the foregoing), other than the assets set forth in subparagraph (i) above, subject to such exceptions as are agreed.

The priority of the security interests and related creditor rights between the Revolving Credit Facility and the Term Loan Facility will be set forth in an intercreditor agreement (the "Intercreditor Agreement") on terms and conditions reasonably satisfactory to the Revolving Administrative Agent, the Revolving Co-Collateral Agents, the Term Loan Administrative Agent and the Term Loan Collateral Agent.

Borrowing Base:

The amount from time to time outstanding (including any obligations with respect to Letters of Credit) under the Revolving Credit Facility shall not exceed the lesser of the Maximum Amount or the total of (the "Borrowing Base Amount"):

1.    90% of the value of Borrower's eligible credit card receivables and, to the extent not constituting eligible credit card receivables, 85% of the value of Borrower's eligible accounts; plus

2.    (i) During the period from the Closing Date through the first anniversary thereof, the lesser of (x) 75% of the lower of cost or market value of Borrower's eligible inventory, or (y) 90% of the net orderly liquidation value of such eligible inventory (based on

-7-

the most recent inventory appraisal), and (ii) thereafter, the lesser of (x) 75% of the lower of cost or market value of Borrower's eligible inventory, or (y) 85% of the net orderly liquidation value of such eligible inventory (based on the most recent inventory appraisal); <u>minus</u>

3.    reserves as the Revolving Co-Collateral Agents may, from time to time, establish in good faith.

Actual advance rates and details of eligibility criteria as well as other levels of and limitations on collateral that may be included in the Borrowing Base, are to be determined after the collateral audit and appraisals are completed and shall be subject to further revision, from time to time, pursuant to procedures to be detailed in the Bank Documentation. In addition, the Revolving Co-Collateral Agents and the Revolving Administrative Agent shall have the right to establish reserves with respect to the borrowing base for such purposes and in such amounts as they shall determine appropriate in their discretion from time to time, pursuant to procedures to be detailed in the Bank Documentation.

**Conditions to Initial Borrowings:**      Conditions precedent to initial borrowings under the Revolving Credit Facility will be those set forth in the Commitment Letter and in <u>Annex IV</u> to the Commitment Letter and the accuracy of the Acquisition Agreement Representations and the Specified Representations.

**Conditions to Each Borrowing:**      Conditions precedent to each borrowing or issuance under the Revolving Credit Facility will be (1) the absence of any continuing default or event of default, (2) subject to the limitations set forth in the penultimate sentence under "Conditions" in the Commitment Letter, the accuracy of all representations and warranties, (3) receipt of a customary borrowing notice or letter of credit request, as applicable and (4) continued compliance with the Borrowing Base requirements after giving effect to such borrowing or issuance.

**Representations and Warranties:**      Representations and warranties will apply to Borrower and its subsidiaries, will be subject to materiality levels and/or exceptions to be negotiated and reflected in the Bank Documentation, and will be:

Accuracy and completeness of financial statements (including that pro forma financial statements and forecasts are prepared in good faith based upon reasonable assumptions); no mate-

-8-

rial adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of the Bank Documentation; no conflict with law or contractual obligations; no labor disputes; no material litigation; no material casualty event; no default; ownership of property; liens; intellectual property; use of proceeds; taxes; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; no restrictions on subsidiaries regarding dividends, loans to Borrower or its subsidiaries or transfer of property to Borrower or its subsidiaries; environmental matters; solvency; accuracy and completeness of disclosure; Patriot Act and anti-terrorism law compliance; location of inventory; accuracy of Borrowing Base; creation and perfection of security interests; and status of debt under the applicable Facility as senior debt or designated senior debt.

<u>Reporting and Related Requirements</u>:    Customary in credit agreements of this nature, including, but not limited to, the following:

1.    Annual audited financial statements within 75 days of each fiscal year end or sooner if required by the US Securities and Exchange Commission ("<u>SEC</u>"), accompanied by a compliance certificate.

2.    Quarterly financial statements within 40 days of each quarter end or sooner if required by the SEC, accompanied by a compliance certificate.

3.    Monthly financial statements within 30 days of each month end.

4.    Annual perfection certificate supplement.

5.    Management letters.

6.    Annually prepared monthly budget for the upcoming year, including line items for budgeted Borrowing Base levels and credit utilization.

7.    Collateral field audits and independent appraisals, at the expense of the Borrower, to be performed no more frequently than once per year or more frequently during the continuation of a Trigger Event.

8.    Borrowing Base certificates on a monthly basis (unless a Trigger Event shall be continuing, in which case as often as may be reasonably requested by the

-9-

Revolving Co-Collateral Agent or the Revolving Administrative Agent) signed by a responsible corporate officer and supplemental or supporting exhibits, and other specific supporting data reasonably requested from time to time by the Revolving Co-Collateral Agents or the Revolving Administrative Agent, all on a basis and form to be determined after the Revolving Co-Collateral Agents have reviewed the results of the collateral audit work.

9.  Notices of default, material litigation, material liens, material adverse change, reports to shareholders, other material events to be mutually agreed and casualty events.

**Affirmative Covenants:**

Affirmative covenants will apply to Borrower and its subsidiaries, will be subject to thresholds and/or exceptions to be negotiated and reflected in the Bank Documentation and will be those set forth above under the heading "Reporting and Related Requirements" and the following:

Payment of taxes; continuation of business and maintenance of existence and material rights and privileges; compliance with all applicable laws and regulations (including, without limitation, environmental matters, taxation and ERISA); maintenance of property and insurance; maintenance of books and records; right of the Lenders to inspect property and books and records; agreement to hold annual meetings of Lenders; further assurances (including, without limitation, with respect to security interests in after-acquired property); commercially reasonable efforts to cause the Bank Facilities and Borrower to continue to be rated by Moody's and S&P (but not to maintain a specific rating); and delivery of an irrevocable notice of redemption for the Genesco Preferred Stock outstanding as of the Closing Date within a reasonable period of time after the Closing Date.

**Negative Covenants:**

Negative covenants will apply to Borrower and its subsidiaries and will be subject to thresholds and/or exceptions to be negotiated and reflected in the Bank Documentation and will be:

1.  Limitation on dispositions of assets and changes of business.

2.  Limitation on mergers and acquisitions.

-10-

3.   Limitations on dividends, stock repurchases and re-demptions and other restricted payments.

4.   Limitation on indebtedness (including guarantees and other similar contingent obligations) and preferred stock and prepayment, amendment and redemption of subordinated debt and preferred stock.

5.   Limitation on loans and investments.

6.   Limitation on liens and further negative pledges.

7.   Limitation on transactions with affiliates.

8.   Limitation on restrictions on subsidiaries regarding dividends, loans to Borrower or its subsidiaries or transfer of property to Borrower or its subsidiaries.

9.   Limitation on sale and leaseback transactions.

10.   Limitation on capital expenditures.

11.   Maintenance of holding companies and/or any inac-tive subsidiaries as passive, non-operating enter-prises.

12.   No modification or waiver of certain material docu-ments to be agreed (including charter documents of Borrower and its subsidiaries) in any manner materi-ally adverse to the Lenders without the consent of the Requisite Lenders.

13.   No change to fiscal year.

14.   Maintenance of intellectual property at the Borrower or any of the Guarantors.

Financial Covenants:     At any time that Excess Availability is at or below 10% of the then aggregate amount of the commitments under the Revolv-ing Credit Facility, Borrower and its consolidated subsidiaries will be subject to a minimum fixed charge coverage ratio of 1.00:1.00.

Events of Default:     Events of default will be subject to materiality levels, default triggers, cure periods and/or exceptions to be negotiated and reflected in the Bank Documentation and will be: nonpay-ment, breach of representations and covenants, cross-defaults,

-11-

loss of lien on collateral (other than immaterial collateral), invalidity of guarantees or other material provisions of the Bank Documentation, bankruptcy and insolvency events, ERISA events, restraint on doing business resulting in a material adverse effect, unsatisfied judgments and change of ownership or control (to be defined).

**Assignments and Participations:**

Each Lender may assign all or, subject to minimum amounts to be agreed, a portion of its loans and commitments under the Revolving Credit Facility. Assignments will require payment of an administrative fee to the Revolving Administrative Agent and the consents of the Revolving Administrative Agent and Borrower, which consents shall not be unreasonably withheld; *provided* that (i) no consents shall be required for an assignment to an existing Lender or an affiliate of an existing Lender and (ii) no consent of Borrower shall be required during an event of default or prior to the completion of the primary syndication of the Revolving Credit Facility (as determined by UBSS)(it being understood that UBSS shall not as part of the primary syndication syndicate the Revolving Credit Facility to those financial institutions, if any, on the Blacklist). In addition, each Lender may sell participations in all or a portion of its loans and commitments under the Revolving Credit Facility; *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the Revolving Credit Facility (except as to certain basic issues).

**Expenses and Indemnification:**

All reasonable out-of-pocket expenses (including but not limited to reasonable legal fees and expenses and expenses incurred in connection with due diligence and travel, courier, reproduction, printing and delivery expenses) of UBS, UBSS, the Revolving Administrative Agent, the Revolving Co-Collateral Agents and the Issuing Bank associated with the syndication of the Revolving Credit Facility and with the preparation, execution and delivery, administration, amendment, waiver or modification (including proposed amendments, waivers or modifications) of the documentation contemplated hereby are to be paid by Borrower. In addition, all out-of-pocket expenses (including but not limited to reasonable legal fees and expenses) of the Lenders and the Revolving Administrative Agent for workout proceedings, enforcement costs and documentary taxes associated with the Revolving Credit Facility are to be paid by Borrower.

-12-

Borrower will indemnify the Lenders, UBS, UBSS, the Revolving Administrative Agent, the Revolving Co-Collateral Agents and the Issuing Bank and their respective affiliates, and hold them harmless from and against all reasonable out-of-pocket costs, expenses (including but not limited to reasonable legal fees and expenses) and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the Revolving Credit Facility; *provided, however,* that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred primarily by reason of the bad faith, gross negligence or willful misconduct of such person.

Yield Protection, Taxes and Other Deductions:

The Bank Documentation will contain yield protection provisions, customary for facilities of this nature, protecting the Lenders in the event of unavailability of LIBOR, breakage losses, reserve and capital adequacy requirements.

All payments are to be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than income taxes in the jurisdiction of the Lender's organization or of its applicable lending office). The Lenders will use commercially reasonable efforts to minimize to the extent possible any applicable taxes and Borrower will indemnify the Lenders and the Revolving Administrative Agent for such taxes paid by the Lenders and the Revolving Administrative Agent, as the case may be.

Required Lenders:

Lenders holding at least a majority of total loans and commitments under the Revolving Credit Facility, with certain amendments requiring the consent of Lenders holding a greater percentage (or all) of the total loans and commitments under the Revolving Credit Facility and amendments prior to completion of the primary syndication of the Revolving Credit Facility (as determined by UBSS) also requiring the consent of UBS.

Governing Law and Forum:

The laws of the State of New York. Each party to the Bank Documentation will waive the right to trial by jury and will consent to jurisdiction of the state and federal courts located in The City of New York.

-13-

Counsel to UBS, UBSS,
the Revolving Administrative Agent,
the Issuing Bank and UBS AG, Stamford
Branch in its capacity as one of the
<u>Revolving Co-Collateral Agents</u>:          Latham & Watkins LLP.

ANNEX II

**TERM LOAN FACILITY**[1]

**SUMMARY OF PRINCIPAL TERMS AND CONDITIONS**

| | |
|---|---|
| Borrower: | The Finish Line, Inc. ("Borrower"), the outstanding equity interests of which are currently traded in the public securities markets. |
| Sole Lead Arranger and Sole Book Running Manager: | UBS Securities LLC ("UBSS" or the "Arranger"). |
| Lenders: | A syndicate of banks, financial institutions and other entities (other than the Blacklist), including UBS Loan Finance LLC ("UBS"), arranged by UBSS (collectively, the "Lenders"). |
| Term Loan Administrative Agent and Term Loan Collateral Agent: | UBS AG, Stamford Branch (the "Term Loan Administrative Agent" and the "Term Loan Collateral Agent"). |
| Type and Amount of Facility: | A Term Loan Facility (the "Term Loan Facility") in an aggregate principal amount of up to $690.0 million. |
| Purpose: | To finance a portion of the Acquisition consideration and the Refinancing and to pay fees, commissions and expenses in connection therewith. |
| Maturity Date: | 7 years from the Closing Date. |
| Availability: | Upon satisfaction or waiver of conditions precedent to funding set forth herein, a single drawing may be made on the Closing Date of the full amount of the Term Loan Facility. |
| Amortization: | The Term Loan Facility will amortize in equal quarterly installments in annual amounts equal to 1.0% of the original principal amount of the Term Loan Facility, with the balance payable on the Maturity Date |
| Interest: | Interest options and default interest will be substantially identical to those in the Bank Documentation for the Revolving |

---

[1]    All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

-2-

Credit Facility. The applicable Interest Margin will be the
basis points set forth in the following table.

|  | Base Rate Loans | LIBOR Loans |
|---|---|---|
| Term Loan Facility | 125 bps | 250 bps |

To the extent the corporate credit is rated less than B2 (with a
stable outlook) by Moody's or less than B (with a stable out
look) by S&P as of the Closing Date, each of the Interest
Margins in the table above shall be increased by 25 bps.

**Mandatory Prepayments:**

At any time when a Trigger Event is not continuing, loans
shall be prepaid in an amount equal to (a) 100% of the net
cash proceeds received from the sale or other disposition of
all or any part of the assets of Borrower or any of its subsidi-
aries after the Closing Date other than sales of inventory in
the ordinary course of business and other than amounts rein-
vested in assets to be used in Borrower's business within 12
months of such disposition (or if committed to be reinvested
within such 12 months, reinvested within 6 months of such
commitment) and subject to other exceptions to be agreed,
(b) 100% of the net cash proceeds received by Borrower or
any of its subsidiaries from the issuance of debt or preferred
stock after the Closing Date, other than debt or preferred
stock permitted to be incurred under the Bank Documentation
and other exceptions to be agreed, (c) 100% of all casualty
and condemnation proceeds received by Borrower or any of
its subsidiaries, subject to reinvestment rights to be agreed
and (d) 50% of excess cash flow of Borrower and its subsidi-
aries (to be defined in a manner to be agreed), subject to step-
downs to 25% and 0% based upon leverage ratios to be
agreed.

**Optional Prepayments:**

Optional prepayments of the Term Loan Facility will be per-
mitted in whole or part, with prior notice but without pre-
mium or penalty, except LIBOR breakage costs, and includ-
ing accrued and unpaid interest, subject to limitations as to
minimum amounts of prepayments.

**Prepayment Premium:**

None.

**Guarantees:**

The Term Loan Facility will be fully and unconditionally
guaranteed on a joint and several basis by each of the guaran-

LA\1729820.12

-3-

tors of the Revolving Credit Facility (collectively, the "Guar-antors").

**Security:**

The Term Loan Facility and any hedging or treasury man-agement obligations to which a Lender or an affiliate of a Lender is a counterparty will be secured by (i) perfected first priority pledges of all of the equity interests of each of Bor-rower's direct and indirect domestic subsidiaries (and of 65% of the equity interests of each of the Borrower's direct and indirect first-tier foreign subsidiaries) and perfected first pri-ority security interests in and mortgages on all tangible and intangible assets of the Borrower and the Guarantors, wher-ever located, now or hereafter owned (including, without limitation, equipment, general intangibles, intercompany notes, insurance policies, investment property, intellectual property, owned real property and cash and proceeds of the foregoing), other than the assets set forth in subparagraph (ii) below and (ii) perfected second priority security interests on all accounts receivable, inventory and deposit accounts of Borrower and the Guarantors, wherever located, now or here-after owned, and all proceeds thereof (including cash, cash equivalents, instruments, chattel paper, general intangibles (excluding trademarks, trade names and other intellectual property), letters of credit, insurance proceeds and investment property in each case arising from any such accounts receiv-able, inventory and deposit accounts).

The priority of the security interests and related creditor rights between the Revolving Credit Facility and the Term Loan Facility will be set forth in an intercreditor agreement (the "Intercreditor Agreement") on terms and conditions rea-sonably satisfactory to the Revolving Administrative Agent, the Revolving Co-Collateral Agents, the Term Loan Admin-istrative Agent and the Term Loan Collateral Agent.

**Conditions to Borrowing:**

Substantially identical to those conditions applicable to the initial extension of credit under the Revolving Credit Facility, other than any condition relating to "Borrowing Base".

**Representations and Warranties:**

Substantially identical to those in the Bank Documentation for the Revolving Credit Facility.

**Affirmative Covenants:**

Substantially identical to those in the Bank Documentation for the Revolving Credit Facility plus the requirement to es-tablish an interest rate protection program and/or have fixed rate financing on a percentage to be determined of the aggre-gate funded indebtedness of Borrower and its subsidiaries.

LA\1729820.12

-4-

| | |
|---|---|
| <u>Negative Covenants</u>: | Substantially identical to those in the Bank Documentation for the Revolving Credit Facility. |
| <u>Financial Covenants</u>: | None. |
| <u>Events of Default</u>: | Substantially identical to those in the Bank Documentation for the Revolving Credit Facility. |
| <u>Assignments and Participations</u>: | Each Lender may assign all or, subject to minimum amounts to be agreed, a portion of its loans and commitments under the Term Loan Facility. Assignments will require payment of an administrative fee to the Term Loan Administrative Agent and the consent of the Term Loan Administrative Agent and the Borrower, which consent shall not be unreasonably withheld; *provided* that (i) no consent shall be required for an assignment to an existing Lender or an affiliate of an existing Lender and (ii) no consent of Borrower shall be required during an event of default or prior to the completion of the primary syndication of the Term Loan Facility (as determined by UBSS) (it being understood that UBSS shall not as part of the primary syndication syndicate the Term Loan Facility to those financial institutions, if any, on the Blacklist). In addition, each Lender may sell participations in all or a portion of its loans and commitments under the Term Loan Facility; *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the Term Loan Facility (except as to certain basic issues). |
| <u>Expenses and Indemnification</u>: | Substantially identical to those in the Bank Documentation for the Revolving Credit Facility. |
| Yield Protection, Taxes and <u>Other Deductions</u>: | Substantially identical to those in the Bank Documentation for the Revolving Credit Facility. |
| <u>Required Lenders</u>: | Lenders holding at least a majority of total loans and commitments under the Term Loan Facility, with certain amendments requiring the consent of Lenders holding a greater percentage (or all) of the total loans and commitments under the Term Loan Facility and amendments prior to completion of the primary syndication of the Term Loan Facility (as determined by UBSS) also requiring the consent of UBS. |
| <u>Governing Law and Forum</u>: | The laws of the State of New York. Each party to the Bank Documentation will waive the right to trial by jury and will |

-5-

consent to jurisdiction of the state and federal courts located in The City of New York.

Counsel to UBS, UBSS,
the Term Loan Administrative
Agent and the Term Loan
<u>Collateral Agent</u>:

Latham & Watkins LLP.

ANNEX III

**BRIDGE FACILITY**

**SUMMARY OF PRINCIPAL TERMS AND CONDITIONS**[1]

| | |
|---|---|
| Borrower: | The Finish Line, Inc. ("Borrower"), the outstanding equity interests of which are currently traded in the public securities markets. |
| Sole Lead Arranger and Sole Book Running Manager: | UBS Securities LLC ("UBSS" or the "Arranger"). |
| Lenders: | A syndicate of banks, financial institutions and other entities (other than the Blacklist), including UBS Loan Finance LLC ("UBS"), arranged by UBSS. |
| Bridge Loan Administrative Agent: | UBS AG, Stamford Branch (the "Bridge Loan Administrative Agent"). |
| Type and Amount of Bridge Facility: | $700.0 million senior unsecured bridge loan facility (the "Bridge Facility"). |
| Purpose: | Proceeds of borrowings under the Bridge Facility (the "Initial Loans") will be used to finance a portion of the Acquisition and the Refinancing and to pay fees, commissions and expenses in connection therewith. |
| Maturity/Exchange: | All the Initial Loans will mature on the date that is one year following the Closing Date (the "Maturity Date"). If any Initial Loan has not been previously repaid in full on or prior to the Maturity Date, subject to the conditions outlined below under "Conditions to Conversion of the Initial Loans," such Initial Loan shall be converted into a term loan (each, a "Extended Term Loan" and, together with the Initial Loans, the "Loans") maturing on the 8th anniversary of the Closing Date (the "Final Maturity Date"). The Lenders in respect of the Initial Loans and the Extended Term Loans will have the option (i) in the case of Initial Loans, at the Maturity Date or (ii) in the case of Extended Term Loans, at any time or from time to time, to receive |

---

[1]     All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

-2-

notes (the "Exchange Notes") in exchange for such Initial Loans or Extended Term Loans having the terms set forth in the term sheet attached hereto as Exhibit A.

**Availability:**

Upon satisfaction of conditions precedent to drawing to be specified herein, a single drawing may be made on the Closing Date of up to the full amount of the Bridge Facility.

**Interest:**

Prior to the Maturity Date, the Initial Loans will accrue interest at a rate per annum equal to the three-month London Interbank Offered Rate ("LIBOR") as determined by UBS for a corresponding U.S. dollar deposit amount (adjusted quarterly) plus a spread (the "Spread"). The initial Spread will be determined based on the bond rating of the Borrower and the lease-adjusted leverage ratio as of the Closing Date. If (i) such ratings are Caa1 (with a stable outlook) or better by Moody's and CCC+(with a stable outlook) or better by S&P (such ratings, the "Ratings Threshold") and (ii) the lease-adjusted leverage ratio for the last 12 months ending more than 45 days prior to the Closing Date (after giving effect to the Transactions) is less than 6.5x (the "Leverage Threshold", and together with the Ratings Threshold, the "Thresholds"), then the Spread will initially be 500 basis points, and if the Thresholds are not met, then the Spread will initially be 600 basis points. If the Initial Loans are not repaid in full within six months following the Closing Date, the Spread will increase by 50 basis points at the beginning of the subsequent three-month period and shall increase by an additional 50 basis points at the beginning of each three-month period thereafter (but, in any event, not on the Maturity Date). LIBOR will be adjusted for statutory reserve requirements (if any).

Interest on the Initial Loans will be payable in arrears at the end of each three-month period and at the Maturity Date. Interest on the Initial Loans shall not exceed 12.0% per annum (the "Total Cap"); *provided* that the Total Cap for the Initial Loans and the Exchange Notes shall each be increased by 100 basis points if the Thresholds are not met.

Following the Maturity Date, all outstanding Extended Term Loans will accrue interest at the rate provided for in the Exchange Notes in Exhibit A hereto; provided that a holder of an Extended Term Loan may at any time fix the rate thereon at the effective rate (such loans, "Fixed Rate Term Loans").

-3-

Calculation of interest shall be on the basis of actual days elapsed in a year of 360 days.

**Default Interest:**

Upon the occurrence and during the continuance of an event of default, interest will accrue on the amount of any loan or other amount outstanding under the Bridge Facility at a rate of 2.0% per annum plus the rate otherwise applicable to the loans under the Bridge Facility and will be payable on demand.

**Mandatory Prepayment:**

Borrower will be required to prepay Initial Loans and Extended Term Loans (other than Fixed Rate Term Loans), and offer to prepay Fixed Rate Term Loans, on a pro rata basis, at par plus accrued and unpaid interest, in an amount equal to (a) 100% of the net proceeds received from the sale or other disposition of assets of Borrower or any of its subsidiaries after the Closing Date, other than sales of inventory in the ordinary course of business and other exceptions to be agreed and subject to reinvestment rights to be agreed and prepayment of the Bank Facilities, (b) 100% of the net proceeds received by Borrower or any of its subsidiaries from the issuance of debt or preferred stock after the Closing Date, other than exceptions to be agreed and (c) 100% of the net proceeds received from the issuance of common equity (including, but not limited to, upon the exercise of warrants and options) by, or equity contributions to, Borrower after the Closing Date and (d) 100% of all casualty and condemnation proceeds received by Borrower or any of its subsidiaries, subject to reinvestment rights to be agreed and prepayment of the Bank Facilities.

**Optional Prepayments:**

The Initial Loans and Extended Term Loans (other than Fixed Rate Term Loans) may be prepaid, in whole or in part, at the option of Borrower, at any time with prior notice, at par plus accrued and unpaid interest and breakage costs. The Fixed Rate Term Loans will be subject to prepayment restrictions and premiums consistent with Fixed Rate Exchange Notes.

**Guarantees:**

The Bridge Facility will be guaranteed on a senior unsecured basis by each of Borrower's subsidiaries that guarantees the Bank Facilities.

**Security:**

None.

**Conditions to Borrowing:**

Conditions precedent to borrowing under the Bridge Facility will be those set forth in the Commitment Letter and

-4-

Annex IV to the Commitment Letter, the absence of any
continuing default or event of default, subject to the limita-
tions set forth in the penultimate sentence under "Condi-
tions" in the Commitment Letter, the accuracy of all repre-
sentations and warranties, receipt of a customary borrowing
notice, and there being no legal bar to the lenders making
the loans.

Representations and Warranties:    Substantially the same as those in the Bank Documentation,
with such changes as are necessary or appropriate for the
Bridge Facility.

Affirmative and Negative Covenants:    Substantially the same as those in the Bank Documentation,
with such changes as are necessary or appropriate for the
Bridge Facility, as well as compliance with obligations in
the Fee Letter.

Financial Covenants:    None.

Events of Default:    Events of default will be subject to materiality levels, de-
fault triggers, cure periods and/or exceptions to be negoti-
ated and reflected in the Bridge Documentation and will in-
clude (without limitation) the following: nonpayment,
breach of representations and covenants, cross-payment de-
fault and cross-acceleration, invalidity of guarantees or
other material provisions of the Bridge Documentation,
bankruptcy and insolvency events, ERISA events, restraint
on doing business resulting in a material adverse effect, un-
satisfied judgments and change of ownership or control (to
be defined).

Conditions to Conversion
of Initial Loans:    On the Maturity Date, unless (i) Borrower or any signifi-
cant subsidiary thereof is subject to a bankruptcy or other
insolvency proceeding, (ii) there exists a matured default
with respect to the Initial Loans or (iii) there exists a default
in the payment when due at final maturity of any indebted-
ness of Borrower or any of its subsidiaries, or the maturity
of such indebtedness shall have been accelerated, the Initial
Loans shall automatically be converted into Extended Term
Loans (subject to the Lenders' rights to convert Initial
Loans into Exchange Notes as set forth in Exhibit A
hereto).

Assignments and Participations:    Each Lender may assign all or, subject to minimum
amounts to be agreed, a portion of its loans and commit-

-5-

ments under the Bridge Facility. Assignments will require payment of an administrative fee to the Bridge Loan Administrative Agent and, except for an assignment to an existing Lender or an affiliate of an existing Lender, the consent of the Bridge Loan Administrative Agent and Borrower, which consents shall not be unreasonably withheld; *provided* that (i) no consent shall be required for an assignment to an existing Lender or an affiliate of an existing Lender and (ii) no consent of Borrower shall be required during an event of default or prior to the completion of the primary syndication of the Bridge Facility (as determined by UBSS) (it being understood that UBSS shall not as part of the primary syndication syndicate the Bridge Facility to those financial institutions, if any, on the Blacklist). In addition, each Lender may sell participations in all or a portion of its loans and commitments under the Bridge Facility; *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the Bridge Facility (except as to certain basic issues).

Expenses and Indemnification:

All reasonable out-of-pocket expenses (including but not limited to reasonable legal fees and expenses and expenses incurred in connection with due diligence and travel, courier, reproduction, printing and delivery expenses) of UBS, UBSS and the Bridge Loan Administrative Agent associated with the syndication of the Bridge Facility and with the preparation, execution and delivery, administration, amendment, waiver or modification (including proposed amendments, waivers or modifications) of the documentation contemplated hereby are to be paid by Borrower. In addition, all out-of-pocket expenses (including but not limited to reasonable legal fees and expenses) of the Lenders and the Bridge Loan Administrative Agent for workout proceedings, enforcement costs and documentary taxes associated with the Bridge Facility are to be paid by Borrower.

Borrower will indemnify the Lenders, UBS, UBSS and the Bridge Loan Administrative Agent and their respective affiliates, and hold them harmless from and against all reasonable out-of-pocket costs, expenses (including but not limited to reasonable legal fees and expenses) and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the Bridge Facility; *provided, how-*

-6-

*ever*, that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred primarily by reason of the bad faith, gross negligence or willful misconduct of such person.

Yield Protection, Taxes and
Other Deductions:

The Bridge Documentation will contain yield protection provisions, customary for facilities of this nature, protecting the Lenders in the event of unavailability of LIBOR, breakage losses and reserve and capital adequacy requirements.

All payments are to be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than income taxes in the jurisdiction of the Lender's organization or of its applicable lending office). Borrower will indemnify the Lenders and the Bridge Loan Administrative Agent for such taxes paid by the Lenders or the Bridge Loan Administrative Agent. The Lenders will use commercially reasonable efforts to minimize to the extent possible any applicable taxes and Borrower will indemnify the Lenders and the Bridge Loan Administrative Agent for such taxes paid by the Lenders and the Bridge Loan Administrative Agent, as the case may be.

Requisite Lenders:

Lenders holding at least a majority of total loans and commitments under the Bridge Facility, with certain modifications or amendments requiring the consent of Lenders holding a greater percentage (or all) of the total Loans and commitments under the Bridge Facility.

Governing Law and Forum:

The laws of the State of New York. Each party to the Bridge Documentation will waive the right to trial by jury and will consent to jurisdiction of the state and federal courts located in The City of New York.

Counsel to UBSS and
the Bridge Loan Administrative Agent:

Latham & Watkins LLP.

LA\1729820.12

Summary of Principal Terms and Conditions
of Exchange Notes

Capitalized terms used but not defined herein have the meanings given (or incorporated by reference) in the Summary of Principal Terms and Conditions of the Bridge Facility to which this Exhibit A is attached.

| | |
|---|---|
| Issuer: | Borrower will issue Exchange Notes under an indenture which complies with the Trust Indenture Act (the "Indenture"). Borrower in its capacity as issuer of the Exchange Notes is referred to as the "Issuer." |
| Guarantors: | Same as Initial Loans. |
| Principal Amount: | The Exchange Notes will be available only in exchange for the Initial Loans (at the Maturity Date) or the Extended Term Loans (at any time). The principal amount of any Exchange Note will equal 100% of the aggregate principal amount of the Initial Loans or the Extended Term Loans for which it is exchanged. |
| Maturity: | The Exchange Notes will mature on the 8th anniversary of the Closing Date. |
| Interest Rate: | The Exchange Notes will bear interest at a rate equal to the Initial Rate (as defined below) plus the Exchange Spread (as defined below). Any holder of an Exchange Note may at any time fix the rate thereon at the effective rate (such Exchange Notes, "Fixed Rate Exchange Notes"). Notwithstanding the foregoing, the interest rate in effect at any time shall not exceed the Total Cap. The "Initial Rate" shall be equal to the interest rate applicable to the Initial Loans and in effect on the Maturity Date. "Exchange Spread" shall mean 50 basis points during the three-month period commencing on the Maturity Date and shall increase by 50 basis points at the beginning of each subsequent three-month period. |
| | Calculation of interest shall be on the basis of the actual number of days elapsed in a year of twelve 30-day months. |
| Default Interest: | In the event of a payment default on the Exchange Notes, interest on the Exchange Notes will accrue at a rate of 2.0% per annum in excess of the rate otherwise applicable to the Exchange Notes, and will be payable in accordance with the provisions described above under the heading "Interest Rate." |

LA\1729820.12

-2-

| | |
|---|---|
| <u>Ranking</u>: | Same as Initial Loans. |

<u>Mandatory Offer to Purchase</u>:    The Issuer will be required to offer to purchase the Exchange Notes upon a Change of Control (to be defined in the Indenture) at 101% of the principal amount thereof plus accrued interest to the date of purchase.

<u>Optional Redemption</u>:    Exchange Notes (other than Fixed Rate Exchange Notes) will be redeemable at the option of the Issuer, in whole or in part, at any time at par plus accrued and unpaid interest to the redemption date.

Except as set forth in the following paragraph, Fixed Rate Exchange Notes will not be redeemable at the option of the Issuer on or prior to the third anniversary of the Maturity Date. Subsequent to the third anniversary of the Maturity Date, each Fixed Rate Exchange Note will be redeemable at the option of the Issuer: (a) at a premium equal to 50% of the coupon of such Fixed Rate Exchange Note after the third anniversary of the Maturity Date but on or prior to the fourth anniversary of the Maturity Date, (b) at a premium equal to 25% of the coupon of such Fixed Rate Exchange Note after the fourth anniversary of the Maturity Date but on or prior to the fifth anniversary of the Maturity Date, and (c) at par thereafter.

Each Fixed Rate Exchange Note will be redeemable at the option of the Issuer prior to the third anniversary of the Maturity Date with the net cash proceeds of qualified equity offerings of Borrower at a premium equal to the coupon on such Fixed Rate Exchange Note; provided that after giving effect to such redemption at least 65% of the aggregate principal amount of Exchange Notes originally issued shall remain outstanding.

<u>Registration Rights</u>:    The Issuer will be required to:

- within 120 days after the Maturity Date, file a registration statement for an offer to exchange the Exchange Notes for publicly registered notes with identical terms;

- use its reasonable best efforts to cause the registration statement to become effective under the Securities Act within 180 days after the Maturity Date;

LA\1729820.12

-3-

- complete the exchange offer within 210 days after the Maturity Date; and

- file a shelf registration statement for the resale of the Exchange Notes if it cannot complete an exchange offer within those time periods listed above and in certain other circumstances.

If the Issuer does not comply with these obligations, it will be required to pay additional interest to the holders of the Exchange Notes at the rate of 25 bps per annum, increasing by 25 bps per annum at the beginning of each three-month period thereafter until such time as such failure is cured up to a maximum amount of 100 bps per annum for so long as such failure has not been cured.

In addition, unless and until the Issuer has consummated the exchange offer and, if required, caused the shelf registration statement to become effective, the holders of the Exchange Notes will have the right to "piggy-back" the Exchange Notes in the registration of any debt securities (subject to customary scale-back provisions) that are registered by the Issuer (other than on a Form S-4) unless all the Exchange Notes and Extended Term Loans will be redeemed or repaid from the proceeds of such securities.

**Right to Transfer Exchange Notes:**     The holders of the Exchange Notes shall have the absolute and unconditional right to transfer the Exchange Notes in compliance with applicable law to any third parties.

**Covenants:**     Those typical for an indenture governing a high yield note issue of a new issuer.

**Events of Default:**     Those typical for an indenture governing a high yield note issue of a new issuer.

**Governing Law:**     The laws of the State of New York.

## CONDITIONS TO CLOSING[1]

The commitment of UBS under the Commitment Letter with respect to each of the Facilities, the agreements of UBS and UBSS to perform the services described in the Commitment Letter, and the funding of the Facilities are subject to the conditions set forth in the Commitment Letter and satisfaction of each of the conditions precedent set forth below.

1.    UBS shall have reviewed, and be satisfied with, the final structure of the Acquisition and the terms and conditions of the Acquisition Agreement (it being understood that UBS is satisfied with the execution version of the Acquisition Agreement received by UBS at 9:19 p.m. Los Angeles time on June 16, 2007 and the structure of the Acquisition reflected therein and the disclosure schedules to the Acquisition Agreement received by UBS at 7:47 a.m. Los Angeles time on June 17, 2007). The Acquisition and the other Transactions shall be consummated concurrently with the initial funding of the Facilities in accordance with the Acquisition Agreement without giving effect to any waivers or amendments thereof that is material and adverse to the interests of the Lenders, unless consented to by UBS in its reasonable discretion. Immediately following the Transactions, none of Borrower, the Acquired Business nor any of their subsidiaries shall have any indebtedness or preferred equity other than as set forth in the Commitment Letter.

2.    UBS shall have received (i) audited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of each of the Borrower and the Acquired Business for each of the last three fiscal years ending more than 90 days prior to the Closing Date (collectively, the "Audited Financial Statements"), (ii) unaudited consolidated (and to the extent available, consolidating) balance sheets and related statements of income, stockholders' equity and cash flows of each of Borrower and the Acquired Business for each fiscal quarter of the current fiscal year ending more than 45 days prior to the Closing Date and for the comparable periods of the preceding fiscal year (the "Unaudited Financial Statements") (with respect to which the independent auditors shall have performed an SAS 100 review), (iii) to the extent produced by you or by the Acquired Business, unaudited consolidated (and to the extent available, consolidating) balance sheets and related statements of income of each of Borrower and the Acquired Business for each fiscal month ending after the last fiscal quarter covered by the Unaudited Financial Statements and more than 30 days prior to the Closing Date and for the comparable periods of the preceding fiscal year, (iv) a pro forma consolidated (and to the extent available, consolidating) balance sheet and related statements of income for Borrower and the Acquired Business (the "Pro Forma Financial Statements"), as well as pro forma levels of EBITDAR ("Pro Forma EBITDAR") calculated in a manner reasonably satisfactory to UBS, for the last fiscal year covered by the Audited Financial Statements and for the latest twelve-month period ending more than 45 days prior to the Closing Date, in each case after giving effect to the Transactions and (v) forecasts of the financial performance of Borrower and its subsidiaries (x) on an annual basis, through March 3, 2015 and (y) on a monthly basis, through the Borrower's 2009 fiscal year end. The financial statements referred to in clauses (i), (ii) and (iii) shall be prepared in accordance with ac-

---

[1]    All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this Annex IV is attached.

-2-

counting principles generally accepted in the United States. The Pro Forma Financial Statements shall be prepared on a basis substantially consistent with pro forma financial statements set forth in a registration statement filed with the SEC, subject to customary exceptions for Rule 144A offering materials.

       3.     The transactions contemplated by the Commitment Letter shall be in compliance, in all material respects, with all applicable Canadian and U.S. federal and state laws and regulations. All necessary governmental approvals in connection with the Transactions shall have been obtained and shall be in effect. To the extent required by the Acquisition Agreement, all requisite shareholder approvals and consents required by applicable law or the transactional documents with respect to the Acquisition Agreement and the governing documents of Borrower necessary to effect the merger contemplated by the Acquisition Agreement shall have been obtained and shall be in full force and effect.

       4.     Borrower and each of the Guarantors shall have provided the documentation and other information to the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

       5.     All costs, fees, expenses (including, without limitation, legal fees and expenses and the fees and expenses of appraisers, consultants and other advisors) and other compensation payable to the Lenders, UBSS, UBS, the Revolving Administrative Agent, the Revolving Co-Collateral Agents, the Term Loan Administrative Agent or the Term Loan Collateral Agent by the Borrower shall have been paid, to the extent then due and payable.

       6.     All documents and instruments required to perfect each of the Collateral Agents' security interest in the collateral described under the heading "Security" in the Revolver Term Sheet and the Term Loan Term Sheet shall have been executed and delivered and, if applicable, be in proper form for filing, and none of such collateral shall be subject to any other pledges, security interests or mortgages, except customary permitted liens and other limited exceptions permitted under the Bank Documentation; provided, however, that, with respect to any such collateral the security interest in which may not be perfected by filing of a UCC financing statement or possession of such collateral, if the perfection of each of the Collateral Agents' security interest in such collateral may not be accomplished prior to the Closing Date without undue burden or expense, then delivery of documents and instruments for perfection of such security interest shall not constitute a condition precedent to the initial borrowings under the Bank Facilities if Borrower agrees to deliver or cause to be delivered such documents and instruments, and take or cause to be taken such other actions as may be required to perfect such security interests, within a period after the Closing Date reasonably acceptable to the Revolving Co-Collateral Agents and the Term Loan Collateral Agent.

       7.     The Lenders shall have received all customary opinions, certificates and closing documentation as UBS shall reasonably request, including but not limited to a solvency certificate.

### Additional Bridge Facility Condition

       In addition, the commitment of the Lenders under the Commitment Letter with respect to the Bridge Facility, the agreements of UBS and UBSS to perform the services described in the

LA\1729820.12

-3-

Commitment Letter, the consummation of the Transactions and the funding of the Bridge Facility are subject to the following additional conditions precedent set forth below.

        1.      Borrower shall have engaged the Investment Bank referred to in the Fee Letter to place the Securities (as defined below). Borrower shall have prepared and delivered to the Investment Bank a substantially completed initial draft of an offering memorandum for a private placement pursuant to Rule 144A or prepare, file and cause to become effective a registration statement under the Securities Act of 1933 and prepare a related prospectus, as determined by the Investment Bank, in each case, which shall contain audited, unaudited (which shall have been reviewed by the independent accountants for the Borrower and the Acquired Business as provided in the procedures specified by the Public Company Accounting Oversight Board in AU722) and pro forma financial statements, all meeting the requirements of Regulation S-X under the Securities Exchange Act of 1934 and other information required in a registration statement on Form S-1 for an offering registered under the Securities Act of 1933 (except as may be mutually agreed) and shall be in form for distribution to investors, otherwise in form and substance satisfactory to the Investment Bank and that would be necessary for the Investment Bank to receive customary "comfort" (including customary "negative assurance" comfort) from independent public accountants in connection with a private placement or public offering of Securities (an "Offering Document"), at least 30 business days prior to the Closing Date. The Investment Bank shall have had the opportunity to market senior, senior subordinated or subordinated debt securities and/or preferred equity securities or other debt financing of the Borrower (the proceeds of which will be used to provide funds for the Transactions if such financing is completed on or prior to the Closing Date (and thereby reduce on a dollar-for-dollar basis the aggregate amount of the commitments of UBS under the Commitment Letter in respect of the Bridge Facility) or, to the extent such financing occurs subsequent to the making of the Bridge Loans, the proceeds of which will be used to refinance such Loans) (the "Securities") for not less than 15 calendar days after receipt of an Offering Document, unless a shorter period is acceptable to the Investment Bank

| Date: 2/6/2008 | **Case Summary** | Page 1 of 15 |
|---|---|---|
| Time: 10:27:50 | Case: 72137 | |

| | | |
|---|---|---|
| **Case Style:** Genesco Inc. vs The Finish Line, Inc. et al. | | |
| **Complexity:** High | **Filing Date:** 09/21/07 | |
| **Jury:** No    **Jury Size:** 0 | **Case Sealed:** Not Sealed | |
| **Type:** Contract/Debt | **Chancellor:** Lyle | |
| **Status:** Active | **Disposition Date:** | |

## Case Parties:

| Case Party Name | Case Party Role | End Date |
|---|---|---|
| Headwind, Inc. | Defendant | |
| The Finish Line, Inc. | Defendant | |
| Genesco Inc. | Plaintiff | |
| UBS Loan Finance LLC | Third Party Defendant | |
| UBS Securities LLC | Third Party Defendant | |

## Court Associates:

| Court Associate Name | Court Associate Role | End Date |
|---|---|---|
| Hayworth, John C | Attorney | |
| Farringer, John L, IV | Attorney | |
| Larson, Bryan E | Attorney | |
| Latham, Britt K | Attorney | |
| Hicks, John S | Attorney | |
| Roark, Brian D | Attorney | |
| Stair, Russell E | Attorney | |
| Thompson, Overton, III | Attorney | |
| Tipps, J Mark | Attorney | |
| Walker, Robert J | Attorney | |
| Phillips, W Brantley, Jr | Attorney | |
| Frank, Joseph J | Out Of State Counsel | |

## Party Relationships:

| Associate Name | Party Name | Party Role |
|---|---|---|
| Farringer, John | The Finish Line, Inc. | Defendant |
| Farringer, John | Headwind, Inc. | Defendant |
| Hayworth, John | The Finish Line, Inc. | Defendant |
| Hayworth, John | Headwind, Inc. | Defendant |
| Hicks, John | UBS Securities LLC | Third Party Def |
| Hicks, John | UBS Loan Finance LLC | Third Party Def |
| Larson, Bryan | Genesco Inc. | Plaintiff |
| Latham, Britt | Genesco Inc. | Plaintiff |
| Phillips, W | Genesco Inc. | Plaintiff |
| Roark, Brian | Genesco Inc. | Plaintiff |
| Stair, Russell | Genesco Inc. | Plaintiff |
| Thompson, Overton | Genesco Inc. | Plaintiff |
| Tipps, J | The Finish Line, Inc. | Defendant |
| Tipps, J | Headwind, Inc. | Defendant |

Date: 2/6/2008                              **Case Summary**                              Page 2 of 15
Time: 10:27:50                                Case: 72137

## Party Relationships:

| Associate Name | Party Name | Party Role |
|---|---|---|
| Walker, Robert | Headwind, Inc. | Defendant |
| Walker, Robert | The Finish Line, Inc. | Defendant |

## Docket Entries:

| Filing Date | Docket Type Name | Description |
|---|---|---|
| 2/5/2008 | Misc. | Copies |
| 2/5/2008 | Cost Payment | Cost Payment - copies 7.00 |
| 2/1/2008 | Cost Payment | Cost Payment - copies 11.00 |
| 2/1/2008 | Misc. | Copies |
| 1/31/2008 | Cost Payment | Cost Payment 306.00-copies |
| 1/31/2008 | Misc. | Copies |
| 1/30/2008 | Order | Order Granting the Motions of Finish Line and UBS for an |
| 1/30/2008 | Reply To Response To Motion | USB's Response to Court's Request for Information and |
| 1/29/2008 | Cost Payment | Cost Payment 10.00-fax filing |
| 1/29/2008 | Misc. | Fax Filing Cost Entry |
| 1/28/2008 | Copies Mailed | 3 copies of 1 pg order filed 1-28-08 mailed |
| 1/28/2008 | Order | Order That By 1/30/08 Finish Line and UBS Shall File wit |
| 1/28/2008 | Copies Mailed | 3 copies of 2 pg order filed 1-28-08 mailed |
| 1/28/2008 | Response To Motion | Pltf's Combined Response to Finish Line and USB's Moti |
| 1/28/2008 | Order | Order Vacating the Briefing Deadline for Genesco Issued |
| 1/28/2008 | Motion | Defts The Finish Line and Headwind, Inc.'s Supplement t |
| 1/24/2008 | Misc. | Copies |
| 1/24/2008 | Cost Payment | Cost Payment 16.50-copies |
| 1/23/2008 | Cost Payment | Cost Payment - copies 19.00 |
| 1/23/2008 | Misc. | Copies |
| 1/23/2008 | Cost Payment | Cost Payment - copies 19.00 |
| 1/23/2008 | Cost Payment | Cost Payment - copies 18.00 |
| 1/23/2008 | Cost Payment | Cost Payment - copies 19.00 |
| 1/23/2008 | Cost Payment | Cost Payment - copies 18.00 |
| 1/23/2008 | Misc. | Copies |
| 1/23/2008 | Misc. | Copies |
| 1/23/2008 | Misc. | Copies |
| 1/23/2008 | Misc. | Copies |
| 1/23/2008 | Cost Payment | Cost Payment 18.00-copies |
| 1/23/2008 | Misc. | Copies |
| 1/22/2008 | Cost Payment | Cost Payment 18.00-copies |
| 1/22/2008 | Misc. | Copies |
| 1/22/2008 | Cost Payment | Cost Payment 300.00-appeal |
| 1/22/2008 | Misc. | Copies |
| 1/22/2008 | Cost Payment | Cost Payment 18.00-copies |
| 1/22/2008 | Cost Payment | Cost Payment 18.00-copies |
| 1/22/2008 | Misc. | Copies |
| 1/22/2008 | Cost Payment | Cost Payment - copies 18.00 |
| 1/22/2008 | Misc. | Copies |
| 1/18/2008 | Motion | Defts UBS Securities and UBS Loan Finance LLP's Motic |

Date: 2/6/2008 | **Case Summary** | Page 3 of 15
Time: 10:27:50 | Case: 72137 |

## Docket Entries:

| Filing Date | Docket Type Name | Description |
|---|---|---|
| 1/18/2008 | Motion | Defts UBS Securities and UBS Loan Finance LLP's Expe |
| 1/18/2008 | Appeal Bond | Appeal Bond |
| 1/18/2008 | Notice Of Appeal | Notice Of Appeal of Defendants Finish Line & Headwind, |
| 1/18/2008 | Memorandum in Support of Motion | Defts The Finish Line and Headwind, Inc.'s Memorandun |
| 1/18/2008 | Motion | Defts The Finish Line and Headwind, Inc.'s Motion to See |
| 1/18/2008 | Motion | Defts The Finish Line and Headwind, Inc.'s Motion to Set |
| 1/18/2008 | Cost Payment | Cost Payment 287.00-copies |
| 1/18/2008 | Misc. | Copies |
| 1/18/2008 | Appeal Bond | Appeal Bond for UBS Securities & UBS Loan Finance |
| 1/18/2008 | Notice Of Appeal | Notice Of Appeal of Defts UBS Securities & UBS Loan F |
| 1/16/2008 | Cost Payment | Cost Payment - copies 50.00 |
| 1/16/2008 | Misc. | Copies |
| 1/15/2008 | Cost Payment | Cost Payment - copies 11.00 |
| 1/15/2008 | Misc. | Copies |
| 1/15/2008 | Cost Payment | Cost Payment - copies 77.50 |
| 1/11/2008 | Cost Payment | Cost Payment 22.00-copies |
| 1/11/2008 | Misc. | Copies |
| 1/11/2008 | Cost Payment | Cost Payment - copies 170.50 |
| 1/11/2008 | Misc. | Copies |
| 1/11/2008 | Cost Payment | Cost Payment 122.00-copies |
| 1/11/2008 | Misc. | Copies |
| 1/11/2008 | Cost Payment | Cost Payment 21.50-copies |
| 1/11/2008 | Misc. | Copies |
| 1/10/2008 | Cost Payment | Cost Payment - copies 127.50 |
| 1/10/2008 | Cost Payment | Cost Payment - copies 36.00 |
| 1/10/2008 | Misc. | Copies |
| 1/10/2008 | Misc. | Copies |
| 1/8/2008 | Misc. | Copies |
| 1/8/2008 | Cost Payment | Cost Payment 21.50-copies |
| 1/8/2008 | Misc. | Copies |
| 1/8/2008 | Cost Payment | Cost Payment 308.00-copies |
| 1/8/2008 | Cost Payment | Cost Payment - copies 21.50 |
| 1/8/2008 | Misc. | Copies |
| 1/2/2008 | Order | Order Clarifying That the 12/27/07 Order is not a Final O |
| 1/2/2008 | Order | Under Seal/Order 638089 |
| 1/2/2008 | Exhibits Filed Separately | Exhibits to Parties Joint Designated Deposition Transcrip |
| 1/2/2008 | Exhibits Filed Separately | Exhibits to Parties Joint Designated Deposition Transcrip |
| 1/2/2008 | Deposition | Parties Joint Designated Deposition Transcripts (1 noteb |
| 1/2/2008 | Deposition | Deposition Designations (1 notebook) |
| 1/2/2008 | Order | Order Regarding the Categorization and Numbering of E |
| 12/28/2007 | Cost Payment | Cost Payment - copies 21.50 |
| 12/28/2007 | Misc. | Copies |
| 12/28/2007 | Cost Payment | Cost Payment - copies 21.50 |
| 12/28/2007 | Misc. | Copies |
| 12/28/2007 | Cost Payment | Cost Payment - copies 86.50 |

Date: 2/6/2008                              **Case Summary**                              Page 4 of 15
Time: 10:27:50                                Case: 72137

## Docket Entries:

| Filing Date | Docket Type Name | Description |
|---|---|---|
| 12/28/2007 | Misc. | Copies |
| 12/28/2007 | Cost Payment | Cost Payment - copies  21.50 |
| 12/28/2007 | Misc. | Copies |
| 12/28/2007 | Misc. | Copies |
| 12/28/2007 | Cost Payment | Cost Payment - copies  21.50 |
| 12/28/2007 | Misc. | Copies |
| 12/28/2007 | Cost Payment | Cost Payment - copies  21.50 |
| 12/28/2007 | Motion | (Filed Under Seal) Emergency Motion |
| 12/27/2007 | Chancellor's Memo & Order | Orders : Chancellor's Memo & Order 637897 |
| 12/27/2007 | Cost Payment | Cost Payment - copies  9.50 |
| 12/27/2007 | Misc. | Copies |
| 12/21/2007 | Misc. | Copies |
| 12/21/2007 | Cost Payment | Cost Payment 164.00-copies |
| 12/18/2007 | Brief | Plf.Genesco Inc's Supplemental Memorandum of Law ar |
| 12/18/2007 | Trial Exhibits | Trial Exhibits |
| 12/17/2007 | Answer | Answer of Plaintiff/Counter-Defendant Genesco Inc. to C |
| 12/17/2007 | Answer | Answer of Plaintiff/counter-Defendant Genesco Inc to C |
| 12/17/2007 | Cost Payment | Cost Payment 24.00-copies |
| 12/17/2007 | Misc. | Copies |
| 12/17/2007 | Cost Payment | Cost Payment - copies  78.50 |
| 12/17/2007 | Misc. | Copies |
| 12/14/2007 | Cost Payment | Cost Payment 69.50 |
| 12/14/2007 | Misc. | Copies |
| 12/14/2007 | Misc. | Copies |
| 12/14/2007 | Cost Payment | Cost Payment - copies  38.50 |
| 12/14/2007 | Cost Payment | Cost Payment 111.50 |
| 12/14/2007 | Misc. | Copies |
| 12/13/2007 | Order | Order Denying the Request of The Tennessean for a Car |
| 12/12/2007 | Cost Payment | Cost Payment - copies  36.50 |
| 12/12/2007 | Misc. | Copies |
| 12/12/2007 | Cost Payment | Cost Payment - copies  18.00 |
| 12/12/2007 | Misc. | Copies |
| 12/12/2007 | Misc. | Copies |
| 12/12/2007 | Cost Payment | Cost Payment - copies  52.00 |
| 12/12/2007 | Order | Order Granting Motion to Admit Gerson A. Zweifach as A |
| 12/12/2007 | Cost Payment | Cost Payment 6.00-copies |
| 12/12/2007 | Misc. | Copies |
| 12/12/2007 | Cost Payment | Cost Payment - copies  88.00 |
| 12/12/2007 | Misc. | Copies |
| 12/11/2007 | Proposal Received | Order to Admit Counsel (Gerson A. Zweifach) pro hac vic |
| 12/11/2007 | Motion | Pltf's Motion for Appearance of Counsel (Gerson A. Zwei |
| 12/11/2007 | Cost Payment | Cost Payment 12.50-copies |
| 12/11/2007 | Misc. | Copies |
| 12/11/2007 | Misc. | Copies |
| 12/11/2007 | Cost Payment | Cost Payment 12.00-copies |

Date: 2/6/2008
Time: 10:27:50

# Case Summary

Case: 72137

## Docket Entries:

| Filing Date | Docket Type Name | Description |
|---|---|---|
| 12/11/2007 | Order | Order That Having Failed to Properly File a Rule 30 Requ |
| 12/11/2007 | Cost Payment | Cost Payment 85.00-copies |
| 12/11/2007 | Misc. | Copies |
| 12/11/2007 | Misc. | Copies |
| 12/11/2007 | Cost Payment | Cost Payment 66.00-copies |
| 12/10/2007 | Cost Payment | Cost Payment - copies 35.50 |
| 12/10/2007 | Misc. | Copies |
| 12/10/2007 | Cost Payment | Cost Payment 27.50-copies |
| 12/10/2007 | Misc. | Copies |
| 12/10/2007 | Cost Payment | Cost Payment - copies 60.50 |
| 12/10/2007 | Misc. | Copies |
| 12/10/2007 | Cost Payment | Cost Payment - copies 65.00 |
| 12/10/2007 | Misc. | Copies |
| 12/10/2007 | Cost Payment | Cost Payment - copies 12.00 |
| 12/10/2007 | Misc. | Copies |
| 12/10/2007 | Cost Payment | Cost Payment - copies 28.00 |
| 12/10/2007 | Misc. | Copies |
| 12/10/2007 | Misc. | Copies |
| 12/10/2007 | Cost Payment | Cost Payment 84.50-copies |
| 12/10/2007 | Answer With Counter Claim | UBS Securities LLC and UBS Loan Finance LLC's Amen |
| 12/10/2007 | Notice Of Filing | Notice of Filing Authorities Cited in UBS Securities LLC a |
| 12/10/2007 | Misc. | Copies |
| 12/10/2007 | Cost Payment | Cost Payment - copies 78.00 |
| 12/10/2007 | Misc. | Copies |
| 12/10/2007 | Cost Payment | Cost Payment 159.00-copies |
| 12/10/2007 | Misc. | Copies |
| 12/10/2007 | Cost Payment | Cost Payment 78.50-copies |
| 12/10/2007 | Cost Payment | Cost Payment - copies 38.50 |
| 12/10/2007 | Misc. | Copies |
| 12/7/2007 | Pre-Trial Brief | Trial brief of Finish Line and Headwind w/ appendix of ca |
| 12/7/2007 | Answer | Deft The Finish Line amendment to answer and counterc |
| 12/7/2007 | Cost Payment | Cost Payment - copies 38.50 |
| 12/7/2007 | Misc. | Copies |
| 12/7/2007 | Cost Payment | Cost Payment - copies 38.50 |
| 12/7/2007 | Misc. | Copies |
| 12/7/2007 | Misc. | Pre-trial brief of UBS Securities |
| 12/7/2007 | Trial Brief | Pretrial Brief of Plaintiff Genesco Inc. with Appendix A ar |
| 12/7/2007 | Cost Payment | Copies 28.50 pd by EJR |
| 12/7/2007 | Misc. | Copies |
| 12/7/2007 | Misc. | Copies |
| 12/7/2007 | Cost Payment | Cost Payment - copies 33.50 |
| 12/7/2007 | Cost Payment | Trial Payment - copies 28.50 |
| 12/7/2007 | Misc. | Copies |
| 12/7/2007 | Cost Payment | Cost Payment - copies 30.50 |
| 12/7/2007 | Misc. | Copies |

Date: 2/6/2008
Time: 10:27:50

# Case Summary
Case: 72137

## Docket Entries:

| Filing Date | Docket Type Name | Description |
|---|---|---|
| 12/7/2007 | Misc. | Copies |
| 12/7/2007 | Cost Payment | Cost Payment - copies  36.50 |
| 12/7/2007 | Misc. | Copies |
| 12/7/2007 | Cost Payment | Cost Payment -copies  28.50 |
| 12/7/2007 | Cost Payment | Cost Payment - copies  11.50 |
| 12/7/2007 | Misc. | Copies |
| 12/7/2007 | Misc. | Copies |
| 12/7/2007 | Cost Payment | Cost Payment - copies  10.00 |
| 12/7/2007 | Misc. | Copies |
| 12/7/2007 | Cost Payment | Cost Payment - copies  13.00 |
| 12/7/2007 | Memorandum in Support of Motion | Genesco's Memorandum in Support of Its Emergency M |
| 12/7/2007 | Motion | Genesco's Emergency Motion to Compel Deposition of S |
| 12/7/2007 | Objection To Motion | Memorandum in Opposition to Genesco's Motion to Com |
| 12/6/2007 | Cost Payment | Cost Payment - copies  46.00 |
| 12/6/2007 | Misc. | Copies |
| 12/6/2007 | Order | Order That the 12/5/07 Order Is Vacated and That CVN's |
| 12/6/2007 | Misc. | Copies |
| 12/6/2007 | Cost Payment | Cost Payment 31.50-copies |
| 12/6/2007 | Notice Of Filing | Notice Of Filing |
| 12/6/2007 | Cost Payment | Cost Payment 29.50-copies |
| 12/6/2007 | Misc. | Copies |
| 12/6/2007 | Misc. | Copies |
| 12/6/2007 | Cost Payment | Cost Payment 32.00-copies |
| 12/5/2007 | Notice | Notice (filed under seal) |
| 12/5/2007 | Order | Stipulations (UNDER SEAL - HIGHLY CONFIDENTIAL) |
| 12/5/2007 | Misc. | Copies |
| 12/5/2007 | Cost Payment | Cost Payment 29.50-copies |
| 12/5/2007 | Misc. | Copies |
| 12/5/2007 | Cost Payment | Cost Payment 10.50-copies |
| 12/5/2007 | Misc. | Copies |
| 12/5/2007 | Cost Payment | Cost Payment 29.50-copies |
| 12/5/2007 | Misc. | Copies |
| 12/5/2007 | Cost Payment | Cost Payment 31.50-copies |
| 12/5/2007 | Misc. | Copies |
| 12/5/2007 | Cost Payment | Cost Payment 31.50-copies |
| 12/5/2007 | Order | Order That to Increase Courtroom Efficiency and Save T |
| 12/5/2007 | Cost Payment | Cost Payment - copies  33.50 |
| 12/5/2007 | Misc. | Copies |
| 12/5/2007 | Misc. | Copies |
| 12/5/2007 | Cost Payment | Cost Payment 18.00-copies |
| 12/5/2007 | Cost Payment | Cost Payment - copies  31.00 |
| 12/5/2007 | Misc. | Copies |
| 12/5/2007 | Notice | Finish Line's notice regarding confidential information at |
| 12/5/2007 | Order | Order Denying UBS's Motion in Limine to Exclude the Ex |
| 12/5/2007 | Order | Order Denying CVN's Request for Live Feed During the |

Date: 2/6/2008
Time: 10:27:50

**Case Summary**

Case: 72137

## Docket Entries:

| Filing Date | Docket Type Name | Description |
|---|---|---|
| 12/4/2007 | Stipulation | Under Seal/ Proposed Stipulation |
| 12/4/2007 | Notice | Under seal/ Notice of Filing |
| 12/4/2007 | Notice Of Filing | (Under Seal) Notice Of Filing with attached Proposed Stip |
| 12/4/2007 | Order | Order Granting Motion to Admit David R. Boyd as Couns |
| 12/4/2007 | Objection To Motion | Pltf's Opposition to Deft Intervenors UBS Securities and |
| 12/4/2007 | Misc. | Copies |
| 12/4/2007 | Cost Payment | Cost Payment 18.00-copies |
| 12/4/2007 | Cost Payment | Cost Payment  35.00 |
| 12/4/2007 | Misc. | Copies |
| 12/4/2007 | Cost Payment | Cost Payment- copies  16.00 |
| 12/4/2007 | Misc. | Copies |
| 12/4/2007 | Misc. | Copies |
| 12/4/2007 | Cost Payment | Cost Payment - Copies |
| 12/3/2007 | Cost Payment | Copies 16.00 pd by EJR |
| 12/3/2007 | Misc. | Copies |
| 12/3/2007 | Affidavit | (filed under seal) Affidavit |
| 12/3/2007 | Misc. | Copies |
| 12/3/2007 | Cost Payment | Cost Payment 16.00-copies |
| 12/3/2007 | Cost Payment | Copies 16.00 pd by Elizabeth Ferguson |
| 12/3/2007 | Misc. | Copies |
| 12/3/2007 | Motion | Deft Intervenors UBS Securities and UBS Loan Finance' |
| 12/3/2007 | Memorandum | (Under Seal) Plaintiff Genesco, Inc's Memorandum Rega |
| 12/3/2007 | Order | Order filed Under Seal 634185 |
| 12/3/2007 | Misc. | (filed under seal) Letter from John Hicks re Court's Order |
| 12/3/2007 | Misc. | Copies |
| 12/3/2007 | Cost Payment | Cost Payment 89.50-copies |
| 12/1/2007 | Order | Order-UNDER SEAL 634104 |
| 11/30/2007 | Cost Payment | Cost Payment - copies  89.50 |
| 11/30/2007 | Misc. | Certified Copies |
| 11/30/2007 | Motion | (UNDER SEAL) Deft Intervenors UBS Securities and UB |
| 11/30/2007 | Order | Order That Counsel Shall File with the Court by 10:00 A.I |
| 11/30/2007 | Misc. | Copies |
| 11/30/2007 | Cost Payment | Cost Payment 17.00-copies |
| 11/30/2007 | Misc. | Commission |
| 11/30/2007 | Cost Payment | Cost Payment 10.00-commissions |
| 11/30/2007 | Misc. | Copies |
| 11/30/2007 | Cost Payment | Cost Payment 100.50 |
| 11/30/2007 | Misc. | Commission |
| 11/30/2007 | Cost Payment | Cost Payment 5.00-commission |
| 11/29/2007 | Cost Payment | Cost Payment 101.00-copies |
| 11/29/2007 | Misc. | Copies |
| 11/29/2007 | Order | Memorandum and Order That the Scope of the 12/10/07 |
| 11/29/2007 | Misc. | Copies |
| 11/29/2007 | Cost Payment | Cost Payment 13.50-copies |
| 11/29/2007 | Misc. | Commission |

Date: 2/6/2008

**Case Summary**

Time: 10:27:50

Case: 72137

## Docket Entries:

| Filing Date | Docket Type Name | Description |
|---|---|---|
| 11/29/2007 | Cost Payment | Cost Payment - commissions 10.00 |
| 11/29/2007 | Misc. | Copies |
| 11/29/2007 | Cost Payment | Cost Payment 11.00-copies |
| 11/29/2007 | Misc. | Copies |
| 11/29/2007 | Cost Payment | Cost Payment - docket sheet/copies 11.00 |
| 11/29/2007 | Motion | Pltf's Motion to Admit Counsel (David Robert Boyd) in a |
| 11/29/2007 | Proposal Received | Order Granting Motion to Admit Counsel pro hac vice - a |
| 11/28/2007 | Cost Payment | Cost Payment - copies 98.50 |
| 11/28/2007 | Misc. | Copies |
| 11/28/2007 | Cost Payment | Cost Payment - copies 97.50 |
| 11/28/2007 | Misc. | Copies |
| 11/28/2007 | Cost Payment | Cost Payment - copies 89.50 |
| 11/28/2007 | Misc. | Copies |
| 11/28/2007 | Cost Payment | Cost Payment - copies 93.00 |
| 11/28/2007 | Misc. | Copies |
| 11/28/2007 | Cost Payment | Cost Payment - copies 113.00 |
| 11/28/2007 | Misc. | Copies |
| 11/28/2007 | Cost Payment | Cost Payment - copies 102.50 |
| 11/28/2007 | Misc. | Copies |
| 11/28/2007 | Cost Payment | Cost Payment - copies 19.00 |
| 11/28/2007 | Misc. | Copies |
| 11/28/2007 | Misc. | Copies |
| 11/28/2007 | Cost Payment | Cost Payment - copies 97.00 |
| 11/28/2007 | Subpoena | Jeanne Fawbush |
| 11/28/2007 | Response To Motion | Deft USB's Response to Pltf's Motion to Clarify |
| 11/28/2007 | Misc. | Copies |
| 11/28/2007 | Cost Payment | Cost Payment - copies 88.50 |
| 11/28/2007 | Response To Motion | Deft Finish Line's Response to Pltf's Motion to Clarify Sco |
| 11/27/2007 | Exhibits Filed Separately | Pltf's Appendix of Cases Cited in Their Memorandum of |
| 11/27/2007 | Memorandum in Support of Motion | Pltf's Memorandum of Points and Authorities in Support |
| 11/27/2007 | Motion To Dismiss | Pltf's Motion to Dismiss Defts' Counterclaims and to Strik |
| 11/27/2007 | Order | Order That by Noon on Wednesday, 11/28/07, Defendan |
| 11/26/2007 | Memorandum in Support of Motion | Pltf's Memorandum in Support of Motion to Clarify Scope |
| 11/26/2007 | Motion | Pltf's Motion to Clarify Scope of Hearing; no date request |
| 11/26/2007 | Cost Payment | Cost Payment - commissions 15.00 |
| 11/26/2007 | Misc. | Commission |
| 11/26/2007 | Order | Order Regarding the Request of Courtroom View Networ |
| 11/26/2007 | Order | Order Granting Motion to Admit Counsel Pro Hac Vice: J |
| 11/21/2007 | Cost Payment | Cost Payment - commissions 10.00 |
| 11/21/2007 | Misc. | Commission to Take Depos |
| 11/21/2007 | Misc. | Copies |
| 11/21/2007 | Cost Payment | Cost Payment 25.50-copies |
| 11/21/2007 | Order | Revised Protective Order 632871 |
| 11/20/2007 | Misc. | Commission to Take Deposition |
| 11/20/2007 | Cost Payment | Cost Payment 10.00-commission |

Date: 2/6/2008                    **Case Summary**                    Page 9 of 15
Time: 10:27:50                      Case: 72137

## Docket Entries:

| Filing Date | Docket Type Name | Description |
|---|---|---|
| 11/20/2007 | Cost Payment | Cost Payment 40.50-copies |
| 11/20/2007 | Misc. | Copies |
| 11/20/2007 | Cost Payment | Cost Payment 25.50-copies |
| 11/20/2007 | Misc. | Copies |
| 11/20/2007 | Cost Payment | Cost Payment 38.00-copies |
| 11/20/2007 | Misc. | Copies |
| 11/20/2007 | Cost Payment | Cost Payment 25.50-copies |
| 11/20/2007 | Misc. | Copies |
| 11/19/2007 | Cost Payment | Cost Payment - commissions  10.00 |
| 11/19/2007 | Misc. | Commission to Take Depos |
| 11/19/2007 | Misc. | Commission |
| 11/19/2007 | Cost Payment | Cost Payment 21.00 (comm 15.00, subpoeana 6.00) |
| 11/19/2007 | Subpoena | Ernst & Young |
| 11/16/2007 | Subpoena | Ernst & Young c/o John O. Skelton |
| 11/16/2007 | Notice Of Filing | Notice Of Filing Related Action with Attachment |
| 11/16/2007 | Cost Payment | Cost Payment - copies  10.50 |
| 11/16/2007 | Misc. | Copies |
| 11/16/2007 | Cost Payment | Cost Payment - copies  83.00 |
| 11/16/2007 | Misc. | Copies |
| 11/16/2007 | Cost Payment | Cost Payment 6.00-subpoena |
| 11/16/2007 | Cost Payment | Cost Payment 11.50 |
| 11/16/2007 | Misc. | Copies |
| 11/16/2007 | Cost Payment | Cost  Payment 10.50-copies |
| 11/16/2007 | Misc. | Copies |
| 11/16/2007 | Cost Payment | Cost Payment 78.00-copies |
| 11/16/2007 | Misc. | Copies |
| 11/16/2007 | Cost Payment | Cost Payment - copies  10.50 |
| 11/16/2007 | Misc. | Copies |
| 11/16/2007 | Cost Payment | Cost Payment - counterclaim  100.00 |
| 11/16/2007 | Cost Payment | Cost Payment - copies  10.50 |
| 11/16/2007 | Misc. | Copies |
| 11/16/2007 | Proposal Received | Order Granting Motion to Admit Counsel Pro Hac Vice |
| 11/16/2007 | Cost Payment | Cost Payment - copies  12.00 |
| 11/16/2007 | Misc. | Copies |
| 11/16/2007 | Cost Payment | Cost Payment - copies  10.50 |
| 11/16/2007 | Misc. | Copies |
| 11/16/2007 | Misc. | Copies |
| 11/16/2007 | Cost Payment | Cost Payment - copies  10.50 |
| 11/16/2007 | Cost Payment | Cost Payment - copies  109.00 |
| 11/16/2007 | Misc. | Copies |
| 11/16/2007 | Cost Payment | Cost Payment - copies  10.50 |
| 11/16/2007 | Misc. | Copies |
| 11/15/2007 | Misc. | Copies |
| 11/15/2007 | Cost Payment | Cost Payment 78.00-copies |
| 11/15/2007 | Misc. | Copies |

# Case Summary

Case: 72137

## Docket Entries:

| Filing Date | Docket Type Name | Description |
|---|---|---|
| 11/15/2007 | Cost Payment | Cost Payment 78.00-copies |
| 11/15/2007 | Cost Payment | Cost Payment 91.00-copies |
| 11/15/2007 | Misc. | Copies |
| 11/15/2007 | Cost Payment | Cost Payment - copies 78.00 |
| 11/15/2007 | Cost Payment | Cost Payment - copies 78.00 |
| 11/15/2007 | Answer | Defendants' Answer to Plaintiff's Amended Complaint |
| 11/15/2007 | Answer With Counter Claim | (faxed) UBS Securities LLC and UBS Loan Finance LLC |
| 11/14/2007 | Misc. | Copies |
| 11/14/2007 | Cost Payment | Cost Payment 78.00-copies |
| 11/14/2007 | Misc. | Copies |
| 11/14/2007 | Cost Payment | Cost Payment 78.00-copies |
| 11/14/2007 | Misc. | Copies |
| 11/14/2007 | Cost Payment | Cost Payment 78.00-copies |
| 11/14/2007 | Notice Of Filing | Notice Of Filing with attached affidavit of good standing |
| 11/13/2007 | Amended Complaint | Amended Complaint for Specific Performance of Obligati |
| 11/13/2007 | Misc. | Copies |
| 11/13/2007 | Cost Payment | Cost Payment - copies 13.50 |
| 11/13/2007 | Cost Payment | Cost of commission 5.00 pd by Baker Donelson et al |
| 11/13/2007 | Motion | Pltf's Motion for Appearance pro hac vice of Eric Samuel |
| 11/13/2007 | Motion | Pltf's Motion for Appearance pro hac vice of Jennifer Lyn |
| 11/13/2007 | Motion | Pltf's Motion for Appearance pro hac vice of Blair, Conne |
| 11/9/2007 | Cost Payment | Cost Payment - copies 15.00 |
| 11/9/2007 | Misc. | Copies |
| 11/9/2007 | Cost Payment | Cost Payment - copies 12.00 |
| 11/9/2007 | Misc. | Copies |
| 11/8/2007 | Cost Payment | Cost Payment - subpoena 18.00 |
| 11/8/2007 | Subpoena | Subpoena/ The Goldman Sachs Group Inc |
| 11/8/2007 | Subpoena | Subpoena in Blank |
| 11/8/2007 | Subpoena | Subpoena in Blank |
| 11/7/2007 | Order | Protective Order 630637 |
| 11/6/2007 | Order | Order Admitting Attorney Joseph J. Frank to Practice Pro |
| 11/6/2007 | Order | Order Admitting Attorney Noreen Kelly-Najah to Practice |
| 11/6/2007 | Proposal Received | Protective Order |
| 11/5/2007 | Cost Payment | Cost Payment - copies 44.50 |
| 11/5/2007 | Misc. | Copies |
| 11/5/2007 | Proposal Received | stipulated protective order-attys Overton Thompson III; J |
| 11/2/2007 | Cost Payment | Cost Payment 77.50-copies |
| 11/2/2007 | Misc. | Copies |
| 11/1/2007 | Cost Payment | Cost Payment 5.00-commission |
| 11/1/2007 | Cost Payment | Cost Payment - subpoena 6.00 |
| 11/1/2007 | Order | Scheduling Order to Prepare This Case for the 12/10/07 |
| 11/1/2007 | Proposal Received | agreed order granting pltf's motion to amend complaint-a |
| 11/1/2007 | Cost Payment | Cost Payment -copies 37.00 |
| 11/1/2007 | Misc. | Copies |
| 11/1/2007 | Order | Agreed Order Granting Plaintiff's Motion to Amend Comp |

Date: 2/6/2008
Time: 10:27:50

# Case Summary
Case: 72137

## Docket Entries:

| Filing Date | Docket Type Name | Description |
|---|---|---|
| 10/31/2007 | Cost Payment | Cost Payment - copies 37.00 |
| 10/31/2007 | Misc. | Copies |
| 10/31/2007 | Proposal Received | order granting motion to appear pro hac vice-atty Courtne |
| 10/31/2007 | Proposal Received | order granting motion to appear pro hac vice-atty Courtne |
| 10/30/2007 | Cost Payment | Cost Payment - copies 16.00 |
| 10/30/2007 | Misc. | Copies |
| 10/30/2007 | Cost Payment | Cost Payment - copies 16.00 |
| 10/30/2007 | Misc. | Copies |
| 10/30/2007 | Misc. | Copies |
| 10/30/2007 | Cost Payment | Cost Payment - copies 16.00 |
| 10/30/2007 | Cost Payment | Cost Payment - copies 61.00 |
| 10/30/2007 | Misc. | Copies |
| 10/30/2007 | Cost Payment | Cost Payment 222.00-copies |
| 10/30/2007 | Misc. | Copies |
| 10/30/2007 | Cost Payment | Cost Payment - copies 21.00 |
| 10/30/2007 | Misc. | Copies |
| 10/30/2007 | Misc. | Copies |
| 10/30/2007 | Cost Payment | Cost Payment 21.00-copies |
| 10/30/2007 | Motion | TP Defts UBS Securities and UBS Loan Finance, LLC's I |
| 10/30/2007 | Motion | TP Defts UBS Securities and UBS Loan Finance, LLC's I |
| 10/29/2007 | Response | Genesco Inc's Response to Defts' Notice to the Court Re |
| 10/29/2007 | Cost Payment | Cost Payment - copies 26.00 |
| 10/29/2007 | Misc. | Copies |
| 10/29/2007 | Misc. | Copies |
| 10/29/2007 | Cost Payment | Cost Payment - copies 29.50 |
| 10/29/2007 | Cost Payment | Cost Payment - copies 21.00 |
| 10/29/2007 | Misc. | Copies |
| 10/29/2007 | Answer To Counter Claim | Answer of Pltf to Counter-Complaint of The Finish Line Ir |
| 10/26/2007 | Cost Payment | Cost Payment - copies 21.00 |
| 10/26/2007 | Misc. | Copies |
| 10/26/2007 | Cost Payment | Cost Payment - copies 21.00 |
| 10/26/2007 | Misc. | Copies |
| 10/26/2007 | Cost Payment | Cost Payment - copies 21.00 |
| 10/26/2007 | Misc. | Copies |
| 10/26/2007 | Cost Payment | Cost Payment 21.00-copies |
| 10/26/2007 | Misc. | Copies |
| 10/26/2007 | Cost Payment | Cost Payment 21.00-copies |
| 10/26/2007 | Misc. | Copies |
| 10/26/2007 | Cost Payment | Cost Payment 21.00-copies |
| 10/26/2007 | Misc. | Copies |
| 10/26/2007 | Cost Payment | Cost Payment 21.00-copies |
| 10/26/2007 | Misc. | Copies |
| 10/25/2007 | Cost Payment | Cost Payment 93.50-copies |
| 10/25/2007 | Misc. | Copies |
| 10/25/2007 | Notice | Defts' Notice to the Court Regarding Status of Voluntary |

Date: 2/6/2008
Time: 10:27:50

# Case Summary
Case: 72137

## Docket Entries:

| Filing Date | Docket Type Name | Description |
|---|---|---|
| 10/22/2007 | Misc. | Copies |
| 10/22/2007 | Cost Payment | Cost Payment 16.00-copies |
| 10/17/2007 | Cost Payment | Cost of copies 26.00 pd by Upton Services |
| 10/17/2007 | Misc. | Copies |
| 10/16/2007 | Cost Payment | Cost of copies 186.00 pd by CKM Legal Research |
| 10/16/2007 | Misc. | Copies |
| 10/12/2007 | Cost Payment | Cost Payment 189.00-copies |
| 10/12/2007 | Misc. | Copies |
| 10/12/2007 | Cost Payment | Cost Payment 22.00 |
| 10/12/2007 | Misc. | Copies |
| 10/12/2007 | Cost Payment | Cost Payment - copies  193.00 |
| 10/12/2007 | Misc. | Copies |
| 10/11/2007 | Chancellor's Memo & Order | Chancellor's Memorandum and Order 626815 |
| 10/11/2007 | Misc. | Copies |
| 10/11/2007 | Cost Payment | Cost Payment 22.00-copies |
| 10/11/2007 | Cost Payment | Cost Payment 14.00-copies |
| 10/11/2007 | Misc. | Copies |
| 10/11/2007 | Cost Payment | Cost Payment 19.00-copies |
| 10/11/2007 | Misc. | Copies |
| 10/11/2007 | Cost Payment | Cost Payment 14.00-copies |
| 10/11/2007 | Misc. | Copies |
| 10/11/2007 | Cost Payment | Cost Payment 14.00-copies |
| 10/11/2007 | Misc. | Copies |
| 10/11/2007 | Cost Payment | Cost Payment 14.00-copies |
| 10/10/2007 | Reply To Response To Motion | Pltf's Reply in Support of Emergency Motion to Expedite |
| 10/10/2007 | Misc. | Copies |
| 10/10/2007 | Cost Payment | Cost Payment 14.00-copies |
| 10/10/2007 | Proposal Received | Discovery and Scheduling Order (faxed and original) - at |
| 10/10/2007 | Answer | UBS Securities LLC and UBS Loan Finance LLC's Answ |
| 10/10/2007 | Memorandum in Support of Motion | UBS Securities LLC's Memorandum in Support of Motion |
| 10/10/2007 | Notice Of Dismissal | Defts' Notice of Voluntary Dismissal |
| 10/10/2007 | Motion | UBS Securities LLC's Motion to Intervene |
| 10/10/2007 | Cost Payment | Cost Payment 39.50 |
| 10/10/2007 | Misc. | Copies |
| 10/10/2007 | Cost Payment | Cost Payment 18.50 |
| 10/10/2007 | Misc. | Copies |
| 10/10/2007 | Response To Motion | Deft's, Finish Line, Inc. and Headwind, Inc. Emergency M |
| 10/10/2007 | Cost Payment | Cost Payment - copies  33.00 |
| 10/10/2007 | Misc. | Copies |
| 10/9/2007 | Cost Payment | Cost Payment - copies  169.00 |
| 10/9/2007 | Misc. | Copies |
| 10/9/2007 | Cost Payment | Cost Payment - copies  31.50 |
| 10/9/2007 | Misc. | Copies |
| 10/9/2007 | Cost Payment | Cost Payment 140.50-copies |
| 10/9/2007 | Misc. | Copies |

Date: 2/6/2008               **Case Summary**            Page 13 of 15
Time: 10:27:50               Case: 72137

## Docket Entries:

| Filing Date | Docket Type Name | Description |
|---|---|---|
| 10/9/2007 | Cost Payment | Cost Payment - copies  93.50 |
| 10/9/2007 | Misc. | Copies |
| 10/9/2007 | Cost Payment | Cost Payment - copies  25.50 |
| 10/9/2007 | Misc. | Copies |
| 10/9/2007 | Response To Motion | Pltf's Response to Defts' Motion to Continue 10/8/07 Hea |
| 10/8/2007 | Motion | fax filing - Pltf's Motion to Reconsider, no date requested |
| 10/8/2007 | Order | Order Denying the Plaintiff's Motion for the Court to Reco |
| 10/8/2007 | Order | Order Resetting Scheduling Hearing from Monday, 10/8/ |
| 10/8/2007 | Motion | Pltf's Motion to Reconsider |
| 10/8/2007 | Misc. | Copies |
| 10/8/2007 | Cost Payment | Cost Payment - copies  26.50 |
| 10/8/2007 | Motion | duplicate filing - Defts' Motion to Continue 10/8/07 Hearir |
| 10/8/2007 | Motion For Continuance | Defts' Motion to Continue 10/8/07 Hearing on Pltf's Emer |
| 10/8/2007 | Cost Payment | Cost Payment - copies  25.50 |
| 10/8/2007 | Misc. | Copies |
| 10/5/2007 | Cost Payment | Cost Payment - copies  21.00 |
| 10/5/2007 | Misc. | Copies |
| 10/5/2007 | Cost Payment | Cost Payment - copies  21.00 |
| 10/5/2007 | Misc. | Copies |
| 10/5/2007 | Memorandum in Support of Motion | Pltf's Memorandum in Support of Motion to File Amended |
| 10/5/2007 | Motion To Alter Or Amend | Pltf's Motion to File Amended Complaint with one Exhibit |
| 10/5/2007 | Memorandum in Support of Motion | Pltf's Supplemental Memorandum in Support of Emerger |
| 10/4/2007 | Misc. | Copies |
| 10/4/2007 | Cost Payment | Cost Payment 16.00-copies |
| 10/4/2007 | Misc. | Copies |
| 10/4/2007 | Cost Payment | Cost Payment 52.50 |
| 10/4/2007 | Order | Order Notifying the Parties that Monday, 11/5/07 at 1:30 |
| 10/3/2007 | Misc. | Copies |
| 10/3/2007 | Cost Payment | Cost Payment 122.50-copies |
| 10/3/2007 | Misc. | Copies |
| 10/3/2007 | Cost Payment | Cost Payment 16.00-copies |
| 10/3/2007 | Misc. | Copies |
| 10/3/2007 | Cost Payment | Cost Payment 93.50 |
| 10/2/2007 | Misc. | Copies |
| 10/2/2007 | Cost Payment | Cost Payment 16.00-copies |
| 10/2/2007 | Misc. | Copies |
| 10/2/2007 | Cost Payment | Cost Payment 16.00-copies |
| 10/2/2007 | Misc. | Copies |
| 10/2/2007 | Cost Payment | Cost Payment 16.00-copies |
| 10/1/2007 | Misc. | Copies |
| 10/1/2007 | Cost Payment | Cost Payment 30.00-copies |
| 10/1/2007 | Cost Payment | Cost Payment - copies  16.00 |
| 10/1/2007 | Misc. | Copies |
| 10/1/2007 | Cost Payment | Cost Payment - copies  26.50 |
| 10/1/2007 | Misc. | Copies |

# Case Summary

Case: 72137

## Docket Entries:

| Filing Date | Docket Type Name | Description |
|---|---|---|
| 10/1/2007 | Transfer Order | Order Granting Motion to Transfer to Part III   625015 |
| 10/1/2007 | Misc. | Copies |
| 10/1/2007 | Cost Payment | Cost Payment 16.00 |
| 10/1/2007 | Cost Payment | Cost Payment - copies  104.50 |
| 10/1/2007 | Misc. | Copies |
| 10/1/2007 | Misc. | Commission |
| 10/1/2007 | Cost Payment | Cost Payment - commissions  25.00 |
| 10/1/2007 | Misc. | Copies |
| 10/1/2007 | Cost Payment | Cost Payment 22.00 |
| 10/1/2007 | Order | Order That the Court Shall Conduct a Hearing on Monda |
| 9/28/2007 | Proposal Received | order granting motion to transfer-attys Overton Thompso |
| 9/28/2007 | Cost Payment | Cost Payment - TPC & Counterclaim  325.00 |
| 9/28/2007 | Summons | UBS Loan Finance LLC (New York) - serve S/St - rrc sta |
| 9/28/2007 | Summons | UBS Securities LLC (Nashville) served Cathy Jones on 9 |
| 9/28/2007 | Answer with Counterclaim & Third Pa | Defendants' Answer, Counterclaim & Third Party Claim F |
| 9/28/2007 | Cost Payment | Cost Payment - copies  24.00 |
| 9/28/2007 | Misc. | Copies |
| 9/27/2007 | Motion | Pltf's Motion to Admit Counsel pro hac vice with two Exhi |
| 9/26/2007 | Misc. | Copies |
| 9/26/2007 | Cost Payment | Cost Payment 88.50-copies |
| 9/25/2007 | Notice Of Setting Motion | Pltf's Notice of Setting Expedited Motion to Transfer Actic |
| 9/25/2007 | Proposal Received | Order Granting Emergency Motion for Expedited Hearing |
| 9/25/2007 | Cost Payment | Cost Payment - copies  77.50 |
| 9/25/2007 | Misc. | Copies |
| 9/25/2007 | Misc. | Copies |
| 9/25/2007 | Cost Payment | Cost Payment 77.50 |
| 9/24/2007 | Cost Payment | Cost Payment 77.00 |
| 9/24/2007 | Misc. | Copies |
| 9/24/2007 | Misc. | Copies |
| 9/24/2007 | Cost Payment | Cost Payment 77.00-copies |
| 9/21/2007 | Memorandum in Support of Motion | Pltf's Memorandum in Support of Expedited Motion to Tr |
| 9/21/2007 | Motion | Pltf's Expedited Motion to Transfer Action - will be heard |
| 9/21/2007 | Cost Payment | Cost Payment 85.00 |
| 9/21/2007 | Misc. | Copies |
| 9/21/2007 | Cost Payment | Cost Payment 85.00-copies |
| 9/21/2007 | Misc. | Copies |
| 9/21/2007 | Cost Payment | Cost Payment 77.00 |
| 9/21/2007 | Misc. | Copies |
| 9/21/2007 | Misc. | Copies |
| 9/21/2007 | Cost Payment | Cost Payment - copies  77.00 |
| 9/21/2007 | Misc. | Copies |
| 9/21/2007 | Cost Payment | Cost Payment - copies  77.50 |
| 9/21/2007 | Cost Payment | Cost Payment 77.50-copies |
| 9/21/2007 | Misc. | Copies |
| 9/21/2007 | Cost Payment | Cost Payment - copies  85.00 |

Date: 2/6/2008                           **Case Summary**                           Page 15 of 15
Time: 10:27:50                           Case: 72137

## Docket Entries:

| Filing Date | Docket Type Name | Description |
|---|---|---|
| 9/21/2007 | Misc. | Copies |
| 9/21/2007 | Cost Payment | Cost Payment – copies  85.00 |
| 9/21/2007 | Misc. | Copies |
| 9/21/2007 | Memorandum in Support of Motion | Pltf's Memorandum in Support of Emergency Motion to E |
| 9/21/2007 | Motion | Pltf's Emergency Motion to Expedite Proceedings, gave t |
| 9/21/2007 | Cost Bond | Bass Berry etc. |
| 9/21/2007 | Cost Payment | lit tax 42.50 paid by Bass Berry & Sims PLC |
| 9/21/2007 | Original Complaint/Petition | Complaint : Original Complaint/Petition w/ 5 exh |
| 9/21/2007 | Summons | The Finish Line |
| 9/21/2007 | Summons | Headwind Inc served 9/24/07 |

IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE

| | | |
|---|---|---|
| GENESCO INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 07-2137-II (III) |
| | ) | |
| THE FINISH LINE, INC., *et al*, | ) | |
| | ) | |
| Defendants | ) | |

## UBS SECURITIES LLC AND UBS LOAN FINANCE LLC'S
## MOTION TO INTERVENE

Come now, UBS Securities LLC and UBS Loan Finance LLC (collectively, "UBS"), by and through counsel, and hereby move to intervene in the above-referenced cause of action pursuant to Rule 24 of the Tennessee Rules of Civil Procedure. As grounds for this Motion, UBS respectfully refers this Court to its Memorandum in Support hereof which has been filed contemporaneously. A copy of the proposed answer of UBS is attached to this Motion.

Dated: October 10, 2007

Respectfully submitted,

John S. Hicks (BPR No. 10478)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ
211 Commerce Street, Suite 1000
Nashville, Tennessee  37201
(615) 726-5600
(615) 726-0464 (*Facsimile*)

Attorneys for UBS Securities LLC and
UBS Loan Finance LLC

Of Counsel:
Joseph J. Frank
Latham & Watkins LLP
885 Third Avenue
New York, NY  10022

2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing has been served upon the following via hand delivery and email, on this _____ day of October, 2007:

Robert J. Walker
J. Mark Tipps
John C. Hayworth
John L. Farringer
WALKER TIPPS & MALONE
2300 One Nashville Place
150 Fourth Avenue North
Nashville, TN 37219


Overton Thompson, III
Britt K. Latham
W. Brantley Phillips, Jr.
Brian D. Roark
Russell E. Stair
BASS, BERRY & SIMS PLC
Suite 2700
315 Deaderick Street
Nashville, Tennessee  37238-3001

3

IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE

| | | |
|---|---|---|
| GENESCO INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 07-2137-II (III) |
| | ) | |
| THE FINISH LINE, INC., *et al*, | ) | |
| | ) | |
| Defendants | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF UBS SECURITIES LLC AND UBS LOAN FINANCE LLC'S MOTION TO INTERVENE

UBS Securities LLC and UBS Loan Finance LLC (collectively, "UBS"), by and through counsel, hereby move this Court, pursuant to Rules 24.01 and 24.02 of the Tennessee Rules of Civil Procedure,[1] for an Order granting UBS leave to intervene as a Defendant in this case for the purposes of obtaining discovery from Genesco and participating in any adjudication of whether a Material Adverse Change has occurred under either the Commitment Letter[2] or the Merger Agreement.[3]

### BACKGROUND

The Finish Line, Inc. ("Finish Line") agreed to acquire Genesco on June 17, 2007 pursuant to the terms of the Merger Agreement. On June 17, 2007, Finish Line and UBS signed

---

[1] Tenn. R. Civ. P. 24.03 requires that a motion to intervene be accompanied by a "pleading setting forth the claim or defense for which intervention is sought." UBS's proposed Answer is attached to this Motion as Exhibit A.

[2] "Commitment Letter" refers to the Bank and Bridge Facilities Commitment Letter by and between UBS Loan Finance LLC, UBS Securities LLC and The Finish Line, Inc., dated June 17, 2007.

[3] "Merger Agreement" refers to the Agreement and Plan of Merger By and Among The Finish Line, Inc., Headwind, Inc. and Genesco, Inc., dated as of June 17, 2007.

the Commitment Letter, which obligates UBS to provide $1.8 billion to finance the acquisition, provided, among other things, that certain pre-closing conditions are satisfied. One of these conditions excuses UBS from performing under the Commitment Letter if, after June 17, 2007, Genesco suffers a "Material Adverse Effect," and the Material Adverse Effect is not cured prior to December 31, 2007.

On August 30, 2007, Genesco released its financial performance for the second quarter 2007.[4] Genesco announced that its earnings (EBIT) were down 77% compared to the same period for the prior year. That decline seemed to surprise almost everyone. Indeed, not only were Genesco's earnings dramatically lower than the prior year, but those earnings also were dramatically lower than recent analyst estimates—which actually had been projecting a gain on the prior year based on Genesco's own recent guidance. Genesco instead announced an unexpected and significant loss. To date, Genesco has offered no satisfactory explanation for its second quarter decline.

Under Section 6.3 of the Merger Agreement, Genesco is obligated to "afford [Finish Line's] lenders such access to the books and records, financial, operating and other data" of Genesco "as is reasonably necessary or appropriate." Also, in connection with any request that UBS close its financing and participate in a public offering of securities, Genesco must ensure that the financial information "is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein, in light of the circumstances under which such statements are made, not misleading."

---

[4]    Genesco's fiscal year begins in February, meaning the second quarter of the fiscal year covers May through July.

2

After Genesco announced its dramatic and unexpected second quarter decline, UBS and Finish Line were not able to determine based on available information whether Genesco has suffered a Material Adverse Effect under either the Merger Agreement or the Commitment Letter.  UBS and Finish Line exercised their rights under the transaction agreements and requested that Genesco provide additional information to begin to understand whether a Material Adverse Effect had occurred.  Genesco refused this request; instead of satisfying its obligations under the agreements and providing UBS and Finish Line access to its books and records, Genesco filed this lawsuit against Finish Line seeking specific performance under the Merger Agreement.

## ARGUMENT

### I.     Intervention as of Right

To establish a right to intervene under Tenn. R. Civ. P. 24.01, a party must satisfy four elements: "(1) The application for intervention was timely; (2) The proposed intervenor has a substantial legal interest in the subject matter of the pending litigation; (3) The proposed intervenor's ability to protect that interest is impaired; and (4) The parties to the underlying suit do not adequately represent the intervenor's interest." *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 190 (Tenn. 2000).  For the reasons set forth below, UBS satisfies each of elements required to demonstrate intervention as of right.

### A.     UBS's Motion is Timely

"The timeliness of an intervention is governed by equitable principles and is determined by the facts and circumstances of each particular case." *American Materials Technologies, LLC v. City of Chattanooga*, 42 S.W.3d 914, 916 (Tenn. Ct. App. 2000).  Genesco filed its Complaint on September 21, 2007.  Only 19 days later on October 10, 2007, UBS

hereby moves to intervene. Tennessee precedent makes clear that under these circumstances, the

motion is timely. *See, e.g., Posey v. Dryvit Sys., Inc.* ("*Posey*"), No. E2003-00392-COA-R3-CV,

2004 WL 572348, at *4 (Tenn. Ct. App. 2004) (motion timely when filed less than 90 days after

notice was given); *Beckman Indus. v. Int'l Ins. Co.,* 966 F.2d 470, 471 (9th Cir. 1992) (motion to

intervene timely when filed 2 years after settlement); *FDIC v. Ernst & Ernst*, 677 F.2d 230 (2d

Cir. 1982) (third party permitted to intervene and challenge a stipulated confidentiality order two

years after a judicially-approved settlement).

**B.    UBS Has a Substantial Legal Interest**

"The right to intervene in litigation must be a substantial interest, a legal interest,

an interest known and protected by the law, or must be sufficiently related to the original action."

*Posey*, 2004 WL 572348, at *6 (Tenn. Ct. App. 2004) (quoting 59 AM. JUR. 2D Parties § 168). In

determining whether or not an interest is substantial, a court must consider whether resolution of

the litigation would change the intervenor's status in any way. *See Blount v. City of Memphis*,

No. W2006-01191-COA-R3-CV, 2007 Tenn. App. LEXIS 214, at *11 (Tenn. Ct. App. 2007).

In this case, the court will have to decide whether all closing conditions have been

met. One of those closing conditions is whether a Material Adverse Effect has occurred under

the Merger Agreement and Commitment Letter. Whether a Material Adverse Effect has

occurred could directly affect UBS's obligation to fund the $1.8 billion under the Commitment

Letter. Because UBS's interest in a lawsuit is such that the outcome of the case may alter its

contractual obligations to an extant party, it has a "substantial interest" in the litigation and is

entitled to intervene as a matter of right. *See, e.g., Reich v. ABC/York-Estes Corp.*, 64 F.3d 316,

322 (7th Cir. 1995) (employees have a substantial interest in Fair Labor Standards Act action

against employer where the lawsuit will define the contractual relationship between employer

and employees); *Hartford Fire Ins. Co. v. Mitlof*, 193 F.R.D. 154, 160-61 (S.D.N.Y. 2000)

(insurer permitted to intervene in action that would determine the scope of coverage).

### C.    UBS's Interest Would Be Impaired and Impeded Absent Joinder

Impairment is shown when disposition of the action "may" impede or impair the

movant's ability to protect its interest "as a practical matter." Tenn. R. Civ. P. § 24.01.  An

intervenor "need not show that . . .  impairment will inevitably ensue from an unfavorable

disposition . . . [T]he would-be intervenors need only show that the disposition '*may*  . . . impair

or impede [their] ability to protect [their] interest.'" *Purnell v. City of Akron*, 925 F.2d 941, 948

(6th Cir. 1991) (emphasis, brackets, and second ellipses in original); *see also Posey*, 2004 WL

572348, at *6 (permitting intervention in a settlement discussion where "the terms of the

Settlement expressly impact upon the [intervenors'] interests" such that the proposed settlement

might increase intervenors' liability).

UBS stands to "gain or lose" a substantial interest "by direct operation of the [the

court's] judgment." *Brown & Williamson*, 18 S.W.3d at 192.  For the reasons explained above,

any determination that Genesco's poor financial performance constitutes a Material Adverse

Effect would directly affect UBS's obligations and rights under the Commitment Letter.

Intervention is clearly warranted under these circumstances. *See, e.g., Posey*, 2004 WL 572348,

at *4.

### D.    UBS's Ability to Protect Its Legal Interests Will Be Impaired If It Is
###        Excluded from This Case.

The Supreme Court of the United States has stated that the burden of showing that

representation may not be adequate is "minimal." *Trbovich v. United Mine Workers of America*,

404 U.S. 528, 538 n.10 (1972).  "This burden has been described as minimal because it need

only be shown that there is a *potential* for inadequate representation." *United States v. Michigan*,

5

424 F.3d 438, 443 (6th Cir. 2005) (emphasis in original; internal quotation marks omitted); *see also Fed. Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist.*, 983 F.2d 211, 216 (11th Cir. 1993) ("Any doubt concerning the propriety of intervention should be resolved in favor of the proposed intervenors . . ."). "[T]here is good reason in most cases to suppose that the applicant is the best judge of the representation of the applicant's own interests and to be liberal in finding that one who is willing to bear the cost of separate representation may not be adequately represented by the existing parties." Charles A. Wright & Arthur R. Miller, 7C Fed. Prac. & Proc. Civ.3d § 1909.

UBS's interest in these proceedings is unique. As the potential financier of $1.8 billion for the Finish Line/Genesco merger, UBS is in a place of enormous risk. Since UBS has a unique and substantial interest in the transaction, and that interest would be impaired absent joinder, UBS is entitled to intervene pursuant to Tenn. R. Civ. P. 24.01.

## II.    Permissive Intervention

In the alternative, UBS is entitled to intervene permissively pursuant to Tenn. R. Civ. P. 24.02. Permissive intervention is appropriate where, "upon timely application . . . an applicant's claim or defense and the main action have a question of law or fact in common." Tenn. R. Civ. P. 24.02. Permissive intervention is within the discretion of the court, and "[i]n exercising discretion the court shall consider whether or not the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Tenn. R. Civ. P. 24.02. Thus, where a "would-be intervenor's claim or defense contains a question of law or fact that also is raised by the main action then the requirement of the rule has been satisfied and the trial court is afforded discretion to permit intervention." *Ballard v. Herzke,* 924 S.W.2d 652, 657 (Tenn. 1996). The permissive intervention statute does not require "that the intervenor have a direct

6

personal or pecuniary interest in the subject of litigation." *SEC v. U.S. Realty & Improvement Co.*, 310 U.S. 434, 459 (1940).

UBS seeks to intervene to gather more information about Genesco's recent decline and, if necessary, to determine whether Genesco has experienced a Material Adverse Change—all issues that are presently before the Court. *See Kentucky National Insurance Co. v. Gardner*, 6 S.W.3d 493, 499 (Tenn. 1999) (insurer may intervene to assert subrogation claims against tortfeasor on behalf of insured); *Travelers Ins. Company v. Williams*, 541 S.W.2d 587, 590 (Tenn. 1976) (same); *see also State ex rel. Elvis Presley International Memorial Foundation v. Crowell*, 733 S.W.2d 89, 93 (Tenn. App. 1987) (Elvis Presley's estate permitted to intervene in support of defendant being sued for unfair competition for using Presley as part of its corporate name). For this reason, intervention by UBS will neither delay nor prejudice adjudication of the extant parties' rights. The Court will adjudicate the same issues and proceed according to the same schedule regardless of whether or not UBS intervenes.

7

## CONCLUSION

For the reasons set forth above, UBS respectfully requests that it be permitted to intervene in this matter pursuant to Tenn. R. Civ. P. 24.01 or, in the alternative, Tenn. R. Civ. P. 24.02.

Dated:  October ___, 2007

Respectfully submitted,

John S. Hicks (BPR No. 10478)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ
211 Commerce Street, Suite 1000
Nashville, Tennessee  37201
(615) 726-5600
(615) 726-0464 (*Facsimile*)

Attorneys for UBS Securities LLC and
UBS Loan Finance LLC

Of Counsel:
Joseph J. Frank
Latham & Watkins LLP
885 Third Avenue
New York, NY  10022

8

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing has been served upon the following via hand delivery and email, on this _____ day of October, 2007:

Robert J. Walker
J. Mark Tipps
John C. Hayworth
John L. Farringer
WALKER TIPPS & MALONE
2300 One Nashville Place
150 Fourth Avenue North
Nashville, TN 37219


Overton Thompson, III
Britt K. Latham
W. Brantley Phillips, Jr.
Brian D. Roark
Russell E. Stair
BASS, BERRY & SIMS PLC
Suite 2700
315 Deaderick Street
Nashville, Tennessee  37238-3001

Genesco Inc.

vs.

Finish Line and UBS

---

TRANSCRIPT OF PROCEEDINGS

October 10, 2007

---

Condensed Transcript and Word Index

---

**CLEETON DAVIS COURT REPORTERS, LLC**
**200 Fourth Avenue North, Suite 825**
**Nashville, TN  37219**
**(615) 726-2737**
**www.cleetondavis.com**

Transcript of Proceedings

Page 3

1    IN THE CHANCERY COURT OF DAVIDSON COUNTY, TENNESSEE
2                    AT NASHVILLE
3    GENESCO, INC.,                )
                                   )
4         Plaintiff,               )
                                   )
5    vs.                           )  No.
                                   )  07-2137-II(III)
6    FINISH LINE, INC., and        )
     HEADWIND, INC.,               )
7                                  )
          Defendants,              )
8                                  )
                                   )
9    vs.                           )
                                   )
     UBS SECURITIES LLC and        )
10   UBS LOAN FINANCE LLC,         )
                                   )
11        Third-Party Defendants.  )
12
13
14
15   TRANSCRIPT OF PROCEEDINGS
16
17   October 10, 2007
18
19   BEFORE:  The Honorable Ellen Hobbs Lyle, Chancellor
20
21
22
23   -------------------------------------------------
              CLEETON DAVIS COURT REPORTERS, LLC
24         200 Fourth Avenue North, Suite 825
                 Nashville, Tennessee 37219
25                  (615) 726-2737

Page 2

1   APPEARANCES:
2   For the        Overton Thompson, Esq.
    Plaintiff:     Russell E. Stair, Esq.
3                  Bass, Berry & Sims
                   315 Deaderick Street
4                  Suite 2700
                   Nashville, TN 37238
5
                   James P. Denvir, Esq.
6                  Michael Brille, Esq.
                   Boies, Schiller & Flexner LLP
7                  5301 Washington Avenue, N.W.
                   Washington, DC 20015
8
    For the        Robert J. Walker, Esq.
9   Defendants:    J. Mark Tipps, Esq.
                   Walker, Tipps & Malone
10                 2300 One Nashville Place
                   150 Fourth Avenue North
11                 Nashville, TN 37219
12  For the        John S. Hicks, Esq.
    Third-Party    Baker, Donelson, Bearman,
13  Defendant:     Caldwell & Berkowitz
                   Commerce Center, Suite 1000
14                 211 Commerce Street
                   Nashville, TN 37201
15
                   Joseph J. Frank, Esq.
16                 Latham & Watkins
                   53rd at Third
17                 885 Third Avenue
                   New York, NY 10022-4834
18
19
20
21
22
23
24
25

Page 3

1        The above-styled cause came on for
2    hearing on October 10, 2007, in the Chancery Court of
3    Davidson County, Tennessee, when the following
4    proceedings were had, to-wit:
5
6        THE CLERK:  This is the matter of Genesco
7    versus Finish Line, Incorporated, et al.
8        THE COURT:  Thank you.  Good afternoon.
9        ALL:  Good afternoon, Your Honor.
10       THE COURT:  I just received defendant's
11   response to plaintiff's emergency motion to expedite
12   proceedings.  Let me tell the lawyers, before I
13   received the way that I was going to proceed was,
14   one, get an update on the UBS venue question; then,
15   secondly, I was going to have the plaintiff outline its
16   need and plan for expedited proceedings, talk a little
17   bit about whether UBS was a necessary party depending
18   on what's happened with UBS agreeing to venue.  And
19   then I was going to call on the defendants to respond.
20       I understand from the clerk that there
21   are some folks that need some time to review what I've
22   just been handed.  Is there agreement/consensus on that
23   or not?
24       MR. THOMPSON:  Yes, Your Honor, I believe
25   there is.

Page 4

1        THE COURT:  Okay.
2        MR. THOMPSON:  What we'd like is just a
3    short delay, if we could, depending on the Court's
4    schedule to, say, 4:00 o'clock if that works.
5        THE COURT:  Sure.  Is that too soon?  Do
6    you-all need to come later than that?
7        MR. HICKS:  Four o'clock's fine, Your
8    Honor.  John Hicks on behalf of UBS.  And that would be
9    good for us as well.
10       THE COURT:  Okay.  So we're basically
11   just going to reschedule this and everybody will come
12   back at 4:00 o'clock --
13       MR. THOMPSON:  Exactly.
14       THE COURT:  -- read this and then we'll
15   start back.  The outline that I just gave you, is that
16   going to work for this afternoon?
17       MR. THOMPSON:  Absolutely.  That will be
18   perfect.
19       THE COURT:  Good.
20       MR. HICKS:  Your Honor, I think that in
21   the next hour or so we'll have some things to put
22   before Your Honor that will be helpful in that regard
23   also.
24       THE COURT:  Okay.  Well, this worked out
25   well because my hearing finished this morning so we've

1 (Pages 1 to 4)

Page 5

1 got the afternoon if you-all need it.
2          Okay.  Good, I'll see you at 4:00.
3          MR. THOMPSON:  Thank you, Your Honor.
4          THE CLERK:  Court is in recess.
5          (Recess.)
6          THE COURT:  Okay.  We have reconvened our
7 hearing, and the way that I would like to start out is
8 I have a few specific questions to ask -- not of you --
9          MR. THOMPSON:  Sorry.
10          THE COURT:  -- yet.  Yet.  And then the
11 Court will hear any presentations that the lawyers
12 would like to make.
13          Okay.  Let me start out with UBS's motion
14 to intervene.  I'm assuming the defendants don't have
15 any objections to that.
16          MR. WALKER:  That's correct.
17          THE COURT:  Okay.  What about plaintiff?
18 Do you-all object to that?
19          MR. THOMPSON:  Your Honor, we do not,
20 again assuming -- and we'll make this clear later --
21 assuming that they're willing to accommodate the
22 schedule that the Court adopts, we've got no
23 objections.
24          THE COURT:  Okay.  Having gotten that
25 housekeeping item out of the way, let me ask a few

Page 6

1 questions where I think we have some agreement.
2          MR. HICKS:  Your Honor, I'm hesitant to
3 interrupt the Court, but --
4          THE COURT:  That's okay.
5          MR. HICKS:  -- I wondered if I could
6 introduce my colleague, Mr. Frank, and make a --
7          THE COURT:  Pro hac vice?
8          MR. HICKS:  Yes, Your Honor.
9          This is Joseph Frank of the New York Bar.
10 We'll be filing the appropriate pro hac motions, but
11 Mr. Frank has a preliminary matter on behalf of
12 everybody on this side of the V, so to speak, that I
13 think will impact the kind of information that we can
14 give to Your Honor in the course of this hearing.
15          THE COURT:  What does it pertain to?
16          MR. FRANK:  Your Honor, with respect, it
17 pertains to the issues that are squarely at issue
18 raised by the motion of plaintiffs to expedite.  In a
19 nutshell, I don't want to waste too much of the Court's
20 time on this preliminary matter.
21          THE COURT:  I was just headed there.
22          MR. FRANK:  We are in possession of new
23 nonpublic information about Genesco's performance that
24 we are under an obligation not to refer to in open
25 court.  With respect, we'd like the Court's guidance on

Page 7

1 how to proceed on this.  We certainly believe that this
2 information goes directly to the heart of the issue
3 that Your Honor will decide today.
4          THE COURT:  Okay.  We don't need to take
5 that up right now but I'll keep it in the back of my
6 mind.
7          MR. FRANK:  We'd certainly be willing to
8 make a proffer at the time that the Court --
9          THE COURT:  All right.  I don't think
10 we're going to get to that level of detail.  Let me get
11 back to where I think we have common ground; and then
12 if we get to that level, I'll give you a remedy for
13 that.
14          MR. FRANK:  Thank you.
15          THE COURT:  All right.  Everyone agrees
16 that we need expedition.  The disagreement is how much.
17 Genesco wanted a hearing in November, the defendants --
18 and I'm assuming UBS along with that -- wanted the end
19 of January.  The Court has available the week of
20 December 10th, or we could move some things from
21 December 17th.  Okay?
22          Now, to do that, it looked like after
23 looking through all this, any evidentiary hearing would
24 boil down to the issue of material adverse effect.
25 Does everybody agree with that?

Page 8

1          MR. FRANK:  We do, Your Honor.
2          MR. THOMPSON:  Yes.
3          THE COURT:  Okay.  So common ground one,
4 material adverse effect is our issue.  And then how
5 long will it take us to discover that, and that would
6 designate our hearing date.
7          It looks like on material adverse effect
8 we're going to have discovery, I guess, on what's going
9 on in the market and Genesco's proportionate
10 performance to that.  Genesco says it's been giving
11 information to the defendants on that issue.  The
12 defendants, though, seem to think that they're going to
13 need some more information, and I guess experts are
14 going to be the problem because we've got to get our
15 information to the experts, let them digest it, get
16 them deposed and prepared for our hearing.
17          My question is do you think -- I know
18 Genesco thinks that can be done by December 10th or
19 17th.  What about UBS and the defendants?  Could
20 you-all do it by then?
21          MR. FRANK:  Your Honor, you want me to --
22          MR. THOMPSON:  Go ahead.
23          THE COURT:  Sure.
24          MR. FRANK:  I think I speak on behalf of
25 both defendants, Your Honor, on this point.  We are

Page 9

1  interested in expediting the proceedings. You know,
2  obviously my client, UBS, has come down and submitted
3  itself to the jurisdiction of the Court to try to get
4  everything done. We believe that an early to mid-
5  January deadline is important for the following reason.
6          THE COURT: Let me tell you there's a
7  problem.
8          MR. FRANK: Yes, Your Honor.
9          THE COURT: Genesco is suffering, it
10  says, every day that it doesn't get this remedy, an
11  answer, and I think you can understand that when you
12  look at the confidential information that's been given
13  and also just the uncertainty in the market that that's
14  going to affect their company. So to say -- and you
15  also know the end of the year is an important time,
16  too. Going into the next year is psychologically
17  problematic for them. So that's how I came up with the
18  December date. Why is that logistically impossible for
19  this side?
20          MR. FRANK: And let me respond directly
21  to that, Your Honor, and there's a legal answer and a
22  logistics answer.
23          THE COURT: Okay.
24          MR. FRANK: With respect to the legal
25  answer -- and I can show Your Honor the language if

Page 10

1  you're interested -- but Genesco bargained for a
2  materiality period of June 17th, 2007, when the
3  agreements were signed --
4          THE COURT: Right.
5          MR. FRANK: -- through and including
6  December 31st, 2007.
7          THE COURT: Right.
8          MR. FRANKS: So, Your Honor, I understand
9  that a hearing on December 17th might be certainly more
10  ready available than, say, a hearing on January 5th or
11  something like that. But if we were to present Your
12  Honor with evidence that a material adverse change had
13  occurred, our friends at Genesco would say, "Well, we
14  have to come back on January 5th because we don't know
15  whether they're going to cure that MAC by the 31st."
16  So --
17          THE COURT: But it seems like -- and I'm
18  sorry to interrupt. I'm just trying to move quickly.
19          MR. FRANK: No.
20          THE COURT: It seemed like, though,
21  that's why the December dates would work, because is it
22  realistic to say you could cure. And if we have a
23  hearing December 10th or 17th, wouldn't that
24  information give us substantially what we need, and
25  they really can't come up with this, "Oh, but we can

Page 11

1  turn it around"?
2          MR. FRANK: Well, I think Your Honor's
3  observation would be very well taken except for the
4  fact that Genesco has argued many times before -- and
5  Your Honor will hear it today -- that they are, like
6  many retailers, a fourth-quarter company.
7          THE COURT: Right.
8          MR. FRANK: And that they make most of
9  their money in the Christmas period --
10          THE COURT: True.
11          MR. FRANK: -- and the post-Christmas
12  period.
13          THE COURT: True.
14          MR. FRANKS: And so what we don't want to
15  have happen, again, Your Honor, whether it's December
16  17 or January 5th, we understand it's an imposition on
17  all the parties. And, of course --
18          THE COURT: Let me test how sure they are
19  that no material adverse effect has occurred as of yet,
20  because what they might agree to is that that not --
21  they might agree not to bring up this cure through
22  Christmas. Let's see if they'll go with that.
23          MR. FRANK: Sure.
24          THE COURT: Would you go with that or
25  not?

Page 12

1          MR. THOMPSON: Your Honor, one thing, I
2  obviously need to talk to our client about that, but
3  also one point I want to make clear is that the closing
4  conditions had been satisfied as of September the 17th.
5  So our argument is going to be that that is when the
6  look ends. Now, you know, obviously it's going to be
7  difficult for the Court not to look at what had
8  happened after that. But, absolutely, if the proof
9  demonstrates that the conditions for closing were
10  satisfied as of the 17th of September, then, you know,
11  the look stops then.
12          But, Your Honor, the principal problem we
13  have is what you identified, and that's the effect on
14  Genesco's business.
15          THE COURT: Okay. Let me probe this look
16  business. Okay. What's your response?
17          MR. FRANK: On that issue, Your Honor, we
18  have certain facts that I think are undisputed between
19  the parties.
20          On the second quarter, Genesco is a
21  one-month-off calendar year fiscal year. In the second
22  quarter from May to July 31st -- I note parenthetically
23  that the merger agreement was signed on June 17th,
24  right smack dab in the middle of that -- Genesco
25  announced an unexpected --

Transcript of Proceedings

Page 13

1       THE COURT: Right. I've read all that.
2   I know that.
3       MR. FRANK: -- 77 percent decline in
4   earnings. So a 77 percent decline in earnings compared
5   to the prior year.
6       THE COURT: Right.
7       MR. FRANK: They offered an explanation
8   to the public markets which said, among other things,
9   really don't worry about that. This is essentially a
10  timing issue. Right? There are later back-to-school
11  purchases and later sales holidays that last year --
12      THE COURT: They also said merger costs
13  and they said the industry.
14      MR. FRANK: No, no. Correct, Your Honor.
15  And that 77 percent that I just referred to decline in
16  earnings compared to the second quarter of 2006
17  excludes all those merger costs.
18      THE COURT: Oh, okay. Good.
19      MR. FRANK: And the issue here, Your
20  Honor, 77 percent decline compared to internal
21  projections that are gain, analyst consensus a gain,
22  everybody was shocked: Finish Line, the bank,
23  everybody.
24      THE COURT: Right.
25      MR. FRANKS: So now what did they say?

Page 14

1   And I'll be brief. They said essentially, among other
2   things, don't worry about it, it's a timing issue,
3   back-to-school purchases and certain sales tax holidays
4   in Texas and Florida, who are big markets, are in the
5   third quarter this year compared to the second quarter
6   this year. And as a consequence, just wait,
7   everything's going to be good.
8       THE COURT: And what would that date have
9   been then?
10      MR. FRANK: I'm sorry. Which date, Your
11  Honor?
12      THE COURT: The tax days in Texas and all
13  of that.
14      MR. FRANK: It varies, but it all centers
15  around the third quarter which includes, for example,
16  the Labor Day holiday. And Genesco took the unusual
17  step when it made its public announcement about the --
18  first it delayed 30 months -- 30 days, and then
19  announced its earnings. And when it did so, it said,
20  you know, this explanation. And it basically said here
21  are same-store sales for the first three weeks of --
22  and this is an important point, Your Honor -- the first
23  three weeks of the third quarter.
24      But then they stopped releasing those
25  numbers, and we're getting close to the issue that I

Page 15

1   don't want to refer to in open court. But the point, I
2   guess, Your Honor, is their explanation for don't worry
3   about the 77 percent decline in the second quarter
4   depends on what's happening right now. If their
5   explanation doesn't hold water or it's contradicted by
6   what's happening, we're left with an unexplained 77
7   percent decline.
8       THE COURT: Okay. Now, you've gotten me
9   really off focus here because what I heard from the
10  other side is that the look should stop at September
11  17th because under the terms of the agreement, that was
12  when all these conditions were fulfilled. And you're
13  telling me the look should extend to when?
14      MR. FRANK: Well, Your Honor, it would
15  extend until the closing conditions are satisfied. One
16  of -- you know --
17      THE COURT: I'm sorry. I didn't make my
18  question precise enough. Okay. You need more
19  information --
20      MR. FRANK: Yes, Your Honor.
21      THE COURT: -- because what has happened
22  with their sales.
23      MR. FRANK: Yes, Your Honor.
24      THE COURT: They've told you it will be
25  explained. What is the ending or --

Page 16

1       MR. FRANK: The ending date for us is
2   December 31st, 2007. In other words, unless Genesco's
3   willing to say --
4       THE COURT: Why?
5       MR. FRANK: The answer, Your Honor, is
6   very clear. Genesco bargained that the evidence will
7   be uncontradicted, and Genesco insisted on a very
8   unusual provision, this December 31st cure date.
9   That's their date. So what we're saying, Your Honor,
10  this is the question that you asked counsel a moment
11  ago. If they're willing to say the cure doesn't
12  matter, then our need for the numbers all the way up to
13  December 31st arguably goes away.
14      THE COURT: They're only willing to say
15  the cure doesn't matter if you give them a deadline
16  that's more along the lines of the September 17th look.
17  I think what they're saying is, "Yeah, we could explain
18  those -- the bad numbers. We can explain them, but it
19  wouldn't be information much past September 17th." And
20  that's why I'm trying to get you to answer.
21      MR. FRANK: And I'm trying to answer your
22  question. Both the Finish Line counter-party to
23  Genesco in the merger agreement disputes what
24  Mr. Thompson said, which is that all the closing
25  conditions were satisfied by that September deadline.

4 (Pages 13 to 16)

Transcript of Proceedings

Page 17

1  They've denied it in their answer. And so the question
2  of then whether a material adverse effect has occurred
3  and when it has occurred is the issue that --
4       THE COURT: I really think you're making
5  it too complicated.
6       MR. FRANK: Forgive me.
7       THE COURT: All the conditions were
8  fulfilled. They had the shareholder meeting,
9  everything except the question of material adverse
10  effect.
11       MR. FRANK: That's incorrect, Your Honor.
12       THE COURT: Why is that incorrect?
13       MR. FRANK: Well, I'll let Finish Line
14  counsel tell you that. We're the bank.
15       THE COURT: Well, we're getting -- okay.
16  Okay. Let me go back to Mr. Thompson.
17       MR. THOMPSON: Sure, Your Honor.
18       THE COURT: Anything else you want to say
19  about, I guess, this December 31st date that you agreed
20  to?
21       MR. THOMPSON: Well, Your Honor, I guess
22  what I would say is that, again, for the reasons that
23  you've identified, and that is the position that
24  Genesco is in now that is just intolerable where their
25  employees don't know if they've got jobs. You know,

Page 18

1  the headhunters are just having a feeding frenzy.
2  We're at real risk of losing key employees. Plus we
3  can't follow through with our plans for opening stores,
4  we've got a distribution facility, because we agreed in
5  the merger agreement that we wouldn't do that.
6       So -- but I say that, Your Honor, let me
7  get to the point. Obviously, we would like this heard
8  on November 5th. If Your Honor can hear us on December
9  the 10th, we're okay with that. We're not okay with
10  the end of January. But December 10th, I think, is a
11  reasonable compromise.
12       THE COURT: Okay. But the problem with
13  that is this window of information that the other side
14  wants. And I guess what I need to hear from you is
15  September 17th, based on the facts that I've looked at
16  so far, appears to be not enough information for them?
17  It seems they are entitled to more information. What
18  I'm trying to get a feel for is September 17th to
19  December 31.
20       MR. THOMPSON: Right.
21       THE COURT: You don't want me to wait
22  until after December 31, and so I'm looking here for
23  what you would be willing to do to get us a hearing
24  before that date in terms of giving them critical
25  information, or at least in their eyes critical

Page 19

1  information.
2       MR. THOMPSON: Your Honor, if the proof
3  demonstrates -- which we think it will -- that the
4  closing conditions were satisfied as of September the
5  17th, then that's where the Court looks. If the Court
6  decides that's not the case but that they have
7  subsequently been then satisfied, then yes, we have the
8  right to cure to December 31. But I need to talk with
9  my clients again in order to give up that right.
10       THE COURT: Sure.
11       MR. THOMPSON: But, absolutely, the
12  timing is critical to us because of the state of limbo
13  that we're in. And so December -- you know, having
14  this case tried at the beginning of December is far
15  preferable than January.
16       THE COURT: Another way to approach this
17  problem would be to have some tiered hearings, in other
18  words, to prioritize some issues. Is that one way that
19  we could go with this, would be to determine whether
20  there had been a material adverse effect, I don't know,
21  prior to September 17th, just hear the preliminary
22  proof on that? Do a quick hearing on that?
23       MR. THOMPSON: Sure. Your Honor, again,
24  we think this is not a complicated issue. I mean, I'm
25  sure Your Honor's already looked at the Tyson case. I

Page 20

1  mean, it's got to be long-term. A couple of bad
2  quarters, even if that's the case -- plus, they're
3  never going to be able to demonstrate that our results
4  are materially disproportionate to everybody else,
5  including Finish Line.
6       THE COURT: Okay. I'm going to let the
7  other side respond to that question as well.
8       MR. THOMPSON: Sure.
9       THE COURT: And then after we've done
10  that, I'm going to turn it over to the lawyers and you
11  can make any other points you want to.
12       Okay. Yeah.
13       MR. WALKER: Your Honor, may I speak on
14  this?
15       THE COURT: Sure.
16       MR. WALKER: Addressing the questions you
17  asked and the statements made by counsel, it's not just
18  whether Genesco will yield up the last two weeks or
19  last three weeks of December to look at. What has
20  happened here is that in the second quarter it is
21  apparent to the world that they had a dramatic decline.
22  So the question is, is that dramatic decline in how
23  this horse performs because of a little sprained ankle
24  or has it developed bone cancer, okay?
25       And so what happens after July the 30th

5 (Pages 17 to 20)

Page 21

1  or August 4th, whenever that second quarter ended, is
2  very critical as an evidentiary matter to is this a
3  material adverse event at Genesco or is this just like
4  everybody else may suffer or may not, a reduce in
5  sales. What they pointed out when they made their
6  statements to the analysts and to the world in a
7  conference call on August 30th was that, oh, don't
8  worry about this. This was just a timing issue from
9  dates being moved from July into August. And, see, our
10 first two or three weeks in August look good or flat,
11 and you're going to see it's better and we don't plan
12 on making any further announcements.
13          Now we get to the point of what we have
14 seen through the end of August, the month of September
15 including the Labor Day weekend, and now just about all
16 of October. What we've seen is not full financial
17 numbers. All we see is same-store sales or sales
18 compared to last year. And without going into detail
19 about it, the excuse that Genesco put up for why this
20 wasn't a material event is that it's just a temporary
21 shock in the retail market, a timing issue. Now, if it
22 turns out, which is what they wanted everybody to look
23 at, let us see all the way through Christmas.
24          THE COURT: Well, and I guess my question
25 is why we have to go through Christmas if they said it

Page 22

1  was going to be fixed Labor Day, school sales, all of
2  that. If I require them to turn over all the
3  information to you to date, won't you be able then to
4  prove what you've just said to me, that this is bone
5  cancer, it's not a sprained ankle?
6          MR. WALKER: Except suppose this, Your
7  Honor: Since they always claim -- and it's true in the
8  retail industry -- that the fourth quarter is where
9  they make it all. That's why they wanted a look right
10 up to December 31. If the fourth quarter turns out
11 badly, as someone might suspect the third quarter is
12 today as we speak, then the cure -- the problem is a
13 whole lot more than a temporary timing issue, and it's
14 clear evidence --
15          THE COURT: But you're anticipating their
16 defense to what we don't even know yet. I mean, you're
17 speculating -- your side is speculating that this is
18 serious and they can't explain it, and if we get all of
19 the information, we're going to see that this is a big
20 problem. And then you anticipate they're going to say,
21 "But hang on, we've got Christmas coming." But my
22 point is, right now we may be able to solve -- at least
23 get to a bottom line and have a hearing if you are just
24 given information to date and you could analyze that
25 and then come in on material adverse effect.

Page 23

1          MR. WALKER: Well, we still think the
2  agreement doesn't require us to buy a pig in a poke
3  here.
4          THE COURT: No, it does not.
5          MR. WALKER: We're entitled to take this
6  look, and they bargained for a look through the end of
7  the year. And the only pressure they've ever alleged
8  about that in the five or six briefs they filed is that
9  there was this cutoff drop-dead date of December 31.
10 We don't have that anymore.
11          THE COURT: We have a request for
12 declaratory judgment here. Your side asked for that.
13 That can be done in several different hearings,
14 different levels, priorities. We can divide it up in
15 terms of time. The Court could conduct an evidentiary
16 hearing and make a determination on material adverse
17 effect through X date. You know, through -- I don't
18 know, what -- the end of October or something.
19          And I guess my point is we would at least
20 know more at that time. Then if they want to come
21 forward with the Christmas defense, they can. If
22 you-all want to say, "Well, you know, Judge, this isn't
23 the whole picture. We've got to play it out to
24 December 31," we could, but at least we would have a
25 better handle on material adverse effect.

Page 24

1          Is that prejudicial to your side?
2          MR. WALKER: Are we talking about a kind
3  of a piecemeal determination --
4          THE COURT: Yes.
5          MR. WALKER: -- of whether all the
6  conditions to closing have been met --
7          THE COURT: Yes.
8          MR. WALKER: -- the principal one of
9  which is the existence or not of MAE.
10          THE COURT: Yes, exactly.
11          MR. WALKER: It doesn't seem like a very
12 efficient way to do it.
13          THE COURT: It's not efficient, but of
14 course this is like a temporary injunction hearing
15 where we need to expedite the matter and so you pull
16 out the core sort of issues and you put it within a
17 time frame and you say, "We're going to look just at
18 this part of it and make some determinations based upon
19 that." And then move from there. I can see
20 strategically why your side might oppose it.
21          MR. WALKER: I could see some possibility
22 of organizing a discovery, hearing, further discovery,
23 hearing, period like that. I don't think it would be
24 the thing to do.
25          Second thing I don't like about it is it

6 (Pages 21 to 24)

Page 25

1  assumes that Mr. Thompson's statement and Genesco's
2  position that all conditions of closing are met. Well,
3  they're not. We denied them. They filed a lawsuit.
4  We have some rights in a lawsuit to have time to
5  discover things and to establish or have them fail to
6  prove that all conditions have been met.
7         THE COURT: Your colleague wanted to tell
8  me about those. Don't tell them to me in detail but
9  just tick them off. What are the other conditions that
10 you say have not been met?
11        MR. WALKER: Well, of course, we still
12 say -- and maybe when we finish receiving them we
13 won't -- but we still say they have not completed their
14 obligation of providing us, aside from discovery, the
15 necessary financial information to look. And what they
16 did on that, we asked for it on September 18th, got a
17 letter on September 19th saying, "You can't have it,
18 it's a fishing expedition, you're looking into too
19 broad of things." Then when we serve them a notice of
20 default because they were in breach of a covenant and
21 after the lawsuit's filed they come back last week and
22 say, "Okay. We'll give it to you," and all this
23 fishing expedition, this mountain of stuff that they
24 say we're doing turned out to be two-thirds of a small
25 banker's box of information.

Page 26

1         THE COURT: Don't tell me what's in
2  there, but what does it consist of? What kind of
3  information did they give you?
4         MR. WALKER: The kind of information we
5  asked for and what it's supposed to contain and some of
6  the stuff they sent us is breakdown of sales, expenses,
7  profits, cash flows, inventory buildup or inventory
8  retraction by each banner line of store. And they have
9  several banner lines and some of them are more
10 important than others in terms both of their mix of
11 business and contribution to a viable enterprise going
12 forward, and some of them are less. And one of the
13 things important to the merger was what we call the
14 brown shoe part of their business, which they call
15 Journeys and J & M.
16        So the question is not just same-store
17 sales up or down. What caused that? Are there massive
18 discounts? Are they building inventory? Reducing
19 inventory? There's a lot of financial stuff. If I
20 wanted to tell you more, I couldn't because that's
21 about as far as I understand.
22        THE COURT: It was superficial, may be
23 cherry-picking.
24        MR. WALKER: Exactly. Exactly. And
25 moving expenses from one period to another and that

Page 27

1  kind of thing. So -- and, you know, they knew when
2  they signed the agreement, as we did, that there were
3  going to be conditions to closing. And there might
4  very well be uncertainty about whether it's going to
5  happen or not right up until December 31. That's part
6  of what they knew and bargained for. We're under
7  confidentiality agreements with them in regard to
8  information we're receiving so we're not supposed to
9  use them against them.
10        So on all those points, it seems to me
11 that they should be happy to have us look at their
12 Christmas business. If it's not good, then nobody is
13 going to be served by a deal being forced to close.
14 Maybe the people at the top who are getting billions of
15 dollars in payouts to leave will be real happy that the
16 money came, but the enterprise on the other side of
17 this transaction will not be able to service the debt,
18 will not be able to carry the load, and the people who
19 will suffer by that are the people trying to run
20 Genesco's business on the other side and the Finish
21 Line business on the other side. And that's, you know,
22 employees and things.
23        MR. FRANK: One point of law, if I may,
24 Your Honor, just to answer your question. The --
25 unlike what Genesco's counsel is saying, a material

Page 28

1  adverse effect, according to case law, is not a single
2  point in time. Right? So it's basically the Tyson
3  case by Chancellor Strine -- the Court's familiar with
4  these. You know, basically it's a question of has
5  something happened to this company that over the long
6  term will cause it to have a problem generating
7  earnings? So when counsel says we need the fourth
8  quarter as an evidentiary point to understand whether
9  the downturn was something that will turn around or
10 not, it will determine what kind of an issue has
11 happened.
12        THE COURT: I appreciate you-all's big
13 picture. What I'm trying to do, I realize it's a bit
14 unusual and I don't want you to -- I don't want you to
15 confuse remedy with the proceeding that I'm talking
16 about. Specific performance is what they want. What I
17 was talking about was getting some findings and some
18 information on material adverse effect and unfulfilled
19 conditions on a date prior to December 31 so that we
20 could go on and at least get a chunk of this to see,
21 get it decided, get it looked at, and not talk about
22 remedy at that time. And I guess I'm thinking more in
23 terms of like a temporary injunction hearing, dec
24 action, something like that.
25        Okay. Let me -- I'll think about it a

Page 29

1 little bit more. Let me ask you one other question,
2 Mr. Walker. You are sensitive to the other side's
3 concerns about dragging this out. And the end of
4 January, I mean, that is a long time that this has been
5 pending, and they have a lot of confidential
6 information out there. And really, their company is at
7 a halt right now because of the uncertainty that's been
8 created by all this. It's very damaging to them, I
9 mean, could be immediate and irreparable harm.
10        Is there any -- any competing concern
11 that your side has that requires me to wait until the
12 end of January? Anything else that we haven't talked
13 about?
14        MR. WALKER: Yes.
15        THE COURT: What is that?
16        MR. WALKER: My side here is actually the
17 enterprise on the other side of the transaction.
18 Finish Line is going to get the money from UBS and buy
19 Genesco. When the dust settles, Genesco's operations
20 it has today will be two-thirds of the resulting
21 enterprise. So the real harm's going to happen if it
22 turns out that we are forced to close, can get the
23 money to do it, and their horse has had bone cancer
24 since the second quarter and all that happens is money
25 passes to a few people who were in great positions, the

Page 30

1 arbs make money on the trades and the resulting
2 enterprise goes in the tank. To nobody's benefit.
3        THE COURT: Okay. You-all have answered
4 all of my questions so I'm going to start back with the
5 plaintiff. You can make any remarks that you'd like to
6 to the Court, about 15 minutes, then I'll turn it over
7 to the defendants and then UBS.
8        MR. THOMPSON: Great. Thank you, Your
9 Honor. And let me just say briefly that the staggering
10 is -- is certainly okay with us, Your Honor. Because
11 if the finding is that there is no MAE, then they have
12 to close. They want to try to rewrite the agreement to
13 say that they've got till December 31. That's not what
14 the agreement says. The agreement says if the closing
15 conditions haven't been satisfied by then. If the
16 closing conditions have been satisfied, then there has
17 been no MAE, then they have to close.
18        Also, Your Honor, I want to make sure
19 that -- I believe it was clear to me, the only thing
20 Mr. Walker said about the only closing condition that
21 hasn't been satisfied was this informational request
22 that came from UBS's litigation consultant, not Finish
23 Line. But in any event, we've cured that.
24        THE COURT: But they say that under the
25 merger agreement, your client has an obligation to

Page 31

1 assist with them getting financing, and they interpret
2 that to include that you should help by giving
3 financial data. But you say you've cured it. They say
4 what you gave was superficial.
5        MR. THOMPSON: And, Your Honor, and I
6 will get to this. We are an open book in this case.
7 We are more than happy to give them whatever financial
8 information they want to look at, and we will expedite
9 that. That is the only thing this case is about, and
10 you will not see us trying to keep them from getting
11 that information.
12        THE COURT: So if they want more at a
13 deeper level, you-all will work that out.
14        MR. THOMPSON: Absolutely. Your Honor,
15 we offered this Friday to have our entire senior
16 management there to answer -- UBS come in, Finish Line
17 come in, sit down, ask whatever questions you want to
18 ask, and I've gotten no response to that. No response.
19 That says to me --
20        THE COURT: Do I have that letter in the
21 record?
22        MR. THOMPSON: You do, Your Honor.
23        THE COURT: I do? Okay. Is it attached
24 to --
25        MR. THOMPSON: You have the letter that I

Page 32

1 sent to Mr. Walker.
2        THE COURT: Yeah. I think it's attached
3 to your response to --
4        MR. THOMPSON: That I think we filed on
5 Monday.
6        THE COURT: Yes. Okay. I'll look back
7 over that.
8        Okay. What else?
9        MR. THOMPSON: All right. Your Honor,
10 briefly, if I may, I'd like to introduce my co-counsel,
11 Jim Denvir and Mike Brille of the Boies Schiller firm
12 in Washington. And then I've got my partner, Russell
13 Stair.
14        MR. DENVIR: Your Honor, I actually
15 appeared before you eight years ago.
16        THE COURT: I remember you, yes. I do.
17 You look familiar.
18        MR. DENVIR: Great experience. Glad to
19 be back.
20        THE COURT: Thank you for reminding me.
21        MR. THOMPSON: Your Honor, I think there
22 are two essential points that the Court needs to keep
23 in mind as we go through this hearing today. The first
24 one is, Your Honor, that nobody in this courtroom has
25 taken the position that an MAE has occurred. Nobody.

8 (Pages 29 to 32)

Page 33

1      Finish Line in their answer, I'm sure
2  Your Honor saw this in their answer --
3          THE COURT:  They did.  They backed off of
4  that.
5          MR. THOMPSON:  They do.  And, matter of
6  fact, they say this, Paragraph 72:  Defendants are
7  without sufficient knowledge or information at this
8  time to know if there has been a material adverse
9  effect in Genesco's business and deny that Finish Line
10 has ever stated or taken the position that there has
11 been a material adverse effect in Genesco's business.
12 UBS on the same has not taken the position that a
13 material adverse effect has occurred.  All they have
14 said is that there may have been one.
15         So the question that I propose to the
16 Court is should we disrupt this transaction and the
17 timing of this transaction when nobody before the Court
18 is taking the position that an MAE has occurred?
19         The second point that I want the Court to
20 keep in mind -- and you've already identified it -- and
21 that is the continuing harm to Genesco's business.
22 They are in a complete state of limbo.  As I said, the
23 employees over there don't know whether they've got a
24 job or not.  The headhunters are going crazy.  You lose
25 key employees, it seems to me that that would be

Page 34

1  irreparable harm also to Finish Line.
2          THE COURT:  The remedy that you've asked
3  for is specific performance.
4          MR. THOMPSON:  Right.
5          THE COURT:  The agreement calls it
6  something else.  I can't remember.  Something
7  performance or specific enforcement.
8          MR. THOMPSON:  Enforcement, right.
9          THE COURT:  If your main point is
10 immediate and irreparable harm, why didn't you file an
11 injunction?  Is it because the burden is so high for
12 your client?  Why?
13         MR. THOMPSON:  Well, Your Honor, I think
14 that specific performance is essentially an injunction.
15 That is what we're asking for.  Maybe it's just the
16 terminology.  But Your Honor is exactly right that
17 that's essentially the hearing that we're having.  The
18 immediate and irreparable harm is the reason why you're
19 entitled to specific.  And maybe we need to amend to --
20         THE COURT:  Well, the only reason I ask
21 that is that that provision about specific
22 enforcement -- that's the title -- it talks in terms of
23 an injunction.  Never says anything about specific
24 performance.  We all know that with an injunction
25 you've got a pretty heavy burden on that.

Page 35

1          MR. THOMPSON:  Right.
2          THE COURT:  Immediate and irreparable
3  harm, substantial likelihood of success on the merits,
4  balancing the equities, the public interest.
5          MR. THOMPSON:  Right.
6          THE COURT:  And so I wondered, you know,
7  but you say it's just semantics.
8          MR. THOMPSON:  It is.  And also keep in
9  mind that that would be a temporary hearing.  What
10 we're talking about is having the trial on this issue
11 of specific performance.  So I don't think that there's
12 a burden of substantial likelihood, that any of that is
13 present.  The immediate and irreparable harm is what
14 causes us to expedite the specific performance.
15         THE COURT:  I see.  All right.
16         MR. THOMPSON:  And, obviously, Your
17 Honor, we've filed a motion to amend the complaint to
18 state that if for whatever reason that wasn't
19 available, if they are -- you know, don't pursue their
20 claims against UBS and that wasn't available, then
21 we're entitled to damages.  But specific performance is
22 the remedy we seek.
23         THE COURT:  Okay.  And under Rule 65.07,
24 we can advance the trial on the merits to be
25 consolidated with an application for an injunction.

Page 36

1  That's helpful to me procedurally.  Thank you for
2  straightening that out.
3          Okay.  So you were saying we're here
4  because of immediate and irreparable harm, Genesco's in
5  limbo --
6          MR. THOMPSON:  Right.  We've got the
7  employees problem.  We've got this problem, Your Honor,
8  that you've seen our papers.  They came in, I guess
9  it's three weeks ago now, and had a meeting with our
10 upper management and got information that does not even
11 come off -- they call it the fourth floor over there
12 because that's where the management suites are --
13 information that is the most commercially sensitive
14 information that Genesco has, things like, you know,
15 what is going to be the next hot seller in the fall and
16 winter season, what are our marketing strategies.  All
17 of those were shared with Finish Line.
18         And the very next Monday -- the very next
19 Monday -- Your Honor's going to hear some in this case
20 about a shoe called Heelys, which is a shoe you may
21 have seen that's got the little wheel on the heel of
22 it.  Well, that shoe has had an interesting course and
23 everyone has seen that there are some issues, for
24 instance, with that shoe.  They took that information
25 and used it the very next Monday.

Page 37

1    THE COURT: Yes.
2        MR. THOMPSON: So they've demonstrated
3    that they're willing to do that. It's that kind of
4    irreparable harm, Your Honor, that just can't continue;
5    that what I mentioned earlier, opening the stores, you
6    know, we put those plans on hold. We had a
7    distribution facility. So there's a big impact on the
8    business. But I think Your Honor has already touched
9    on that.
10        Your Honor, as far as UBS is concerned,
11    again, we are happy to have them in the case as long as
12    they will comply with the Court's schedule. Keep in
13    mind, Your Honor, that this case is exactly like a real
14    estate contract for your house. And I want Your Honor
15    to appreciate the dynamics of what happened here.
16        Let's assume that you're sitting in your
17    house one day, you don't even have a for sale sign in
18    the front yard. Your house is not for sale. And you
19    get a call and it's somebody that wants to buy your
20    house and you say, "No, that offer's too low. I don't
21    want to buy that house -- I'm not going to accept
22    that." And then they come back with an even higher
23    offer and you start looking at that.
24        In the meantime, their buddy finds out
25    that they're looking at your house and they decide they

Page 38

1    want the house more than the first guy. So they come
2    in and offer you an even higher number. And in order
3    to get you to sell it to them, they make an offer that
4    is so compelling that it will make the first guy go
5    away, it will make everybody else go away. They make
6    you not only a really high offer for this house that
7    you didn't even have a for sale sign on, they give you
8    a clean contract.
9        THE COURT: Right.
10        MR. THOMPSON: No financing.
11        THE COURT: Nothing contingent on
12    financing.
13        MR. THOMPSON: Right. No financing
14    contingency. They are represented by very
15    sophisticated lawyers. They have the Gibson Dunn firm
16    out in LA. They know what they're doing, they sign the
17    agreement. It has a statement in there that says, "For
18    avoidance of doubt, let there be no misunderstanding,
19    financing is not a contingency to the contract."
20        So -- and also, Your Honor, and this is
21    what I want to show you, too. In the contract you also
22    have a provision that says, "Okay. I'm going to do
23    this because you've come to me and made me this great
24    offer. But in the contract we're going to have a
25    provision that says this: "If the real estate market

Page 39

1    goes down and if interest rates go up, you still have
2    to close." And, again, with very sophisticated
3    counsel, they signed that agreement. And, Your Honor
4    a deal is a deal.
5        Surprise, surprise, after the -- after
6    the real estate market goes down, the interest rates
7    come up, that buyer comes back to you and they are
8    looking for every possible way they can to get out of
9    that contract. But the contract specifically provided
10    that if the real estate market went down and if
11    interest rates went up, they still had to close.
12        Now, Your Honor, this argument about UBS
13    having to be here, if in that situation if you had
14    accepted a contract, a clean contract with no financing
15    contingency, then you don't want your transaction
16    disrupted by the bank coming in and saying, "Oh, no,
17    our deal with them, we've got to get more information
18    from them on that," and let that effectively do an end
19    run around what they agreed to, which was a clean
20    contract.
21        So while we are more than happy to have
22    UBS participate, we're more than happy, we are not
23    going to try to keep them out, Finish Line cannot use
24    the presence of UBS when they agreed there was no
25    financing contingency, use the presence of UBS to

Page 40

1    disrupt our deal with Finish Line.
2        THE COURT: The additional information
3    that they're asking you for they say fits within your
4    obligation under the contract to assist with them
5    getting financing. Do you agree that what they've
6    asked for is reasonable or does that get us back to
7    this look date of September 17th and you say it's
8    irrelevant and not reasonable?
9        MR. THOMPSON: Certainly that is our
10    argument, Your Honor. But, again, in order to make
11    sure that this matter is expedited, we are not going to
12    rest on what we think is a clear right under the merger
13    agreement not to give that to them. But we're not
14    willing to engage in a procedural fight about that.
15    And also, frankly, Your Honor, we have nothing to hide.
16    We have nothing to hide.
17        The Tyson case says that, you know, what
18    we're talking about is something that happened since
19    the merger agreement was signed that affected the
20    long-term value of this company. And a couple of
21    quarter bad results just doesn't do it. So come and
22    look at it.
23        You know, it's the same as kind of a
24    house inspector. They obviously did an inspection
25    before they agreed to pay a billion and a half dollars

10 (Pages 37 to 40)

Page 41

1  for the company, and we let them in. Well, we'll let
2  them come back in, bring the house inspector back in
3  because -- and this is where the analogy keeps going --
4  as long as our house doesn't go down in value any more
5  than the rest of the neighborhood, then they don't get
6  off. They have to find something peculiar about our
7  house.
8         THE COURT: So you think if next week you
9  give them everything they want, access to talk with
10 your key personnel, inspect premises, look at all sorts
11 of confidential information, you think that that will
12 answer their questions and we won't even get to the
13 Christmas defense.
14        MR. THOMPSON: Right, exactly. And, Your
15 Honor, I anticipate that there will be more questions
16 and more questions and more questions, and we are here.
17 And, again, we just don't think that there's any way
18 because, you know what's going to be most compelling,
19 Your Honor, is when we put up the slide that shows
20 everybody else's performance in the second quarter,
21 including Finish Line. I don't know how they get
22 around it. Everybody -- virtually everybody in the
23 retail footwear industry was down. When you agree to a
24 provision like this in a merger agreement, I don't see
25 how they can get around that.

Page 42

1         THE COURT: Footnote question: Have
2  you-all talked about a protective order?
3         MR. THOMPSON: We have drafted one.
4  Again, because of what has happened today, obviously we
5  have -- you know, we have not -- I don't anticipate
6  that will be a problem.
7         THE COURT: But that's in the works.
8  Okay.
9         MR. THOMPSON: I'm sure we'll be able to.
10        THE COURT: All right. Anything else?
11 About five more minutes and then I'll hear from the
12 defendant.
13        MR. THOMPSON: Okay. Let me see, Your
14 Honor.
15        Your Honor, too, let me just point out
16 that in the Tyson case, they didn't have this provision
17 that we've got about as long as our results are not --
18 if our results are affected by general economic
19 conditions, as long as we're not material to this
20 point, they didn't even have that in the Tyson case and
21 still didn't find MAE. So I think that's important.
22        And, Your Honor, too, they were talking
23 about this back-to-school thing and all that.
24        THE COURT: Yes.
25        MR. THOMPSON: What they failed to tell

Page 43

1  you is in that very conference and in those releases,
2  what he left out is general economic conditions.
3  General economic conditions, problems with
4  back-to-school, problems with the tax holidays. And
5  the general economic conditions, of course that
6  explains why all of the other footwear retailers are
7  down, that the general economic conditions have created
8  that. And these parties expressly agreed that if that
9  was the case that it was not an MAE.
10        Your Honor, again, you know, it's just
11 not a -- not a complicated case. We gave them a
12 massive amount of information in that, you know, we
13 have this electronic data room that they were in before
14 they signed the merger agreement, obviously. We've
15 continued to update that. They've continued to be in
16 there. That's a huge amount of information. Since
17 August, when any issues started to develop, we've given
18 them information on a weekly basis as to the comparable
19 sales in our stores. Every single week, practically,
20 since the beginning of August. So there's not going to
21 be any argument that we haven't complied.
22        This last one, again, comes out of the
23 blue from UBS, from the litigation consultants, clear
24 where they were headed that they weren't entitled to
25 it. But, again, we're an open book, we're going to

Page 44

1  give them that information, we'll make all of our
2  people available, and there's simply no reason that
3  they can't take all this information and be ready to
4  try this case in short order.
5         Again, that's what the agreement
6  contemplated. The parties agreed that it was going to
7  be immediate and irreparable harm. The company is in
8  complete limbo. We need to get this tried. Again, I
9  think your idea of doing it on a staggering basis just
10 makes perfect sense. The only issue is the MAE, and
11 we'll give them all the information they need.
12        THE COURT: It may be too early for you
13 to know the answer to this question: Do you think that
14 the plaintiff will have an expert outside the company
15 on the MAE issue and defending against that?
16        MR. THOMPSON: Yes, Your Honor. Yeah, we
17 will.
18        THE COURT: You've already got that
19 moving?
20        MR. THOMPSON: We do.
21        THE COURT: Good.
22        MR. THOMPSON: And I anticipate that they
23 will, too.
24        THE COURT: You just think one expert?
25        MR. THOMPSON: Your Honor, it could be

11 (Pages 41 to 44)

Transcript of Proceedings

Page 45

1  more than one. We've got one on the MAE. We've also
2  got -- we'll need some specific information about the
3  footwear industry. And then, finally, one thing that I
4  think is going to be very telling to the Court is to
5  really see what's happened in the credit market, and
6  really that's why we're here, Your Honor. At the end
7  of the day, the reason we're here is because of what
8  happened in the credit market. UBS is not going to
9  make nearly as much off this as they had hoped they
10 would, and that's what's driving this whole thing. We
11 want Your Honor to see what the real motive is.
12        But that notwithstanding, we're willing
13 to take the risk that as far as discovery, we'll be
14 ready to go. We've got our people lined up. This
15 matter will not be slowed down because of anything that
16 we've done.
17        THE COURT: All right. Thank you.
18        All right. Defendants, yes.
19        MR. WALKER: I'm going to directly
20 address Mr. Thompson's comments and try not to get
21 beyond that.
22        He seems to forget that Genesco filed
23 this lawsuit and Genesco has the burden of proving the
24 things it alleged, that all conditions have been met.
25 And he just said, "Well, when we show it, it will

Page 46

1  appear that all the companies in this industry have had
2  the same thing happen to them, or in this economy."
3  Well, we haven't seen the proof of that. We haven't
4  seen that that's so. But let's see what he comes up
5  with.
6        Now, he says also that he will provide
7  the information to us. Well, they flat out stiff-armed
8  us when we asked for it under the contract, under the
9  agreement. And that would lead any reasonable person
10 to suspect something here. And then when we declare
11 default and they file the lawsuit, now they're going to
12 have to give it to us in discovery, I hope, because I
13 hope the Court isn't considering substituting these
14 requests on the agreement for discovery because they
15 filed the lawsuit.
16        You should have seen -- you should see
17 the discovery they put on five nonparties here. Our
18 investment bankers, advisors. The subpoena calls
19 for -- honestly, we've got a picture of it here, but it
20 will be 500,000 documents. There is no question about
21 it. Just let her see what they've called for here.
22 All documents and communications, without limitation,
23 internal communications with UBS and between UBS and
24 Finish Line, Genesco, UBS AG, UBS Securities, Moelis --
25 that's our advisor. Referring to or relating to

Page 47

1  proposals for the merger back in the spring. The
2  merger, the merger agreement, the financing, or any
3  alternative, the commitment letter or Genesco
4  generally.
5        I mean, honestly, so we don't even -- I
6  don't know why they want that if their position is the
7  condition's been met. What we want to do is discover
8  what is it that has caused -- getting to his analogy --
9  we signed the agreement to buy the house, drive by the
10 next day and we see the roof's dropped down on one end.
11 Well, is that just a wind blowing or do we have
12 termites in this house?
13        And by the way, when you agreed that we
14 would buy your house, you knew that we were way too
15 poor to buy it. We couldn't pay for it. It's all over
16 their proxy statement. I don't know how many times
17 they use the word "necessary financing," a necessity
18 that we have financing. So we're too poor to buy it
19 and our banker says, "Geez, I want to know, are there
20 termites in there or is there a sinkhole under it?
21 What's happened?"
22        So we just want opportunity for
23 discovery. And moving faster now, we would ask the
24 Court to give us -- to have this hearing set January
25 7th. That's a Monday. It can't make that much

Page 48

1  difference to what they think's going to happen to them
2  to do it after the end of the Christmas selling month.
3  We still won't have the whole fourth quarter but we'll
4  have that and we'll have the third quarter, we'll have
5  November, we'll have December, and we'll see whether
6  there are termites in this house or a sinkhole under
7  it.
8        If it is as Mr. Thompson represents, then
9  bankers are here with the money and we're here to do
10 it. But if it isn't, there's a far bigger disaster on
11 the other side of this deal than there is shaking money
12 out of UBS to pay a few people that have got stock
13 options.
14        THE COURT: Thank you.
15        MR. WALKER: We would ask for January
16 7th.
17        MR. FRANK: Thank you, Your Honor.
18        We would on behalf of UBS also be willing
19 to relent from our original request of the end of
20 January, move it up to January 7th if the Court is so
21 inclined. We've obviously come down here, we had an
22 exclusive jurisdiction arrangement in New York. We
23 acknowledge that equity is important and our client is
24 here. Our client has expressed concerns about the
25 financial performance, the house, whether we've got

12 (Pages 45 to 48)

Page 49

1  termites or not, to use Mr. Walker's analogy. And
2  we're here to try to adjudicate that and to get the
3  necessary information. That's what we're here to do.
4      I want to address one issue, and it's in
5  the pleadings, I believe, of our friends and clients at
6  Finish Line. They had a conversation back when I think
7  Mr. Thompson's client was hoping to rush to a closing
8  with Finish Line. They had a conversation -- it's
9  referenced in the pleading -- where the lawyers for
10  Genesco said to the lawyers for Finish Line, "We need
11  to hurry up and close here because each day that goes
12  by" -- and this is almost a quote from the pleading --
13  "the possibility of a MAC or the evidence for MAC
14  increases."
15      Now, Your Honor knows -- and I won't
16  spend a lot of time on this, but Your Honor knows that
17  that's not the way a MAC works, right? A MAC is a
18  thing that affects, in Mr. Thompson's language, the
19  long-term earnings prospects of the company. What
20  we're asking for here, and in accordance with all the
21  factors -- and I won't bore the Court with them now,
22  but all the factors go to the question of is this a
23  temporary problem or is it a long-term problem?
24      THE COURT: Sure. Right.
25      MR. FRANK: As Your Honor knows, we don't

Page 50

1  have a crystal ball and we don't have tea leaves. What
2  we do have is performance, and so what we're looking to
3  do here is to look at the 77 percent decline in the
4  second quarter. And I note for the Court's reference a
5  50 percent -- you know, again, Mr. Thompson's
6  suggesting that there's no evidence of termites, right?
7  There was a 77 percent decline, and that's -- and I'll
8  say one more time, 77 percent decline that was a big
9  surprise.
10      In the Raskin case, one of the leading
11  MAC cases, a 50 percent decline was enough for a MAC.
12  And in that case just like this one, we have the buyer
13  and the lender saying, "What's going on here?" That's
14  all we want to know. As Mr. Walker said, if it turns
15  out that we're wrong and there's not a long-term
16  problem, if their numbers in the third quarter suggest
17  that it was a blip and it's not something that's
18  continuing then, you know, we don't have a MAC and
19  we're going to move forward.
20      That's the question, though. And all we
21  want is an opportunity to have full discovery. I was
22  comforted by Mr. Thompson's question. So when we come
23  and say, you know, give us the e-mails about whether
24  you knew about this trend and didn't tell anybody or
25  you say in a memo that this is a long-term problem and,

Page 51

1  boy, we're sure glad we got that 54.50 price because,
2  if we didn't, we'd be in trouble. You know, those
3  kinds of documents and the financial information that's
4  associated with them go to the heart of the question
5  about whether this is a short-term problem or a
6  long-term problem.
7      The last thing I think I want to say on
8  behalf of UBS is we're here with our client. We are in
9  the business of lending money. We agreed to lend a
10  billion six for this property -- for this transaction.
11  We have no problem giving a billion six for what the
12  parties bargained for. If that's the case, we're here
13  to fund. We're bankers, we lend money, that's what we
14  do. What we are not interested in doing, though, is
15  having a house with termites that perhaps they knew
16  about. Or even if they don't, that in the period of
17  time they bargained for, Judge, June 16th to December
18  31st, the measuring period, that there was a discovery
19  of termites.
20      And, again, the issue is not whether
21  there were termites on September 17th, you know, or
22  whatever the closing date is they say. The question is
23  were there termites on September 17th and then in
24  October, November, December it became clear that those
25  termites had already eaten all the supports in the

Page 52

1  house and the house was going to collapse. We want to
2  lend money based on the parties' bargain. We don't
3  want to lend money based on a pig in a poke.
4      Thank you.
5      MR. THOMPSON: Your Honor, they are more
6  than welcome to go get Terminix and bring them in. We
7  are happy to have them do it. But also keep in mind
8  that in this agreement that we've got that if everybody
9  else in the neighborhood had termites, they would still
10  have to close. They've got to demonstrate that there's
11  some problem. How do they explain the drop in all the
12  other -- virtually all the other footwear retailers at
13  the same time?
14      I'm not sure how they get over that.
15  We're confident we're going to be able to demonstrate
16  that. We absolutely have nothing to hide. Come in, we
17  will give them the information, that's not going to be
18  a problem. But we have to get this case resolved so
19  that the irreparable harm that the parties agreed to in
20  the merger agreement is not going to happen to Genesco.
21      THE COURT: The measuring period, you
22  say, is through September 17th. They say it's through
23  December 31. Am I right about September 17th is your
24  measuring term?
25      MR. THOMPSON: Right. Well, actually,

Page 53

1  yes, the agreement says two days after the closing
2  conditions are satisfied.
3          THE COURT: And when was that meeting,
4  the shareholder vote?
5          MR. THOMPSON: September 17th.
6          THE COURT: Okay. So it would actually
7  be the 19th, I guess.
8          MR. THOMPSON: 19th, right.
9          THE COURT: But you said the measuring
10  period is September 19th. They say it's December 31.
11  And just so I make sure I understand your position, the
12  only way you say that it could be beyond that September
13  19th is if they show an MAE.
14          MR. THOMPSON: Right. And then -- well,
15  if they show an MAE then, I mean, we would have an
16  opportunity to cure. And that's an issue that's been
17  identified. But, again, if they don't show an MAE --
18  and the Court has recognized this and I think it's the
19  perfect way to handle it. If they don't show an MAE,
20  it's over.
21          THE COURT: Right. Then there's no -- is
22  it your position as a matter of law that under this
23  agreement the burden is on the defendants to show the
24  MAE under 7.2, I think it's (b)?
25          MR. THOMPSON: Your Honor, we have not

Page 54

1  definitively looked at that yet so I'm not -- I'm not
2  willing to say that it is or it isn't. I mean, again,
3  clearly it's an issue that we're not concerned about.
4  So regardless of what the burden of proof is going to
5  be, yeah, we think the outcome's going to be the same
6  but we've not made a determination on that.
7          THE COURT: All right. The Court is
8  going to -- oh, did you want --
9          MR. FRANK: Ten seconds, Your Honor, if I
10  may.
11          THE COURT: Sure. That's fine.
12          MR. FRANKS: I wanted to just clarify one
13  thing so we don't start heading down the wrong road
14  here. The MAE clause does contain a carve-out for
15  general economic conditions.
16          THE COURT: Yes.
17          MR. FRANK: It is characterized by
18  Mr. Thompson as if it said a downturn in industry
19  conditions. Those words are very, very different. And
20  if you have a downturn in the national economy, for
21  example, or you have, you know, some sort of recession
22  and it has an impact on all market participants, then
23  we would agree that Mr. Thompson is correct. And I
24  think I speak on behalf of the defendants here
25  together, we would agree that then there would be an

Page 55

1  argument that the effect would have to be
2  disproportionate.
3          We believe the effect is disproportionate
4  on Genesco just as a preliminary matter --
5          THE COURT: Okay.
6          MR. FRANKS: -- but it's a fundamental
7  misreading. And you'll see, Your Honor, when we put
8  on --
9          THE COURT: I've got it right here.
10          MR. FRANKS: You'll see evidence of lots
11  of other MAC clauses that talk about downturns in
12  industry conditions as opposed to general economic
13  conditions.
14          THE COURT: Let's say national or world
15  economy or financial markets.
16          MR. FRANKS: Or general economic
17  conditions.
18          THE COURT: As a whole, or changes in
19  general economic conditions. Okay.
20          MR. FRANK: Correct. And, Your Honor,
21  that's the point, because that phrase right there talks
22  about what we call macroeconomic issues rather than
23  industry-specific issues.
24          THE COURT: Okay.
25          MR. FRANK: And if they can prove that

Page 56

1  their downturn is because, you know, the dollar has
2  been devalued or there's a recession, then we're
3  dealing with the exception. If we're talking about,
4  you know, a downturn in the industry which is not due
5  to macroeconomic conditions but instead, for example,
6  people are buying less-expensive shoes -- which you may
7  hear some more about here -- and generally there's a
8  downturn, that would not come within that exception.
9          THE COURT: Well, we've got changes in
10  general economic conditions that affect the industries
11  in which the company and the company subsidiaries
12  conduct their business.
13          MR. FRANK: Absolutely.
14          THE COURT: Okay.
15          MR. FRANKS: So, for example, if the
16  rubber price goes up and you're making tennis shoes or
17  the, you know, hemp price goes up for your shoestrings
18  or, you know, there's a general downturn in the
19  recession or the dollar selling overseas, whatever
20  those issues, it's all part of the same clause there.
21          THE COURT: What if people aren't buying
22  as many shoes?
23          MR. FRANK: Because of general economic
24  conditions? That would qualify. If, however, they're
25  buying fewer shoes of a particular type, for example,

14 (Pages 53 to 56)

Transcript of Proceedings

Page 57

1  and there's a general trend in consumer preference to
2  buy flip-flops -- and I'm out of my depth here, Your
3  Honor -- flip-flops versus Johnston & Murphy shoes and
4  that's affecting all the brown shoe people in the same
5  way, that's a consumer preference trend within the
6  industry rather than a general economic issue.
7         I just wanted to clarify our position on
8  that point, Your Honor. Thank you.
9         THE COURT: All right. Anything else?
10        I'm going to take the matter under
11  advisement. I will issue an order tomorrow, tomorrow
12  afternoon, will fax it to you.
13        In terms of a protective order, you-all
14  will keep working on that. I have one if you-all can't
15  agree. Okay?
16        Anything else?
17        Mr. Hicks. Yes.
18        MR. HICKS: Will Your Honor enter an
19  order on the intervention or would you like --
20        THE COURT: Yes.
21        MR. HICKS: -- the parties to prepare
22  that?
23        THE COURT: I'll just put it in my order.
24  It will save us some time. Let me make a note on that.
25        MR. FRANK: Thank you, Your Honor.

Page 58

1         THE COURT: The pro hac vice, though, if
2  you would submit an order on that, please.
3         MR. HICKS: I will, Your Honor.
4         THE COURT: Okay. And be sure and pay
5  the fee to the State of Tennessee.
6         MR. FRANK: We will, Your Honor.
7         MR. HICKS: We have all those things in
8  the works, Your Honor. Thank you.
9         THE COURT: Thank you. Anything else
10  before we adjourn?
11        MR. THOMPSON: No, Your Honor. Thank
12  you.
13        THE COURT: Thank you.
14        MR. EVANS: Your Honor?
15        THE COURT: Yes, sir. Oh, Mr. Evans,
16  yes.
17        MR. EVANS: I don't represent a party,
18  but there are a lot of observers that would like to
19  know how we could get a copy of that order.
20        THE COURT: Yes. Here's what we'll do.
21  Ms. Correa, if you would wait in the courtroom, and if
22  you would write down your name and your fax number.
23  Okay? I haven't cleared this with the clerk and master
24  so there may be a fee involved. I'll find out about
25  that, but at least give us the information, your name

Page 59

1  and fax number, anyone who wants a copy of the order.
2  If there is a fee involved, we'll let you know that.
3  So give us a telephone number, too. Name, fax number,
4  telephone number. Okay?
5         MR. EVANS: Thank you very much, Your
6  Honor.
7                    *    *    *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 60

1         C E R T I F I C A T E
2
3         I, Maxine Cleeton, Registered Diplomate
4  Reporter and Notary Public, State of Tennessee at
5  Large, do hereby certify that I recorded to the best of
6  my skill and ability by machine shorthand the court
7  proceedings contained herein, that same was reduced to
8  computer transcription by myself, and that the
9  foregoing is a true, accurate, and complete transcript
10  of the proceedings heard in this cause.
11        I further certify that I am not an attorney or
12  counsel of any of the parties, nor a relative or
13  employee of any attorney or counsel connected with the
14  action, nor financially interested in the action.
15        This 11th day of October, 2007.
16
17
18
19
20
                        Maxine Cleeton
21
22
23  My Commission Expires:
24  January 17, 2010
25

15 (Pages 57 to 60)

**A**

ability 60:6
able 20:3 22:3,22
 27:17,18 42:9 52:15
about 3:17 5:17 6:23
 8:19 12:2 13:9 14:2
 14:17 15:3 17:19
 21:8,15,19 23:8
 24:2,25 25:8 26:21
 27:4 28:16,17,21,25
 29:3,13 30:6,20
 31:9 34:21,23 35:10
 36:20 39:12 40:14
 40:18 41:6 42:2,11
 42:17,23 45:2 46:20
 48:24 50:23,24 51:5
 51:16 52:23 54:3
 55:11,22 56:3,7
 58:24
above-styled 3:1
absolutely 4:17 12:8
 19:11 31:14 52:16
 56:13
accept 37:21
accepted 39:14
access 41:9
accommodate 5:21
accordance 49:20
according 28:1
accurate 60:9
acknowledge 48:23
action 28:24 60:14,14
actually 29:16 32:14
 52:25 53:6
additional 40:2
address 45:20 49:4
Addressing 20:16
adjourn 58:10
adjudicate 49:2
adopts 5:22
advance 35:24
adverse 7:24 8:4,7
 10:12 11:19 17:2,9
 19:20 21:3 22:25
 23:16,25 28:1,18
 33:8,11,13
advisement 57:11
advisor 46:25
advisors 46:18
affect 9:14 56:10
affected 40:19 42:18
affecting 57:4
affects 49:18
after 7:22 12:8 18:22
 20:9,25 25:21 39:5
 39:5 48:2 53:1

afternoon 3:8,9 4:16
 5:1 57:12
AG 46:24
again 5:20 11:15
 17:22 19:9,23 37:11
 39:2 40:10 41:17
 42:4 43:10,22,25
 44:5,8 50:5 51:20
 53:17 54:2
against 27:9 35:20
 44:15
ago 16:11 32:15 36:9
agree 7:25 11:20,21
 40:5 41:23 54:23,25
 57:15
agreed 17:19 18:4
 39:19,24 40:25 43:8
 44:6 47:13 51:9
 52:19
agreeing 3:18
agreement 6:1 12:23
 15:11 16:23 18:5
 23:2 27:2 30:12,14
 30:14,25 34:5 38:17
 39:3 40:13,19 41:24
 43:14 44:5 46:9,14
 47:2,9 52:8,20 53:1
 53:23
agreements 10:3 27:7
agreement/consensus
 3:22
agrees 7:15
ahead 8:22
al 3:7
alleged 23:7 45:24
almost 49:12
along 7:18 16:16
already 19:25 33:20
 37:8 44:18 51:25
alternative 47:3
always 22:7
amend 34:19 35:17
among 13:8 14:1
amount 43:12,16
analogy 41:3 47:8
 49:1
analyst 13:21
analysts 21:6
analyze 22:24
ankle 20:23 22:5
announced 12:25
 14:19
announcement 14:17
announcements
 21:12
another 19:16 26:25
answer 9:11,21,22,25

16:5,20,21 17:1
 27:24 31:16 33:1,2
 41:12 44:13
answered 30:3
anticipate 22:20
 41:15 42:5 44:22
anticipating 22:15
anybody 50:24
anymore 23:10
anyone 59:1
anything 17:18 29:12
 34:23 42:10 45:15
 57:9,16 58:9 59:4
apparent 20:21
appear 46:1
APPEARANCES 2:1
appeared 32:15
appears 18:16
application 35:25
appreciate 28:12
 37:15
approach 19:16
appropriate 6:10
arbs 30:1
arguably 16:13
argued 11:4
argument 12:5 39:12
 40:10 43:21 55:1
around 11:1 14:15
 28:9 39:19 41:22,25
arrangement 48:22
aside 25:14
asked 16:10 20:17
 23:12 25:16 26:5
 34:2 40:6 46:8
asking 34:15 40:3
 49:20
assist 31:1 40:4
associated 51:4
assume 37:16
assumes 25:1
assuming 5:14,20,21
 7:18
attached 31:23 32:2
attorney 60:11,13
August 21:1,7,9,10
 21:14 43:17,20
available 7:19 10:10
 35:19,20 44:2
Avenue 1:24 2:7,10
 2:17
avoidance 38:18
away 16:13 38:5,5

**B**

b 53:24
back 4:12,15 7:5,11

10:14 17:16 25:21
 30:4 32:6,19 37:22
 39:7 40:6 41:2,2
 47:1 49:6
backed 33:3
back-to-school 13:10
 14:3 42:23 43:4
bad 16:18 20:1 40:21
badly 22:11
Baker 2:12
balancing 35:4
ball 50:1
bank 13:22 17:14
 39:16
banker 47:19
bankers 46:18 48:9
 51:13
banker's 25:25
banner 26:8,9
Bar 6:9
bargain 52:2
bargained 10:1 16:6
 23:6 27:6 51:12,17
based 18:15 24:18
 52:2,3
basically 4:10 14:20
 28:2,4
basis 43:18 44:9
Bass 2:3
Bearman 2:12
became 51:24
before 1:19 3:12 4:22
 11:4 18:24 32:15
 33:17 40:25 43:13
 58:10
beginning 19:14
 43:20
behalf 4:8 6:11 8:24
 48:18 51:8 54:24
being 21:9 27:13
believe 3:24 7:1 9:4
 30:19 49:5 55:3
benefit 30:2
Berkowitz 2:13
Berry 2:3
best 60:5
better 21:11 23:25
between 12:18 46:23
beyond 45:21 53:12
big 14:4 22:19 28:12
 37:7 50:8
bigger 48:10
billion 40:25 51:10,11
billions 27:14
bit 3:17 28:13 29:1
blip 50:17
blowing 47:11

blue 43:23
Boies 2:6 32:11
boil 7:24
bone 20:24 22:4
 29:23
book 31:6 43:25
bore 49:21
both 8:25 16:22 26:10
bottom 22:23
box 25:25
boy 51:1
breach 25:20
breakdown 26:6
brief 14:1
briefly 30:9 32:10
briefs 23:8
Brille 2:6 32:11
bring 11:21 41:2 52:6
broad 25:19
brown 26:14 57:4
buddy 37:24
building 26:18
buildup 26:7
burden 34:11,25
 35:12 45:23 53:23
 54:4
business 12:14,16
 26:11,14 27:12,20
 27:21 33:9,11,21
 37:8 51:9 56:12
buy 23:2 29:18 37:19
 37:21 47:9,14,15,18
 57:2
buyer 39:7 50:12
buying 56:6,21,25

**C**

C 60:1,1
Caldwell 2:13
calendar 12:21
call 3:19 21:7 26:13
 26:14 36:11 37:19
 55:22
called 36:20 46:21
calls 34:5 46:18
came 3:1 9:17 27:16
 30:22 36:8
cancer 20:24 22:5
 29:23
carry 27:18
carve-out 54:14
case 19:6,14,25 20:2
 28:1,3 31:6,9 36:19
 37:11,13 40:17
 42:16,20 43:9,11
 44:4 50:10,12 51:12
 52:18

1

cases 50:11
cash 26:7
cause 3:1 28:6 60:10
caused 26:17 47:8
causes 35:14
Center 2:13
centers 14:14
certain 12:18 14:3
certainly 7:1,7 10:9
  30:10 40:9
certify 60:5,11
Chancellor 1:19 28:3
Chancery 1:1 3:2
change 10:12
changes 55:18 56:9
characterized 54:17
cherry-picking 26:23
Christmas 11:9,22
  21:23,25 22:21
  23:21 27:12 41:13
  48:2
chunk 28:20
claim 22:7
claims 35:20
clarify 54:12 57:7
clause 54:14 56:20
clauses 55:11
clean 38:8 39:14,19
clear 5:20 12:3 16:6
  22:14 30:19 40:12
  43:23 51:24
cleared 58:23
clearly 54:3
Cleeton 1:23 60:3,20
clerk 3:6,20 5:4 58:23
client 9:2 12:2 30:25
  34:12 48:23,24 49:7
  51:8
clients 19:9 49:5
close 14:25 27:13
  29:22 30:12,17 39:2
  39:11 49:11 52:10
closing 12:3,9 15:15
  16:24 19:4 24:6
  25:2 27:3 30:14,16
  30:20 49:7 51:22
  53:1
collapse 52:1
colleague 6:6 25:7
come 4:6,11 9:2 10:14
  10:25 22:25 23:20
  25:21 31:16,17
  36:11 37:22 38:1,23
  39:7 40:21 41:2
  48:21 50:22 52:16
  56:8
comes 39:7 43:22

46:4
comforted 50:22
coming 22:21 39:16
comments 45:20
Commerce 2:13,14
commercially 36:13
Commission 60:23
commitment 47:3
common 7:11 8:3
communications
  46:22,23
companies 46:1
company 9:14 11:6
  28:5 29:6 40:20
  41:1 44:7,14 49:19
  56:11,11
comparable 43:18
compared 13:4,16,20
  14:5 21:18
compelling 38:4
  41:18
competing 29:10
complaint 35:17
complete 33:22 44:8
  60:9
completed 25:13
complicated 17:5
  19:24 43:11
complied 43:21
comply 37:12
compromise 18:11
computer 60:8
concern 29:10
concerned 37:10 54:3
concerns 29:3 48:24
condition 30:20
conditions 12:4,9
  15:12,15 16:25 17:7
  19:4 24:6 25:2,6,9
  27:3 28:19 30:15,16
  42:19 43:2,3,5,7
  45:24 53:2 54:15,19
  55:12,13,17,19 56:5
  56:10,24
condition's 47:7
conduct 23:15 56:12
conference 21:7 43:1
confident 52:15
confidential 9:12
  29:5 41:11
confidentiality 27:7
confuse 28:15
connected 60:13
consensus 13:21
consequence 14:6
considering 46:13
consist 26:2

consolidated 35:25
consultant 30:22
consultants 43:23
consumer 57:1,5
contain 26:5 54:14
contained 60:7
contemplated 44:6
contingency 38:14,19
  39:15,25
contingent 38:11
continue 37:4
continued 43:15,15
continuing 33:21
  50:18
contract 37:14 38:8
  38:19,21,24 39:9,9
  39:14,14,20 40:4
  46:8
contradicted 15:5
contribution 26:11
conversation 49:6,8
copy 58:19 59:1
core 24:16
Correa 58:21
correct 5:16 13:14
  54:23 55:20
costs 13:12,17
counsel 16:10 17:14
  20:17 27:25 28:7
  39:3 60:12,13
counter-party 16:22
County 1:1 3:3
couple 20:1 40:20
course 6:14 11:17
  24:14 25:11 36:22
  43:5
court 1:1,23 3:2,8,10
  4:1,5,10,14,19,24
  5:4,6,10,11,17,22
  5:24 6:3,4,7,15,21
  6:25 7:4,8,9,15,19
  8:3,23 9:3,6,9,23
  10:4,7,17,20 11:7
  11:10,13,18,24 12:7
  12:15 13:1,6,12,18
  13:24 14:8,12 15:1
  15:8,17,21,24 16:4
  16:14 17:4,7,12,15
  17:18 18:12,21 19:5
  19:5,10,16 20:6,9
  20:15 21:24 22:15
  23:4,11,15 24:4,7
  24:10,13 25:7 26:1
  26:22 28:12 29:15
  30:3,6,24 31:12,20
  31:23 32:2,6,16,20
  32:22 33:3,16,17,19

34:2,5,9,20 35:2,6
  35:15,23 37:1 38:9
  38:11 40:2 41:8
  42:1,7,10,24 44:12
  44:18,21,24 45:4,17
  46:13 47:24 48:14
  48:20 49:21,24
  52:21 53:3,6,9,18
  53:21 54:7,7,11,16
  55:5,9,14,18,24
  56:9,14,21 57:9,20
  57:23 58:1,4,9,13
  58:15,20 60:6
courtroom 32:24
  58:21
Court's 4:3 6:19,25
  28:3 37:12 50:4
covenant 25:20
co-counsel 32:10
crazy 33:24
created 29:8 43:7
credit 45:5,8
critical 18:24,25
  19:12 21:2
crystal 50:1
cure 10:15,22 11:21
  16:8,11,15 19:8
  22:12 53:16
cured 30:23 31:3
cutoff 23:9

_____

**D**

dab 12:24
damages 35:21
damaging 29:8
data 31:3 43:13
date 8:6 9:18 14:8,10
  16:1,8,9 17:19
  18:24 22:3,24 23:9
  23:17 28:19 40:7
  51:22
dates 10:21 21:9
Davidson 1:1 3:3
DAVIS 1:23
day 9:10 14:16 21:15
  22:1 37:17 45:7
  47:10 49:11 60:15
days 14:12,18 53:1
DC 2:7
Deaderick 2:3
deadline 9:5 16:15,25
deal 27:13 39:4,4,17
  40:1 48:11
dealing 56:3
debt 27:17
dec 28:23
December 7:20,21

8:18 9:18 10:6,9,21
  10:23 11:15 16:2,8
  16:13 17:19 18:8,10
  18:19,22 19:8,13,14
  20:19 22:10 23:9,24
  27:5 28:19 30:13
  48:5 51:17,24 52:23
  53:10
decide 7:3 37:25
decided 28:21
decides 19:6
declaratory 23:12
declare 46:10
decline 13:3,4,15,20
  15:3,7 20:21,22
  50:3,7,8,11
deeper 31:13
default 25:20 46:11
defendant 2:13 42:12
defendants 1:7,11 2:9
  3:19 5:14 7:17 8:11
  8:12,19,25 30:7
  33:6 45:18 53:23
  54:24
defendant's 3:10
defending 44:16
defense 22:16 23:21
  41:13
definitively 54:1
delay 4:3
delayed 14:18
demonstrate 20:3
  52:10,15
demonstrated 37:2
demonstrates 12:9
  19:3
denied 17:1 25:3
Denvir 2:5 32:11,14
  32:18
deny 33:9
depending 3:17 4:3
depends 15:4
deposed 8:16
depth 57:2
designate 8:6
detail 7:10 21:18 25:8
determination 23:16
  24:3 54:6
determinations 24:18
determine 19:19
  28:10
devalued 56:2
develop 43:17
developed 20:24
difference 48:1
different 23:13,14
  54:19

2

Transcript of Proceedings

difficult 12:7
digest 8:15
Diplomate 60:3
directly 7:2 9:20
    45:19
disagreement 7:16
disaster 48:10
discounts 26:18
discover 8:5 25:5
    47:7
discovery 8:8 24:22
    24:22 25:14 45:13
    46:12,14,17 47:23
    50:21 51:18
disproportionate
    20:4 55:2,3
disputes 16:23
disrupt 33:16 40:1
disrupted 39:16
distribution 18:4
    37:7
divide 23:14
documents 46:20,22
    51:3
doing 25:24 38:16
    44:9 51:14
dollar 56:1,19
dollars 27:15 40:25
done 8:18 9:4 20:9
    23:13 45:16
Donelson 2:12
doubt 38:18
down 7:24 9:2 26:17
    31:17 39:1,6,10
    41:4,23 43:7 45:15
    47:10 48:21 54:13
    58:22
downturn 28:9 54:18
    54:20 56:1,4,8,18
downturns 55:11
drafted 42:3
dragging 29:3
dramatic 20:21,22
drive 47:9
driving 45:10
drop 52:11
dropped 47:10
drop-dead 23:9
due 56:4
Dunn 38:15
dust 29:19
dynamics 37:15

_____
E
E 2:2 60:1,1
each 26:8 49:11
earlier 37:5

early 9:4 44:12
earnings 13:4,4,16
    14:19 28:7 49:19
eaten 51:25
economic 42:18 43:2
    43:3,5,7 54:15
    55:12,16,19 56:10
    56:23 57:6
economy 46:2 54:20
    55:15
effect 7:24 8:4,7
    11:19 12:13 17:2,10
    19:20 22:25 23:17
    23:25 28:1,18 33:9
    33:11,13 55:1,3
effectively 39:18
efficient 24:12,13
eight 32:15
electronic 43:13
Ellen 1:19
else's 41:20
emergency 3:11
employee 60:13
employees 17:25 18:2
    27:22 33:23,25 36:7
end 7:18 9:15 18:10
    21:14 23:6,18 29:3
    29:12 39:18 45:6
    47:10 48:2,19
ended 21:1
ending 15:25 16:1
ends 12:6
enforcement 34:7,8
    34:22
engage 40:14
enough 15:18 18:16
    50:11
enter 57:18
enterprise 26:11
    27:16 29:17,21 30:2
entire 31:15
entitled 18:17 23:5
    34:19 35:21 43:24
equities 35:4
equity 48:23
Esq 2:2,2,5,6,8,9,12
    2:15
essential 32:22
essentially 13:9 14:1
    34:14,17
establish 25:5
estate 37:14 38:25
    39:6,10
et 3:7
Evans 58:14,15,17
    59:5
even 20:2 22:16 36:10

37:17,22 38:2,7
41:12 42:20 47:5
51:16
event 21:3,20 30:23
ever 23:7 33:10
every 9:10 39:8 43:19
everybody 4:11 6:12
    7:25 13:22,23 20:4
    21:4,22 38:5 41:20
    41:22,22 52:8
everyone 7:15 36:23
everything 9:4 17:9
    41:9
everything's 14:7
evidence 10:12 16:6
    22:14 49:13 50:6
    55:10
evidentiary 7:23 21:2
    23:15 28:8
exactly 4:13 24:10
    26:24,24 34:16
    37:13 41:14
example 14:15 54:21
    56:5,15,25
except 11:3 17:9 22:6
exception 56:3,8
excludes 13:17
exclusive 48:22
excuse 21:19
existence 24:9
expedite 3:11 6:18
    24:15 31:8 35:14
expedited 3:16 40:11
expediting 9:1
expedition 7:16 25:18
    25:23
expenses 26:6,25
experience 32:18
expert 44:14,24
experts 8:13,15
Expires 60:23
explain 16:17,18
    22:18 52:11
explained 15:25
explains 43:6
explanation 13:7
    14:20 15:2,5
expressed 48:24
expressly 43:8
extend 15:13,15
eyes 18:25
e-mails 50:23

_____
F
F 60:1
facility 18:4 37:7
fact 11:4 33:6

factors 49:21,22
facts 12:18 18:15
fail 25:5
failed 42:25
fall 36:15
familiar 28:3 32:17
far 18:16 19:14 26:21
    37:10 45:13 48:10
faster 47:23
fax 57:12 58:22 59:1
    59:3
fee 58:5,24 59:2
feeding 18:1
feel 18:18
few 5:8,25 29:25
    48:12
fewer 56:25
fight 40:14
file 34:10 46:11
filed 23:8 25:3,21
    32:4 35:17 45:22
    46:15
filing 6:10
finally 45:3
FINANCE 1:10
financial 21:16 25:15
    26:19 31:3,7 48:25
    51:3 55:15
financially 60:14
financing 31:1 38:10
    38:12,13,19 39:14
    39:25 40:5 47:2,17
    47:18
find 41:6 42:21 58:24
finding 30:11
findings 28:17
finds 37:24
fine 4:7 54:11
finish 1:6 3:7 13:22
    16:22 17:13 20:5
    25:12 27:20 29:18
    30:22 31:16 33:1,9
    34:1 36:17 39:23
    40:1 41:21 46:24
    49:6,8,10
finished 4:25
firm 32:11 38:15
first 14:18,21,22
    21:10 32:23 38:1,4
fiscal 12:21
fishing 25:18,23
fits 40:3
five 23:8 42:11 46:17
fixed 22:1
flat 21:10 46:7
Flexner 2:6
flip-flops 57:2,3

floor 36:11
Florida 14:4
flows 26:7
focus 15:9
folks 3:21
follow 18:3
following 3:3 9:5
Footnote 42:1
footwear 41:23 43:6
    45:3 52:12
forced 27:13 29:22
foregoing 60:9
forget 45:22
Forgive 17:6
forward 23:21 26:12
    50:19
Four 4:7
fourth 1:24 2:10 22:8
    22:10 28:7 36:11
    48:3
fourth-quarter 11:6
frame 24:17
Frank 2:15 6:6,9,11
    6:16,22 7:7,14 8:1
    8:21,24 9:8,20,24
    10:5,19 11:2,8,11
    11:23 12:17 13:3,7
    13:14,19 14:10,14
    15:14,20,23 16:1,5
    16:21 17:6,11,13
    27:23 48:17 49:25
    54:9,17 55:20,25
    56:13,23 57:25 58:6
frankly 40:15
FRANKS 10:8 11:14
    13:25 54:12 55:6,10
    55:16 56:15
frenzy 18:1
Friday 31:15
friends 10:13 49:5
from 3:20 7:20 12:22
    15:9 18:14 21:8,9
    24:19 25:14 26:25
    29:18 30:22 31:10
    39:18 42:11 43:23
    43:23 48:19 49:12
front 37:18
fulfilled 15:12 17:8
full 21:16 50:21
fund 51:13
fundamental 55:6
further 21:12 24:22
    60:11

_____
G
gain 13:21,21
gave 4:15 31:4 43:11

Transcript of Proceedings

Geez 47:19
general 42:18 43:2,3
  43:5,7 54:15 55:12
  55:16,19 56:10,18
  56:23 57:1,6
generally 47:4 56:7
generating 28:6
Genesco 1:3 3:6 7:17
  8:10,18 9:9 10:1,13
  11:4 12:20,24 14:16
  16:6,7,23 17:24
  20:18 21:3,19 29:19
  36:14 45:22,23
  46:24 47:3 49:10
  52:20 55:4
Genesco's 6:23 8:9
  12:14 16:2 25:1
  27:20,25 29:19 33:9
  33:11,21 36:4
getting 14:25 17:15
  27:14 28:17 31:1,10
  40:5 47:8
Gibson 38:15
give 6:14 7:12 10:24
  16:15 19:9 25:22
  26:3 31:7 38:7
  40:13 41:9 44:1,11
  46:12 47:24 50:23
  52:17 58:25 59:3
given 9:12 22:24
  43:17
giving 8:10 18:24
  31:2 51:11
glad 32:18 51:1
go 8:22 11:22,24
  17:16 19:19 21:25
  28:20 32:23 38:4,5
  39:1 41:4 45:14
  49:22 51:4 52:6
goes 7:2 16:13 30:2
  39:1,6 49:11 56:16
  56:17
going 3:13,15,19 4:11
  4:16 7:10 8:8,8,12
  8:14 9:14,16 10:15
  12:5,6 14:7 20:3,6
  20:10 21:11,18 22:1
  22:19,20 24:17
  26:11 27:3,4,13
  29:18,21 30:4 33:24
  36:15,19 37:21
  38:22,24 39:23
  40:11 41:3,18 43:20
  43:25 44:6 45:4,8
  45:19 46:11 48:1
  50:13,19 52:1,15,17
  52:20 54:4,5,8

57:10
good 3:8,9 4:9,19 5:2
  13:18 14:7 21:10
  27:12 44:21
gotten 5:24 15:8
  31:18
great 29:25 30:8
  32:18 38:23
ground 7:11 8:3
guess 8:8,13 15:2
  17:19,21 18:14
  21:24 23:19 28:22
  36:8 53:7
guidance 6:25
guy 38:1,4

_____ H _____

hac 6:7,10 58:1
half 40:25
halt 29:7
handed 3:22
handle 23:25 53:19
hang 22:21
happen 11:15 27:5
  29:21 46:2 48:1
  52:20
happened 3:18 12:8
  15:21 20:20 28:5,11
  37:15 40:18 42:4
  45:5,8 47:21
happening 15:4,6
happens 20:25 29:24
happy 27:11,15 31:7
  37:11 39:21,22 52:7
harm 29:9 33:21 34:1
  34:10,18 35:3,13
  36:4 37:4 44:7
  52:19
harm's 29:21
having 5:24 18:1
  19:13 34:17 35:10
  39:13 51:15
headed 6:21 43:24
headhunters 18:1
  33:24
heading 54:13
HEADWIND 1:6
hear 5:11 11:5 18:8
  18:14 19:21 36:19
  42:11 56:7
heard 15:9 18:7
  60:10
hearing 3:2 4:25 5:7
  6:14 7:17,23 8:6,16
  10:9,10,23 18:23
  19:22 22:23 23:16
  24:14,22,23 28:23

32:23 34:17 35:9
  47:24
hearings 19:17 23:13
heart 7:2 51:4
heavy 34:25
heel 36:21
Heelys 36:20
help 31:2
helpful 4:22 36:1
hemp 56:17
her 46:21
hesitant 6:2
Hicks 2:12 4:7,8,20
  6:2,5,8 57:17,18,21
  58:3,7
hide 40:15,16 52:16
high 34:11 38:6
higher 37:22 38:2
Hobbs 1:19
hold 15:5 37:6
holiday 14:1
holidays 13:11 14:3
  43:4
honestly 46:19 47:5
Honor 3:9,24 4:8,20
  4:22 5:3,19 6:2,8,14
  6:16 7:3 8:1,21,25
  9:8,21,25 10:8,12
  11:5,15 12:1,12,17
  13:14,20 14:11,22
  15:2,14,20,23 16:5
  16:9 17:11,17,21
  18:6,8 19:2,23
  20:13 22:7 27:24
  30:9,10,18 31:5,14
  31:22 32:9,14,21,24
  33:2 34:13,16 35:17
  36:7 37:4,8,10,13
  37:14 38:20 39:3,12
  40:10,15 41:15,19
  42:14,15,22 43:10
  44:16,25 45:6,11
  48:17 49:15,16,25
  52:5 53:25 54:9
  55:7,20 57:3,8,18
  57:25 58:3,6,8,11
  58:14 59:6
Honorable 1:19
Honor's 11:2 19:25
  36:19
hope 46:12,13
hoped 45:9
hoping 49:7
horse 20:23 29:23
hot 36:15
hour 4:21
house 37:14,17,18,20

37:21,25 38:1,6
  40:24 41:2,4,7 47:9
  47:12,14 48:6,25
  51:15 52:1,1
housekeeping 5:25
huge 43:16
hurry 49:11

_____ I _____

idea 44:9
identified 12:13
  17:23 33:20 53:17
immediate 29:9 34:10
  34:18 35:2,13 36:4
  44:7
impact 6:13 37:7
  54:22
important 9:5,15
  14:22 26:10,13
  42:21 48:23
imposition 11:16
impossible 9:18
INC 1:3,6,6
inclined 48:21
include 31:2
includes 14:15
including 10:5 20:5
  21:15 41:21
Incorporated 3:7
incorrect 17:11,12
increases 49:14
industries 56:10
industry 13:13 22:8
  41:23 45:3 46:1
  54:18 55:12 56:4
  57:6
industry-specific
  55:23
information 6:13,23
  7:2 8:11,13,15 9:12
  10:24 15:19 16:19
  18:13,16,17,25 19:1
  22:3,19,24 25:15,25
  26:3,4 27:8 28:18
  29:6 31:8,11 33:7
  36:10,13,14,24
  39:17 40:2 41:11
  43:12,16,18 44:1,3
  44:11 45:2 46:7
  49:3 51:3 52:17
  58:25
informational 30:21
injunction 24:14
  28:23 34:11,14,23
  34:24 35:25
insisted 16:7
inspect 41:10

inspection 40:24
inspector 40:24 41:2
instance 36:24
instead 56:5
interest 35:4 39:1,6
  39:11
interested 9:1 10:1
  51:14 60:14
interesting 36:22
internal 13:20 46:23
interpret 31:1
interrupt 6:3 10:18
intervene 5:14
intervention 57:19
intolerable 17:24
introduce 6:6 32:10
inventory 26:7,7,18
  26:19
investment 46:18
involved 58:24 59:2
irrelevant 40:8
irreparable 29:9 34:1
  34:10,18 35:2,13
  36:4 37:4 44:7
  52:19
issue 6:17 7:2,24 8:4
  8:11 12:17 13:10,19
  14:2,25 17:3 19:24
  21:8,21 22:13 28:10
  35:10 44:10,15 49:4
  51:20 53:16 54:3
  57:6,11
issues 6:17 19:18
  24:16 36:23 43:17
  55:22,23 56:20
item 5:25

_____ J _____

J 2:8,9,15 26:15
James 2:5
January 7:19 9:5
  10:10,14 11:16
  18:10 19:15 29:4,12
  47:24 48:15,20,20
  60:24
Jim 32:11
job 33:24
jobs 17:25
John 2:12 4:8
Johnston 57:3
Joseph 2:15 6:9
Journeys 26:15
Judge 23:22 51:17
judgment 23:12
July 12:22 20:25 21:9
June 10:2 12:23
  51:17

4

Transcript of Proceedings

jurisdiction 9:3 48:22
just 3:10,22 4:2,11,15
  6:21 9:13 10:18
  13:15 14:6 17:24
  18:1 19:21 20:17
  21:3,8,15,20 22:4
  22:23 24:17 25:9
  26:16 27:24 30:9
  34:15 35:7 37:4
  40:21 41:17 42:15
  43:10 44:9,24 45:25
  46:21 47:11,22
  50:12 53:11 54:12
  55:4 57:7,23

_____

**K**

keep 7:5 31:10 32:22
  33:20 35:8 37:12
  39:23 52:7 57:14
keeps 41:3
key 18:2 33:25 41:10
kind 6:13 24:2 26:2,4
  27:1 28:10 37:3
  40:23
kinds 51:3
knew 27:1,6 47:14
  50:24 51:15
know 8:17 9:1,15
  10:14 12:6,10 13:2
  14:20 15:16 17:25
  17:25 19:13,20
  22:16 23:17,18,20
  23:22 27:1,21 28:4
  33:8,23 34:24 35:6
  35:19 36:14 37:6
  38:16 40:17,23
  41:18,21 42:5 43:10
  43:12 44:13 47:6,16
  47:19 50:5,14,18,23
  51:2,21 54:21 56:1
  56:4,17,18 58:19
  59:2
knowledge 33:7
knows 49:15,16,25

_____

**L**

LA 38:16
Labor 14:16 21:15
  22:1
language 9:25 49:18
Large 60:5
last 13:11 20:18,19
  21:18 25:21 43:22
  51:7
later 4:6 5:20 13:10
  13:11
Latham 2:16

law 27:23 28:1 53:22
lawsuit 25:3,4 45:23
  46:11,15
lawsuit's 25:21
lawyers 1:3 5:11
  20:10 38:15 49:9,10
lead 46:9
leading 50:10
least 18:25 22:22
  23:19,24 28:20
  58:25
leave 27:15
leaves 50:1
left 15:6 43:2
legal 9:21,24
lend 51:9,13 52:2,3
lender 50:13
lending 51:9
less 26:12
less-expensive 56:6
let 3:12 5:13,25 7:10
  8:15 9:6,20 11:18
  12:15 17:13,16 18:6
  20:6 21:23 28:25
  29:1 30:9 38:18
  39:18 41:1,1 42:13
  42:15 46:21 57:24
  59:2
letter 25:17 31:20,25
  47:3
let's 11:22 37:16 46:4
  55:14
level 7:10,12 31:13
levels 23:14
like 4:2 5:7,12 6:25
  7:22 8:7 10:11,17
  10:20 11:5 18:7
  21:3 24:11,14,23,25
  28:23,24 30:5 32:10
  36:14 37:13 41:24
  50:12 57:19 58:18
likelihood 35:3,12
limbo 19:12 33:22
  36:5 44:8
limitation 46:22
line 1:6 3:7 13:22
  16:22 17:13 20:5
  22:23 26:8 27:21
  29:18 30:23 31:16
  33:1,9 34:1 36:17
  39:23 40:1 41:21
  46:24 49:6,8,10
lined 45:14
lines 16:16 26:9
litigation 30:22 43:23
little 3:16 20:23 29:1
  36:21

LLC 1:9,10,23
LLP 2:6
load 27:18
LOAN 1:10
logistically 9:18
logistics 9:22
long 8:5 28:5 29:4
  37:11 41:4 42:17,19
long-term 20:1 40:20
  49:19,23 50:15,25
  51:6
look 9:12 12:6,7,11
  12:15 15:10,13
  16:16 20:19 21:10
  21:22 22:9 23:6,6
  24:17 25:15 27:11
  31:8 32:6,17 40:7
  40:22 41:10 50:3
looked 7:22 18:15
  19:25 28:21 54:1
looking 7:12 18:22
  25:18 37:23,25 39:8
  50:2
looks 8:7 19:5
lose 33:24
losing 18:2
lot 22:13 26:19 29:5
  49:16 58:18
lots 55:10
low 37:20
Lyle 1:19

_____

**M**

M 26:15
MAC 10:15 49:13,13
  49:17,17 50:11,11
  50:18 55:11
machine 60:6
macroeconomic
  55:22 56:5
made 14:17 20:17
  21:5 38:23 54:6
MAE 24:9 30:11,17
  32:25 33:18 42:21
  43:9 44:10,15 45:1
  53:13,15,17,19,24
  54:14
main 34:9
make 5:12,20 6:6 7:8
  11:8 12:13 15:17
  20:11 22:9 23:16
  24:18 30:1,5,18
  38:3,4,5,5 40:10
  44:1 45:9 47:25
  53:11 57:24
makes 44:10
making 17:4 21:12

56:16
Malone 2:9
management 31:16
  36:10,12
many 11:4,6 47:16
  56:22
Mark 2:9
market 8:9 9:13
  21:21 38:25 39:6,10
  45:5,8 54:22
marketing 36:16
markets 13:8 14:4
  55:15
massive 26:17 43:12
master 58:23
material 7:24 8:4,7
  10:12 11:19 17:2,9
  19:20 21:3,20 22:25
  23:16,25 27:25
  28:18 33:8,11,13
  42:19
materiality 10:2
materially 20:4
matter 3:6 6:11,20
  16:12,15 21:2 24:15
  33:5 40:11 45:15
  53:22 55:4 57:10
Maxine 60:3,20
may 12:22 20:13 21:4
  21:4 22:22 26:22
  27:23 32:10 33:14
  36:20 44:12 54:10
  56:6 58:24
maybe 25:12 27:14
  34:15,19
mean 19:24 20:1
  22:16 29:4,9 47:5
  53:15 54:2
measuring 51:18
  52:21,24 53:9
meeting 17:8 36:9
  53:3
memo 50:25
mentioned 37:5
merger 12:23 13:12
  13:17 16:23 18:5
  26:13 30:25 40:12
  40:19 41:24 43:14
  47:1,2,2 52:20
merits 35:3,24
met 24:6 25:2,6,10
  45:24 47:7
Michael 2:6
mid 9:4
middle 12:24
might 10:9 11:20,21
  22:11 24:20 27:3

Mike 32:11
mind 7:6 32:23 33:20
  35:9 37:13 52:7
minutes 30:6 42:11
misreading 55:7
misunderstanding
  38:18
mix 26:10
mix 26:10
Moelis 46:24
moment 16:10
Monday 32:5 36:18
  36:19,25 47:25
money 11:9 27:16
  29:18,23,24 30:1
  48:9,11 51:9,13
  52:2,3
month 21:14 48:2
months 14:18
more 8:13 10:9 15:18
  16:16 18:17 22:13
  23:20 26:9,20 28:22
  29:1 31:7,12 38:1
  39:17,21,22 41:4,15
  41:16,16 42:11 45:1
  50:8 52:5 56:7
morning 4:25
most 11:8 36:13
  41:18
motion 3:11 5:13 6:18
  35:17
motions 6:10
motive 45:11
mountain 25:23
move 7:20 10:18
  24:19 48:20 50:19
moved 21:9
moving 26:25 44:19
  47:23
much 6:19 7:16 16:19
  45:9 47:25 59:5
Murphy 57:3
myself 60:8

_____

**N**

name 58:22,25 59:3
Nashville 1:2,24 2:4
  2:10,11,14
national 54:20 55:14
nearly 45:9
necessary 3:17 25:15
  47:17 49:3
necessity 47:17
need 3:16,21 4:6 5:1
  7:4,16 8:13 10:24
  12:2 15:18 16:12
  18:14 19:8 24:15
  28:7 34:19 44:8,11

5

Transcript of Proceedings

45:2 49:10
needs 32:22
neighborhood 41:5
52:9
never 20:3 34:23
new 2:17 6:9,22 48:22
next 4:21 9:16 36:15
36:18,18,25 41:8
47:10
nobody 27:12 32:24
32:25 33:17
nobody's 30:2
nonparties 46:17
nonpublic 6:23
North 1:24 2:10
Notary 60:4
note 12:22 50:4 57:24
nothing 38:11 40:15
40:16 52:16
notice 25:19
notwithstanding
45:12
November 7:17 18:8
48:5 51:24
number 38:2 58:22
59:1,3,3,4
numbers 14:25 16:12
16:18 21:17 50:16
nutshell 6:19
NY 2:17
N.W 2:7

__O__
object 5:18
objections 5:15,23
obligation 6:24 25:14
30:25 40:4
observation 11:3
observers 58:18
obviously 9:2 12:2,6
18:7 35:16 40:24
42:4 43:14 48:21
occurred 10:13 11:19
17:2,3 32:25 33:13
33:18
October 1:17 3:2
21:16 23:18 51:24
60:15
off 15:9 25:9 33:3
36:11 41:6 45:9
offer 37:23 38:2,3,6
38:24
offered 13:7 31:15
offer's 37:20
oh 10:25 13:18 21:7
39:16 54:8 58:15
okay 4:1,10,24 5:2,6

5:13,17,24 6:4 7:4
7:21 8:3 9:23 12:15
12:16 13:18 15:8,18
17:15,16 18:9,9,12
20:6,12,24 25:22
28:25 30:3,10 31:23
32:6,8 35:23 36:3
38:22 42:8,13 53:6
55:5,19,24 56:14
57:15 58:4,23 59:4
one 2:10 3:14 8:3
12:1,3 15:15 19:18
24:8 26:12,25 27:23
29:1 32:24 33:14
37:17 42:3 43:22
44:24 45:1,1,3
47:10 49:4 50:8,10
50:12 54:12 57:14
one-month-off 12:21
only 16:14 23:7 30:19
30:20 31:9 34:20
38:6 44:10 53:12
open 6:24 15:1 31:6
43:25
opening 18:3 37:5
operations 29:19
opportunity 47:22
50:21 53:16
oppose 24:20
opposed 55:12
options 48:13
order 19:9 38:2 40:10
42:2 44:4 57:11,13
57:19,23 58:2,19
59:1
organizing 24:22
original 48:19
other 13:8 14:1 15:10
16:2 18:13 19:17
20:7,11 25:9 27:16
27:20,21 29:1,2,17
43:6 48:11 52:12,12
55:11
others 26:10
out 4:24 5:7,13,25
21:5,22 22:10 23:23
24:16 25:24 29:3,6
29:22 31:13 36:2
37:24 38:16 39:8,23
42:15 43:2,22 46:7
48:12 50:15 57:2
58:24
outcome's 54:5
outline 3:15 4:15
outside 44:14
over 20:10 22:2 28:5
30:6 32:7 33:23

36:11 47:15 52:14
53:20
overseas 56:19
Overton 2:2
o'clock 4:4,12
o'clock's 4:7

__P__
P 2:5
papers 36:8
Paragraph 33:6
parenthetically 12:22
part 24:18 26:14 27:5
56:20
participants 54:22
participate 39:22
particular 56:25
parties 11:17 12:19
43:8 44:6 51:12
52:2,19 57:21 60:12
partner 32:12
party 3:17 58:17
passes 29:25
past 16:19
pay 40:25 47:15
48:12 58:4
payouts 27:15
peculiar 41:6
pending 29:5
people 27:14,18,19
29:25 44:2 45:14
48:12 56:6,21 57:4
percent 13:3,4,15,20
15:3,7 50:3,5,7,8,11
perfect 4:18 44:10
53:19
performance 6:23
8:10 28:16 34:3,7
34:14,24 35:11,14
35:21 41:20 48:25
50:2
performs 20:23
perhaps 51:15
period 10:2 11:9,12
24:23 26:25 51:16
51:18 52:21 53:10
person 46:9
personnel 41:10
pertain 6:15
pertains 6:17
phrase 55:21
picture 23:23 28:13
46:19
piecemeal 24:3
pig 23:2 52:3
Place 2:10
plaintiff 1:4 2:2 3:15

5:17 30:5 44:14
plaintiffs 6:18
plaintiff's 3:11
plan 3:16 21:11
plans 18:3 37:6
play 23:23
pleading 49:9,12
pleadings 49:5
please 58:2
plus 18:2 20:2
point 8:25 12:3 14:22
15:1 18:7 21:13
22:22 23:19 27:23
28:2,8 33:19 34:9
42:15,20 55:21 57:8
pointed 21:5
points 20:11 27:10
32:22
poke 23:2 52:3
poor 47:15,18
position 17:23 25:2
32:25 33:10,12,18
47:6 53:11,22 57:7
positions 29:25
possession 6:22
possibility 24:21
49:13
possible 39:8
post-Christmas 11:11
practically 43:19
precise 15:18
preferable 19:15
preference 57:1,5
prejudicial 24:1
preliminary 6:11,20
19:21 55:4
premises 41:10
prepare 57:21
prepared 8:16
presence 39:24,25
present 10:11 35:13
presentations 5:11
pressure 23:7
pretty 34:25
price 51:1 56:16,17
principal 12:12 24:8
prior 13:5 19:21
28:19
priorities 23:14
prioritize 19:18
pro 6:7,10 58:1
probe 12:15
problem 8:14 9:7
12:12 18:12 19:17
22:12,20 28:6 36:7
36:7 42:6 49:23,23
50:16,25 51:5,6,11

52:11,18
problematic 9:17
problems 43:3,4
procedural 40:14
procedurally 36:1
proceed 3:13 7:1
proceeding 28:15
proceedings 1:15 3:4
3:12,16 9:1 60:7,10
proffer 7:8
profits 26:7
projections 13:21
proof 12:8 19:2,22
46:3 54:4
property 51:10
proportionate 8:9
proposals 47:1
propose 33:15
prospects 49:19
protective 42:2 57:13
prove 22:4 25:6 55:25
provide 46:6
provided 39:9
providing 25:14
proving 45:23
provision 16:8 34:21
38:22,25 41:24
42:16
proxy 47:16
psychologically 9:16
public 13:8 14:17
35:4 60:4
pull 24:15
purchases 13:11 14:3
pursue 35:19
put 4:21 21:19 24:16
37:6 41:19 46:17
55:7 57:23

__Q__
qualify 56:24
quarter 12:20,22
13:16 14:5,5,15,23
15:3 20:20 21:1
22:8,10,11 28:8
29:24 40:21 41:20
48:3,4 50:4,16
quarters 20:2
question 3:14 8:17
15:18 16:10,22 17:1
17:9 20:7,22 21:24
26:16 27:24 28:4
29:1 33:15 42:1
44:13 46:20 49:22
50:20,22 51:4,22
questions 5:8 6:1
20:16 30:4 31:17

6

Transcript of Proceedings

41:12,15,16,16
quick 19:22
quickly 10:18
quote 49:12

---

**R**

R 60:1
raised 6:18
Raskin 50:10
rates 39:1,6,11
rather 55:22 57:6
read 4:14 13:1
ready 10:10 44:3
    45:14
real 18:2 27:15 29:21
    37:13 38:25 39:6,10
    45:11
realistic 10:22
realize 28:13
really 10:25 13:9 15:9
    17:4 29:6 38:6 45:5
    45:6
reason 9:5 34:18,20
    35:18 44:2 45:7
reasonable 18:11
    40:6,8 46:9
reasons 17:22
received 3:10,13
receiving 25:12 27:8
recess 5:4,5
recession 54:21 56:2
    56:19
recognized 53:18
reconvened 5:6
record 31:21
recorded 60:5
reduce 21:4
reduced 60:7
Reducing 26:18
refer 6:24 15:1
reference 50:4
referenced 49:9
referred 13:15
Referring 46:25
regard 4:22 27:7
regardless 54:4
Registered 60:3
relating 46:25
relative 60:12
releases 43:1
releasing 14:24
relent 48:19
remarks 30:5
remedy 7:12 9:10
    28:15,22 34:2 35:22
remember 32:16 34:6
reminding 32:20

Reporter 60:4
REPORTERS 1:23
represent 58:17
represented 38:14
represents 48:8
request 23:11 30:21
    48:19
requests 46:14
require 22:2 23:2
requires 29:11
reschedule 4:11
resolved 52:18
respect 6:16,25 9:24
respond 3:19 9:20
    20:7
response 3:11 12:16
    31:18,18 32:3
rest 40:12 41:5
resulting 29:20 30:1
results 20:3 40:21
    42:17,18
retail 21:21 22:8
    41:23
retailers 11:6 43:6
    52:12
retraction 26:8
review 3:21
rewrite 30:12
right 7:5,9,15 10:4,7
    11:7 12:24 13:1,6
    13:10,24 15:4 18:20
    19:8,9 22:9,22 27:5
    28:2 29:7 32:9 34:4
    34:8,16 35:1,5,15
    36:6 38:9,13 40:12
    41:14 42:10 45:17
    45:18 49:17,24 50:6
    52:23,25 53:8,14,21
    54:7 55:9,21 57:9
rights 25:4
risk 18:2 45:13
road 54:13
Robert 2:8
roof's 47:10
room 43:13
rubber 56:16
Rule 35:23
run 27:19 39:19
rush 49:7
Russell 2:2 32:12

---

**S**

S 2:12
sale 37:17,18 38:7
sales 13:11 14:3,21
    15:22 21:5,17,17
    22:1 26:6,17 43:19

same 33:12 40:23
    46:2 52:13 54:5
    56:20 57:4 60:7
same-store 14:21
    21:17 26:16
satisfied 12:4,10
    15:15 16:25 19:4,7
    30:15,16,21 53:2
save 57:24
saw 33:2
saying 16:9,17 25:17
    27:25 36:3 39:16
    50:13
says 8:10 9:10 28:7
    30:14,14 31:19
    34:23 38:17,22,25
    40:17 46:6 47:19
    53:1
schedule 4:4 5:22
    37:12
Schiller 2:6 32:11
school 22:1
season 36:16
second 12:20,21
    13:16 14:5 15:3
    20:20 21:1 24:25
    29:24 33:19 41:20
    50:4
secondly 3:15
seconds 54:9
Securities 1:9 46:24
see 5:2 11:22 21:9,11
    21:17,23 22:19
    24:19,21 28:20
    31:10 35:15 41:24
    42:13 45:5,11 46:4
    46:16,21 47:10 48:5
    55:7,10
seek 35:22
seem 8:12 24:11
seemed 10:20
seems 10:17 18:17
    27:10 33:25 45:22
seen 21:14,16 36:8,21
    36:23 46:3,4,16
sell 38:3
seller 36:15
selling 48:2 56:19
semantics 35:7
senior 31:15
sense 44:10
sensitive 29:2 36:13
sent 26:6 32:1
September 12:4,10
    15:10 16:16,19,25
    18:15,18 19:4,21
    21:14 25:16,17 40:7

51:21,23 52:22,23
    53:5,10,12
serious 22:18
serve 25:19
served 27:13
service 27:17
set 47:24
settles 29:19
several 23:13 26:9
shaking 48:11
shared 36:17
shareholder 17:8
    53:4
shock 21:21
shocked 13:22
shoe 26:14 36:20,20
    36:22,24 57:4
shoes 56:6,16,22,25
    57:3
shoestrings 56:17
short 4:3 44:4
shorthand 60:6
short-term 51:5
show 9:25 38:21
    45:25 53:13,15,17
    53:19,23
shows 41:19
side 6:12 9:19 15:10
    18:13 20:7 22:17
    23:12 24:1,20 27:16
    27:20,21 29:11,16
    29:17 48:11
side's 29:2
sign 37:17 38:7,16
signed 10:3 12:23
    27:2 39:3 40:19
    43:14 47:9
simply 44:2
Sims 2:3
since 22:7 29:24
    40:18 43:16,20
single 28:1 43:19
sinkhole 47:20 48:6
sir 58:15
sit 31:17
sitting 37:16
situation 39:13
six 23:8 51:10,11
skill 60:6
slide 41:19
slowed 45:15
smack 12:24
small 25:24
solve 22:22
some 3:21,21 4:21 6:1
    7:20 8:13 19:17,18
    24:18,21 25:4 26:5

26:9,12 28:17,17
    36:19,23 45:2 52:11
    54:21 56:7 57:24
somebody 37:19
someone 22:11
something 10:11
    23:18 28:5,9,24
    34:6,6 40:18 41:6
    46:10 50:17
soon 4:5
sophisticated 38:15
    39:2
sorry 5:9 10:18 14:10
    15:17
sort 24:16 54:21
sorts 41:10
speak 6:12 8:24 20:13
    22:12 54:24
specific 5:8 28:16
    34:3,7,14,19,21,23
    35:11,14,21 45:2
specifically 39:9
speculating 22:17,17
spend 49:16
sprained 20:23 22:5
spring 47:1
squarely 6:17
staggering 30:9 44:9
Stair 2:2 32:13
start 4:15 5:7,13 30:4
    37:23 54:13
started 43:17
state 19:12 33:22
    35:18 58:5 60:4
stated 33:10
statement 25:1 38:17
    47:16
statements 20:17 21:6
step 14:17
stiff-armed 46:7
still 23:1 25:11,13
    39:1,11 42:21 48:3
    52:9
stock 48:12
stop 15:10
stopped 14:24
stops 12:11
store 26:8
stores 18:3 37:5
    43:19
straightening 36:2
strategically 24:20
strategies 36:16
Street 2:3,14
Strine 28:3
stuff 25:23 26:6,19
submit 58:2

7

Transcript of Proceedings

submitted 9:2
subpoena 46:18
subsequently 19:7
subsidiaries 56:11
substantial 35:3,12
substantially 10:24
substituting 46:13
success 35:3
suffer 21:4 27:19
suffering 9:9
sufficient 33:7
suggest 50:16
suggesting 50:6
Suite 1:24 2:4,13
suites 36:12
superficial 26:22 31:4
supports 51:25
suppose 22:6
supposed 26:5 27:8
sure 4:5 8:23 11:18
  11:23 17:17 19:10
  19:23,25 20:8,15
  30:18 33:1 40:11
  42:9 49:24 51:1
  52:14 53:11 54:11
  58:4
surprise 39:5,5 50:9
suspect 22:11 46:10

_____

T

T 60:1,1
take 7:4 8:5 23:5 44:3
  45:15 57:10
taken 11:3 32:25
  33:10,12
taking 33:18
talk 3:16 12:2 19:8
  28:21 41:9 55:11
talked 29:12 42:2
talking 24:2 28:15,17
  35:10 40:18 42:22
  56:3
talks 34:22 55:21
tank 30:2
tax 14:3,12 43:4
tea 50:1
telephone 59:3,4
tell 3:12 9:6 17:14
  25:7,8 26:1,20
  42:25 50:24
telling 15:13 45:4
temporary 21:20
  22:13 24:14 28:23
  35:9 49:23
Ten 54:9
Tennessee 1:1,24 3:3
  58:5 60:4

tennis 56:16
term 28:6 52:24
Terminix 52:6
terminology 34:16
termites 47:12,20
  48:6 49:1 50:6
  51:15,19,21,23,25
  52:9
terms 15:11 18:24
  23:15 26:10 28:23
  34:22 57:13
test 11:18
Texas 14:4,12
Thank 3:8 5:3 7:14
  30:8 32:20 36:1
  45:17 48:14,17 52:4
  57:8,25 58:8,9,11
  58:13 59:5
their 9:14 11:9 15:2,4
  15:22 16:9 17:1,24
  18:25 21:5 22:15
  25:13 26:10,14
  27:11 29:6,23 33:1
  33:2 35:19 37:24
  41:12 47:6,16 50:16
  56:1,12
thing 12:1 24:24,25
  27:1 30:19 31:9
  42:23 45:3,10 46:2
  49:18 51:7 54:13
things 4:21 7:20 13:8
  14:2 25:5,19 26:13
  27:22 36:14 45:24
  58:7
think 4:20 6:1,13 7:9
  7:11 8:12,17,24
  9:11 11:2 12:18
  16:17 17:4 18:10
  19:3,24 23:1 24:23
  28:25 32:2,4,21
  34:13 35:11 37:8
  40:12 41:8,11,17
  42:21 44:9,13,24
  45:4 49:6 51:7
  53:18,24 54:5,24
thinking 28:22
thinks 8:18
think's 48:1
third 2:16,17 14:5,15
  14:23 22:11 48:4
  50:16
Third-Party 1:11
  2:12
Thompson 2:2 3:24
  4:2,13,17 5:3,9,19
  8:2,22 12:1 16:24
  17:16,17,21 18:20

19:2,11,23 20:8
  30:8 31:5,14,22,25
  32:4,9,21 33:5 34:4
  34:8,13 35:1,5,8,16
  36:6 37:2 38:10,13
  40:9 41:14 42:3,9
  42:13,25 44:16,20
  44:22,25 48:8 52:5
  52:25 53:5,8,14,25
  54:18,23 58:11
Thompson's 25:1
  45:20 49:7,18 50:5
  50:22
though 8:12 10:20
  50:20 51:14 58:1
three 14:21,23 20:19
  21:10 36:9
through 7:23 10:5
  11:21 18:3 21:14,23
  21:25 23:6,17,17
  32:23 52:22,22
tick 25:9
tiered 19:17
till 30:13
time 3:21 6:20 7:8
  9:15 23:15,20 24:17
  25:4 28:2,22 29:4
  33:8 49:16 50:8
  51:17 52:13 57:24
times 11:4 47:16
timing 13:10 14:2
  19:12 21:8,21 22:13
  33:17
Tipps 2:9,9
title 34:22
TN 2:4,11,14
today 7:3 11:5 22:12
  29:20 32:23 42:4
together 54:25
told 15:24
tomorrow 57:11,11
top 27:14
touched 37:8
to-wit 3:4
trades 30:1
transaction 27:17
  29:17 33:16,17
  39:15 51:10
transcript 1:15 60:9
transcription 60:8
trend 50:24 57:1,5
trial 35:10,24
tried 19:14 44:8
trouble 51:2
true 11:10,13 22:7
  60:9
try 9:3 30:12 39:23

44:4 45:20 49:2
trying 10:18 16:20,21
  18:18 27:19 28:13
  31:10
turn 11:1 20:10 22:2
  28:9 30:6
turned 25:24
turns 21:22 22:10
  29:22 50:14
two 20:18 21:10
  32:22 53:1
two-thirds 25:24
  29:20
type 56:25
Tyson 19:25 28:2
  40:17 42:16,20

_____

U

UBS 1:9,10 3:14,17
  3:18 4:8 7:18 8:19
  9:2 29:18 30:7
  31:16 33:12 35:20
  37:10 39:12,22,24
  39:25 43:23 45:8
  46:23,23,24,24
  48:12,18 51:8
UBS's 5:13 30:22
uncertainty 9:13 27:4
  29:7
uncontradicted 16:7
under 6:24 15:11
  27:6 30:24 35:23
  40:4,12 46:8,8
  47:20 48:6 53:22,24
  57:10
understand 3:20 9:11
  10:8 11:16 26:21
  28:8 53:11
undisputed 12:18
unexpected 12:25
unexplained 15:6
unfulfilled 28:18
unless 16:2
unlike 27:25
until 15:15 18:22
  27:5 29:11
unusual 14:16 16:8
  28:14
update 3:14 43:15
upper 36:10
use 27:9 39:23,25
  47:17 49:1
used 36:25

_____

V

V 6:12
value 40:20 41:4

varies 14:14
venue 3:14,18
versus 3:7 57:3
very 11:3 16:6,7 21:2
  24:11 27:4 29:8
  36:18,18,25 38:14
  39:2 43:1 45:4
  54:19,19 59:5
viable 26:11
vice 6:7 58:1
virtually 41:22 52:12
vote 53:4
vs 1:5,8

_____

W

wait 14:6 18:21 29:11
  58:21
Walker 2:8,9 5:16
  20:13,16 22:6 23:1
  23:5 24:2,5,8,11,21
  25:11 26:4,24 29:2
  29:14,16 30:20 32:1
  45:19 48:15 50:14
Walker's 49:1
want 6:19 8:21 11:14
  12:3 15:1 17:18
  18:21 20:11 23:20
  23:22 28:14,14,16
  30:12,18 31:8,12,17
  33:19 37:14,21 38:1
  38:21 39:15 41:9
  45:11 47:6,7,19,22
  49:4 50:14,21 51:7
  52:1,3 54:8
wanted 7:17,18 21:22
  22:9 25:7 26:20
  54:12 57:7
wants 18:14 37:19
  59:1
Washington 2:7,7
  32:12
wasn't 21:20 35:18
  35:20
waste 6:19
water 15:5
Watkins 2:16
way 3:13 5:7,25
  16:12 19:16,18
  21:23 24:12 39:8
  41:17 47:13,14
  49:17 53:12,19 57:5
week 7:19 25:21 41:8
  43:19
weekend 21:15
weekly 43:18
weeks 14:21,23 20:18
  20:19 21:10 36:9

Transcript of Proceedings

**welcome** 52:6
**well** 4:9,24,25 10:13
  11:2,3 15:14 17:13
  17:15,21 20:7 21:24
  23:1,22 25:2,11
  27:4 34:13,20 36:22
  41:1 45:25 46:3,7
  47:11 52:25 53:14
  56:9
**went** 39:10,11
**were** 3:4 10:3,11 12:9
  15:12 16:25 17:7
  19:4 25:20 27:2
  29:25 36:3,17 42:22
  43:13,24 47:14
  51:21,23
**weren't** 43:24
**we'll** 4:14,21 5:20
  6:10 25:22 41:1
  42:9 44:1,11 45:2
  45:13 48:3,4,4,5,5
  58:20 59:2
**we're** 4:10 7:10 8:8
  14:25 15:6 16:9
  17:14,15 18:2,9,9
  19:13 22:19 23:5
  24:17 25:24 27:6,8
  27:8 34:15,17 35:10
  35:21 36:3 38:24
  39:22 40:13,18
  42:19 43:25,25 45:6
  45:7,12 47:18 48:9
  49:2,3,20 50:2,15
  50:19 51:1,8,12,13
  52:15,15 54:3 56:2
  56:3
**we've** 4:25 5:22 8:14
  18:4 20:9 21:16
  22:21 23:23 30:23
  35:17 36:6,7 39:17
  42:17 43:14,17 45:1
  45:1,14,16 46:19
  48:21,25 52:8 54:6
  56:9
**wheel** 36:21
**while** 39:21
**whole** 22:13 23:23
  45:10 48:3 55:18
**willing** 5:21 7:7 16:3
  16:11,14 18:23 37:3
  40:14 45:12 48:18
  54:2
**wind** 47:11
**window** 18:13
**winter** 36:16
**wondered** 6:5 35:6
**word** 47:17

**words** 16:2 19:18
  54:19
**work** 4:16 10:21
  31:13
**worked** 4:24
**working** 57:14
**works** 4:4 42:7 49:17
  58:8
**world** 20:21 21:6
  55:14
**worry** 13:9 14:2 15:2
  21:8
**wouldn't** 10:23 16:19
  18:5
**write** 58:22
**wrong** 50:15 54:13

       **X**

**X** 23:17

       **Y**

**yard** 37:18
**yeah** 16:17 20:12
  32:4 44:16 54:5
**year** 9:15,16 12:21,21
  13:5,11 14:5,6
  21:18 23:7
**years** 32:15
**yield** 20:18
**York** 2:17 6:9 48:22
**you-all** 4:6 5:1,18
  8:20 23:22 30:3
  31:13 42:2 57:13,14
**you-all's** 28:12

       **0**

**07-2137-II(III)** 1:5

       **1**

**10** 1:17 3:2
**10th** 7:20 8:18 10:23
  18:9,10
**1000** 2:13
**10022-4834** 2:17
**11th** 60:15
**15** 30:6
**150** 2:10
**16th** 51:17
**17** 11:16 60:24
**17th** 7:21 8:19 10:2,9
  10:23 12:4,10,23
  15:11 16:16,19
  18:15,18 19:5,21
  40:7 51:21,23 52:22
  52:23 53:5
**18th** 25:16
**19th** 25:17 53:7,8,10

**53:13**

       **2**

**200** 1:24
**20015** 2:7
**2006** 13:16
**2007** 1:17 3:2 10:2,6
  16:2 60:15
**2010** 60:24
**211** 2:14
**2300** 2:10
**2700** 2:4

       **3**

**30** 14:18,18
**30th** 20:25 21:7
**31** 18:19,22 19:8
  22:10 23:9,24 27:5
  28:19 30:13 52:23
  53:10
**31st** 10:6,15 12:22
  16:2,8,13 17:19
  51:18
**315** 2:3
**37201** 2:14
**37219** 1:24 2:11
**37238** 2:4

       **4**

**4th** 21:1
**4:00** 4:4,12 5:2

       **5**

**5th** 10:10,14 11:16
  18:8
**50** 50:5,11
**500,000** 46:20
**53rd** 2:16
**5301** 2:7
**54.50** 51:1

       **6**

**615** 1:25
**65.07** 35:23

       **7**

**7th** 47:25 48:16,20
**7.2** 53:24
**72** 33:6
**726-2737** 1:25
**77** 13:3,4,15,20 15:3
  15:6 50:3,7,8

       **8**

**825** 1:24
**885** 2:17

9

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY, PART III

| | | |
|---|---|---|
| GENESCO, INC., | ) | |
| | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| VS. | ) | NO. 07-2137-II(III) |
| | ) | |
| THE FINISH LINE, INC., and | ) | |
| HEADWIND, INC., | ) | |
| | ) | |
|     **Defendants,** | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| UBS SECURITIES LLC and | ) | |
| UBS LOAN FINANCE LLC, | ) | |
| | ) | |
|     **Third-Party Defendants.** | ) | |

## MEMORANDUM AND ORDER

    This lawsuit pertains to a merger initiated by The Finish Line, Inc. and Headwind, Inc. (hereinafter referred to as "Finish Line") to acquire Genesco. After negotiating, the parties, on June 17, 2007, entered into a Merger Agreement for Finish Line to acquire Genesco for $54.50 per share. The merger was projected to close September 24, 2007.

    As is standard, the Merger Agreement contains certain steps/conditions which have to be completed for the merger to close. Failure to complete a step can constitute grounds under the Merger Agreement to delay or terminate the deal. Presently, the merger is stalled at one of these steps, "Material Adverse Effect," contained in Section 7 of the Merger Agreement.

The impasse results from Genesco posting, on August 30, 2007, a second quarter loss of earnings (EBIT) of 77% compared to the previous year. This loss, Finish Line and its lender UBS assert, appears to be so significant a percentage and not predicted, that the loss constitutes a Material Adverse Effect ("MAE") under section 7 of the Merger Agreement to delay or terminate the deal. Genesco asserts that the loss is explained by market and other forces external to Genesco and that those forces are recognized in the Merger Agreement as not constituting an MAE.

Construing and applying the terms of the Merger Agreement, the Court concludes that a 77% drop in second quarter earnings from the previous year is sufficient on its face to trigger Genesco's obligation to respond to the request of the defendants to provide information about the second quarter loss in earnings in connection with the MAE provisions of the Merger Agreement.

1.    The Court therefore shall adopt Genesco's offer made in court to voluntarily make its books, records, facilities, management and personnel available to the defendants. It is ORDERED that on Monday, October 15, 2007, counsel for defendants shall initiate requests for information to plaintiff's counsel. UBS' request for Genesco information shall be made through and with the requests made by defendants' counsel. This voluntary exchange of information shall proceed through October 23, 2007. On or before October 25, 2007, defendants and Intervenor shall file with the Court any disputes the parties have been unable to resolve in the exchange. Plaintiff shall file its reply on October 29, 2007. The

2

Court shall conduct a hearing on the disputes October 31, 2007, at 1:30 p.m. By voluntarily providing information Genesco has not waived any claims or defenses that it is not required to produce the information and may assert those at the October 31 hearing.

2.    Additionally, the Court finds that delay in a court decision on whether an MAE has occurred threatens irreparable damage to Genesco. A speedy trial on this issue is required. The Court therefore ORDERS counsel to reserve the week of December 10, 2007, to conduct a trial on the issue of whether an MAE has occurred under the terms of the Merger Agreement. Subsequent to October 31, 2007, the Court shall issue a more detailed scheduling order with discovery deadlines for the December 10, 2007 trial.

In setting the MAE trial for December 10, 2007, and rejecting the Intervenor's request for a January 7, 2008 trial date, the Court has concluded that the provision of the Merger Agreement that allows Genesco to cure an MAE before December 31, 2007 is not a ripe issue, and, therefore, does not warrant delaying the trial to January 7, 2008. The Court's conclusion is that under the terms of the Merger Agreement, as applied to the circumstances of this case, Genesco's right to assert that it has cured a defect in its performance is not an issue until a defect in performance has been demonstrated.

3.    Based on its authority under the Tennessee Rules of Civil Procedure to regulate the sequence of discovery, the Court ORDERS that prior to October 31, 2007, all discovery

3

in the case shall be held in abeyance except for the voluntary exchange of information ordered above in paragraph 1.

    4.    It is further ORDERED that the motion of UBS to intervene is granted.

*Ellen Hobbs Lyle*
ELLEN HOBBS LYLE
CHANCELLOR

cc:    Overton Thompson III
       Britt Latham
       W. Brantley Phillips, Jr.
       Brian Roark
       Russell Stair
       Bryan Larson
           *Attorneys for Genesco, Inc.*

       Jonathan Schiller
       James Denvir
       Michael Brille
       William Jackson
       Jonathan Shaw
           *Of Counsel for Genesco, Inc.*

       Robert Walker
       J. Mark Tipps
       John Hayworth
       John Farringer IV
           *Attorneys for The Finish Line, Inc. and Headwind, Inc.*

       John Hicks
           *Attorneys for UBS Securities LLC and UBS Loan Finance LLC*

       Joseph Frank
           *Of Counsel for UBS Securities LLC and UBS Loan Finance LLC*

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
20TH JUDICIAL DISTRICT, DAVIDSON COUNTY, TENNESSEE

| | | |
|---|---|---|
| GENESCO INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 07-2137-II (III) |
| | ) | |
| THE FINISH LINE, INC., | ) | |
| HEADWIND, INC., | ) | |
| UBS SECURITIES LLC and | ) | |
| UBS LOAN FINANCE LLC, | ) | |
| | ) | |
| Defendants. | ) | |

---

## NOTICE OF FILING RELATED ACTION

---

Defendant Intervenor UBS hereby gives notice of the filing on November 15, 2007 of the

attached related action on the issue of insolvency in the United States District Court for the

Southern District of New York.

The attached related action was filed in the Southern District pursuant to the agreement

with The Finish Line, Inc. that provides for exclusive jurisdiction and venue in New York for

determination of the issues raised in the related action.

Respectfully submitted,

John S. Hicks (#10478)
BAKER, DONELSON, BEARMAN, CALDWELL
& BERKOWITZ
211 Commerce Street, Suite 1000
Nashville, Tennessee 37201
Tel: (615) 726-7337
Fax: (615) 744-7337

Joseph J. Frank
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York  10022

*Attorneys for UBS Securities LLC and
UBS Loan Finance LLC*

## CERTIFICATE OF SERVICE

I hereby certify that, on this __16th__ day of November, 2007, a true and correct copy of the foregoing has been forwarded, via electronic mail and United States Mail, first-class postage prepaid, to:

Robert J. Walker
J. Mark Tipps
John C. Hayworth
John L. Farringer, IV
WALKER, TIPPS & MALONE
2300 One Nashville Place
150 Fourth Avenue, North
Nashville, TN  37219

Overton Thompson, III
Britt K. Latham
W. Brantley Phillips, Jr.
Brian D. Roark
Russell E. Stair
BASS, BERRY & SIMS, PLC
Suite 2700
315 Deaderick Street
Nashville, TN  37238-3001

Jonathan D. Schiller
James P. Denvir
Michael A. Brille
William C. Jackson
Jonathan M. Shaw
BOIES, SCHILLER & FLEXNER LLP
Suite 800
5301 Wisconsin Avenue, N.W.
Washington, DC  20015

2

N JSH 639657 v1
2909043-000001 11/16/2007

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UBS SECURITIES LLC, and<br>UBS LOAN FINANCE LLC,<br><br>     Plaintiffs,<br><br>     v.<br>THE FINISH LINE, INC., and<br>GENESCO INC.,<br><br>     Defendants. | Civil Action No. _____<br><br><br><br><br><br>**COMPLAINT FOR DECLARATORY<br>RELIEF** |

Plaintiffs UBS Securities LLC and UBS Loan Financing LLC (collectively, "UBS") hereby aver and allege for their complaint against Defendants The Finish Line, Inc. ("Finish Line") and Genesco, Inc. ("Genesco") as follows:

### Preliminary Statement

1.     Finish Line and Genesco are scheduled to combine pursuant to a June 17, 2007 merger agreement (the "Merger Agreement"). UBS asks this Court to declare that the combined Finish Line-Genesco entity would be insolvent and that, as a consequence, any obligation by UBS to fund the merger is null and void.

2.     Finish Line and Genesco agreed to combine in a $1.5 billion merger transaction. Finish Line's acquisition of Genesco was to be funded by only $11 million in cash from Finish Line, with the remainder of the purchase price being debt provided by UBS.

3.     On June 17, 2007, Finish Line and UBS executed a commitment letter by which UBS agreed to provide its financing (the "Commitment Letter"). One of the conditions to the Commitment Letter is that UBS receive a valid solvency certificate attesting to the solvency of the combined Finish Line-Genesco entity resulting from the merger.

4.     Both the Merger Agreement and Commitment Letter require solvency because the Finish Line-Genesco transaction is highly-leveraged and highly dependent on the combined entity's ability to generate sufficient cash flow to pay its debt. Indeed, from the very announcement of the merger, analysts and investors have commented that the combined entity would need to manage its debt burden very carefully.

5.     Genesco responded to such concerns by explaining that the combined entity was expected to produce revenues more than sufficient to service its expected debt. Those expectations in turn were based on earnings projections that Genesco had provided to Finish Line and UBS on May 24, 2007.

6.     Genesco has since experienced a crash in earnings, dramatically undermining its financial health. Finish Line also has experienced substantial earnings difficulties since the transaction was signed.

7.     As a result of Finish Line's earnings difficulties and Genesco's dramatically weakened financial condition, the combined Finish Line-Genesco entity will be insolvent.

8.     UBS, therefore, seeks a declaration that its Commitment Letter is void and/or may properly be terminated by UBS because Finish Line cannot provide a valid solvency certificate, a condition precedent to the closing of the financing.

**Parties**

9.     Plaintiff UBS Securities LLC is a limited liability company organized under the laws of the state of Delaware, with its principal place of business in New York, New York.

10.     Plaintiff UBS Loan Financing LLC is a limited liability company organized under the laws of the state of Delaware, with its principal place of business in Connecticut.

11.     Defendant The Finish Line, Inc. is a corporation organized under the laws of the state of Indiana, with its principal place of business in Indianapolis, Indiana.

12. Defendant Genesco, Inc. is a corporation organized under the laws of the state of Tennessee, with its principal place of business in Nashville, Tennessee.

13. Defendant Genesco is added to this action as an interested party pursuant to Fed. R. Civ. P. 19 and 20.

### Jurisdiction and Venue

14. This is a civil action for declaratory relief under 28 U.S.C. § 2201 and other appropriate relief under 28 U.S.C. § 2202.

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiffs and Defendant are citizens of different States and the matter in controversy exceeds $75,000, exclusive of interest and costs.

16. Venue is proper pursuant to 28 U.S.C. § 1391(a), as a substantial part of the events giving rise to this claim occurred in this district.

17. Venue also is appropriate in this Court by written consent of Finish Line providing that any dispute related to the Commitment Letter is to be brought in the federal or state courts located in the City of New York and that the parties to the Commitment Letter consent to, and will not object to, the laying of venue in the City of New York.

### The Finish Line/Genesco Merger

18. On June 17, 2007, Finish Line and Genesco entered into a Merger Agreement providing that Finish Line would acquire all of the outstanding shares of Genesco for $54.50 per share in cash, for a total transaction value of $1.5 billion. Finish Line proposed to fund the acquisition almost exclusively with debt financing.

19. Pursuant to that agreement, Finish Line engaged UBS to provide $1.6 billion in financing, consisting of a revolving credit facility, a senior secured term loan, and a senior bridge facility. The terms under which UBS would provide this debt are set forth in the Commitment

Letter executed by the Finish Line and UBS on June 17, 2007. A true and correct copy of the Commitment Letter is attached as Exhibit A to this Complaint.

20.    Among the conditions precedent to UBS providing financing under the Commitment Letter, Annex IV requires that Finish Line provide UBS a valid solvency certificate attesting to the solvency of the post-merger combined entity.

21.    Prior to execution of the Merger Agreement and the Commitment Letter, Genesco provided Finish Line and UBS with projections for Genesco's 2008 fiscal year. Finish Line relied on those projections when it entered into the Merger Agreement and arranged to finance the acquisition. UBS also relied on those projections when it entered into the Commitment Letter.

### Genesco's Financial Performance Collapses

22.    On August 30, 2007, Genesco announced its 2nd Quarter Results. Genesco reported a net loss of $0.13 per share, compared to net earnings of $0.26 for the same quarter in 2006. Genesco's earnings (EBIT) crashed 77% compared to the same quarter in the prior fiscal year.

23.    This unexpected crash contradicted Genesco's own May 24 projections – projections made almost 1/3 of the way through the 2nd Quarter. Genesco's actual loss of more than $2.5 million compared to a $15 million projected gain was over 100% below the information Genesco had provided to Finish Line, UBS, and to the public markets.

### The Genesco-Finish Line Entity Will be Insolvent

24.    The Genesco-Finish Line entity will be insolvent both as a matter of law and under the terms of the Merger Agreement. Section 4.9 of the Merger Agreement defines "solvent" to mean that, as of the date of determination:

   a.  The amount of the fair saleable value of the assets of the combined entity would not exceed (i) the value of all liabilities of the combined entity including

4

contingent and other liabilities, and (ii) the amount that would be required to pay

the probable liabilities of the combined entity on their existing debts (including

contingent liabilities) as such debts become absolute and mature;

b.  The combined entity would have an unreasonably small amount of capital for the

operation of the businesses in which they are engaged or proposed to be engaged;

c.  The combined entity would not be able to pay their respective liabilities,

including contingent liabilities, as they mature in the ordinary course of business;

and

d.  Satisfaction of any other solvency requirement set forth under Tennessee, Indiana,

federal or any other law applicable to the combined entity.

25.     Because Genesco-Finish Line will be insolvent, Finish Line will be unable to

deliver a valid solvency opinion and certificate as required by Section 4.9 of the Merger

Agreement and the Conditions to Closing set forth in Annex IV to the Commitment Letter.

<u>Claim for Relief</u>

<u>Count 1</u>

**(Declaratory Judgment That UBS Is Relieved Of Its Obligations
Under the Commitment Letter)**

26.     All facts alleged in Paragraphs 1-25 are incorporated here as if repeated.

27.     Due to Finish Line's earnings difficulties and Genesco's disastrous financial

condition, the combined Finish Line-Genesco entity will be insolvent under applicable law and

under the Merger Agreement.

28.     Due to this insolvency, Finish Line cannot deliver a valid solvency certificate or

opinion, as required by the Commitment Letter between Finish Line and UBS as a condition to

UBS's obligation to close under the Commitment Letter.

29.    The parties to this action dispute whether the Finish Line-Genesco entity will be insolvent.

30.    UBS therefore is entitled to a declaratory judgment that any obligation of UBS to provide financing pursuant to the Commitment Letter is void.

**WHEREFORE,** UBS prays for judgment against Finish Line and Genesco as follows:

1.    For a declaration that UBS is relieved of its obligations under the Commitment Letter and that the Commitment Letter is null and void as a result of the insolvency of the combined entity to be formed by the merger and failure to fulfill the Condition to Closing under the Commitment Letter that a solvency certificate be obtained;

2.    For UBS's costs, including reasonable attorneys' fees; and

3.    For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
Tel.:    (212) 906-1200
Fax:    (212) 751-4864

6

# EXHIBIT A

UBS LOAN FINANCE LLC
677 Washington Boulevard
Stamford, Connecticut 06901

UBS SECURITIES LLC
299 Park Avenue
New York, New York 10171

June 17, 2007

The Finish Line, Inc.
3308 N. Mitthoeffer Road
Indianapolis, Indiana 46235

Attention: Chief Financial Officer

<u>Bank and Bridge Facilities Commitment Letter</u>

Ladies and Gentlemen:

   You have advised UBS Loan Finance LLC ("<u>UBS</u>") and UBS Securities LLC
("<u>UBSS</u>" and, together with UBS, "<u>we</u>" or "<u>us</u>") that The Finish Line, Inc. ("<u>you</u>" or the "<u>Borrower</u>")
proposes to acquire (the "<u>Acquisition</u>") Genesco Inc. (the "<u>Acquired Business</u>"). The Acquisition will
be effected pursuant to a merger agreement (the "<u>Acquisition Agreement</u>") among you, a wholly-
owned merger subsidiary created by you and the Acquired Business. All references to "<u>dollars</u>" or "<u>$</u>"
in this agreement and the attachments hereto (collectively, this "<u>Commitment Letter</u>") are references
to United States dollars. All references to "Borrower" or "Borrower and its subsidiaries" for any pe-
riod from and after consummation of the Acquisition shall include the Acquired Business.

   We understand that the sources of funds required to fund the Acquisition considera-
tion, to repay certain existing indebtedness of Borrower, the Acquired Business and their respective
subsidiaries of approximately $84.3 million (the "<u>Refinancing</u>"), to pay fees, commissions and ex-
penses of approximately $70.5 million in connection with the Transactions (as defined below) and to
provide ongoing working capital requirements of Borrower and its subsidiaries following the Transac-
tions will include:

-  a senior secured revolving credit facility to Borrower of up to $450.0 million (the
  "<u>Revolving Credit Facility</u>") as described in the Summary of Principal Terms and
  Conditions attached hereto as <u>Annex I</u> (the "<u>Revolver Term Sheet</u>"), of which no
  more than the Closing Date Permitted Revolver Draw shall be drawn immediately
  after giving effect to the Transactions;

-  a senior secured term loan facility to Borrower of up to $690.0 million (the "<u>Term
  Loan Facility</u>" and, together with the Revolving Credit Facility, the "<u>Bank Facili-
  ties</u>"), as described in the Summary of Principal Terms and Conditions attached
  hereto as <u>Annex II</u> (the "<u>Term Loan Term Sheet</u>");

LA\1729820.12

- the issuance by Borrower of up to $700.0 million aggregate gross proceeds of unsecured senior notes (the "Notes") pursuant to a public offering or Rule 144A or other private placement (the "Notes Offering") or, in the event the Notes are not issued at the time the Transactions are consummated, borrowings by Borrower of up to $700.0 million under a senior unsecured credit facility (the "Bridge Facility" and, together with the Bank Facilities, the "Facilities"), as described in the Bridge Facility Summary of Principal Terms and Conditions attached hereto as Annex III (the "Bridge Term Sheet" and, together with the Revolver Term Sheet and the Term Loan Term Sheet, the "Term Sheets"); and

- excess cash of the Borrower of approximately $11.0 million.

No other financing will be required for the uses described above. Immediately following the Transactions, neither you nor any of your subsidiaries will have any indebtedness or preferred equity other than the Bank Facilities, the Notes or the Bridge Facility and other existing indebtedness to be mutually agreed (including the Convertible Bonds, the Employee Preferred Stock and the Genesco Preferred Stock (in each case, as defined below). As used herein, the term "Transactions" means the Acquisition, the Refinancing, the initial borrowings under the Bank Facilities, the issuance of the Notes or the borrowings under the Bridge Facility and the payments of fees, commissions and expenses in connection with each of the foregoing.

As used herein, the term "Closing Date Permitted Revolver Draw" means the positive difference, if any, between (i) $250.0 million and (ii) (a) the amount of 4.125% Convertible Subordinated Debentures due 2023 (the "Convertible Bonds") outstanding on the Closing Date after giving effect to any tender offer for or conversion of the Convertible Bonds on or prior to the Closing Date, (b) the amount of the Acquired Business's Employees' Subordinated Convertible Preferred Stock (the "Employee Preferred Stock") outstanding on the Closing Date after giving effect to any tender offer for or conversion of the Employee Preferred Stock on or prior to the Closing Date and (c) the amount of the Acquired Business's preferred stock other than Employee Preferred Stock (the "Genesco Preferred Stock") outstanding as of the Closing Date after giving effect to any redemption of, tender offer for or conversion of the Genesco Preferred Stock on or prior to the Closing Date; provided however that in no event shall the Closing Date Permitted Revolver Draw exceed the Borrowing Base Amount (as defined in the Revolver Term Sheet).

Notwithstanding anything to the contrary herein, to the extent that the Borrowing Base Amount (as defined in the Revolver Term Sheet) as of the Closing Date is not sufficient to fund, together with the amount of the Term Loan Facility set forth above, the Acquisition consideration, the Refinancing and the payments of fees, commissions and expenses in connection with the Acquisition, the Refinancing, the Notes Offering and the Facilities (the "Funding Shortfall"), the amount of the Term Loan Facility set forth above shall be increased on a dollar-for-dollar basis by the amount of the Funding Shortfall and the Revolving Credit Facility shall be reduced on a dollar-for-dollar basis by the amount of the Funding Shortfall.

LA\1729820.12

<u>Commitments.</u>

You have requested that UBS commit to provide the Facilities and that UBSS agree to structure, arrange and syndicate the Facilities.

UBS is pleased to advise you of its commitment to provide the entire amount of the Bank Facilities to Borrower upon the terms and subject to the conditions set forth or referred to in this Commitment Letter. The commitment of UBS hereunder is subject to the negotiation, execution and delivery of definitive documentation (the "<u>Bank Documentation</u>") with respect to the Bank Facilities reasonably satisfactory to UBS reflecting the terms and conditions set forth in the Bank Term Sheet, in <u>Annex IV</u> hereto (the "<u>Conditions Annex</u>") and in the letter of even date herewith addressed to you providing, among other things, for certain fees relating to the Facilities (the "<u>Fee Letter</u>"), and such other terms (but not conditions) as you and we may mutually agree. In addition, UBS is pleased to advise you of its commitment to provide the entire amount of the Bridge Facility to Borrower upon the terms and subject to the conditions set forth or referred to in this Commitment Letter. The commitment of UBS hereunder is subject to the negotiation, execution and delivery of definitive documentation (the "<u>Bridge Documentation</u>" and, together with the Bank Documentation, the "<u>Financing Documentation</u>") with respect to the Bridge Facility reasonably satisfactory to UBS reflecting the terms and conditions set forth in the Bridge Term Sheet, the Conditions Annex and the Fee Letter, and such other terms (but not conditions) as you and we may mutually agree. You agree that the closing of the Facilities, and if applicable, the Notes Offering (the "<u>Closing Date</u>") shall be a date mutually agreed upon between you and us, but which shall be concurrent with the closing of the Acquisition in accordance with the Acquisition Agreement so long as all conditions precedent to the initial funding of the Facilities set forth herein, in the Term Sheets and in the Conditions Annex have been satisfied, or as soon as practicable thereafter after all such conditions are satisfied.

<u>Syndication.</u>

It is agreed that UBSS will act as the sole and exclusive advisor, arranger and book-manager for the Facilities, and, in consultation with you, will exclusively manage the syndication of the Facilities, and will, in such capacities, exclusively perform the duties and exercise the authority customarily associated with such roles. It is further agreed that no additional advisors, agents, co-agents, arrangers or bookmanagers will be appointed and no Lender (as defined below) will receive compensation with respect to any of the Facilities other than as provided herein and in the Fee Letter in order to obtain its commitment to participate in such Facilities, in each case unless you and we so agree.

UBS reserves the right, prior to or after execution of the Bank Documentation, in consultation with you, to syndicate all or a portion of its commitment to one or more institutions (other than those certain institutions previously identified by you in your reasonable discretion to us, if any, prior to the date of this Commitment Letter to be excluded from syndication, the "<u>Blacklist</u>") that will become parties to the Bank Documentation (UBS and the institutions becoming parties to the Bank Documentation with respect to all or a portion of the Bank Facilities, the "<u>Bank Lenders</u>"). UBS also reserves the right, prior to or after the execution of the Bridge Documentation, to syndicate all or a portion of its commitment to one or more institutions other than those on the Blacklist that will be-

LA\1729820.12

come parties to the Bridge Documentation (UBS and the institutions becoming parties to the Bridge Documentation, the "Bridge Lenders" and, together with the Bank Lenders, the "Lenders"). Notwithstanding UBS's right to syndicate the Facilities and receive commitments with respect thereto, UBS will not be relieved of all or any portion of its commitments hereunder prior to the initial funding under the Facilities. Without limiting your obligations to assist with syndication efforts as set forth herein, UBS agrees that completion of such syndications is not a condition to its commitments hereunder.

UBSS will exclusively manage all aspects of the syndication of the Facilities, including selection of additional Lenders (other than the Blacklist), determination of when UBSS will approach potential additional Lenders, awarding of any naming rights and the final allocations of the commitments in respect of the Facilities among the additional Lenders. You agree to, and to use commercially reasonable efforts to cause the Acquired Business to (including with a covenant to such effect in the Acquisition Agreement), actively assist UBSS in achieving a timely syndication of the Facilities. To assist UBSS in its syndication efforts, you agree that you will, and will cause your representatives and advisors to, and will use commercially reasonable efforts to cause the Acquired Business and its representatives and advisors to, (a) prepare and provide all financial and other information as we may reasonably request and as is customary for similar financings with respect to you, the Acquired Business, your and their respective subsidiaries and the transactions contemplated hereby, including but not limited to financial projections (the "Projections") relating to the foregoing, (b) provide copies of any due diligence reports or memoranda prepared at your direction or any of your affiliates by legal, accounting, tax or other advisors in connection with the Acquisition (subject to (x) the delivery of customary non-disclosure agreements reasonably acceptable to UBSS and (y) your right to maintain any applicable attorney-client or other applicable privilege as you may reasonably determine in good faith), (c) use commercially reasonable efforts to ensure that such syndication efforts benefit materially from your existing lending relationships and the existing lending relationships of the Acquired Business and your and its respective subsidiaries, (d) make available to prospective Lenders your senior management and advisors, and the senior management of the Acquired Business and its subsidiaries at mutually agreeable times, (e) host, with UBSS, one or more meetings with prospective Lenders under each of the Facilities at mutually agreeable times, (f) assist UBSS in the preparation of one or more customary confidential information memoranda and other customary marketing materials to be used in connection with the syndication of each of the Facilities, and (g) use commercially reasonable efforts to obtain, at your expense, monitored public ratings of the Facilities and the Notes from Moody's Investors Service ("Moody's") and Standard & Poor's Ratings Group ("S&P") at least 30 days prior to the Closing Date and to participate reasonably in the process of securing such ratings, including having your senior management and the senior management of the Acquired Business meet with such rating agencies at mutually agreeable times.

At our request, you agree to prepare a version of the information package and presentation and other marketing materials to be used in connection with the syndication that do not contain material non-public information concerning you or the Acquired Business, your or their respective affiliates or your or their securities. In addition, you agree that unless specifically labeled "PUBLIC — Contains No Material Non-Public Information," all information, documentation or other data disseminated to prospective Lenders in connection with the syndication of the Facilities, whether through an Internet website (including, without limitation, an IntraLinks workspace), electronically, in presen-

tations at meetings or otherwise, will be assumed by us to contain material non-public information concerning you or the Acquired Business, your or their respective affiliates or your or their securities. You acknowledge and agree that the following documents are public and may be distributed to public Lenders (unless you promptly notify us otherwise): (a) drafts and final definitive documentation with respect to the Facilities; (b) administrative materials prepared by us for prospective Lenders (such as a lender meeting invitation, allocations and funding and closing memoranda); and (c) notification of changes in the terms of the Facilities.

Information.

You hereby represent and covenant that (a) to the best of your knowledge, all informa-tion (other than the Projections) that has been or will be made available to us or any of the Lenders by you, the Acquired Business or any of your or its respective representatives in connection with the transactions contemplated hereby (the "Information"), when taken as a whole, is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein, in the light of the circumstances under which such statements are made, not misleading and (b) the Projections that have been or will be made available to us or any of the Lenders by you, the Acquired Business or any of your or its respective representatives in connection with the transactions contemplated hereby have been and will be prepared in good faith based upon assumptions believed by you to be reasonable (it being understood that projections by their nature are inherently uncertain and no assurances are being given that the results reflected in the Projections will be achieved). You agree to supplement the In-formation and the Projections from time to time and agree to promptly advise us and the Lenders of all developments materially affecting you, the Acquired Business, any of your or its respective subsidiar-ies or affiliates or the transactions contemplated hereby or the accuracy of Information and Projections previously furnished to us or any of the Lenders.

Compensation.

As consideration for the commitments of UBS hereunder with respect to the Facilities and the agreement of UBSS to structure, arrange and syndicate the Facilities and to provide advisory services in connection therewith, you agree to pay, or cause to be paid, the fees set forth in the Term Sheets and the Fee Letter. Once paid, such fees shall not be refundable under any circumstances.

Conditions.

The commitment of UBS hereunder with respect to each of the Facilities and UBSS's agreement to perform the services described herein may be terminated by UBS if (i) since the date hereof, a Material Adverse Effect (as defined below) has occurred with respect to the Acquired Busi-ness and its subsidiaries, considered as a whole, that has not been cured prior to December 31, 2007; or (ii) any condition set forth in either Term Sheet or the Conditions Annex is not satisfied or any covenant or agreement in this Commitment Letter or the Fee Letter is not complied with in any mate-rial respect. As used herein, "Material Adverse Effect" means any event, circumstance, change or ef-fect that, individually or in the aggregate, is materially adverse to the business, condition (financial or otherwise), assets, liabilities or results of operations of the Acquired Business and its subsidiaries,

LA\1729820.12

taken as a whole; provided, however, that none of the following shall constitute, or shall be considered in determining whether there has occurred, and no event, circumstance, change or effect resulting from or arising out of any of the following shall constitute, a Material Adverse Effect:  (A) the announcement of the execution of the Acquisition Agreement or the pendency of consummation of the Acquisition (including the threatened or actual impact on relationships of the Acquired Business and its subsidiaries with customers, vendors, suppliers, distributors, landlords or employees (including the threatened or actual termination, suspension, modification or reduction of such relationships)); (B) changes in the national or world economy or financial markets as a whole or changes in general economic conditions that affect the industries in which the Acquired Business and its subsidiaries conduct their business, so long as such changes or conditions do not adversely affect the Acquired Business and its subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (C) any change in applicable law, rule or regulation or in accounting principles generally accepted in the United States or interpretation thereof after the date hereof, so long as such changes do not adversely affect the Acquired Business or its subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (D) the failure, in and of itself, of the Acquired Business to meet any published or internally prepared estimates of revenues, earnings or other financial projections, performance measures or operating statistics; provided, however, that the facts and circumstances underlying any such failure may, except as may be provided in subsection (A), (B), (C), (E), (F) and (G) of this definition, be considered in determining whether a Material Adverse Effect has occurred; (E) a decline in the price, or a change in the trading volume, of the common stock of the Acquired Business on the New York Stock Exchange or the Chicago Stock Exchange; (F) compliance with the terms of, and taking any action required by, the Acquisition Agreement, or taking or not taking any actions at the request of, or with the consent of, you; and (G) acts or omissions of you or your wholly-owned merger subsidiary after the date of the Acquisition Agreement (other than actions or omissions specifically contemplated by the Acquisition Agreement).

Notwithstanding anything in this Commitment Letter, the Term Sheets, the Fee Letter, the Financing Documentation or any other letter agreement or other undertaking concerning the financing of the Transactions to the contrary, (i) the only representations relating to the Borrower, the Acquired Business, their respective subsidiaries and their respective businesses the making of which shall be a condition to availability of the Facilities on the Closing Date shall be (A) such of the representations made by the Acquired Business in the Acquisition Agreement as are material to the interests of the Lenders, but only to the extent that you have the right to terminate your obligations under the Acquisition Agreement as a result of a breach of such representations in the Acquisition Agreement (including but not limited to the Acquired Business' representation regarding the nonoccurrence of a Material Adverse Effect since February 3, 2007) (collectively, the "Acquisition Agreement Representations") and (B) the Specified Representations (as defined below) and (ii) the terms of the Financing Documentation shall be in a form such that they do not impair availability of the Facilities on the Closing Date if the conditions set forth herein and in the Term Sheets and the Conditions Annex are satisfied.  For purposes hereof, "Specified Representations" means the representations and warranties relating to the Borrower and the Acquired Business set forth in the Term Sheets relating to corporate power and authority, the due authorization, execution, delivery and enforceability of the Financing Documentation, the Financing Documentation not conflicting with charter documents or law, Federal Reserve margin regulations, validity, priority and perfection of security interests (subject to paragraph

6 of the Conditions Annex), status of debt under the applicable Facility as senior debt, the Patriot Act and the Investment Company Act.

Clear Market.

From the date of this Commitment Letter until the earlier of (x) our completion of syndication (as determined by us and notified in writing to you) of each of the Facilities and, if later, of the distribution of the Notes or (y) 90 days after the Closing Date, you will (and with respect to the Acquired Business, until the Closing Date, you will use commercially reasonably efforts to) ensure that no financing for you, the Acquired Business or any of your or its respective subsidiaries or affiliates is announced, syndicated or placed without the prior written consent of UBS if such financing, syndication or placement would have, in the reasonable judgment of UBS, a detrimental effect upon the transactions contemplated hereby.

Indemnity and Expenses.

By your acceptance below, you hereby agree to indemnify and hold harmless us and our affiliates (including, without limitation, controlling persons) and the directors, officers, employees, advisors and agents of the foregoing (each, an "Indemnified Person") from and against any and all losses, claims, costs, expenses, damages or liabilities (or actions or other proceedings commenced or threatened in respect thereof) that arise out of or in connection with this Commitment Letter, the Term Sheets, the Conditions Annex, the Fee Letter, the Facilities or any of the transactions contemplated hereby or thereby or the providing or syndication of the Facilities (or the actual or proposed use of the proceeds thereof), and to reimburse each Indemnified Person promptly upon its written demand for any legal or other expenses incurred in connection with investigating, preparing to defend or defending against, or participating in, any such loss, claim, cost, expense, damage, liability or action or other proceeding (whether or not such Indemnified Person is a party to any action or proceeding); *provided* that any such obligation to indemnify, hold harmless and reimburse an Indemnified Person shall not be applicable to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from the bad faith, gross negligence or willful misconduct of such Indemnified Person. You shall not be liable for any settlement of any such proceeding effected without your written consent, but if settled with such consent or if there shall be a final judgment against an Indemnified Person, you shall, subject to the proviso in the preceding sentence, indemnify such Indemnified Person from and against any loss or liability by reason of such settlement or judgment. You shall not, without the prior written consent of any Indemnified Person, effect any settlement of any pending or threatened proceeding in respect of which such Indemnified Person is or could have been a party and indemnity could have been sought hereunder by such Indemnified Person, unless such settlement (i) includes an unconditional release of such Indemnified Person from all liability or claims that are the subject matter of such proceeding and (ii) does not include a statement as to or an admission of fault, culpability, or a failure to act by or on behalf of such Indemnified Person. None of us (or any of our respective affiliates) shall be responsible or liable to you, the Acquired Business or any of your or its respective subsidiaries, affiliates or stockholders or any other person or entity for any indirect, punitive or consequential damages which may be alleged as a result of this Commitment Letter, the Term Sheets, the Conditions Annex, the Fee Letter, the Facilities or the transactions contemplated hereby or thereby. In addition, you hereby agree to reimburse us from time to time upon

LA\1729820.12

demand for all reasonable out-of-pocket costs and expenses (including, without limitation, reasonable legal fees and expenses of UBS and UBSS, appraisal, consulting and audit fees, and printing, reproduction, document delivery, travel, communication and publicity costs) incurred in connection with the syndication and execution of the Facilities, and the preparation, review, negotiation, execution and delivery of this Commitment Letter, the Term Sheets, the Conditions Annex, the Fee Letter, the Financing Documentation and the administration, amendment, modification or waiver thereof (or any proposed amendment, modification or waiver), whether or not the Closing Date occurs or any Financing Documentation is executed and delivered or any extensions of credit are made under either of the Facilities.

Confidentiality.

This Commitment Letter is delivered to you upon the condition that neither the existence of this Commitment Letter, the Term Sheets, the Conditions Annex or the Fee Letter nor any of their contents shall be disclosed by you or any of your affiliates, directly or indirectly, to any other person, except that such existence and contents may be disclosed (i) as may be compelled in a judicial or administrative proceeding or as otherwise required by law and (ii) to your directors, officers, employees, legal counsel and accountants, in each case on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby. In addition, this Commitment Letter, the Term Sheets and the Conditions Annex (but not the Fee Letter) may be disclosed to the Acquired Business and its directors, officers, employees, advisors and agents, in each case on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby.

Until the earlier of the execution of the Financing Documentation and 90 days following the termination of this Commitment Letter, UBS and its affiliates will use all confidential information provided to it or such affiliates by or on behalf of you hereunder solely for the purpose of providing the services which are the subject of this Commitment Letter and shall treat confidentially all such information; *provided* that nothing herein shall prevent UBS or its affiliates from disclosing any such information (a) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case UBS, to the extent permitted by law, agrees to inform you promptly thereof), (b) upon the request or demand of any regulatory authority having jurisdiction over UBS or any of its affiliates (in which case UBS, to the extent permitted by law, agrees to inform you promptly thereof), (c) to the extent that such information becomes publicly available other than by reason of disclosure by UBS or any of its related parties, (d) to the extent that such information is received by UBS from a third party that is not to UBS' knowledge subject to confidentiality obligations to you, (e) to the extent that such information is independently developed by UBS or its affiliates, (f) to UBS' affiliates and the employees, legal counsel, independent auditors and other experts or agents of UBS or UBS' affiliates who need to know such information in connection with the Transactions and are informed of the confidential nature of such information (with UBS responsible for such persons' compliance with this paragraph), (g) to potential Lenders, participants or assignees or swap counterparties who agree to be bound by the terms of this paragraph (or language substantially similar to this paragraph), (h) for purposes of establishing a "due diligence" defense or enforcing its rights hereunder, (i) to any other party hereto or its affiliates, (j) to Moody's and/or S&P or (k) with your consent (including in a confidential information memorandum or other marketing document).

LA\1729820.12

### Other Services.

You acknowledge and agree that we and/or our affiliates may be requested to provide additional services with respect to you, the Acquired Business and/or your or their respective affiliates or other matters contemplated hereby. Any such services will be set out in and governed by a separate agreement(s) (containing terms relating, without limitation, to services, fees and indemnification) in form and substance satisfactory to the parties thereto. Nothing in this Commitment Letter is intended to obligate or commit us or any of our affiliates to provide any services other than as set out herein.

### Governing Law, Etc.

This Commitment Letter and the commitment of UBS shall not be assignable by you without the prior written consent of UBS, and any purported assignment without such consent shall be void. We reserve the right to employ the services of our affiliates in providing services contemplated by this Commitment Letter and to allocate, in whole or in part, to our affiliates certain fees payable to us in such manner as we and our affiliates may agree in our sole discretion. You also agree that, subject to the penultimate sentence in the second paragraph under the caption "Syndication" herein, UBS may at any time and from time to time assign all or any portion of its commitments hereunder to one or more of its affiliates. You further acknowledge that we may share with any of our affiliates, and such affiliates may share with us, any information related to you, the Acquired Business, or any of your or its respective subsidiaries or affiliates (including, without limitation, information relating to creditworthiness) and the transactions contemplated hereby. We agree to treat, and cause any such affiliate to treat, all non-public information provided to us by you as confidential information in accordance with customary banking industry practices.

This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by us and you. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart of this Commitment Letter. Headings are for convenience of reference only and shall not affect the construction of, or be taken into consideration when interpreting, this Commitment Letter. This Commitment Letter is intended to be for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, and may not be relied on by, any persons other than the parties hereto and, with respect to the indemnification provided under the heading "Indemnity and Expenses," each Indemnified Person.

This Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of law to the extent that the application of the laws of another jurisdiction will be required thereby. Any right to trial by jury with respect to any claim or action arising out of this Commitment Letter is hereby waived. You hereby submit to the exclusive jurisdiction of the federal and New York State courts located in The City of New York (and appellate courts thereof) in connection with any dispute related to this Commitment Letter or any of the matters contemplated hereby, and agree that service of any process, summons, notice or document by registered mail addressed to you shall be effective service of

process against you for any suit, action or proceeding relating to any such dispute. You irrevocably and unconditionally waive any objection to the laying of such venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. A final judgment in any such suit, action or proceeding brought in any such court may be enforced in any other courts to whose jurisdiction you are or may be subject by suit upon judgment.

Patriot Act.

We hereby notify you that pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "Patriot Act"), we and the other Lenders may be required to obtain, verify and record information that identifies you, which information includes the name, address and tax identification number and other information regarding you that will allow us or such Lender to identify you in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective as to us and the Lenders.

Please indicate your acceptance of the terms hereof and of the Term Sheets, the Conditions Annex, the Fee Letter by returning to us executed counterparts of this Commitment Letter, the Fee Letter not later than 5:00 p.m., New York City time, on June 22, 2007 (the "Deadline"). This Commitment Letter and the commitments of UBS hereunder and the agreement of UBSS to provide the services described herein are also conditioned upon your acceptance hereof and of the Fee Letter, and our receipt of executed counterparts hereof and thereof on or prior to the Deadline. Upon the earliest to occur of (A) the execution and delivery of the Financing Documentation by all of the parties thereto and the initial funding of the Term Loan Facility on the Closing Date, (B) December 31, 2007, if the Financing Documentation shall not have been executed and delivered by all such parties prior to that date and (C) if earlier than (B), the date of termination of the Acquisition Agreement, this Commitment Letter and the commitments of UBS hereunder and the agreement of UBSS to provide the services described herein shall automatically terminate unless UBS and UBSS shall, in their discretion, agree to an extension. The compensation, expense reimbursement, confidentiality, indemnification and governing law and forum provisions hereof and in the Term Sheets and the Fee Letter shall survive termination of (i) this Commitment Letter (or any portion hereof) and (ii) any or all of the commitments of UBS hereunder. The provisions under the headings "Syndication" and "Clear Market" above shall survive the execution and delivery of the Financing Documentation.

[Signature Page Follows]

LA\1729820.12

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

UBS LOAN FINANCE LLC

By: _____
Name:
Title:
    John C. Crockett
    Executive Director

By: _____
Name:
Title:
    Warren Jervey
    Executive Director and Counsel
    Region Americas Legal

UBS SECURITIES LLC

By: _____
Name:
Title:
    John C. Crockett
    Executive Director

By: _____
Name:
Title:
    Warren Jervey
    Executive Director and Counsel
    Region Americas Legal

Signature page to Commitment Letter

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

UBS LOAN FINANCE LLC

By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

UBS SECURITIES LLC

By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

Accepted and agreed to as of
the date first written above:

THE FINISH LINE, INC.

By: _____
    Name: Kevin S. Wampler
    Title: Executive Vice President,
           Chief Financial Officer and
           Assistant Secretary

Signature page to Commitment Letter

## REVOLVING CREDIT FACILITY

## SUMMARY OF PRINCIPAL TERMS AND CONDITIONS[1]

| | |
|---|---|
| <u>Borrower</u>: | The Finish Line, Inc. ("<u>Borrower</u>"), the outstanding equity interests of which are currently traded in the public securities markets. |
| <u>Sole Lead Arranger and Sole Book Running Manager</u>: | UBS Securities LLC ("<u>UBSS</u>" or the "<u>Arranger</u>"). |
| <u>Lenders</u>: | A syndicate of banks, financial institutions and other entities (other than the Blacklist), including UBS Loan Finance LLC ("<u>UBS</u>"), arranged by UBSS (collectively, the "<u>Lenders</u>"). |
| <u>Revolving Administrative Agent and Issuing Bank</u>: | UBS AG, Stamford Branch. |
| <u>Revolving Co-Collateral Agents</u>: | UBS AG, Stamford Branch and a financial institution to be designated by the Arranger (together, the "<u>Revolving Co-Collateral Agents</u>"). |
| <u>Swingline Lender</u>: | UBS Loan Finance LLC. |
| <u>Type and Amount of Facility</u>: | An asset-based revolving credit facility (the "<u>Revolving Credit Facility</u>") in an aggregate principal amount of $450.0 million (the "<u>Maximum Amount</u>"). |
| <u>Purpose</u>: | Not more than the Closing Date Permitted Revolver Draw will be used on the Closing Date to finance a portion of the Acquisition consideration and the Refinancing and to pay fees, commissions and expenses in connection therewith. Following the Closing Date, the Revolving Credit Facility will also be used by Borrower and its subsidiaries for working capital and general corporate purposes. |
| <u>Maturity Date</u>: | 5 years from the Closing Date. |
| <u>Availability</u>: | Upon satisfaction or waiver of conditions precedent to drawing to be specified herein and subject to the then current Bor- |

---

[1]    All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

-2-

rowing Base, borrowings may be made at any time on or after
the Closing Date to but excluding the business day preceding
the maturity date of the Revolving Credit Facility. Borrow-
ing availability under the Revolving Credit Facility will be
limited to the lesser of (i) the Borrowing Base Amount (as de-
fined below) and (ii) the Maximum Amount, in each case less
any applicable reserves as determined by the Revolving Ad-
ministrative Agent in its reasonable discretion.

Letters of Credit:

Up to $50.0 million of the Revolving Credit Facility will be
available for letters of credit, on terms and conditions to be
set forth in the Bank Documentation. Each letter of credit
shall expire not later than the earlier of (i) 12 months after its
date of issuance and (ii) the fifteenth day prior to the Maturity
Date of the Revolving Credit Facility.

Drawings under any letter of credit shall be reimbursed by
Borrower on the same business day. To the extent that Bor-
rower does not reimburse the Issuing Bank on the same busi-
ness day, the Lenders under the Revolving Credit Facility
shall be irrevocably obligated to reimburse the Issuing Bank
pro rata based upon their respective Revolving Credit Facility
commitments.

The issuance of all letters of credit shall be subject to the cus-
tomary procedures of the Issuing Bank.

Swingline Facility:

Up to $25.0 million of the Revolving Credit Facility will be
available for swingline borrowings, on terms and conditions
to be set forth in the Bank Documentation.

Except for purposes of calculating the commitment fee
described below, any swingline borrowings will reduce
availability under the Revolving Credit Facility on a dollar-
for-dollar basis.

Amortization:

None.

Interest:

At Borrower's option, loans will bear interest based on the
Base Rate or LIBOR, as described below (except that all
swingline borrowings will accrue interest based on the Base
Rate):

A. Base Rate Option

Interest will be at the Base Rate plus the applicable Interest
Margin, calculated on the basis of the actual number of days

LA\1729820.12

-3-

elapsed in a year of 365 days and payable quarterly in arrears. The Base Rate is defined as the higher of the Federal Funds Rate, as published by the Federal Reserve Bank of New York, plus 1/2 of 1% and the prime commercial lending rate of UBS AG, as established from time to time at its Stamford Branch.

Base Rate borrowings will be in minimum amounts to be agreed upon and (other than swingline borrowings) will require same day prior notice.

B. LIBOR Option

Interest will be determined for periods to be selected by Borrower ("Interest Periods") of one, two, three or six months (or nine or twelve months if agreed to by all relevant Lenders) and will be at an annual rate equal to the London Interbank Offered Rate ("LIBOR") for the corresponding deposits of U.S. dollars, plus the applicable Interest Margin. LIBOR will be determined by the Revolving Administrative Agent at the start of each Interest Period and will be fixed through such period. Interest will be paid at the end of each Interest Period or, in the case of Interest Periods longer than three months, quarterly, and will be calculated on the basis of the actual number of days elapsed in a year of 360 days. LIBOR will be adjusted for statutory reserve requirements (if any).

LIBOR borrowings will require three business days' prior notice and will be in minimum amounts to be agreed upon.

Default Interest and Fees:  Upon the occurrence and during the continuance of a payment default, interest will accrue (i) in the case of principal or interest on any loan at a rate of 2.0% per annum plus the rate otherwise applicable to such loan and (ii) in the case of any other amount, at a rate of 2.0% per annum plus the non-default interest rate then applicable to Base Rate loans under the Revolving Credit Facility. Default interest shall be payable on demand.

Interest Margins:  The applicable Interest Margin will be the basis points set forth in the following table:

-4-

|  | Base Rate Loans | LIBOR Loans |
|---|---|---|
| Revolving Credit Facility | 25 bps | 150 bps |

After the date on which Borrower shall have delivered financial statements for the fiscal quarter ending at least six months after the Closing Date, the Interest Margin will be determined pursuant to the following grid based on Excess Availability (as defined below).

| Excess Availability | Base Rate Loans | LIBOR Loans |
|---|---|---|
| < $100.0 million | 50 bps | 175 bps |
| ≥ $100.0 million and ≤ $300.0 million | 25 bps | 150 bps |
| > $300.0 million | 0 bps | 125 bps |

"Excess Availability" shall mean, on the date of determination, (a) the lesser of (i) the commitments of all of the Lenders under the Revolving Credit Facility and (ii) the Borrowing Base on the date of determination *less* (b) all outstanding loans and obligations in respect of letters of credit under the Revolving Credit Facility.

| Commitment Fee: | A Commitment Fee shall accrue on the unused amounts of the commitments under the Revolving Credit Facility. Such Commitment Fee will be 0.25% per annum. Accrued Commitment Fees will be payable quarterly in arrears (calculated on a 360-day basis) for the account of the Lenders from the Closing Date. |
|---|---|
| Letter of Credit Fees: | Borrower will pay (i) the Issuing Bank a fronting fee equal to 12.5 basis points per annum and (ii) the Lenders under the Revolving Credit Facility letter of credit participation fees equal to the Interest Margin for LIBOR Loans under the Revolving Credit Facility, in each case, on the undrawn amount of all outstanding letters of credit. In addition, Borrower will pay the Issuing Bank customary issuance fees. |

-5-

| | |
|---|---|
| <u>Mandatory Prepayments</u>: | From and after the date that is 30 days after the Closing Date, all cash or cash equivalents (other than payroll accounts and certain other accounts to be mutually agreed) and proceeds will be deposited (or swept within 3 business days after receipt of collected funds) into one or more bank accounts with respect to which account control agreements acceptable to the Revolving Co-Collateral Agents and the Revolving Administrative Agent have been executed and delivered or with respect to which the Revolving Co-Collateral Agents have otherwise obtained control in a manner acceptable to the Revolving Co-Collateral Agents and the Revolving Administrative Agent and if either (a) an Event of Default shall have occurred and be continuing or (b) Excess Availability shall be less than $50.0 million at any time (each of clauses (a) and (b), a "<u>Trigger Event</u>"), such proceeds, at the option of the Revolving Co-Collateral Agents, shall be applied to reduce the balance of any swingline loans, and thereafter to any other revolving loans outstanding under the Revolving Credit Facility or to cash collateralize Letters of Credit. |
| | Borrower shall make mandatory prepayments with respect to outstanding borrowings under the Revolving Credit Facility in an amount, if any, required from time to time, to assure that amounts outstanding under the Revolving Credit Facility do not exceed the Borrowing Base. Any such prepayments shall not reduce the commitments. |
| | There will be no prepayment penalties (except LIBOR breakage costs) for mandatory prepayments. |
| <u>Optional Prepayments</u>: | Permitted in whole or in part, with prior notice but without premium or penalty (except LIBOR breakage costs) and including accrued and unpaid interest, subject to limitations as to minimum amounts of prepayments. |
| <u>Application of Prepayments</u>: | Mandatory and optional prepayments shall be applied first to repay any swingline loans, then to prepay principal on a pro rata basis among the Lenders and pay accrued and unpaid interest on the principal amount so prepaid. |
| <u>Guarantees</u>: | The Revolving Credit Facility will be fully and unconditionally guaranteed on a joint and several basis by all of the existing and future direct and indirect domestic subsidiaries of Borrower (collectively, the "<u>Guarantors</u>"). |
| <u>Security</u>: | The Revolving Credit Facility and any hedging or treasury management obligations to which a Lender or an affiliate of a |

LA\1729820.12

-6-

Lender is a counterparty will be secured by (i) perfected first priority security interests on all accounts receivable, inventory and deposit accounts of Borrower and the Guarantors, wherever located, now or hereafter owned, and all proceeds thereof (including cash, cash equivalents, instruments, chattel paper, general intangibles (excluding trademarks, trade names and other intellectual property), letters of credit, insurance proceeds and investment property in each case arising from any such accounts receivable, inventory and deposit accounts) and (ii) perfected second priority pledges of all of the equity interests of each of Borrower's direct and indirect domestic subsidiaries (and of 65% of the equity interests of each of the Borrower's direct and indirect first-tier foreign subsidiaries) and perfected second priority security interests in and mortgages on all tangible and intangible assets of the Borrower and the Guarantors, wherever located, now or hereafter owned (including, without limitation, equipment, general intangibles, intercompany notes, insurance policies, investment property, intellectual property, owned real property and cash and proceeds of the foregoing), other than the assets set forth in subparagraph (i) above, subject to such exceptions as are agreed.

The priority of the security interests and related creditor rights between the Revolving Credit Facility and the Term Loan Facility will be set forth in an intercreditor agreement (the "Intercreditor Agreement") on terms and conditions reasonably satisfactory to the Revolving Administrative Agent, the Revolving Co-Collateral Agents, the Term Loan Administrative Agent and the Term Loan Collateral Agent.

Borrowing Base:

The amount from time to time outstanding (including any obligations with respect to Letters of Credit) under the Revolving Credit Facility shall not exceed the lesser of the Maximum Amount or the total of (the "Borrowing Base Amount"):

1.    90% of the value of Borrower's eligible credit card receivables and, to the extent not constituting eligible credit card receivables, 85% of the value of Borrower's eligible accounts; plus

2.    (i) During the period from the Closing Date through the first anniversary thereof, the lesser of (x) 75% of the lower of cost or market value of Borrower's eligible inventory, or (y) 90% of the net orderly liquidation value of such eligible inventory (based on

LA\1729820.12

-7-

the most recent inventory appraisal), and (ii) thereafter, the lesser of (x) 75% of the lower of cost or market value of Borrower's eligible inventory, or (y) 85% of the net orderly liquidation value of such eligible inventory (based on the most recent inventory appraisal); <u>minus</u>

3.    reserves as the Revolving Co-Collateral Agents may, from time to time, establish in good faith.

Actual advance rates and details of eligibility criteria as well as other levels of and limitations on collateral that may be included in the Borrowing Base, are to be determined after the collateral audit and appraisals are completed and shall be subject to further revision, from time to time, pursuant to procedures to be detailed in the Bank Documentation. In addition, the Revolving Co-Collateral Agents and the Revolving Administrative Agent shall have the right to establish reserves with respect to the borrowing base for such purposes and in such amounts as they shall determine appropriate in their discretion from time to time, pursuant to procedures to be detailed in the Bank Documentation.

<u>Conditions to Initial Borrowings:</u>    Conditions precedent to initial borrowings under the Revolving Credit Facility will be those set forth in the Commitment Letter and in <u>Annex IV</u> to the Commitment Letter and the accuracy of the Acquisition Agreement Representations and the Specified Representations.

<u>Conditions to Each Borrowing:</u>    Conditions precedent to each borrowing or issuance under the Revolving Credit Facility will be (1) the absence of any continuing default or event of default, (2) subject to the limitations set forth in the penultimate sentence under "Conditions" in the Commitment Letter, the accuracy of all representations and warranties, (3) receipt of a customary borrowing notice or letter of credit request, as applicable and (4) continued compliance with the Borrowing Base requirements after giving effect to such borrowing or issuance.

<u>Representations and Warranties:</u>    Representations and warranties will apply to Borrower and its subsidiaries, will be subject to materiality levels and/or exceptions to be negotiated and reflected in the Bank Documentation, and will be:

Accuracy and completeness of financial statements (including that pro forma financial statements and forecasts are prepared in good faith based upon reasonable assumptions); no mate-

-8-

rial adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of the Bank Documentation; no conflict with law or contractual obligations; no labor disputes; no material litigation; no material casualty event; no default; ownership of property; liens; intellectual property; use of proceeds; taxes; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; no restrictions on subsidiaries regarding dividends, loans to Borrower or its subsidiaries or transfer of property to Borrower or its subsidiaries; environmental matters; solvency; accuracy and completeness of disclosure; Patriot Act and anti-terrorism law compliance; location of inventory; accuracy of Borrowing Base; creation and perfection of security interests; and status of debt under the applicable Facility as senior debt or designated senior debt.

<u>Reporting and Related Requirements:</u>    Customary in credit agreements of this nature, including, but not limited to, the following:

1.    Annual audited financial statements within 75 days of each fiscal year end or sooner if required by the US Securities and Exchange Commission ("<u>SEC</u>"), accompanied by a compliance certificate.

2.    Quarterly financial statements within 40 days of each quarter end or sooner if required by the SEC, accompanied by a compliance certificate.

3.    Monthly financial statements within 30 days of each month end.

4.    Annual perfection certificate supplement.

5.    Management letters.

6.    Annually prepared monthly budget for the upcoming year, including line items for budgeted Borrowing Base levels and credit utilization.

7.    Collateral field audits and independent appraisals, at the expense of the Borrower, to be performed no more frequently than once per year or more frequently during the continuation of a Trigger Event.

8.    Borrowing Base certificates on a monthly basis (unless a Trigger Event shall be continuing, in which case as often as may be reasonably requested by the

-9-

Revolving Co-Collateral Agent or the Revolving Administrative Agent) signed by a responsible corporate officer and supplemental or supporting exhibits, and other specific supporting data reasonably requested from time to time by the Revolving Co-Collateral Agents or the Revolving Administrative Agent, all on a basis and form to be determined after the Revolving Co-Collateral Agents have reviewed the results of the collateral audit work.

9.   Notices of default, material litigation, material liens, material adverse change, reports to shareholders, other material events to be mutually agreed and casualy events.

**Affirmative Covenants:**

Affirmative covenants will apply to Borrower and its subsidiaries, will be subject to thresholds and/or exceptions to be negotiated and reflected in the Bank Documentation and will be those set forth above under the heading "Reporting and Related Requirements" and the following:

Payment of taxes; continuation of business and maintenance of existence and material rights and privileges; compliance with all applicable laws and regulations (including, without limitation, environmental matters, taxation and ERISA); maintenance of property and insurance; maintenance of books and records; right of the Lenders to inspect property and books and records; agreement to hold annual meetings of Lenders; further assurances (including, without limitation, with respect to security interests in after-acquired property); commercially reasonable efforts to cause the Bank Facilities and Borrower to continue to be rated by Moody's and S&P (but not to maintain a specific rating); and delivery of an irrevocable notice of redemption for the Genesco Preferred Stock outstanding as of the Closing Date within a reasonable period of time after the Closing Date.

**Negative Covenants:**

Negative covenants will apply to Borrower and its subsidiaries and will be subject to thresholds and/or exceptions to be negotiated and reflected in the Bank Documentation and will be:

1.   Limitation on dispositions of assets and changes of business.

2.   Limitation on mergers and acquisitions.

-10-

3.  Limitations on dividends, stock repurchases and re-
    demptions and other restricted payments.

4.  Limitation on indebtedness (including guarantees and
    other similar contingent obligations) and preferred
    stock and prepayment, amendment and redemption of
    subordinated debt and preferred stock.

5.  Limitation on loans and investments.

6.  Limitation on liens and further negative pledges.

7.  Limitation on transactions with affiliates.

8.  Limitation on restrictions on subsidiaries regarding
    dividends, loans to Borrower or its subsidiaries or
    transfer of property to Borrower or its subsidiaries.

9.  Limitation on sale and leaseback transactions.

10. Limitation on capital expenditures.

11. Maintenance of holding companies and/or any inac-
    tive subsidiaries as passive, non-operating enter-
    prises.

12. No modification or waiver of certain material docu-
    ments to be agreed (including charter documents of
    Borrower and its subsidiaries) in any manner materi-
    ally adverse to the Lenders without the consent of the
    Requisite Lenders.

13. No change to fiscal year.

14. Maintenance of intellectual property at the Borrower
    or any of the Guarantors.

**Financial Covenants:**   At any time that Excess Availability is at or below 10% of the
then aggregate amount of the commitments under the Revolv-
ing Credit Facility, Borrower and its consolidated subsidiaries
will be subject to a minimum fixed charge coverage ratio of
1.00:1.00.

**Events of Default:**   Events of default will be subject to materiality levels, default
triggers, cure periods and/or exceptions to be negotiated and
reflected in the Bank Documentation and will be: nonpay-
ment, breach of representations and covenants, cross-defaults,

-11-

loss of lien on collateral (other than immaterial collateral), invalidity of guarantees or other material provisions of the Bank Documentation, bankruptcy and insolvency events, ERISA events, restraint on doing business resulting in a material adverse effect, unsatisfied judgments and change of ownership or control (to be defined).

**Assignments and Participations:**

Each Lender may assign all or, subject to minimum amounts to be agreed, a portion of its loans and commitments under the Revolving Credit Facility. Assignments will require payment of an administrative fee to the Revolving Administrative Agent and the consents of the Revolving Administrative Agent and Borrower, which consents shall not be unreasonably withheld; *provided* that (i) no consents shall be required for an assignment to an existing Lender or an affiliate of an existing Lender and (ii) no consent of Borrower shall be required during an event of default or prior to the completion of the primary syndication of the Revolving Credit Facility (as determined by UBSS)(it being understood that UBSS shall not as part of the primary syndication syndicate the Revolving Credit Facility to those financial institutions, if any, on the Blacklist). In addition, each Lender may sell participations in all or a portion of its loans and commitments under the Revolving Credit Facility; *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the Revolving Credit Facility (except as to certain basic issues).

**Expenses and Indemnification:**

All reasonable out-of-pocket expenses (including but not limited to reasonable legal fees and expenses and expenses incurred in connection with due diligence and travel, courier, reproduction, printing and delivery expenses) of UBS, UBSS, the Revolving Administrative Agent, the Revolving Co-Collateral Agents and the Issuing Bank associated with the syndication of the Revolving Credit Facility and with the preparation, execution and delivery, administration, amendment, waiver or modification (including proposed amendments, waivers or modifications) of the documentation contemplated hereby are to be paid by Borrower. In addition, all out-of-pocket expenses (including but not limited to reasonable legal fees and expenses) of the Lenders and the Revolving Administrative Agent for workout proceedings, enforcement costs and documentary taxes associated with the Revolving Credit Facility are to be paid by Borrower.

-12-

Borrower will indemnify the Lenders, UBS, UBSS, the Revolving Administrative Agent, the Revolving Co-Collateral Agents and the Issuing Bank and their respective affiliates, and hold them harmless from and against all reasonable out-of-pocket costs, expenses (including but not limited to reasonable legal fees and expenses) and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the Revolving Credit Facility; *provided, however,* that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred primarily by reason of the bad faith, gross negligence or willful misconduct of such person.

Yield Protection, Taxes and
Other Deductions:

The Bank Documentation will contain yield protection provisions, customary for facilities of this nature, protecting the Lenders in the event of unavailability of LIBOR, breakage losses, reserve and capital adequacy requirements.

All payments are to be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than income taxes in the jurisdiction of the Lender's organization or of its applicable lending office). The Lenders will use commercially reasonable efforts to minimize to the extent possible any applicable taxes and Borrower will indemnify the Lenders and the Revolving Administrative Agent for such taxes paid by the Lenders and the Revolving Administrative Agent, as the case may be.

Required Lenders:

Lenders holding at least a majority of total loans and commitments under the Revolving Credit Facility, with certain amendments requiring the consent of Lenders holding a greater percentage (or all) of the total loans and commitments under the Revolving Credit Facility and amendments prior to completion of the primary syndication of the Revolving Credit Facility (as determined by UBSS) also requiring the consent of UBS.

Governing Law and Forum:

The laws of the State of New York. Each party to the Bank Documentation will waive the right to trial by jury and will consent to jurisdiction of the state and federal courts located in The City of New York.

-13-

Counsel to UBS, UBSS,
the Revolving Administrative Agent,
the Issuing Bank and UBS AG, Stamford
Branch in its capacity as one of the
Revolving Co-Collateral Agents:          Latham & Watkins LLP.

LA\1729820.12

## TERM LOAN FACILITY[1]

## SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

| | |
|---|---|
| Borrower: | The Finish Line, Inc. ("Borrower"), the outstanding equity interests of which are currently traded in the public securities markets. |
| Sole Lead Arranger and Sole Book Running Manager: | UBS Securities LLC ("UBSS" or the "Arranger"). |
| Lenders: | A syndicate of banks, financial institutions and other entities (other than the Blacklist), including UBS Loan Finance LLC ("UBS"), arranged by UBSS (collectively, the "Lenders"). |
| Term Loan Administrative Agent and Term Loan Collateral Agent: | UBS AG, Stamford Branch (the "Term Loan Administrative Agent" and the "Term Loan Collateral Agent"). |
| Type and Amount of Facility: | A Term Loan Facility (the "Term Loan Facility") in an aggregate principal amount of up to $690.0 million. |
| Purpose: | To finance a portion of the Acquisition consideration and the Refinancing and to pay fees, commissions and expenses in connection therewith. |
| Maturity Date: | 7 years from the Closing Date. |
| Availability: | Upon satisfaction or waiver of conditions precedent to funding set forth herein, a single drawing may be made on the Closing Date of the full amount of the Term Loan Facility. |
| Amortization: | The Term Loan Facility will amortize in equal quarterly installments in annual amounts equal to 1.0% of the original principal amount of the Term Loan Facility, with the balance payable on the Maturity Date |
| Interest: | Interest options and default interest will be substantially identical to those in the Bank Documentation for the Revolving |

---

[1] All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

LA\1729820.12

-2-

Credit Facility. The applicable Interest Margin will be the basis points set forth in the following table.

|  | Base Rate Loans | LIBOR Loans |
|---|---|---|
| Term Loan Facility | 125 bps | 250 bps |

To the extent the corporate credit is rated less than B2 (with a stable outlook) by Moody's or less than B (with a stable outlook) by S&P as of the Closing Date, each of the Interest Margins in the table above shall be increased by 25 bps.

**Mandatory Prepayments:**   At any time when a Trigger Event is not continuing, loans shall be prepaid in an amount equal to (a) 100% of the net cash proceeds received from the sale or other disposition of all or any part of the assets of Borrower or any of its subsidiaries after the Closing Date other than sales of inventory in the ordinary course of business and other than amounts reinvested in assets to be used in Borrower's business within 12 months of such disposition (or if committed to be reinvested within such 12 months, reinvested within 6 months of such commitment) and subject to other exceptions to be agreed, (b) 100% of the net cash proceeds received by Borrower or any of its subsidiaries from the issuance of debt or preferred stock after the Closing Date, other than debt or preferred stock permitted to be incurred under the Bank Documentation and other exceptions to be agreed, (c) 100% of all casualty and condemnation proceeds received by Borrower or any of its subsidiaries, subject to reinvestment rights to be agreed and (d) 50% of excess cash flow of Borrower and its subsidiaries (to be defined in a manner to be agreed), subject to step-downs to 25% and 0% based upon leverage ratios to be agreed.

**Optional Prepayments:**   Optional prepayments of the Term Loan Facility will be permitted in whole or part, with prior notice but without premium or penalty, except LIBOR breakage costs, and including accrued and unpaid interest, subject to limitations as to minimum amounts of prepayments.

**Prepayment Premium:**   None.

**Guarantees:**   The Term Loan Facility will be fully and unconditionally guaranteed on a joint and several basis by each of the guaran-

-3-

tors of the Revolving Credit Facility (collectively, the "<u>Guar-antors</u>").

Security:

The Term Loan Facility and any hedging or treasury management obligations to which a Lender or an affiliate of a Lender is a counterparty will be secured by (i) perfected first priority pledges of all of the equity interests of each of Borrower's direct and indirect domestic subsidiaries (and of 65% of the equity interests of each of the Borrower's direct and indirect first-tier foreign subsidiaries) and perfected first priority security interests in and mortgages on all tangible and intangible assets of the Borrower and the Guarantors, wherever located, now or hereafter owned (including, without limitation, equipment, general intangibles, intercompany notes, insurance policies, investment property, intellectual property, owned real property and cash and proceeds of the foregoing), other than the assets set forth in subparagraph (ii) below and (ii) perfected second priority security interests on all accounts receivable, inventory and deposit accounts of Borrower and the Guarantors, wherever located, now or hereafter owned, and all proceeds thereof (including cash, cash equivalents, instruments, chattel paper, general intangibles (excluding trademarks, trade names and other intellectual property), letters of credit, insurance proceeds and investment property in each case arising from any such accounts receivable, inventory and deposit accounts).

The priority of the security interests and related creditor rights between the Revolving Credit Facility and the Term Loan Facility will be set forth in an intercreditor agreement (the "<u>Intercreditor Agreement</u>") on terms and conditions reasonably satisfactory to the Revolving Administrative Agent, the Revolving Co-Collateral Agents, the Term Loan Administrative Agent and the Term Loan Collateral Agent.

Conditions to Borrowing:

Substantially identical to those conditions applicable to the initial extension of credit under the Revolving Credit Facility, other than any condition relating to "Borrowing Base".

Representations and Warranties:

Substantially identical to those in the Bank Documentation for the Revolving Credit Facility.

Affirmative Covenants:

Substantially identical to those in the Bank Documentation for the Revolving Credit Facility plus the requirement to establish an interest rate protection program and/or have fixed rate financing on a percentage to be determined of the aggregate funded indebtedness of Borrower and its subsidiaries.

LA\1729820.12

-4-

| | |
|---|---|
| <u>Negative Covenants</u>: | Substantially identical to those in the Bank Documentation for the Revolving Credit Facility. |
| <u>Financial Covenants</u>: | None. |
| <u>Events of Default</u>: | Substantially identical to those in the Bank Documentation for the Revolving Credit Facility. |
| <u>Assignments and Participations</u>: | Each Lender may assign all or, subject to minimum amounts to be agreed, a portion of its loans and commitments under the Term Loan Facility. Assignments will require payment of an administrative fee to the Term Loan Administrative Agent and the consent of the Term Loan Administrative Agent and the Borrower, which consent shall not be unreasonably withheld; *provided* that (i) no consent shall be required for an assignment to an existing Lender or an affiliate of an existing Lender and (ii) no consent of Borrower shall be required during an event of default or prior to the completion of the primary syndication of the Term Loan Facility (as determined by UBSS) (it being understood that UBSS shall not as part of the primary syndication syndicate the Term Loan Facility to those financial institutions, if any, on the Blacklist). In addition, each Lender may sell participations in all or a portion of its loans and commitments under the Term Loan Facility; *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the Term Loan Facility (except as to certain basic issues). |
| <u>Expenses and Indemnification</u>: | Substantially identical to those in the Bank Documentation for the Revolving Credit Facility. |
| <u>Yield Protection, Taxes and Other Deductions</u>: | Substantially identical to those in the Bank Documentation for the Revolving Credit Facility. |
| <u>Required Lenders</u>: | Lenders holding at least a majority of total loans and commitments under the Term Loan Facility, with certain amendments requiring the consent of Lenders holding a greater percentage (or all) of the total loans and commitments under the Term Loan Facility and amendments prior to completion of the primary syndication of the Term Loan Facility (as determined by UBSS) also requiring the consent of UBS. |
| <u>Governing Law and Forum</u>: | The laws of the State of New York. Each party to the Bank Documentation will waive the right to trial by jury and will |

LA\1729820.12

-8-

consent to jurisdiction of the state and federal courts located in The City of New York.

Counsel to UBS, UBSS,
the Term Loan Administrative
Agent and the Term Loan
Collateral Agent:                    Latham & Watkins LLP.

LA\1729820.12

**BRIDGE FACILITY**

**SUMMARY OF PRINCIPAL TERMS AND CONDITIONS**[1]

| | |
|---|---|
| Borrower: | The Finish Line, Inc. ("Borrower"), the outstanding equity interests of which are currently traded in the public securities markets. |
| Sole Lead Arranger and Sole Book Running Manager: | UBS Securities LLC ("UBSS" or the "Arranger"). |
| Lenders: | A syndicate of banks, financial institutions and other entities (other than the Blacklist), including UBS Loan Finance LLC ("UBS"), arranged by UBSS. |
| Bridge Loan Administrative Agent: | UBS AG, Stamford Branch (the "Bridge Loan Administrative Agent"). |
| Type and Amount of Bridge Facility: | $700.0 million senior unsecured bridge loan facility (the "Bridge Facility"). |
| Purpose: | Proceeds of borrowings under the Bridge Facility (the "Initial Loans") will be used to finance a portion of the Acquisition and the Refinancing and to pay fees, commissions and expenses in connection therewith. |
| Maturity/Exchange: | All the Initial Loans will mature on the date that is one year following the Closing Date (the "Maturity Date"). If any Initial Loan has not been previously repaid in full on or prior to the Maturity Date, subject to the conditions outlined below under "Conditions to Conversion of the Initial Loans," such Initial Loan shall be converted into a term loan (each, a "Extended Term Loan" and, together with the Initial Loans, the "Loans") maturing on the 8th anniversary of the Closing Date (the "Final Maturity Date"). The Lenders in respect of the Initial Loans and the Extended Term Loans will have the option (i) in the case of Initial Loans, at the Maturity Date or (ii) in the case of Extended Term Loans, at any time or from time to time, to receive |

---

[1]    All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

-2-

notes (the "Exchange Notes") in exchange for such Initial Loans or Extended Term Loans having the terms set forth in the term sheet attached hereto as Exhibit A.

Availability:

Upon satisfaction of conditions precedent to drawing to be specified herein, a single drawing may be made on the Closing Date of up to the full amount of the Bridge Facility.

Interest:

Prior to the Maturity Date, the Initial Loans will accrue interest at a rate per annum equal to the three-month London Interbank Offered Rate ("LIBOR") as determined by UBS for a corresponding U.S. dollar deposit amount (adjusted quarterly) plus a spread (the "Spread"). The initial Spread will be determined based on the bond rating of the Borrower and the lease-adjusted leverage ratio as of the Closing Date. If (i) such ratings are Caa1 (with a stable outlook) or better by Moody's and CCC+ (with a stable outlook) or better by S&P (such ratings, the "Ratings Threshold") and (ii) the lease-adjusted leverage ratio for the last 12 months ending more than 45 days prior to the Closing Date (after giving effect to the Transactions) is less than 6.5x (the "Leverage Threshold", and together with the Ratings Threshold, the "Thresholds"), then the Spread will initially be 500 basis points, and if the Thresholds are not met, then the Spread will initially be 600 basis points. If the Initial Loans are not repaid in full within six months following the Closing Date, the Spread will increase by 50 basis points at the beginning of the subsequent three-month period and shall increase by an additional 50 basis points at the beginning of each three-month period thereafter (but, in any event, not on the Maturity Date). LIBOR will be adjusted for statutory reserve requirements (if any).

Interest on the Initial Loans will be payable in arrears at the end of each three-month period and at the Maturity Date. Interest on the Initial Loans shall not exceed 12.0% per annum (the "Total Cap"); *provided* that the Total Cap for the Initial Loans and the Exchange Notes shall each be increased by 100 basis points if the Thresholds are not met.

Following the Maturity Date, all outstanding Extended Term Loans will accrue interest at the rate provided for in the Exchange Notes in Exhibit A hereto; provided that a holder of an Extended Term Loan may at any time fix the rate thereon at the effective rate (such loans, "Fixed Rate Term Loans").

-3-

| | |
|---|---|
| | Calculation of interest shall be on the basis of actual days elapsed in a year of 360 days. |
| **Default Interest:** | Upon the occurrence and during the continuance of an event of default, interest will accrue on the amount of any loan or other amount outstanding under the Bridge Facility at a rate of 2.0% per annum plus the rate otherwise applicable to the loans under the Bridge Facility and will be payable on demand. |
| **Mandatory Prepayment:** | Borrower will be required to prepay Initial Loans and Extended Term Loans (other than Fixed Rate Term Loans), and offer to prepay Fixed Rate Term Loans, on a pro rata basis, at par plus accrued and unpaid interest, in an amount equal to (a) 100% of the net proceeds received from the sale or other disposition of assets of Borrower or any of its subsidiaries after the Closing Date, other than sales of inventory in the ordinary course of business and other exceptions to be agreed and subject to reinvestment rights to be agreed and prepayment of the Bank Facilities, (b) 100% of the net proceeds received by Borrower or any of its subsidiaries from the issuance of debt or preferred stock after the Closing Date, other than exceptions to be agreed and (c) 100% of the net proceeds received from the issuance of common equity (including, but not limited to, upon the exercise of warrants and options) by, or equity contributions to, Borrower after the Closing Date and (d) 100% of all casualty and condemnation proceeds received by Borrower or any of its subsidiaries, subject to reinvestment rights to be agreed and prepayment of the Bank Facilities. |
| **Optional Prepayments:** | The Initial Loans and Extended Term Loans (other than Fixed Rate Term Loans) may be prepaid, in whole or in part, at the option of Borrower, at any time with prior notice, at par plus accrued and unpaid interest and breakage costs. The Fixed Rate Term Loans will be subject to prepayment restrictions and premiums consistent with Fixed Rate Exchange Notes. |
| **Guarantees:** | The Bridge Facility will be guaranteed on a senior unsecured basis by each of Borrower's subsidiaries that guarantees the Bank Facilities. |
| **Security:** | None. |
| **Conditions to Borrowing:** | Conditions precedent to borrowing under the Bridge Facility will be those set forth in the Commitment Letter and |

LA\1729820.12

-4-

Annex IV to the Commitment Letter, the absence of any continuing default or event of default, subject to the limitations set forth in the penultimate sentence under "Conditions" in the Commitment Letter, the accuracy of all representations and warranties, receipt of a customary borrowing notice, and there being no legal bar to the lenders making the loans.

**Representations and Warranties:**

Substantially the same as those in the Bank Documentation, with such changes as are necessary or appropriate for the Bridge Facility.

**Affirmative and Negative Covenants:**

Substantially the same as those in the Bank Documentation, with such changes as are necessary or appropriate for the Bridge Facility, as well as compliance with obligations in the Fee Letter.

**Financial Covenants:**

None.

**Events of Default:**

Events of default will be subject to materiality levels, default triggers, cure periods and/or exceptions to be negotiated and reflected in the Bridge Documentation and will include (without limitation) the following: nonpayment, breach of representations and covenants, cross-payment default and cross-acceleration, invalidity of guarantees or other material provisions of the Bridge Documentation, bankruptcy and insolvency events, ERISA events, restraint on doing business resulting in a material adverse effect, unsatisfied judgments and change of ownership or control (to be defined).

**Conditions to Conversion of Initial Loans:**

On the Maturity Date, unless (i) Borrower or any significant subsidiary thereof is subject to a bankruptcy or other insolvency proceeding, (ii) there exists a matured default with respect to the Initial Loans or (iii) there exists a default in the payment when due at final maturity of any indebtedness of Borrower or any of its subsidiaries, or the maturity of such indebtedness shall have been accelerated, the Initial Loans shall automatically be converted into Extended Term Loans (subject to the Lenders' rights to convert Initial Loans into Exchange Notes as set forth in Exhibit A hereto).

**Assignments and Participations:**

Each Lender may assign all or, subject to minimum amounts to be agreed, a portion of its loans and commit-

-5-

ments under the Bridge Facility. Assignments will require payment of an administrative fee to the Bridge Loan Administrative Agent and, except for an assignment to an existing Lender or an affiliate of an existing Lender, the consent of the Bridge Loan Administrative Agent and Borrower, which consents shall not be unreasonably withheld; *provided* that (i) no consent shall be required for an assignment to an existing Lender or an affiliate of an existing Lender and (ii) no consent of Borrower shall be required during an event of default or prior to the completion of the primary syndication of the Bridge Facility (as determined by UBSS) (it being understood that UBSS shall not as part of the primary syndication syndicate the Bridge Facility to those financial institutions, if any, on the Blacklist). In addition, each Lender may sell participations in all or a portion of its loans and commitments under the Bridge Facility; *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the Bridge Facility (except as to certain basic issues).

<u>Expenses and Indemnification:</u>

All reasonable out-of-pocket expenses (including but not limited to reasonable legal fees and expenses and expenses incurred in connection with due diligence and travel, courier, reproduction, printing and delivery expenses) of UBS, UBSS and the Bridge Loan Administrative Agent associated with the syndication of the Bridge Facility and with the preparation, execution and delivery, administration, amendment, waiver or modification (including proposed amendments, waivers or modifications) of the documentation contemplated hereby are to be paid by Borrower. In addition, all out-of-pocket expenses (including but not limited to reasonable legal fees and expenses) of the Lenders and the Bridge Loan Administrative Agent for workout proceedings, enforcement costs and documentary taxes associated with the Bridge Facility are to be paid by Borrower.

Borrower will indemnify the Lenders, UBS, UBSS and the Bridge Loan Administrative Agent and their respective affiliates, and hold them harmless from and against all reasonable out-of-pocket costs, expenses (including but not limited to reasonable legal fees and expenses) and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the Bridge Facility; *provided, how-*

LA\1729820.12

-6-

*ever*, that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred primarily by reason of the bad faith, gross negligence or willful misconduct of such person.

**Yield Protection, Taxes and Other Deductions:**

The Bridge Documentation will contain yield protection provisions, customary for facilities of this nature, protecting the Lenders in the event of unavailability of LIBOR, breakage losses and reserve and capital adequacy requirements.

All payments are to be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than income taxes in the jurisdiction of the Lender's organization or of its applicable lending office). Borrower will indemnify the Lenders and the Bridge Loan Administrative Agent for such taxes paid by the Lenders or the Bridge Loan Administrative Agent. The Lenders will use commercially reasonable efforts to minimize to the extent possible any applicable taxes and Borrower will indemnify the Lenders and the Bridge Loan Administrative Agent for such taxes paid by the Lenders and the Bridge Loan Administrative Agent, as the case may be.

**Requisite Lenders:**

Lenders holding at least a majority of total loans and commitments under the Bridge Facility, with certain modifications or amendments requiring the consent of Lenders holding a greater percentage (or all) of the total Loans and commitments under the Bridge Facility.

**Governing Law and Forum:**

The laws of the State of New York. Each party to the Bridge Documentation will waive the right to trial by jury and will consent to jurisdiction of the state and federal courts located in The City of New York.

**Counsel to UBSS and the Bridge Loan Administrative Agent:**

Latham & Watkins LLP.

<u>Exhibit A to Annex III</u>

<u>Summary of Principal Terms and Conditions
of Exchange Notes</u>

Capitalized terms used but not defined herein have the meanings given (or incorporated by reference) in the Summary of Principal Terms and Conditions of the Bridge Facility to which this Exhibit A is attached.

| | |
|---|---|
| <u>Issuer:</u> | Borrower will issue Exchange Notes under an indenture which complies with the Trust Indenture Act (the "<u>Indenture</u>"). Borrower in its capacity as issuer of the Exchange Notes is referred to as the "<u>Issuer</u>." |
| <u>Guarantors:</u> | Same as Initial Loans. |
| <u>Principal Amount:</u> | The Exchange Notes will be available only in exchange for the Initial Loans (at the Maturity Date) or the Extended Term Loans (at any time). The principal amount of any Exchange Note will equal 100% of the aggregate principal amount of the Initial Loans or the Extended Term Loans for which it is exchanged. |
| <u>Maturity:</u> | The Exchange Notes will mature on the 8th anniversary of the Closing Date. |
| <u>Interest Rate:</u> | The Exchange Notes will bear interest at a rate equal to the Initial Rate (as defined below) plus the Exchange Spread (as defined below). Any holder of an Exchange Note may at any time fix the rate thereon at the effective rate (such Exchange Notes, "<u>Fixed Rate Exchange Notes</u>"). Notwithstanding the foregoing, the interest rate in effect at any time shall not exceed the Total Cap. The "<u>Initial Rate</u>" shall be equal to the interest rate applicable to the Initial Loans and in effect on the Maturity Date. "<u>Exchange Spread</u>" shall mean 50 basis points during the three-month period commencing on the Maturity Date and shall increase by 50 basis points at the beginning of each subsequent three-month period. |
| | Calculation of interest shall be on the basis of the actual number of days elapsed in a year of twelve 30-day months. |
| <u>Default Interest:</u> | In the event of a payment default on the Exchange Notes, interest on the Exchange Notes will accrue at a rate of 2.0% per annum in excess of the rate otherwise applicable to the Exchange Notes, and will be payable in accordance with the provisions described above under the heading "Interest Rate." |

LA\1729820.12

-2-

| | |
|---|---|
| Ranking: | Same as Initial Loans. |

Mandatory Offer to Purchase:    The Issuer will be required to offer to purchase the Exchange Notes upon a Change of Control (to be defined in the Indenture) at 101% of the principal amount thereof plus accrued interest to the date of purchase.

Optional Redemption:    Exchange Notes (other than Fixed Rate Exchange Notes) will be redeemable at the option of the Issuer, in whole or in part, at any time at par plus accrued and unpaid interest to the redemption date.

Except as set forth in the following paragraph, Fixed Rate Exchange Notes will not be redeemable at the option of the Issuer on or prior to the third anniversary of the Maturity Date. Subsequent to the third anniversary of the Maturity Date, each Fixed Rate Exchange Note will be redeemable at the option of the Issuer: (a) at a premium equal to 50% of the coupon of such Fixed Rate Exchange Note after the third anniversary of the Maturity Date but on or prior to the fourth anniversary of the Maturity Date, (b) at a premium equal to 25% of the coupon of such Fixed Rate Exchange Note after the fourth anniversary of the Maturity Date but on or prior to the fifth anniversary of the Maturity Date, and (c) at par thereafter.

Each Fixed Rate Exchange Note will be redeemable at the option of the Issuer prior to the third anniversary of the Maturity Date with the net cash proceeds of qualified equity offerings of Borrower at a premium equal to the coupon on such Fixed Rate Exchange Note; provided that after giving effect to such redemption at least 65% of the aggregate principal amount of Exchange Notes originally issued shall remain outstanding.

Registration Rights:    The Issuer will be required to:

- within 120 days after the Maturity Date, file a registration statement for an offer to exchange the Exchange Notes for publicly registered notes with identical terms;

- use its reasonable best efforts to cause the registration statement to become effective under the Securities Act within 180 days after the Maturity Date;

LA\1729820.12

-3-

- complete the exchange offer within 210 days after the Maturity Date; and

- file a shelf registration statement for the resale of the Exchange Notes if it cannot complete an exchange offer within those time periods listed above and in certain other circumstances.

If the Issuer does not comply with these obligations, it will be required to pay additional interest to the holders of the Exchange Notes at the rate of 25 bps per annum, increasing by 25 bps per annum at the beginning of each three-month period thereafter until such time as such failure is cured up to a maximum amount of 100 bps per annum for so long as such failure has not been cured.

In addition, unless and until the Issuer has consummated the exchange offer and, if required, caused the shelf registration statement to become effective, the holders of the Exchange Notes will have the right to "piggy-back" the Exchange Notes in the registration of any debt securities (subject to customary scale-back provisions) that are registered by the Issuer (other than on a Form S-4) unless all the Exchange Notes and Extended Term Loans will be redeemed or repaid from the proceeds of such securities.

| | |
|---|---|
| Right to Transfer Exchange Notes: | The holders of the Exchange Notes shall have the absolute and unconditional right to transfer the Exchange Notes in compliance with applicable law to any third parties. |
| Covenants: | Those typical for an indenture governing a high yield note issue of a new issuer. |
| Events of Default: | Those typical for an indenture governing a high yield note issue of a new issuer. |
| Governing Law: | The laws of the State of New York. |

LA\1729820.12

## CONDITIONS TO CLOSING[1]

The commitment of UBS under the Commitment Letter with respect to each of the Facilities, the agreements of UBS and UBSS to perform the services described in the Commitment Letter, and the funding of the Facilities are subject to the conditions set forth in the Commitment Letter and satisfaction of each of the conditions precedent set forth below.

1.    UBS shall have reviewed, and be satisfied with, the final structure of the Acquisition and the terms and conditions of the Acquisition Agreement (it being understood that UBS is satisfied with the execution version of the Acquisition Agreement received by UBS at 9:19 p.m. Los Angeles time on June 16, 2007 and the structure of the Acquisition reflected therein and the disclosure schedules to the Acquisition Agreement received by UBS at 7:47 a.m. Los Angeles time on June 17, 2007). The Acquisition and the other Transactions shall be consummated concurrently with the initial funding of the Facilities in accordance with the Acquisition Agreement without giving effect to any waivers or amendments thereof that is material and adverse to the interests of the Lenders, unless consented to by UBS in its reasonable discretion. Immediately following the Transactions, none of Borrower, the Acquired Business nor any of their subsidiaries shall have any indebtedness or preferred equity other than as set forth in the Commitment Letter.

2.    UBS shall have received (i) audited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of each of the Borrower and the Acquired Business for each of the last three fiscal years ending more than 90 days prior to the Closing Date (collectively, the "Audited Financial Statements"), (ii) unaudited consolidated (and to the extent available, consolidating) balance sheets and related statements of income, stockholders' equity and cash flows of each of Borrower and the Acquired Business for each fiscal quarter of the current fiscal year ending more than 45 days prior to the Closing Date and for the comparable periods of the preceding fiscal year (the "Unaudited Financial Statements") (with respect to which the independent auditors shall have performed an SAS 100 review), (iii) to the extent produced by you or by the Acquired Business, unaudited consolidated (and to the extent available, consolidating) balance sheets and related statements of income of each of Borrower and the Acquired Business for each fiscal month ending after the last fiscal quarter covered by the Unaudited Financial Statements and more than 30 days prior to the Closing Date and for the comparable periods of the preceding fiscal year, (iv) a pro forma consolidated (and to the extent available, consolidating) balance sheet and related statements of income for Borrower and the Acquired Business (the "Pro Forma Financial Statements"), as well as pro forma levels of EBITDAR ("Pro Forma EBITDAR") calculated in a manner reasonably satisfactory to UBS, for the last fiscal year covered by the Audited Financial Statements and for the latest twelve-month period ending more than 45 days prior to the Closing Date, in each case after giving effect to the Transactions and (v) forecasts of the financial performance of Borrower and its subsidiaries (x) on an annual basis, through March 3, 2015 and (y) on a monthly basis, through the Borrower's 2009 fiscal year end. The financial statements referred to in clauses (i), (ii) and (iii) shall be prepared in accordance with ac-

---

[1]    All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this Annex IV is attached.

-2-

counting principles generally accepted in the United States. The Pro Forma Financial Statements shall be prepared on a basis substantially consistent with pro forma financial statements set forth in a registration statement filed with the SEC, subject to customary exceptions for Rule 144A offering materials.

3.    The transactions contemplated by the Commitment Letter shall be in compliance, in all material respects, with all applicable Canadian and U.S. federal and state laws and regulations. All necessary governmental approvals in connection with the Transactions shall have been obtained and shall be in effect. To the extent required by the Acquisition Agreement, all requisite shareholder approvals and consents required by applicable law or the transactional documents with respect to the Acquisition Agreement and the governing documents of Borrower necessary to effect the merger contemplated by the Acquisition Agreement shall have been obtained and shall be in full force and effect.

4.    Borrower and each of the Guarantors shall have provided the documentation and other information to the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

5.    All costs, fees, expenses (including, without limitation, legal fees and expenses and the fees and expenses of appraisers, consultants and other advisors) and other compensation payable to the Lenders, UBSS, UBS, the Revolving Administrative Agent, the Revolving Co-Collateral Agents, the Term Loan Administrative Agent or the Term Loan Collateral Agent by the Borrower shall have been paid, to the extent then due and payable.

6.    All documents and instruments required to perfect each of the Collateral Agents' security interest in the collateral described under the heading "Security" in the Revolver Term Sheet and the Term Loan Term Sheet shall have been executed and delivered and, if applicable, be in proper form for filing, and none of such collateral shall be subject to any other pledges, security interests or mortgages, except customary permitted liens and other limited exceptions permitted under the Bank Documentation; provided, however, that, with respect to any such collateral the security interest in which may not be perfected by filing of a UCC financing statement or possession of such collateral, if the perfection of each of the Collateral Agents' security interest in such collateral may not be accomplished prior to the Closing Date without undue burden or expense, then delivery of documents and instruments for perfection of such security interest shall not constitute a condition precedent to the initial borrowings under the Bank Facilities if Borrower agrees to deliver or cause to be delivered such documents and instruments, and take or cause to be taken such other actions as may be required to perfect such security interests, within a period after the Closing Date reasonably acceptable to the Revolving Co-Collateral Agents and the Term Loan Collateral Agent.

7.    The Lenders shall have received all customary opinions, certificates and closing documentation as UBS shall reasonably request, including but not limited to a solvency certificate.

**Additional Bridge Facility Condition**

In addition, the commitment of the Lenders under the Commitment Letter with respect to the Bridge Facility, the agreements of UBS and UBSS to perform the services described in the

-3-

Commitment Letter, the consummation of the Transactions and the funding of the Bridge Facility are subject to the following additional conditions precedent set forth below.

              1.      Borrower shall have engaged the Investment Bank referred to in the Fee Letter to place the Securities (as defined below). Borrower shall have prepared and delivered to the Investment Bank a substantially completed initial draft of an offering memorandum for a private placement pursuant to Rule 144A or prepare, file and cause to become effective a registration statement under the Securities Act of 1933 and prepare a related prospectus, as determined by the Investment Bank, in each case, which shall contain audited, unaudited (which shall have been reviewed by the independent accountants for the Borrower and the Acquired Business as provided in the procedures specified by the Public Company Accounting Oversight Board in AU722) and pro forma financial statements, all meeting the requirements of Regulation S-X under the Securities Exchange Act of 1934 and other information required in a registration statement on Form S-1 for an offering registered under the Securities Act of 1933 (except as may be mutually agreed) and shall be in form for distribution to investors, otherwise in form and substance satisfactory to the Investment Bank and that would be necessary for the Investment Bank to receive customary "comfort" (including customary "negative assurance" comfort) from independent public accountants in connection with a private placement or public offering of Securities (an "Offering Document"), at least 30 business days prior to the Closing Date. The Investment Bank shall have had the opportunity to market senior, senior subordinated or subordinated debt securities and/or preferred equity securities or other debt financing of the Borrower (the proceeds of which will be used to provide funds for the Transactions if such financing is completed on or prior to the Closing Date (and thereby reduce on a dollar-for-dollar basis the aggregate amount of the commitments of UBS under the Commitment Letter in respect of the Bridge Facility) or, to the extent such financing occurs subsequent to the making of the Bridge Loans, the proceeds of which will be used to refinance such Loans) (the "Securities") for not less than 15 calendar days after receipt of an Offering Document, unless a shorter period is acceptable to the Investment Bank

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
20TH JUDICIAL DISTRICT, DAVIDSON COUNTY, TENNESSEE

| | | |
|---|---|---|
| GENESCO INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-2137-II |
| | ) | |
| THE FINISH LINE, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### UBS SECURITIES LLC AND UBS LOAN FINANCE LLC'S
### AMENDED ANSWER AND COUNTERCLAIM

Come now UBS Securities LLC and UBS Loan Finance LLC (collectively, "UBS") and submit their Amended Answer and Counterclaim pursuant to Rule 15.01, no answer to the original Answer and Counterclaim having been filed. The purpose of this Amended Answer and Counterclaim is to amend and supplement certain factual allegations based on discovery occurring after the filing of UBS's Answer and Counterclaim. Further, although UBS believes that the Court's November 29, 2007 Order makes clear the matters to be tried, UBS notes once again that it has reserved its right to litigate certain issues in New York, including the insolvency of the Finish Line-Genesco combined entity:

### FIRST DEFENSE
### (Incorporation of Defenses)

Genesco does not assert any claims against UBS. UBS is participating in this action solely for purposes of litigating: (1) the issue of whether Genesco Inc. ("Genesco") has suffered a Material Adverse Effect, the resolution of which will have an effect upon UBS's contract with The Finish Line, Inc.; and (2) any counterclaims that UBS may choose to bring. For that reason, UBS need not assert any affirmative defenses to Genesco's claims against The Finish Line. To

the extent such defenses are required, UBS incorporates the affirmative defenses asserted by The Finish Line it its Answer to the Amended Complaint.

### SECOND DEFENSE
### (Answer)

1.    The following paragraphs do not contain any allegations relating to UBS and therefore, UBS need not respond to them:  1-3, 5-6, 9-14, 16-18, 21-28, 31-33, 36, 46-47, 50, 52, 54, 57-60, 62-63, 65, 68-69, 74-87, 89-91, 93-96, 98-99, 102, 104-06, 110-11, and 113-14.

2.    The following paragraphs purport to contain conclusions of law as to which no response is required:  4, 29, 30 and 100.

3.    UBS is without sufficient knowledge or information to admit or deny the allegations in the following paragraphs: 15, 45, 48, 55, 107-08, and 112.

4.    UBS is without sufficient knowledge or information to admit or deny the remaining allegations contained in paragraph 7, but denies that it has ever exerted pressure on Finish Line to explore ways to escape from the deal or to renegotiate it.

5.    UBS is without sufficient knowledge or information to admit or deny whether an analyst who is monitoring the progress of the merger noted that Finish Line or UBS's purported actions are nothing more than a "concerted effort by [Finish Line] and its bankers to break apart the deal or achieve a price concession."  The remaining allegations in paragraph 8 are denied.

6.    UBS admits that prior to June 17, 2007, it negotiated a financing commitment letter with Finish Line.  UBS is otherwise without sufficient knowledge or information to admit or deny the allegations in Paragraph 19.

7.    UBS is without sufficient knowledge or information to admit or deny the allegations in paragraph 20, except that UBS admits that it communicated with Genesco on or

2

about June 11, 2007, and that on or about June 11, 2007 UBS negotiated a financing commitment letter with Finish Line.

8.      To the extent Paragraphs 29, 30, 34 and 35 purport to characterize the Merger Agreement, they require no response as that document speaks for itself.

9.      UBS admits that a proposed timeline was circulated on or about June 21, 2007. To the extent that Paragraphs 37, 41-43 and 49 purport to characterize the timeline, they require no response as that document speaks for itself.

10.     Paragraphs 38-40 purport to characterize the Commitment Letter, and require no response as that document speaks for itself

11.     UBS admits that Genesco filed a proxy statement.  Paragraph 44 purports to characterize the timeline, and requires no response as that document speaks for itself.  UBS is without sufficient knowledge or information to deny or admit the remaining allegations in Paragraph 44.

12.     To the extent paragraph 51 purports to characterize the Merger Agreement, that document speaks for itself.  UBS is otherwise without sufficient knowledge or information to admit or deny the allegations in paragraph 51.

13.     UBS admits that a proposed timeline was circulated in July, 2007.  To the extent that Paragraph 53 purports to characterize the timeline, it requires no response as that document speaks for itself.

14.     UBS denies all allegations in paragraph 56 that relate to UBS and is without sufficient knowledge or information to admit or deny the remaining allegations in paragraph 56.

N JSH 642133 v1
2909043-000001 12/7/2007

15.    UBS admits that it sent a letter to Finish Line dated September 11, 2007; that letter speaks for itself.  UBS denies that the letter was a sign that UBS trying to delay or renege on its commitments.

16.    UBS admits that it sent a letter to Finish Line dated September 13, 2007; that letter speaks for itself.

17.    UBS denies all allegations in Paragraph 66 that relate to UBS and that there is no legitimate basis for concluding that a Material Adverse Effect may have occurred. UBS is without sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 66.

18.    UBS admits that Finish Line issued a press release on September 14, 2007; that document speaks for itself.  UBS is without sufficient knowledge or information to admit or deny whether Finish Line's purported actions to cast public doubt on the merger only make placing the debt more difficult.

19.    Paragraph 70 characterizes the Commitment Letter; that document speaks for itself.  UBS admits that it sent an email to Finish Line on September 18, 2007.  Paragraph 70 characterizes that communication; that communication speaks for itself.  Paragraph 70 sets forth legal conclusions as to which no response is required.  UBS is without sufficient knowledge or information to admit or deny the remaining allegations in paragraph 70.

20.    Paragraph 71 excerpts the Merger Agreement; that Agreement speaks for itself.

21.    UBS denies that there necessarily has been no Material Adverse Effect with respect to Genesco's business.  UBS is without sufficient knowledge or information to deny or admit the remaining allegations in paragraph 72.

4

22.    Paragraph 73 characterizes the Merger Agreement; that Agreement speaks for itself.  UBS denies that there necessarily has been no Material Adverse Effect in Genesco's business.  UBS is without sufficient knowledge or information to admit or deny the remaining allegations in paragraph 73.

23.    In response to Paragraphs 88, 92, 97, 103, and 109, in which Genesco purports to incorporate other Paragraphs of the Amended Complaint, UBS incorporates its response to the incorporated Paragraphs.

24.    UBS denies all allegations in Paragraph 101 that pertain to UBS.  UBS is without sufficient knowledge or information to deny or admit the remaining allegations in paragraph 101.

## COUNTERCLAIM AGAINST GENESCO

For its Counterclaim, UBS alleges the following:

### Preliminary Statement

1.    In an effort to sell their company before everyone knew that its financial condition was collapsing, Genesco's senior officers intentionally misrepresented and failed to disclose material facts to Finish Line, UBS, and Genesco shareholders.  Those same senior officers stand to gain millions of dollars should they succeed in their fraud.

2.    In particular, in early June, Genesco provided projections to UBS and Finish Line that purported to reflect Genesco's expected profitability for the 2nd, 3rd and 4th Quarters of Fiscal Year 2008.  Before inducing Finish Line and UBS to enter into their agreements, however, Genesco knew that it would fail to meet its projections and that something was seriously wrong with the Company.

3.    Specifically, Genesco hid information showing that the Company's May 2007 earnings had crashed more than 180% from the prior year and almost 45% from the earnings

N JSH 642133 v1
2909043-000001 12/7/2007

projections it had delivered to Finish Line and UBS only days before.  Despite knowing that Genesco's disastrous May results meant that it would not meet its projections, Genesco nonetheless withheld the actual results revealing that fact.  Instead, Genesco repeatedly told UBS (including on June 5 and 14, 2007) that Genesco was on track to meet its projections, that those projections did not need to be revised, that Genesco's projections could be relied on, and that any slight decline in Genesco's same store sales for May would not affect Genesco's earnings projections.  Genesco knew at the time that each of those statements was materially false.

4.      Genesco's deception worked.  On June 17, 2007, Finish Line and Genesco entered into a Merger Agreement whereby Finish Line would acquire all of Genesco's common stock for $54.50 per share.   Because Finish Line is substantially smaller than Genesco, Finish Line planned to finance the acquisition by obtaining $1.6 billion in debt.  Relying on Genesco's representations that Genesco was on track to meet its projections and that Genesco's cash flows were sufficient to service the debt, Finish Line and UBS entered into an agreement providing the terms upon which UBS would provide the required debt financing.  Finish Line and UBS's agreement was executed on June 17, 2007, concurrent with the execution of the Merger Agreement.

**Background to the Fraud**

5.      On April 20, 2007, Alan Cohen, chief executive officer of Finish Line, contacted Bob Dennis, Genesco's president and chief operating officer, indicating Finish Line's potential interest in a business combination with Genesco. On April 23, 2007, UBS contacted Genesco's financial advisor, Goldman Sachs, on behalf of Finish Line to discuss such a combination.

6.      On May 24, 2007, Genesco prepared projections for its financial results for the remainder of its fiscal year 2008 (the "May 24th projections").  The May 24th projections

6

included Genesco's expected monthly results for May, June and July and for the final three quarters of fiscal year 2008.

7.     Genesco, however, concealed that fact from UBS and Finish Line – at first providing only Genesco's annual projections.  As part of its due diligence, UBS and Finish Line requested that Genesco provide monthly and quarterly projections, in addition to annual projections.  Genesco then provided UBS and Finish Line with quarterly projections, but falsely stated that it did not have monthly projections.

8.     On June 5, 2007, Genesco told UBS and Finish Line that Genesco was on track to meet its May 24th projections, that those projections were still valid, and that Genesco's projections did not need to be revised because of May's earnings.

9.     On June 11, 2007, Finish Line conveyed to Genesco a definitive proposal of $54 per share of Genesco's common stock in cash.  After negotiations over the next two days, Finish Line and Genesco agreed on a merger price of $54.50 per share.

10.     On June 14, 2007, Genesco again represented to UBS and Finish Line that Genesco was on track to meet its May 24th projections, as well as that those projections were still valid and did not need to be revised because of May's earnings.

11.     When Genesco reaffirmed the May 24th projections, it knew or should have known that the projections would not in fact be met.  Specifically, Genesco knew that its earnings for May 2007 had declined more than 180% from prior year results and almost 45% from the monthly performance they had projected only days before.

12.     If Genesco had told UBS the truth about the May results, UBS would not have executed the Commitment Letter.

### Genesco's Cover-Up

13.    About a month after the deals were signed, Finish Line and UBS began to suspect that Genesco had misled them.  In July 2007, Genesco finally gave Finish Line and UBS the much-delayed May and the June Monthly Operating Reports – Reports showing for the first time that Genesco had suffered a massive decline in profitability.    Indeed, Genesco's June performance was even worse than May.  For June, Genesco reported a loss 60 times greater than what Genesco had projected in the numbers delivered to UBS and Finish Line.  Genesco's new information triggered serious questions about Genesco's financial condition, the validity and completeness of Genesco's prior disclosures, and the financial viability of the highly-leveraged merger.

14.    Recognizing that the truth about Genesco's financial performance would endanger the merger, Genesco then proceeded to perpetuate the fraud by misleading everyone into believing that Genesco's condition was not as bad as it seemed and did not pose an obstacle to the completion of its merger with Finish Line.  Without disclosing that Genesco's disastrous May and June financial performance ensured that its projections were defective, Genesco filed a preliminary proxy statement on July 11, 2007.  Genesco then filed a definitive proxy statement on August 13, 2007—again without disclosing the truth about its actual earnings or its projections.

15.    Eventually, on August 30, 2007, Genesco announced that it had lost $0.13 per share.  Yet, in the Company's press release and on the earnings call, Genesco proceeded to hide the true cause of the decline by falsely claiming that it was "primarily" due to a shift in back-to-school dates and sales tax holidays from the 2nd Quarter to the 3rd Quarter.  In doing so, they claimed that the 2nd Quarter downturn was not evidence of a material downturn or change in

Genesco's business. Indeed, in an effort to convince everyone that the 2nd Quarter downturn was the result of timing differences, Genesco took the unusual step of describing its weekly sales results for August that the Company said confirmed that it would return to profitability in the 3rd Quarter. Based on that "evidence," Genesco reaffirmed its belief that the Company would meet its prior earnings guidance for the back half of the year. None of those statements, however, were true.

16.    First, Genesco now has admitted that, at the time of its August 30, 2007 earnings announcement, the Company knew it could not accurately state to the market that its second quarter results were primarily due to a shift in back-to-school and sales tax holiday dates. That admission alone establishes a violation of law by Genesco and, together with the other violations described in this Amended Counterclaim, invalidates the Merger Agreement. Moreover, Genesco's admitted misstatements were incorporated into Genesco's proxy statement upon which its shareholders approved the merger. Accordingly, Genesco's proxy statement contained material misstatements and UBS contends that the shareholder vote in favor of the merger is invalid.

17.    Second, financial analysis of Genesco's results confirms that the timing shifts described by Genesco were in fact a small part of Genesco's actual loss. Indeed, the timing shift in July to which Genesco referred had absolutely nothing to do with Genesco's poor results in May and June. Despite knowing that Genesco's May and June results were a key factor in causing its 2nd Quarter loss, Genesco failed to disclose that fact. Third, Genesco knew at the time of its statements that the Company's sales results from August did not portend a return to profitability since they hardly made up for Genesco's 2nd Quarter loss. More fundamentally,

9

however, at the time of the August 30 earnings announcement, Genesco knew that its same store sales for the important days preceding Labor Day had been declining precipitously.

18.    Fourth, at the time of Genesco's earnings announcement, Genesco no longer believed that the Company would achieve its projected financial performance for the back half of the year.  Indeed, less than 24 hours after reassuring the public that Genesco would meet its projections, Genesco advised Finish Line and UBS that Genesco had revised its projections for August substantially and dramatically downward.  Following Genesco's announcement that it was revising its projections downward, Genesco delivered to UBS and Finish Line written confirmation of its revised numbers in early September 2007.

19.    The intended purpose of the false statements by Genesco was to perpetuate a fraud on UBS and to preserve Genesco's merger with Finish Line.  Indeed, although Genesco now agrees that its much-vaunted timing shift was not in fact the "primary" cause of its 2nd Quarter loss, Genesco still has not corrected its prior false statements to the market nor explained the true reason for its decline.  Nonetheless, Genesco held a shareholder vote on September 17, 2007, at which time its shareholders approved the merger based upon a materially false proxy statement.

20.    Genesco now seeks to reap the gains of its fraud by compelling Finish Line to go forward with the merger and by compelling UBS to provide the financing necessary to complete that transaction. The fraudulent conduct of Genesco, however, cannot be rewarded.  Rather, Genesco must be required to pay for its conduct—by compensating UBS, Finish Line, and any other persons who have been injured by its deception.

10

## FIRST COUNTERCLAIM

### (Fraud)

21.     All facts alleged in Paragraphs 1-19 are incorporated here as if repeated.

22.     Genesco and its senior officers intentionally made the misrepresentations and omissions of material fact described herein to UBS.

23.     Genesco and its senior officers knew that those statements to UBS were false when made.

24.     UBS reasonably relied on those misrepresentations when UBS entered into its Commitment Letter with Finish Line and has been injured thereby.

**WHEREFORE**, UBS prays for judgment against Genesco as follows:

1.     For damages caused to UBS by virtue of Genesco's fraud;

2.     For UBS's costs, including reasonable attorneys' fees; and

3.     For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Joseph J. Frank */pern. Eric Olney (PHV)

LATHAM & WATKINS LLP
Joseph J. Frank (admitted *pro hac vice*)
Noreen Kelly-Najah (admitted *pro hac vice*)
J. Christian Word (admitted *pro hac vice*)
885 Third Avenue
New York, New York  10022
Tel:    (212) 906-1200
Fax:    (212) 751-4864

11

*John S. Hicks w/perm. Eric Olney (PHV)*

BAKER, DONELSON, BEARMAN, CALDWELL
& BERKOWITZ, PC
John S. Hicks, Bar No. 10478
211 Commerce Street, Suite 1000
Nashville, Tennessee 37201
Tel:    (615) 726-5600
Fax:    (615) 726-0464

*Attorneys for UBS Securities LLC and UBS Loan Finance LLC*

## Certificate of Service

I certify that, on this 7th day of December, 2007, a true and correct copy of the foregoing was served by email and U.S. Mail, postage prepaid, upon Overton Thompson, III, Britt K. Latham, W. Brantley Phillips, Jr., Brian D. Roark and Russell E. Stair, BASS, BERRY & SIMS, PLC, Suite 2700, 315 Deaderick Street, Nashville, Tennessee, 37238-3001, and Jonathan D. Schiller, James P. Denvir, Michael A Brille, William C. Jackson and Jonathan M. Shaw, BOIES, SCHILLER & FLEXNER, LLP, Suite 800, 5301 Wisconsin Ave, N.W., Washington, D.C., 20015, and Robert J. Walker, J. Mark Tipps, John C. Hayworth and John L. Farringer, WALKER, TIPPS & MALONE, 2300 One Nashville Place, 150 Fourth Avenue, North, Nashville, Tennessee, 37219.

12

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY, PART III

GENESCO, INC.,              )
                                 )
      Plaintiff,        )
                                 )
VS.                   )   NO. 07-2137-II(III)
                                 )
THE FINISH LINE, INC., and  )
HEADWIND, INC.,       )
                                 )
      Defendants,     )
                                 )
VS.                   )
                                 )
UBS SECURITIES LLC and   )
UBS LOAN FINANCE LLC,   )
                                 )
      Defendants.     )

## MEMORANDUM AND ORDER

On June 17, 2007, the parties to this lawsuit, both sellers of footwear, signed a Merger Agreement for the defendant, Finish Line, Inc. to acquire the plaintiff, Genesco, for $1.5 billion. The transaction was highly leveraged with UBS providing the financing. The Merger Agreement provided that if it was not closed by December 31, 2007, either party could terminate the transaction.

Within a couple months of the merger being signed, Genesco's quarterly earnings were falling significantly short of projections and were some of the lowest in 10 years. By early September 2007, the deal had stalled after Genesco obtained shareholder approval of

the merger and demanded a closing; whereas UBS refused to proceed, demanding more information about the decline in earnings.

Genesco filed this lawsuit on September 24, 2007, for the Court to order Finish Line and UBS to close the deal before the December 31, 2007 termination date.

Finish Line and UBS asserted a contract and two tort defenses to closing the merger. The contract defense is related to paragraph 3.1(a) of the Merger Agreement which excuses closing the deal if a Material Adverse Effect ("MAE") has occurred. The tort defenses are that Genesco committed securities fraud and fraudulently induced Finish Line to enter into the deal by not providing material information concerning Genesco's May performance and updated projections to Finish Line prior to the signing of the Merger Agreement.

In section 9.9 of the Merger Agreement the parties acknowledge that failure of the merger to close will result in immediate and irreparable harm and unquantifiable damage. The remedy they stipulate is specific performance. Enforcing that stipulation of the parties, the Court commenced a speedy trial on December 10 and ending December 18, 2007, to decide whether Genesco was entitled to have the merger closed, or if Finish Line and UBS, were entitled to rescission or have their performance excused due to Genesco's fraud, and/or, due to the occurrence of an MAE.

After considering the proof and argument of counsel, the Court finds that Genesco has proven that all conditions in the Merger Agreement to closing have been met; Finish Line

2

and UBS have failed to prove that Genesco fraudulently induced Finish Line to enter into the contract or that Genesco committed securities fraud. Finish Line and UBS have also failed to demonstrate the existence of an MAE under section 3.1(a) of the Merger Agreement to excuse performance because the Court concludes that Genesco fits within exception/carve-out (B) to the MAE provision.

It is therefore ORDERED that the Court declares that all conditions to the Merger Agreement have been met. The Court declares that Finish Line has breached the Merger Agreement by not closing and declares that Finish Line is not entitled to invoke the December 31, 2007 termination procedures of Section 8 of the Merger Agreement. The Court ORDERS that Finish Line shall specifically perform the terms of the Merger Agreement, including that it shall close the merger pursuant to section 1.2 of the Merger Agreement, it shall use its reasonable best efforts to take all actions to consummate the merger as required by section 6.4(d) of the Merger Agreement, and it shall use its reasonable best efforts to obtain financing as per section 6.8(a) of the Merger Agreement. Excepted from the provisions of this Order and Memorandum are issues as to the solvency of the merged entity. That issue is reserved for determination by a New York Court in a lawsuit filed by UBS.

The findings of fact and conclusions of law on which the Court bases its decision follow. The Court begins with findings of core facts which provide a main thoroughfare sequence of events. Then, the Court turns to detailed findings of fact and conclusions of law with respect to each of the three defenses asserted by Finish Line and UBS and the remedy of specific performance.

## Findings of Fact

Genesco is a retailer of shoes, hats and apparel. It was founded in the 1920's and operates over 2,000 retail stores. Its net sales for 2006[1] were close to $1.5 billion. Its operation income exceeded $121 million. Its banners include Journeys, Hat World, and Johnston & Murphy. Genesco's senior management team is led by Hal Pennington (CEO), Bob Dennis (President and COO), Jim Gulmi (CFO) and Jim Estepa (Senior Vice President of Genesco's largest banner, Journeys).

Finish Line is an Indianapolis based specialty retailer of athletic, lifestyle and outdoor footwear and apparel. It was started in 1976. Beginning as an athletic Finish Line specialty store, it bought the franchise rights for Athlete's Foot. In the mid-1970's when athletic footwear became fashionable, Finish Line grew the business and went public. It operates 800 stores, a chain of Finish Line athletic apparel stores and ManAlive, a retailer offering men

---

[1] Throughout this memorandum, for ease of reference, the Court refers to the calendar year even though many of the exhibits state the dates in terms of Genesco's fiscal year. Genesco's fiscal year '08 is calendar year 2007.

4

and women's brand clothing and accessories. Finish Line's 2007 revenues were $1.3 billion, with operating income of $57 million. Finish Line's only competitor is Foot Locker. The latter has four to five times the revenue of Finish Line.

Finish Line's president, Mr. Alan Cohen, testified that in the last two years Finish Line's operation income has declined, the company is not growing, and business has not been going well. In October of 2006, Finish Line retained UBS and lawyers Gibson, Dunn & Crutcher and began exploring strategic alternatives. Finish Line considered a merger with Foot Locker but never seriously pursued it because of the downturn in the athletic wear industry.

In the spring of 2007, Alan Cohen saw a press release that Foot Locker was making a hostile move on Genesco. Foot Locker had offered to purchase Genesco and Genesco had refused.

Mr. Cohen testified that because Finish Line and Genesco are not primary competitors, he was interested in Genesco. The companies have different products and customer bases. Accordingly, if combined, the companies would result in a $3 billion entity with ManAlive (Finish Line's "hip hop" banner), Finish Line's athletic banner, and the diversity of Genesco's Journey's, Journey's Kids, Underground Station, Johnston & Murphy and Hat World. With a greater scale of the combined company, there would be growth potential and diversity of different concepts. The combined company would have more strength with vendors, landlords and REITs. Mr. Cantrell, a retail expert presented by

Genesco, testified to the counter-cyclical nature of the combined businesses because of this diversity which would provide more flexibility and strength in withstanding fashion trends.

In April of 2007, Foot Locker made a $46 per share offer to buy Genesco which was rejected by Genesco. Just prior to that time Genesco had retained Goldman Sachs in March of 2007 to explore strategic alternatives preparatory to Foot Locker's interest.

On the same day of the announcement of the Foot Locker $46 per share offer, Alan Cohen of Finish Line contacted Bob Dennis about Finish Line's interest in Genesco. Several days later, UBS, on behalf of Finish Line, contacted David Friedland, of Goldman Sachs, stating Finish Line's serious interest in acquiring Genesco. In addition to Foot Locker and Finish Line, there were also six private equity firms interested in acquiring Genesco.

To provide information to potential purchasers, Genesco established an electronic data room. David Friedland of Goldman Sachs supervised the data room and due diligence process for Genesco. From his testimony, the Court finds that the data room contained information on Genesco for prospective purchasers. Goldman Sachs worked with Genesco to initially populate the site with information Genesco was willing to post. After initially populating the site, buyers would send questions and requests to Goldman Sachs who would take them to Genesco. The response of Genesco was provided to Goldman Sachs who then either posted the information in the data room, emailed the information to the interested party or set up a conference call.

A condition to receiving information in the data room was signing a confidentiality and stand still agreement (P5).[2] One was signed by Finish Line on May 7. From May 17 to the signing of the Merger Agreement, Finish Line had access to the data room.

The Confidentiality Agreement (P5) which Finish Line signed contained a provision that neither Finish Line nor its representatives UBS and Dunn & Phelps were entitled to rely upon the accuracy or completeness of information provided by Genesco and that neither Genesco nor its representatives were liable for any action or inaction taken by Finish Line in reliance on the information unless it was specified in the Merger Agreement.

The Merger Agreement, as well, addressed reliance. Section 3.24 provides that "neither Parent nor Merger Sub have relied upon or otherwise been induced by, any other express or implied representation or warranty with respect to the Company or with respect to any information provided to or made available to Parent or Merger Sub in connection with the transaction contemplated hereunder." Finally, section 9.1 of the Merger Agreement provided that the parties made no "other representations or warranties and hereby disclaims any other representations or warranties" made by the companies or their agents.

Foot Locker did not sign the Confidentiality Agreement and, therefore, did not have access to the electronic data room.

---

[2]References to "P___," "D____," or "TE____" are references identifying an exhibit admitted into evidence at trial.

7

On May 24, 2007, Foot Locker made a $51 per share offer. It was rejected by Genesco on May 29, 2007. Finish Line offered $54 per share on June 11. It was rejected by Genesco with a counteroffer of $55 on June 12. On June 13, Finish Line made its best and final offer of $54.50 per share, which was accepted by Genesco. The parties signed their Merger Agreement (P1) on June 17, 2007.

In addition to the foregoing findings, the Court finds from the testimony of senior management of Genesco, David Friedland of Goldman Sachs, Alan Cohen of Finish Line and Mr. Winkler of UBS that the following motivations of the parties were present in negotiating the provisions of the Merger Agreement:

1.  It was critical to Genesco that the deal not be contingent on financing. The merger was structured as a cash deal so that it would quickly and with more certainty close. Bob Dennis, president and COO of Genesco, explained that Genesco did not want the damage and harm that would result from a merger that did not close or one that was delayed.

2.  That Finish Line was smaller in terms of number of stores than Genesco, Genesco insisted that Finish Line obtain a solvency opinion on whether it could assume the debt that would be required to fund the merger. Mr. Friedland testified that UBS's presence as the lender assuaged Genesco's concern as well.

3.  Finish Line's primary concern was that it might lose out to Foot Locker or one of the private equity firms in the bidding for Genesco. The Court finds that on June 8 when Mr. Friedland communicated to Mr. Winkler of UBS that it was time for Finish Line to make an offer, Mr. Winkler's main concern was that Finish Line would lose the bidding.

4.  Finish Line's primary motivation in pursuing the merger was diversity, synergies resulting from reduced costs, and the opportunities for growth.

8

After the Merger Agreement was signed, in a July 10, 2007 call from Genesco senior management to Finish Line, the latter was told that Genesco had missed its June projections by $4.7 million. May results were also provided at that time, showing a $2.1 million miss from projections. By August, Genesco's May market guidance of 30 cents per share failed to reach those results; actual results were 0 cents per share.

On September 17, 2007, Genesco shareholders voted to approve the merger. Genesco pressed for closing the merger. UBS delayed and requested information on the drop in Genesco's performance, asserting its concern that a Material Adverse Effect had occurred. This lawsuit followed.

Subsequent to the filing of the lawsuit, Finish Line and UBS interviewed witnesses and obtained production of emails from which they concluded that Genesco had concealed its actual May results and revised projections prior to Finish Line signing the merger while Genesco senior management and Goldman Sachs assured Finish Line and UBS that May was on track with its projections. The concealment and false representations, Finish Line and UBS asserted, fraudulently induced them to proceed with the Merger Agreement. Then, after the Merger Agreement was signed, Genesco continued to distort its performance to the detriment of Finish Line and UBS by providing false guidance to the market in an August 30, 2007 conference call by attributing its Q2[3] disappointing results primarily to a delayed

---

[3]"Q___" refers to "Quarter." Genesco's Q1 is February, March, April; Q2 is May, June, July, and so on.

tax holiday and back to school date and by stating that its August sales were positive when more recent results revealed them to be negative.

With respect to Genesco's financial and sales performance, the proof at trial established that they declined in May 2007 and have not been mitigated or offset by significant rebounds in the rest of the year:

1.  Genesco missed its projections for the first quarter: February was down $1.7 million and April was down $1.2 million. Genesco was down 34% in same store sales in its first quarter. Prior to the merger Finish Line was told this by its advisor Dunn & Phelps. Average selling price declined 3.4% in Q1.

2.  Genesco continued to miss its projections for 2007: the May miss was $2.1 million; the June miss was $4.7 million. Q3 was projected at $23.6 million; it came in at $13.6 million—a decline of $10 million.

3.  TE31 depicts a 61% decline in earnings for Q2 and Q3 compared to the previous year. 54% for combined Q1, Q2 and Q3.

4.  In 2006, Genesco missed its projections significantly in May, missed its projections in six months and yet had a banner year based on Q4 gains.

5.  2007, however, has not seen a rebound like there was in 2006. Comparative store sales in 2007 have continued to decline: July was down 5-6%. November (first month of the fourth quarter) was down by 4.2%. Sales in the week before Christmas were disappointing.

6.  Between June 11 and June 15, senior management at Genesco concluded that because of a delay in return to school and tax free holidays in two states, performance projections for Genesco in Q2 (May, June, July) would shift to Q3 (August, September, October) and there would be a net effect such that decreased performance in Q2 would net out in Q3 when sales from back to school and tax holiday days hit. That net, however, did not occur. The back to school and tax effect was later calculated to be only 8 cents per share. The balance sheet effect was $261,000 to $300,000. In hindsight, back to school

10

and tax holidays delay did not come close to accounting for the decline in Q2. Total Q2 decline of earnings per share of 30 cents only 8 cents accounted for the back to school and tax free delay.

7.    Expert Deetz' graph (TE 29) depicts that operating income losses in Q2 2007 are the lowest in 10 years.

8.    Professor Weil's graph (TE16) show EBITDA in 2007 is in the low range for Genesco's 10-year history.

Alongside Genesco's decline in performance and only a few weeks after the Merger Agreement was signed, the credit markets felt the effects from a number of defaults in sub-prime mortgages. UBS was hit particularly hard. It sustained a $3.44 billion loss in Q3—its first quarter loss after 9 straight years of profitability. This loss was attributable to losses sustained by a UBS hedge fund heavily invested in subprime mortgage backed securities as well as losses in UBS's fixed income securities. UBS's CEO was terminated. UBS has had to borrow from foreign investors to raise $11.5 billion  It has admitted that the Finish Line/Genesco deal is now a huge losing proposition for UBS. Emails obtained by Genesco in discovery uncovered that UBS in the fall of 2007 was attempting to put pressure on Genesco to renegotiate the price of the deal.

In addition to the foregoing findings of fact, the Court shall provide an overview of the expert testimony that was presented. Seven expert witnesses testified at trial:

1.    Professor Roman Weil, Ph.D., a professor of economics and accounting at the Graduate School of Business at the University of Chicago, testified that Genesco has not suffered a material adverse effect and, if so, it is not out of proportion to its peers in the footwear industry. He further testified that the addition of the May operating report to the total

mix of information Finish Line had when it signed the Merger Agreement would not have significantly altered the mix. Dr. Weil based these opinions on his analyses of Genesco's historical data showing growth over time but, instead of uniform growth, depicting that lows such as the current one in 2007 are to be expected (TE16).

2.  Mr. Cantrell, a consultant for retail companies who worked in retail for 26 years and served as the President and Director of Payless Shoe Stores testified that the merger, despite Genesco's declines in 2007, still has strategic value for Finish Line in the areas identified by Finish Line when it entered into the merger. He also testified that Genesco's declines are due to broad economic conditions such as higher gas, food and eating oil prices, pressure in the housing and mortgage industry and consumer credit issues. He testified that Genesco's declines are not disproportionately worse than its competitors (TE25; P369, 370, 371).

3.  Professor Saunders, a professor at NYU for 30 years and a Ph.D. graduate of the London School of Economics, who specializes in risk management and credit risk, and who has worked for the Federal Reserve, the Controller of Washington and the International Monetary Fund, analyzed markets after June 17, 2007, to determine UBS's economic circumstances in relation to funding the Merger Agreement. He testified that inaccurate rating of subprime mortgages resulted in a flight to the safe haven of government treasury investments. The cost of borrowing increased. The rise in submortgage rates resulted in foreclosures and defaults which affected the value of the subprime mortgages and caused mortgage bank securities to fall. This turmoil in the credit markets has made it very hard for UBS to syndicate and so it has had to reintermediate loans on its balance sheet. UBS is now left with loans as assets on the cost side but there is a higher cost to doing the deals and with these loans there have to be equity holdings. In its form 6K filed with the SEC on October 30, 2007 (P378), UBS announced to the public an overall profit. A few weeks later it announced a full loss and that it would write down US subprime holdings by $10 billion. This is UBS's first quarter loss in 9 years. P381 documents that UBS has had to borrow from foreign lenders; it had to raise $11.5 billion.

With respect to the merger in issue, when the $1.5 billion of Finish Line was committed to by UBS, these were fixed rates and they

were fair market transactions. But after June 2007, the spread has widen, the margins have become too low and so the deal was no longer a good one for UBS. Professor Saunders stated that this deal has been disastrous to UBS, that it is a big loss to UBS.

4.    Professor Hitscherich, a law professor and former transactional attorney who specializes in drafting mergers and acquisitions, testified that application of industry custom of transactional attorneys in drafting merger agreements to the Merger Agreement in this case reveals that Genesco had negotiating power. Genesco negotiated in section 3.24 that the seller had no contractual duty under the Merger Agreement to provide information nor did the seller have liability with respect to information that was not specified in the agreement. The buyer's remedy for the seller not producing information was for the buyer to walk away from the transaction, renegotiate price, or seek representations in closing, for example, by stipulating a certain level of EBITDA. In section 4.6, Genesco was able to prevent financing from being a condition to closing. Genesco also negotiated a narrow MAE clause with a right to cure.

5.    Mr. Bronner, an attorney and specialist in drafting mergers and acquisitions and who has chaired and authored numerous ABA publications on the subject, was offered by UBS as an expert in the field of drafting merger agreements. Applying drafting practices and standards of the industry to the Merger Agreement, Mr. Bronner testified that the carve-out of a material adverse effect under the Merger Agreement, section 3.1(a)(B) excludes from the MAE, general economic conditions such as gas prices, problems in the lending industry, but not intra-industry economic conditions such as change in fashion trends or decline in the average selling price of footwear.

6.    Mr. Deetz, a principal in Chicago Partners, LLC, who is a CPA and accredited senior appraiser, offered by Finish Line, testified that the May operating results were material to the merger transaction. In TE 29 he demonstrated that the Q2 decline is the largest dollar decline in operating income in 10 years. The new entity resulting from the merger will have significantly more debt than its competitors. The loss in operating income will make it difficult for the new entity to achieve the growth Finish Line sought in entering into the merger.

7.    Mr. Rock, managing director of a consulting firm, a CPA and certified fraud examiner, testified that the May operating report was material and that Genesco has suffered a material adverse effect. He further testified that the MAE has had a disproportionately lower effect on Genesco than its peers and is due to intra-industry conditions such that the carve-out of section 3.1(a)(B) of the MAE does not apply.

The Court now turns to the specific defenses raised by Finish Line and UBS.

## Fraud

The fraud allegations are that in June of 2007, prior to the June 17 signing of the merger, Genesco concealed from Finish Line and UBS its May operating report and its revised June 15 projections which were based on actual May results. Meanwhile, Finish Line and UBS claim, Genesco senior management and the head of Goldman Sachs' due diligence team, Mr. Friedland, assured Finish Line and UBS that May and June represented a turnaround for Genesco and/or that May was on track.

As to the latter oral representations, the Court dismisses those based on credibility determinations. The Court does not believe the Finish Line and UBS witnesses, Margaret Shanley, Alan Cohen and Mr. Winkler, that Genesco senior management or Goldman Sachs represented that May and June were turnaround months or that May was on track with the May 24 projections. As to each of these alleged oral representations, the Court believes Genesco senior management and Goldman Sachs for the following reasons:

1.    As to the June 5, 2007 call between Genesco and Dunn & Phelps in which Ms. Shanley says that Genesco represented that May and June

14

would be turnaround months, there were many other witnesses to the call and none corroborate Ms. Shanley's recollection.

2. With respect to the June 14, 2007 call between Mr. Gulmi, Mr. Dennis, P. J. Solomon representatives and Steven's Schneider of Finish Line to obtain information for a fairness opinion to be issued by P. J. Solomon for Finish Line, the latter took extensive notes of the conversation and these do not contain notations of a representation by Genesco that the month of May was on track, in line with its projections or a request for May operating results.

3. Mr. Winkler claims that David Friedland represented that Genesco did not prepare monthly projections. This testimony is inconsistent with data that was existing in the data room containing monthly projections. Therefore, it makes no sense that Mr. Friedland would make such a representation since it was patently contradicted by existing data.

4. Mr. Winkler claims that on June 6, Mr. Friedland told Mr. Winkler, in discussing the decline in May same store sales, that May was on track as well as telling this to Mr. Winkler again on June 8. The Court finds that Mr. Friedland did not have the May actual numbers at the time of these conversations. Accordingly, if Mr. Friedland made these representations, they were not false.

5. Mr. Winkler claims that Mr. Friedland told him that the May 8 trial balance was not available when it was. The Court finds that at the time that Mr. Friedland and Mr. Winkler had this conversation, the trial balance had not been provided to Mr. Friedland.

In addition to the foregoing specific reasons for dismissing the claims of alleged oral representations, the Court observed Mr. Gulmi, Mr. Pennington, Mr. Dennis and Mr. Friedland to be believable in their testimony on these points; Mr. Winkler was not. Accordingly, the Court finds that senior management at Genesco and Mr. Friedland did not

make oral representations about May and June performance being on track in the face of actual numbers in May showing a sharp decline.

Where the claims of pre-merger fraud become more difficult to analyze are with respect to the claim of concealment. The difficulty is in mapping out emails to identify who knew what and when.

After a detailed analysis of the facts and the law, the Court finds that Genesco and Goldman Sachs did not fraudulently conceal information. Instead, the Court finds that the fault is with Finish Line's advisor, UBS and its agents, whom Finish Line was relying on to investigate Genesco. These advisors, the Court finds, asked for the May actual numbers before the numbers had been finalized and a May trial balance was prepared. At that point, with its premature request, Finish Line's advisors were required by both the law and the parties' agreement to renew the request for the May numbers. Despite ongoing lists by UBS for information and responses by Genesco and Goldman Sachs, UBS never asked again for the May trial balance. It failed to make such a renewed request despite several opportunities to do so. Under these circumstances, where Finish Line/UBS had the means at its disposal for obtaining the information it now claims was concealed, neither the law nor the parties' agreements required Genesco or Goldman Sachs to voluntarily provide the information. Genesco and Goldman Sachs were allowed by law and their agreement not to provide the May actual numbers. Finish Line, then, signed the Merger Agreement at its own peril.

The Court has arrived at this foregoing conclusion through a detailed analysis of the timing of requests by UBS and Dunn & Phelps for actual May results and receipt of the actual May results by Genesco and Goldman Sachs as well as the rules/procedure the parties agreed to with respect to requesting information. This analysis is tedious but because of its importance to the Court's decision, that analysis is detailed as follows.

1.  As early as May 2007, Finish Line knew that there was a 34% operating decline in Genesco's performance for Q1 2007 (February, March, April). The decline was reported by Dunn & Phelps and reported to Finish Line that there was a deterioration in Genesco's "operating performance in the year-to-date March FY '08 period of all segments except for licensed brands and Johnston and Murphy compared to the year-to-date March FY '07 period." Subsequent to this report, Dunn & Phelps was not instructed by Finish Line to examine any financial information for the May fiscal month. Dunn & Phelps' financial due diligence cutoff was May 5, 2007.

2.  Alongside the Dunn & Phelps report was information posted in the data room of a decline in Genesco's same store sales for May as compared to the previous May.

3.  Meanwhile at the due diligence level, requests were being made by Mr. Raskin and his UBS team to Mr. Downen and his Goldman Sachs team for monthly financial numbers. It is not clear from the emails between these two whether the request for quarterly numbers was for calendar year 2007/fiscal year 2008 well as calendar year 2008/fiscal year 2009 and beyond. As to the latter, it is undisputed that Genesco does not generate prospective monthly financial statements, and that prospective monthly financial statements do not exist and could not have been turned over in response to the request.

    If, however, UBS and Goldman Sachs also were seeking production of quarterly financial reports for 2007, the record establishes that by June 1, 2007 (D48) that UBS recognized that these were not being voluntarily provided, "It sounds like GS/Genesco are unwilling to provide monthly financials. Is that accurate?" and it would have to

press Goldman Sachs to produce these: "Please let Craig know exactly what the communication has been so that he can contact GS if necessary (D48)."

4.    Accordingly, by June 7, 2007, UBS had requested a May trial balance for the Duff and Phelps due diligence (D89). The Court finds that Genesco did not have its trial balance at the time of the request from UBS on June 7, 2007. A later email by Goldman Sachs confirmed that the response to UBS's June 7 request for the trial balance is that it was not provided because it did not exist at the time (P164).

5.    At the same time UBS in due diligence was requesting the May operating report from Goldman Sachs, there was an indication by June 6, 2007 (D86) in the rank, mid-management that the actual numbers for May would vary from the projections. Mr. Gulmi noted to Mr. Pennington and Mr. Dennis that there was a drop in average selling price from May to April (D74).

6.    Coming up from the sales division were the actual May results. Genesco's sales manager, Mr. Estepa, employed at Genesco for 27 years and the creator of Genesco's largest banner, testified about the process Genesco uses to make its monthly projections. The Court credits his testimony. At month end Mr. Estepa's team has a 7:30 staff meeting on that Monday. His team analyzes numbers received from the stores. Tuesday receipts and margin reductions are made and his operational people look at the selling costs to determine the cost effect. The catalogue and web sales are evaluated and then costs pertaining to such things as employee meetings are taken into account. On Wednesday or Thursday evening Tim Baxter, vice president of finance, meets with Mr. Estepa to review the results and then put it in the computer and send to senior management at Genesco. Mr. Estepa testified that he had never been instructed or told that monthly projections had to hit a certain number. He testified that the projections are based on numbers that come from the bottom up. The May 2007 report followed this same procedure as did the June 2007 report.

7.    On Friday, June 8, Mr. Gulmi received the actual May numbers. As is his regular practice, Mr. Gulmi took the May results home to analyze them over the weekend. The May results were not known to Goldman Sachs on June 8.

Also on June 8, Mr. Friedland of Goldman Sachs told Mr. Winkler at UBS to put a number on the table to purchase Genesco. Mr. Winkler's state of mind, as he testified to at trial, was that he believed from Mr. Friedland's statement that Genesco might receive another offer from a private equity firm and Finish Line would not be able to acquire Genesco.

8.  On Monday, June 11, 2007, Mr. Gulmi documented with a handwritten calculation that he realized there had been a $2.1 million miss in the month of May from the projections that had been made (D98). On that day Mr. Gulmi sent the actual May numbers to Mr. Dennis and Mr. Pennington (D97).

9.  The Court finds that Genesco's management (Mr. Gulmi, Mr. Pennington and Mr. Dennis) and mid-management (D102) recognized by Monday, June 11, 2007, that there was a sharp decline in earnings in May and a miss from projections of more than was expected. The Court also finds that they were surprised by the miss. The Court finds that Mr. Gulmi proceeded to try to identify the causes. On that same day, Finish Line made a $54 per share offer to acquire Genesco.

10. The next day, Tuesday, June 12, 2007, Mr. Johnson at Genesco, who works at Mr. Gulmi's direction, proceeded to post the May trial balance in the data room. He then received instructions from Mr. Gulmi not to do so. Also, on June 12, Goldman Sachs was notified by Mr. Gulmi about the sharp decline in May performance. Goldman Sachs linked the May decline with UBS's June 7 request for the May trial balance in an email and concluded that Goldman Sachs had no obligation to provide the trial balance but that it was up to UBS to request it again (P164). On that same day, outstanding due diligence requests of UBS were summarized and listed (P33); the May trial balance was not on UBS's summarized list of outstanding due diligence obligations. Nor was the trial balance requested in a subsequent summarized list of outstanding due diligence requests (P161 and P162).

11. Mr Friedland testified that on Wednesday, June 13, 2007, Finish Line/UBS stated that its due diligence was substantially complete. On that day negotiations continued with Genesco rejecting $54 per share, making a $55 counteroffer and Finish Line offering $54.50. During this same time, Mr. Gulmi was investigating the reason for the May

decline. He found that only $1 million of the loss was attributable to sales. The other million had to do with setting up a reserve and other nonsales related reasons. Of the $1 million sales decline, he concluded that the miss was due to a later tax holiday in key states and back to school date than the previous year. By June 15, 2007, Mr. Gulmi concluded that there would be a shift, due to timing of these sales events, of increased sales to Q3. He concluded that the shift from Q2 to Q3 would net out with no effect on annual projections (P32, P171). Mr. Gulmi reported his conclusions to Goldman Sachs (D127).

12.    Mr. Gulmi and Goldman Sachs agreed on June 15 that Mr. Pennington should call Finish Line to discuss the May numbers and Genesco's determination that the numbers had no effect for the year but merely required a shift in projections from the second quarter to the third quarter. Mr. Pennington, however, did not mention the May numbers in his telephone conversation with Mr. Cohen. Mr. Cohen has testified that Mr. Pennington said in the June 15 telephone conversation, in addition to mentioning the shift in quarters due to back to school sales and taxes, that the May numbers were in line with their projections. The Court does not credit this testimony by Mr. Cohen; the Court finds that Mr. Pennington did not make that statement. In so concluding, the Court observes that notes made by Mr. Pennington with respect to the telephone call do not contain such a notation. Additionally, the Court believes Mr. Pennington when he denies that statement.

13.    Additionally, Genesco revised its projections, after receiving the actual May numbers, on June 15. These revised projections were not provided to UBS or Finish Line.

In short form, then, the Court finds that the foregoing sequence of events reveals that a May trial balance had been requested by Finish Line/UBS prior to the information being available. That request was not placed on the parties list of due diligence items because at the time the information was not available. Then, four days later, simultaneous to Finish Line making its first offer to acquire Genesco, senior management at Genesco realized that

20

there was a sharp decline in May earnings from what was anticipated. Genesco did not know the reason for the decline. The negotiating process continued and Genesco did not provide to Finish Line/UBS the May actual results. Also, during the negotiations due diligence was closed out on June 13, 2007, without Finish Line or UBS having requested that the May trial balance be provided. Further, during the negotiations, Genesco, after receiving the May actual numbers, revised its projections after the parties have agreed to the merger but before it is signed, and Genesco did not provide the change in projections to Finish Line/UBS. Without having seen the May actual results and the revised projections, Finish Line signed the Merger Agreement on June 17, 2007.

With respect to these foregoing events, the legal issue is whether Genesco committed fraud by not providing the May actual results and/or the revised projections prior to Finish Line signing the merger. In deciding this issue the Court has analyzed two sources: (1) the parties' contracts and due diligence procedure and (2) Tennessee and analogous state law.

Key to deciding the fraud claim are provisions in the parties' agreements that Finish Line and its advisors could not hold Genesco liable except for information specified by Finish Line in the Merger Agreement that it was relying on. This agreement is contained in the following provisions of the May 7 confidentiality agreement and the June 17 Merger Agreement:

— Page 4 of the Confidentiality Agreement (P5)—Although the Company was endeavored to include in the Evaluation Material information

which it believes to be relevant for the purpose of your investigation, you understand that such information is provided "as is" and neither the Company nor any of its representatives have made or make any representation or warranty, express or implied, as to the accuracy or completeness of the Evaluation Material and that nothing contained in any discussion between the Company or any of its directors, officers, employees, agents or any other representatives or its advisors and you or any of your representatives shall be deemed to constitute a representation or warranty. You agree that neither the Company nor its representatives or advisors shall have any liability to you or any of your representatives resulting from the use or content of the Evaluation Material or from any action taken or any inaction occurring in reliance on the Evaluation Material, except as may be included in any definitive agreement which provides for any transaction between the Company or any subsidiary thereof or its stockholder and you.

\* \* \*

—    Section 3.24 of the Merger Agreement—<u>No Other Representations or Warranties; Investigation by Parent</u>. Parent and Merger Sub each acknowledges and agrees that (a) it has had an opportunity to discuss the business of the Company and the Company Subsidiaries with the management of the Company, (b) it has had reasonable access to (i) the books and records of the Company an the Company Subsidiaries and (ii) the electronic dataroom maintained by the Company through Merrill Corporation for purposes of the transactions contemplated by this Agreement, (c) it has been afforded the opportunity to ask questions of and receive answers from officers of the Company and (d) except for the representations and warranties contained in this Section 3, and any certificates delivered by the Company in connection with Closing, neither Parent nor Merger Sub have relied upon or otherwise been induced by, any other express or implied representation or warranty with respect to the Company or with respect to any information provided to or made available to Parent or Merger Sub in connection with the transaction contemplated hereunder. Neither the Company nor any other person will have or be subject to any liability or indemnification obligation to Parent, Merger Sub or any other person resulting from the distribution to Parent or Merger Sub, or Parent's or Merger Sub's use of, any such information, including any information, documents, projections, forecasts or other material made available to

Parent or Merger Sub in certain data rooms or management presentations in expectation of the transactions contemplated by this Agreement, unless any such information is expressly included in a representation or warranty contained in this Section 3 or in the corresponding section of the Company Disclosure Schedule.

\* \* \*

— Section 4.10 of the Merger Agreement—<u>No Other Representations Or Warranties</u>. Except for the representations and warranties contained in this Section 4, and any certificate delivered by Parent or Merger Sub in connection with Closing, the Company acknowledges and agrees that none of Parent, Merger Sub or any other person on behalf of Parent or Merger Sub makes, nor has the Company relief upon or otherwise been induced by, any other express or implied representation or warranty with respect to Parent or Merger Sub or with respect to any other information provided to or made available to the Company in connection with the transactions contemplated hereunder. Except as provided in Section 6.8, neither Parent, Merger Sub nor any other person will have or be subject to any liability or indemnification obligation to the Company or any other person resulting from the distribution to the Company, or the Company's use of, any such information, including any information, documents, projections, forecasts or other material made available to the Company in certain data rooms or management presentations in expectation of the transactions contemplated in this Agreement, unless any such information is expressly included in a representation or warranty contained in this Section 4 or in the corresponding section of the Parent Disclosure Schedule.

\* \* \*

— Section 9.1 of the Merger Agreement—<u>Entire Agreement</u>. This Agreement, together with the Company Disclosure Schedule and the Parent Disclosure Schedule and the documents and instruments referred to herein that are to be delivered at the Closing, contains the entire agreement among the parties with respect to the Merger and related transactions, and supersedes all prior agreements, written or oral, among the parties with respect thereto, other than the Confidentiality Agreement which shall survive execution of this Agreement and shall

terminate in accordance with the provisions thereof. EACH PARTY HERETO AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, NEITHER PARENT, MERGER SUB NOR THE COMPANY MAKES ANY OTHER REPRESENTATIONS OR WARRANTIES, AND EACH HEREBY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES MADE BY ITSELF OR ANY OF ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, FINANCIAL AND LEGAL ADVISORS OR OTHER REPRESENTATIVES (OTHER THAN AS SET FORTH IN THE CONFIDENTIALITY AGREEMENT), WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT OR THE MERGER, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO THE OTHER OR THE OTHER'S REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION WITH RESPECT TO ANY ONE OR MORE OF THE FOREGOING.

Accordingly, under the terms of the parties' contracts Finish Line's and UBS's claims that a certain level of monthly or quarterly EBITDA was critical to them in signing the Merger Agreement or that Genesco's performance at the time of the signing of the Merger Agreement was on track with projections or the information provided, is not actionable.

In addition to the parties' contracts is the procedure the parties established with respect to due diligence. The testimony of David Friedland, head of the Goldman Sachs due diligence team for Genesco, as well as emails prepared during due diligence (e.g. D48, D53, P33, P161, P162, P164) establish that it was Finish Line/UBS's duty to specify the information it needed to review. Genesco would then respond. If no response was provided or an inadequate one was provided, the obligation was on Finish Line/UBS to renew the request. This procedure is demonstrated by emails D48 and D53 which show that Finish

Line/UBS recognized that the burden was on them to press for information. Finish Line/UBS did so and would send to Goldman Sachs lists of due diligence items that had not been responded to at all, had not been sufficiently responded or for which Finish Line/UBS sought an update.

Accordingly, in this case, when UBS requested the May trial balance on June 7, it was not available and Goldman Sachs told UBS this. Thereafter, Goldman Sachs internally discussed among its due diligence team (P164) whether UBS would ask again for the May trial balance, reflecting the parties' due diligence procedure that the burden was on UBS to request the information. In the days that follow, UBS did not ask for the May trial balance; nor did UBS consider its June 7 request for the May trial balance an outstanding request because that May trial balance is not contained on UBS's list of outstanding due diligence items (P33, P161, P162).

The combination, then, of the parties agreements and due diligence procedure prevent Genesco from being liable for withholding the May trial balance and the numbers that underlie the June 15 revised projections.

In addition to the parties' agreements and due diligence procedure, Tennessee law also provides that Genesco is not liable for withholding the information contained in the May trial balance.

A general principle of Tennessee law is that if "means of knowledge are at hand and equally available to both parties, the injured party must show that he has availed himself of the means of information existing at the time of the transaction before he will be heard to say that he was deceived by the misrepresentations of the other party." *Solomon v. First American National Bank of Nashville*, 774 S.W.2d 935, 943 (Tenn. App. 1989).

In the *Solomon* case, a guarantor was not permitted to rescind a guaranty allegedly containing a dollar amount she had not agreed to where the guarantor was a literate person who failed to read the guaranty.

Similarly in *Allied Sound, Inc. v. Neely*, 58 S.W.3d 119 (Tenn. App. 2001) the court dismissed a fraud claim where a plaintiff asserted that he was deceived about a condition in a lease requiring a letter of credit:

> Plaintiff had the means to obtain the information needed and discovery any 'fraud' if he had simply asked Century for a copy of the actual lease agreement or inquired as to what additional documentation was required by Century before continuing the performance. While Link asserts that he had never been involved in a lease transaction before, he was an experienced business person, and on this record is charged with knowing there were contingencies to be met by a certain date in connection with the lease. Where information is reasonably discovered, and here where the plaintiff was invited to inquire, it cannot claim reasonable reliance upon a misrepresentation.

*Id.* at 123.

In both of these cases, the courts refused to find fraud where the party had the means to obtain the information the party claims was concealed from it. With respect to the Merger Agreement in issue, the record is clear that Finish Line/UBS had the means to obtain the May

trial balance. UBS and Goldman Sachs acknowledged this in the emails (D48, D53, P164). The fault is with Finish Line's advisor UBS for not requesting the information.

Finally, there is the case of *Hord v. Environmental Research Institute of Michigan*, 463 Mich. 399, 617 N.W.2d 543 (2000). Although not a Tennessee case, it is nevertheless persuasive because the decision applies the same principles discussed above in the Tennessee cases that there is no fraud where a party has the means to obtain the information. This Court mentions the Michigan case because it discusses silent fraud and failure to provide updated information, the precise allegations in this case. Dispositive to the Michigan court, in holding that the failure to provide updated information was not fraudulent, was that the financial information already provided clearly identified its date and there was no evidence that the plaintiffs made any request for updated financial data in particular:

> In the instant case, the 1999 operating summary was the most recent document available in that format. It clearly identified the times for which the financial information was provided. There was no evidence that the plaintiff made any inquiry about the financial condition of the company in general or requested updated financial data in particular.

463 Mich. 412.

This Court concludes, then, that Genesco and Goldman Sachs had no duty by law to provide the May trial balance and revised projections to Finish Line/UBS and that Genesco is not liable for Finish Line/UBS's reliance on information that was not current.

The foregoing conclusion renders it unnecessary for the Court to make findings and conclusion of law with respect to the materiality of the May results. Those results, however,

and their materiality are one component of and to some extent overlap with the analysis of Finish Line/UBS's MAE defense. Accordingly, the Court shall go on at this juncture to state its findings with respect to some of the aspects of the materiality of the May results:

1.  The Court finds that neither Genesco's senior management nor David Friedland of Goldman Sachs had an intent to deceive or defraud in not providing the actual results for May. The claims of Genesco's senior management and David Friedland that they honestly believed that the May results would not change the projections for the year are credited by the Court for three reasons. First, the amount of sales attributable to later back to school and tax free holidays could not be quantified in May. Next, May is historically one of Genesco's lowest months. Thus, it would have been difficult to draw inferences about Genesco's performance for the third quarter or the year from the May numbers. Thirdly, the previous year, Genesco had experienced a low May but had a banner year overall due to a high Q4.

2.  The Court does not believe and does not credit as a matter of law Finish Line's claim that the May results were material. Finish Line has asserted that because the deal was highly leveraged, the sharp decline in May in EBITDA would have halted Finish Line from entering into the Merger Agreement. As a matter of law, the Court rejects this claim because Finish Line did not specify a certain level of EBITDA as a condition to closing. Additionally, Section 4.6 of the Merger Agreement provides, "For avoidance of doubt, it shall not be a condition to Closing for Parent or Merger Sub to obtain the Financing or any alternative financing." Next, as a matter of fact, the Court does not find that production of the May results would have caused Finish Line not to sign the Merger Agreement. Finish Line had determined that acquiring Genesco was the answer to its declines. In the face of the Dunn & Phelps report to Finish Line in May of a 34% decline in Genesco in Q1, Finish Line nevertheless continued to pursue the merger. The Court finds that Finish Line was primarily focused on acquiring Genesco and beating out Foot Locker and the private equity firms. This motivation along with the fact that May is traditionally a low month from which inferences about future performance cannot be drawn, establish that the May results were not material.

3.    There was not enough data and a track record in May to determine that an MAE was occurring.

With respect to the claim of securities fraud, the Court adopts and incorporates its foregoing findings of fact and conclusions of law in dismissing that claim as well.

## Material Adverse Effect

Under the terms of section 7.2(a) of the Merger Agreement a prerequisite for Genesco to obtain specific performance is to demonstrate the absence of a Material Adverse Effect. That term is defined in section 3.1(a):

"Company Material Adverse Effect" shall mean any event, circumstance, change or effect that, individually or in the aggregate, is materially adverse to the business, condition (financial or otherwise), assets, liabilities or results of operations of the Company and the Company Subsidiaries, taken as a whole; provided, however, that none of the following shall constitute, or shall be considered in determining whether there has occurred, and no event, circumstance, change or effect resulting from or arising out of any of the following shall constitute, a Company Material Adverse Effect: (A) the announcement of the execution of this Agreement or the pendency of consummation of the Merger (including the threatened or actual impact on relationships of the Company and the Company Subsidiaries with customers, vendors, suppliers, distributors, landlords or employees (including the threatened or actual termination, suspension, modification or reduction of such relationships)); (B) changes in the national or world economy or financial markets as a whole or changes in general economic conditions that affect the industries in which the Company and the Company Subsidiaries conduct their business, so long as such changes or conditions do not adversely affect the Company and the Company Subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (C) any change in applicable Law,

29

rule or regulation or GAAP or interpretation thereof after the date hereof, so long as such changes do not adversely affect the Company and the Company Subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (D) the failure, in and of itself, of the Company to meet any published or internally prepared estimates of revenues, earnings or other financial projections, performance measures or operating statistics; provided, however, that the facts and circumstances underlying any such failure may, except as may be provided in subsection (A), (B), (C), (E), (F) and (G) of this definition, be considered in determining whether a Company Material Adverse Effect has occurred; (E) a decline in the price, or a change in the trading volume, of the Company Common Stock on the New York Stock Exchange ("NYSE") or the Chicago Stock Exchange ("CHX"); (F) compliance with the terms of, and taking any action required by, this Agreement, or taking or not taking any actions at the request of, or with the consent of, Parent; and (G) acts or omissions of Parent or Merger Sub after the date of this Agreement (other than actions or omissions specifically contemplated by this Agreement).

In addition section 3.1(a) provides that Genesco shall be in good standing under state and federal laws.

The parties' positions are that Genesco asserts that its performance in May and continuing through 2007 is a short term decline in performance in line with its history of "blips" such that no MAE has occurred. Moreover Genesco asserts that the decline in performance are due to general economic conditions such as high gas prices, housing and mortgage issues, and consumer debt, or changes in projections which come within the "carve-outs" in section 3.1(a)(B) and (D). Finish Line and UBS assert that an MAE has occurred and that it does not fit within one of the carve-outs. They also assert that because of the securities investigation of Genesco by federal authorities an MAE has occurred.

30

*Supra* at 10-11 the Court stated its findings with respect to Genesco's 2007 decline in performance. Those statistics have been sliced and diced, configured and reconfigured by the parties and their experts in a variety of ways. There is, though, the Court finds, one fact that is established by the greater weight and preponderance of the evidence from all of the competing analyses, and that fact is dispositive of the MAE issue: Genesco's decline in performance in 2007 is due to general economic conditions such as higher gasoline, heating oil and food prices, housing and mortgage issues, and increased consumer debt loads. This fact is established by the expert testimony of Mr. Cantrell, the empirical observations of Genesco's Senior Vice President of Journeys, Mr. Estepa, and the expert testimony of Professor Saunders concerning UBS's 2007 decline in performance.

With respect to the testimony of Mr. Cantrell, the Court attaches great weight to it. Of all the experts who testified, Mr. Cantrell is the one who had, in addition to academic or professional certification and expertise, actual retail experience. For 26 years, Mr. Cantrell was employed in the retail industry. He served as president and director of a retail footwear company Payless Shoe Stores.

TE25 is an excerpt from Mr. Cantrell's report identifying general economic conditions as the cause for declines in Genesco's sales in 2007. The report contains a quotation from a September 2007 presentation by Finish Line to equity investors citing these macroeconomic conditions on consumer spending. He also quotes other footwear retailers, industry analysts and journalists who cite these same macroeconomic conditions as causing weaker earnings.

31

Finish Line and UBS's challenge to Mr. Cantrell was through the testimony of its experts Mr. Rock and Mr. Bronner. Mr. Rock testified and graphed (TE31) that retail sales were up 3.5% in Q2 and Q3. He also testified that Mr. Cantrell and Genesco had identified causes such as fashion trends and a decline in average selling price of footwear as being responsible for the 2007 Genesco decline. These causes, Mr. Rock testified, are intra-industry conditions. Mr. Bronner testified, per industry custom in drafting merger agreements, that the provisions of section 3.1(a)(B), as written, do not include in the MAE carve-out intra-industry conditions but only general economic conditions.

As to this dispute, Mr. Cantrell's retail experience, the Court concludes, carries the day as well as the breadth of sources he identifies, both in and outside of the footwear industry. The Court concludes from Mr. Cantrell's testimony that the decline in Genesco's sales and earnings in 2007 is due to general economic conditions.

Bolstering Mr. Cantrell's opinion is testimony from Mr. Estepa, the Senior Vice President of Journeys at Genesco, who analyzes sales data from Genesco's stores and meets with Genesco's sales personnel. His empirical impression is that higher gas prices and consumer debt problems have caused consumers to spend less.

Finally, UBS's performance in 2007 and the reasons for that decline testified to by Professor Saunders and detailed above establish that there are significant adjustments in the housing and mortgage and credit industries which are having a ripple effect on consumer spending and creating general economic conditions.

32

The proof, the Court finds, preponderates that Genesco's declines in 2007 are due to general economic conditions, not intra-industry conditions.

The other condition of the MAE carve-out 3.1(a)(B) is that Genesco's decline must not be disproportionate to others in its industry. Again, due to his retail experience, the Court credits Mr. Cantrell's analysis on this point over Mr. Rock. Additionally, the Court does not place weight on Mr. Rock's findings because he included teen footwear retailers in the peer group that he analyzed. That inclusion, the Court finds, skewed the results. Only a part of Genesco's business, 50 to 60%, is due to Journeys, a teen footwear line. Teen retailers, then, included in the peer group askew the results. Also Mr. Rock included in his analysis Genesco's Underground Station which skewed the results downward. The proof at trial established that Finish Line knew before signing the merger of issues with Underground Station, such that its performance should be excluded from Genesco's performance in analyzing peers. The Court, therefore, adopts Mr. Cantrell's conclusion that Genesco's decline in performance is due to general economic conditions and is not disproportionate to its peers in the industry.

Having concluded that Genesco fits within one of the MAE carve-outs, it is not necessary for the Court to decide whether an MAE has occurred. The Court, nevertheless, includes its MAE analysis for completeness. On the issue of whether Genesco has sustained an MAE, the Court finds its has for several reasons.

33

The Court begins with the essential elements of an MAE as provided in the parties' Merger Agreement. Those are a change to the assets, liabilities or result of operations at Genesco (1) taken as a whole, that is (2) material and (3) adverse. The words "material," "adverse," and "as a whole" in the text plainly convey that the change in the target company's business must be significant. Common sense considerations such as the duration of the change, the measure of the change and whether the change relates to an essential purpose or purposes the parties sought to achieve by entering into the merger have been identified and examined by courts in deciding whether an MAE has occurred. *See, e.g. IBP, Inc. v. Tyson Foods, Inc.*, 789 A.2d 14 (De. Ch. 2001); *Frontier Oil Corp. v. Holly Corp.*, 2005 De. Ch. LEXIS 57 (Del. Ch. Apr. 29, 2005); *Esplanade Oil & Gas, Inc. v. Templeton Energy Income Corp.*, 889 F.2d 621 (5th Cir. 1989); *Raskin v. Birmingham Steel Corp.*, 1990 WL 193326 (Del. Ch. Ct. Dec. 4, 1990); *In re Digital Resource, LLC*, 246 B.R. 357 (8th Cir. B.A. P. 2000); *Pan Am Corp. v. Delta Airlines, Inc.*, 175 B.R. 428 (S.D.N.Y. 1994). Corollary to these considerations by courts is that in deciding whether a business change is significant a court must not do in a vacuum but with reference to the context and circumstances of the merger.

With respect to the measure or quantification of the change in Genesco's earnings and performance, the Court finds that that change has been material. The parties and their experts have depicted Genesco's performance and earnings for 2007 in a variety of ways and methods. Cutting through all of these different spins is that the May loss in earnings is one

of the lowest in 10 years, and that, as 2007 comes to a conclusion, there has not been, so far, an offset or mitigation of the Q2 and Q3 declines to remove 2007 as one of the lowest earnings in 10 years.

With respect to duration, the parties have lached onto the statement by Chancellor Strine in *Tyson* that a "blip" in earnings does not constitute an MAE, arguing (Genesco) the May, June decline is just a blip as opposed to (Finish Line/UBS), the continuing results of Genesco's lower performance than last year and previous years reveal that it is not a "blip." This Court uses a somewhat different analysis derived from a point made by UBS from the text of the Merger Agreement.

Section 7.2(b) provides:

> Since the date of this Agreement, there shall not have occurred a Company Material Adverse Effect with respect to the Company and the Company Subsidiaries, considered as a whole, that has not been cured <u>prior to the Termination Date</u> [emphasis added].

The Termination Date is December 31, 2007. Accordingly, as argued by UBS, the inclusion of a provision in the Merger Agreement that Genesco has the opportunity to attempt to cure an MAE by December 31, 2007, is an acknowledgment by the parties that in the context of this merger an MAE can occur in three or four months.

Taking this text of the Merger Agreement and its durational implications into account, the Court further reasons that the facts in this case are that Genesco's sales and earnings have not stayed at the low May, June levels and have increased but have not done so at a level or

pace to offset the decline in May or June to remove 2007, so far, as one of the lowest years in Genesco's ten year performance. The Court concludes that in the context of what the parties acknowledge in the Merger Agreement could be a durationally significant time, the changes in Genesco's performance are of sufficient durational significance to be considered in determining whether an MAE as defined under the Merger Agreement has occurred.

Finally, there is the consideration of whether the change in issue affects the essential purposes the parties sought to achieve by entering into merger. The Court finds that Finish Line had long-term strategic goals in entering into the merger such as diversification, synergies from reduced costs and opportunity for growth. The merger benefits of diversification and synergies from reduced costs remain intact and provide the same complement to Finish Line's business despite a decline in Genesco's earnings. For this reason, Genesco argues, that the 2007 decline in earnings does not relate to an essential purpose the parties sought to achieve in the merger agreement and therefore does not constitute an MAE. The Court rejects this argument. It ignores some of the context and circumstances of the transaction.

First, Genesco's weak performance in Q2 and Q3, the testimony of Mr. Deetz establishes, results in less money being available, after paying financing, to grow the merged company. Secondly, while it is true that the proof establishes that the most important part of the merger to Finish Line were the long-term strategic goals mentioned above, the proof established that a highly leveraged deal with 100% financing was the vehicle required to

accomplish this long-term strategy. That financing was not an essential part of the merger is made clear by several provisions in the Merger Agreement including section 4.6, but it cannot be said that financing was incidental to the merger. Financing had a second tier role. The record revealed that the Genesco part of the merged business, in light of its historical earnings, was planned by Finish Line to contribute 70% to payment of the financing. The 2007 sharp decline in earnings affects this second tier concern of the merger. Accordingly, in deciding whether the change in Genesco's earnings has been material, the Court takes into account, to some degree, that Genesco's decline in earnings affects the ability of the merged entity to pay its financing and have money left over to grow the company.

Totaling up the foregoing, the Court finds that a secondary purpose of the Merger Agreement—paying the financing costs—has been affected by the change in Genesco's performance; the measurable change in earnings—one of the lowest in 10 years—to generate cash to pay the financing and grow the company is a significant change, and that the change in Genesco's earnings from May 2007 to the present is durationally significant. The Court, therefore, concludes that an MAE has occurred.

Finally, there is the claim that an investigation of Genesco for securities violations and a class action lawsuit filed in federal court in Nashville constitute an MAE. This claim relates to an August 30, 2007 conference call to provide information to the market, in which Genesco's senior management stated that (1) low Q2 performance was due primarily to the

shift from Q2 to Q3 of sales resulting from a later back to school and tax free holiday and (2) August sales were positive.

As to the first statement about the Q2/Q3 shift, Finish Line and UBS assert that Q2 performance was so low that Genesco knew by August 2007 that the performance was not attributable to the shift.

As to the statement that August performance was positive, the facts are that the first three weeks of August performance were positive but that on the Thursday the call was made, that week's performance was negative and would have a negative effect on the month. The proof establishes, the Court finds, through the testimony of Mr. Pennington and Mr. Estepa that the sales numbers for Tuesday and Wednesday prior to the call and then Thursday of the call were not final and official and, therefore, were not included in stating August results. Because Genesco made it clear in its call that it was only analyzing sales to date and that the numbers for that week were not final, official numbers, the Court concludes that Genesco had good reason to exclude the unofficial numbers from its analysis and that the call was not fraudulent.

Additionally, the Court dismisses this claim adopting Genesco's argument in its trial brief at p. 57:

> Before any federal investigation can be materially adverse to Genesco's business, there must first be a finding that fraud has, in fact, occurred. *See United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (a grand jury "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not."); *see also Expert Report of Paul Schectman, Dec. 5, 2007, at ¶ 4* (GTB 318-19) ("The issuance of a subpoena,

by itself, does not give rise to an inference of wrongdoing.")  The mere announcement of an investigation that is a direct result of the . . . counterclaims filed by the Defendants in this action cannot be the basis for a MAC.

## Specific Performance

Having dismissed the claims of Finish Line and UBS of fraud and the occurrence of an MAE to excuse their performance of or to rescind the Merger Agreement, lastly the Court must determine if Genesco is entitled to the remedy of specific performance to require Finish Line to close the merger.  That closing, the Court concludes, is appropriate as a matter of equity.

With respect to specific performance, Tennessee law provides five conditions which must be met before the remedy is available.  Justice Koch succinctly identified those in his dissent in the Court of Appeals decision *Colonial Funeral Home, Inc. v. Gilmore*, 1994 WL 521254 at *8 (Tenn. App. 1994).  Three of those conditions are at issue in this case:  there must be no other adequate legal remedy available, *New River Lumber Co. v. Tennessee Ry.*, 136 Tenn. 661, 671, 191 S.W. 334, 338 (1916); the contract must be free from suspicion of fraud, *Shuptrine v. Quinn*, 597 S.W.2d 728, 730 (Tenn. 1979); and specific performance will not be enforced if the contract is harsh, inequitable or oppressive, *Miller v. Resha*, 820 S.W.2d 357, 360 (Tenn. 1991).

The testimony established that Genesco's business has been irreparably harmed as a result of the stalled merger. Genesco's business is in a state of limbo. Uncertainty has negatively affected its stock price, vendor relationships, employee morale, public perception, and virtually every other aspect of its business during the pendency of the merger and this litigation. Due to restrictions that the Merger Agreement imposes on its activities pending closing, it has been unable to open new stores, make significant capital expenditures, and otherwise engage in ordinary business activities that would be inconsistent with Finish Line's plan for Genesco but that would be necessary or desirable for an independent Genesco. For example, Genesco had planned to open a west coast distribution facility that would have reduced the lead time to Genesco's stores on the West Coast and otherwise improve Genesco's west coast inventory management, affecting inventory and sales in its stores. In reliance on the merger and in consultation with Finish Line about its distribution capacity, Genesco has deferred its plans for this new facility because Finish Line's own distribution capacity would have made the new facility unnecessary. Further, Genesco has invested substantial funds, and its employees have invested hours in preparing for the planned integration of the two companies, providing financial information, and complying with onerous and detailed requests for information and analysis from UBS and Finish Line. Those efforts have diverted massive amounts of time from Genesco's business. These facts proven at trial establish irreparable harm and that the payment of damages is not an adequate remedy.

The last two conditions—free from fraud, and a harsh, inequitable or oppressive result—shall be considered together.

The Court has decided as a matter of law that Genesco did not commit fraud. But equity probes deeper than the law and, even where fraud is not present, equity will not enforce an agreement that is unconscientious or will work a hardship.

Genesco's sharp dealings in not voluntarily providing the May actual results; distrust between the parties' management teams generated by the lawsuit; and financial weakness due to the combination of Genesco's 2007 lower earnings and the debt taken on to fund the merger have been identified by Finish Line as grounds for denying specific performance.

The Court must be very careful in its analysis of Finish Line's claim that Genesco, in withholding the May results, acted unconscientiously, as Chancellor Strine in *Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1058 (Del. Ch. 2006) observed in commenting on the "morally tinged ruminations on the importance of deterring fraud." The transaction in issue is not a handshake deal; it does not come within the *Lonesome Dove* frontier standards of dealing. The merger in this case was a highly negotiated transaction, with teams of lawyers, advisors and handlers being paid enormous sums to orchestrate the procedure for obtaining information, the production of information, and the use and reliability of information. This milieu is UBS's home territory. UBS was advising Finish Line. There was, then, no inequality of bargaining power nor oppression. As Professor Hitscherich testified, the provisions contained in the Merger Agreement are standard. Under

these circumstances, the Court finds its does not offend the conscience to enforce performance of the Merger Agreement.

As to the final consideration that enforcing the merger creates a conflicted, financially weak company, the Court has thought long and hard. In deciding to order the merger, the Court has concluded that the merger has a reasonable chance of succeeding. In so concluding the Court credits the testimony of Mr. Estepa, the Senior Vice President of Genesco's most successful banner, Journeys, which represents 50 to 60% of Genesco's business and is important to the merged entity. Mr. Estepa testified about his respect for Mr. Alan Cohen of Finish Line. Mr. Estepa testified about his determination to make the merger work and his commitment to its success. The Court also recalls that Mr. Schneider of Finish Line could not identify any systemic problem with Genesco's operation, and Mr. Cantrell's testimony that the same synergies that caused Finish Line to propose the merger, such as diversity of product lines and customers, are still present. Finally, insolvency proof of the combined entities was not provided to this Court. That issue has been reserved and carved out of this litigation for the New York Court to decide. If the combined companies would result in an insolvent entity, the New York lawsuit by UBS will halt the merger. Accordingly, from the proof presented to it, this Court concludes that the combined entity can succeed. Specific performance is not a futile, harsh result.

_Ellen Hobbs Lyle_
ELLEN HOBBS LYLE
CHANCELLOR

cc:    Overton Thompson III
       Britt Latham
       W. Brantley Phillips, Jr.
       Brian Roark
       Russell Stair

       Jonathan Schiller
       James Denvir
       Michael Brille
       William Jackson
       Jonathan Shaw

       Robert Walker
       J. Mark Tipps
       John Hayworth
       John Farringer IV

       John Hicks

       Joseph Frank

# IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY, PART III

|  |  |  |
|---|---|---|
| GENESCO, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| VS. | ) | **NO. 07-2137-II(III)** |
| | ) | |
| THE FINISH LINE, INC., and | ) | |
| HEADWIND, INC., UBS SECURITIES | ) | |
| LLC and UBS LOAN FINANCE LLC, | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

For the parties' notice in determining the timing and procedure for appeal, the Court clarifies that the December 27, 2007 Order granting Genesco specific performance is not a final order.

The parties agreed prior to trial that the issue of insolvency would be determined by the New York Court in the lawsuit filed by UBS. Accordingly, no proof or argument concerning insolvency or frustration of commercial purpose was presented to this Court. The few facts and expert testimony presented in this case on the financial condition of the merged entity were provided on the fraud issue on the materiality of financing and on the MAE issue, and the proof was confined mostly to testimony by Mr. Deetz with respect to the UBS model on the cash flow of the merged entity (TE29). The Court, therefore, did not consider insolvency in its ruling, leaving that determination for UBS's lawsuit in New York.

Thus, this Court's December 27, 2007 order requires Finish Line to perform the parties' Merger Agreement, including exercising its best efforts to obtain financing. Finish Line's performance of the merger, however, could be impossible if the New York Court determines that the merged entity is insolvent, and Finish Line returns to this Court asserting the doctrine of frustration of commercial purpose to prevent enforcement by Genesco of the order of specific performance. *See Haun v. King and Merritt*, 690 S.W.2d 869, 872 (Tenn. 1985) (unexpected financial difficulty, expense or hardship did not excuse performance of contract where discontinuance of financing was foreseen). The issue of insolvency and the implications of the determination of that issue for this lawsuit, then, are not ripe and depend upon developments in the New York lawsuit.

It is so ORDERED.

_Ellen Hobbs Lyle_
ELLEN HOBBS LYLE
CHANCELLOR

cc:    Overton Thompson III
            (via fax and US Mail)
        Britt Latham
        W. Brantley Phillips, Jr.
        Brian Roark
        Russell Stair

        Jonathan Schiller
        James Denvir
        Michael Brille
        William Jackson
        Jonathan Shaw

        Robert Walker
            (via fax and US Mail)
        J. Mark Tipps
        John Hayworth
        John Farringer IV

        John Hicks
            (via fax and US Mail)

        Joseph Frank