# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UBS SECURITIES LLC, and
UBS LOAN FINANCE LLC,

                    Plaintiffs/Counter-Defendants,

v.

THE FINISH LINE, INC.,

                    Defendants/Counter-Plaintiff,

and

GENESCO INC.,

                    Defendant.

No. 07 Civ. 10382 (LAP)

## DECLARATION OF ALEXANDRA A.E. SHAPIRO IN SUPPORT OF PLAINTIFFS' OPPOSITION TO GENESCO INC.'S MOTION TO DISMISS OR ABSTAIN

I, Alexandra A.E. Shapiro, do hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am a member of Latham & Watkins LLP, 885 Third Avenue, New York, New York, 10022, (212) 906-1200, attorneys of record for Plaintiff UBS Securities LLC and UBS Loan Finance LLC in the above-captioned matter.

2. As a member in good standing in this Court and in the Bar of the State of New York, I respectfully submit this Opposition to Genesco Inc.'s Memorandum of Law in Support of Motion to Dismiss or Abstain, which is submitted concurrently herewith.

3. Attached hereto are true and correct copies of the following documents:

    Exhibit 1: *Genesco, Inc. v. The Finish Line, Inc. et al.,* No. 07-2137-II(III) (20th Div. Tenn. Chancery Ct.), UBS's Memorandum in Support of Motion to Intervene, dated Oct. 10, 2007;

    Exhibit 2: *Genesco, Inc. v. The Finish Line, Inc. et al.,* No. 07-2137-II(III) (20th Div. Tenn. Chancery Ct.), Memorandum and Order, dated Dec. 27, 2007;

Exhibit 3:  *Genesco, Inc. v. The Finish Line, Inc. et al.,* No. 07-2137-II(III) (20th Div. Tenn. Chancery Ct.), UBS's Response to Genesco's Motion to Clarify, dated Nov. 28, 2007;

Exhibit 4:  *Genesco, Inc. v. The Finish Line, Inc. et al.,* No. 07-2137-II(III) (20th Div. Tenn. Chancery Ct.), Order, dated Jan. 2, 2008;

Exhibit 5:  *Genesco, Inc. v. The Finish Line, Inc. et al.,* No. 07-2137-II(III) (20th Div. Tenn. Chancery Ct.), Memorandum and Order, dated Nov. 29, 2007;

Exhibit 6:  Bank and Bridge Facilities Commitment Letter, dated June 17, 2007;

Exhibit 7:  Bank and Bridge Facilities Fee Letter, dated June 17, 2007.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully submitted,

Dated:    February 9, 2008
          New York, New York

By:

Alexandra A.E. Shapiro (AS-4816)
Attorney for Plaintiffs UBS Securities
LLC and UBS Loan Finance LLC

IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE

| | |
|---|---|
| GENESCO INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )    Case No. 07-2137-II (III) |
| | ) |
| THE FINISH LINE, INC., *et al*, | ) |
| | ) |
| Defendants | ) |

## MEMORANDUM OF LAW IN SUPPORT OF UBS SECURITIES LLC AND UBS LOAN FINANCE LLC'S MOTION TO INTERVENE

UBS Securities LLC and UBS Loan Finance LLC (collectively, "UBS"), by and through counsel, hereby move this Court, pursuant to Rules 24.01 and 24.02 of the Tennessee Rules of Civil Procedure,[1] for an Order granting UBS leave to intervene as a Defendant in this case for the purposes of obtaining discovery from Genesco and participating in any adjudication of whether a Material Adverse Change has occurred under either the Commitment Letter[2] or the Merger Agreement.[3]

### BACKGROUND

The Finish Line, Inc. ("Finish Line") agreed to acquire Genesco on June 17, 2007 pursuant to the terms of the Merger Agreement. On June 17, 2007, Finish Line and UBS signed

---

[1] Tenn. R. Civ. P. 24.03 requires that a motion to intervene be accompanied by a "pleading setting forth the claim or defense for which intervention is sought." UBS's proposed Answer is attached to this Motion as Exhibit A.

[2] "Commitment Letter" refers to the Bank and Bridge Facilities Commitment Letter by and between UBS Loan Finance LLC, UBS Securities LLC and The Finish Line, Inc., dated June 17, 2007.

[3] "Merger Agreement" refers to the Agreement and Plan of Merger By and Among The Finish Line, Inc., Headwind, Inc. and Genesco, Inc., dated as of June 17, 2007.

the Commitment Letter, which obligates UBS to provide $1.8 billion to finance the acquisition,

provided, among other things, that certain pre-closing conditions are satisfied.  One of these

conditions excuses UBS from performing under the Commitment Letter if, after June 17, 2007,

Genesco suffers a "Material Adverse Effect," and the Material Adverse Effect is not cured prior

to December 31, 2007.

On August 30, 2007, Genesco released its financial performance for the second

quarter 2007.[4]  Genesco announced that its earnings (EBIT) were down 77% compared to the

same period for the prior year.  That decline seemed to surprise almost everyone.  Indeed, not

only were Genesco's earnings dramatically lower than the prior year, but those earnings also

were dramatically lower than recent analyst estimates—which actually had been projecting a

gain on the prior year based on Genesco's own recent guidance.  Genesco instead announced an

unexpected and significant loss.  To date, Genesco has offered no satisfactory explanation for its

second quarter decline.

Under Section 6.3 of the Merger Agreement, Genesco is obligated to "afford

[Finish Line's] lenders such access to the books and records, financial, operating and other data"

of Genesco "as is reasonably necessary or appropriate."  Also, in connection with any request

that UBS close its financing and participate in a public offering of securities, Genesco must

ensure that the financial information "is and will be complete and correct in all material respects

and does not and will not contain any untrue statement of a material fact or omit to state a

material fact necessary to make the statements contained therein, in light of the circumstances

under which such statements are made, not misleading."

---

[4]    Genesco's fiscal year begins in February, meaning the second quarter of the fiscal year covers May through July.

2

After Genesco announced its dramatic and unexpected second quarter decline, UBS and Finish Line were not able to determine based on available information whether Genesco has suffered a Material Adverse Effect under either the Merger Agreement or the Commitment Letter. UBS and Finish Line exercised their rights under the transaction agreements and requested that Genesco provide additional information to begin to understand whether a Material Adverse Effect had occurred. Genesco refused this request; instead of satisfying its obligations under the agreements and providing UBS and Finish Line access to its books and records, Genesco filed this lawsuit against Finish Line seeking specific performance under the Merger Agreement.

## ARGUMENT

## I.    Intervention as of Right

To establish a right to intervene under Tenn. R. Civ. P. 24.01, a party must satisfy four elements: "(1) The application for intervention was timely; (2) The proposed intervenor has a substantial legal interest in the subject matter of the pending litigation; (3) The proposed intervenor's ability to protect that interest is impaired; and (4) The parties to the underlying suit do not adequately represent the intervenor's interest." *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 190 (Tenn. 2000). For the reasons set forth below, UBS satisfies each of elements required to demonstrate intervention as of right.

### A.    UBS's Motion is Timely

"The timeliness of an intervention is governed by equitable principles and is determined by the facts and circumstances of each particular case." *American Materials Technologies, LLC v. City of Chattanooga*, 42 S.W.3d 914, 916 (Tenn. Ct. App. 2000). Genesco filed its Complaint on September 21, 2007. Only 19 days later on October 10, 2007, UBS

3

hereby moves to intervene.  Tennessee precedent makes clear that under these circumstances, the

motion is timely.  *See, e.g., Posey v. Dryvit Sys., Inc.* ("*Posey*"), No. E2003-00392-COA-R3-CV,

2004 WL 572348, at *4 (Tenn. Ct. App. 2004) (motion timely when filed less than 90 days after

notice was given); *Beckman Indus. v. Int'l Ins. Co.,* 966 F.2d 470, 471 (9th Cir. 1992) (motion to

intervene timely when filed 2 years after settlement); *FDIC v. Ernst & Ernst*, 677 F.2d 230 (2d

Cir. 1982) (third party permitted to intervene and challenge a stipulated confidentiality order two

years after a judicially-approved settlement).

**B.**     **UBS Has a Substantial Legal Interest**

"The right to intervene in litigation must be a substantial interest, a legal interest,

an interest known and protected by the law, or must be sufficiently related to the original action."

*Posey*, 2004 WL 572348, at *6 (Tenn. Ct. App. 2004) (quoting 59 AM. JUR. 2D Parties § 168).  In

determining whether or not an interest is substantial, a court must consider whether resolution of

the litigation would change the intervenor's status in any way.  *See Blount v. City of Memphis*,

No. W2006-01191-COA-R3-CV, 2007 Tenn. App. LEXIS 214, at *11 (Tenn. Ct. App. 2007).

In this case, the court will have to decide whether all closing conditions have been

met.  One of those closing conditions is whether a Material Adverse Effect has occurred under

the Merger Agreement and Commitment Letter.  Whether a Material Adverse Effect has

occurred could directly affect UBS's obligation to fund the $1.8 billion under the Commitment

Letter.  Because UBS's interest in a lawsuit is such that the outcome of the case may alter its

contractual obligations to an extant party, it has a "substantial interest" in the litigation and is

entitled to intervene as a matter of right.  *See, e.g., Reich v. ABC/York-Estes Corp.*, 64 F.3d 316,

322 (7th Cir. 1995) (employees have a substantial interest in Fair Labor Standards Act action

against employer where the lawsuit will define the contractual relationship between employer

4

and employees); *Hartford Fire Ins. Co. v. Mitlof*, 193 F.R.D. 154, 160-61 (S.D.N.Y. 2000) (insurer permitted to intervene in action that would determine the scope of coverage).

### C.    UBS's Interest Would Be Impaired and Impeded Absent Joinder

Impairment is shown when disposition of the action "may" impede or impair the movant's ability to protect its interest "as a practical matter." Tenn. R. Civ. P. § 24.01. An intervenor "need not show that . . . impairment will inevitably ensue from an unfavorable disposition . . . [T]he would-be intervenors need only show that the disposition '*may* . . . impair or impede [their] ability to protect [their] interest.'" *Purnell v. City of Akron*, 925 F.2d 941, 948 (6th Cir. 1991) (emphasis, brackets, and second ellipses in original); *see also Posey*, 2004 WL 572348, at *6 (permitting intervention in a settlement discussion where "the terms of the Settlement expressly impact upon the [intervenors'] interests" such that the proposed settlement might increase intervenors' liability).

UBS stands to "gain or lose" a substantial interest "by direct operation of the [the court's] judgment." *Brown & Williamson*, 18 S.W.3d at 192. For the reasons explained above, any determination that Genesco's poor financial performance constitutes a Material Adverse Effect would directly affect UBS's obligations and rights under the Commitment Letter. Intervention is clearly warranted under these circumstances. *See, e.g., Posey*, 2004 WL 572348, at *4.

### D.    UBS's Ability to Protect Its Legal Interests Will Be Impaired If It Is Excluded from This Case.

The Supreme Court of the United States has stated that the burden of showing that representation may not be adequate is "minimal." *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 n.10 (1972). "This burden has been described as minimal because it need only be shown that there is a *potential* for inadequate representation." *United States v. Michigan*,

424 F.3d 438, 443 (6th Cir. 2005) (emphasis in original; internal quotation marks omitted); *see also Fed. Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist.*, 983 F.2d 211, 216 (11th Cir. 1993) ("Any doubt concerning the propriety of intervention should be resolved in favor of the proposed intervenors . . ."). "[T]here is good reason in most cases to suppose that the applicant is the best judge of the representation of the applicant's own interests and to be liberal in finding that one who is willing to bear the cost of separate representation may not be adequately represented by the existing parties." Charles A. Wright & Arthur R. Miller, 7C Fed. Prac. & Proc. Civ.3d § 1909.

UBS's interest in these proceedings is unique. As the potential financier of $1.8 billion for the Finish Line/Genesco merger, UBS is in a place of enormous risk. Since UBS has a unique and substantial interest in the transaction, and that interest would be impaired absent joinder, UBS is entitled to intervene pursuant to Tenn. R. Civ. P. 24.01.

## II.    Permissive Intervention

In the alternative, UBS is entitled to intervene permissively pursuant to Tenn. R. Civ. P. 24.02. Permissive intervention is appropriate where, "upon timely application . . . an applicant's claim or defense and the main action have a question of law or fact in common." Tenn. R. Civ. P. 24.02. Permissive intervention is within the discretion of the court, and "[i]n exercising discretion the court shall consider whether or not the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Tenn. R. Civ. P. 24.02. Thus, where a "would-be intervenor's claim or defense contains a question of law or fact that also is raised by the main action then the requirement of the rule has been satisfied and the trial court is afforded discretion to permit intervention." *Ballard v. Herzke,* 924 S.W.2d 652, 657 (Tenn. 1996). The permissive intervention statute does not require "that the intervenor have a direct

6

personal or pecuniary interest in the subject of litigation." *SEC v. U.S. Realty & Improvement Co.*, 310 U.S. 434, 459 (1940).

UBS seeks to intervene to gather more information about Genesco's recent decline and, if necessary, to determine whether Genesco has experienced a Material Adverse Change—all issues that are presently before the Court. *See Kentucky National Insurance Co. v. Gardner*, 6 S.W.3d 493, 499 (Tenn. 1999) (insurer may intervene to assert subrogation claims against tortfeasor on behalf of insured); *Travelers Ins. Company v. Williams*, 541 S.W.2d 587, 590 (Tenn. 1976) (same); *see also State ex rel. Elvis Presley International Memorial Foundation v. Crowell*, 733 S.W.2d 89, 93 (Tenn. App. 1987) (Elvis Presley's estate permitted to intervene in support of defendant being sued for unfair competition for using Presley as part of its corporate name). For this reason, intervention by UBS will neither delay nor prejudice adjudication of the extant parties' rights. The Court will adjudicate the same issues and proceed according to the same schedule regardless of whether or not UBS intervenes.

7

## CONCLUSION

For the reasons set forth above, UBS respectfully requests that it be permitted to intervene in this matter pursuant to Tenn. R. Civ. P. 24.01 or, in the alternative, Tenn. R. Civ. P. 24.02.

Dated:  October ___, 2007

Respectfully submitted,

John S. Hicks (BPR No. 10478)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ
211 Commerce Street, Suite 1000
Nashville, Tennessee  37201
(615) 726-5600
(615) 726-0464 (*Facsimile*)

Attorneys for UBS Securities LLC and
UBS Loan Finance LLC

Of Counsel:
Joseph J. Frank
Latham & Watkins LLP
885 Third Avenue
New York, NY  10022

8

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing has been served upon the following via hand delivery and email, on this _10th_ day of October, 2007:

> Robert J. Walker
> J. Mark Tipps
> John C. Hayworth
> John L. Farringer
> WALKER TIPPS & MALONE
> 2300 One Nashville Place
> 150 Fourth Avenue North
> Nashville, TN 37219
>
>
> Overton Thompson, III
> Britt K. Latham
> W. Brantley Phillips, Jr.
> Brian D. Roark
> Russell E. Stair
> BASS, BERRY & SIMS PLC
> Suite 2700
> 315 Deaderick Street
> Nashville, Tennessee  37238-3001

9

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY, PART III

GENESCO, INC.,                          )
                                        )
        Plaintiff,                      )
                                        )
VS.                                     )    NO. 07-2137-II(III)
                                        )
THE FINISH LINE, INC., and              )
HEADWIND, INC.,                         )
                                        )
        Defendants,                     )
                                        )
VS.                                     )
                                        )
UBS SECURITIES LLC and                  )
UBS LOAN FINANCE LLC,                   )
                                        )
        Defendants.                     )

## MEMORANDUM AND ORDER

On June 17, 2007, the parties to this lawsuit, both sellers of footwear, signed a Merger

Agreement for the defendant, Finish Line, Inc. to acquire the plaintiff, Genesco, for

$1.5 billion. The transaction was highly leveraged with UBS providing the financing. The

Merger Agreement provided that if it was not closed by December 31, 2007, either party

could terminate the transaction.

Within a couple months of the merger being signed, Genesco's quarterly earnings

were falling significantly short of projections and were some of the lowest in 10 years. By

early September 2007, the deal had stalled after Genesco obtained shareholder approval of

the merger and demanded a closing; whereas UBS refused to proceed, demanding more information about the decline in earnings.

Genesco filed this lawsuit on September 24, 2007, for the Court to order Finish Line and UBS to close the deal before the December 31, 2007 termination date.

Finish Line and UBS asserted a contract and two tort defenses to closing the merger. The contract defense is related to paragraph 3.1(a) of the Merger Agreement which excuses closing the deal if a Material Adverse Effect ("MAE") has occurred. The tort defenses are that Genesco committed securities fraud and fraudulently induced Finish Line to enter into the deal by not providing material information concerning Genesco's May performance and updated projections to Finish Line prior to the signing of the Merger Agreement.

In section 9.9 of the Merger Agreement the parties acknowledge that failure of the merger to close will result in immediate and irreparable harm and unquantifiable damage. The remedy they stipulate is specific performance. Enforcing that stipulation of the parties, the Court commenced a speedy trial on December 10 and ending December 18, 2007, to decide whether Genesco was entitled to have the merger closed, or if Finish Line and UBS, were entitled to rescission or have their performance excused due to Genesco's fraud, and/or, due to the occurrence of an MAE.

After considering the proof and argument of counsel, the Court finds that Genesco has proven that all conditions in the Merger Agreement to closing have been met; Finish Line

and UBS have failed to prove that Genesco fraudulently induced Finish Line to enter into the contract or that Genesco committed securities fraud. Finish Line and UBS have also failed to demonstrate the existence of an MAE under section 3.1(a) of the Merger Agreement to excuse performance because the Court concludes that Genesco fits within exception/carve-out (B) to the MAE provision.

It is therefore ORDERED that the Court declares that all conditions to the Merger Agreement have been met. The Court declares that Finish Line has breached the Merger Agreement by not closing and declares that Finish Line is not entitled to invoke the December 31, 2007 termination procedures of Section 8 of the Merger Agreement. The Court ORDERS that Finish Line shall specifically perform the terms of the Merger Agreement, including that it shall close the merger pursuant to section 1.2 of the Merger Agreement, it shall use its reasonable best efforts to take all actions to consummate the merger as required by section 6.4(d) of the Merger Agreement, and it shall use its reasonable best efforts to obtain financing as per section 6.8(a) of the Merger Agreement. Excepted from the provisions of this Order and Memorandum are issues as to the solvency of the merged entity. That issue is reserved for determination by a New York Court in a lawsuit filed by UBS.

3

The findings of fact and conclusions of law on which the Court bases its decision follow. The Court begins with findings of core facts which provide a main thoroughfare sequence of events. Then, the Court turns to detailed findings of fact and conclusions of law with respect to each of the three defenses asserted by Finish Line and UBS and the remedy of specific performance.

## Findings of Fact

Genesco is a retailer of shoes, hats and apparel. It was founded in the 1920's and operates over 2,000 retail stores. Its net sales for 2006[1] were close to $1.5 billion. Its operation income exceeded $121 million. Its banners include Journeys, Hat World, and Johnston & Murphy. Genesco's senior management team is led by Hal Pennington (CEO), Bob Dennis (President and COO), Jim Gulmi (CFO) and Jim Estepa (Senior Vice President of Genesco's largest banner, Journeys).

Finish Line is an Indianapolis based specialty retailer of athletic, lifestyle and outdoor footwear and apparel. It was started in 1976. Beginning as an athletic Finish Line specialty store, it bought the franchise rights for Athlete's Foot. In the mid-1970's when athletic footwear became fashionable, Finish Line grew the business and went public. It operates 800 stores, a chain of Finish Line athletic apparel stores and ManAlive, a retailer offering men

---

[1]Throughout this memorandum, for ease of reference, the Court refers to the calendar year even though many of the exhibits state the dates in terms of Genesco's fiscal year. Genesco's fiscal year '08 is calendar year 2007.

4

and women's brand clothing and accessories. Finish Line's 2007 revenues were $1.3 billion, with operating income of $57 million. Finish Line's only competitor is Foot Locker. The latter has four to five times the revenue of Finish Line.

Finish Line's president, Mr. Alan Cohen, testified that in the last two years Finish Line's operation income has declined, the company is not growing, and business has not been going well. In October of 2006, Finish Line retained UBS and lawyers Gibson, Dunn & Crutcher and began exploring strategic alternatives. Finish Line considered a merger with Foot Locker but never seriously pursued it because of the downturn in the athletic wear industry.

In the spring of 2007, Alan Cohen saw a press release that Foot Locker was making a hostile move on Genesco. Foot Locker had offered to purchase Genesco and Genesco had refused.

Mr. Cohen testified that because Finish Line and Genesco are not primary competitors, he was interested in Genesco. The companies have different products and customer bases. Accordingly, if combined, the companies would result in a $3 billion entity with ManAlive (Finish Line's "hip hop" banner), Finish Line's athletic banner, and the diversity of Genesco's Journey's, Journey's Kids, Underground Station, Johnston & Murphy and Hat World. With a greater scale of the combined company, there would be growth potential and diversity of different concepts. The combined company would have more strength with vendors, landlords and REITs. Mr. Cantrell, a retail expert presented by

5

Genesco, testified to the counter-cyclical nature of the combined businesses because of this diversity which would provide more flexibility and strength in withstanding fashion trends.

In April of 2007, Foot Locker made a $46 per share offer to buy Genesco which was rejected by Genesco. Just prior to that time Genesco had retained Goldman Sachs in March of 2007 to explore strategic alternatives preparatory to Foot Locker's interest.

On the same day of the announcement of the Foot Locker $46 per share offer, Alan Cohen of Finish Line contacted Bob Dennis about Finish Line's interest in Genesco. Several days later, UBS, on behalf of Finish Line, contacted David Friedland, of Goldman Sachs, stating Finish Line's serious interest in acquiring Genesco. In addition to Foot Locker and Finish Line, there were also six private equity firms interested in acquiring Genesco.

To provide information to potential purchasers, Genesco established an electronic data room. David Friedland of Goldman Sachs supervised the data room and due diligence process for Genesco. From his testimony, the Court finds that the data room contained information on Genesco for prospective purchasers. Goldman Sachs worked with Genesco to initially populate the site with information Genesco was willing to post. After initially populating the site, buyers would send questions and requests to Goldman Sachs who would take them to Genesco. The response of Genesco was provided to Goldman Sachs who then either posted the information in the data room, emailed the information to the interested party or set up a conference call.

6

A condition to receiving information in the data room was signing a confidentiality and stand still agreement (P5).[2] One was signed by Finish Line on May 7. From May 17 to the signing of the Merger Agreement, Finish Line had access to the data room.

The Confidentiality Agreement (P5) which Finish Line signed contained a provision that neither Finish Line nor its representatives UBS and Dunn & Phelps were entitled to rely upon the accuracy or completeness of information provided by Genesco and that neither Genesco nor its representatives were liable for any action or inaction taken by Finish Line in reliance on the information unless it was specified in the Merger Agreement.

The Merger Agreement, as well, addressed reliance. Section 3.24 provides that "neither Parent nor Merger Sub have relied upon or otherwise been induced by, any other express or implied representation or warranty with respect to the Company or with respect to any information provided to or made available to Parent or Merger Sub in connection with the transaction contemplated hereunder." Finally, section 9.1 of the Merger Agreement provided that the parties made no "other representations or warranties and hereby disclaims any other representations or warranties" made by the companies or their agents.

Foot Locker did not sign the Confidentiality Agreement and, therefore, did not have access to the electronic data room.

---

[2]References to "P____," "D____," or "TE____" are references identifying an exhibit admitted into evidence at trial.

On May 24, 2007, Foot Locker made a $51 per share offer. It was rejected by Genesco on May 29, 2007. Finish Line offered $54 per share on June 11. It was rejected by Genesco with a counteroffer of $55 on June 12. On June 13, Finish Line made its best and final offer of $54.50 per share, which was accepted by Genesco. The parties signed their Merger Agreement (P1) on June 17, 2007.

In addition to the foregoing findings, the Court finds from the testimony of senior management of Genesco, David Friedland of Goldman Sachs, Alan Cohen of Finish Line and Mr. Winkler of UBS that the following motivations of the parties were present in negotiating the provisions of the Merger Agreement:

1.   It was critical to Genesco that the deal not be contingent on financing. The merger was structured as a cash deal so that it would quickly and with more certainty close. Bob Dennis, president and COO of Genesco, explained that Genesco did not want the damage and harm that would result from a merger that did not close or one that was delayed.

2.   That Finish Line was smaller in terms of number of stores than Genesco, Genesco insisted that Finish Line obtain a solvency opinion on whether it could assume the debt that would be required to fund the merger. Mr. Friedland testified that UBS's presence as the lender assuaged Genesco's concern as well.

3.   Finish Line's primary concern was that it might lose out to Foot Locker or one of the private equity firms in the bidding for Genesco. The Court finds that on June 8 when Mr. Friedland communicated to Mr. Winkler of UBS that it was time for Finish Line to make an offer, Mr. Winkler's main concern was that Finish Line would lose the bidding.

4.   Finish Line's primary motivation in pursuing the merger was diversity, synergies resulting from reduced costs, and the opportunities for growth.

8

After the Merger Agreement was signed, in a July 10, 2007 call from Genesco senior management to Finish Line, the latter was told that Genesco had missed its June projections by $4.7 million. May results were also provided at that time, showing a $2.1 million miss from projections. By August, Genesco's May market guidance of 30 cents per share failed to reach those results; actual results were 0 cents per share.

On September 17, 2007, Genesco shareholders voted to approve the merger. Genesco pressed for closing the merger. UBS delayed and requested information on the drop in Genesco's performance, asserting its concern that a Material Adverse Effect had occurred. This lawsuit followed.

Subsequent to the filing of the lawsuit, Finish Line and UBS interviewed witnesses and obtained production of emails from which they concluded that Genesco had concealed its actual May results and revised projections prior to Finish Line signing the merger while Genesco senior management and Goldman Sachs assured Finish Line and UBS that May was on track with its projections. The concealment and false representations, Finish Line and UBS asserted, fraudulently induced them to proceed with the Merger Agreement. Then, after the Merger Agreement was signed, Genesco continued to distort its performance to the detriment of Finish Line and UBS by providing false guidance to the market in an August 30, 2007 conference call by attributing its Q2[3] disappointing results primarily to a delayed

---

[3] "Q___" refers to "Quarter." Genesco's Q1 is February, March, April; Q2 is May, June, July, and so on.

tax holiday and back to school date and by stating that its August sales were positive when more recent results revealed them to be negative.

With respect to Genesco's financial and sales performance, the proof at trial established that they declined in May 2007 and have not been mitigated or offset by significant rebounds in the rest of the year:

1.  Genesco missed its projections for the first quarter: February was down $1.7 million and April was down $1.2 million. Genesco was down 34% in same store sales in its first quarter. Prior to the merger Finish Line was told this by its advisor Dunn & Phelps. Average selling price declined 3.4% in Q1.

2.  Genesco continued to miss its projections for 2007: the May miss was $2.1 million; the June miss was $4.7 million. Q3 was projected at $23.6 million; it came in at $13.6 million—a decline of $10 million.

3.  TE31 depicts a 61% decline in earnings for Q2 and Q3 compared to the previous year. 54% for combined Q1, Q2 and Q3.

4.  In 2006, Genesco missed its projections significantly in May, missed its projections in six months and yet had a banner year based on Q4 gains.

5.  2007, however, has not seen a rebound like there was in 2006. Comparative store sales in 2007 have continued to decline: July was down 5-6%. November (first month of the fourth quarter) was down by 4.2%. Sales in the week before Christmas were disappointing.

6.  Between June 11 and June 15, senior management at Genesco concluded that because of a delay in return to school and tax free holidays in two states, performance projections for Genesco in Q2 (May, June, July) would shift to Q3 (August, September, October) and there would be a net effect such that decreased performance in Q2 would net out in Q3 when sales from back to school and tax holiday days hit. That net, however, did not occur. The back to school and tax effect was later calculated to be only 8 cents per share. The balance sheet effect was $261,000 to $300,000. In hindsight, back to school

10

and tax holidays delay did not come close to accounting for the decline in Q2. Total Q2 decline of earnings per share of 30 cents only 8 cents accounted for the back to school and tax free delay.

7. Expert Deetz' graph (TE 29) depicts that operating income losses in Q2 2007 are the lowest in 10 years.

8. Professor Weil's graph (TE16) show EBITDA in 2007 is in the low range for Genesco's 10-year history.

Alongside Genesco's decline in performance and only a few weeks after the Merger Agreement was signed, the credit markets felt the effects from a number of defaults in sub-prime mortgages. UBS was hit particularly hard. It sustained a $3.44 billion loss in Q3—its first quarter loss after 9 straight years of profitability. This loss was attributable to losses sustained by a UBS hedge fund heavily invested in subprime mortgage backed securities as well as losses in UBS's fixed income securities. UBS's CEO was terminated. UBS has had to borrow from foreign investors to raise $11.5 billion It has admitted that the Finish Line/Genesco deal is now a huge losing proposition for UBS. Emails obtained by Genesco in discovery uncovered that UBS in the fall of 2007 was attempting to put pressure on Genesco to renegotiate the price of the deal.

In addition to the foregoing findings of fact, the Court shall provide an overview of the expert testimony that was presented. Seven expert witnesses testified at trial:

1. Professor Roman Weil, Ph.D., a professor of economics and accounting at the Graduate School of Business at the University of Chicago, testified that Genesco has not suffered a material adverse effect and, if so, it is not out of proportion to its peers in the footwear industry. He further testified that the addition of the May operating report to the total

11

mix of information Finish Line had when it signed the Merger Agreement would not have significantly altered the mix. Dr. Weil based these opinions on his analyses of Genesco's historical data showing growth over time but, instead of uniform growth, depicting that lows such as the current one in 2007 are to be expected (TE16).

2. Mr. Cantrell, a consultant for retail companies who worked in retail for 26 years and served as the President and Director of Payless Shoe Stores testified that the merger, despite Genesco's declines in 2007, still has strategic value for Finish Line in the areas identified by Finish Line when it entered into the merger. He also testified that Genesco's declines are due to broad economic conditions such as higher gas, food and eating oil prices, pressure in the housing and mortgage industry and consumer credit issues. He testified that Genesco's declines are not disproportionately worse than its competitors (TE25; P369, 370, 371).

3. Professor Saunders, a professor at NYU for 30 years and a Ph.D. graduate of the London School of Economics, who specializes in risk management and credit risk, and who has worked for the Federal Reserve, the Controller of Washington and the International Monetary Fund, analyzed markets after June 17, 2007, to determine UBS's economic circumstances in relation to funding the Merger Agreement. He testified that inaccurate rating of subprime mortgages resulted in a flight to the safe haven of government treasury investments. The cost of borrowing increased. The rise in submortgage rates resulted in foreclosures and defaults which affected the value of the subprime mortgages and caused mortgage bank securities to fall. This turmoil in the credit markets has made it very hard for UBS to syndicate and so it has had to reintermediate loans on its balance sheet. UBS is now left with loans as assets on the cost side but there is a higher cost to doing the deals and with these loans there have to be equity holdings. In its form 6K filed with the SEC on October 30, 2007 (P378), UBS announced to the public an overall profit. A few weeks later it announced a full loss and that it would write down US subprime holdings by $10 billion. This is UBS's first quarter loss in 9 years. P381 documents that UBS has had to borrow from foreign lenders; it had to raise $11.5 billion.

With respect to the merger in issue, when the $1.5 billion of Finish Line was committed to by UBS, these were fixed rates and they

12

were fair market transactions. But after June 2007, the spread has widen, the margins have become too low and so the deal was no longer a good one for UBS. Professor Saunders stated that this deal has been disastrous to UBS, that it is a big loss to UBS.

4. Professor Hitscherich, a law professor and former transactional attorney who specializes in drafting mergers and acquisitions, testified that application of industry custom of transactional attorneys in drafting merger agreements to the Merger Agreement in this case reveals that Genesco had negotiating power. Genesco negotiated in section 3.24 that the seller had no contractual duty under the Merger Agreement to provide information nor did the seller have liability with respect to information that was not specified in the agreement. The buyer's remedy for the seller not producing information was for the buyer to walk away from the transaction, renegotiate price, or seek representations in closing, for example, by stipulating a certain level of EBITDA. In section 4.6, Genesco was able to prevent financing from being a condition to closing. Genesco also negotiated a narrow MAE clause with a right to cure.

5. Mr. Bronner, an attorney and specialist in drafting mergers and acquisitions and who has chaired and authored numerous ABA publications on the subject, was offered by UBS as an expert in the field of drafting merger agreements. Applying drafting practices and standards of the industry to the Merger Agreement, Mr. Bronner testified that the carve-out of a material adverse effect under the Merger Agreement, section 3.1(a)(B) excludes from the MAE, general economic conditions such as gas prices, problems in the lending industry, but not intra-industry economic conditions such as change in fashion trends or decline in the average selling price of footwear.

6. Mr. Deetz, a principal in Chicago Partners, LLC, who is a CPA and accredited senior appraiser, offered by Finish Line, testified that the May operating results were material to the merger transaction. In TE 29 he demonstrated that the Q2 decline is the largest dollar decline in operating income in 10 years. The new entity resulting from the merger will have significantly more debt than its competitors. The loss in operating income will make it difficult for the new entity to achieve the growth Finish Line sought in entering into the merger.

13

7.     Mr. Rock, managing director of a consulting firm, a CPA and certified fraud examiner, testified that the May operating report was material and that Genesco has suffered a material adverse effect. He further testified that the MAE has had a disproportionately lower effect on Genesco than its peers and is due to intra-industry conditions such that the carve-out of section 3.1(a)(B) of the MAE does not apply.

The Court now turns to the specific defenses raised by Finish Line and UBS.

### Fraud

The fraud allegations are that in June of 2007, prior to the June 17 signing of the merger, Genesco concealed from Finish Line and UBS its May operating report and its revised June 15 projections which were based on actual May results. Meanwhile, Finish Line and UBS claim, Genesco senior management and the head of Goldman Sachs' due diligence team, Mr. Friedland, assured Finish Line and UBS that May and June represented a turnaround for Genesco and/or that May was on track.

As to the latter oral representations, the Court dismisses those based on credibility determinations. The Court does not believe the Finish Line and UBS witnesses, Margaret Shanley, Alan Cohen and Mr. Winkler, that Genesco senior management or Goldman Sachs represented that May and June were turnaround months or that May was on track with the May 24 projections. As to each of these alleged oral representations, the Court believes Genesco senior management and Goldman Sachs for the following reasons:

1.     As to the June 5, 2007 call between Genesco and Dunn & Phelps in which Ms. Shanley says that Genesco represented that May and June

14

would be turnaround months, there were many other witnesses to the call and none corroborate Ms. Shanley's recollection.

2.  With respect to the June 14, 2007 call between Mr. Gulmi, Mr. Dennis, P. J. Solomon representatives and Steven's Schneider of Finish Line to obtain information for a fairness opinion to be issued by P. J. Solomon for Finish Line, the latter took extensive notes of the conversation and these do not contain notations of a representation by Genesco that the month of May was on track, in line with its projections or a request for May operating results.

3.  Mr. Winkler claims that David Friedland represented that Genesco did not prepare monthly projections. This testimony is inconsistent with data that was existing in the data room containing monthly projections. Therefore, it makes no sense that Mr. Friedland would make such a representation since it was patently contradicted by existing data.

4.  Mr. Winkler claims that on June 6, Mr. Friedland told Mr. Winkler, in discussing the decline in May same store sales, that May was on track as well as telling this to Mr. Winkler again on June 8. The Court finds that Mr. Friedland did not have the May actual numbers at the time of these conversations.    Accordingly, if Mr. Friedland made these representations, they were not false.

5.  Mr. Winkler claims that Mr. Friedland told him that the May 8 trial balance was not available when it was. The Court finds that at the time that Mr. Friedland and Mr. Winkler had this conversation, the trial balance had not been provided to Mr. Friedland.

In addition to the foregoing specific reasons for dismissing the claims of alleged oral representations, the Court observed Mr. Gulmi, Mr. Pennington, Mr. Dennis and Mr. Friedland to be believable in their testimony on these points; Mr. Winkler was not. Accordingly, the Court finds that senior management at Genesco and Mr. Friedland did not

15

make oral representations about May and June performance being on track in the face of actual numbers in May showing a sharp decline.

Where the claims of pre-merger fraud become more difficult to analyze are with respect to the claim of concealment. The difficulty is in mapping out emails to identify who knew what and when.

After a detailed analysis of the facts and the law, the Court finds that Genesco and Goldman Sachs did not fraudulently conceal information. Instead, the Court finds that the fault is with Finish Line's advisor, UBS and its agents, whom Finish Line was relying on to investigate Genesco. These advisors, the Court finds, asked for the May actual numbers before the numbers had been finalized and a May trial balance was prepared. At that point, with its premature request, Finish Line's advisors were required by both the law and the parties' agreement to renew the request for the May numbers. Despite ongoing lists by UBS for information and responses by Genesco and Goldman Sachs, UBS never asked again for the May trial balance. It failed to make such a renewed request despite several opportunities to do so. Under these circumstances, where Finish Line/UBS had the means at its disposal for obtaining the information it now claims was concealed, neither the law nor the parties' agreements required Genesco or Goldman Sachs to voluntarily provide the information. Genesco and Goldman Sachs were allowed by law and their agreement not to provide the May actual numbers. Finish Line, then, signed the Merger Agreement at its own peril.

16

The Court has arrived at this foregoing conclusion through a detailed analysis of the timing of requests by UBS and Dunn & Phelps for actual May results and receipt of the actual May results by Genesco and Goldman Sachs as well as the rules/procedure the parties agreed to with respect to requesting information. This analysis is tedious but because of its importance to the Court's decision, that analysis is detailed as follows.

1. As early as May 2007, Finish Line knew that there was a 34% operating decline in Genesco's performance for Q1 2007 (February, March, April). The decline was reported by Dunn & Phelps and reported to Finish Line that there was a deterioration in Genesco's "operating performance in the year-to-date March FY '08 period of all segments except for licensed brands and Johnston and Murphy compared to the year-to-date March FY '07 period." Subsequent to this report, Dunn & Phelps was not instructed by Finish Line to examine any financial information for the May fiscal month. Dunn & Phelps' financial due diligence cutoff was May 5, 2007.

2. Alongside the Dunn & Phelps report was information posted in the data room of a decline in Genesco's same store sales for May as compared to the previous May.

3. Meanwhile at the due diligence level, requests were being made by Mr. Raskin and his UBS team to Mr. Downen and his Goldman Sachs team for monthly financial numbers. It is not clear from the emails between these two whether the request for quarterly numbers was for calendar year 2007/fiscal year 2008 well as calendar year 2008/fiscal year 2009 and beyond. As to the latter, it is undisputed that Genesco does not generate prospective monthly financial statements, and that prospective monthly financial statements do not exist and could not have been turned over in response to the request.

   If, however, UBS and Goldman Sachs also were seeking production of quarterly financial reports for 2007, the record establishes that by June 1, 2007 (D48) that UBS recognized that these were not being voluntarily provided, "It sounds like GS/Genesco are unwilling to provide monthly financials. Is that accurate?" and it would have to

17

press Goldman Sachs to produce these: "Please let Craig know exactly what the communication has been so that he can contact GS if necessary (D48)."

4. Accordingly, by June 7, 2007, UBS had requested a May trial balance for the Duff and Phelps due diligence (D89). The Court finds that Genesco did not have its trial balance at the time of the request from UBS on June 7, 2007. A later email by Goldman Sachs confirmed that the response to UBS's June 7 request for the trial balance is that it was not provided because it did not exist at the time (P164).

5. At the same time UBS in due diligence was requesting the May operating report from Goldman Sachs, there was an indication by June 6, 2007 (D86) in the rank, mid-management that the actual numbers for May would vary from the projections. Mr. Gulmi noted to Mr. Pennington and Mr. Dennis that there was a drop in average selling price from May to April (D74).

6. Coming up from the sales division were the actual May results. Genesco's sales manager, Mr. Estepa, employed at Genesco for 27 years and the creator of Genesco's largest banner, testified about the process Genesco uses to make its monthly projections. The Court credits his testimony. At month end Mr. Estepa's team has a 7:30 staff meeting on that Monday. His team analyzes numbers received from the stores. Tuesday receipts and margin reductions are made and his operational people look at the selling costs to determine the cost effect. The catalogue and web sales are evaluated and then costs pertaining to such things as employee meetings are taken into account. On Wednesday or Thursday evening Tim Baxter, vice president of finance, meets with Mr. Estepa to review the results and then put it in the computer and send to senior management at Genesco. Mr. Estepa testified that he had never been instructed or told that monthly projections had to hit a certain number. He testified that the projections are based on numbers that come from the bottom up. The May 2007 report followed this same procedure as did the June 2007 report.

7. On Friday, June 8, Mr. Gulmi received the actual May numbers. As is his regular practice, Mr. Gulmi took the May results home to analyze them over the weekend. The May results were not known to Goldman Sachs on June 8.

18

Also on June 8, Mr. Friedland of Goldman Sachs told Mr. Winkler at UBS to put a number on the table to purchase Genesco. Mr. Winkler's state of mind, as he testified to at trial, was that he believed from Mr. Friedland's statement that Genesco might receive another offer from a private equity firm and Finish Line would not be able to acquire Genesco.

8. On Monday, June 11, 2007, Mr. Gulmi documented with a handwritten calculation that he realized there had been a $2.1 million miss in the month of May from the projections that had been made (D98). On that day Mr. Gulmi sent the actual May numbers to Mr. Dennis and Mr. Pennington (D97).

9. The Court finds that Genesco's management (Mr. Gulmi, Mr. Pennington and Mr. Dennis) and mid-management (D102) recognized by Monday, June 11, 2007, that there was a sharp decline in earnings in May and a miss from projections of more than was expected. The Court also finds that they were surprised by the miss. The Court finds that Mr. Gulmi proceeded to try to identify the causes. On that same day, Finish Line made a $54 per share offer to acquire Genesco.

10. The next day, Tuesday, June 12, 2007, Mr. Johnson at Genesco, who works at Mr. Gulmi's direction, proceeded to post the May trial balance in the data room. He then received instructions from Mr. Gulmi not to do so. Also, on June 12, Goldman Sachs was notified by Mr. Gulmi about the sharp decline in May performance. Goldman Sachs linked the May decline with UBS's June 7 request for the May trial balance in an email and concluded that Goldman Sachs had no obligation to provide the trial balance but that it was up to UBS to request it again (P164). On that same day, outstanding due diligence requests of UBS were summarized and listed (P33); the May trial balance was not on UBS's summarized list of outstanding due diligence obligations. Nor was the trial balance requested in a subsequent summarized list of outstanding due diligence requests (P161 and P162).

11. Mr Friedland testified that on Wednesday, June 13, 2007, Finish Line/UBS stated that its due diligence was substantially complete. On that day negotiations continued with Genesco rejecting $54 per share, making a $55 counteroffer and Finish Line offering $54.50. During this same time, Mr. Gulmi was investigating the reason for the May

19

decline. He found that only $1 million of the loss was attributable to sales. The other million had to do with setting up a reserve and other nonsales related reasons. Of the $1 million sales decline, he concluded that the miss was due to a later tax holiday in key states and back to school date than the previous year. By June 15, 2007, Mr. Gulmi concluded that there would be a shift, due to timing of these sales events, of increased sales to Q3. He concluded that the shift from Q2 to Q3 would net out with no effect on annual projections (P32, P171). Mr. Gulmi reported his conclusions to Goldman Sachs (D127).

12.   Mr. Gulmi and Goldman Sachs agreed on June 15 that Mr. Pennington should call Finish Line to discuss the May numbers and Genesco's determination that the numbers had no effect for the year but merely required a shift in projections from the second quarter to the third quarter. Mr. Pennington, however, did not mention the May numbers in his telephone conversation with Mr. Cohen. Mr. Cohen has testified that Mr. Pennington said in the June 15 telephone conversation, in addition to mentioning the shift in quarters due to back to school sales and taxes, that the May numbers were in line with their projections. The Court does not credit this testimony by Mr. Cohen; the Court finds that Mr. Pennington did not make that statement. In so concluding, the Court observes that notes made by Mr. Pennington with respect to the telephone call do not contain such a notation. Additionally, the Court believes Mr. Pennington when he denies that statement.

13.   Additionally, Genesco revised its projections, after receiving the actual May numbers, on June 15. These revised projections were not provided to UBS or Finish Line.

In short form, then, the Court finds that the foregoing sequence of events reveals that a May trial balance had been requested by Finish Line/UBS prior to the information being available. That request was not placed on the parties list of due diligence items because at the time the information was not available. Then, four days later, simultaneous to Finish Line making its first offer to acquire Genesco, senior management at Genesco realized that

there was a sharp decline in May earnings from what was anticipated. Genesco did not know

the reason for the decline. The negotiating process continued and Genesco did not provide

to Finish Line/UBS the May actual results. Also, during the negotiations due diligence was

closed out on June 13, 2007, without Finish Line or UBS having requested that the May trial

balance be provided. Further, during the negotiations, Genesco, after receiving the May

actual numbers, revised its projections after the parties have agreed to the merger but before

it is signed, and Genesco did not provide the change in projections to Finish Line/UBS.

Without having seen the May actual results and the revised projections, Finish Line signed

the Merger Agreement on June 17, 2007.

With respect to these foregoing events, the legal issue is whether Genesco committed

fraud by not providing the May actual results and/or the revised projections prior to Finish

Line signing the merger. In deciding this issue the Court has analyzed two sources: (1) the

parties' contracts and due diligence procedure and (2) Tennessee and analogous state law.

Key to deciding the fraud claim are provisions in the parties' agreements that Finish

Line and its advisors could not hold Genesco liable except for information specified by

Finish Line in the Merger Agreement that it was relying on. This agreement is contained in

the following provisions of the May 7 confidentiality agreement and the June 17 Merger

Agreement:

    —  Page 4 of the Confidentiality Agreement (P5)—Although the Company
        was endeavored to include in the Evaluation Material information

which it believes to be relevant for the purpose of your investigation, you understand that such information is provided "as is" and neither the Company nor any of its representatives have made or make any representation or warranty, express or implied, as to the accuracy or completeness of the Evaluation Material and that nothing contained in any discussion between the Company or any of its directors, officers, employees, agents or any other representatives or its advisors and you or any of your representatives shall be deemed to constitute a representation or warranty. You agree that neither the Company nor its representatives or advisors shall have any liability to you or any of your representatives resulting from the use or content of the Evaluation Material or from any action taken or any inaction occurring in reliance on the Evaluation Material, except as may be included in any definitive agreement which provides for any transaction between the Company or any subsidiary thereof or its stockholder and you.

\* \* \*

Section 3.24 of the Merger Agreement—No Other Representations or Warranties; Investigation by Parent.    Parent and Merger Sub each acknowledges and agrees that (a) it has had an opportunity to discuss the business of the Company and the Company Subsidiaries with the management of the Company, (b) it has had reasonable access to (i) the books and records of the Company an the Company Subsidiaries and (ii) the electronic dataroom maintained by the Company through Merrill Corporation for purposes of the transactions contemplated by this Agreement, (c) it has been afforded the opportunity to ask questions of and receive answers from officers of the Company and (d) except for the representations and warranties contained in this Section 3, and any certificates delivered by the Company in connection with Closing, neither Parent nor Merger Sub have relied upon or otherwise been induced by, any other express or implied representation or warranty with respect to the Company or with respect to any information provided to or made available to Parent or Merger Sub in connection with the transaction contemplated hereunder. Neither the Company nor any other person will have or be subject to any liability or indemnification obligation to Parent, Merger Sub or any other person resulting from the distribution to Parent or Merger Sub, or Parent's or Merger Sub's use of, any such information, including any information, documents, projections, forecasts or other material made available to

Parent or Merger Sub in certain data rooms or management presentations in expectation of the transactions contemplated by this Agreement, unless any such information is expressly included in a representation or warranty contained in this Section 3 or in the corresponding section of the Company Disclosure Schedule.

\* \* \*

Section 4.10 of the Merger Agreement—<u>No Other Representations Or Warranties</u>. Except for the representations and warranties contained in this Section 4, and any certificate delivered by Parent or Merger Sub in connection with Closing, the Company acknowledges and agrees that none of Parent, Merger Sub or any other person on behalf of Parent or Merger Sub makes, nor has the Company relief upon or otherwise been induced by, any other express or implied representation or warranty with respect to Parent or Merger Sub or with respect to any other information provided to or made available to the Company in connection with the transactions contemplated hereunder. Except as provided in Section 6.8, neither Parent, Merger Sub nor any other person will have or be subject to any liability or indemnification obligation to the Company or any other person resulting from the distribution to the Company, or the Company's use of, any such information, including any information, documents, projections, forecasts or other material made available to the Company in certain data rooms or management presentations in expectation of the transactions contemplated in this Agreement, unless any such information is expressly included in a representation or warranty contained in this Section 4 or in the corresponding section of the Parent Disclosure Schedule.

\* \* \*

Section 9.1 of the Merger Agreement—<u>Entire Agreement</u>. This Agreement, together with the Company Disclosure Schedule and the Parent Disclosure Schedule and the documents and instruments referred to herein that are to be delivered at the Closing, contains the entire agreement among the parties with respect to the Merger and related transactions, and supersedes all prior agreements, written or oral, among the parties with respect thereto, other than the Confidentiality Agreement which shall survive execution of this Agreement and shall

23

terminate in accordance with the provisions thereof. EACH PARTY HERETO AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, NEITHER PARENT, MERGER SUB NOR THE COMPANY MAKES ANY OTHER REPRESENTATIONS OR WARRANTIES, AND EACH HEREBY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES MADE BY ITSELF OR ANY OF ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, FINANCIAL AND LEGAL ADVISORS OR OTHER REPRESENTATIVES (OTHER THAN AS SET FORTH IN THE CONFIDENTIALITY AGREEMENT), WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT OR THE MERGER, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO THE OTHER OR THE OTHER'S REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION WITH RESPECT TO ANY ONE OR MORE OF THE FOREGOING.

Accordingly, under the terms of the parties' contracts Finish Line's and UBS's claims that a certain level of monthly or quarterly EBITDA was critical to them in signing the Merger Agreement or that Genesco's performance at the time of the signing of the Merger Agreement was on track with projections or the information provided, is not actionable.

In addition to the parties' contracts is the procedure the parties established with respect to due diligence. The testimony of David Friedland, head of the Goldman Sachs due diligence team for Genesco, as well as emails prepared during due diligence (e.g. D48, D53, P33, P161, P162, P164) establish that it was Finish Line/UBS's duty to specify the information it needed to review. Genesco would then respond. If no response was provided or an inadequate one was provided, the obligation was on Finish Line/UBS to renew the request. This procedure is demonstrated by emails D48 and D53 which show that Finish

24

Line/UBS recognized that the burden was on them to press for information.    Finish
Line/UBS did so and would send to Goldman Sachs lists of due diligence items that had not
been responded to at all, had not been sufficiently responded or for which Finish Line/UBS
sought an update.

    Accordingly, in this case, when UBS requested the May trial balance on June 7, it was
not available and Goldman Sachs told UBS this.    Thereafter, Goldman Sachs internally
discussed among its due diligence team (P164) whether UBS would ask again for the May
trial balance, reflecting the parties' due diligence procedure that the burden was on UBS to
request the information.    In the days that follow, UBS did not ask for the May trial balance;
nor did UBS consider its June 7 request for the May trial balance an outstanding request
because that May trial balance is not contained on UBS's list of outstanding due diligence
items (P33, P161, P162).

    The combination, then, of the parties agreements and due diligence procedure prevent
Genesco from being liable for withholding the May trial balance and the numbers that
underlie the June 15 revised projections.


    In addition to the parties' agreements and due diligence procedure, Tennessee law also
provides that Genesco is not liable for withholding the information contained in the May trial
balance.

25

A general principle of Tennessee law is that if "means of knowledge are at hand and equally available to both parties, the injured party must show that he has availed himself of the means of information existing at the time of the transaction before he will be heard to say that he was deceived by the misrepresentations of the other party." *Solomon v. First American National Bank of Nashville*, 774 S.W.2d 935, 943 (Tenn. App. 1989).

In the *Solomon* case, a guarantor was not permitted to rescind a guaranty allegedly containing a dollar amount she had not agreed to where the guarantor was a literate person who failed to read the guaranty.

Similarly in *Allied Sound, Inc. v. Neely*, 58 S.W.3d 119 (Tenn. App. 2001) the court dismissed a fraud claim where a plaintiff asserted that he was deceived about a condition in a lease requiring a letter of credit:

> Plaintiff had the means to obtain the information needed and discovery any 'fraud' if he had simply asked Century for a copy of the actual lease agreement or inquired as to what additional documentation was required by Century before continuing the performance. While Link asserts that he had never been involved in a lease transaction before, he was an experienced business person, and on this record is charged with knowing there were contingencies to be met by a certain date in connection with the lease. Where information is reasonably discovered, and here where the plaintiff was invited to inquire, it cannot claim reasonable reliance upon a misrepresentation.

*Id.* at 123.

In both of these cases, the courts refused to find fraud where the party had the means to obtain the information the party claims was concealed from it. With respect to the Merger Agreement in issue, the record is clear that Finish Line/UBS had the means to obtain the May

26

trial balance. UBS and Goldman Sachs acknowledged this in the emails (D48, D53, P164).
The fault is with Finish Line's advisor UBS for not requesting the information.

Finally, there is the case of *Hord v. Environmental Research Institute of Michigan*,
463 Mich. 399, 617 N.W.2d 543 (2000). Although not a Tennessee case, it is nevertheless
persuasive because the decision applies the same principles discussed above in the Tennessee
cases that there is no fraud where a party has the means to obtain the information. This Court
mentions the Michigan case because it discusses silent fraud and failure to provide updated
information, the precise allegations in this case. Dispositive to the Michigan court, in
holding that the failure to provide updated information was not fraudulent, was that the
financial information already provided clearly identified its date and there was no evidence
that the plaintiffs made any request for updated financial data in particular:

> In the instant case, the 1999 operating summary was the most recent document
> available in that format. It clearly identified the times for which the financial
> information was provided. There was no evidence that the plaintiff made any
> inquiry about the financial condition of the company in general or requested
> updated financial data in particular.

463 Mich. 412.

This Court concludes, then, that Genesco and Goldman Sachs had no duty by law to
provide the May trial balance and revised projections to Finish Line/UBS and that Genesco
is not liable for Finish Line/UBS's reliance on information that was not current.

The foregoing conclusion renders it unnecessary for the Court to make findings and
conclusion of law with respect to the materiality of the May results. Those results, however,

and their materiality are one component of and to some extent overlap with the analysis of Finish Line/UBS's MAE defense. Accordingly, the Court shall go on at this juncture to state its findings with respect to some of the aspects of the materiality of the May results:

1. The Court finds that neither Genesco's senior management nor David Friedland of Goldman Sachs had an intent to deceive or defraud in not providing the actual results for May. The claims of Genesco's senior management and David Friedland that they honestly believed that the May results would not change the projections for the year are credited by the Court for three reasons. First, the amount of sales attributable to later back to school and tax free holidays could not be quantified in May. Next, May is historically one of Genesco's lowest months. Thus, it would have been difficult to draw inferences about Genesco's performance for the third quarter or the year from the May numbers. Thirdly, the previous year, Genesco had experienced a low May but had a banner year overall due to a high Q4.

2. The Court does not believe and does not credit as a matter of law Finish Line's claim that the May results were material. Finish Line has asserted that because the deal was highly leveraged, the sharp decline in May in EBITDA would have halted Finish Line from entering into the Merger Agreement. As a matter of law, the Court rejects this claim because Finish Line did not specify a certain level of EBITDA as a condition to closing. Additionally, Section 4.6 of the Merger Agreement provides, "For avoidance of doubt, it shall not be a condition to Closing for Parent or Merger Sub to obtain the Financing or any alternative financing." Next, as a matter of fact, the Court does not find that production of the May results would have caused Finish Line not to sign the Merger Agreement. Finish Line had determined that acquiring Genesco was the answer to its declines. In the face of the Dunn & Phelps report to Finish Line in May of a 34% decline in Genesco in Q1, Finish Line nevertheless continued to pursue the merger. The Court finds that Finish Line was primarily focused on acquiring Genesco and beating out Foot Locker and the private equity firms. This motivation along with the fact that May is traditionally a low month from which inferences about future performance cannot be drawn, establish that the May results were not material.

28

3.     There was not enough data and a track record in May to determine that an MAE was occurring.

With respect to the claim of securities fraud, the Court adopts and incorporates its foregoing findings of fact and conclusions of law in dismissing that claim as well.

### Material Adverse Effect

Under the terms of section 7.2(a) of the Merger Agreement a prerequisite for Genesco to obtain specific performance is to demonstrate the absence of a Material Adverse Effect. That term is defined in section 3.1(a):

> "Company Material Adverse Effect" shall mean any event, circumstance, change or effect that, individually or in the aggregate, is materially adverse to the business, condition (financial or otherwise), assets, liabilities or results of operations of the Company and the Company Subsidiaries, taken as a whole; provided, however, that none of the following shall constitute, or shall be considered in determining whether there has occurred, and no event, circumstance, change or effect resulting from or arising out of any of the following shall constitute, a Company Material Adverse Effect: (A) the announcement of the execution of this Agreement or the pendency of consummation of the Merger (including the threatened or actual impact on relationships of the Company and the Company Subsidiaries with customers, vendors, suppliers, distributors, landlords or employees (including the threatened or actual termination, suspension, modification or reduction of such relationships)); (B) changes in the national or world economy or financial markets as a whole or changes in general economic conditions that affect the industries in which the Company and the Company Subsidiaries conduct their business, so long as such changes or conditions do not adversely affect the Company and the Company Subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (C) any change in applicable Law,

29

rule or regulation or GAAP or interpretation thereof after the date hereof, so long as such changes do not adversely affect the Company and the Company Subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (D) the failure, in and of itself, of the Company to meet any published or internally prepared estimates of revenues, earnings or other financial projections, performance measures or operating statistics; provided, however, that the facts and circumstances underlying any such failure may, except as may be provided in subsection (A), (B), (C), (E), (F) and (G) of this definition, be considered in determining whether a Company Material Adverse Effect has occurred; (E) a decline in the price, or a change in the trading volume, of the Company Common Stock on the New York Stock Exchange ("NYSE") or the Chicago Stock Exchange ("CHX"); (F) compliance with the terms of, and taking any action required by, this Agreement, or taking or not taking any actions at the request of, or with the consent of, Parent; and (G) acts or omissions of Parent or Merger Sub after the date of this Agreement (other than actions or omissions specifically contemplated by this Agreement).

In addition section 3.1(a) provides that Genesco shall be in good standing under state and federal laws.

The parties' positions are that Genesco asserts that its performance in May and continuing through 2007 is a short term decline in performance in line with its history of "blips" such that no MAE has occurred. Moreover Genesco asserts that the decline in performance are due to general economic conditions such as high gas prices, housing and mortgage issues, and consumer debt, or changes in projections which come within the "carve-outs" in section 3.1(a)(B) and (D). Finish Line and UBS assert that an MAE has occurred and that it does not fit within one of the carve-outs. They also assert that because of the securities investigation of Genesco by federal authorities an MAE has occurred.

30

*Supra* at 10-11 the Court stated its findings with respect to Genesco's 2007 decline in performance. Those statistics have been sliced and diced, configured and reconfigured by the parties and their experts in a variety of ways. There is, though, the Court finds, one fact that is established by the greater weight and preponderance of the evidence from all of the competing analyses, and that fact is dispositive of the MAE issue: Genesco's decline in performance in 2007 is due to general economic conditions such as higher gasoline, heating oil and food prices, housing and mortgage issues, and increased consumer debt loads. This fact is established by the expert testimony of Mr. Cantrell, the empirical observations of Genesco's Senior Vice President of Journeys, Mr. Estepa, and the expert testimony of Professor Saunders concerning UBS's 2007 decline in performance.

With respect to the testimony of Mr. Cantrell, the Court attaches great weight to it. Of all the experts who testified, Mr. Cantrell is the one who had, in addition to academic or professional certification and expertise, actual retail experience. For 26 years, Mr. Cantrell was employed in the retail industry. He served as president and director of a retail footwear company Payless Shoe Stores.

TE25 is an excerpt from Mr. Cantrell's report identifying general economic conditions as the cause for declines in Genesco's sales in 2007. The report contains a quotation from a September 2007 presentation by Finish Line to equity investors citing these macroeconomic conditions on consumer spending. He also quotes other footwear retailers, industry analysts and journalists who cite these same macroeconomic conditions as causing weaker earnings.

31

Finish Line and UBS's challenge to Mr. Cantrell was through the testimony of its experts Mr. Rock and Mr. Bronner. Mr. Rock testified and graphed (TE31) that retail sales were up 3.5% in Q2 and Q3. He also testified that Mr. Cantrell and Genesco had identified causes such as fashion trends and a decline in average selling price of footwear as being responsible for the 2007 Genesco decline. These causes, Mr. Rock testified, are intra-industry conditions. Mr. Bronner testified, per industry custom in drafting merger agreements, that the provisions of section 3.1(a)(B), as written, do not include in the MAE carve-out intra-industry conditions but only general economic conditions.

As to this dispute, Mr. Cantrell's retail experience, the Court concludes, carries the day as well as the breadth of sources he identifies, both in and outside of the footwear industry. The Court concludes from Mr. Cantrell's testimony that the decline in Genesco's sales and earnings in 2007 is due to general economic conditions.

Bolstering Mr. Cantrell's opinion is testimony from Mr. Estepa, the Senior Vice President of Journeys at Genesco, who analyzes sales data from Genesco's stores and meets with Genesco's sales personnel. His empirical impression is that higher gas prices and consumer debt problems have caused consumers to spend less.

Finally, UBS's performance in 2007 and the reasons for that decline testified to by Professor Saunders and detailed above establish that there are significant adjustments in the housing and mortgage and credit industries which are having a ripple effect on consumer spending and creating general economic conditions.

32

The proof, the Court finds, preponderates that Genesco's declines in 2007 are due to general economic conditions, not intra-industry conditions.

The other condition of the MAE carve-out 3.1(a)(B) is that Genesco's decline must not be disproportionate to others in its industry. Again, due to his retail experience, the Court credits Mr. Cantrell's analysis on this point over Mr. Rock. Additionally, the Court does not place weight on Mr. Rock's findings because he included teen footwear retailers in the peer group that he analyzed. That inclusion, the Court finds, skewed the results. Only a part of Genesco's business, 50 to 60%, is due to Journeys, a teen footwear line. Teen retailers, then, included in the peer group askew the results. Also Mr. Rock included in his analysis Genesco's Underground Station which skewed the results downward. The proof at trial established that Finish Line knew before signing the merger of issues with Underground Station, such that its performance should be excluded from Genesco's performance in analyzing peers. The Court, therefore, adopts Mr. Cantrell's conclusion that Genesco's decline in performance is due to general economic conditions and is not disproportionate to its peers in the industry.

Having concluded that Genesco fits within one of the MAE carve-outs, it is not necessary for the Court to decide whether an MAE has occurred. The Court, nevertheless, includes its MAE analysis for completeness. On the issue of whether Genesco has sustained an MAE, the Court finds its has for several reasons.

33

The Court begins with the essential elements of an MAE as provided in the parties'
Merger Agreement. Those are a change to the assets, liabilities or result of operations at
Genesco (1) taken as a whole, that is (2) material and (3) adverse. The words "material,"
"adverse," and "as a whole" in the text plainly convey that the change in the target
company's business must be significant. Common sense considerations such as the duration
of the change, the measure of the change and whether the change relates to an essential
purpose or purposes the parties sought to achieve by entering into the merger have been
identified and examined by courts in deciding whether an MAE has occurred. *See, e.g. IBP,
Inc. v. Tyson Foods, Inc.*, 789 A.2d 14 (De. Ch. 2001); *Frontier Oil Corp. v. Holly Corp.*,
2005 De. Ch. LEXIS 57 (Del. Ch. Apr. 29, 2005); *Esplanade Oil & Gas, Inc. v. Templeton
Energy Income Corp.*, 889 F.2d 621 (5th Cir. 1989); *Raskin v. Birmingham Steel Corp.*, 1990
WL 193326 (Del. Ch. Ct. Dec. 4, 1990); *In re Digital Resource, LLC*, 246 B.R. 357 (8th Cir.
B.A. P. 2000); *Pan Am Corp. v. Delta Airlines, Inc.*, 175 B.R. 428 (S.D.N.Y. 1994).
Corollary to these considerations by courts is that in deciding whether a business change is
significant a court must not do in a vacuum but with reference to the context and
circumstances of the merger.

With respect to the measure or quantification of the change in Genesco's earnings and
performance, the Court finds that that change has been material. The parties and their
experts have depicted Genesco's performance and earnings for 2007 in a variety of ways and
methods. Cutting through all of these different spins is that the May loss in earnings is one

34

of the lowest in 10 years, and that, as 2007 comes to a conclusion, there has not been, so far, an offset or mitigation of the Q2 and Q3 declines to remove 2007 as one of the lowest earnings in 10 years.

With respect to duration, the parties have lached onto the statement by Chancellor Strine in *Tyson* that a "blip" in earnings does not constitute an MAE, arguing (Genesco) the May, June decline is just a blip as opposed to (Finish Line/UBS), the continuing results of Genesco's lower performance than last year and previous years reveal that it is not a "blip." This Court uses a somewhat different analysis derived from a point made by UBS from the text of the Merger Agreement.

Section 7.2(b) provides:

> Since the date of this Agreement, there shall not have occurred a Company Material Adverse Effect with respect to the Company and the Company Subsidiaries, considered as a whole, that has not been cured prior to the Termination Date [emphasis added].

The Termination Date is December 31, 2007. Accordingly, as argued by UBS, the inclusion of a provision in the Merger Agreement that Genesco has the opportunity to attempt to cure an MAE by December 31, 2007, is an acknowledgment by the parties that in the context of this merger an MAE can occur in three or four months.

Taking this text of the Merger Agreement and its durational implications into account, the Court further reasons that the facts in this case are that Genesco's sales and earnings have not stayed at the low May, June levels and have increased but have not done so at a level or

35

pace to offset the decline in May or June to remove 2007, so far, as one of the lowest years in Genesco's ten year performance. The Court concludes that in the context of what the parties acknowledge in the Merger Agreement could be a durationally significant time, the changes in Genesco's performance are of sufficient durational significance to be considered in determining whether an MAE as defined under the Merger Agreement has occurred.

Finally, there is the consideration of whether the change in issue affects the essential purposes the parties sought to achieve by entering into merger. The Court finds that Finish Line had long-term strategic goals in entering into the merger such as diversification, synergies from reduced costs and opportunity for growth. The merger benefits of diversification and synergies from reduced costs remain intact and provide the same complement to Finish Line's business despite a decline in Genesco's earnings. For this reason, Genesco argues, that the 2007 decline in earnings does not relate to an essential purpose the parties sought to achieve in the merger agreement and therefore does not constitute an MAE. The Court rejects this argument. It ignores some of the context and circumstances of the transaction.

First, Genesco's weak performance in Q2 and Q3, the testimony of Mr. Deetz establishes, results in less money being available, after paying financing, to grow the merged company. Secondly, while it is true that the proof establishes that the most important part of the merger to Finish Line were the long-term strategic goals mentioned above, the proof established that a highly leveraged deal with 100% financing was the vehicle required to

36

accomplish this long-term strategy. That financing was not an essential part of the merger is made clear by several provisions in the Merger Agreement including section 4.6, but it cannot be said that financing was incidental to the merger. Financing had a second tier role. The record revealed that the Genesco part of the merged business, in light of its historical earnings, was planned by Finish Line to contribute 70% to payment of the financing. The 2007 sharp decline in earnings affects this second tier concern of the merger. Accordingly, in deciding whether the change in Genesco's earnings has been material, the Court takes into account, to some degree, that Genesco's decline in earnings affects the ability of the merged entity to pay its financing and have money left over to grow the company.

Totaling up the foregoing, the Court finds that a secondary purpose of the Merger Agreement—paying the financing costs—has been affected by the change in Genesco's performance; the measurable change in earnings—one of the lowest in 10 years—to generate cash to pay the financing and grow the company is a significant change, and that the change in Genesco's earnings from May 2007 to the present is durationally significant. The Court, therefore, concludes that an MAE has occurred.

Finally, there is the claim that an investigation of Genesco for securities violations and a class action lawsuit filed in federal court in Nashville constitute an MAE. This claim relates to an August 30, 2007 conference call to provide information to the market, in which Genesco's senior management stated that (1) low Q2 performance was due primarily to the

shift from Q2 to Q3 of sales resulting from a later back to school and tax free holiday and (2) August sales were positive.

As to the first statement about the Q2/Q3 shift, Finish Line and UBS assert that Q2 performance was so low that Genesco knew by August 2007 that the performance was not attributable to the shift.

As to the statement that August performance was positive, the facts are that the first three weeks of August performance were positive but that on the Thursday the call was made, that week's performance was negative and would have a negative effect on the month. The proof establishes, the Court finds, through the testimony of Mr. Pennington and Mr. Estepa that the sales numbers for Tuesday and Wednesday prior to the call and then Thursday of the call were not final and official and, therefore, were not included in stating August results. Because Genesco made it clear in its call that it was only analyzing sales to date and that the numbers for that week were not final, official numbers, the Court concludes that Genesco had good reason to exclude the unofficial numbers from its analysis and that the call was not fraudulent.

Additionally, the Court dismisses this claim adopting Genesco's argument in its trial brief at p. 57:

> Before any federal investigation can be materially adverse to Genesco's business, there must first be a finding that fraud has, in fact, occurred. *See United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (a grand jury "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not."); *see also Expert Report of Paul Schectman, Dec. 5, 2007, at ¶ 4* (GTB 318-19) ("The issuance of a subpoena,

38

by itself, does not give rise to an inference of wrongdoing.") The mere announcement of an investigation that is a direct result of the . . . counterclaims filed by the Defendants in this action cannot be the basis for a MAC.

## Specific Performance

Having dismissed the claims of Finish Line and UBS of fraud and the occurrence of an MAE to excuse their performance of or to rescind the Merger Agreement, lastly the Court must determine if Genesco is entitled to the remedy of specific performance to require Finish Line to close the merger. That closing, the Court concludes, is appropriate as a matter of equity.

With respect to specific performance, Tennessee law provides five conditions which must be met before the remedy is available. Justice Koch succinctly identified those in his dissent in the Court of Appeals decision *Colonial Funeral Home, Inc. v. Gilmore*, 1994 WL 521254 at *8 (Tenn. App. 1994). Three of those conditions are at issue in this case: there must be no other adequate legal remedy available, *New River Lumber Co. v. Tennessee Ry.*, 136 Tenn. 661, 671, 191 S.W. 334, 338 (1916); the contract must be free from suspicion of fraud, *Shuptrine v. Quinn*, 597 S.W.2d 728, 730 (Tenn. 1979); and specific performance will not be enforced if the contract is harsh, inequitable or oppressive, *Miller v. Resha*, 820 S.W.2d 357, 360 (Tenn. 1991).

39

The testimony established that Genesco's business has been irreparably harmed as a result of the stalled merger. Genesco's business is in a state of limbo. Uncertainty has negatively affected its stock price, vendor relationships, employee morale, public perception, and virtually every other aspect of its business during the pendency of the merger and this litigation. Due to restrictions that the Merger Agreement imposes on its activities pending closing, it has been unable to open new stores, make significant capital expenditures, and otherwise engage in ordinary business activities that would be inconsistent with Finish Line's plan for Genesco but that would be necessary or desirable for an independent Genesco. For example, Genesco had planned to open a west coast distribution facility that would have reduced the lead time to Genesco's stores on the West Coast and otherwise improve Genesco's west coast inventory management, affecting inventory and sales in its stores. In reliance on the merger and in consultation with Finish Line about its distribution capacity, Genesco has deferred its plans for this new facility because Finish Line's own distribution capacity would have made the new facility unnecessary. Further, Genesco has invested substantial funds, and its employees have invested hours in preparing for the planned integration of the two companies, providing financial information, and complying with onerous and detailed requests for information and analysis from UBS and Finish Line. Those efforts have diverted massive amounts of time from Genesco's business. These facts proven at trial establish irreparable harm and that the payment of damages is not an adequate remedy.

The last two conditions—free from fraud, and a harsh, inequitable or oppressive result—shall be considered together.

The Court has decided as a matter of law that Genesco did not commit fraud. But equity probes deeper than the law and, even where fraud is not present, equity will not enforce an agreement that is unconscientious or will work a hardship.

Genesco's sharp dealings in not voluntarily providing the May actual results; distrust between the parties' management teams generated by the lawsuit; and financial weakness due to the combination of Genesco's 2007 lower earnings and the debt taken on to fund the merger have been identified by Finish Line as grounds for denying specific performance.

The Court must be very careful in its analysis of Finish Line's claim that Genesco, in withholding the May results, acted unconscientiously, as Chancellor Strine in *Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1058 (Del. Ch. 2006) observed in commenting on the "morally tinged ruminations on the importance of deterring fraud." The transaction in issue is not a handshake deal; it does not come within the *Lonesome Dove* frontier standards of dealing. The merger in this case was a highly negotiated transaction, with teams of lawyers, advisors and handlers being paid enormous sums to orchestrate the procedure for obtaining information, the production of information, and the use and reliability of information. This milieu is UBS's home territory. UBS was advising Finish Line. There was, then, no inequality of bargaining power nor oppression. As Professor Hitscherich testified, the provisions contained in the Merger Agreement are standard. Under

these circumstances, the Court finds its does not offend the conscience to enforce performance of the Merger Agreement.

As to the final consideration that enforcing the merger creates a conflicted, financially weak company, the Court has thought long and hard. In deciding to order the merger, the Court has concluded that the merger has a reasonable chance of succeeding. In so concluding the Court credits the testimony of Mr. Estepa, the Senior Vice President of Genesco's most successful banner, Journeys, which represents 50 to 60% of Genesco's business and is important to the merged entity. Mr. Estepa testified about his respect for Mr. Alan Cohen of Finish Line. Mr. Estepa testified about his determination to make the merger work and his commitment to its success. The Court also recalls that Mr. Schneider of Finish Line could not identify any systemic problem with Genesco's operation, and Mr. Cantrell's testimony that the same synergies that caused Finish Line to propose the merger, such as diversity of product lines and customers, are still present. Finally, insolvency proof of the combined entities was not provided to this Court. That issue has been reserved and carved out of this litigation for the New York Court to decide. If the combined companies would result in an insolvent entity, the New York lawsuit by UBS will halt the merger. Accordingly, from the proof presented to it, this Court concludes that the combined entity can succeed. Specific performance is not a futile, harsh result.

ELLEN HOBBS LYLE
CHANCELLOR

42

cc:    Overton Thompson III
      Britt Latham
      W. Brantley Phillips, Jr.
      Brian Roark
      Russell Stair

      Jonathan Schiller
      James Denvir
      Michael Brille
      William Jackson
      Jonathan Shaw

      Robert Walker
      J. Mark Tipps
      John Hayworth
      John Farringer IV

      John Hicks

      Joseph Frank

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
20TH JUDICIAL DISTRICT, DAVIDSON COUNTY, TENNESSEE

| | | |
|---|---|---|
| GENESCO INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 07-2137-II (III) |
| | ) | |
| THE FINISH LINE, INC., | ) | |
| HEADWIND, INC., | ) | |
| UBS SECURITIES LLC, and | ) | |
| UBS LOAN FINANCE LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## UBS'S RESPONSE TO GENESCO'S MOTION TO CLARIFY

Come now Defendants UBS Securities LLC and UBS Loan Finance LLC (collectively "UBS") and, for their response to Genesco's Motion to Clarify, state:

### Preliminary Statement

Genesco began this litigation by claiming that it was an "open book" and that it "had nothing to hide". Discovery has shown that nothing could be further from the truth. Now faced with compelling evidence of its own fraud, having been sued by both Finish Line and UBS, and now being the subject of investigation by a federal grand jury, Genesco now seeks to slam shut its open book and foreclose the very issues that this Court would try on December 10th.

Discovery has revealed that Genesco has tried to hide just about everything from everyone. Indeed, Finish Line and UBS now have evidence that Genesco *knew* that its financial condition was collapsing in May – the key month prior to the execution of its June 17th merger agreement. Incredibly, Genesco withheld the Company's May Operating Results from Finish

Line and UBS – Operating Results that would have shown Genesco's earnings collapsing 183%
from the same period in the prior year and over 40% from the merger projections that Genesco
itself had prepared and delivered to Finish Line and UBS just days before. Genesco's defense?
That it didn't think that Finish Line and UBS would have been interested in Genesco's May
Results.

       In addition to Genesco's misrepresentations in May and June, discovery has
established that Genesco then went even further to cover up its fraud – by lying to Finish Line,
UBS, and the public securities markets about the reasons for Genesco's disastrous performance.
Faced with its worst 2nd Quarter in the Company's history: (1) Genesco falsely claimed that its
downturn was "primarily due" to a timing shift in earnings from the 2nd Quarter to the 3rd
Quarter; and (2) Genesco falsely reaffirmed its prior earnings guidance for the remainder of the
year – including its 53 cents/share guidance for the 3rd Quarter. Genesco's 08/30/07 2nd Quarter
Earnings Conference Call Transcript at 12; *see also* Sesquahana Financial Group LLC 11/20/07
Research Report at 1 (reaffirming Genesco's 3rd Quarter 53 cents/share earnings guidance).[1]

       Faced with discovery in this action, Genesco now ***admits*** that it misspoke on
August 30th when it claimed that the Company's 2nd Quarter downturn was "primarily due" to
later back to school and sales tax holiday timing shifts. Genesco's 11/13/07 Response to Request
for Admission No. 3. Although Genesco now claims that it was confused when it made that
false statement – the fact is that Genesco itself acknowledged ***in July*** that such timing shifts

---

[1]     In a series of increasingly shrill press releases and factually inaccurate court filings, Genesco has blamed
UBS and Finish Line for filing fraud claims against it, and for the corresponding decision by federal prosecutors to
open a criminal investigation and serve Genesco with a grand jury subpoena.

     Genesco, however, has no one to blame but itself for its fraud. For its part, UBS takes its obligations as a
regulated financial institution very seriously and proceeded to allege fraud only in the face of compelling evidence
of Genesco's misconduct.

would account for at most 8 cents out its 30 cents/per share decline in the 2nd Quarter. Deposition of Steve Schneider at 82.

With respect to Genesco's second August 30th claim – that its downturn was transitory and that Genesco would still meet its 53 cents/share guidance for the 3rd Quarter – the investing public will just have to wait for Genesco's 3rd Quarter earnings announcement (scheduled for later this week, on Thursday, November 29th) to find out if this was yet another Genesco misrepresentation.

<u>Argument</u>

Genesco's Motion to Clarify obscures two key facts that establish the scope of this Court's December 10th trial.

First, far from being "belated", both Finish Line and UBS raised the prospect of trying fraud claims during this Court's October 31, 2007 hearing. 10/31/07 Transcript of Hearing at 12, 15 attached to this Response as Exhibit A (Finish Line's Counsel: The "information we're seeing raises two additional problems . . . One is whether, in fact, when we signed the merger agreement on the 17th of June the bad information that we now see was there for May and for early June of 2007 was not known to us."); (Finish Line's Counsel: "For instance, if there had been a securities law violation, a violation of law is a condition of closing."). On October 31st, prior to its current predicament, Genesco did not object to such claims being tried on December 10th. 10/31/07 Transcript of Hearing at 35, attached to this Response as Exhibit B (Genesco's Counsel: "We will be prepared to go forward on December 10 and be prepared to demonstrate that there are no – that all the closing conditions have been satisfied.").

Second, and most importantly, Genesco fails to inform this Court that both Finish Line and UBS have *agreed* that damages may be awarded in a second hearing after this Court determines whether Genesco committed fraud or negligent misrepresentation.[2]  Accordingly, Finish Line and UBS are entitled to have those issues adjudicated on December 10th – both as defenses to Genesco's claim for specific performance and as adjudications of liability on Defendants' claims for fraud and negligent misrepresentation.  Not only has Genesco suffered a MAC – but by bringing this action for specific performance, Genesco itself has put into question whether or not it committed fraud and negligent misrepresentation in the events leading up to Genesco's June 17th merger agreement.[3]

WHEREFORE, Defendants Finish Line and UBS respectfully request that this Court deny Plaintiff Genesco's Motion to Clarify and proceed to trial on December 10, 2007 on all issues raised by the pleadings with the exception of any damages to be awarded to Finish Line and UBS.

Respectfully submitted,

Joseph J. Frank, *pro hac vice*
Noreen Kelly-Najah, *pro hac vice*
J. Christian Word, *pro hac vice*
LATHAM & WATKINS, LLP
885 Third Avenue
New York, New York  10022
Tel:  (212) 906-1200
Fax:  (212) 751-4864

---

[2]    Finish Line and UBS agreed to have any fraud or misrepresentation damages awarded in a second hearing *before* Genesco filed its current motion to "clarify".

[3]    Throughout this litigation, UBS consistently has maintained that it is before this Court only to litigate issues of a MAC and fraud.  UBS also consistently has reserved its right to have insolvency and other closing conditions to the parties' Commitment Letter adjudicated in New York pursuant to the parties' exclusive jurisdiction agreement.  *See* UBS's 10/10/07 Motion to Intervene at 1; UBS's 11/15/07 Answer and Counterclaim at 1; UBS's 11/19/07 Supplemental Interrogatory Responses at ¶¶ 3, 4.  UBS has filed such an action in the United States District Court for the Southern District of New York.

4

John S. Hicks (BPR #10478)
Courtney H. Gilmer (BPR #22131)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
211 Commerce Street, Suite 1000
Nashville, Tennessee  37201
Tel: (615) 726-5600
Fax: (615) 744-7337

*Attorneys for UBS Securities LLC and
UBS Loan Finance LLC*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 28th day of November, 2007, a true and exact copy of the foregoing has been served via electronic mail and United States Mail, first-class postage prepaid, on the following:

Overton Thompson III
Britt K. Latham
W. Brantley Phillips, Jr.
Brian D. Roark
Russell E. Stair
BASS, BERRY & SIMS PLC
315 Deaderick Street, Suite 2700
Nashville, Tennessee 37238-3001

Jonathan D. Schiller
James P. Denvir
Michael A. Brille
William C. Jackson
Jonathan M. Shaw
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue N.W., Suite 800
Washington, DC 20015

Robert J. Walker
J. Mark Tipps
John Hayworth
John Farringer IV
WALKER, TIPPS & MALONE
2300 One Nashville Place
150 Fourth Avenue North
Nashville, Tennessee 37219-2424

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT
DAVIDSON COUNTY, PART III

GENESCO, INC.,                          )
                                        )
                    Plaintiff,          )
                                        )
vs.                                     ) CASE NO.
                                        ) 07-2137
THE FINISH LINE, INC.;                  )
HEADWIND, INC.;                         )
UBS SECURITIES LLC and                  )
UBS LOAN FINANCE LLC,                   )
                                        )
                    Defendants.         )
                                        )


Hearing Held Before
CHANCELLOR ELLEN HOBBS LYLE
on October 31, 2007


VOWELL & JENNINGS, INC.
Court Reporting Services
207 Washington Square Building
214 Second Avenue North
Nashville, Tennessee 37201
(615) 256-1935



EXHIBIT
A

1    agreement.  The merger agreement itself talks

2    about an MAE not in existence from February 3,

3    '07, through the closing.  So there are warranties

4    and representations in this merger agreement, and

5    there are conditions to close beyond just the

6    absence of -- well, we all call them MAC.  It is

7    easier to say MAC.

8              And there are conditions.  They pled

9    in their original complaint that all conditions of

10   closing had been met after the shareholders

11   meeting.  I forgot what paragraph.  We denied

12   that.  We deny that today.  We will assert more

13   specifically what they may be beyond just the

14   existence of a MAC when we get some more

15   discovery.

16             Here is some -- and I want the court

17   to be alert to this and the plaintiff to be alert

18   to this.

19             The financial information we're

20   seeing raises two additional problems from the

21   prima facie, what we see.  One is whether, in

22   fact, when we signed the merger agreement on the

23   17th of June the bad information that we now see

24   was there for May and for early June of 2007 was

25   not known to us.  That's an issue, due diligence

1  several different legal theories that apply?

2         MR. WALKER:  Yes.  And this also

3  causes this to be one hearing.  Some of the --

4  what you might find in some contracts, be a

5  failure to completely disclose.

6         THE COURT:  Yeah.

7         MR. WALKER:  Under the terms of the

8  agreement would need to constitute a MAC to become

9  a conditional problem.  Some of them wouldn't.

10  But the MAC is interwoven.  For instance, if there

11  had been a securities law violation, a violation

12  of law is a condition of closing.  That is an

13  example.  I'm not suggesting that we're going to

14  need any more wide ranging, longer term discovery

15  or trial than I think Your Honor is contemplating

16  here.

17         But what I don't want to do is get

18  into a deposition with somebody and start asking

19  them about what these directors considered and saw

20  when they compared in April the analysis of the

21  Foot Locker deal for three or four points less but

22  not as highly leveraged with the deal that the

23  Finish Line had that they knew to be highly

24  leveraged, depend upon financing, and require a

25  certain quantum of cash flow to service it.  Those

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT
DAVIDSON COUNTY, PART III

GENESCO, INC.,                           )
                                         )
                    Plaintiff,           )
                                         )
vs.                                      ) CASE NO.
                                         ) 07-2137
THE FINISH LINE, INC.;                   )
HEADWIND, INC.;                          )
UBS SECURITIES LLC and                   )
UBS LOAN FINANCE LLC,                    )
                                         )
                    Defendants.          )
                                         )

Hearing Held Before
CHANCELLOR ELLEN HOBBS LYLE
on October 31, 2007

VOWELL & JENNINGS, INC.
Court Reporting Services
207 Washington Square Building
214 Second Avenue North
Nashville, Tennessee 37201
(615) 256-1935


EXHIBIT
B

1    to find some way out of this deal because, again,

2    we think that's what's going on.  The credit

3    markets have changed, and they are just doing

4    everything they can to try to get a way out.

5              We will be prepared to go forward on

6    December 10 and be prepared to demonstrate that

7    there are no -- that all the closing conditions

8    have been satisfied.

9              Your Honor, if I could just take one

10   second because they've gotten into the merits on

11   this MAE, and I just want to say one thing.

12             THE COURT:  I would like to hear your

13   response.

14             MR. THOMPSON:  Sure, exactly.  The

15   case that is the leading case on this is Vice

16   Chancellor Strine's case of 2001 in Tyson.  He

17   makes it crystal clear in that case that a

18   short-term hiccup in earnings is not an MAE

19   because that is not something that would worry the

20   long-term purchaser, somebody, a strategic buyer

21   that is coming in to buy this company for a

22   long-term.  This is not a short-term speculator.

23             What they have failed to tell you,

24   Your Honor, and what you will see at the hearing

25   is that this has happened ten times over the last

## IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY, PART III

| | |
|---|---|
| **GENESCO, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **VS.** | ) **NO. 07-2137-II(III)** |
| | ) |
| **THE FINISH LINE, INC., and** | ) |
| **HEADWIND, INC., UBS SECURITIES** | ) |
| **LLC and UBS LOAN FINANCE LLC,** | ) |
| | ) |
| **Defendants.** | ) |

### ORDER

For the parties' notice in determining the timing and procedure for appeal, the Court clarifies that the December 27, 2007 Order granting Genesco specific performance is not a final order.

The parties agreed prior to trial that the issue of insolvency would be determined by the New York Court in the lawsuit filed by UBS. Accordingly, no proof or argument concerning insolvency or frustration of commercial purpose was presented to this Court. The few facts and expert testimony presented in this case on the financial condition of the merged entity were provided on the fraud issue on the materiality of financing and on the MAE issue, and the proof was confined mostly to testimony by Mr. Deetz with respect to the UBS model on the cash flow of the merged entity (TE29). The Court, therefore, did not consider insolvency in its ruling, leaving that determination for UBS's lawsuit in New York.

Thus, this Court's December 27, 2007 order requires Finish Line to perform the parties' Merger Agreement, including exercising its best efforts to obtain financing. Finish Line's performance of the merger, however, could be impossible if the New York Court determines that the merged entity is insolvent, and Finish Line returns to this Court asserting the doctrine of frustration of commercial purpose to prevent enforcement by Genesco of the order of specific performance. *See Haun v. King and Merritt*, 690 S.W.2d 869, 872 (Tenn. 1985) (unexpected financial difficulty, expense or hardship did not excuse performance of contract where discontinuance of financing was foreseen). The issue of insolvency and the implications of the determination of that issue for this lawsuit, then, are not ripe and depend upon developments in the New York lawsuit.

It is so ORDERED.

*Ellen Hobbs Lyle*
ELLEN HOBBS LYLE
CHANCELLOR

cc:    Overton Thompson III
          (via fax and US Mail)
       Britt Latham
       W. Brantley Phillips, Jr.
       Brian Roark
       Russell Stair

       Jonathan Schiller
       James Denvir
       Michael Brille
       William Jackson
       Jonathan Shaw

       Robert Walker
          (via fax and US Mail)
       J. Mark Tipps
       John Hayworth
       John Farringer IV

       John Hicks
          (via fax and US Mail)

       Joseph Frank

2

CLERK AND MASTER        Fax:615-862-5722        Nov 29 2007  12:20        P.02

# IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY, PART III

|  |  |  |
|---|---|---|
| GENESCO, INC., | ) | |
| Plaintiff, | ) | |
| VS. | ) | NO. 07-2137-II(III) |
| THE FINISH LINE, INC., and HEADWIND, INC., | ) | |
| Defendants, | ) | |
| VS. | ) | |
| USB SECURITIES LLC and USB LOAN FINANCE LLC, | ) | |
| Defendants. | ) | |

FILED 2007 NOV 29 PM 12:02
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.
D.C. & M.

## MEMORANDUM AND ORDER

This lawsuit arises out of a corporate merger entered into in June of 2007 by two footwear companies. The company being acquired, Genesco, filed the lawsuit in September of 2007 to obtain a court order of specific performance to require defendant Finish Line to immediately close the $1.5 billion merger.  Genesco asserts that it has performed all conditions required to close, that Finish Line's failure to close is a breach of the parties' Merger Agreement, and that an immediate court order is necessary because Genesco's business is being irreparably harmed by the failure to close.  Citing to a continuing decrease in Genesco's earnings and financial position reported after the deal was signed and a recently

opened government securities fraud investigation, Finish Line and its lender, UBS, assert they are excused from closing the merger under the Material Adverse Effect ("MAC") provision of the Merger Agreement. They also assert that Genesco committed fraud in connection with representations about its financial position prior to the signing of the Merger Agreement which fraud renders the Agreement void and excuses closing. This case is, then, at bottom, a breach of contract case.

There is, though, a distinguishing feature. That is its immediacy. A trial has been set commencing December 10, 2007—within only three months of the complaint being filed. The authority for ordering a speedy trial is paragraph 9.9 of the Merger Agreement in which the parties acknowledge that any breach of any provision of the Agreement will cause immediate and irreparable harm. Further, they acknowledge that under those circumstances equitable relief, which the Court has concluded includes specific performance, shall be available prior to there being an actual termination of the Merger Agreement.

While responsive to the threat of immediate and irreparable harm, the expedited trial has the downside of drastically compressing the time to discover and develop facts and legal theories, and narrow and refine the issues for trial through pretrial motions. This compressed pretrial development of the case is the source of two motions filed by the plaintiff presently pending before the Court. One motion is to clarify the scope of the December 10, 2007 trial, and the second motion seeks to dismiss the fraud claims asserted by Finish Line and UBS.

2

In its first motion, Genesco seeks clarification from the Court that Finish Line and UBS can assert the fraud claim at the December 10, 2007 hearing only to the extent of defending against specific performance but that the Court should not rule on the counterclaim request for rescission and restitution.  Along the same lines, Genesco's second motion, a motion to dismiss, argues that the allegations of fraud are legally irrelevant and should be stricken from the trial because the parties in the Merger Agreement contracted that Finish Line was not relying upon financial representations made by Genesco.

From the outset of the lawsuit, all parties recognized that a ruling on whether a MAC had occurred was determinative of Genesco's claim of specific performance and Finish Line's and UBS's defense to that claim.  In that the facts related to MAC were a closed universe and limited temporally, the December 10 trial was ambitious but realistic and potentially dispositive.  But, also raised by Finish Line and UBS as a defense to specific performance, was fraud by Genesco.  Further, fraud has been alleged by Finish Line and UBS as the basis for counterclaim relief of rescission and restitution, and recovery of damages.  All along the fraud claim has been problematic to process in the decompressed preparation of the case for trial.  Recognized, though, in the law as a defense to specific performance, fraud cannot be excluded by the Court from the defendants' claims.  The issue, then, for the Court is how to fairly define the scope of the fraud claims within the framework of an expedited trial.

3

With respect to the motion to clarify, the Court determines that the scope of the relief of the December 10, 2007 trial is for the Court to issue a declaratory judgment, pursuant to Tennessee Code Annotated sections 29-14-102 – 104, on whether a MAC has occurred because of the decline in Genesco's financial performance; whether a MAC has occurred because of the fundamental operations failure of Genesco as revealed by its financial performance; and whether a MAC has occurred because of the recently opened securities fraud investigation. Further, pursuant to these Code sections, the Court shall issue a declaratory judgment on whether the Merger Agreement is void due to acts of fraud allegedly committed by Genesco in the timeframe of Spring of 2007 to the present, and limited to the facts alleged in the answers and counterclaims filed by Finish Line and UBS.

Beyond issuing a declaratory judgment on whether a MAC has occurred and/or fraud to excuse performance by Finish Line and UBS, the Court shall attempt, at the conclusion of the trial, to rule on Genesco's request for specific performance and Finish Line's request for rescission. The Court shall bifurcate and rule on subsequently any damages claims. Depending on the proof and argument of counsel, however, it may not be possible for the Court to issue a ruling beyond declaratory judgment on a MAC and fraud, and the Court may not be in a position to rule on the remedies of specific performance and rescission because UBS has asserted in a lawsuit in New York insolvency and other conditions as excusing its performance. At the conclusion of the proof at trial the Court will determine whether its decision on declaratory relief can be expanded to rule on the remedies of specific

4

performance and rescission without conflicting with UBS's insolvency claims filed in New York.

Mindful of the pitfalls of piecemeal litigation, the Court nevertheless concludes that the expedited December 10 trial within the scope outlined above is the best way to proceed. The trial has the potential, on the one hand, to relieve Genesco from immediate and irreparable harm, or, on the other hand, to provide a court declaration to Finish Line and UBS that their closure of the merger is excused.

It is therefore ORDERED that the scope of the December 10, 2007 trial is to issue declaratory judgment relief, pursuant to Tennessee Code Annotated sections 29-14-102 – 104, on whether a closing of the merger by Finish Line and UBS is excused by fraud committed by Genesco in the Spring of 2007 and/or whether closing the merger is excused under the MAC provisions due to Genesco's decline in financial performance, operations failure and/or the securities fraud investigation. It is further ORDERED that the Court shall consider and attempt to issue a ruling on Genesco's remedy claim for specific performance and Finish Line's remedy claim for rescission, to the extent that those would not conflict with UBS's insolvency and other claims pending in New York. It is additionally ORDERED that the parties' damages claims are separated out for a subsequent trial.

With respect to Genesco's motion to dismiss the fraud claims, for two reasons, the Court shall not conduct a hearing on the motion prior to trial. First, there is not time to do

5

so. Secondly, whether the Court can enforce contractual provisions that disclaim or excuse fraudulent information is a fact specific inquiry, turning on whether the alleged misrepresentations were intentional and material. As the court in *Abry Partners V., L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1036 explained, "[P]arties may allocate the risk of factual error freely as to any error where the speaking party did not consciously convey an untruth. In that context, there is no moral imperative . . . . But the contractual freedom to immunize a seller from liability for a false contractual statement of fact ends there. . . . [I]t is difficult to identify an economically-sound rationale for permitting a seller to deny the remedy of rescission to a buyer when the seller is proven to have induced the contract's formation or closing by lying about a contractually-represented fact." A factual context and credibility determinations, it appears, may be attendant to the Court ruling on Genesco's claims of law that the allegations of fraud are legally irrelevant as per the terms of the Merger Agreement. Accordingly, the Court shall allow Finish Line and UBS to present their proof of fraud, and then the Court shall consider and rule on Genesco's argument contained in the motion to dismiss as to the legal relevancy of the alleged fraud.

It is therefore ORDERED that the plaintiff's motion to set an expedited hearing in advance of trial on its motion to dismiss the fraud claims is denied; those legal claims shall be ruled on at the conclusion of the December 10 trial.

_Ellen Hobbs Lyle_
ELLEN HOBBS LYLE
CHANCELLOR

6

| UBS LOAN FINANCE LLC | UBS SECURITIES LLC |
|---|---|
| 677 Washington Boulevard | 299 Park Avenue |
| Stamford, Connecticut  06901 | New York, New York  10171 |

June 17, 2007

The Finish Line, Inc.
3308 N. Mitthoeffer Road
Indianapolis, Indiana 46235

Attention:  Chief Financial Officer

<u>Bank and Bridge Facilities Commitment Letter</u>

Ladies and Gentlemen:

You have advised UBS Loan Finance LLC ("<u>UBS</u>") and UBS Securities LLC ("<u>UBSS</u>" and, together with UBS, "<u>we</u>" or "<u>us</u>") that The Finish Line, Inc. ("<u>you</u>" or the "<u>Borrower</u>") proposes to acquire (the "<u>Acquisition</u>") Genesco Inc. (the "<u>Acquired Business</u>").  The Acquisition will be effected pursuant to a merger agreement (the "<u>Acquisition Agreement</u>") among you, a wholly-owned merger subsidiary created by you and the Acquired Business.  All references to "<u>dollars</u>" or "<u>$</u>" in this agreement and the attachments hereto (collectively, this "<u>Commitment Letter</u>") are references to United States dollars.  All references to "Borrower" or "Borrower and its subsidiaries" for any period from and after consummation of the Acquisition shall include the Acquired Business.

We understand that the sources of funds required to fund the Acquisition consideration, to repay certain existing indebtedness of Borrower, the Acquired Business and their respective subsidiaries of approximately $84.3 million (the "<u>Refinancing</u>"), to pay fees, commissions and expenses of approximately $70.5 million in connection with the Transactions (as defined below) and to provide ongoing working capital requirements of Borrower and its subsidiaries following the Transactions will include:

- a senior secured revolving credit facility to Borrower of up to $450.0 million (the "<u>Revolving Credit Facility</u>") as described in the Summary of Principal Terms and Conditions attached hereto as <u>Annex I</u> (the "<u>Revolver Term Sheet</u>"), of which no more than the Closing Date Permitted Revolver Draw shall be drawn immediately after giving effect to the Transactions;

- a senior secured term loan facility to Borrower of up to $690.0 million (the "<u>Term Loan Facility</u>" and, together with the Revolving Credit Facility, the "<u>Bank Facilities</u>"), as described in the Summary of Principal Terms and Conditions attached hereto as <u>Annex II</u> (the "<u>Term Loan Term Sheet</u>");

- the issuance by Borrower of up to $700.0 million aggregate gross proceeds of unsecured senior notes (the "Notes") pursuant to a public offering or Rule 144A or other private placement (the "Notes Offering") or, in the event the Notes are not issued at the time the Transactions are consummated, borrowings by Borrower of up to $700.0 million under a senior unsecured credit facility (the "Bridge Facility" and, together with the Bank Facilities, the "Facilities"), as described in the Bridge Facility Summary of Principal Terms and Conditions attached hereto as Annex III (the "Bridge Term Sheet" and, together with the Revolver Term Sheet and the Term Loan Term Sheet, the "Term Sheets"); and

- excess cash of the Borrower of approximately $11.0 million.

No other financing will be required for the uses described above.  Immediately following the Transactions, neither you nor any of your subsidiaries will have any indebtedness or preferred equity other than the Bank Facilities, the Notes or the Bridge Facility and other existing indebtedness to be mutually agreed (including the Convertible Bonds, the Employee Preferred Stock and the Genesco Preferred Stock (in each case, as defined below)).  As used herein, the term "Transactions" means the Acquisition, the Refinancing, the initial borrowings under the Bank Facilities, the issuance of the Notes or the borrowings under the Bridge Facility and the payments of fees, commissions and expenses in connection with each of the foregoing.

As used herein, the term "Closing Date Permitted Revolver Draw" means the positive difference, if any, between (i) $250.0 million and (ii) (a) the amount of 4.125% Convertible Subordinated Debentures due 2023 (the "Convertible Bonds") outstanding on the Closing Date after giving effect to any tender offer for or conversion of the Convertible Bonds on or prior to the Closing Date, (b) the amount of the Acquired Business's Employees' Subordinated Convertible Preferred Stock (the "Employee Preferred Stock") outstanding on the Closing Date after giving effect to any tender offer for or conversion of the Employee Preferred Stock on or prior to the Closing Date and (c) the amount of the Acquired Business's preferred stock other than Employee Preferred Stock (the "Genesco Preferred Stock") outstanding as of the Closing Date after giving effect to any redemption of, tender offer for or conversion of the Genesco Preferred Stock on or prior to the Closing Date; provided however that in no event shall the Closing Date Permitted Revolver Draw exceed the Borrowing Base Amount (as defined in the Revolver Term Sheet).

Notwithstanding anything to the contrary herein, to the extent that the Borrowing Base Amount (as defined in the Revolver Term Sheet) as of the Closing Date is not sufficient to fund, together with the amount of the Term Loan Facility set forth above, the Acquisition consideration, the Refinancing and the payments of fees, commissions and expenses in connection with the Acquisition, the Refinancing, the Notes Offering and the Facilities (the "Funding Shortfall"), the amount of the Term Loan Facility set forth above shall be increased on a dollar-for-dollar basis by the amount of the Funding Shortfall and the Revolving Credit Facility shall be reduced on a dollar-for-dollar basis by the amount of the Funding Shortfall.

<u>Commitments</u>.

You have requested that UBS commit to provide the Facilities and that UBSS agree to structure, arrange and syndicate the Facilities.

UBS is pleased to advise you of its commitment to provide the entire amount of the Bank Facilities to Borrower upon the terms and subject to the conditions set forth or referred to in this Commitment Letter. The commitment of UBS hereunder is subject to the negotiation, execution and delivery of definitive documentation (the "<u>Bank Documentation</u>") with respect to the Bank Facilities reasonably satisfactory to UBS reflecting the terms and conditions set forth in the Bank Term Sheet, in <u>Annex IV</u> hereto (the "<u>Conditions Annex</u>") and in the letter of even date herewith addressed to you providing, among other things, for certain fees relating to the Facilities (the "<u>Fee Letter</u>"), and such other terms (but not conditions) as you and we may mutually agree. In addition, UBS is pleased to advise you of its commitment to provide the entire amount of the Bridge Facility to Borrower upon the terms and subject to the conditions set forth or referred to in this Commitment Letter. The commitment of UBS hereunder is subject to the negotiation, execution and delivery of definitive documentation (the "<u>Bridge Documentation</u>" and, together with the Bank Documentation, the "<u>Financing Documentation</u>") with respect to the Bridge Facility reasonably satisfactory to UBS reflecting the terms and conditions set forth in the Bridge Term Sheet, the Conditions Annex and the Fee Letter, and such other terms (but not conditions) as you and we may mutually agree. You agree that the closing of the Facilities, and if applicable, the Notes Offering (the "<u>Closing Date</u>") shall be a date mutually agreed upon between you and us, but which shall be concurrent with the closing of the Acquisition in accordance with the Acquisition Agreement so long as all conditions precedent to the initial funding of the Facilities set forth herein, in the Term Sheets and in the Conditions Annex have been satisfied, or as soon as practicable thereafter after all such conditions are satisfied.

<u>Syndication</u>.

It is agreed that UBSS will act as the sole and exclusive advisor, arranger and book-manager for the Facilities, and, in consultation with you, will exclusively manage the syndication of the Facilities, and will, in such capacities, exclusively perform the duties and exercise the authority customarily associated with such roles. It is further agreed that no additional advisors, agents, co-agents, arrangers or bookmanagers will be appointed and no Lender (as defined below) will receive compensation with respect to any of the Facilities other than as provided herein and in the Fee Letter in order to obtain its commitment to participate in such Facilities, in each case unless you and we so agree.

UBS reserves the right, prior to or after execution of the Bank Documentation, in consultation with you, to syndicate all or a portion of its commitment to one or more institutions (other than those certain institutions previously identified by you in your reasonable discretion to us, if any, prior to the date of this Commitment Letter to be excluded from syndication, the "<u>Blacklist</u>") that will become parties to the Bank Documentation (UBS and the institutions becoming parties to the Bank Documentation with respect to all or a portion of the Bank Facilities, the "<u>Bank Lenders</u>"). UBS also reserves the right, prior to or after the execution of the Bridge Documentation, to syndicate all or a portion of its commitment to one or more institutions other than those on the Blacklist that will be-

come parties to the Bridge Documentation (UBS and the institutions becoming parties to the Bridge Documentation, the "Bridge Lenders" and, together with the Bank Lenders, the "Lenders").  Notwithstanding UBS's right to syndicate the Facilities and receive commitments with respect thereto, UBS will not be relieved of all or any portion of its commitments hereunder prior to the initial funding under the Facilities.  Without limiting your obligations to assist with syndication efforts as set forth herein, UBS agrees that completion of such syndications is not a condition to its commitments hereunder.

UBSS will exclusively manage all aspects of the syndication of the Facilities, including selection of additional Lenders (other than the Blacklist), determination of when UBSS will approach potential additional Lenders, awarding of any naming rights and the final allocations of the commitments in respect of the Facilities among the additional Lenders.  You agree to, and to use commercially reasonable efforts to cause the Acquired Business to (including with a covenant to such effect in the Acquisition Agreement), actively assist UBSS in achieving a timely syndication of the Facilities.  To assist UBSS in its syndication efforts, you agree that you will, and will cause your representatives and advisors to, and will use commercially reasonable efforts to cause the Acquired Business and its representatives and advisors to, (a) prepare and provide all financial and other information as we may reasonably request and as is customary for similar financings with respect to you, the Acquired Business, your and their respective subsidiaries and the transactions contemplated hereby, including but not limited to financial projections (the "Projections") relating to the foregoing, (b) provide copies of any due diligence reports or memoranda prepared at your direction or any of your affiliates by legal, accounting, tax or other advisors in connection with the Acquisition (subject to (x) the delivery of customary non-disclosure agreements reasonably acceptable to UBSS and (y) your right to maintain any applicable attorney-client or other applicable privilege as you may reasonably determine in good faith), (c) use commercially reasonable efforts to ensure that such syndication efforts benefit materially from your existing lending relationships and the existing lending relationships of the Acquired Business and your and its respective subsidiaries, (d) make available to prospective Lenders your senior management and advisors, and the senior management of the Acquired Business and its subsidiaries at mutually agreeable times, (e) host, with UBSS, one or more meetings with prospective Lenders under each of the Facilities at mutually agreeable times, (f) assist UBSS in the preparation of one or more customary confidential information memoranda and other customary marketing materials to be used in connection with the syndication of each of the Facilities, and (g) use commercially reasonable efforts to obtain, at your expense, monitored public ratings of the Facilities and the Notes from Moody's Investors Service ("Moody's") and Standard & Poor's Ratings Group ("S&P") at least 30 days prior to the Closing Date and to participate reasonably in the process of securing such ratings, including having your senior management and the senior management of the Acquired Business meet with such rating agencies at mutually agreeable times.

At our request, you agree to prepare a version of the information package and presentation and other marketing materials to be used in connection with the syndication that do not contain material non-public information concerning you or the Acquired Business, your or their respective affiliates or your or their securities.  In addition, you agree that unless specifically labeled "PUBLIC — Contains No Material Non-Public Information," all information, documentation or other data disseminated to prospective Lenders in connection with the syndication of the Facilities, whether through an Internet website (including, without limitation, an IntraLinks workspace), electronically, in presen-

tations at meetings or otherwise, will be assumed by us to contain material non-public information concerning you or the Acquired Business, your or their respective affiliates or your or their securities. You acknowledge and agree that the following documents are public and may be distributed to public Lenders (unless you promptly notify us otherwise):  (a) drafts and final definitive documentation with respect to the Facilities; (b) administrative materials prepared by us for prospective Lenders (such as a lender meeting invitation, allocations and funding and closing memoranda); and (c) notification of changes in the terms of the Facilities.

Information.

You hereby represent and covenant that (a) to the best of your knowledge, all information (other than the Projections) that has been or will be made available to us or any of the Lenders by you, the Acquired Business or any of your or its respective representatives in connection with the transactions contemplated hereby (the "Information"), when taken as a whole, is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein, in the light of the circumstances under which such statements are made, not misleading and (b) the Projections that have been or will be made available to us or any of the Lenders by you, the Acquired Business or any of your or its respective representatives in connection with the transactions contemplated hereby have been and will be prepared in good faith based upon assumptions believed by you to be reasonable (it being understood that projections by their nature are inherently uncertain and no assurances are being given that the results reflected in the Projections will be achieved).  You agree to supplement the Information and the Projections from time to time and agree to promptly advise us and the Lenders of all developments materially affecting you, the Acquired Business, any of your or its respective subsidiaries or affiliates or the transactions contemplated hereby or the accuracy of Information and Projections previously furnished to us or any of the Lenders.

Compensation.

As consideration for the commitments of UBS hereunder with respect to the Facilities and the agreement of UBSS to structure, arrange and syndicate the Facilities and to provide advisory services in connection therewith, you agree to pay, or cause to be paid, the fees set forth in the Term Sheets and the Fee Letter.  Once paid, such fees shall not be refundable under any circumstances.

Conditions.

The commitment of UBS hereunder with respect to each of the Facilities and UBSS's agreement to perform the services described herein may be terminated by UBS if (i) since the date hereof, a Material Adverse Effect (as defined below) has occurred with respect to the Acquired Business and its subsidiaries, considered as a whole, that has not been cured prior to December 31, 2007; or (ii) any condition set forth in either Term Sheet or the Conditions Annex is not satisfied or any covenant or agreement in this Commitment Letter or the Fee Letter is not complied with in any material respect.  As used herein, "Material Adverse Effect" means any event, circumstance, change or effect that, individually or in the aggregate, is materially adverse to the business, condition (financial or otherwise), assets, liabilities or results of operations of the Acquired Business and its subsidiaries,

taken as a whole; provided, however, that none of the following shall constitute, or shall be considered in determining whether there has occurred, and no event, circumstance, change or effect resulting from or arising out of any of the following shall constitute, a Material Adverse Effect:  (A) the announcement of the execution of the Acquisition Agreement or the pendency of consummation of the Acquisition (including the threatened or actual impact on relationships of the Acquired Business and its subsidiaries with customers, vendors, suppliers, distributors, landlords or employees (including the threatened or actual termination, suspension, modification or reduction of such relationships)); (B) changes in the national or world economy or financial markets as a whole or changes in general economic conditions that affect the industries in which the Acquired Business and its subsidiaries conduct their business, so long as such changes or conditions do not adversely affect the Acquired Business and its subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (C) any change in applicable law, rule or regulation or in accounting principles generally accepted in the United States or interpretation thereof after the date hereof, so long as such changes do not adversely affect the Acquired Business or its subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (D) the failure, in and of itself, of the Acquired Business to meet any published or internally prepared estimates of revenues, earnings or other financial projections, performance measures or operating statistics; provided, however, that the facts and circumstances underlying any such failure may, except as may be provided in subsection (A), (B), (C), (E), (F) and (G) of this definition, be considered in determining whether a Material Adverse Effect has occurred; (E) a decline in the price, or a change in the trading volume, of the common stock of the Acquired Business on the New York Stock Exchange or the Chicago Stock Exchange; (F) compliance with the terms of, and taking any action required by, the Acquisition Agreement, or taking or not taking any actions at the request of, or with the consent of, you; and (G) acts or omissions of you or your wholly-owned merger subsidiary after the date of the Acquisition Agreement (other than actions or omissions specifically contemplated by the Acquisition Agreement).

Notwithstanding anything in this Commitment Letter, the Term Sheets, the Fee Letter, the Financing Documentation or any other letter agreement or other undertaking concerning the financing of the Transactions to the contrary, (i) the only representations relating to the Borrower, the Acquired Business, their respective subsidiaries and their respective businesses the making of which shall be a condition to availability of the Facilities on the Closing Date shall be (A) such of the representations made by the Acquired Business in the Acquisition Agreement as are material to the interests of the Lenders, but only to the extent that you have the right to terminate your obligations under the Acquisition Agreement as a result of a breach of such representations in the Acquisition Agreement (including but not limited to the Acquired Business' representation regarding the nonoccurrence of a Material Adverse Effect since February 3, 2007) (collectively, the "Acquisition Agreement Representations") and (B) the Specified Representations (as defined below) and (ii) the terms of the Financing Documentation shall be in a form such that they do not impair availability of the Facilities on the Closing Date if the conditions set forth herein and in the Term Sheets and the Conditions Annex are satisfied.  For purposes hereof, "Specified Representations" means the representations and warranties relating to the Borrower and the Acquired Business set forth in the Term Sheets relating to corporate power and authority, the due authorization, execution, delivery and enforceability of the Financing Documentation, the Financing Documentation not conflicting with charter documents or law, Federal Reserve margin regulations, validity, priority and perfection of security interests (subject to paragraph

6 of the Conditions Annex), status of debt under the applicable Facility as senior debt, the Patriot Act and the Investment Company Act.

     Clear Market.

     From the date of this Commitment Letter until the earlier of (x) our completion of syndication (as determined by us and notified in writing to you) of each of the Facilities and, if later, of the distribution of the Notes or (y) 90 days after the Closing Date, you will (and with respect to the Acquired Business, until the Closing Date, you will use commercially reasonably efforts to) ensure that no financing for you, the Acquired Business or any of your or its respective subsidiaries or affiliates is announced, syndicated or placed without the prior written consent of UBS if such financing, syndication or placement would have, in the reasonable judgment of UBS, a detrimental effect upon the transactions contemplated hereby.

     Indemnity and Expenses.

     By your acceptance below, you hereby agree to indemnify and hold harmless us and our affiliates (including, without limitation, controlling persons) and the directors, officers, employees, advisors and agents of the foregoing (each, an "Indemnified Person") from and against any and all losses, claims, costs, expenses, damages or liabilities (or actions or other proceedings commenced or threatened in respect thereof) that arise out of or in connection with this Commitment Letter, the Term Sheets, the Conditions Annex, the Fee Letter, the Facilities or any of the transactions contemplated hereby or thereby or the providing or syndication of the Facilities (or the actual or proposed use of the proceeds thereof), and to reimburse each Indemnified Person promptly upon its written demand for any legal or other expenses incurred in connection with investigating, preparing to defend or defending against, or participating in, any such loss, claim, cost, expense, damage, liability or action or other proceeding (whether or not such Indemnified Person is a party to any action or proceeding); *provided* that any such obligation to indemnify, hold harmless and reimburse an Indemnified Person shall not be applicable to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from the bad faith, gross negligence or willful misconduct of such Indemnified Person. You shall not be liable for any settlement of any such proceeding effected without your written consent, but if settled with such consent or if there shall be a final judgment against an Indemnified Person, you shall, subject to the proviso in the preceding sentence, indemnify such Indemnified Person from and against any loss or liability by reason of such settlement or judgment. You shall not, without the prior written consent of any Indemnified Person, effect any settlement of any pending or threatened proceeding in respect of which such Indemnified Person is or could have been a party and indemnity could have been sought hereunder by such Indemnified Person, unless such settlement (i) includes an unconditional release of such Indemnified Person from all liability or claims that are the subject matter of such proceeding and (ii) does not include a statement as to or an admission of fault, culpability, or a failure to act by or on behalf of such Indemnified Person. None of us (or any of our respective affiliates) shall be responsible or liable to you, the Acquired Business or any of your or its respective subsidiaries, affiliates or stockholders or any other person or entity for any indirect, punitive or consequential damages which may be alleged as a result of this Commitment Letter, the Term Sheets, the Conditions Annex, the Fee Letter, the Facilities or the transactions contemplated hereby or thereby. In addition, you hereby agree to reimburse us from time to time upon

demand for all reasonable out-of-pocket costs and expenses (including, without limitation, reasonable legal fees and expenses of UBS and UBSS, appraisal, consulting and audit fees, and printing, reproduction, document delivery, travel, communication and publicity costs) incurred in connection with the syndication and execution of the Facilities, and the preparation, review, negotiation, execution and delivery of this Commitment Letter, the Term Sheets, the Conditions Annex, the Fee Letter, the Financing Documentation and the administration, amendment, modification or waiver thereof (or any proposed amendment, modification or waiver), whether or not the Closing Date occurs or any Financing Documentation is executed and delivered or any extensions of credit are made under either of the Facilities.

    <u>Confidentiality</u>.

    This Commitment Letter is delivered to you upon the condition that neither the existence of this Commitment Letter, the Term Sheets, the Conditions Annex or the Fee Letter nor any of their contents shall be disclosed by you or any of your affiliates, directly or indirectly, to any other person, except that such existence and contents may be disclosed (i) as may be compelled in a judicial or administrative proceeding or as otherwise required by law and (ii) to your directors, officers, employees, legal counsel and accountants, in each case on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby.  In addition, this Commitment Letter, the Term Sheets and the Conditions Annex (but not the Fee Letter) may be disclosed to the Acquired Business and its directors, officers, employees, advisors and agents, in each case on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby.

    Until the earlier of the execution of the Financing Documentation and 90 days following the termination of this Commitment Letter, UBS and its affiliates will use all confidential information provided to it or such affiliates by or on behalf of you hereunder solely for the purpose of providing the services which are the subject of this Commitment Letter and shall treat confidentially all such information; *provided* that nothing herein shall prevent UBS or its affiliates from disclosing any such information (a) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case UBS, to the extent permitted by law, agrees to inform you promptly thereof), (b) upon the request or demand of any regulatory authority having jurisdiction over UBS or any of its affiliates (in which case UBS, to the extent permitted by law, agrees to inform you promptly thereof), (c) to the extent that such information becomes publicly available other than by reason of disclosure by UBS or any of its related parties, (d) to the extent that such information is received by UBS from a third party that is not to UBS' knowledge subject to confidentiality obligations to you, (e) to the extent that such information is independently developed by UBS or its affiliates, (f) to UBS' affiliates and the employees, legal counsel, independent auditors and other experts or agents of UBS or UBS' affiliates who need to know such information in connection with the Transactions and are informed of the confidential nature of such information (with UBS responsible for such persons' compliance with this paragraph), (g) to potential Lenders, participants or assignees or swap counterparties who agree to be bound by the terms of this paragraph (or language substantially similar to this paragraph), (h) for purposes of establishing a "due diligence" defense or enforcing its rights hereunder, (i) to any other party hereto or its affiliates, (j) to Moody's and/or S&P or (k) with your consent (including in a confidential information memorandum or other marketing document).

LA\1729820.12

<u>Other Services</u>.

You acknowledge and agree that we and/or our affiliates may be requested to provide additional services with respect to you, the Acquired Business and/or your or their respective affiliates or other matters contemplated hereby. Any such services will be set out in and governed by a separate agreement(s) (containing terms relating, without limitation, to services, fees and indemnification) in form and substance satisfactory to the parties thereto. Nothing in this Commitment Letter is intended to obligate or commit us or any of our affiliates to provide any services other than as set out herein.

<u>Governing Law, Etc</u>.

This Commitment Letter and the commitment of UBS shall not be assignable by you without the prior written consent of UBS, and any purported assignment without such consent shall be void. We reserve the right to employ the services of our affiliates in providing services contemplated by this Commitment Letter and to allocate, in whole or in part, to our affiliates certain fees payable to us in such manner as we and our affiliates may agree in our sole discretion. You also agree that, subject to the penultimate sentence in the second paragraph under the caption "Syndication" herein, UBS may at any time and from time to time assign all or any portion of its commitments hereunder to one or more of its affiliates. You further acknowledge that we may share with any of our affiliates, and such affiliates may share with us, any information related to you, the Acquired Business, or any of your or its respective subsidiaries or affiliates (including, without limitation, information relating to creditworthiness) and the transactions contemplated hereby. We agree to treat, and cause any such affiliate to treat, all non-public information provided to us by you as confidential information in accordance with customary banking industry practices.

This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by us and you. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart of this Commitment Letter. Headings are for convenience of reference only and shall not affect the construction of, or be taken into consideration when interpreting, this Commitment Letter. This Commitment Letter is intended to be for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, and may not be relied on by, any persons other than the parties hereto and, with respect to the indemnification provided under the heading "Indemnity and Expenses," each Indemnified Person.

**This Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of law to the extent that the application of the laws of another jurisdiction will be required thereby.** Any right to trial by jury with respect to any claim or action arising out of this Commitment Letter is hereby waived. You hereby submit to the exclusive jurisdiction of the federal and New York State courts located in The City of New York (and appellate courts thereof) in connection with any dispute related to this Commitment Letter or any of the matters contemplated hereby, and agree that service of any process, summons, notice or document by registered mail addressed to you shall be effective service of

process against you for any suit, action or proceeding relating to any such dispute. You irrevocably and unconditionally waive any objection to the laying of such venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. A final judgment in any such suit, action or proceeding brought in any such court may be enforced in any other courts to whose jurisdiction you are or may be subject by suit upon judgment.

Patriot Act.

We hereby notify you that pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "Patriot Act"), we and the other Lenders may be required to obtain, verify and record information that identifies you, which information includes the name, address and tax identification number and other information regarding you that will allow us or such Lender to identify you in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective as to us and the Lenders.

Please indicate your acceptance of the terms hereof and of the Term Sheets, the Conditions Annex, the Fee Letter by returning to us executed counterparts of this Commitment Letter, the Fee Letter not later than 5:00 p.m., New York City time, on June 22, 2007 (the "Deadline"). This Commitment Letter and the commitments of UBS hereunder and the agreement of UBSS to provide the services described herein are also conditioned upon your acceptance hereof and of the Fee Letter, and our receipt of executed counterparts hereof and thereof on or prior to the Deadline. Upon the earliest to occur of (A) the execution and delivery of the Financing Documentation by all of the parties thereto and the initial funding of the Term Loan Facility on the Closing Date, (B) December 31, 2007, if the Financing Documentation shall not have been executed and delivered by all such parties prior to that date and (C) if earlier than (B), the date of termination of the Acquisition Agreement, this Commitment Letter and the commitments of UBS hereunder and the agreement of UBSS to provide the services described herein shall automatically terminate unless UBS and UBSS shall, in their discretion, agree to an extension. The compensation, expense reimbursement, confidentiality, indemnification and governing law and forum provisions hereof and in the Term Sheets and the Fee Letter shall survive termination of (i) this Commitment Letter (or any portion hereof) and (ii) any or all of the commitments of UBS hereunder. The provisions under the headings "Syndication" and "Clear Market" above shall survive the execution and delivery of the Financing Documentation.

[Signature Page Follows]

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

UBS LOAN FINANCE LLC

By: _____

Name:
Title:
John C. Crockett
Executive Director

By: _____

Name:
Title:
Warren Jervey
Executive Director and Counsel
Region Americas Legal

UBS SECURITIES LLC

By: _____

Name:
Title:
John C. Crockett
Executive Director

By: _____

Name:
Title:
Warren Jervey
Executive Director and Counsel
Region Americas Legal

Signature page to Commitment Letter

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

UBS LOAN FINANCE LLC

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

UBS SECURITIES LLC

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

Accepted and agreed to as of
the date first written above:

THE FINISH LINE, INC.

By: _Kevin S. Wampler_ (signature) _____
    Name: Kevin S. Wampler
    Title: Executive Vice President,
        Chief Financial Officer and
        Assistant Secretary

Signature page to Commitment Letter

ANNEX I

**REVOLVING CREDIT FACILITY**

**SUMMARY OF PRINCIPAL TERMS AND CONDITIONS**[1]

| | |
|---|---|
| Borrower: | The Finish Line, Inc. ("Borrower"), the outstanding equity interests of which are currently traded in the public securities markets. |
| Sole Lead Arranger and Sole Book Running Manager: | UBS Securities LLC ("UBSS" or the "Arranger"). |
| Lenders: | A syndicate of banks, financial institutions and other entities (other than the Blacklist), including UBS Loan Finance LLC ("UBS"), arranged by UBSS (collectively, the "Lenders"). |
| Revolving Administrative Agent and Issuing Bank: | UBS AG, Stamford Branch. |
| Revolving Co-Collateral Agents: | UBS AG, Stamford Branch and a financial institution to be designated by the Arranger (together, the "Revolving Co-Collateral Agents"). |
| Swingline Lender: | UBS Loan Finance LLC. |
| Type and Amount of Facility: | An asset-based revolving credit facility (the "Revolving Credit Facility") in an aggregate principal amount of $450.0 million (the "Maximum Amount"). |
| Purpose: | Not more than the Closing Date Permitted Revolver Draw will be used on the Closing Date to finance a portion of the Acquisition consideration and the Refinancing and to pay fees, commissions and expenses in connection therewith. Following the Closing Date, the Revolving Credit Facility will also be used by Borrower and its subsidiaries for working capital and general corporate purposes. |
| Maturity Date: | 5 years from the Closing Date. |
| Availability: | Upon satisfaction or waiver of conditions precedent to drawing to be specified herein and subject to the then current Bor- |

---

[1] All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

-2-

rowing Base, borrowings may be made at any time on or after the Closing Date to but excluding the business day preceding the maturity date of the Revolving Credit Facility.  Borrowing availability under the Revolving Credit Facility will be limited to the lesser of (i) the Borrowing Base Amount (as defined below) and (ii) the Maximum Amount, in each case less any applicable reserves as determined by the Revolving Administrative Agent in its reasonable discretion.

<u>Letters of Credit</u>:

Up to $50.0 million of the Revolving Credit Facility will be available for letters of credit, on terms and conditions to be set forth in the Bank Documentation.  Each letter of credit shall expire not later than the earlier of (i) 12 months after its date of issuance and (ii) the fifteenth day prior to the Maturity Date of the Revolving Credit Facility.

Drawings under any letter of credit shall be reimbursed by Borrower on the same business day.  To the extent that Borrower does not reimburse the Issuing Bank on the same business day, the Lenders under the Revolving Credit Facility shall be irrevocably obligated to reimburse the Issuing Bank pro rata based upon their respective Revolving Credit Facility commitments.

The issuance of all letters of credit shall be subject to the customary procedures of the Issuing Bank.

<u>Swingline Facility</u>:

Up to $25.0 million of the Revolving Credit Facility will be available for swingline borrowings, on terms and conditions to be set forth in the Bank Documentation.

Except for purposes of calculating the commitment fee described below, any swingline borrowings will reduce availability under the Revolving Credit Facility on a dollar-for-dollar basis.

<u>Amortization</u>:

None.

<u>Interest</u>:

At Borrower's option, loans will bear interest based on the Base Rate or LIBOR, as described below (except that all swingline borrowings will accrue interest based on the Base Rate):

A.  <u>Base Rate Option</u>

Interest will be at the Base Rate plus the applicable Interest Margin, calculated on the basis of the actual number of days

-3-

elapsed in a year of 365 days and payable quarterly in arrears. The Base Rate is defined as the higher of the Federal Funds Rate, as published by the Federal Reserve Bank of New York, plus 1/2 of 1% and the prime commercial lending rate of UBS AG, as established from time to time at its Stamford Branch.

Base Rate borrowings will be in minimum amounts to be agreed upon and (other than swingline borrowings) will require same day prior notice.

B. <u>LIBOR Option</u>

Interest will be determined for periods to be selected by Borrower ("<u>Interest Periods</u>") of one, two, three or six months (or nine or twelve months if agreed to by all relevant Lenders) and will be at an annual rate equal to the London Interbank Offered Rate ("<u>LIBOR</u>") for the corresponding deposits of U.S. dollars, plus the applicable Interest Margin.  LIBOR will be determined by the Revolving Administrative Agent at the start of each Interest Period and will be fixed through such period.  Interest will be paid at the end of each Interest Period or, in the case of Interest Periods longer than three months, quarterly, and will be calculated on the basis of the actual number of days elapsed in a year of 360 days.  LIBOR will be adjusted for statutory reserve requirements (if any).

LIBOR borrowings will require three business days' prior notice and will be in minimum amounts to be agreed upon.

<u>Default Interest and Fees</u>:     Upon the occurrence and during the continuance of a payment default, interest will accrue (i) in the case of principal or interest on any loan at a rate of 2.0% per annum plus the rate otherwise applicable to such loan and (ii) in the case of any other amount, at a rate of 2.0% per annum plus the non-default interest rate then applicable to Base Rate loans under the Revolving Credit Facility.  Default interest shall be payable on demand.

<u>Interest Margins</u>:     The applicable Interest Margin will be the basis points set forth in the following table:

-4-

|  | Base Rate Loans | LIBOR Loans |
|---|---|---|
| Revolving Credit Facility | 25 bps | 150 bps |

After the date on which Borrower shall have delivered financial statements for the fiscal quarter ending at least six months after the Closing Date, the Interest Margin will be determined pursuant to the following grid based on Excess Availability (as defined below).

| Excess Availability | Base Rate Loans | LIBOR Loans |
|---|---|---|
| < $100.0 million | 50 bps | 175 bps |
| ≥ $100.0 million and ≤ $300.0 million | 25 bps | 150 bps |
| > $300.0 million | 0 bps | 125 bps |

"Excess Availability" shall mean, on the date of determination, (a) the lesser of (i) the commitments of all of the Lenders under the Revolving Credit Facility and (ii) the Borrowing Base on the date of determination *less* (b) all outstanding loans and obligations in respect of letters of credit under the Revolving Credit Facility.

Commitment Fee:

A Commitment Fee shall accrue on the unused amounts of the commitments under the Revolving Credit Facility. Such Commitment Fee will be 0.25% per annum. Accrued Commitment Fees will be payable quarterly in arrears (calculated on a 360-day basis) for the account of the Lenders from the Closing Date.

Letter of Credit Fees:

Borrower will pay (i) the Issuing Bank a fronting fee equal to 12.5 basis points per annum and (ii) the Lenders under the Revolving Credit Facility letter of credit participation fees equal to the Interest Margin for LIBOR Loans under the Revolving Credit Facility, in each case, on the undrawn amount of all outstanding letters of credit. In addition, Borrower will pay the Issuing Bank customary issuance fees.

-5-

| | |
|---|---|
| <u>Mandatory Prepayments</u>: | From and after the date that is 30 days after the Closing Date, all cash or cash equivalents (other than payroll accounts and certain other accounts to be mutually agreed) and proceeds will be deposited (or swept within 3 business days after receipt of collected funds) into one or more bank accounts with respect to which account control agreements acceptable to the Revolving Co-Collateral Agents and the Revolving Administrative Agent have been executed and delivered or with respect to which the Revolving Co-Collateral Agents have otherwise obtained control in a manner acceptable to the Revolving Co-Collateral Agents and the Revolving Administrative Agent and if either (a) an Event of Default shall have occurred and be continuing or (b) Excess Availability shall be less than $50.0 million at any time (each of clauses (a) and (b), a "<u>Trigger Event</u>"), such proceeds, at the option of the Revolving Co-Collateral Agents, shall be applied to reduce the balance of any swingline loans, and thereafter to any other revolving loans outstanding under the Revolving Credit Facility or to cash collateralize Letters of Credit. |

Borrower shall make mandatory prepayments with respect to outstanding borrowings under the Revolving Credit Facility in an amount, if any, required from time to time, to assure that amounts outstanding under the Revolving Credit Facility do not exceed the Borrowing Base.  Any such prepayments shall not reduce the commitments.

There will be no prepayment penalties (except LIBOR breakage costs) for mandatory prepayments.

| | |
|---|---|
| <u>Optional Prepayments</u>: | Permitted in whole or in part, with prior notice but without premium or penalty (except LIBOR breakage costs) and including accrued and unpaid interest, subject to limitations as to minimum amounts of prepayments. |
| <u>Application of Prepayments</u>: | Mandatory and optional prepayments shall be applied first to repay any swingline loans, then to prepay principal on a pro rata basis among the Lenders and pay accrued and unpaid interest on the principal amount so prepaid. |
| <u>Guarantees</u>: | The Revolving Credit Facility will be fully and unconditionally guaranteed on a joint and several basis by all of the existing and future direct and indirect domestic subsidiaries of Borrower (collectively, the "<u>Guarantors</u>"). |
| <u>Security</u>: | The Revolving Credit Facility and any hedging or treasury management obligations to which a Lender or an affiliate of a |

-6-

Lender is a counterparty will be secured by (i) perfected first priority security interests on all accounts receivable, inventory and deposit accounts of Borrower and the Guarantors, wherever located, now or hereafter owned, and all proceeds thereof (including cash, cash equivalents, instruments, chattel paper, general intangibles (excluding trademarks, trade names and other intellectual property), letters of credit, insurance proceeds and investment property in each case arising from any such accounts receivable, inventory and deposit accounts) and (ii) perfected second priority pledges of all of the equity interests of each of Borrower's direct and indirect domestic subsidiaries (and of 65% of the equity interests of each of the Borrower's direct and indirect first-tier foreign subsidiaries) and perfected second priority security interests in and mortgages on all tangible and intangible assets of the Borrower and the Guarantors, wherever located, now or hereafter owned (including, without limitation, equipment, general intangibles, intercompany notes, insurance policies, investment property, intellectual property, owned real property and cash and proceeds of the foregoing), other than the assets set forth in subparagraph (i) above, subject to such exceptions as are agreed.

The priority of the security interests and related creditor rights between the Revolving Credit Facility and the Term Loan Facility will be set forth in an intercreditor agreement (the "Intercreditor Agreement") on terms and conditions reasonably satisfactory to the Revolving Administrative Agent, the Revolving Co-Collateral Agents, the Term Loan Administrative Agent and the Term Loan Collateral Agent.

Borrowing Base:

The amount from time to time outstanding (including any obligations with respect to Letters of Credit) under the Revolving Credit Facility shall not exceed the lesser of the Maximum Amount or the total of (the "Borrowing Base Amount"):

1.      90% of the value of Borrower's eligible credit card receivables and, to the extent not constituting eligible credit card receivables, 85% of the value of Borrower's eligible accounts; plus

2.      (i) During the period from the Closing Date through the first anniversary thereof, the lesser of (x) 75% of the lower of cost or market value of Borrower's eligible inventory, or (y) 90% of the net orderly liquidation value of such eligible inventory (based on

-7-

the most recent inventory appraisal), and (ii) thereafter, the lesser of (x) 75% of the lower of cost or market value of Borrower's eligible inventory, or (y) 85% of the net orderly liquidation value of such eligible inventory (based on the most recent inventory appraisal); <u>minus</u>

3. reserves as the Revolving Co-Collateral Agents may, from time to time, establish in good faith.

Actual advance rates and details of eligibility criteria as well as other levels of and limitations on collateral that may be included in the Borrowing Base, are to be determined after the collateral audit and appraisals are completed and shall be subject to further revision, from time to time, pursuant to procedures to be detailed in the Bank Documentation. In addition, the Revolving Co-Collateral Agents and the Revolving Administrative Agent shall have the right to establish reserves with respect to the borrowing base for such purposes and in such amounts as they shall determine appropriate in their discretion from time to time, pursuant to procedures to be detailed in the Bank Documentation.

<u>Conditions to Initial Borrowings</u>: Conditions precedent to initial borrowings under the Revolving Credit Facility will be those set forth in the Commitment Letter and in <u>Annex IV</u> to the Commitment Letter and the accuracy of the Acquisition Agreement Representations and the Specified Representations.

<u>Conditions to Each Borrowing</u>: Conditions precedent to each borrowing or issuance under the Revolving Credit Facility will be (1) the absence of any continuing default or event of default, (2) subject to the limitations set forth in the penultimate sentence under "Conditions" in the Commitment Letter, the accuracy of all representations and warranties, (3) receipt of a customary borrowing notice or letter of credit request, as applicable and (4) continued compliance with the Borrowing Base requirements after giving effect to such borrowing or issuance.

<u>Representations and Warranties</u>: Representations and warranties will apply to Borrower and its subsidiaries, will be subject to materiality levels and/or exceptions to be negotiated and reflected in the Bank Documentation, and will be:

Accuracy and completeness of financial statements (including that pro forma financial statements and forecasts are prepared in good faith based upon reasonable assumptions); no mate-

-8-

rial adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of the Bank Documentation; no conflict with law or contractual obligations; no labor disputes; no material litigation; no material casualty event; no default; ownership of property; liens; intellectual property; use of proceeds; taxes; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; no restrictions on subsidiaries regarding dividends, loans to Borrower or its subsidiaries or transfer of property to Borrower or its subsidiaries; environmental matters; solvency; accuracy and completeness of disclosure; Patriot Act and anti-terrorism law compliance; location of inventory; accuracy of Borrowing Base; creation and perfection of security interests; and status of debt under the applicable Facility as senior debt or designated senior debt.

Reporting and Related Requirements:    Customary in credit agreements of this nature, including, but not limited to, the following:

1.    Annual audited financial statements within 75 days of each fiscal year end or sooner if required by the US Securities and Exchange Commission ("SEC"), accompanied by a compliance certificate.

2.    Quarterly financial statements within 40 days of each quarter end or sooner if required by the SEC, accompanied by a compliance certificate.

3.    Monthly financial statements within 30 days of each month end.

4.    Annual perfection certificate supplement.

5.    Management letters.

6.    Annually prepared monthly budget for the upcoming year, including line items for budgeted Borrowing Base levels and credit utilization.

7.    Collateral field audits and independent appraisals, at the expense of the Borrower, to be performed no more frequently than once per year or more frequently during the continuation of a Trigger Event.

8.    Borrowing Base certificates on a monthly basis (unless a Trigger Event shall be continuing, in which case as often as may be reasonably requested by the

-9-

Revolving Co-Collateral Agent or the Revolving Administrative Agent) signed by a responsible corporate officer and supplemental or supporting exhibits, and other specific supporting data reasonably requested from time to time by the Revolving Co-Collateral Agents or the Revolving Administrative Agent, all on a basis and form to be determined after the Revolving Co-Collateral Agents have reviewed the results of the collateral audit work.

9.     Notices of default, material litigation, material liens, material adverse change, reports to shareholders, other material events to be mutually agreed and casualty events.

<u>Affirmative Covenants</u>:

Affirmative covenants will apply to Borrower and its subsidiaries, will be subject to thresholds and/or exceptions to be negotiated and reflected in the Bank Documentation and will be those set forth above under the heading "Reporting and Related Requirements" and the following:

Payment of taxes; continuation of business and maintenance of existence and material rights and privileges; compliance with all applicable laws and regulations (including, without limitation, environmental matters, taxation and ERISA); maintenance of property and insurance; maintenance of books and records; right of the Lenders to inspect property and books and records; agreement to hold annual meetings of Lenders; further assurances (including, without limitation, with respect to security interests in after-acquired property); commercially reasonable efforts to cause the Bank Facilities and Borrower to continue to be rated by Moody's and S&P (but not to maintain a specific rating); and delivery of an irrevocable notice of redemption for the Genesco Preferred Stock outstanding as of the Closing Date within a reasonable period of time after the Closing Date.

<u>Negative Covenants</u>:

Negative covenants will apply to Borrower and its subsidiaries and will be subject to thresholds and/or exceptions to be negotiated and reflected in the Bank Documentation and will be:

1.     Limitation on dispositions of assets and changes of business.

2.     Limitation on mergers and acquisitions.

-10-

3.      Limitations on dividends, stock repurchases and re-demptions and other restricted payments.

4.      Limitation on indebtedness (including guarantees and other similar contingent obligations) and preferred stock and prepayment, amendment and redemption of subordinated debt and preferred stock.

5.      Limitation on loans and investments.

6.      Limitation on liens and further negative pledges.

7.      Limitation on transactions with affiliates.

8.      Limitation on restrictions on subsidiaries regarding dividends, loans to Borrower or its subsidiaries or transfer of property to Borrower or its subsidiaries.

9.      Limitation on sale and leaseback transactions.

10.     Limitation on capital expenditures.

11.     Maintenance of holding companies and/or any inac-tive subsidiaries as passive, non-operating enter-prises.

12.     No modification or waiver of certain material docu-ments to be agreed (including charter documents of Borrower and its subsidiaries) in any manner materi-ally adverse to the Lenders without the consent of the Requisite Lenders.

13.     No change to fiscal year.

14.     Maintenance of intellectual property at the Borrower or any of the Guarantors.

Financial Covenants:            At any time that Excess Availability is at or below 10% of the then aggregate amount of the commitments under the Revolv-ing Credit Facility, Borrower and its consolidated subsidiaries will be subject to a minimum fixed charge coverage ratio of 1.00:1.00.

Events of Default:              Events of default will be subject to materiality levels, default triggers, cure periods and/or exceptions to be negotiated and reflected in the Bank Documentation and will be: nonpay-ment, breach of representations and covenants, cross-defaults,

-11-

loss of lien on collateral (other than immaterial collateral), invalidity of guarantees or other material provisions of the Bank Documentation, bankruptcy and insolvency events, ERISA events, restraint on doing business resulting in a material adverse effect, unsatisfied judgments and change of ownership or control (to be defined).

Assignments and Participations:

Each Lender may assign all or, subject to minimum amounts to be agreed, a portion of its loans and commitments under the Revolving Credit Facility. Assignments will require payment of an administrative fee to the Revolving Administrative Agent and the consents of the Revolving Administrative Agent and Borrower, which consents shall not be unreasonably withheld; *provided* that (i) no consents shall be required for an assignment to an existing Lender or an affiliate of an existing Lender and (ii) no consent of Borrower shall be required during an event of default or prior to the completion of the primary syndication of the Revolving Credit Facility (as determined by UBSS)(it being understood that UBSS shall not as part of the primary syndication syndicate the Revolving Credit Facility to those financial institutions, if any, on the Blacklist). In addition, each Lender may sell participations in all or a portion of its loans and commitments under the Revolving Credit Facility; *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the Revolving Credit Facility (except as to certain basic issues).

Expenses and Indemnification:

All reasonable out-of-pocket expenses (including but not limited to reasonable legal fees and expenses and expenses incurred in connection with due diligence and travel, courier, reproduction, printing and delivery expenses) of UBS, UBSS, the Revolving Administrative Agent, the Revolving Co-Collateral Agents and the Issuing Bank associated with the syndication of the Revolving Credit Facility and with the preparation, execution and delivery, administration, amendment, waiver or modification (including proposed amendments, waivers or modifications) of the documentation contemplated hereby are to be paid by Borrower. In addition, all out-of-pocket expenses (including but not limited to reasonable legal fees and expenses) of the Lenders and the Revolving Administrative Agent for workout proceedings, enforcement costs and documentary taxes associated with the Revolving Credit Facility are to be paid by Borrower.

-12-

Borrower will indemnify the Lenders, UBS, UBSS, the Revolving Administrative Agent, the Revolving Co-Collateral Agents and the Issuing Bank and their respective affiliates, and hold them harmless from and against all reasonable out-of-pocket costs, expenses (including but not limited to reasonable legal fees and expenses) and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the Revolving Credit Facility; *provided, however*, that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred primarily by reason of the bad faith, gross negligence or willful misconduct of such person.

Yield Protection, Taxes and
Other Deductions:

The Bank Documentation will contain yield protection provisions, customary for facilities of this nature, protecting the Lenders in the event of unavailability of LIBOR, breakage losses, reserve and capital adequacy requirements.

All payments are to be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than income taxes in the jurisdiction of the Lender's organization or of its applicable lending office).  The Lenders will use commercially reasonable efforts to minimize to the extent possible any applicable taxes and Borrower will indemnify the Lenders and the Revolving Administrative Agent for such taxes paid by the Lenders and the Revolving Administrative Agent, as the case may be.

Required Lenders:

Lenders holding at least a majority of total loans and commitments under the Revolving Credit Facility, with certain amendments requiring the consent of Lenders holding a greater percentage (or all) of the total loans and commitments under the Revolving Credit Facility and amendments prior to completion of the primary syndication of the Revolving Credit Facility (as determined by UBSS) also requiring the consent of UBS.

Governing Law and Forum:

The laws of the State of New York.  Each party to the Bank Documentation will waive the right to trial by jury and will consent to jurisdiction of the state and federal courts located in The City of New York.

-13-

Counsel to UBS, UBSS,
the Revolving Administrative Agent,
the Issuing Bank and UBS AG, Stamford
Branch in its capacity as one of the
<u>Revolving Co-Collateral Agents</u>:          Latham & Watkins LLP.

## TERM LOAN FACILITY[1]

## SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

| | |
|---|---|
| Borrower: | The Finish Line, Inc. ("Borrower"), the outstanding equity interests of which are currently traded in the public securities markets. |
| Sole Lead Arranger and Sole Book Running Manager: | UBS Securities LLC ("UBSS" or the "Arranger"). |
| Lenders: | A syndicate of banks, financial institutions and other entities (other than the Blacklist), including UBS Loan Finance LLC ("UBS"), arranged by UBSS (collectively, the "Lenders"). |
| Term Loan Administrative Agent and Term Loan Collateral Agent: | UBS AG, Stamford Branch (the "Term Loan Administrative Agent" and the "Term Loan Collateral Agent"). |
| Type and Amount of Facility: | A Term Loan Facility (the "Term Loan Facility") in an aggregate principal amount of up to $690.0 million. |
| Purpose: | To finance a portion of the Acquisition consideration and the Refinancing and to pay fees, commissions and expenses in connection therewith. |
| Maturity Date: | 7 years from the Closing Date. |
| Availability: | Upon satisfaction or waiver of conditions precedent to funding set forth herein, a single drawing may be made on the Closing Date of the full amount of the Term Loan Facility. |
| Amortization: | The Term Loan Facility will amortize in equal quarterly installments in annual amounts equal to 1.0% of the original principal amount of the Term Loan Facility, with the balance payable on the Maturity Date |
| Interest: | Interest options and default interest will be substantially identical to those in the Bank Documentation for the Revolving |

---

[1]     All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

-2-

Credit Facility. The applicable Interest Margin will be the basis points set forth in the following table.

|  | Base Rate Loans | LIBOR Loans |
|---|---|---|
| Term Loan Facility | 125 bps | 250 bps |

To the extent the corporate credit is rated less than B2 (with a stable outlook) by Moody's or less than B (with a stable out look) by S&P as of the Closing Date, each of the Interest Margins in the table above shall be increased by 25 bps.

Mandatory Prepayments:    At any time when a Trigger Event is not continuing, loans shall be prepaid in an amount equal to (a) 100% of the net cash proceeds received from the sale or other disposition of all or any part of the assets of Borrower or any of its subsidiaries after the Closing Date other than sales of inventory in the ordinary course of business and other than amounts reinvested in assets to be used in Borrower's business within 12 months of such disposition (or if committed to be reinvested within such 12 months, reinvested within 6 months of such commitment) and subject to other exceptions to be agreed, (b) 100% of the net cash proceeds received by Borrower or any of its subsidiaries from the issuance of debt or preferred stock after the Closing Date, other than debt or preferred stock permitted to be incurred under the Bank Documentation and other exceptions to be agreed, (c) 100% of all casualty and condemnation proceeds received by Borrower or any of its subsidiaries, subject to reinvestment rights to be agreed and (d) 50% of excess cash flow of Borrower and its subsidiaries (to be defined in a manner to be agreed), subject to stepdowns to 25% and 0% based upon leverage ratios to be agreed.

Optional Prepayments:    Optional prepayments of the Term Loan Facility will be permitted in whole or part, with prior notice but without premium or penalty, except LIBOR breakage costs, and including accrued and unpaid interest, subject to limitations as to minimum amounts of prepayments.

Prepayment Premium:    None.

Guarantees:    The Term Loan Facility will be fully and unconditionally guaranteed on a joint and several basis by each of the guaran-

-3-

tors of the Revolving Credit Facility (collectively, the "Guarantors").

Security:

The Term Loan Facility and any hedging or treasury management obligations to which a Lender or an affiliate of a Lender is a counterparty will be secured by (i) perfected first priority pledges of all of the equity interests of each of Borrower's direct and indirect domestic subsidiaries (and of 65% of the equity interests of each of the Borrower's direct and indirect first-tier foreign subsidiaries) and perfected first priority security interests in and mortgages on all tangible and intangible assets  of the Borrower and the Guarantors, wherever located, now or hereafter owned (including, without limitation, equipment, general intangibles, intercompany notes, insurance policies, investment property, intellectual property, owned real property and cash and proceeds of the foregoing), other than the assets set forth in subparagraph (ii) below and (ii) perfected second priority security interests on all accounts receivable, inventory and deposit accounts of Borrower and the Guarantors, wherever located, now or hereafter owned, and all proceeds thereof (including cash, cash equivalents, instruments, chattel paper, general intangibles (excluding trademarks, trade names and other intellectual property), letters of credit, insurance proceeds and investment property in each case arising from any such accounts receivable, inventory and deposit accounts).

The priority of the security interests and related creditor rights between the Revolving Credit Facility and the Term Loan Facility will be set forth in an intercreditor agreement (the "Intercreditor Agreement") on terms and conditions reasonably satisfactory to the Revolving Administrative Agent, the Revolving Co-Collateral Agents, the Term Loan Administrative Agent and the Term Loan Collateral Agent.

Conditions to Borrowing:

Substantially identical to those conditions applicable to the initial extension of credit under the Revolving Credit Facility, other than any condition relating to "Borrowing Base".

Representations and Warranties:

Substantially identical to those in the Bank Documentation for the Revolving Credit Facility.

Affirmative Covenants:

Substantially identical to those in the Bank Documentation for the Revolving Credit Facility plus the requirement to establish an interest rate protection program and/or have fixed rate financing on a percentage to be determined of the aggregate funded indebtedness of Borrower and its subsidiaries.

-4-

| | |
|---|---|
| Negative Covenants: | Substantially identical to those in the Bank Documentation for the Revolving Credit Facility. |
| Financial Covenants: | None. |
| Events of Default: | Substantially identical to those in the Bank Documentation for the Revolving Credit Facility. |
| Assignments and Participations: | Each Lender may assign all or, subject to minimum amounts to be agreed, a portion of its loans and commitments under the Term Loan Facility.  Assignments will require payment of an administrative fee to the Term Loan Administrative Agent and the consent of the Term Loan Administrative Agent and the Borrower, which consent shall not be unreasonably withheld; *provided* that (i) no consent shall be required for an assignment to an existing Lender or an affiliate of an existing Lender and (ii) no consent of Borrower shall be required during an event of default or prior to the completion of the primary syndication of the Term Loan Facility (as determined by UBSS) (it being understood that UBSS shall not as part of the primary syndication syndicate the Term Loan Facility to those financial institutions, if any, on the Blacklist).  In addition, each Lender may sell participations in all or a portion of its loans and commitments under the Term Loan Facility; *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the Term Loan Facility (except as to certain basic issues). |
| Expenses and Indemnification: | Substantially identical to those in the Bank Documentation for the Revolving Credit Facility. |
| Yield Protection, Taxes and Other Deductions: | Substantially identical to those in the Bank Documentation for the Revolving Credit Facility. |
| Required Lenders: | Lenders holding at least a majority of total loans and commitments under the Term Loan Facility, with certain amendments requiring the consent of Lenders holding a greater percentage (or all) of the total loans and commitments under the Term Loan Facility and amendments prior to completion of the primary syndication of the Term Loan Facility (as determined by UBSS) also requiring the consent of UBS. |
| Governing Law and Forum: | The laws of the State of New York.  Each party to the Bank Documentation will waive the right to trial by jury and will |

-5-

consent to jurisdiction of the state and federal courts located in The City of New York.

Counsel to UBS, UBSS,
the Term Loan Administrative
Agent and the Term Loan
<u>Collateral Agent</u>:                              Latham & Watkins LLP.

## BRIDGE FACILITY

## SUMMARY OF PRINCIPAL TERMS AND CONDITIONS[1]

| | |
|---|---|
| Borrower: | The Finish Line, Inc. ("Borrower"), the outstanding equity interests of which are currently traded in the public securities markets. |
| Sole Lead Arranger and Sole Book Running Manager: | UBS Securities LLC ("UBSS" or the "Arranger"). |
| Lenders: | A syndicate of banks, financial institutions and other entities (other than the Blacklist), including UBS Loan Finance LLC ("UBS"), arranged by UBSS. |
| Bridge Loan Administrative Agent: | UBS AG, Stamford Branch (the "Bridge Loan Administrative Agent"). |
| Type and Amount of Bridge Facility: | $700.0 million senior unsecured bridge loan facility (the "Bridge Facility"). |
| Purpose: | Proceeds of borrowings under the Bridge Facility (the "Initial Loans") will be used to finance a portion of the Acquisition and the Refinancing and to pay fees, commissions and expenses in connection therewith. |
| Maturity/Exchange: | All the Initial Loans will mature on the date that is one year following the Closing Date (the "Maturity Date"). If any Initial Loan has not been previously repaid in full on or prior to the Maturity Date, subject to the conditions outlined below under "Conditions to Conversion of the Initial Loans," such Initial Loan shall be converted into a term loan (each, a "Extended Term Loan" and, together with the Initial Loans, the "Loans") maturing on the 8th anniversary of the Closing Date (the "Final Maturity Date"). The Lenders in respect of the Initial Loans and the Extended Term Loans will have the option (i) in the case of Initial Loans, at the Maturity Date or (ii) in the case of Extended Term Loans, at any time or from time to time, to receive |

---

[1]     All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

-2-

notes (the "<u>Exchange Notes</u>") in exchange for such Initial Loans or Extended Term Loans having the terms set forth in the term sheet attached hereto as <u>Exhibit A</u>.

Availability:                          Upon satisfaction of conditions precedent to drawing to be specified herein, a single drawing may be made on the Closing Date of up to the full amount of the Bridge Facility.

Interest:                             Prior to the Maturity Date, the Initial Loans will accrue interest at a rate per annum equal to the three-month London Interbank Offered Rate ("<u>LIBOR</u>") as determined by UBS for a corresponding U.S. dollar deposit amount (adjusted quarterly) plus a spread (the "<u>Spread</u>"). The initial Spread will be determined based on the bond rating of the Borrower and the lease-adjusted leverage ratio as of the Closing Date. If (i) such ratings are Caa1 (with a stable outlook) or better by Moody's and CCC+ (with a stable outlook) or better by S&P (such ratings, the "<u>Ratings Threshold</u>") and (ii) the lease-adjusted leverage ratio for the last 12 months ending more than 45 days prior to the Closing Date (after giving effect to the Transactions) is less than 6.5x (the "<u>Leverage Threshold</u>", and together with the Ratings Threshold, the "<u>Thresholds</u>"), then the Spread will initially be 500 basis points, and if the Thresholds are not met, then the Spread will initially be 600 basis points. If the Initial Loans are not repaid in full within six months following the Closing Date, the Spread will increase by 50 basis points at the beginning of the subsequent three-month period and shall increase by an additional 50 basis points at the beginning of each three-month period thereafter (but, in any event, not on the Maturity Date). LIBOR will be adjusted for statutory reserve requirements (if any).

Interest on the Initial Loans will be payable in arrears at the end of each three-month period and at the Maturity Date. Interest on the Initial Loans shall not exceed 12.0% per annum (the "<u>Total Cap</u>"); *provided* that the Total Cap for the Initial Loans and the Exchange Notes shall each be increased by 100 basis points if the Thresholds are not met.

Following the Maturity Date, all outstanding Extended Term Loans will accrue interest at the rate provided for in the Exchange Notes in <u>Exhibit A</u> hereto; provided that a holder of an Extended Term Loan may at any time fix the rate thereon at the effective rate (such loans, "<u>Fixed Rate Term Loans</u>").

-3-

Calculation of interest shall be on the basis of actual days elapsed in a year of 360 days.

Default Interest:

Upon the occurrence and during the continuance of an event of default, interest will accrue on the amount of any loan or other amount outstanding under the Bridge Facility at a rate of 2.0% per annum plus the rate otherwise applicable to the loans under the Bridge Facility and will be payable on demand.

Mandatory Prepayment:

Borrower will be required to prepay Initial Loans and Extended Term Loans (other than Fixed Rate Term Loans), and offer to prepay Fixed Rate Term Loans, on a pro rata basis, at par plus accrued and unpaid interest, in an amount equal to (a) 100% of the net proceeds received from the sale or other disposition of assets of Borrower or any of its subsidiaries after the Closing Date, other than sales of inventory in the ordinary course of business and other exceptions to be agreed and subject to reinvestment rights to be agreed and prepayment of the Bank Facilities, (b) 100% of the net proceeds received by Borrower or any of its subsidiaries from the issuance of debt or preferred stock after the Closing Date, other than exceptions to be agreed and (c) 100% of the net proceeds received from the issuance of common equity (including, but not limited to, upon the exercise of warrants and options) by, or equity contributions to, Borrower after the Closing Date and (d) 100% of all casualty and condemnation proceeds received by Borrower or any of its subsidiaries, subject to reinvestment rights to be agreed and prepayment of the Bank Facilities.

Optional Prepayments:

The Initial Loans and Extended Term Loans (other than Fixed Rate Term Loans) may be prepaid, in whole or in part, at the option of Borrower, at any time with prior notice, at par plus accrued and unpaid interest and breakage costs.  The Fixed Rate Term Loans will be subject to prepayment restrictions and premiums consistent with Fixed Rate Exchange Notes.

Guarantees:

The Bridge Facility will be guaranteed on a senior unsecured basis by each of Borrower's subsidiaries that guarantees the Bank Facilities.

Security:

None.

Conditions to Borrowing:

Conditions precedent to borrowing under the Bridge Facility will be those set forth in the Commitment Letter and

-4-

Annex IV to the Commitment Letter, the absence of any continuing default or event of default, subject to the limitations set forth in the penultimate sentence under "Conditions" in the Commitment Letter, the accuracy of all representations and warranties, receipt of a customary borrowing notice, and there being no legal bar to the lenders making the loans.

Representations and Warranties:     Substantially the same as those in the Bank Documentation, with such changes as are necessary or appropriate for the Bridge Facility.

Affirmative and Negative Covenants:     Substantially the same as those in the Bank Documentation, with such changes as are necessary or appropriate for the Bridge Facility, as well as compliance with obligations in the Fee Letter.

Financial Covenants:     None.

Events of Default:     Events of default will be subject to materiality levels, default triggers, cure periods and/or exceptions to be negotiated and reflected in the Bridge Documentation and will include (without limitation) the following: nonpayment, breach of representations and covenants, cross-payment default and cross-acceleration, invalidity of guarantees or other material provisions of the Bridge Documentation, bankruptcy and insolvency events, ERISA events, restraint on doing business resulting in a material adverse effect, unsatisfied judgments and change of ownership or control (to be defined).

Conditions to Conversion
of Initial Loans:     On the Maturity Date, unless (i) Borrower or any significant subsidiary thereof is subject to a bankruptcy or other insolvency proceeding, (ii) there exists a matured default with respect to the Initial Loans or (iii) there exists a default in the payment when due at final maturity of any indebtedness of Borrower or any of its subsidiaries, or the maturity of such indebtedness shall have been accelerated, the Initial Loans shall automatically be converted into Extended Term Loans (subject to the Lenders' rights to convert Initial Loans into Exchange Notes as set forth in Exhibit A hereto).

Assignments and Participations:     Each Lender may assign all or, subject to minimum amounts to be agreed, a portion of its loans and commit-

-5-

ments under the Bridge Facility.  Assignments will require payment of an administrative fee to the Bridge Loan Administrative Agent and, except for an assignment to an existing Lender or an affiliate of an existing Lender, the consent of the Bridge Loan Administrative Agent and Borrower, which consents shall not be unreasonably withheld; *provided* that (i) no consent shall be required for an assignment to an existing Lender or an affiliate of an existing Lender and (ii) no consent of Borrower shall be required during an event of default or prior to the completion of the primary syndication of the Bridge Facility (as determined by UBSS) (it being understood that UBSS shall not as part of the primary syndication syndicate the Bridge Facility to those financial institutions, if any, on the Blacklist).  In addition, each Lender may sell participations in all or a portion of its loans and commitments under the Bridge Facility; *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the Bridge Facility (except as to certain basic issues).

<u>Expenses and Indemnification:</u>

All reasonable out-of-pocket expenses (including but not limited to reasonable legal fees and expenses and expenses incurred in connection with due diligence and travel, courier, reproduction, printing and delivery expenses) of UBS, UBSS and the Bridge Loan Administrative Agent associated with the syndication of the Bridge Facility and with the preparation, execution and delivery, administration, amendment, waiver or modification (including proposed amendments, waivers or modifications) of the documentation contemplated hereby are to be paid by Borrower.  In addition, all out-of-pocket expenses (including but not limited to reasonable legal fees and expenses) of the Lenders and the Bridge Loan Administrative Agent for workout proceedings, enforcement costs and documentary taxes associated with the Bridge Facility are to be paid by Borrower.

Borrower will indemnify the Lenders, UBS, UBSS and the Bridge Loan Administrative Agent and their respective affiliates, and hold them harmless from and against all reasonable out-of-pocket costs, expenses (including but not limited to reasonable legal fees and expenses) and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the Bridge Facility; *provided*, *how-*

-6-

*ever*, that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred primarily by reason of the bad faith, gross negligence or willful misconduct of such person.

Yield Protection, Taxes and
<u>Other Deductions</u>:

The Bridge Documentation will contain yield protection provisions, customary for facilities of this nature, protecting the Lenders in the event of unavailability of LIBOR, breakage losses and reserve and capital adequacy requirements.

All payments are to be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than income taxes in the jurisdiction of the Lender's organization or of its applicable lending office).  Borrower will indemnify the Lenders and the Bridge Loan Administrative Agent for such taxes paid by the Lenders or the Bridge Loan Administrative Agent.  The Lenders will use commercially reasonable efforts to minimize to the extent possible any applicable taxes and Borrower will indemnify the Lenders and the Bridge Loan Administrative Agent for such taxes paid by the Lenders and the Bridge Loan Administrative Agent, as the case may be.

<u>Requisite Lenders</u>:

Lenders holding at least a majority of total loans and commitments under the Bridge Facility, with certain modifications or amendments requiring the consent of Lenders holding a greater percentage (or all) of the total Loans and commitments under the Bridge Facility.

<u>Governing Law and Forum</u>:

The laws of the State of New York.  Each party to the Bridge Documentation will waive the right to trial by jury and will consent to jurisdiction of the state and federal courts located in The City of New York.

Counsel to UBSS and
<u>the Bridge Loan Administrative Agent</u>:

Latham & Watkins LLP.

Exhibit A to Annex III

<u>Summary of Principal Terms and Conditions</u>
<u>of Exchange Notes</u>

Capitalized terms used but not defined herein have the meanings given (or incorporated by reference) in the Summary of Principal Terms and Conditions of the Bridge Facility to which this Exhibit A is attached.

| | |
|---|---|
| <u>Issuer</u>: | Borrower will issue Exchange Notes under an indenture which complies with the Trust Indenture Act (the "<u>Indenture</u>"). Borrower in its capacity as issuer of the Exchange Notes is referred to as the "<u>Issuer</u>." |
| <u>Guarantors</u>: | Same as Initial Loans. |
| <u>Principal Amount</u>: | The Exchange Notes will be available only in exchange for the Initial Loans (at the Maturity Date) or the Extended Term Loans (at any time). The principal amount of any Exchange Note will equal 100% of the aggregate principal amount of the Initial Loans or the Extended Term Loans for which it is exchanged. |
| <u>Maturity</u>: | The Exchange Notes will mature on the 8th anniversary of the Closing Date. |
| <u>Interest Rate</u>: | The Exchange Notes will bear interest at a rate equal to the Initial Rate (as defined below) plus the Exchange Spread (as defined below). Any holder of an Exchange Note may at any time fix the rate thereon at the effective rate (such Exchange Notes, "<u>Fixed Rate Exchange Notes</u>"). Notwithstanding the foregoing, the interest rate in effect at any time shall not exceed the Total Cap. The "<u>Initial Rate</u>" shall be equal to the interest rate applicable to the Initial Loans and in effect on the Maturity Date. "<u>Exchange Spread</u>" shall mean 50 basis points during the three-month period commencing on the Maturity Date and shall increase by 50 basis points at the beginning of each subsequent three-month period. |
| | Calculation of interest shall be on the basis of the actual number of days elapsed in a year of twelve 30-day months. |
| <u>Default Interest</u>: | In the event of a payment default on the Exchange Notes, interest on the Exchange Notes will accrue at a rate of 2.0% per annum in excess of the rate otherwise applicable to the Exchange Notes, and will be payable in accordance with the provisions described above under the heading "Interest Rate." |

-2-

| | |
|---|---|
| <u>Ranking</u>: | Same as Initial Loans. |

<u>Mandatory Offer to Purchase</u>:    The Issuer will be required to offer to purchase the Exchange Notes upon a Change of Control (to be defined in the Indenture) at 101% of the principal amount thereof plus accrued interest to the date of purchase.

<u>Optional Redemption</u>:    Exchange Notes (other than Fixed Rate Exchange Notes) will be redeemable at the option of the Issuer, in whole or in part, at any time at par plus accrued and unpaid interest to the redemption date.

Except as set forth in the following paragraph, Fixed Rate Exchange Notes will not be redeemable at the option of the Issuer on or prior to the third anniversary of the Maturity Date. Subsequent to the third anniversary of the Maturity Date, each Fixed Rate Exchange Note will be redeemable at the option of the Issuer: (a) at a premium equal to 50% of the coupon of such Fixed Rate Exchange Note after the third anniversary of the Maturity Date but on or prior to the fourth anniversary of the Maturity Date, (b) at a premium equal to 25% of the coupon of such Fixed Rate Exchange Note after the fourth anniversary of the Maturity Date but on or prior to the fifth anniversary of the Maturity Date, and (c) at par thereafter.

Each Fixed Rate Exchange Note will be redeemable at the option of the Issuer prior to the third anniversary of the Maturity Date with the net cash proceeds of qualified equity offerings of Borrower at a premium equal to the coupon on such Fixed Rate Exchange Note; provided that after giving effect to such redemption at least 65% of the aggregate principal amount of Exchange Notes originally issued shall remain outstanding.

<u>Registration Rights</u>:    The Issuer will be required to:

- within 120 days after the Maturity Date, file a registration statement for an offer to exchange the Exchange Notes for publicly registered notes with identical terms;

- use its reasonable best efforts to cause the registration statement to become effective under the Securities Act within 180 days after the Maturity Date;

-3-

- complete the exchange offer within 210 days after the Maturity Date; and

- file a shelf registration statement for the resale of the Exchange Notes if it cannot complete an exchange offer within those time periods listed above and in certain other circumstances.

If the Issuer does not comply with these obligations, it will be required to pay additional interest to the holders of the Exchange Notes at the rate of 25 bps per annum, increasing by 25 bps per annum at the beginning of each three-month period thereafter until such time as such failure is cured up to a maximum amount of 100 bps per annum for so long as such failure has not been cured.

In addition, unless and until the Issuer has consummated the exchange offer and, if required, caused the shelf registration statement to become effective, the holders of the Exchange Notes will have the right to "piggy-back" the Exchange Notes in the registration of any debt securities (subject to customary scale-back provisions) that are registered by the Issuer (other than on a Form S-4) unless all the Exchange Notes and Extended Term Loans will be redeemed or repaid from the proceeds of such securities.

| | |
|---|---|
| <u>Right to Transfer Exchange Notes</u>: | The holders of the Exchange Notes shall have the absolute and unconditional right to transfer the Exchange Notes in compliance with applicable law to any third parties. |
| <u>Covenants</u>: | Those typical for an indenture governing a high yield note issue of a new issuer. |
| <u>Events of Default</u>: | Those typical for an indenture governing a high yield note issue of a new issuer. |
| <u>Governing Law</u>: | The laws of the State of New York. |

ANNEX IV

CONDITIONS TO CLOSING[1]

The commitment of UBS under the Commitment Letter with respect to each of the Facilities, the agreements of UBS and UBSS to perform the services described in the Commitment Letter, and the funding of the Facilities are subject to the conditions set forth in the Commitment Letter and satisfaction of each of the conditions precedent set forth below.

1.        UBS shall have reviewed, and be satisfied with, the final structure of the Acquisition and the terms and conditions of the Acquisition Agreement (it being understood that UBS is satisfied with the execution version of the Acquisition Agreement received by UBS at 9:19 p.m. Los Angeles time on June 16, 2007 and the structure of the Acquisition reflected therein and the disclosure schedules to the Acquisition Agreement received by UBS at 7:47 a.m. Los Angeles time on June 17, 2007).  The Acquisition and the other Transactions shall be consummated concurrently with the initial funding of the Facilities in accordance with the Acquisition Agreement without giving effect to any waivers or amendments thereof that is material and adverse to the interests of the Lenders, unless consented to by UBS in its reasonable discretion.  Immediately following the Transactions, none of Borrower, the Acquired Business nor any of their subsidiaries shall have any indebtedness or preferred equity other than as set forth in the Commitment Letter.

2.        UBS shall have received (i) audited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of each of the Borrower and the Acquired Business for each of the last three fiscal years ending more than 90 days prior to the Closing Date (collectively, the "Audited Financial Statements"), (ii) unaudited consolidated (and to the extent available, consolidating) balance sheets and related statements of income, stockholders' equity and cash flows of each of Borrower and the Acquired Business for each fiscal quarter of the current fiscal year ending more than 45 days prior to the Closing Date and for the comparable periods of the preceding fiscal year (the "Unaudited Financial Statements") (with respect to which the independent auditors shall have performed an SAS 100 review), (iii) to the extent produced by you or by the Acquired Business, unaudited consolidated (and to the extent available, consolidating) balance sheets and related statements of income of each of Borrower and the Acquired Business for each fiscal month ending after the last fiscal quarter covered by the Unaudited Financial Statements and more than 30 days prior to the Closing Date and for the comparable periods of the preceding fiscal year, (iv) a pro forma consolidated (and to the extent available, consolidating) balance sheet and related statements of income for Borrower and the Acquired Business (the "Pro Forma Financial Statements"), as well as pro forma levels of EBITDAR ("Pro Forma EBITDAR") calculated in a manner reasonably satisfactory to UBS, for the last fiscal year covered by the Audited Financial Statements and for the latest twelve-month period ending more than 45 days prior to the Closing Date, in each case after giving effect to the Transactions and (v) forecasts of the financial performance of Borrower and its subsidiaries (x) on an annual basis, through March 3, 2015 and (y) on a monthly basis, through the Borrower's 2009 fiscal year end.  The financial statements referred to in clauses (i), (ii) and (iii) shall be prepared in accordance with ac-

---

[1]        All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this Annex IV is attached.

-2-

counting principles generally accepted in the United States. The Pro Forma Financial Statements shall be prepared on a basis substantially consistent with pro forma financial statements set forth in a registration statement filed with the SEC, subject to customary exceptions for Rule 144A offering materials.

       3.     The transactions contemplated by the Commitment Letter shall be in compliance, in all material respects, with all applicable Canadian and U.S. federal and state laws and regulations. All necessary governmental approvals in connection with the Transactions shall have been obtained and shall be in effect. To the extent required by the Acquisition Agreement, all requisite shareholder approvals and consents required by applicable law or the transactional documents with respect to the Acquisition Agreement and the governing documents of Borrower necessary to effect the merger contemplated by the Acquisition Agreement shall have been obtained and shall be in full force and effect.

       4.     Borrower and each of the Guarantors shall have provided the documentation and other information to the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

       5.     All costs, fees, expenses (including, without limitation, legal fees and expenses and the fees and expenses of appraisers, consultants and other advisors) and other compensation payable to the Lenders, UBSS, UBS, the Revolving Administrative Agent, the Revolving Co-Collateral Agents, the Term Loan Administrative Agent or the Term Loan Collateral Agent by the Borrower shall have been paid, to the extent then due and payable.

       6.     All documents and instruments required to perfect each of the Collateral Agents' security interest in the collateral described under the heading "Security" in the Revolver Term Sheet and the Term Loan Term Sheet shall have been executed and delivered and, if applicable, be in proper form for filing, and none of such collateral shall be subject to any other pledges, security interests or mortgages, except customary permitted liens and other limited exceptions permitted under the Bank Documentation; provided, however, that, with respect to any such collateral the security interest in which may not be perfected by filing of a UCC financing statement or possession of such collateral, if the perfection of each of the Collateral Agents' security interest in such collateral may not be accomplished prior to the Closing Date without undue burden or expense, then delivery of documents and instruments for perfection of such security interest shall not constitute a condition precedent to the initial borrowings under the Bank Facilities if Borrower agrees to deliver or cause to be delivered such documents and instruments, and take or cause to be taken such other actions as may be required to perfect such security interests, within a period after the Closing Date reasonably acceptable to the Revolving Co-Collateral Agents and the Term Loan Collateral Agent.

       7.     The Lenders shall have received all customary opinions, certificates and closing documentation as UBS shall reasonably request, including but not limited to a solvency certificate.

**<ins>Additional Bridge Facility Condition</ins>**

       In addition, the commitment of the Lenders under the Commitment Letter with respect to the Bridge Facility, the agreements of UBS and UBSS to perform the services described in the

-3-

Commitment Letter, the consummation of the Transactions and the funding of the Bridge Facility are subject to the following additional conditions precedent set forth below.

1.    Borrower shall have engaged the Investment Bank referred to in the Fee Letter to place the Securities (as defined below).  Borrower shall have prepared and delivered to the Investment Bank a substantially completed initial draft of an offering memorandum for a private placement pursuant to Rule 144A or prepare, file and cause to become effective a registration statement under the Securities Act of 1933 and prepare a related prospectus, as determined by the Investment Bank, in each case, which shall contain audited, unaudited (which shall have been reviewed by the independent accountants for the Borrower and the Acquired Business as provided in the procedures specified by the Public Company Accounting Oversight Board in AU722) and pro forma financial statements, all meeting the requirements of Regulation S-X under the Securities Exchange Act of 1934 and other information required in a registration statement on Form S-1 for an offering registered under the Securities Act of 1933 (except as may be mutually agreed) and shall be in form for distribution to investors, otherwise in form and substance satisfactory to the Investment Bank and that would be necessary for the Investment Bank to receive customary "comfort" (including customary "negative assurance" comfort) from independent public accountants in connection with a private placement or public offering of Securities (an "Offering Document"), at least 30 business days prior to the Closing Date. The Investment Bank shall have had the opportunity to market senior, senior subordinated or subordinated debt securities and/or preferred equity securities or other debt financing of the Borrower (the proceeds of which will be used to provide funds for the Transactions if such financing is completed on or prior to the Closing Date (and thereby reduce on a dollar-for-dollar basis the aggregate amount of the commitments of UBS under the Commitment Letter in respect of the Bridge Facility) or, to the extent such financing occurs subsequent to the making of the Bridge Loans, the proceeds of which will be used to refinance such Loans) (the "Securities") for not less than 15 calendar days after receipt of an Offering Document, unless a shorter period is acceptable to the Investment Bank

UBS LOAN FINANCE LLC
677 Washington Boulevard
Stamford, Connecticut 06901

UBS SECURITIES LLC
299 Park Avenue
New York, New York 10171

June 17, 2007

The Finish Line, Inc.
3308 N. Mitthoeffer Road
Indianapolis, Indiana 46235

Attention:  Chief Financial Officer

<u>Bank and Bridge Facilities Fee Letter</u>

Ladies and Gentlemen:

Reference is made to the letter dated the date hereof among UBS Loan Finance LLC ("UBS"), UBS Securities LLC ("UBSS") and you (including the Term Sheets set forth on Annexes I, II and III thereto and the Conditions Annex set forth on Annex IV thereto, the "Commitment Letter"). Capitalized terms used but not defined in this letter agreement are used with the meanings given to them in the Commitment Letter.

<u>Bank Facility Fees.</u>

As consideration for UBS's and UBSS's respective agreements under the Commitment Letter with respect to the Bank Facilities, you agree to pay to UBS as follows:

| | |
|---|---|
| <u>Underwriting Fee:</u> | An underwriting fee in an amount equal to (x) 1.25% of the full amount of the commitments in respect of the Revolving Credit Facility under the Commitment Letter and (y) 1.75% of the full amount of the Term Loan Facility under the Commitment Letter that is funded, in each case (i) due and payable in cash on the Closing Date, whether or not any amount is funded under the Bank Facilities and (ii) after giving effect to any changes in the amount of the Revolving Credit Facility and Term Loan Facility as a result of any Funding Shortfall or after giving effect to any of the provisions under "Market Flex" in this letter agreement. |
| <u>Agency Fee:</u> | An agency fee payable to the administrative agent in respect of the Bank Facilities, equal to $100,000 per annum, due and payable in cash in advance on the Closing Date and on each anniversary thereof. |
| <u>Collateral Monitoring Fee:</u> | A collateral monitoring fee payable to the Revolving Co-Collateral Agents in respect of the Revolving Credit Facility, in an amount equal to $150,000 per annum, due and payable in cash in advance on the |

LA\1731768.9

CONFIDENTIAL

UBS 00005293

Closing Date and on each anniversary thereof until termination of the Revolving Credit Facility.

### Bridge Facility Fees.

As consideration for UBS's and UBSS's respective agreements under the Commitment Letter with respect to the Bridge Facility, you agree to pay to UBS as follows:

| | |
|---|---|
| Commitment Fee: | A commitment fee in an amount equal to 1.00% of the full amount of the commitments in respect of the Bridge Facility, due and payable in cash on the Closing Date, whether or not any amount is funded under the Bridge Facility. |
| Funding Fee: | A funding fee in an amount equal to 1.50% of the aggregate amount funded under the Bridge Facility, due and payable in cash on the Closing Date. |
| Conversion Fee: | A conversion fee (the "Conversion Fee") in an amount equal to 2.25% of the aggregate principal amount of the Initial Loans then outstanding on the Maturity Date, due and payable in cash on the Maturity Date, such required payment constituting a condition to the conversion of the Initial Loans to Term Loans or Exchange Notes on such date. |

### Fees Generally.

All fees shall be payable in U.S. dollars in immediately available funds to UBS for its own account or as directed by UBS, free and clear of and without deduction for any and all present or future applicable taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (with appropriate gross-up for withholding taxes). Once paid, no fee shall be refundable under any circumstances. At the sole discretion of UBS, all or any portion of any fees may be paid to any other Lender or Lenders.

If you (or any other entity formed or organized by you or any of your subsidiaries or affiliates) consummates the Acquisition without UBSS acting as sole lead arranger and sole book-runner for each of the Facilities and any other debt financing for the Acquisition which replaces or refinances (in whole or in part) the Bridge Facility, or (b) you (or any other entity formed or organized by you or your subsidiaries or affiliates) consummates within one year from the date hereof, in lieu of the Acquisition, any similar transaction in which you (or any other entity formed or organized by you or your subsidiaries or affiliates) will acquire directly or indirectly all or any substantial portion of the stock or assets of the Acquired Business or its subsidiaries (any such transaction, an "Alternate Transaction") without UBSS acting as sole lead arranger and sole book-runner for any debt financing incurred in connection therewith, you will in each case pay (or cause to be paid) to UBS the Underwriting Fee with respect to the Bank Facilities and the Commitment Fee and the Funding Fee with respect to the Bridge Facilities (as if the Bridge Facilities had been fully funded) immediately upon consummation of the Acquisition or such Alternate Transaction.

LA\1731768 9

**CONFIDENTIAL**

<u>Market Flex</u>.

As further consideration for UBS' commitment under the Commitment Letter with respect to the Facilities and the agreement of UBSS to structure, arrange and syndicate the Facilities and to provide advisory services in connection therewith, UBS and UBSS shall be entitled, after consultation with you, until the earlier of (x) the completion of a Successful Syndication (as defined below) and (y) 90 days after the Closing Date, to make the following changes to the Facilities if UBS and UBSS determine that such changes are necessary or advisable in order to ensure a Successful Syndication:

- reallocating an amount equal to up to 0.5x EBITDA (defined in a manner satisfactory to UBS) of the Borrower from (a) the Term Loan Facility to the Bridge Facility or the Notes and/or (b) the Bridge Facility or the Notes to subordinated instruments, Securities or a second lien tranche; *provided, however*, that in the case of (b), at the date of issuance or incurrence the weighted average total interest or dividend rate, as applicable, on the Bridge Facility, the Notes, any such subordinated instruments, the Securities and any second lien tranche shall not exceed the Total Cap (as increased if the Thresholds are not met);

- reallocating up to $75.0 million between the Revolving Credit Facility and the Term Loan Facility;

- adding a leverage maintenance covenant to the Bank Facilities at levels to be mutually agreed; and

- increasing the interest margin applicable to (x) the Revolving Credit Facility by up to 25 basis points and (y) the Term Loan Facility by up to 50 basis points, in each case on a weighted average basis, from the highest applicable interest margins set forth in the Revolving Term Sheet or the Term Loan Term Sheet, as the case may be.

Any increase in the interest margins permitted by the foregoing may, at the option of UBSS, (i) take the form of original issue discount ("OID") or upfront fees (which shall be deemed to constitute like amounts of OID) with OID being equated to such interest margins in a manner determined by UBSS and consistent with generally accepted financial practice based on an assumed four-year life to maturity (e.g., 25 basis points equals 100 basis points in OID or upfront fees payable on the principal amount of debt) or (ii) be accomplished by a combination of an increase in interest margins and OID. UBS' commitment with respect to the Facilities is subject to the agreements in this paragraph and the immediately preceding paragraph. The provisions of this paragraph and the immediately preceding paragraph shall survive the closing of the Facilities, and you shall, and shall cause your subsidiaries to, enter into such amendments to the Financing Documentation and such additional documents as may be reasonably requested by UBSS to document any modifications to the Facilities made pursuant to this paragraph and the immediately preceding paragraph. "Successful Syndication" means UBS holding no more than $125.0 million of the Bank Facilities.

LA\1731768.9

UBS 00005295

<u>Take-out Financing</u>.

You agree to engage an investment bank (the "<u>Investment Bank</u>") reasonably satisfactory to the Lenders to publicly sell or privately place or otherwise arrange, in one or more transactions, up to $700.0 million (or such greater amount to the extent that the Bridge Facility or any other interim financing is increased above $700.0 million) aggregate gross proceeds of senior, senior subordinated or subordinated debt securities and/or preferred equity securities (collectively, the "<u>Securities</u>"), or other debt financing, of Holdings, the Acquired Business and/or any of their subsidiaries (each, a "<u>Take-out Financing</u>"), on terms and conditions as shall be acceptable to the Lenders, the proceeds of which will be used to provide funds for the Transactions if such Take-out Financing is completed on or prior to the Closing Date (and thereby reducing on a dollar-for-dollar basis the aggregate amount of the commitments of the Lenders under the Commitment Letter in respect of such of the Facilities as shall be determined by UBS) or, to the extent such Take-out Financing occurs subsequent to the making of loans under the Facilities, the proceeds of which will be used to refinance loans under such of the Facilities as shall be determined by UBS.

You shall take any and every action necessary or desirable so that the Investment Bank can, as soon as practicable (whether prior to, contemporaneously with or after the making of loans under the Facilities), publicly sell or privately place or arrange the Take-out Financing. Without limiting the foregoing, you shall, and shall cause the Acquired Business to, with respect to each Take-out Financing promptly:

(i)    prepare an offering memorandum for a private placement pursuant to Rule 144A or prepare, file and cause to become effective a registration statement under the Securities Act of 1933 and prepare a related prospectus, as determined by the Investment Bank, in each case, which shall contain audited, unaudited (which shall have been reviewed by independent accountants for you and for the Acquired Business as provided in the procedures specified by the Public Company Accounting Oversight Board in AU722) and pro forma financial statements, all meeting the requirements of Regulation S-X under the Securities Exchange Act of 1934 and other information required in a registration statement on Form S-1 for an offering registered under the Securities Act of 1933 (with such exceptions as may be mutually agreed) and shall be in form for distribution to investors, otherwise in form and substance satisfactory to the Investment Bank and that would be necessary for the Investment Bank to receive customary "comfort" (including customary "negative assurance" comfort) from independent public accountants in connection with the Take-out Financing (each, an "<u>Offering Document</u>");

(ii)    prepare, and assist in the preparation of, rating agency presentations and "road show" and such other marketing materials that the Investment Bank may request in connection with such Take-out Financing;

(iii)    make senior management of you, the Acquired Business and your and their respective subsidiaries (including the chief executive officer and chief financial officer) available to participate in "road show" meetings with prospective investors;

CONFIDENTIAL    UBS 00005296

(iv)     provide access to management and advisors of you, the Acquired Business and your and its respective subsidiaries and information requested by the Investment Bank in connection with such Take-out Financing, including in connection with due diligence investigations; and

(v)     otherwise cooperate with and assist the Investment Bank in connection with such Take-out Financing.

<u>Take-out Demand</u>.

Upon notice by the Investment Bank (a "<u>Take-out Demand</u>"), so long as any commitments are outstanding in respect of the Bridge Facility or any Initial Loans are outstanding under the Bridge Facility, you will cause the issuance and sale or incurrence of Take-out Financing at any time and from time to time on or after the Closing Date in one or more transactions in such amounts and on such terms and conditions (including without limitation covenants, events of default, guarantees, currency, interest and/or dividend rates, yield, redemption provisions, maturity date and registration rights) as specified in the Take-out Demand, in each case, as the Investment Bank in its sole judgment determines to be appropriate in light of the then prevailing circumstances and market conditions and the financial condition and prospects of you and your subsidiaries at such time; *provided, however*, that at the date of issuance or incurrence the weighted average total interest or dividend rate, as applicable, on the Take-out Financing shall not exceed 12% per annum; *provided* that if the Thresholds are not met, the preceding percentage shall be increased by 100 basis points. The Take-out Financing will be issued or incurred pursuant to one or more customary agreements, which shall contain such terms, conditions and covenants as are typical and customary for similar financings (as determined by the Investment Bank) and as are satisfactory in all respects to the Investment Bank. All other arrangements with respect to the Take-out Financing shall be satisfactory in all respects to the Investment Bank in light of the then prevailing market conditions.

Notwithstanding anything to the contrary contained herein, in the event of a failure to execute a Take-out Financing on or after the Closing Date and within 10 days after delivery of a Take-out Demand (such tenth day, the "<u>Demand Failure Date</u>"), UBS shall have the right to increase the interest rate with respect to the loans under the Bridge Facility on the Demand Failure Date (and/or any time thereafter) such that the interest on loans under the Bridge Facility shall be increased to the maximum cash and total amounts permitted by the Bridge Term Sheet. In addition, the Conversion Fee, if not previously paid, shall become immediately due and payable upon any such failure to execute a Take-out Financing.

<u>Governing Law, Etc</u>.

It is understood and agreed that this letter agreement shall not constitute or give rise to any obligation to provide any financing; such an obligation will arise only under the Commitment Letter if accepted in accordance with its terms. This letter agreement may not be amended or any provision hereof waived or modified except by an instrument in writing signed by UBS, UBSS and you. This letter agreement may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Headings are for convenience of reference only and shall not affect the construction of, or be taken into consideration

LA\1731768 9

**CONFIDENTIAL**

when interpreting, this letter agreement. Delivery of an executed counterpart of a signature page of this letter agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart of this letter agreement. **This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of law to the extent that the application of the laws of another jurisdiction would be required thereby.** Any right to trial by jury with respect to any claim or action arising out of this letter agreement or conduct in connection with this agreement is hereby waived. You agree that this letter agreement is subject to the confidentiality provisions of the Commitment Letter. The provisions of this letter agreement shall survive the expiration or termination of the Commitment Letter (including any extensions thereof).

[Signature Page Follows]

LA\1731768.9

**CONFIDENTIAL**

Please confirm that the foregoing is our mutual understanding by signing and returning to us an executed copy of this letter agreement.

Very truly yours,

UBS LOAN FINANCE LLC

By: _____
Name:
Title:
            John C. Crockett
            Executive Director

By: _____
Name:
Title:
            Warren Jervey
            Executive Director and Counsel
            Region Americas Legal

UBS SECURITIES LLC

By: _____
Name:
Title:
            John C. Crockett
            Executive Director

By: _____
Name:
Title:
            Warren Jervey
            Executive Director and Counsel
            Region Americas Legal

Signature page to Fee Letter

CONFIDENTIAL

Accepted and agreed to as of the date first above
written:

THE FINISH LINE, INC.

By: _____
    Name: Steven J. Schneider
    Title:  Chief Operating Officer

Signature page to Fee Letter