## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UBS SECURITIES LLC, and<br>UBS LOAN FINANCE LLC,<br><br>      Plaintiffs/Counter-Defendants<br><br>    v.<br><br>THE FINISH LINE, INC.,<br><br>      Defendant/Counter-Plaintiff<br><br>and<br><br>GENESCO INC.,<br><br>      Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )   Civil Action No. 07 Civ. 10382 (LAP) |

## DECLARATION OF ELIZABETH A. HALEY
## IN SUPPORT OF DEFENDANT THE FINISH LINE, INC.'S OPPOSITION TO THE
## MOTION TO DISMISS BY PLAINTIFFS AND COUNTER-DEFENDANTS UBS

I, Elizabeth A. Haley, hereby declare as follows:

1.      I am an associate attorney at the law firm of Dewey & LeBoeuf LLP, counsel for defendant The Finish Line, Inc. ("Finish Line") in this litigation. I am admitted to practice in this Court. I make this Declaration in Support of Defendant Finish Line, Inc.'s Opposition to the Motion To Dismiss by Plaintiffs and Counter-Defendants UBS Loan Finance LLC and UBS Securities LLC (together, "UBS").

2.      Attached hereto as Exhibit A is a true and correct copy of a December 27, 2007 Memorandum and Order entered in the case captioned as *Genesco, Inc. v. The Finish Line, Inc. et al.*, No. 07-2137-II(III) (pending in the Chancery Court in Davidson County, Tennessee).

Executed on February 9, 2008.


_____
Elizabeth A. Haley

Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, New York  10019-6092
Telephone (212) 259-8000

*Attorney for Defendant and Counter-Plaintiff The Finish Line, Inc.*

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY, PART III

| | |
|---|---|
| GENESCO, INC., | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) NO. 07-2137-II(III) |
| | ) |
| THE FINISH LINE, INC., and | ) |
| HEADWIND, INC., | ) |
| Defendants, | ) |
| | ) |
| VS. | ) |
| | ) |
| UBS SECURITIES LLC and | ) |
| UBS LOAN FINANCE LLC, | ) |
| Defendants. | ) |

FILED
2007 DEC 27  PM 4:44
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.
DC&M

## MEMORANDUM AND ORDER

On June 17, 2007, the parties to this lawsuit, both sellers of footwear, signed a Merger Agreement for the defendant, Finish Line, Inc. to acquire the plaintiff, Genesco, for $1.5 billion. The transaction was highly leveraged with UBS providing the financing. The Merger Agreement provided that if it was not closed by December 31, 2007, either party could terminate the transaction.

Within a couple months of the merger being signed, Genesco's quarterly earnings were falling significantly short of projections and were some of the lowest in 10 years. By early September 2007, the deal had stalled after Genesco obtained shareholder approval of

the merger and demanded a closing; whereas UBS refused to proceed, demanding more information about the decline in earnings.

Genesco filed this lawsuit on September 24, 2007, for the Court to order Finish Line and UBS to close the deal before the December 31, 2007 termination date.

Finish Line and UBS asserted a contract and two tort defenses to closing the merger. The contract defense is related to paragraph 3.1(a) of the Merger Agreement which excuses closing the deal if a Material Adverse Effect ("MAE") has occurred. The tort defenses are that Genesco committed securities fraud and fraudulently induced Finish Line to enter into the deal by not providing material information concerning Genesco's May performance and updated projections to Finish Line prior to the signing of the Merger Agreement.

In section 9.9 of the Merger Agreement the parties acknowledge that failure of the merger to close will result in immediate and irreparable harm and unquantifiable damage. The remedy they stipulate is specific performance. Enforcing that stipulation of the parties, the Court commenced a speedy trial on December 10 and ending December 18, 2007, to decide whether Genesco was entitled to have the merger closed, or if Finish Line and UBS, were entitled to rescission or have their performance excused due to Genesco's fraud, and/or, due to the occurrence of an MAE.

After considering the proof and argument of counsel, the Court finds that Genesco has proven that all conditions in the Merger Agreement to closing have been met; Finish Line

and UBS have failed to prove that Genesco fraudulently induced Finish Line to enter into the contract or that Genesco committed securities fraud. Finish Line and UBS have also failed to demonstrate the existence of an MAE under section 3.1(a) of the Merger Agreement to excuse performance because the Court concludes that Genesco fits within exception/carve-out (B) to the MAE provision.

It is therefore ORDERED that the Court declares that all conditions to the Merger Agreement have been met. The Court declares that Finish Line has breached the Merger Agreement by not closing and declares that Finish Line is not entitled to invoke the December 31, 2007 termination procedures of Section 8 of the Merger Agreement. The Court ORDERS that Finish Line shall specifically perform the terms of the Merger Agreement, including that it shall close the merger pursuant to section 1.2 of the Merger Agreement, it shall use its reasonable best efforts to take all actions to consummate the merger as required by section 6.4(d) of the Merger Agreement, and it shall use its reasonable best efforts to obtain financing as per section 6.8(a) of the Merger Agreement. Excepted from the provisions of this Order and Memorandum are issues as to the solvency of the merged entity. That issue is reserved for determination by a New York Court in a lawsuit filed by UBS.

3

The findings of fact and conclusions of law on which the Court bases its decision follow. The Court begins with findings of core facts which provide a main thoroughfare sequence of events. Then, the Court turns to detailed findings of fact and conclusions of law with respect to each of the three defenses asserted by Finish Line and UBS and the remedy of specific performance.

## **Findings of Fact**

Genesco is a retailer of shoes, hats and apparel. It was founded in the 1920's and operates over 2,000 retail stores. Its net sales for 2006[1] were close to $1.5 billion. Its operation income exceeded $121 million. Its banners include Journeys, Hat World, and Johnston & Murphy. Genesco's senior management team is led by Hal Pennington (CEO), Bob Dennis (President and COO), Jim Gulmi (CFO) and Jim Estepa (Senior Vice President of Genesco's largest banner, Journeys).

Finish Line is an Indianapolis based specialty retailer of athletic, lifestyle and outdoor footwear and apparel. It was started in 1976. Beginning as an athletic Finish Line specialty store, it bought the franchise rights for Athlete's Foot. In the mid-1970's when athletic footwear became fashionable, Finish Line grew the business and went public. It operates 800 stores, a chain of Finish Line athletic apparel stores and ManAlive, a retailer offering men

---

[1]Throughout this memorandum, for ease of reference, the Court refers to the calendar year even though many of the exhibits state the dates in terms of Genesco's fiscal year. Genesco's fiscal year '08 is calendar year 2007.

4

and women's brand clothing and accessories. Finish Line's 2007 revenues were $1.3 billion, with operating income of $57 million. Finish Line's only competitor is Foot Locker. The latter has four to five times the revenue of Finish Line.

Finish Line's president, Mr. Alan Cohen, testified that in the last two years Finish Line's operation income has declined, the company is not growing, and business has not been going well. In October of 2006, Finish Line retained UBS and lawyers Gibson, Dunn & Crutcher and began exploring strategic alternatives. Finish Line considered a merger with Foot Locker but never seriously pursued it because of the downturn in the athletic wear industry.

In the spring of 2007, Alan Cohen saw a press release that Foot Locker was making a hostile move on Genesco. Foot Locker had offered to purchase Genesco and Genesco had refused.

Mr. Cohen testified that because Finish Line and Genesco are not primary competitors, he was interested in Genesco. The companies have different products and customer bases. Accordingly, if combined, the companies would result in a $3 billion entity with ManAlive (Finish Line's "hip hop" banner), Finish Line's athletic banner, and the diversity of Genesco's Journey's, Journey's Kids, Underground Station, Johnston & Murphy and Hat World. With a greater scale of the combined company, there would be growth potential and diversity of different concepts. The combined company would have more strength with vendors, landlords and REITs. Mr. Cantrell, a retail expert presented by

5

Genesco, testified to the counter-cyclical nature of the combined businesses because of this diversity which would provide more flexibility and strength in withstanding fashion trends.

In April of 2007, Foot Locker made a $46 per share offer to buy Genesco which was rejected by Genesco. Just prior to that time Genesco had retained Goldman Sachs in March of 2007 to explore strategic alternatives preparatory to Foot Locker's interest.

On the same day of the announcement of the Foot Locker $46 per share offer, Alan Cohen of Finish Line contacted Bob Dennis about Finish Line's interest in Genesco. Several days later, UBS, on behalf of Finish Line, contacted David Friedland, of Goldman Sachs, stating Finish Line's serious interest in acquiring Genesco. In addition to Foot Locker and Finish Line, there were also six private equity firms interested in acquiring Genesco.

To provide information to potential purchasers, Genesco established an electronic data room. David Friedland of Goldman Sachs supervised the data room and due diligence process for Genesco. From his testimony, the Court finds that the data room contained information on Genesco for prospective purchasers. Goldman Sachs worked with Genesco to initially populate the site with information Genesco was willing to post. After initially populating the site, buyers would send questions and requests to Goldman Sachs who would take them to Genesco. The response of Genesco was provided to Goldman Sachs who then either posted the information in the data room, emailed the information to the interested party or set up a conference call.

6

A condition to receiving information in the data room was signing a confidentiality and stand still agreement (P5).[2]  One was signed by Finish Line on May 7.  From May 17 to the signing of the Merger Agreement, Finish Line had access to the data room.

The Confidentiality Agreement (P5) which Finish Line signed contained a provision that neither Finish Line nor its representatives UBS and Dunn & Phelps were entitled to rely upon the accuracy or completeness of information provided by Genesco and that neither Genesco nor its representatives were liable for any action or inaction taken by Finish Line in reliance on the information unless it was specified in the Merger Agreement.

The Merger Agreement, as well, addressed reliance.  Section 3.24 provides that "neither Parent nor Merger Sub have relied upon or otherwise been induced by, any other express or implied representation or warranty with respect to the Company or with respect to any information provided to or made available to Parent or Merger Sub in connection with the transaction contemplated hereunder."  Finally, section 9.1 of the Merger Agreement provided that the parties made no "other representations or warranties and hereby disclaims any other representations or warranties" made by the companies or their agents.

Foot Locker did not sign the Confidentiality Agreement and, therefore, did not have access to the electronic data room.

---

[2]References to "P___," "D___," or "TE___" are references identifying an exhibit admitted into evidence at trial.

On May 24, 2007, Foot Locker made a $51 per share offer. It was rejected by Genesco on May 29, 2007. Finish Line offered $54 per share on June 11. It was rejected by Genesco with a counteroffer of $55 on June 12. On June 13, Finish Line made its best and final offer of $54.50 per share, which was accepted by Genesco. The parties signed their Merger Agreement (P1) on June 17, 2007.

In addition to the foregoing findings, the Court finds from the testimony of senior management of Genesco, David Friedland of Goldman Sachs, Alan Cohen of Finish Line and Mr. Winkler of UBS that the following motivations of the parties were present in negotiating the provisions of the Merger Agreement:

1.    It was critical to Genesco that the deal not be contingent on financing. The merger was structured as a cash deal so that it would quickly and with more certainty close. Bob Dennis, president and COO of Genesco, explained that Genesco did not want the damage and harm that would result from a merger that did not close or one that was delayed.

2.    That Finish Line was smaller in terms of number of stores than Genesco, Genesco insisted that Finish Line obtain a solvency opinion on whether it could assume the debt that would be required to fund the merger. Mr. Friedland testified that UBS's presence as the lender assuaged Genesco's concern as well.

3.    Finish Line's primary concern was that it might lose out to Foot Locker or one of the private equity firms in the bidding for Genesco. The Court finds that on June 8 when Mr. Friedland communicated to Mr. Winkler of UBS that it was time for Finish Line to make an offer, Mr. Winkler's main concern was that Finish Line would lose the bidding.

4.    Finish Line's primary motivation in pursuing the merger was diversity, synergies resulting from reduced costs, and the opportunities for growth.

8

After the Merger Agreement was signed, in a July 10, 2007 call from Genesco senior management to Finish Line, the latter was told that Genesco had missed its June projections by $4.7 million.  May results were also provided at that time, showing a $2.1 million miss from projections.  By August, Genesco's May market guidance of 30 cents per share failed to reach those results; actual results were 0 cents per share.

On September 17, 2007, Genesco shareholders voted to approve the merger. Genesco pressed for closing the merger. UBS delayed and requested information on the drop in Genesco's performance, asserting its concern that a Material Adverse Effect had occurred. This lawsuit followed.

Subsequent to the filing of the lawsuit, Finish Line and UBS interviewed witnesses and obtained production of emails from which they concluded that Genesco had concealed its actual May results and revised projections prior to Finish Line signing the merger while Genesco senior management and Goldman Sachs assured Finish Line and UBS that May was on track with its projections.  The concealment and false representations, Finish Line and UBS asserted, fraudulently induced them to proceed with the Merger Agreement.  Then, after the Merger Agreement was signed, Genesco continued to distort its performance to the detriment of Finish Line and UBS by providing false guidance to the market in an August 30, 2007 conference call by attributing its Q2[3] disappointing results primarily to a delayed

---

[3]"Q    " refers to "Quarter."  Genesco's Q1 is February, March, April; Q2 is May, June, July, and so on.

tax holiday and back to school date and by stating that its August sales were positive when more recent results revealed them to be negative.

With respect to Genesco's financial and sales performance, the proof at trial established that they declined in May 2007 and have not been mitigated or offset by significant rebounds in the rest of the year:

1.  Genesco missed its projections for the first quarter: February was down $1.7 million and April was down $1.2 million. Genesco was down 34% in same store sales in its first quarter. Prior to the merger Finish Line was told this by its advisor Dunn & Phelps. Average selling price declined 3.4% in Q1.

2.  Genesco continued to miss its projections for 2007: the May miss was $2.1 million; the June miss was $4.7 million. Q3 was projected at $23.6 million; it came in at $13.6 million—a decline of $10 million.

3.  TE31 depicts a 61% decline in earnings for Q2 and Q3 compared to the previous year. 54% for combined Q1, Q2 and Q3.

4.  In 2006, Genesco missed its projections significantly in May, missed its projections in six months and yet had a banner year based on Q4 gains.

5.  2007, however, has not seen a rebound like there was in 2006. Comparative store sales in 2007 have continued to decline: July was down 5-6%. November (first month of the fourth quarter) was down by 4.2%. Sales in the week before Christmas were disappointing.

6.  Between June 11 and June 15, senior management at Genesco concluded that because of a delay in return to school and tax free holidays in two states, performance projections for Genesco in Q2 (May, June, July) would shift to Q3 (August, September, October) and there would be a net effect such that decreased performance in Q2 would net out in Q3 when sales from back to school and tax holiday days hit. That net, however, did not occur. The back to school and tax effect was later calculated to be only 8 cents per share. The balance sheet effect was $261,000 to $300,000. In hindsight, back to school

and tax holidays delay did not come close to accounting for the decline in Q2. Total Q2 decline of earnings per share of 30 cents only 8 cents accounted for the back to school and tax free delay.

7. Expert Deetz' graph (TE 29) depicts that operating income losses in Q2 2007 are the lowest in 10 years.

8. Professor Weil's graph (TE16) show EBITDA in 2007 is in the low range for Genesco's 10-year history.

Alongside Genesco's decline in performance and only a few weeks after the Merger Agreement was signed, the credit markets felt the effects from a number of defaults in sub-prime mortgages. UBS was hit particularly hard. It sustained a $3.44 billion loss in Q3—its first quarter loss after 9 straight years of profitability. This loss was attributable to losses sustained by a UBS hedge fund heavily invested in subprime mortgage backed securities as well as losses in UBS's fixed income securities. UBS's CEO was terminated. UBS has had to borrow from foreign investors to raise $11.5 billion  It has admitted that the Finish Line/Genesco deal is now a huge losing proposition for UBS. Emails obtained by Genesco in discovery uncovered that UBS in the fall of 2007 was attempting to put pressure on Genesco to renegotiate the price of the deal.

In addition to the foregoing findings of fact, the Court shall provide an overview of the expert testimony that was presented. Seven expert witnesses testified at trial:

1. Professor Roman Weil, Ph.D., a professor of economics and accounting at the Graduate School of Business at the University of Chicago, testified that Genesco has not suffered a material adverse effect and, if so, it is not out of proportion to its peers in the footwear industry. He further testified that the addition of the May operating report to the total

11

mix of information Finish Line had when it signed the Merger Agreement would not have significantly altered the mix. Dr. Weil based these opinions on his analyses of Genesco's historical data showing growth over time but, instead of uniform growth, depicting that lows such as the current one in 2007 are to be expected (TE16).

2.  Mr. Cantrell, a consultant for retail companies who worked in retail for 26 years and served as the President and Director of Payless Shoe Stores testified that the merger, despite Genesco's declines in 2007, still has strategic value for Finish Line in the areas identified by Finish Line when it entered into the merger. He also testified that Genesco's declines are due to broad economic conditions such as higher gas, food and eating oil prices, pressure in the housing and mortgage industry and consumer credit issues. He testified that Genesco's declines are not disproportionately worse than its competitors (TE25; P369, 370, 371).

3.  Professor Saunders, a professor at NYU for 30 years and a Ph.D. graduate of the London School of Economics, who specializes in risk management and credit risk, and who has worked for the Federal Reserve, the Controller of Washington and the International Monetary Fund, analyzed markets after June 17, 2007, to determine UBS's economic circumstances in relation to funding the Merger Agreement. He testified that inaccurate rating of subprime mortgages resulted in a flight to the safe haven of government treasury investments. The cost of borrowing increased. The rise in submortgage rates resulted in foreclosures and defaults which affected the value of the subprime mortgages and caused mortgage bank securities to fall. This turmoil in the credit markets has made it very hard for UBS to syndicate and so it has had to reintermediate loans on its balance sheet. UBS is now left with loans as assets on the cost side but there is a higher cost to doing the deals and with these loans there have to be equity holdings. In its form 6K filed with the SEC on October 30, 2007 (P378), UBS announced to the public an overall profit. A few weeks later it announced a full loss and that it would write down US subprime holdings by $10 billion. This is UBS's first quarter loss in 9 years. P381 documents that UBS has had to borrow from foreign lenders; it had to raise $11.5 billion.

With respect to the merger in issue, when the $1.5 billion of Finish Line was committed to by UBS, these were fixed rates and they

12

were fair market transactions. But after June 2007, the spread has widen, the margins have become too low and so the deal was no longer a good one for UBS. Professor Saunders stated that this deal has been disastrous to UBS, that it is a big loss to UBS.

4. Professor Hitscherich, a law professor and former transactional attorney who specializes in drafting mergers and acquisitions, testified that application of industry custom of transactional attorneys in drafting merger agreements to the Merger Agreement in this case reveals that Genesco had negotiating power. Genesco negotiated in section 3.24 that the seller had no contractual duty under the Merger Agreement to provide information nor did the seller have liability with respect to information that was not specified in the agreement. The buyer's remedy for the seller not producing information was for the buyer to walk away from the transaction, renegotiate price, or seek representations in closing, for example, by stipulating a certain level of EBITDA. In section 4.6, Genesco was able to prevent financing from being a condition to closing. Genesco also negotiated a narrow MAE clause with a right to cure.

5. Mr. Bronner, an attorney and specialist in drafting mergers and acquisitions and who has chaired and authored numerous ABA publications on the subject, was offered by UBS as an expert in the field of drafting merger agreements. Applying drafting practices and standards of the industry to the Merger Agreement, Mr. Bronner testified that the carve-out of a material adverse effect under the Merger Agreement, section 3.1(a)(B) excludes from the MAE, general economic conditions such as gas prices, problems in the lending industry, but not intra-industry economic conditions such as change in fashion trends or decline in the average selling price of footwear.

6. Mr. Deetz, a principal in Chicago Partners, LLC, who is a CPA and accredited senior appraiser, offered by Finish Line, testified that the May operating results were material to the merger transaction. In TE 29 he demonstrated that the Q2 decline is the largest dollar decline in operating income in 10 years. The new entity resulting from the merger will have significantly more debt than its competitors. The loss in operating income will make it difficult for the new entity to achieve the growth Finish Line sought in entering into the merger.

13

7. Mr. Rock, managing director of a consulting firm, a CPA and certified fraud examiner, testified that the May operating report was material and that Genesco has suffered a material adverse effect. He further testified that the MAE has had a disproportionately lower effect on Genesco than its peers and is due to intra-industry conditions such that the carve-out of section 3.1(a)(B) of the MAE does not apply.

The Court now turns to the specific defenses raised by Finish Line and UBS.

### Fraud

The fraud allegations are that in June of 2007, prior to the June 17 signing of the merger, Genesco concealed from Finish Line and UBS its May operating report and its revised June 15 projections which were based on actual May results. Meanwhile, Finish Line and UBS claim, Genesco senior management and the head of Goldman Sachs' due diligence team, Mr. Friedland, assured Finish Line and UBS that May and June represented a turnaround for Genesco and/or that May was on track.

As to the latter oral representations, the Court dismisses those based on credibility determinations. The Court does not believe the Finish Line and UBS witnesses, Margaret Shanley, Alan Cohen and Mr. Winkler, that Genesco senior management or Goldman Sachs represented that May and June were turnaround months or that May was on track with the May 24 projections. As to each of these alleged oral representations, the Court believes Genesco senior management and Goldman Sachs for the following reasons:

1. As to the June 5, 2007 call between Genesco and Dunn & Phelps in which Ms. Shanley says that Genesco represented that May and June

would be turnaround months, there were many other witnesses to the call and none corroborate Ms. Shanley's recollection.

2. With respect to the June 14, 2007 call between Mr. Gulmi, Mr. Dennis, P. J. Solomon representatives and Steven's Schneider of Finish Line to obtain information for a fairness opinion to be issued by P. J. Solomon for Finish Line, the latter took extensive notes of the conversation and these do not contain notations of a representation by Genesco that the month of May was on track, in line with its projections or a request for May operating results.

3. Mr. Winkler claims that David Friedland represented that Genesco did not prepare monthly projections. This testimony is inconsistent with data that was existing in the data room containing monthly projections. Therefore, it makes no sense that Mr. Friedland would make such a representation since it was patently contradicted by existing data.

4. Mr. Winkler claims that on June 6, Mr. Friedland told Mr. Winkler, in discussing the decline in May same store sales, that May was on track as well as telling this to Mr. Winkler again on June 8. The Court finds that Mr. Friedland did not have the May actual numbers at the time of these conversations. Accordingly, if Mr. Friedland made these representations, they were not false.

5. Mr. Winkler claims that Mr. Friedland told him that the May 8 trial balance was not available when it was. The Court finds that at the time that Mr. Friedland and Mr. Winkler had this conversation, the trial balance had not been provided to Mr. Friedland.

In addition to the foregoing specific reasons for dismissing the claims of alleged oral representations, the Court observed Mr. Gulmi, Mr. Pennington, Mr. Dennis and Mr. Friedland to be believable in their testimony on these points; Mr. Winkler was not. Accordingly, the Court finds that senior management at Genesco and Mr. Friedland did not

make oral representations about May and June performance being on track in the face of actual numbers in May showing a sharp decline.

Where the claims of pre-merger fraud become more difficult to analyze are with respect to the claim of concealment. The difficulty is in mapping out emails to identify who knew what and when.

After a detailed analysis of the facts and the law, the Court finds that Genesco and Goldman Sachs did not fraudulently conceal information. Instead, the Court finds that the fault is with Finish Line's advisor, UBS and its agents, whom Finish Line was relying on to investigate Genesco. These advisors, the Court finds, asked for the May actual numbers before the numbers had been finalized and a May trial balance was prepared. At that point, with its premature request, Finish Line's advisors were required by both the law and the parties' agreement to renew the request for the May numbers. Despite ongoing lists by UBS for information and responses by Genesco and Goldman Sachs, UBS never asked again for the May trial balance. It failed to make such a renewed request despite several opportunities to do so. Under these circumstances, where Finish Line/UBS had the means at its disposal for obtaining the information it now claims was concealed, neither the law nor the parties' agreements required Genesco or Goldman Sachs to voluntarily provide the information. Genesco and Goldman Sachs were allowed by law and their agreement not to provide the May actual numbers. Finish Line, then, signed the Merger Agreement at its own peril.

16

The Court has arrived at this foregoing conclusion through a detailed analysis of the timing of requests by UBS and Dunn & Phelps for actual May results and receipt of the actual May results by Genesco and Goldman Sachs as well as the rules/procedure the parties agreed to with respect to requesting information. This analysis is tedious but because of its importance to the Court's decision, that analysis is detailed as follows.

1.    As early as May 2007, Finish Line knew that there was a 34% operating decline in Genesco's performance for Q1 2007 (February, March, April). The decline was reported by Dunn & Phelps and reported to Finish Line that there was a deterioration in Genesco's "operating performance in the year-to-date March FY '08 period of all segments except for licensed brands and Johnston and Murphy compared to the year-to-date March FY '07 period." Subsequent to this report, Dunn & Phelps was not instructed by Finish Line to examine any financial information for the May fiscal month. Dunn & Phelps' financial due diligence cutoff was May 5, 2007.

2.    Alongside the Dunn & Phelps report was information posted in the data room of a decline in Genesco's same store sales for May as compared to the previous May.

3.    Meanwhile at the due diligence level, requests were being made by Mr. Raskin and his UBS team to Mr. Downen and his Goldman Sachs team for monthly financial numbers. It is not clear from the emails between these two whether the request for quarterly numbers was for calendar year 2007/fiscal year 2008 well as calendar year 2008/fiscal year 2009 and beyond. As to the latter, it is undisputed that Genesco does not generate prospective monthly financial statements, and that prospective monthly financial statements do not exist and could not have been turned over in response to the request.

      If, however, UBS and Goldman Sachs also were seeking production of quarterly financial reports for 2007, the record establishes that by June 1, 2007 (D48) that UBS recognized that these were not being voluntarily provided, "It sounds like GS/Genesco are unwilling to provide monthly financials. Is that accurate?" and it would have to

press Goldman Sachs to produce these: "Please let Craig know exactly what the communication has been so that he can contact GS if necessary (D48)."

4. Accordingly, by June 7, 2007, UBS had requested a May trial balance for the Duff and Phelps due diligence (D89). The Court finds that Genesco did not have its trial balance at the time of the request from UBS on June 7, 2007. A later email by Goldman Sachs confirmed that the response to UBS's June 7 request for the trial balance is that it was not provided because it did not exist at the time (P164).

5. At the same time UBS in due diligence was requesting the May operating report from Goldman Sachs, there was an indication by June 6, 2007 (D86) in the rank, mid-management that the actual numbers for May would vary from the projections. Mr. Gulmi noted to Mr. Pennington and Mr. Dennis that there was a drop in average selling price from May to April (D74).

6. Coming up from the sales division were the actual May results. Genesco's sales manager, Mr. Estepa, employed at Genesco for 27 years and the creator of Genesco's largest banner, testified about the process Genesco uses to make its monthly projections. The Court credits his testimony. At month end Mr. Estepa's team has a 7:30 staff meeting on that Monday. His team analyzes numbers received from the stores. Tuesday receipts and margin reductions are made and his operational people look at the selling costs to determine the cost effect. The catalogue and web sales are evaluated and then costs pertaining to such things as employee meetings are taken into account. On Wednesday or Thursday evening Tim Baxter, vice president of finance, meets with Mr. Estepa to review the results and then put it in the computer and send to senior management at Genesco. Mr. Estepa testified that he had never been instructed or told that monthly projections had to hit a certain number. He testified that the projections are based on numbers that come from the bottom up. The May 2007 report followed this same procedure as did the June 2007 report.

7. On Friday, June 8, Mr. Gulmi received the actual May numbers. As is his regular practice, Mr. Gulmi took the May results home to analyze them over the weekend. The May results were not known to Goldman Sachs on June 8.

18

Also on June 8, Mr. Friedland of Goldman Sachs told Mr. Winkler at UBS to put a number on the table to purchase Genesco. Mr. Winkler's state of mind, as he testified to at trial, was that he believed from Mr. Friedland's statement that Genesco might receive another offer from a private equity firm and Finish Line would not be able to acquire Genesco.

8. On Monday, June 11, 2007, Mr. Gulmi documented with a handwritten calculation that he realized there had been a $2.1 million miss in the month of May from the projections that had been made (D98). On that day Mr. Gulmi sent the actual May numbers to Mr. Dennis and Mr. Pennington (D97).

9. The Court finds that Genesco's management (Mr. Gulmi, Mr. Pennington and Mr. Dennis) and mid-management (D102) recognized by Monday, June 11, 2007, that there was a sharp decline in earnings in May and a miss from projections of more than was expected. The Court also finds that they were surprised by the miss. The Court finds that Mr. Gulmi proceeded to try to identify the causes. On that same day, Finish Line made a $54 per share offer to acquire Genesco.

10. The next day, Tuesday, June 12, 2007, Mr. Johnson at Genesco, who works at Mr. Gulmi's direction, proceeded to post the May trial balance in the data room. He then received instructions from Mr. Gulmi not to do so. Also, on June 12, Goldman Sachs was notified by Mr. Gulmi about the sharp decline in May performance. Goldman Sachs linked the May decline with UBS's June 7 request for the May trial balance in an email and concluded that Goldman Sachs had no obligation to provide the trial balance but that it was up to UBS to request it again (P164). On that same day, outstanding due diligence requests of UBS were summarized and listed (P33); the May trial balance was not on UBS's summarized list of outstanding due diligence obligations. Nor was the trial balance requested in a subsequent summarized list of outstanding due diligence requests (P161 and P162).

11. Mr Friedland testified that on Wednesday, June 13, 2007, Finish Line/UBS stated that its due diligence was substantially complete. On that day negotiations continued with Genesco rejecting $54 per share, making a $55 counteroffer and Finish Line offering $54.50. During this same time, Mr. Gulmi was investigating the reason for the May

19

decline. He found that only $1 million of the loss was attributable to sales. The other million had to do with setting up a reserve and other nonsales related reasons. Of the $1 million sales decline, he concluded that the miss was due to a later tax holiday in key states and back to school date than the previous year. By June 15, 2007, Mr. Gulmi concluded that there would be a shift, due to timing of these sales events, of increased sales to Q3. He concluded that the shift from Q2 to Q3 would net out with no effect on annual projections (P32, P171). Mr. Gulmi reported his conclusions to Goldman Sachs (D127).

12.   Mr. Gulmi and Goldman Sachs agreed on June 15 that Mr. Pennington should call Finish Line to discuss the May numbers and Genesco's determination that the numbers had no effect for the year but merely required a shift in projections from the second quarter to the third quarter. Mr. Pennington, however, did not mention the May numbers in his telephone conversation with Mr. Cohen. Mr. Cohen has testified that Mr. Pennington said in the June 15 telephone conversation, in addition to mentioning the shift in quarters due to back to school sales and taxes, that the May numbers were in line with their projections. The Court does not credit this testimony by Mr. Cohen; the Court finds that Mr. Pennington did not make that statement. In so concluding, the Court observes that notes made by Mr. Pennington with respect to the telephone call do not contain such a notation. Additionally, the Court believes Mr. Pennington when he denies that statement.

13.   Additionally, Genesco revised its projections, after receiving the actual May numbers, on June 15. These revised projections were not provided to UBS or Finish Line.

In short form, then, the Court finds that the foregoing sequence of events reveals that a May trial balance had been requested by Finish Line/UBS prior to the information being available. That request was not placed on the parties list of due diligence items because at the time the information was not available. Then, four days later, simultaneous to Finish Line making its first offer to acquire Genesco, senior management at Genesco realized that

there was a sharp decline in May earnings from what was anticipated. Genesco did not know

the reason for the decline. The negotiating process continued and Genesco did not provide

to Finish Line/UBS the May actual results. Also, during the negotiations due diligence was

closed out on June 13, 2007, without Finish Line or UBS having requested that the May trial

balance be provided. Further, during the negotiations, Genesco, after receiving the May

actual numbers, revised its projections after the parties have agreed to the merger but before

it is signed, and Genesco did not provide the change in projections to Finish Line/UBS.

Without having seen the May actual results and the revised projections, Finish Line signed

the Merger Agreement on June 17, 2007.


With respect to these foregoing events, the legal issue is whether Genesco committed

fraud by not providing the May actual results and/or the revised projections prior to Finish

Line signing the merger. In deciding this issue the Court has analyzed two sources: (1) the

parties' contracts and due diligence procedure and (2) Tennessee and analogous state law.

Key to deciding the fraud claim are provisions in the parties' agreements that Finish

Line and its advisors could not hold Genesco liable except for information specified by

Finish Line in the Merger Agreement that it was relying on. This agreement is contained in

the following provisions of the May 7 confidentiality agreement and the June 17 Merger

Agreement:

— Page 4 of the Confidentiality Agreement (P5)—Although the Company
  was endeavored to include in the Evaluation Material information

which it believes to be relevant for the purpose of your investigation, you understand that such information is provided "as is" and neither the Company nor any of its representatives have made or make any representation or warranty, express or implied, as to the accuracy or completeness of the Evaluation Material and that nothing contained in any discussion between the Company or any of its directors, officers, employees, agents or any other representatives or its advisors and you or any of your representatives shall be deemed to constitute a representation or warranty. You agree that neither the Company nor its representatives or advisors shall have any liability to you or any of your representatives resulting from the use or content of the Evaluation Material or from any action taken or any inaction occurring in reliance on the Evaluation Material, except as may be included in any definitive agreement which provides for any transaction between the Company or any subsidiary thereof or its stockholder and you.

* * *

Section 3.24 of the Merger Agreement—<u>No Other Representations or Warranties; Investigation by Parent</u>.  Parent and Merger Sub each acknowledges and agrees that (a) it has had an opportunity to discuss the business of the Company and the Company Subsidiaries with the management of the Company, (b) it has had reasonable access to (i) the books and records of the Company an the Company Subsidiaries and (ii) the electronic dataroom maintained by the Company through Merrill Corporation for purposes of the transactions contemplated by this Agreement, (c) it has been afforded the opportunity to ask questions of and receive answers from officers of the Company and (d) except for the representations and warranties contained in this Section 3, and any certificates delivered by the Company in connection with Closing, neither Parent nor Merger Sub have relied upon or otherwise been induced by, any other express or implied representation or warranty with respect to the Company or with respect to any information provided to or made available to Parent or Merger Sub in connection with the transaction contemplated hereunder. Neither the Company nor any other person will have or be subject to any liability or indemnification obligation to Parent, Merger Sub or any other person resulting from the distribution to Parent or Merger Sub, or Parent's or Merger Sub's use of, any such information, including any information, documents, projections, forecasts or other material made available to

Parent or Merger Sub in certain data rooms or management presentations in expectation of the transactions contemplated by this Agreement, unless any such information is expressly included in a representation or warranty contained in this Section 3 or in the corresponding section of the Company Disclosure Schedule.

\* \* \*

Section 4.10 of the Merger Agreement—<u>No Other Representations Or Warranties</u>. Except for the representations and warranties contained in this Section 4, and any certificate delivered by Parent or Merger Sub in connection with Closing, the Company acknowledges and agrees that none of Parent, Merger Sub or any other person on behalf of Parent or Merger Sub makes, nor has the Company relief upon or otherwise been induced by, any other express or implied representation or warranty with respect to Parent or Merger Sub or with respect to any other information provided to or made available to the Company in connection with the transactions contemplated hereunder. Except as provided in Section 6.8, neither Parent, Merger Sub nor any other person will have or be subject to any liability or indemnification obligation to the Company or any other person resulting from the distribution to the Company, or the Company's use of, any such information, including any information, documents, projections, forecasts or other material made available to the Company in certain data rooms or management presentations in expectation of the transactions contemplated in this Agreement, unless any such information is expressly included in a representation or warranty contained in this Section 4 or in the corresponding section of the Parent Disclosure Schedule.

\* \* \*

Section 9.1 of the Merger Agreement—<u>Entire Agreement</u>. This Agreement, together with the Company Disclosure Schedule and the Parent Disclosure Schedule and the documents and instruments referred to herein that are to be delivered at the Closing, contains the entire agreement among the parties with respect to the Merger and related transactions, and supersedes all prior agreements, written or oral, among the parties with respect thereto, other than the Confidentiality Agreement which shall survive execution of this Agreement and shall

23

terminate in accordance with the provisions thereof. EACH PARTY HERETO AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, NEITHER PARENT, MERGER SUB NOR THE COMPANY MAKES ANY OTHER REPRESENTATIONS OR WARRANTIES, AND EACH HEREBY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES MADE BY ITSELF OR ANY OF ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, FINANCIAL AND LEGAL ADVISORS OR OTHER REPRESENTATIVES (OTHER THAN AS SET FORTH IN THE CONFIDENTIALITY AGREEMENT), WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT OR THE MERGER, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO THE OTHER OR THE OTHER'S REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION WITH RESPECT TO ANY ONE OR MORE OF THE FOREGOING.

Accordingly, under the terms of the parties' contracts Finish Line's and UBS's claims that a certain level of monthly or quarterly EBITDA was critical to them in signing the Merger Agreement or that Genesco's performance at the time of the signing of the Merger Agreement was on track with projections or the information provided, is not actionable.

In addition to the parties' contracts is the procedure the parties established with respect to due diligence. The testimony of David Friedland, head of the Goldman Sachs due diligence team for Genesco, as well as emails prepared during due diligence (e.g. D48, D53, P33, P161, P162, P164) establish that it was Finish Line/UBS's duty to specify the information it needed to review. Genesco would then respond. If no response was provided or an inadequate one was provided, the obligation was on Finish Line/UBS to renew the request. This procedure is demonstrated by emails D48 and D53 which show that Finish

24

Line/UBS recognized that the burden was on them to press for information. Finish Line/UBS did so and would send to Goldman Sachs lists of due diligence items that had not been responded to at all, had not been sufficiently responded or for which Finish Line/UBS sought an update.

Accordingly, in this case, when UBS requested the May trial balance on June 7, it was not available and Goldman Sachs told UBS this. Thereafter, Goldman Sachs internally discussed among its due diligence team (P164) whether UBS would ask again for the May trial balance, reflecting the parties' due diligence procedure that the burden was on UBS to request the information. In the days that follow, UBS did not ask for the May trial balance; nor did UBS consider its June 7 request for the May trial balance an outstanding request because that May trial balance is not contained on UBS's list of outstanding due diligence items (P33, P161, P162).

The combination, then, of the parties agreements and due diligence procedure prevent Genesco from being liable for withholding the May trial balance and the numbers that underlie the June 15 revised projections.

In addition to the parties' agreements and due diligence procedure, Tennessee law also provides that Genesco is not liable for withholding the information contained in the May trial balance.

25

A general principle of Tennessee law is that if "means of knowledge are at hand and equally available to both parties, the injured party must show that he has availed himself of the means of information existing at the time of the transaction before he will be heard to say that he was deceived by the misrepresentations of the other party." *Solomon v. First American National Bank of Nashville*, 774 S.W.2d 935, 943 (Tenn. App. 1989).

In the *Solomon* case, a guarantor was not permitted to rescind a guaranty allegedly containing a dollar amount she had not agreed to where the guarantor was a literate person who failed to read the guaranty.

Similarly in *Allied Sound, Inc. v. Neely*, 58 S.W.3d 119 (Tenn. App. 2001) the court dismissed a fraud claim where a plaintiff asserted that he was deceived about a condition in a lease requiring a letter of credit:

> Plaintiff had the means to obtain the information needed and discovery any 'fraud' if he had simply asked Century for a copy of the actual lease agreement or inquired as to what additional documentation was required by Century before continuing the performance. While Link asserts that he had never been involved in a lease transaction before, he was an experienced business person, and on this record is charged with knowing there were contingencies to be met by a certain date in connection with the lease. Where information is reasonably discovered, and here where the plaintiff was invited to inquire, it cannot claim reasonable reliance upon a misrepresentation.

*Id.* at 123.

In both of these cases, the courts refused to find fraud where the party had the means to obtain the information the party claims was concealed from it. With respect to the Merger Agreement in issue, the record is clear that Finish Line/UBS had the means to obtain the May

trial balance. UBS and Goldman Sachs acknowledged this in the emails (D48, D53, P164)
The fault is with Finish Line's advisor UBS for not requesting the information.

Finally, there is the case of *Hord v. Environmental Research Institute of Michigan*,
463 Mich. 399, 617 N.W.2d 543 (2000). Although not a Tennessee case, it is nevertheless
persuasive because the decision applies the same principles discussed above in the Tennessee
cases that there is no fraud where a party has the means to obtain the information. This Court
mentions the Michigan case because it discusses silent fraud and failure to provide updated
information, the precise allegations in this case. Dispositive to the Michigan court, in
holding that the failure to provide updated information was not fraudulent, was that the
financial information already provided clearly identified its date and there was no evidence
that the plaintiffs made any request for updated financial data in particular:

> In the instant case, the 1999 operating summary was the most recent document
> available in that format. It clearly identified the times for which the financial
> information was provided. There was no evidence that the plaintiff made any
> inquiry about the financial condition of the company in general or requested
> updated financial data in particular.

463 Mich. 412.


This Court concludes, then, that Genesco and Goldman Sachs had no duty by law to
provide the May trial balance and revised projections to Finish Line/UBS and that Genesco
is not liable for Finish Line/UBS's reliance on information that was not current.

The foregoing conclusion renders it unnecessary for the Court to make findings and
conclusion of law with respect to the materiality of the May results. Those results, however,

and their materiality are one component of and to some extent overlap with the analysis of Finish Line/UBS's MAE defense. Accordingly, the Court shall go on at this juncture to state its findings with respect to some of the aspects of the materiality of the May results:

1.     The Court finds that neither Genesco's senior management nor David Friedland of Goldman Sachs had an intent to deceive or defraud in not providing the actual results for May. The claims of Genesco's senior management and David Friedland that they honestly believed that the May results would not change the projections for the year are credited by the Court for three reasons. First, the amount of sales attributable to later back to school and tax free holidays could not be quantified in May. Next, May is historically one of Genesco's lowest months. Thus, it would have been difficult to draw inferences about Genesco's performance for the third quarter or the year from the May numbers. Thirdly, the previous year, Genesco had experienced a low May but had a banner year overall due to a high Q4.

2.     The Court does not believe and does not credit as a matter of law Finish Line's claim that the May results were material. Finish Line has asserted that because the deal was highly leveraged, the sharp decline in May in EBITDA would have halted Finish Line from entering into the Merger Agreement. As a matter of law, the Court rejects this claim because Finish Line did not specify a certain level of EBITDA as a condition to closing. Additionally, Section 4.6 of the Merger Agreement provides, "For avoidance of doubt, it shall not be a condition to Closing for Parent or Merger Sub to obtain the Financing or any alternative financing." Next, as a matter of fact, the Court does not find that production of the May results would have caused Finish Line not to sign the Merger Agreement. Finish Line had determined that acquiring Genesco was the answer to its declines. In the face of the Dunn & Phelps report to Finish Line in May of a 34% decline in Genesco in Q1, Finish Line nevertheless continued to pursue the merger. The Court finds that Finish Line was primarily focused on acquiring Genesco and beating out Foot Locker and the private equity firms. This motivation along with the fact that May is traditionally a low month from which inferences about future performance cannot be drawn, establish that the May results were not material.

3.   There was not enough data and a track record in May to determine that an MAE was occurring.

With respect to the claim of securities fraud, the Court adopts and incorporates its foregoing findings of fact and conclusions of law in dismissing that claim as well.

## Material Adverse Effect

Under the terms of section 7.2(a) of the Merger Agreement a prerequisite for Genesco to obtain specific performance is to demonstrate the absence of a Material Adverse Effect. That term is defined in section 3.1(a):

> "Company Material Adverse Effect" shall mean any event, circumstance, change or effect that, individually or in the aggregate, is materially adverse to the business, condition (financial or otherwise), assets, liabilities or results of operations of the Company and the Company Subsidiaries, taken as a whole; provided, however, that none of the following shall constitute, or shall be considered in determining whether there has occurred, and no event, circumstance, change or effect resulting from or arising out of any of the following shall constitute, a Company Material Adverse Effect:  (A) the announcement of the execution of this Agreement or the pendency of consummation of the Merger (including the threatened or actual impact on relationships of the Company and the Company Subsidiaries with customers, vendors, suppliers, distributors, landlords or employees (including the threatened or actual termination, suspension, modification or reduction of such relationships)); (B) changes in the national or world economy or financial markets as a whole or changes in general economic conditions that affect the industries in which the Company and the Company Subsidiaries conduct their business, so long as such changes or conditions do not adversely affect the Company and the Company Subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (C) any change in applicable Law,

29

rule or regulation or GAAP or interpretation thereof after the date hereof, so long as such changes do not adversely affect the Company and the Company Subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (D) the failure, in and of itself, of the Company to meet any published or internally prepared estimates of revenues, earnings or other financial projections, performance measures or operating statistics; provided, however, that the facts and circumstances underlying any such failure may, except as may be provided in subsection (A), (B), (C), (E), (F) and (G) of this definition, be considered in determining whether a Company Material Adverse Effect has occurred; (E) a decline in the price, or a change in the trading volume, of the Company Common Stock on the New York Stock Exchange ("NYSE") or the Chicago Stock Exchange ("CHX"); (F) compliance with the terms of, and taking any action required by, this Agreement, or taking or not taking any actions at the request of, or with the consent of, Parent; and (G) acts or omissions of Parent or Merger Sub after the date of this Agreement (other than actions or omissions specifically contemplated by this Agreement).

In addition section 3.1(a) provides that Genesco shall be in good standing under state and federal laws.

The parties' positions are that Genesco asserts that its performance in May and continuing through 2007 is a short term decline in performance in line with its history of "blips" such that no MAE has occurred. Moreover Genesco asserts that the decline in performance are due to general economic conditions such as high gas prices, housing and mortgage issues, and consumer debt, or changes in projections which come within the "carve-outs" in section 3.1(a)(B) and (D). Finish Line and UBS assert that an MAE has occurred and that it does not fit within one of the carve-outs. They also assert that because of the securities investigation of Genesco by federal authorities an MAE has occurred.

*Supra* at 10-11 the Court stated its findings with respect to Genesco's 2007 decline in performance. Those statistics have been sliced and diced, configured and reconfigured by the parties and their experts in a variety of ways. There is, though, the Court finds, one fact that is established by the greater weight and preponderance of the evidence from all of the competing analyses, and that fact is dispositive of the MAE issue: Genesco's decline in performance in 2007 is due to general economic conditions such as higher gasoline, heating oil and food prices, housing and mortgage issues, and increased consumer debt loads. This fact is established by the expert testimony of Mr. Cantrell, the empirical observations of Genesco's Senior Vice President of Journeys, Mr. Estepa, and the expert testimony of Professor Saunders concerning UBS's 2007 decline in performance.

With respect to the testimony of Mr. Cantrell, the Court attaches great weight to it. Of all the experts who testified, Mr. Cantrell is the one who had, in addition to academic or professional certification and expertise, actual retail experience. For 26 years, Mr. Cantrell was employed in the retail industry. He served as president and director of a retail footwear company Payless Shoe Stores.

TE25 is an excerpt from Mr. Cantrell's report identifying general economic conditions as the cause for declines in Genesco's sales in 2007. The report contains a quotation from a September 2007 presentation by Finish Line to equity investors citing these macroeconomic conditions on consumer spending. He also quotes other footwear retailers, industry analysts and journalists who cite these same macroeconomic conditions as causing weaker earnings.

31

Finish Line and UBS's challenge to Mr. Cantrell was through the testimony of its experts Mr. Rock and Mr. Bronner. Mr. Rock testified and graphed (TE31) that retail sales were up 3.5% in Q2 and Q3. He also testified that Mr. Cantrell and Genesco had identified causes such as fashion trends and a decline in average selling price of footwear as being responsible for the 2007 Genesco decline. These causes, Mr. Rock testified, are intra-industry conditions. Mr. Bronner testified, per industry custom in drafting merger agreements, that the provisions of section 3.1(a)(B), as written, do not include in the MAE carve-out intra-industry conditions but only general economic conditions.

As to this dispute, Mr. Cantrell's retail experience, the Court concludes, carries the day as well as the breadth of sources he identifies, both in and outside of the footwear industry. The Court concludes from Mr. Cantrell's testimony that the decline in Genesco's sales and earnings in 2007 is due to general economic conditions.

Bolstering Mr. Cantrell's opinion is testimony from Mr. Estepa, the Senior Vice President of Journeys at Genesco, who analyzes sales data from Genesco's stores and meets with Genesco's sales personnel. His empirical impression is that higher gas prices and consumer debt problems have caused consumers to spend less.

Finally, UBS's performance in 2007 and the reasons for that decline testified to by Professor Saunders and detailed above establish that there are significant adjustments in the housing and mortgage and credit industries which are having a ripple effect on consumer spending and creating general economic conditions.

The proof, the Court finds, preponderates that Genesco's declines in 2007 are due to general economic conditions, not intra-industry conditions.

The other condition of the MAE carve-out 3.1(a)(B) is that Genesco's decline must not be disproportionate to others in its industry. Again, due to his retail experience, the Court credits Mr. Cantrell's analysis on this point over Mr. Rock. Additionally, the Court does not place weight on Mr. Rock's findings because he included teen footwear retailers in the peer group that he analyzed. That inclusion, the Court finds, skewed the results. Only a part of Genesco's business, 50 to 60%, is due to Journeys, a teen footwear line. Teen retailers, then, included in the peer group askew the results. Also Mr. Rock included in his analysis Genesco's Underground Station which skewed the results downward. The proof at trial established that Finish Line knew before signing the merger of issues with Underground Station, such that its performance should be excluded from Genesco's performance in analyzing peers. The Court, therefore, adopts Mr. Cantrell's conclusion that Genesco's decline in performance is due to general economic conditions and is not disproportionate to its peers in the industry.

Having concluded that Genesco fits within one of the MAE carve-outs, it is not necessary for the Court to decide whether an MAE has occurred. The Court, nevertheless, includes its MAE analysis for completeness. On the issue of whether Genesco has sustained an MAE, the Court finds its has for several reasons.

The Court begins with the essential elements of an MAE as provided in the parties' Merger Agreement. Those are a change to the assets, liabilities or result of operations at Genesco (1) taken as a whole, that is (2) material and (3) adverse. The words "material," "adverse," and "as a whole" in the text plainly convey that the change in the target company's business must be significant. Common sense considerations such as the duration of the change, the measure of the change and whether the change relates to an essential purpose or purposes the parties sought to achieve by entering into the merger have been identified and examined by courts in deciding whether an MAE has occurred. *See, e.g. IBP, Inc. v. Tyson Foods, Inc.*, 789 A.2d 14 (De. Ch. 2001); *Frontier Oil Corp. v. Holly Corp.*, 2005 De. Ch. LEXIS 57 (Del. Ch. Apr. 29, 2005); *Esplanade Oil & Gas, Inc. v. Templeton Energy Income Corp.*, 889 F.2d 621 (5th Cir. 1989); *Raskin v. Birmingham Steel Corp.*, 1990 WL 193326 (Del. Ch. Ct. Dec. 4, 1990); *In re Digital Resource, LLC*, 246 B.R. 357 (8th Cir. B.A. P. 2000); *Pan Am Corp. v. Delta Airlines, Inc.*, 175 B.R. 428 (S.D.N.Y. 1994). Corollary to these considerations by courts is that in deciding whether a business change is significant a court must not do in a vacuum but with reference to the context and circumstances of the merger.

With respect to the measure or quantification of the change in Genesco's earnings and performance, the Court finds that that change has been material. The parties and their experts have depicted Genesco's performance and earnings for 2007 in a variety of ways and methods. Cutting through all of these different spins is that the May loss in earnings is one

34

of the lowest in 10 years, and that, as 2007 comes to a conclusion, there has not been, so far, an offset or mitigation of the Q2 and Q3 declines to remove 2007 as one of the lowest earnings in 10 years.

With respect to duration, the parties have lached onto the statement by Chancellor Strine in *Tyson* that a "blip" in earnings does not constitute an MAE, arguing (Genesco) the May, June decline is just a blip as opposed to (Finish Line/UBS), the continuing results of Genesco's lower performance than last year and previous years reveal that it is not a "blip." This Court uses a somewhat different analysis derived from a point made by UBS from the text of the Merger Agreement.

Section 7.2(b) provides:

> Since the date of this Agreement, there shall not have occurred a Company Material Adverse Effect with respect to the Company and the Company Subsidiaries, considered as a whole, that has not been cured <u>prior to the Termination Date</u> [emphasis added].

The Termination Date is December 31, 2007. Accordingly, as argued by UBS, the inclusion of a provision in the Merger Agreement that Genesco has the opportunity to attempt to cure an MAE by December 31, 2007, is an acknowledgment by the parties that in the context of this merger an MAE can occur in three or four months.

Taking this text of the Merger Agreement and its durational implications into account, the Court further reasons that the facts in this case are that Genesco's sales and earnings have not stayed at the low May, June levels and have increased but have not done so at a level or

pace to offset the decline in May or June to remove 2007, so far, as one of the lowest years in Genesco's ten year performance. The Court concludes that in the context of what the parties acknowledge in the Merger Agreement could be a durationally significant time, the changes in Genesco's performance are of sufficient durational significance to be considered in determining whether an MAE as defined under the Merger Agreement has occurred.

Finally, there is the consideration of whether the change in issue affects the essential purposes the parties sought to achieve by entering into merger. The Court finds that Finish Line had long-term strategic goals in entering into the merger such as diversification, synergies from reduced costs and opportunity for growth. The merger benefits of diversification and synergies from reduced costs remain intact and provide the same complement to Finish Line's business despite a decline in Genesco's earnings. For this reason, Genesco argues, that the 2007 decline in earnings does not relate to an essential purpose the parties sought to achieve in the merger agreement and therefore does not constitute an MAE. The Court rejects this argument. It ignores some of the context and circumstances of the transaction.

First, Genesco's weak performance in Q2 and Q3, the testimony of Mr. Deetz establishes, results in less money being available, after paying financing, to grow the merged company. Secondly, while it is true that the proof establishes that the most important part of the merger to Finish Line were the long-term strategic goals mentioned above, the proof established that a highly leveraged deal with 100% financing was the vehicle required to

accomplish this long-term strategy. That financing was not an essential part of the merger is made clear by several provisions in the Merger Agreement including section 4.6, but it cannot be said that financing was incidental to the merger. Financing had a second tier role. The record revealed that the Genesco part of the merged business, in light of its historical earnings, was planned by Finish Line to contribute 70% to payment of the financing. The 2007 sharp decline in earnings affects this second tier concern of the merger. Accordingly, in deciding whether the change in Genesco's earnings has been material, the Court takes into account, to some degree, that Genesco's decline in earnings affects the ability of the merged entity to pay its financing and have money left over to grow the company.

Totaling up the foregoing, the Court finds that a secondary purpose of the Merger Agreement—paying the financing costs—has been affected by the change in Genesco's performance; the measurable change in earnings—one of the lowest in 10 years—to generate cash to pay the financing and grow the company is a significant change, and that the change in Genesco's earnings from May 2007 to the present is durationally significant. The Court, therefore, concludes that an MAE has occurred.

Finally, there is the claim that an investigation of Genesco for securities violations and a class action lawsuit filed in federal court in Nashville constitute an MAE. This claim relates to an August 30, 2007 conference call to provide information to the market, in which Genesco's senior management stated that (1) low Q2 performance was due primarily to the

shift from Q2 to Q3 of sales resulting from a later back to school and tax free holiday and (2) August sales were positive.

As to the first statement about the Q2/Q3 shift, Finish Line and UBS assert that Q2 performance was so low that Genesco knew by August 2007 that the performance was not attributable to the shift.

As to the statement that August performance was positive, the facts are that the first three weeks of August performance were positive but that on the Thursday the call was made, that week's performance was negative and would have a negative effect on the month. The proof establishes, the Court finds, through the testimony of Mr. Pennington and Mr. Estepa that the sales numbers for Tuesday and Wednesday prior to the call and then Thursday of the call were not final and official and, therefore, were not included in stating August results. Because Genesco made it clear in its call that it was only analyzing sales to date and that the numbers for that week were not final, official numbers, the Court concludes that Genesco had good reason to exclude the unofficial numbers from its analysis and that the call was not fraudulent.

Additionally, the Court dismisses this claim adopting Genesco's argument in its trial brief at p. 57:

> Before any federal investigation can be materially adverse to Genesco's business, there must first be a finding that fraud has, in fact, occurred. *See United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (a grand jury "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not."); *see also Expert Report of Paul Schectman, Dec. 5, 2007, at ¶ 4* (GTB 318-19) ("The issuance of a subpoena,

by itself, does not give rise to an inference of wrongdoing.") The mere announcement of an investigation that is a direct result of the . . . counterclaims filed by the Defendants in this action cannot be the basis for a MAC.

## Specific Performance

Having dismissed the claims of Finish Line and UBS of fraud and the occurrence of an MAE to excuse their performance of or to rescind the Merger Agreement, lastly the Court must determine if Genesco is entitled to the remedy of specific performance to require Finish Line to close the merger. That closing, the Court concludes, is appropriate as a matter of equity.

With respect to specific performance, Tennessee law provides five conditions which must be met before the remedy is available. Justice Koch succinctly identified those in his dissent in the Court of Appeals decision *Colonial Funeral Home, Inc. v. Gilmore*, 1994 WL 521254 at *8 (Tenn. App. 1994). Three of those conditions are at issue in this case: there must be no other adequate legal remedy available, *New River Lumber Co. v. Tennessee Ry.*, 136 Tenn. 661, 671, 191 S.W. 334, 338 (1916); the contract must be free from suspicion of fraud, *Shuptrine v. Quinn*, 597 S.W.2d 728, 730 (Tenn. 1979); and specific performance will not be enforced if the contract is harsh, inequitable or oppressive, *Miller v. Resha*, 820 S.W.2d 357, 360 (Tenn. 1991).

39

The testimony established that Genesco's business has been irreparably harmed as a result of the stalled merger. Genesco's business is in a state of limbo. Uncertainty has negatively affected its stock price, vendor relationships, employee morale, public perception, and virtually every other aspect of its business during the pendency of the merger and this litigation. Due to restrictions that the Merger Agreement imposes on its activities pending closing, it has been unable to open new stores, make significant capital expenditures, and otherwise engage in ordinary business activities that would be inconsistent with Finish Line's plan for Genesco but that would be necessary or desirable for an independent Genesco. For example, Genesco had planned to open a west coast distribution facility that would have reduced the lead time to Genesco's stores on the West Coast and otherwise improve Genesco's west coast inventory management, affecting inventory and sales in its stores. In reliance on the merger and in consultation with Finish Line about its distribution capacity, Genesco has deferred its plans for this new facility because Finish Line's own distribution capacity would have made the new facility unnecessary. Further, Genesco has invested substantial funds, and its employees have invested hours in preparing for the planned integration of the two companies, providing financial information, and complying with onerous and detailed requests for information and analysis from UBS and Finish Line. Those efforts have diverted massive amounts of time from Genesco's business. These facts proven at trial establish irreparable harm and that the payment of damages is not an adequate remedy.

The last two conditions—free from fraud, and a harsh, inequitable or oppressive result—shall be considered together.

The Court has decided as a matter of law that Genesco did not commit fraud. But equity probes deeper than the law and, even where fraud is not present, equity will not enforce an agreement that is unconscientious or will work a hardship.

Genesco's sharp dealings in not voluntarily providing the May actual results; distrust between the parties' management teams generated by the lawsuit; and financial weakness due to the combination of Genesco's 2007 lower earnings and the debt taken on to fund the merger have been identified by Finish Line as grounds for denying specific performance.

The Court must be very careful in its analysis of Finish Line's claim that Genesco, in withholding the May results, acted unconscientiously, as Chancellor Strine in *Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1058 (Del. Ch. 2006) observed in commenting on the "morally tinged ruminations on the importance of deterring fraud." The transaction in issue is not a handshake deal; it does not come within the *Lonesome Dove* frontier standards of dealing. The merger in this case was a highly negotiated transaction, with teams of lawyers, advisors and handlers being paid enormous sums to orchestrate the procedure for obtaining information, the production of information, and the use and reliability of information. This milieu is UBS's home territory. UBS was advising Finish Line. There was, then, no inequality of bargaining power nor oppression. As Professor Hitscherich testified, the provisions contained in the Merger Agreement are standard. Under

these circumstances, the Court finds its does not offend the conscience to enforce performance of the Merger Agreement.

As to the final consideration that enforcing the merger creates a conflicted, financially weak company, the Court has thought long and hard. In deciding to order the merger, the Court has concluded that the merger has a reasonable chance of succeeding. In so concluding the Court credits the testimony of Mr. Estepa, the Senior Vice President of Genesco's most successful banner, Journeys, which represents 50 to 60% of Genesco's business and is important to the merged entity. Mr. Estepa testified about his respect for Mr. Alan Cohen of Finish Line. Mr. Estepa testified about his determination to make the merger work and his commitment to its success. The Court also recalls that Mr. Schneider of Finish Line could not identify any systemic problem with Genesco's operation, and Mr. Cantrell's testimony that the same synergies that caused Finish Line to propose the merger, such as diversity of product lines and customers, are still present. Finally, insolvency proof of the combined entities was not provided to this Court. That issue has been reserved and carved out of this litigation for the New York Court to decide. If the combined companies would result in an insolvent entity, the New York lawsuit by UBS will halt the merger. Accordingly, from the proof presented to it, this Court concludes that the combined entity can succeed. Specific performance is not a futile, harsh result.

_Ellen Hobbs Lyle_
ELLEN HOBBS LYLE
CHANCELLOR

42

cc:   Overton Thompson III
      Britt Latham
      W. Brantley Phillips, Jr.
      Brian Roark
      Russell Stair

      Jonathan Schiller
      James Denvir
      Michael Brille
      William Jackson
      Jonathan Shaw

      Robert Walker
      J. Mark Tipps
      John Hayworth
      John Farringer IV

      John Hicks

      Joseph Frank

P.44    Dec 27 2007  17:11    Fax:615-862-5722    CLERK AND MASTER