```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
UBS SECURITIES LLC, and UBS LOAN    :
FINANCE LLC,                        :
                                    :
     Plaintiffs/Counter-Defendants, :   07 Civ. 10382 (LAP)
                                    :
     -v-                            :   MEMORANDUM AND ORDER
                                    :
THE FINISH LINE, INC.,              :
                                    :
     Defendant/Counter-Plaintiff,   :
                                    :
and                                 :
                                    :
GENESCO INC.,                       :
                                    :
     Defendant.                     :
                                    :
------------------------------------x
```

LORETTA A. PRESKA, U.S.D.J.

This case arises out of an agreement ("the Commitment Letter") by Plaintiffs ("UBS") to provide up to approximately $1.5 billion to finance the acquisition ("the Merger Agreement") by The Finish Line, Inc. ("Finish Line") of all of the outstanding shares of Genesco Inc. ("Genesco").[1] Before the Court are motions by UBS and Genesco to dismiss certain counterclaims raised in Finish Line's Answer.

## BACKGROUND AND PROCEDURAL POSTURE

On June 17, 2007, Finish Line and Genesco signed a Merger Agreement for $1.5 billion. The transaction was highly

---
[1] See Jackson Decl., Ex. 1 (the Merger Agreement).

leveraged, with Finish Line proposing to complete the merger with only $11 million of its own cash, with the remainder coming from proceeds of over $1.5 billion in debt financing from UBS by way of the Commitment Letter entered into on June 17, 2007. (See generally Feb. 9 Shapiro Decl., Ex. 7).

After the Merger Agreement was signed, both Finish Line and Genesco experienced financial distress. However, Genesco obtained shareholder approval of the deal in September 2007 and insisted that the deal close. UBS refused to proceed with the financing provided for by the Commitment Letter and demanded more information about Genesco's quarterly earnings, which fell well short of its second quarter projections. Genesco filed suit in Tennessee Chancery Court on September 24, 2007 ("the Tennessee Action") for an order of specific performance against both Finish Line and UBS. On October 10, 2007, UBS moved to intervene in the Tennessee Action, arguing that it stood to "gain or lose a substantial interest by direct operation of the court's judgment." (Feb. 9 Shapiro Decl., Ex. 1, Mem. of Law in Support of UBS Securities LLC and UBS Loan Finance LLC's Mot. to Intervene at 5) (citation and internal quotations omitted). However, on November 15, 2007, UBS filed a complaint in this Court seeking a declaratory judgment that it was relieved of its financing obligations under the Commitment Letter because the merged entity would be unable to deliver a solvency certificate,

as the Commitment Letter required. (See Commitment Letter, Annex IV ¶ 7) ("The Lenders shall have received all customary opinions, certificates and closing documentation as UBS shall reasonably request, including but not limited to a solvency certificate.")

The Tennessee court held trial on Genesco's suit from December 10 to December 18, 2007. The Court rejected Finish Line and UBS's contractual argument that a Material Adverse Effect occurred under the terms of the Merger Agreement. The Court also rejected the defendants' tort defenses that Genesco either committed securities fraud or fraudulently induced Finish Line to enter into the deal by not providing material information prior to the signing of the Merger Agreement. See Memorandum and Order at 2, Genesco, Inc. v. The Finish Line, Inc. et al., Civil No. 07-2137-II (III) (20th Div. Tenn. Chancery Ct. Dec. 27, 2007) ("Tennessee Order").

The Tennessee Order, however, did not address any issue relating to insolvency. (See Tennessee Order at 42) ("[I]nsolvency proof of the combined entities was not provided to this Court. That issue has been reserved and carved out of this litigation for the New York Court to decide. If the combined companies would result in an insolvent entity, the New York lawsuit by UBS will halt the merger."). The Tennessee Court later clarified that its December 27, 2007 Order granting

specific performance was not a "final order" because "[t]he parties agreed prior to trial that the issue of insolvency would be determined by the New York Court in the lawsuit filed by UBS." Thus, "the issue of insolvency and the implications of the determination of that issue for this lawsuit, then, are not ripe and depend upon developments in the New York lawsuit." See Order at 1-2, Genesco, Inc. v. The Finish Line, Inc. et al., Civil No. 07-2137-II (III) (20th Div. Tenn. Chancery Ct. Jan. 2, 2008).

This Court granted the parties' request to hear the case on an expedited basis, setting a trial date of March 3, 2008. (See dkt. no. 19.) Hoping to narrow the issues to be resolved at trial, the parties have submitted motions to dismiss Finish Line's counterclaims pursuant to Fed. R. Civ. P. 12(b)(6).

The Motions to Dismiss

Finish Line's Answer raises six counterclaims. Counts I, II, and III ask the Court to declare that, assuming the merged entity is insolvent at as a result of a transaction consummated at $54.50 per Genesco share, the transaction would result in a voidable fraudulent transfer (Count I), fraudulent incurrence of debt (Count II), and an unlawful distribution (Count III). Counts IV, V, and VI turn on UBS's obligation under the Commitment Letter. Assuming insolvency at $54.50 per Genesco share, Finish Line seeks declarations: that UBS's obligations

under the Commitment Letter do not terminate if the merged entity is insolvent (Count IV), that UBS's obligations do not terminate while Genesco and Finish Line negotiate a different purchase price (Count V), or that at a specified price per Genesco share, the merged entity would be solvent (Count VI).

UBS has moved to dismiss Counts IV through VI, arguing that a purchase price reduction would violate conditions to closing under the Commitment Letter. (See generally UBS Mot. Mem.)[2] UBS also purports to "consent to judgment" on Counts I through III, agreeing that the merger would result in an unlawful distribution. Genesco opposes the "consent to judgment" and has moved to dismiss all Counts except Count IV, because they "address issues under the Merger Agreement" and thus are properly adjudicated in the Tennessee court. (See generally Gen. Mot. Mem.)[3]

## DISCUSSION

The counterclaims and motions to dismiss center around two basic questions both of which assume arguendo that the merged entity will be insolvent. The first question is whether the

---

[2] "UBS Mot. Mem." refers to Defendants UBS Securities LLC and UBS Loan Finance LLC's Memorandum of Law in Support of Their Motion for Entry of Judgment on Counts I-III and Their Motion to Dimiss Counts IV-VI of Defendant The Finish Line, Inc.'s Counterclaims, dated February 6, 2008.

[3] "Gen. Mot. Mem." refers to Genesco, Inc.'s Memorandum of Law in Support of Motion to Dismiss or Abstain, dated February 6, 2008.

Court should issue a declaratory judgment on Claims I through III or abstain from so doing in favor of allowing the Tennessee Court to adjudicate those issues. The second question is substantive, viz., what UBS's obligations are to provide financing under the Commitment Letter if the merged entity is, in fact, insolvent.

I. Whether the Court Should Issue a Declaratory Judgment With Respect to Counts I through III

This is an action for a declaratory judgment, i.e., it provides a means by which rights and obligations of the parties may be adjudicated where there is an actual controversy but before the controversy has ripened into a breach of a contractual obligation. See 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2751 (3d ed. 1998 & supp. 2007) ("Wright & Miller"). When a federal court is asked to issue such a judgment while there is a concurrent state court proceeding addressing matters in common with the declaratory judgment action, the court must take special care, lest it engage in "[g]ratuitous interference" with the state proceeding. See Brillhart v. Excess Ins. Co. of Am., 316 U.S. 491, 495 (1942).

In determining whether to issue the judgment, the district court must ask whether the controversy between the parties to the federal suit "can better be settled in the proceeding

- 6 -

pending in the state court." Id. at 495. The answer to that question turns, in part, on the scope of the pending proceeding and whether the claims of all parties can be satisfactorily adjudicated there. See Wilton v. Seven Falls Co., 515 U.S. 277, 282 (1995). The Supreme Court has not provided a "comprehensive enumeration" of the factors that the district court should take under consideration in making this judgment, but the Court of Appeals has identified the following as relevant: the nature of the parallel state litigation and the availability of defenses there; whether the state proceeding can satisfactorily adjudicate the claims of all parties in interest; and whether the parties are amenable to process in that proceeding. See Youell v. Exxon Corp., 74 F.3d 373, 375-76 (2d Cir. 1996); Nat'l Union Fire Ins. Co. of Pittsburgh v. Karp, 108 F.3d 17, 22 (2d Cir. 1997). Ultimately the district court has broad discretion over all declaratory judgment actions. See Wilton, 515 U.S. at 282-83.

Turning to the facts of this case, orders of the Tennessee Court provide a bright line delineating the issues that are appropriate for resolution in this forum. The initial Genesco suit was brought in Tennessee because the Merger Agreement provided that the parties submit to the exclusive jurisdiction

of the courts in that state.[4] In Commitment Letter between UBS and Finish Line, on the other hand, Finish Line submitted to the jurisdiction of New York courts to resolve any disputes arising out of that agreement.[5]

Quite sensibly, then, the only issue the Tennessee court "carved out" for resolution here was the issue of insolvency of the merged entity and the consequences of such insolvency. This was a logical stopping point for the Chancery Court because in order to make determinations about (i) the meaning of a Material Adverse Effect under the Merger Agreement and (ii) whether Genesco defrauded Finish Line, the Tennessee Court heard considerable evidence over the course of a seven-day trial about both the negotiation and execution of the Agreement. See Tennessee Order at 4-14. Thus, that Court has become the expert, in a particular way, in interpreting the Merger Agreement. For this reason, any issue that arises most directly out of the

---

[4] See Merger Agreement § 9.8 ("Each of the Company, Parent and Merger Sub irrevocably submits to the exclusive jurisdiction and venue of the courts of the State of Tennessee (or, in the case of any claim as to which the federal courts have exclusive subject matter jurisdiction, the Federal Court of the United States of America) sitting in the City of Nashville in the State of Tennessee in any Action arising out of or relating to this Agreement.").

[5] See Commitment Letter at 9. ("You [Finish Line] hereby submit to the exclusive jurisdiction of the federal and New York State courts located in The City of New York (and appellate courts thereof) in connection with any dispute related to this Commitment Letter or any of the matters contemplated hereby.")

Merger Agreement is more efficiently resolved in that Court, which has retained jurisdiction over the case subject to the insolvency "carve-out." See <u>United Food & Commercial Workers v. Food Employers Council, Inc.</u>, 827 F.2d 519, 524 (9th Cir. 1987) (noting that one of the purposes of the Declaratory Judgment Act was to "avoid multiplicity of actions by affording an adequate, expedient, and inexpensive means for declaring in one action the rights and obligations of litigants") (citation omitted).

As a factual matter, the issues presented by counterclaims I-III arise most directly out of the Merger Agreement. Finish Line's claim that the merger would constitute a fraudulent transfer of debt, for example, is predicated on the allegation that "[b]ased on facts in existence, but not known by Finish Line prior to June 17, 2007, the Genesco shares were not worth $54.50" and that, as a result, "Finish Line did not receive fair consideration or reasonably equivalent value" in the Merger Agreement. (Finish Line Ans. ¶¶ 21-22.) This factual allegation was already rejected by the Tennessee Court, and this Court will not revisit this or any other issue that has already been litigated.

New York is neither the appropriate nor the most efficient court for the resolution of those issues. The parties advance no persuasive argument for a contrary conclusion. UBS's principal argument is that because the actions are not "parallel," this

Court should assume jurisdiction over the claims. (UBS Resp. to Gen. Mot. at 5). However, the Brillhart standard does not require the matters to be absolutely identical, but rather only that they "present[] [an] opportunity for ventilation of the same state law issues." Wilton v. Seven Falls Co., 515 U.S. 277, 290 (1995). What is of central concern is whether the claims involve sufficient overlap of both the same events and subject matter. See Telesco v. Telesco Fuel and Masons' Materials, Inc., 765 F.2d 356, 362 (2d Cir. 1985); Alliance of Am. Insurers v. Cuomo, 854 F.2d 591, 603 (2d Cir. 1988). The parties do not argue that these claims have been "foreclosed under the applicable substantive law." Brillhart v. Excess Ins. Co. of Am., 316 U.S. 491, 495 (1942). Thus the question is which is the better forum. See Id. at 495. For the reasons discussed above, Tennessee, whose Chancery Court has retained jurisdiction over Genesco's initial action, is the better forum for the resolution of these issues. Consequently, the Court abstains from deciding whether to issue a Declaratory Judgment on counterclaims I through III.

II.  <u>UBS's Obligations Under the Commitment Letter</u>

Turning to the claims that arise under the Commitment Letter, Counts IV-V require the Court to resolve whether UBS retains its obligation to finance Finish Line's acquisition of Genesco even if the merging companies negotiate a <u>lower</u> acquisition price in order to avoid insolvency of the merged entity, a price which would require <u>less</u> financing on the part of UBS. UBS argues that the following provision in the Commitment Letter relieves it of its financing obligation:

> UBS shall have reviewed, and be satisfied with, the final structure of the Acquisition and the terms and conditions of the Acquisition Agreement (it being understood that UBS is satisfied with the execution version of the Acquisition Agreement received by UBS at 9:19 p.m. Los Angeles time on June 16, 2007 and the structure of the Acquisition reflected therein and the disclosure schedules to the Acquisition Agreement received by UBS at 7:47 a.m. Los Angeles time on June 17, 2007).  The Acquisition and the other Transactions shall be consummated concurrently with the initial funding of the Facilities in accordance with the Acquisition Agreement without giving effect to any waivers or amendments thereof that is <u>material and adverse</u> to the interests of the Lenders, unless consented to by UBS in its <u>reasonable discretion</u>.

(Commitment Letter, Annex IV ¶ 1) (emphasis added). UBS makes two arguments. First, that UBS will not "be satisfied" with <u>any</u> new acquisition price because UBS "believes it has been defrauded by Genesco." (UBS Mot. Mem. at 4.) Second, UBS argues that <u>any</u> amendment to the Merger Agreement will "necessarily" be "material and adverse" to UBS and thus, UBS will exercise its

- 11 -

"reasonable discretion" to withhold its consent to such an amendment. (UBS Mot. Mem. at 5.)

The Court cannot conclude, as a matter of law, that UBS's interpretation is the only reasonable interpretation of this provision. Under New York law, the role of the court in construing a contract is to ascertain the intent of the parties; this is a fundamental and neutral precept of contract interpretation. See Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002). Ordinarily the parties' intent can and should be gleaned from the terms of the contract because the best evidence of what the parties to a written agreement intended, is what they said in their writing. See, e.g., Slamow v. Del Col, 79 N.Y.2d 1016, 1018 (1992). However, if the terms of a contract are ambiguous, a court will look to evidence extrinsic to the four corners of the contract in order to ascertain the intent of the parties. See Scholastic, Inc. v. Harris, 259 F.3d 73, 82 (2d Cir. 2001). A contract is ambiguous when it is reasonably susceptible to more than one reading or one as to which reasonable minds could differ. Allianz Ins. Co. v. Lener, 416 F.3d 109, 113 (2d Cir. 2005). The provision of the Commitment Letter on which UBS relies is ambiguous in the following respects:

First, the phrase "material and adverse" is ambiguous. UBS takes the position that this phrase means that any amendment,

even one which requires less financing on the part of UBS, is currently adverse to UBS's interests because the "credit crunch" has diminished UBS's ability to syndicate its debt, i.e., resell the debt to third-party lenders. (UBS Mot. Mem. at 5.) As a result of the diminished debt market, UBS says:

> An amendment of the purchase price [in the Merger Agreement] would be material and adverse to UBS's interests. The only situation in which it would be necessary [for Genesco and Finish Line] to reduce the agreed purchase price is if the combined entity would be insolvent at that price. If the combined entity were insolvent, UBS would face no financing losses at all – because the Commitment Letter would be terminated. In contrast, if the proposed amendment cured the insolvency, and the Court held that UBS was required to finance the new deal, UBS would be exposed to risk of substantial losses.

(UBS Mot. Mem. at 5.) Thus, UBS takes the counterintuitive position that it would prefer an insolvent entity because it would relieve UBS of its financing obligation altogether because of a clause in the Commitment Letter requiring the merged entity to deliver a solvency certificate.

But this interpretation of "material and adverse" is not the only reasonable interpretation. Another plausible interpretation of this phrase is that it means material and adverse to the interests of UBS under the terms of the agreement, i.e., the provision prevents amendments that are facially adverse to UBS's interests. The latter interpretation finds support in the first sentence of the provision, providing that UBS be satisfied with the structure of the Acquisition (in addition to the particular terms and conditions) as well as

- 13 -

several other provisions in the Commitment Letter providing Finish Line with, for example, a "Revolving Credit Facility" of "up to $450.0 million," a "Term Loan Facility" of "up to $690.0 million," and a "Bridge Facility of "up to $700.0 million." (Commitment Letter at 1-2) (emphasis added). While UBS reads the "up to" language as a limitation on the allocation of a fixed amount of aggregate financing, the relevant point is that the terms of the agreement at least contemplate that Finish Line need not take all of the financing available to it. Accordingly, the Court finds that the phrase "material and adverse" is sufficiently ambiguous as to create a question of fact as to what the parties intended when they incorporated it into the Commitment Letter.

Second, the phrase "reasonable discretion" is ambiguous. UBS can only withhold its consent to an amendment if that decision is reasonable. UBS argues that its decision to reject any new acquisition price will necessarily be reasonable because of the depleted market for syndicating debt. But this construction would transform reasonable discretion to withhold consent into unconditional discretion, on the part of UBS alone, to veto any amended acquisition price – a result inconsistent with the term "reasonable." But in any event, UBS's proposed construction is subject to the same ambiguity as the phrase "material and adverse." It cannot be determined from the face of

the agreement whether reasonable discretion was intended to mean (1) <u>rational</u>, i.e., in UBS's business interests at the time of the amendment, or (2) <u>objectively</u> reasonable with reference only to the face of the agreement. If the latter construction was intended, then it would be unreasonable as a matter of law for UBS to withhold its consent to an amended share price because the amendment would <u>lessen</u> UBS's financing obligation.[6]

The same factual dispute about the parties' intent will inform the meaning of the "satisfaction clause." While UBS argues that it will not "be satisfied" with any new share price, again because of external market conditions, these clauses are interpreted to apply an objective standard of reasonableness to the "satsifaction" determination. <u>See</u> Blask v. Miller, 588 N.Y.S.2d 940, 960 (3d Dep't 1992) ("[W]hen contract duties are contingent upon a particular condition being "satisfactory" to one party-as here, the purchasers obtaining a satisfactory report as to the soundness of the structure and its electrical, plumbing and heating systems-that party's rejection of the condition is to be judged by an objective standard of

---

[6] Indeed one of the cases that UBS cites for the proposition that it can withhold its consent "for any reason or no reason" explicitly states that this unconditional right exists only if that discretion is not modified by the term <u>reasonable</u>. <u>State Bank and Trust Co. v. Invesrsiones Errazuriz</u>, 374 F.3d 158, 170 (2d Cir. 2004) ("[I]n the absence of explicit contractual language stating that a party may not <u>unreasonably</u> withhold consent, parties may withhold consent for any reason or no reason.") (emphasis added).

reasonableness."); Restatement (Contracts) Second § 228. Moreover, UBS's dissatisfaction "must be with the circumstance and not with the underlying bargain." Restatement (Second) of Contracts § 228 cmt. a.

## JUSTICIABILITY

The Court requested briefing on the justiciability of Claims IV-VI, questioning whether the issues were ripe for adjudication in light of the fact that Genesco and Finish Line have not yet agreed to a lower share price. However, the Court concludes that the final price need not actually be settled before the claim is ripe. UBS's suit has requested a declaratory judgment that (a) as a factual matter the merged entity will be unable to deliver a solvency certificate as required by the Commitment Letter, but also (b) that as a result, UBS's obligation to finance Finish Line's acquisition is terminated. Counterclaims IV and V are, in essence, the flip-side of this latter portion of the requested declaratory judgment. The Court, which always has broad discretion over whether to issue declaratory judgments, is simply being asked to determine the parties' rights and obligations without requiring them to actually breach the underlying agreement. A new merger price is not an "academic" or "hypothetical" question, making such a judgment inappropriate for adjudication. And the mere fact that

there are contingencies that may not occur does not mean there is no "actual controversy" in this case. <u>See</u> Wright & Miller § 2757 ("It is clear that in some instances a declaratory judgment is proper even though there are future contingencies that will determine whether a controversy actually becomes real.").

With respect to UBS's motion to dismiss Count VI, which asks the Court to determine a share price at which the merged entity will be solvent, the motion is denied without prejudice to renewal.

CONCLUSION

Therefore, the Court (1) finds that controversy is justiciable, (2) that Brillhart counsels in favor of abstaining from issuing a declaratory judgment on Counts I-III, thus Genesco's Motion to Dismiss or abstain [dkt. no. 32] is granted to the extent of abstaining, and (3) UBS' motion to dismiss counts IV - VI of Finish Line's counterclaims [dkt. no. 29] is denied.

SO ORDERED:

Dated:   New York, New York
         February 22, 2008

*Loretta A. Preska*
LORETTA A. PRESKA, U.S.D.J.